# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| *In re*: | ) | Chapter 7 |
|  | ) |  |
| PLASSEIN INTERNATIONAL | ) | Bankr. Case No. 03-11489-KG |
| CORP., *et al.* (n/k/a PL Liquidation Corp.), | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) | Adversary Proceeding |
|  | ) | No. 05-50692-KG |
|  | ) |  |
|  | ) |  |
| WILLIAM BRANDT, as he is | ) |  |
| the Trustee of the Estates of | ) |  |
| Plassein International Corp., *et al.*, | ) |  |
|  | ) |  |
| Appellant, | ) | Civil Action No. 07-345-JJF |
|  | ) |  |
| *v.* | ) |  |
|  | ) |  |
| B.A. CAPITAL CO. LP, *et al.*, | ) |  |
|  | ) |  |
| Appellees. | ) |  |

## APPELLANT'S OPENING BRIEF

Dated:  February 14, 2008

CROSS & SIMON, LLC
Christopher P. Simon (No. 3697)
Amy Evans (No. 3829)
913 N. Market St., 11th Floor
P.O. Box 1380
Wilmington, DE 19899-1380
(302) 777-4200

-and-

HANIFY & KING
Charles R. Bennett, Jr.
Professional Corporation
One Beacon Street
Boston, MA  02108
(617) 423-0400

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

NATURE AND STAGE OF PROCEEDINGS ...................................................... 2

ISSUES PRESENTED FOR REVIEW ............................................................... 3

SUMMARY OF ARGUMENT ........................................................................... 4

STATEMENT OF FACTS ................................................................................. 5

ARGUMENT ................................................................................................... 7

    I.    Section 546(e) Is Not Applicable to the Transfers At Issue Here .......................... 10

        A.  The Plain Language of § 546(e) Restricts Its Application To Settlement Payments With Respect To Publicly-Traded Securities ............... 11

        B.  The Legislative History of § 546(e) Confirms That It Was Intended To Apply Only To Publicly-Traded Securities ................................... 15

        C.  Neither the *Resorts* Case Nor Any Other Binding Authority Requires the Application of § 546(e) To Transactions Involving Privately-Held Stocks ........................................................................ 18

    II.   Actual Fraud is Not A Prerequisite for Considering the January and Rex LBOs as Single Transactions ............................................................. 28

        A.  The Third Circuit Has Expressly Rejected A Transferee's Intent to Defraud as the *Sine Que Non* for Collapsing an LBO ...................... 30

        B.  Collapsing the January and August LBOs is Appropriate on the Facts Presented by the Trustee ....................................................... 34

CONCLUSION ............................................................................................... 37

ADDENDUM

**Unreported Decisions**

*Buckley* v. *Goldman, Sachs & Co.*,
   No. 02-CV-11497-RGS, 2005 WL 1206865, at *7 (D. Mass. May 20, 2005) ..AD00001

*Enron Corp.* v. *JP Morgan Securities, Inc.* (In re *Enron Corp.*),
   Nos. M-47 (GBD) *et al.*, 2008 WL 281972, at *4 (S.D.N.Y. Jan. 25, 2008) ..AD000013

**Federal Statutes and Public Laws**

11 U.S.C. § 101(48) .............................................................................AD000020

11 U.S.C. § 544....................................................................................AD000021

11 U.S.C. § 546(e) ...............................................................................AD000023

11 U.S.C. § 548(a)(1)(A) .....................................................................AD000024

11 U.S.C. § 741(5) ...............................................................................AD000026

11 U.S.C. § 741(8) ...............................................................................AD000026

Pub. L. 97-222, § 8, 96 Stat. 235 (1982)..............................................AD000027

**State Statutes**

6 Del. Code § 1304 ..............................................................................AD000036

6 Del. Code § 1305 ..............................................................................AD000038

6 Del. Code § 1311 ..............................................................................AD000039

# TABLE OF AUTHORITIES

## Cases

*Bevill, Bresler & Schulman Asset Mgmt. Corp.* v. *Spencer Sav. & Loan Ass'n,*
  878 F.2d 742 (3d Cir. 1989) ...............................................................................23,25,27

*Brandt* v. *Hicks Muse & Co., Inc.* (In re *Healthco Int'l, Inc.*)
  195 B.R. 971 (Bankr. D. Mass. 1996) ........................................................................30

*Buckley* v. *Goldman, Sachs & Co.,*
  No. 02-CV-11497-RGS, 2005 WL 1206865 (D. Mass. May 20, 2005) ........................18

*Cerro Metal Products* v. *Marshall,*
  620 F.2d 964(3d Cir. 1980) ........................................................................................23

*Conley* v. *Gibson,*
  355 U.S. 41 (1957) ....................................................................................................10

*Crowthers McCall Pattern Inc.* v. *Lewis*
  129 B.R. 992 (S.D.N.Y. 1991) ..................................................................................30

*End of the Road Trust* v. *Terex Corp.* (In re *Fruehauf Trailer Corporation*)
  250 B.R. 168 (D. Del. 2000) ......................................................................................36

*Enron Corp.* v. *JP Morgan Securities, Inc.* (In re *Enron Corp.*),
  Nos. M-47 (GBD) *et al.*, 2008 WL 281972, at *4 (S.D.N.Y. Jan. 25, 2008) ................26

*Enron Corp.* v. *JP Morgan Securities, Inc.* (In re *Enron Corp.*)
  325 B.R. 671, 685 (Bankr. S.D.N.Y. 2005) ...............................................................26

*FAG Italia S.p.A.* v. *United States,*
  291 F.3d 806 (Fed. Cir. 2002) ...................................................................................14

*Grasso* v. *IRS,*
  785 F.2d 70 (3d Cir. 1986) ........................................................................................22

*Griffin* v. *Oceanic Contractors, Inc.*
  458 U.S. 564 (1982) ..................................................................................................15

*HBE Leasing Corp.* v. *Frank*
  48 F.3d 623 (2d Cir. 1995) ...................................................................................29,33

*Hubbard* v. *Taylor,*
   399 F.3d 150 (3d Cir. 2005) ............................................................22

*In re AppOnline.com, Inc.*
   315 B.R. 259 (Bankr. E.D.N.Y. 2004) ...........................................27

*In re Bullion Reserve of N. Am.*
   922 F.2d 544 (9th Cir. 1991) ...........................................................27

In re *Burlington Coat Factory Sec. Litig.*
   114 F.3d 1410 (3d Cir. 1997) .............................................................5

*In re Carrozzella & Richardson*
   286 B.R. 480 (D.Conn. 2002) ...........................................................31

*In re CIS Corp.*
   195 B.R. 251 (Bankr. S.D.N.Y. 1996) .............................................27

In re *Financial Mgmt. Sciences,*
   261 B.R. 150 (Bankr. W.D. Pa. 2001) ..............................................12

*In re Hechinger Inv. Co. of Del., Inc.,*
   335 F.3d 243 (3d Cir. 2003) ..................................................14,28,29

*In re O'Brien Environmental Energy, Inc.,*
   188 F.3d 116 (3d Cir. 1999) .............................................................10

*Kaiser Steel Corp.* v. *Charles Schwab & Co., Inc.,*
   913 F.2d 846 (10th Cir. 1990) .........................................................23

*Kaiser Steel Corp.* v. *Pearl Brewing Co.* (In re *Kaiser Steel Corp.*)
   952 F.2d 1230 (10th Cir. 1991) ...............................................12,16,23,25

*Kipperman* v. *Circle Trust* (In re *Grafton Partners, L.P.*)
   321 B.R. 527 (B.A.P. 9th Cir. 2005) ..........................................12,19

*Jackson* v. *Mishkin* (In re *Adler, Coleman Clearing Corp.*)
   263 B.R. 406 (S.D.N.Y. 2001) .........................................................26

*Jewel Recovery, L.P.* v. *Gordon*
   196 B.R. 348 (N.D. Tex. 1996) ........................................................19

*Lexington Nat. Ins. Corp.* v. *Ranger Ins. Co.*,
  326 F.3d 416 (3d Cir. 2003) ............................................................5

*Lippi* v. *City Bank*
  955 F.2d 599 (9th Cir. 1992) ........................................................29

*Loranger Mfg. Corp.* v. *PNC Bank* (In re *Loranger Mfg. Corp.*),
  324 B.R. 575 (Bankr. W.D. Pa. 2005) .....................................24,25

*Lowenschuss* v. *Resorts Int'l, Inc.* (In re *Resorts Int'l, Inc.*),
  181 F.3d 505 (3d Cir.), *cert. denied sub nom.Sun Int'l North
  America, Inc.* v. *Lowenschuss*, 528 U.S. 1021 (1999) ................11,19

*McLellan* v. *Mississippi Power & Light Co.*,
  545 F.2d 919, 938 (5th Cir. 1977) ................................................14

*Mellon Bank* v. *Metro Communications*
  945 F.2d 635 (3d Cir. 1991), *cert. denied sub nom. Comm. Unsec.
  Creditors* v. *Mellon Bank*, 503 U.S. 937 (1992) ..........................29

*Moody* v. *Security Pacific Bus. Credit, Inc.*
  971 F.2d 1056 (3d Cir. 1992) .......................................................29

*Munford* v. *Valuation Research Corp.* (In re *Munford, Inc.*)
  98 F.3d 604 (11th Cir. 1996), *cert. denied*, 522 U.S. 1068 (1998) ...........19,20

*Murphy* v. *Meritor Savings Bank (*In re *O'Day Corporation)*
  126 B.R. 370 (Bankr. D. Mass. 1991) ...........................................30

*Official Comm. of Unsecured Creditors* v. *Asea Brown
Boveri, Inc.* (In re *Grand Eagle Cos., Inc.*)
  288 B.R. 484 (Bankr. N.D. Ohio 2003) .........................................19

*Official Comm. of Unsec. Creditors of Norstan Apparel
Shops, Inc.*, v. *Lattman* (In re *Norstan Apparel Shops, Inc.*),
  367 B.R. 68 (Bankr. E.D.N.Y. 2007) ................................... *passim*

*Official Comm. of Unsec. Creditors of The IT Group, Inc.* v. *Acres
of Diamonds, L.P.* (In re *The IT Group, Inc.*),
  359 B.R. 97 (Bankr. D. Del. 2006) ..........................................24,25

*Official Comm. of Unsec. Creditors of Nat'l Forge Co.* v. *Clark*
  (In re *National Forge Co.*)
  344 B.R. 340 (W.D. Pa. 2006) .................................................25,35

*Official Committee of Unsecured Creditors v. Welsh*
(In re
  238 B.R. 819 (Bankr. W.D. Mo. 1999) ........................................................................31

*Orr* v. *Kinderhill Corporation*
  991 F.2d 31 (2d Cir. 1993) ........................................................................35

*Oshiver* v. *Levin, Fishbein, Sedran & Berman*
  38 F.3d 1380 (3d Cir. 1994) ........................................................................36

*Pajaro Dunes Rental Agency, Inc. v. Spitters*
(In re *Pajaro Dunes Rental Agency, Inc.* )
  174 B.R. 557 (Bankr. N. D. Cal. 1994) ........................................................................31

*Pilot Life Ins. Co.* v. *Dedeaux,*
  481 U.S. 41 (1987) ........................................................................28

*QSI Holdings, Inc.* v. *Alford*
  No. 1:06-CV-876, 2007 WL 4557855 (W.D. Mich. Dec. 21, 2007) ..............................25

*Richardson* v. *FDIC* (In re *M. Blackburn Mitchell, Inc.*),
  164 B.R. 117 (Bankr. N.D. Cal. 1994) ........................................................................27

*Rosenberg* v. *XM Ventures,*
  274 F.3d 137 (3d Cir. 2001) ........................................................................12,21,28

*Rosener* v. *Majestic Mgmt., Inc.* (In re *OODC, LLC*)
  321 B.R. 128 (Bankr. D. Del. 2005) ........................................................................30

*Schrob* v. *Catterson,*
  948 F.2d 1402 (3d Cir. 1991) ........................................................................10

*TRW, Inc.* v. *Andrews*
  534 U.S. 19 (2001) ........................................................................27,28

*U.S. Express Lines, Ltd.* v. *Higgins*
  281 F.3d 383 (3d Cir. 2002) ........................................................................5,10

*United States* v. *Hodge,*
  321 F.3d 429 (3d Cir. 2003) ........................................................................15

*United States* v. *Tabor Court Realty Corp.*
  803 F.2d 1288 (3d Cir. 1986), *cert. denied sub nom. McClellan*
  *Realty Co. v. U.S,* 483 U.S. 1005 (1987) ........................................................................28,29,30,33

*Voest-Alpine Trading USA Corporation* v. *Vantage Steel Corporation*
  919 F.2d 206 (3d Cir. 1990) ..............................................................29,33,34

*Wieboldt Stores, Inc.* v. *Schottenstein,*
  131 B.R. 655
  (N.D. Ill. 1991) ...................................................................................*passim*

*Zahn* v. *Yucaipa Capital Fund,*
  218 B.R. 656 (D.R.I. 1998) ...............................................................*passim*

**Federal Statutes and Public Laws**

11 U.S.C. § 101(48) ..............................................................................13

11 U.S.C. § 544........................................................................................2, 31

11 U.S.C. § 546(e) ..............................................................................*passim*

11 U.S.C. § 548(a)(1)(A) ......................................................................11, 20

11 U.S.C. § 741(5).................................................................................13, 14

11 U.S.C. § 741(8).................................................................................*passim*

Pub. L. 97-222, § 8, 96 Stat. 235 (1982)................................................11, 14

**State Statutes**

6 Del. Code § 1304 ................................................................................2, 31

6 Del. Code § 1305 ...................................................................................2

6 Del. Code § 1311 ...............................................................................31

**Other Authorities**

Black's Law Dictionary 1529 (8th ed. 2004) .......................................13

Downes & Goodman, Dictionary of Finance and Investment Terms 327 (4th ed. 1995) 13, 14

Garfinkel, Note, *No Way Out: Section 546(e) Is No Escape for the Public
Shareholder of a Failed LBO*, 1991 Colum. Bus. L. Rev. 51, 64-65 (1991) ....................16

H.R. Rep. No. 420, 97th Cong., 2d Sess., at 1-2 (1982),
*reprinted in* 1982 U.S.C.C.A.N. 583, 583 ................................................17, 22

Merriam-Webster's Collegiate Dictionary 1246 (10th ed. 2001) .....................................13

Munn *et al.*, Encyclopedia of Banking & Finance 937 (9th ed. 1991) .......................13, 14

## NATURE AND STAGE OF PROCEEDINGS

This adversary proceeding is a "core" proceeding under 28 U.S.C. § 157(b)(2)(H). The Bankruptcy Court had jurisdiction pursuant to 28 U.S.C. § 157(b)(1), and entered a final order dismissing the proceeding on April 20, 2007. Appellant filed a timely notice of appeal on April 27, 2007. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a).

Debtors Plassein International Corp. ("Plassein") and associated entities filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code on May 14, 2003, in the United States Bankruptcy Court of the District of Delaware. Following the cases' conversion to Chapter 7, Appellant William Brandt was appointed as trustee, and in that capacity initiated this adversary proceeding on or about April 1, 2005, against Appellees B.A. Capital Co., LP, *et al.* The action, filed pursuant to 11 U.S.C. § 544 and 6 Del. Code §§1304 and 1305, alleges a series of avoidable fraudulent transfers that rendered Plassein insolvent or with unreasonably small capital for the business in which it was about to engage. Appellees filed motions to dismiss pursuant to Fed. R. Bankr. P. 7012(b) and Fed. R. Civ. P. 12(b)(6), on the grounds, *inter alia*, that 11 U.S.C. § 546(e) rendered the transfers unavoidable, and that Brandt had failed to allege transfers meeting the requirements of Delaware law. The Bankruptcy Court allowed the motions in an Order dated April 20, 2007. This timely appeal followed.

## ISSUES PRESENTED FOR REVIEW

I.   Did the Bankruptcy Court err in finding that § 546(e) of the Bankruptcy Code applies to a transaction that does not involve the sale or transfer of a publicly traded security?

II.  Did the Bankruptcy Court err in failing to find that under the plain language of § 741(8) of the Bankruptcy Code, only settlement payments "commonly used in the securities trade," that is, made with respect to publicly traded securities, fall within the exception provided by § 546(e) of the Bankruptcy Code?

III. Did the Bankruptcy Court err in finding that the Complaint failed to state a claim for relief because the transfers were made by a non-debtor (Plassein Packaging Corp.) where the record clearly establishes that Plassein International Corp., a debtor, was known as Plassein Packaging Corp. at the time of the transactions at issue?

IV.  Did the Bankruptcy Court err in holding that the Plaintiff was required to allege actual intent to defraud in order to collapse the transactions constituting a leveraged buyout and thereby state a claim under the Delaware Fraudulent Transfer Act, Sections 1304 and 1305?

## SUMMARY OF ARGUMENT

I.     Section 546(e) of the Bankruptcy Code does not apply to the transactions at issue here.  Under the plain language of § 741(8), which § 546(e) incorporates, only "settlement payments" commonly made in "the securities trade," i.e., with respect to publicly-traded securities, fall within § 546(e).  The statute's legislative history and the policy underlying it support this interpretation, and the case law does not foreclose it.  Because none of the stock of the companies at issue here was publicly traded, § 546(e) has no application.

II.     Brandt has adequately pled fraudulent transfers under Delaware law.  The Third Circuit and numerous other courts have allowed leveraged buyouts of the kind at issue here to be "collapsed" to reflect the reality of the transaction and have not allowed recipients of fraudulent transfers to escape the legal consequences of their actions by elevating form over substance.  The Bankruptcy Court's holding that "collapsing" an LBO transaction is permissible only in cases of actual intent to defraud is unsupported by case law.

## STATEMENT OF FACTS

The following narrative summary of facts is taken directly from the Complaint (dated April 1, 2005) and from the attachments thereto[1]. Additional information relevant to the case is set forth in the Affidavit of Charles R. Bennett, Jr. ("Bennett Aff."), to which are attached excerpts from documents "'integral to or explicitly relied upon in the complaint,'" *U.S. Express Lines, Ltd.* v. *Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) (quoting In re *Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)), namely, certain closing documents from the acquisitions at issue here, including the Stock Purchase Agreements for certain companies, and the Loan Agreement and Second Amended and Restated Loan and Security Agreement among the lenders, Plassein Packaging Corp., and certain companies. *See also Lexington Nat. Ins. Corp.* v. *Ranger Ins. Co.*, 326 F.3d 416, 418-19 (3d Cir. 2003) (approving consideration of affidavits on a motion to dismiss).

Debtor Plassein International Corp. ("Plassein") was formed in 1999 (and was then known as "Plassein Packaging Corp.," *see* Bennett Aff. ¶ 11) for the purpose of acquiring several privately held manufacturers of flexible packaging and specialty film. The acquisitions all took the familiar form of a leveraged buyout ("LBO"): a group of lenders agreed to advance funds and extend credit to Plassein in exchange for security interests in the target companies' assets and promises by the target companies to repay the loans, and Plassein then used those funds to acquire the stock of the target companies and to pay off the companies' existing secured debt. The target companies were not merged into Plassein; instead, they changed their names but continued in operation as

---

[1]    The Trustee has compiled an Appendix of portions of the appellate record cited herein, which has been filed with his Opening Brief.

separate corporate entities, each obligated to repay the advances used by Plassein to acquire its stock and pay off its debts.

The LBO transactions proceeded in two phases. On January 10, 2000, Plassein closed on acquisitions of the stock of Plastical Industries, Inc. ("Plastical," n/k/a Plassein International of Spartanburg, Inc.), Nor Baker Industries, Ltd. ("Nor Baker," now in liquidation in Canada); Marshall Plastics Film, Inc. ("Marshall," n/k/a Plassein International of Martin, Inc.); and Key Packaging Industries Corp. ("Key," n/k/a Plassein International of Salem, Inc.), and of the assets of Transamerican Plastic LLC ("Transamerican," n/k/a Plassein International of Ontario, Inc.) (collectively, the "January Target Companies"). As part of these acquisitions, each of the January Target Companies became jointly and severally liable for the entire debt incurred to finance the transactions, and each granted a security interest in all of its assets to secure that debt. Complaint ¶ 33; Bennett Aff. ¶ 8; Bennett Aff. Ex. C p. 4 (defining "Borrower" as each of the January Target Companies); *id.* Ex. C § 2.3(a) (providing that each "Borrower" holds a "joint and several obligation" for "[t]he outstanding principal amount of all the Revolving Credit Loans"); *id.* Ex. C, ex. A-1 ("Form of Revolving Credit Note") (providing that all the January Target Companies "hereby jointly and severally unconditionally promise to pay…"); *id.* Ex. C, ex. A-2 (same for "Form of Swingline Note"); *id.* Ex. C, ex. B-1 (same for "Form of Term Note A"); *id.* Ex. C, ex. B-2 (same for "Form of Term Note B"); *id.* Ex. C, ex. B-3 (same for "Form of Capex Note").

In a separate transaction, which closed on August 15, 2000, Plassein acquired the stock of Rex International, Inc. ("Rex," n/k/a Plassein International of Thomasville, Inc., together with the January Target Companies, the "Target Companies"). As part of the

Rex transaction, Rex became liable not only for the debt incurred in the course of Plassein's acquisition of the Rex stock, but Rex also became a "borrower" under the loan agreement for the acquisition of the January Target Companies.  Complaint ¶ 48.  Rex granted a security interest in all of its assets to secure all of those obligations.  *Id.*  Thus, after the Rex transaction, Rex and each of the January Target Companies were jointly and severally liable for the entire debt incurred to acquire both Rex and all of the January Target Companies.  *Id.*; Bennett Aff. ¶¶ 9-10; Bennett Aff. Ex. D p. 4 (defining "Borrower" as each of the January Target Companies plus Rex); *id.* Ex. D § 2.3(a) (providing that each "Borrower" holds a "joint and several obligation" for "[t]he outstanding principal amount of all the Revolving Credit Loans"); *id.* Ex. D, ex. A-1 ("Form of Second Amended and Restated Revolving Credit Note") (providing that all the January Target Companies and Rex "hereby jointly and severally unconditionally promise to pay..."); *id.* Ex. D, ex. A-2 (same for "Form of Second Amended and Restated Swingline Note"); *id.* Ex. D, ex. B-1 (same for "Form of Second Amended and Restated Term Note A"); *id.* Ex. D, ex. B-2 (same for "Form of Second Amended and Restated Term Note B"); *id.* Ex. D, ex. B-3 (same for "Form of Second Amended and Restated Capex Note").

With respect to each transaction, the selling shareholders received a substantial premium for their shares, which was accounted on the post-closing balance sheets as "goodwill."  And with respect to each transaction, each target company was rendered insolvent in that the sum of its debts was greater than the value of its assets at fair valuation.  Furthermore, as a result of the transactions, each company was engaged in a business for which its remaining assets were unreasonably small.

The closing documents for the January Target Companies provide that the stock certificates are to be delivered directly to the buyer with no intermediary. For example, the Stock Purchase Agreement for Key provides that "at the Closing … the Stockholders will sell, transfer, convey, assign and deliver to the Purchaser the Shares and the certificates representing the Shares, together with stock powers duly endorsed by the Stockholders …." Further, the stockholders represented and warranted that "[a]ll outstanding shares of Company Stock to be conveyed by a Stockholder pursuant to Section 3 are owned by such Stockholder free and clear…." Bennett Aff. Ex. A (Key Stock Purchase Agreement §§ 3.2 and 5.3). The pertinent language for each of the other January Target Companies is similar. *Id.* ¶ 3.

The closing documents for the Rex transaction also provide for a transfer of stock from seller to buyer with no intermediary. Section 1.04 of the Rex Stock Purchase Agreement provides that "at the Closing … each of the Sellers will deliver to the Buyer stock and warrant certificate representing all of his or its Company Shares, endorsed in Blank or accompanied by duly executed assignment documents…." Bennett Aff. Ex. B (Rex Stock Purchase Agreement § 1.04).

Thus, for each closing at issue in this case, the selling shareholders delivered their shares of stock directly to Plassein. Plassein, in exchange, instructed Fleet Bank ("Fleet") to execute a wire transfer of funds from Plassein's account to the accounts of the various shareholders and secured creditors of the target companies. Fleet never had custody or control of any shares of stock; it simply transferred money at the request of its customer. Bennett Aff. ¶¶ 4(c), 6(c). All of the shares that changed hands in these transactions were of privately held companies; the public securities markets were not implicated in any

respect by any of the Plassein transactions.  Bennett Aff. ¶¶ 4(a)-(b), 6(a)-(b); *see also id.* Ex. A, first paragraph (noting that the eight named Stockholders of Key "are the owners of all the issued and outstanding capital stock of the Company"); *id.* Ex. B, ¶ A (noting that seven of the eight named Sellers of Rex shares "own all the outstanding capital stock of the Company").

Following several months of defaults, debt accelerations, forbearance agreements, and other negotiations among the companies and the lenders, Plassein, Rex, and the January Target Companies filed Chapter 11 bankruptcy petitions in the Bankruptcy Court for the District of Delaware on May 14, 2003, and Nor Baker commenced an insolvency proceeding in Canada on the same date.  Following the cases' conversion to Chapter 7, Brandt was appointed trustee of all of the debtors' estates on February 6, 2004.  He initiated this action on or about April 1, 2005.

## ARGUMENT

The familiar legal standard on motions to dismiss is that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley* v. *Gibson*, 355 U.S. 41, 45 (1957). In evaluating such motions, the court must assume that all facts alleged in the plaintiff's Complaint are true, and must give Plaintiff "the benefit of every favorable inference that can be drawn from those allegations." *Schrob* v. *Catterson*, 948 F.2d 1402, 1405 (3d Cir. 1991); *see also, e.g., U.S. Express Lines, Ltd.* v. *Higgins*, 281 F.3d 383, 388 (3d Cir. 2002). Because the Bankruptcy Court decided only questions of law, this Court's review of the Bankruptcy Court's decision is *de novo. In re O'Brien Environmental Energy, Inc.*, 188 F.3d 116, 122 (3d Cir. 1999).

### I.    Section 546(e) Is Not Applicable to the Transfers At Issue Here

The Bankruptcy Court held that § 546(e)[2] renders the transfers at issue here exempt from avoidance. That holding is incorrect, because § 546(e)'s exception to the trustee's avoidance powers extends only to securities that are publicly traded, and the securities at issue here were privately held. The Bankruptcy Court's contrary conclusion ignores the plain language of § 546(e); it ignores the purpose for which § 546(e) was enacted; and it immunizes a host of transactions from avoidance for no good reason, contrary to the usual rule that the trustee's avoidance powers are to be broadly construed. The Bankruptcy Court's conclusion was compelled neither by the statute nor by the case law, and it should be reversed.

---

[2]    Throughout this brief statutes identified only by section number ("§ __") are from the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, unless otherwise noted.

### A.    The Plain Language of § 546(e) Restricts Its Application To Settlement Payments With Respect To Publicly-Traded Securities

Section 546(e) provides in pertinent part that, absent actual fraud under § 548(a)(1)(A), "the trustee may not avoid a transfer that is a ... settlement payment, as defined in section 101 or 741 ..., made by or to a ... financial institution ...." Section 741(8)[3] defines "settlement payment" as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." The final clause of § 741(8) – "commonly used in the securities trade" – is the key to this case. As one court has held, "[t]he 'securities trade' in this statutory context plainly means the public securities markets." *Official Comm. of Unsec. Creditors of Norstan Apparel Shops, Inc.*, v. *Lattman* (In re *Norstan Apparel Shops, Inc.*), 367 B.R. 68, 76 (Bankr. E.D.N.Y. 2007).

The Code's definition of "settlement payment" was added as part of the same 1982 package of amendments that added § 546(e) to the Code. *See* Pub. L. 97-222, § 8, 96 Stat. 235 (1982).[4]   That definition, although "extremely broad," *Lowenschuss* v. *Resorts Int'l, Inc.* (In re *Resorts Int'l, Inc.*), 181 F.3d 505, 515 (3d Cir.), *cert. denied sub nom.Sun Int'l North America, Inc. v. Lowenschuss*, 528 U.S. 1021 (1999), has been described as "circular and cryptic" because it contains within it the very term it purports to be defining. *Zahn* v. *Yucaipa Capital Fund*, 218 B.R. 656, 675 (D.R.I. 1998); *see also,*

---

[3]    The definition of "settlement payment" that appears in § 101 applies only to the "forward contract" trade, and therefore has no relevance here. *See* 11 U.S.C. § 101(51A).

[4]    The definition has been amended once since its enactment. The original version read "'settlement payment' means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, or any other similar payment commonly used in the securities trade." Pub. L. 97-222, § 8, 96 Stat. 235 (1982). A subsequent amendment added "a final settlement payment."

*e.g.*, *Wieboldt Stores, Inc.* v. *Schottenstein*, 131 B.R. 655, 663 (N.D. Ill. 1991); In re *Financial Mgmt. Sciences*, 261 B.R. 150, 154 (Bankr. W.D. Pa. 2001) ("This 'definition' is unilluminating in that the *definiendum* appears as a term in the *definiens*."). However, courts have focused on the definition's final clause – "any other similar payment commonly used in the securities trade" – as a way of giving the definition some content. "Whatever else a settlement payment may be, it is *restricted to the securities trade* and must be 'commonly used.'" *Kipperman* v. *Circle Trust O.P.B.* (In re *Grafton Partners, L.P.*), 321 B.R. 527, 538 (B.A.P. 9th Cir. 2005) (emphasis added); *see also, e.g., Kaiser Steel Corp.* v. *Pearl Brewing Co.* (In re *Kaiser Steel Corp.*), 952 F.2d 1230, 1237 (10th Cir. 1991) ("The clear aim of the definition is to encompass all 'settlement payments' commonly used *in the securities trade*.") (emphasis added), *cert. denied*, 505 U.S. 1213 (1992); *Norstan*, 367 B.R. at 76 ("The definition of 'settlement payment' ... is saved from complete circularity by the concluding phrase, 'or any other similar payment commonly used in the securities trade.' It is therefore important to give meaning to this modifying language, because in its absence, the statutory definition contained in § 741(8) would be, in effect, a meaningless tautology."). Failure to give content to the term "the securities trade" in § 741(8) would violate the basic canon of statutory construction that, "when interpreting a statute, courts should endeavor to give meaning to every word which Congress used and therefore should avoid an interpretation which renders an element of the language superfluous." *Rosenberg* v. *XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001).

The term "the securities trade" in § 741(8) is not defined, but it is best read as referring to the industry dealing in publicly-traded securities. "Trade," when used as a noun (as it is in § 741(8)), means "the business of buying and selling or bartering

commodities" and is synonymous with "business" or "market." Merriam-Webster's Collegiate Dictionary 1246 (10th ed. 2001); *see also* Black's Law Dictionary 1529 (8th ed. 2004) (defining "trade" as "the business of buying and selling or bartering goods and services"). Thus, the "securities trade" means, essentially, the "securities business" or "securities market," and naturally refers only to the "business of buying and selling" *publicly-traded* securities, since there is by definition no organized "market" for securities that are not available to the public.

Further support for this reading of "securities trade" comes from the fact that § 546(e), in addition to exempting "settlement payments" from avoidance, also exempts "margin payments," which are defined in § 741 as payments "commonly known to *the securities trade* as original margin, initial margin, maintenance margin, or variation margin, or as a mark-to-market payment, or that secures an obligation of a participant in a securities clearing agency." § 741(5) (emphasis added).[5] These terms have no meaning outside the markets for publicly-traded securities, as is evident from the securities industry's definitions of several terms relating to margins and margin payments, all of which depend on the notion of a current "market value" for a particular security. For example, "margin" is measured "by the ratio between the customer's equity and the current market value of the purchased securities," Munn *et al.*, Encyclopedia of Banking & Finance 640 (9th ed. 1991); to "mark to the market" means to "adjust the valuation of a security or portfolio to reflect current market values," Downes & Goodman, Dictionary of Finance and Investment Terms 327 (4th ed. 1995); "minimum maintenance" is the

---

[5]  "Securities clearing agency" is a defined term meaning "person that is registered as a clearing agency under section 17A of the Securities Exchange Act of 1934, or whose business is confined to the performance of functions of a clearing agency with respect to exempted securities, as defined in section 3a(12) of such Act for the purposes of such section 17A." § 101(48).

level of equity that must be maintained in a margin account as measured by "the market value of eligible securities long or short in customers' accounts," *id.* at 334; and a "margin call" is a demand by a broker for additional security or partial payment "in order to offset or make good a loss in the value of the collateral due to a decline in the market price of securities pledged," Munn *et al.*, *supra*, at 644 (excerpts from Munn *et al.* and Downes & Goodman are attached hereto as Exhibits A and B respectively). In addition, the term "margin security," which refers to the types of securities that may be bought and sold in margin accounts, is defined to include only securities that trade in public markets. Downes & Goodman, *supra*, at 321-22 (listing four types of publicly-traded securities). None of these definitions can be sensibly applied to securities that are not publicly traded.

The term "the securities trade" in § 741(5) therefore must refer specifically, and only, to the industry that deals in publicly-traded securities. Sections 741(5) and 741(8) were enacted simultaneously, *see* Pub. L. 97-222, § 8, 96 Stat. 235 (1982), so the usual rule that identical words in the same statute have the same meaning, *see, e.g.,* In re *Hechinger Inv. Co. of Del., Inc.*, 335 F.3d 243, 253 (3d Cir. 2003) (citing cases), applies with particular force here, *see, e.g., FAG Italia S.p.A.* v. *United States*, 291 F.3d 806, 820 (Fed. Cir. 2002); *McLellan* v. *Mississippi Power & Light Co.*, 545 F.2d 919, 938 (5th Cir. 1977). The definition of "margin payment" thus provides further evidence that the term "the securities trade" in § 741(8) limits the definition of "settlement payment" to transactions in publicly-traded securities.

In sum, "in order to be encompassed in the statutory definition of 'settlement payment,' a transaction must involve the public securities markets." *Norstan*, 367 B.R. at

76.    The plain language of § 741(8) thus resolves this case, and requires that the

Bankruptcy Court's decision be reversed.

### B.    The Legislative History of § 546(e) Confirms That It Was Intended To Apply Only To Publicly-Traded Securities

Appellant's position is that §§ 546(e) and 741(8) unambiguously apply only to

publicly-traded securities, and therefore that investigating the legislative history is

unnecessary. However, to the extent that the Court finds the term "the securities trade" to

be ambiguous, resort to the statute's legislative history is appropriate. *See, e.g., United*

*States* v. *Hodge*, 321 F.3d 429, 437 (3d Cir. 2003) ("When the language of a statute is

ambiguous, we look to its legislative history to deduce its purpose.") (citing cases). The

Third Circuit has also emphasized that it "will not read a statute to produce absurd or

unintended results 'demonstrably at odds with the intentions of its drafters.'" *Id.* (quoting

*Griffin* v. *Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)). The legislative history

and the intent of Congress in drafting § 546(e) are remarkably clear in their limitation of

its reach to publicly-traded securities.

To understand why § 546(e) should have no application here, it is necessary first

to consider why that section – which exempts a large number of transactions from the

trustee's normally broad avoidance powers – appears in the Bankruptcy Code at all.

Section 546(e) (originally designated § 546(d)) was introduced into the Code in 1982 as

part of Pub. L. 97-222, 96 Stat. 235 (1982), which was "a package of amendments

designed to protect the carefully-regulated mechanisms for clearing trades in securities

and commodities *in the public markets* from dysfunction that could result from the

automatic stay and from certain trustee avoiding powers." *Grafton Partners,* 321 B.R. at

532-33 (emphasis added).    Those "carefully-regulated mechanisms," known as the

15

"clearance and settlement system," are the means by which virtually all trades in public

securities are accomplished.  The system works roughly as follows:

> [T]ypically, when a customer wishes to buy a security, he or she places an order
> with his or her broker, who purchases the security from another broker, who is
> acting on behalf of a party who has placed an order to sell.  Once the trade has
> been agreed upon, the process by which the security is delivered in exchange for
> the purchase price is known as "clearance and settlement."  The clearing agency
> compares the trades its member brokers have made to arrive at an accounting of
> the day's transactions, which it then uses to establish each broker's money and
> securities settlement obligations.  Finally, the trades are "settled" – funds and
> securities are delivered in satisfaction of the obligations.

> One of the keys to the success of this system is that each participant in the chain
> guarantees that he or she will make good on his or her obligation.  The buying
> broker guarantees that he or she will deliver funds in exchange for the securities.
> The selling broker guarantees he will deliver the security in exchange for funds.
> Because the comparison and settlement process is not instantaneous, however, the
> clearing agency must guarantee to the seller that it will deliver the funds, and it
> must also guarantee to the buyer that it will deliver the securities.  In the event of
> a default by any party in the chain, the clearing agency must still make good on its
> guarantee, which it can do by calling on a backup clearing fund provided by its
> members.    Brokers and other intermediaries require collateralization of their
> respective risks by means of various types of margin payments.    This system
> depends upon the availability of the respective guarantees to the clearing agency;
> without        them,        the        potential        exposure        is        tremendous.

Garfinkel, Note, *No Way Out: Section 546(e) Is No Escape for the Public Shareholder of*

*a Failed LBO*, 1991 Colum. Bus. L. Rev. 51, 64-65 (1991) (footnotes omitted) (citing,

*inter alia*, congressional hearings on the need for the 1982 amendments) [hereinafter

"Garfinkel"]; *see also, e.g., Kaiser Steel*, 952 F.2d at 1237 n.4 (describing the system of

interrelated guarantees and margin payments); *Zahn*, 218 B.R. at 675-76 (same; citing

Garfinkel); *Wieboldt*, 131 B.R. at 663-64 & nn.9-10 (same; citing Garfinkel).  The system

of interdependent guarantees and margin payments gives rise to the danger that a

bankruptcy could pose to the affected market:

> If the pre-bankruptcy trades by a bankrupt intermediary could be set aside, then
> the guarantees that allow the system to function would be threatened, the parties

could not proceed with confidence, and a bankruptcy by one party in the chain could spread to other parties in the chain, threatening a collapse of the entire industry.

*Zahn*, 218 B.R. at 676; *see also, e.g.,* Garfinkel, *supra*, at 65 ("If the trustee can recover as a preference, or avoid as a fraudulent conveyance, any of the types of payments that are used to secure the obligations of the market participants – and minimize the risk for the clearing agency – one participant's bankruptcy might trigger a ripple effect that spreads throughout the securities industry. In order for the system to work smoothly, the parties must be able to assume that the margin and settlement payments are valid, and will not be subject to subsequent attack.") (footnote omitted).

In light of these concerns, Congress concluded that the protections already present in the 1978 version of the Code for the commodities market should be extended to the public securities market. The legislative history explains the purpose of the 1982 amendments:

> The commodities and securities markets operate through a complex system of accounts and guarantees. Because of the structure of the clearing systems in these industries and the sometimes volatile nature [of] the markets, certain protections are necessary to prevent the insolvency of one commodity or security firm from spreading to other firms and possibl[y] threatening the collapse of the affected market.
>
> ....
> The thrust of several of the amendments … is to clarify and, in some instances, broaden the commodities market protections and expressly extend similar protections to the securities market.

H.R. Rep. No. 420, 97th Cong., 2d Sess., at 1-2 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583, 583. With respect to § 546(e), the legislative history explains: Section 546([e]), together with provisions of section 548, prohibits a trustee from avoiding a transfer that is a margin payment to a commodity broker or forward contract merchant or is *a settlement*

*payment made by a clearing organization*, except where the transfer was made with intent to hinder, delay, or defraud other creditors and was not taken in good faith.

*Id.* at 3, 1982 U.S.C.C.A.N. at 585 (emphasis added).  From that passage, Congress's intent could hardly be clearer – as one district court has observed, "[t]he object that Congress sought to accomplish by enacting § 546(e) was to protect the operation of the security industry's clearance and settlement system." *Buckley* v. *Goldman, Sachs & Co.*, No. 02-CV-11497-RGS, 2005 WL 1206865, at *7 (D. Mass. May 20, 2005).

Of course, the clearance and settlement system operates only with respect to securities that are publicly traded. *See, e.g., Grafton Partners*, 321 B.R. at 532-33; Munn *et al.*, Encyclopedia of Banking & Finance 937 (9th ed. 1991) (showing flow chart of clearance and settlement system as part of definition of "securities markets" that refers only to public markets) (attached as Ex. A).  There is, therefore, no indication in the legislative history that Congress saw any need to exempt from avoidance payments with respect to transfers of privately held stocks.

In sum, Congress's intention to apply § 546(e) only to transactions in publicly-traded securities is manifest in the legislative history, and is consistent with common sense – the trustee's avoidance powers are intentionally broad, and there is no reason to exempt transactions in privately-held stocks from those powers.  Congress enacted its intention into law by expressly defining the terms "settlement payment" and "margin payment" only as those terms are used in "the securities trade," i.e., the industry that deals in publicly-traded securities.  Section 546(e) therefore has no application where only privately-held stocks are involved.

**C.    Neither the *Resorts* Case Nor Any Other Binding Authority Requires the Application of § 546(e) To Transactions Involving Privately-Held**

18

**Stocks**

The Bankruptcy Court's decision never even considered the meaning of the term "the securities trade" in § 741(8), nor did it make any mention of the legislative history of § 546(e), even though those points were expressly called to its attention. *See* Brandt Bankr. Ct. Br. at 11-19. Instead, the Bankruptcy Court concluded that Third Circuit precedent – specifically, *Lowenschuss* v. *Resorts Int'l, Inc.* (In re *Resorts Int'l, Inc.*), 181 F.3d 505 (3d Cir.), *cert. denied sub nom.Sun Int'l North America, Inc.* v. *Lowenschuss*, 528 U.S. 1021 (1999) – required the conclusion that "settlement payments" include payments with respect to privately-held stocks such as those at issue here, and therefore that § 546(e) barred any action to avoid the payments. That conclusion is incorrect. No Third Circuit decision – including *Resorts* – has addressed whether § 546(e) applies to transactions involving privately-held stocks.[6] The question remains open in this Circuit, and the handful of non-binding decisions from other courts that agree with the decision below are not persuasive.

*Resorts* concerned a transfer that occurred with respect to the LBO of a publicly-held company, Resorts International, Inc.[7] *See Lowenschuss* v. *Resorts Int'l, Inc.*, 194

---

[6]    A number of courts from other jurisdictions have held that § 546(e) does not apply to transactions involving privately-held stocks. *See, e.g., Kipperman* v. *Circle Trust* (In re *Grafton Partners, L.P.*), 321 B.R. 527 (B.A.P. 9th Cir. 2005); *Zahn* v. *Yucaipa Capital Fund*, 218 B.R. 656 (D.R.I. 1998); *Wieboldt Stores, Inc.* v. *Schottenstein*, 131 B.R. 655 (N.D. Ill. 1991); *Jewel Recovery, L.P.* v. *Gordon*, 196 B.R. 348 (N.D. Tex. 1996); *Official Comm. of Unsecured Creditors* v. *Asea Brown Boveri, Inc.* (In re *Grand Eagle Cos., Inc.*), 288 B.R. 484 (Bankr. N.D. Ohio 2003). While the Third Circuit did not accept the policy-based mode of analysis set forth in some of these cases, they contain useful discussions of the policy reasons for not extending § 546(e) beyond transactions involving the public securities markets.

[7]    Some courts, and several commentators, have rejected the application of § 546(e) to LBO payments even for public companies. In addition, the Eleventh Circuit in *Munford* v. *Valuation Research Corp.* (Matter of *Munford, Inc.*), 98 F.3d 604 (11th Cir. 1996), *cert. denied*, 522 U.S. 1068 (1998), concluded that when a "financial institution" is "nothing more than an intermediary or conduit" in an LBO, the transfers from the institution do not meet § 546(e)'s requirement of a

B.R. 339, 344 (D.N.J. 1996) (noting that prior to the LBO Resorts International was "a publicly-owned company"); *see also Grafton*, 321 B.R. at 539 (listing *Resorts* among cases that "have involved publicly traded securities in public markets in which an intermediary played a role"). The Third Circuit discussed the transfer at issue as follows:

> Here, the securities passed from [shareholder]'s broker, Merrill Lynch, to the transfer bank, Chase Manhattan. Resorts wired funds to Chase which Chase then forwarded them [sic] to Merrill Lynch who paid [shareholder]. Although no clearing agency was involved in this transfer, two financial institutions – Merrill Lynch and Chase – were.

181 F.3d at 515. Thus, the transfer at issue in *Resorts* did not implicate the clearance and settlement system, even though it did involve shares of a publicly-traded company.

The court considered, and rejected, the proposition adopted in *Zahn* , 218 B.R. at 676, and *Wieboldt*, 131 B.R. at 664-65, that only payments that directly implicate the clearance and settlement system should be deemed "settlement payments." *See Resorts*, 181 F.3d at 515-16.[8] But, of course, the court had no occasion to consider whether § 741(8)'s definition of "settlement payment" applied to privately-held stocks, since Resorts was a public company. The Third Circuit emphasized that it was bound by the "plain language of the statute," and concluded that "section 546 applies to this transaction and prevents its avoidance under section 548(a)(1)(B)." *Id.* at 515-16.

---

"settlement payment … made by or to" a "financial institution." 98 F.3d at 610. However, *Resorts* rejected *Munford*'s conclusion. *See* 181 F.3d at 516. While we of course recognize that this Court is bound to follow the holding of *Resorts*, we expressly reserve the right to argue to the Third Circuit that *Resorts* should be reconsidered, should this case reach that court.

[8]    The court also rejected the Eleventh Circuit case of *Munford* v. *Valuation Research Corp.*, 98 F.3d 604 (11th Cir. 1996), *cert. denied*, 522 U.S. 1068 (1998), which held that § 546(e) was not implicated if the financial institution acted as a mere "intermediary or conduit" for the funds or shares that passed through its hands in the course of the LBO. 181 F.3d at 516.

The Third Circuit's rejection of *Zahn* and *Wieboldt* does not resolve this case. To the contrary, the Third Circuit's emphasis on the "plain language of the statute" renders it essential that this Court give content to *all* portions of the relevant statutory texts. *See, e.g., Rosenberg* v. *XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001) (noting that courts should "give meaning to every word which Congress used") (citing cases). *Zahn* and *Wieboldt* failed to base their holdings on the language of the statutes they were interpreting, instead resting their conclusions on policy considerations derived from the statutes' legislative history. It was this mode of analysis that *Resorts* rejected. *Zahn*, for example, after reviewing the legislative history and concluding that Congress intended § 546(e) to protect the clearance and settlement system, and noting that the transaction before it "had no connection whatsoever to the clearance and settlement system," 218 B.R. at 676, simply concluded that "[i]t thus appears highly unlikely that Congress would intend these transfers to be covered as 'settlement payments.'" *Id.* at 677 (citing cases relying on "the statutory scheme" and "what Congress had in mind" in reaching similar conclusions). Similarly, *Wieboldt* noted that avoiding the transfers at issue "poses no significant threat to those in the clearance and settlement chain," 131 B.R. at 664, and from that concluded that "the section's legislative history, when combined with consideration of the system which Section 546(e) was designed to protect, convince this court that Section 546(e) does not bar the Trustee's claims ....," *id.* at 665.

The Third Circuit has thus made clear that it will not allow legislative history and policy considerations to override a statute's plain language. But, as explained *supra* Part I-A, the plain language of § 741(8) *does* distinguish transactions involving publicly-traded securities from transactions involving shares of privately-held corporations. By

limiting the definition of "settlement payment" to "payments commonly used *in the securities trade*," § 741(8) (emphasis added), Congress clearly expressed its intention to exempt from the trustee's avoidance powers only transactions that involve publicly-traded securities, consistent with its intent (as shown by the legislative history) to "minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." H.R. Rep. No. 420, 97th Cong., 2d Sess., at 1 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583, 583. *Resorts* appropriately rejected the policy-based and legislative history-based decisions of *Zahn* and *Wieboldt* – but neither of those cases was based on the textual argument, set forth *supra* Part I-A, that the plain language of §§ 546(e) and 741(8) restricts the operation of those sections to publicly-traded securities. And *Resorts*, which concerned publicly-traded securities, had no reason to consider that issue.

It is true that the *Resorts* opinion contains some broad language that, if taken out of context, could be read to encompass this case. *E.g.,* 181 F.3d at 516 ("A payment for shares during an LBO is obviously a common securities transaction, and we therefore hold that it is also a settlement payment for the purposes of section 546(e)"). But the question whether the phrase "the securities trade" in § 741(8) restricts that section to publicly-traded securities (and therefore the question whether § 546(e) applies only to such securities) simply did not arise in *Resorts*. Broad language in a judicial opinion, however clearly it may seem to apply to a different situation, cannot be read to have determined an issue that was not presented to the court. *See, e.g., Hubbard* v. *Taylor*, 399 F.3d 150, 163 (3d Cir. 2005) (noting that issue in a previous case "was not before us and we did not decide it" despite language that seemed to address it); *Grasso* v. *IRS*, 785

F.2d 70, 74 n.3 (3d Cir. 1986) (rejecting suggestion that prior case had decided issue that "was patently not before the court" despite language seeming to address it); *Cerro Metal Products* v. *Marshall*, 620 F.2d 964, 978 (3d Cir. 1980) (statements pertaining to issues not decided are dictum because "the precise issue [is not] before the court."). To the extent that overly broad language in the *Resorts* opinion appears to address transactions involving the stock of both public *and* private companies, it is dictum, and it does not bind this (or any other) court.

The other Third Circuit case to have considered the meaning of "settlement payment," *Bevill, Bresler & Schulman Asset Mgmt. Corp.* v. *Spencer Sav. & Loan Ass'n*, 878 F.2d 742 (3d Cir. 1989), also involved publicly-traded securities, so again, the issue presented here was not addressed there. Furthermore, *Bevill* arose in the very different context of repurchase (or "repo") agreements. *See id.* at 743-44 (describing the repo transactions at issue, which involved government securities). And the Tenth Circuit, which wrote the *Kaiser Steel* opinion upon which *Resorts* relies heavily, actually undercuts the Bankruptcy Court's conclusion in an earlier opinion arising out of the same transaction. In that case, Kaiser, a publicly-traded company (before the LBO), urged that its LBO should not be considered a "securities transaction" for purposes of § 546(e). The Court rejected the argument in a footnote: "That LBOs *of publicly-traded companies* are securities transactions is shown by the fact that they are within the purview of the Securities and Exchange Commission." *Kaiser Steel Corp.* v. *Charles Schwab & Co., Inc.*, 913 F.2d 846, 850 n.8 (10th Cir. 1990) (emphasis added). Clearly, the Court left open the possibility that LBOs of privately-held companies might not fall within § 546(e).

A handful of lower-court decisions from within the Third Circuit have applied § 546(e) to transactions involving privately-held stocks. None of them is binding on this court, and none of them is persuasive, because none of them considers the textual argument set forth *supra* Part I-A.

The Bankruptcy Court's opinion mentions two such cases, *Loranger Mfg. Corp. v. PNC Bank* (In re *Loranger Mfg. Corp.*), 324 B.R. 575 (Bankr. W.D. Pa. 2005), and *Official Comm. of Unsec. Creditors of The IT Group, Inc.* v. *Acres of Diamonds, L.P.* (In re *The IT Group, Inc.*), 359 B.R. 97 (Bankr. D. Del. 2006). But the *IT Group* opinion does not address the argument that the statutory definition of "settlement payment" expressly excludes transactions in privately-held stocks. Rather, in that case, the plaintiff urged the court to "consider Congressional intent," 359 B.R. at 100, in excluding from § 546(e) transactions that did not "involve[] a 'true' financial intermediary that deserved protection to ensure a stable securities market," *id.* at 101. As far as the *IT Group* opinion reflects, the plaintiffs supplied no basis in the statute's text for their argument, urging instead that the court should simply rely on policy considerations in following what plaintiffs perceived to be Congress's intent. That mode of analysis, as noted *supra*, was expressly rejected by *Resorts*, and it is therefore unsurprising that the *IT Group* case rejected it as well. But because the *IT Group* opinion did not even consider the statutory argument set forth *supra* Part I-A, it is not persuasive authority for rejecting that argument.

*Loranger* is even less relevant. The *Loranger* court reached its conclusion *without even considering* the key issue of whether the definition of "settlement payment" extends to transactions in stocks that are not publicly traded. It did so because the

plaintiff in *Loranger* "*conceded* that [the transfer at issue] was a settlement payment." 324 B.R. at 584 (emphasis added). The *Loranger* court thus never even cited the definition of "settlement payment" in § 741(8), instead focusing entirely on whether the transaction was "by or to" a "financial institution." *See* 324 B.R. at 583-86. We do not know why the plaintiffs in *Loranger* conceded what would seem to be their strongest argument, but their concession to a bankruptcy court in Pennsylvania has no relevance to this Court's analysis of § 741(8).

A Pennsylvania District Court has also concluded that § 546(e) applies to transactions in privately-held stocks. *See Official Comm. of Unsec. Creditors of Nat'l Forge Co.* v. *Clark* (In re *National Forge Co.*), 344 B.R. 340, 365-66 (W.D. Pa. 2006). But that opinion, for all of its lengthy discussion of *Resorts, Bevill, Kaiser Steel*, and other cases, *see* 344 B.R. at 352-66, never mentions the presence of the term "the securities trade" in § 741(8), nor does it ever consider what that term might mean. Again, it appears that that argument was not presented to the *National Forge* court, which instead addressed (and rejected) arguments based on policy and legislative history, including arguments that the court should "examine[] the congressional intent," *id.* at 361, that "applying § 546(e) to our facts *would* lead to an absurd result," *id.* at 364, and that the involvement of clearing agencies was a key factor to be considered, *see id.* at 365-66. Because *National Forge*, like *Loranger* and *IT Group*, did not address the textual argument presented here, it has no persuasive value.[9]

---

[9]    Lower court decisions from outside the Third Circuit that apply § 546(e) to transactions in privately-held stock, such as *QSI Holdings, Inc.* v. *Alford*, No. 1:06-CV-876, 2007 WL 4557855 (W.D. Mich. Dec. 21, 2007), similarly fail to engage the statutory argument presented here, and thus are similarly unhelpful in resolving it.

On the other hand, a recent Bankruptcy Court decision that *did* consider the statutory argument presented here accepted it, and concluded that the plain language of §§ 546(e) and 741(8) restricts the operation of § 546(e) to publicly-traded securities. The court in *In re Norstan Apparel Shops*, 367 B.R. 68 (Bankr. E.D.N.Y. 2007), first noted the congressional purpose behind § 546(e), and then observed that "while the term 'settlement payment' as used in § 546(e) 'is to be read broadly, the term is not boundless.'" *Id.* at 76 (quoting *Jackson* v. *Mishkin* (In re *Adler, Coleman Clearing Corp.*), 263 B.R. 406, 478 (S.D.N.Y. 2001)); *see also, e.g., Enron Corp.* v. *JP Morgan Securities, Inc.* (In re *Enron Corp.*), Nos. M-47 (GBD) *et al.*, 2008 WL 281972, at *4 (S.D.N.Y. Jan. 25, 2008) ("Not every payment to complete a securities transaction constitutes a settlement payment as a matter of law.") (citing *Resorts* for the proposition that "settlement payment" "includes *almost* all securities transactions," 181 F.3d at 515 (emphasis added)). *Norstan* then noted that "[t]he definition of 'settlement payment' contained in § 741(8) is saved from complete circularity by the concluding phrase, 'or any other similar payment commonly used in the securities trade." 367 B.R. at 76; *see also, e.g., Enron Corp.* v. *JP Morgan Securities, Inc.* (In re *Enron Corp.*), 325 B.R. 671, 685 (Bankr. S.D.N.Y. 2005) (noting that "the reference in section 741(8) to 'or any other similar payment commonly used in the securities trade' provided a basis upon which to get around the circularity of the definition and discern the meaning of the term 'settlement payment.'"). The court then explained:

> The "securities trade" in this statutory context plainly means the public securities markets. To stretch the statutory definition of "settlement payment" to include any payment made for securities, whether or not involving the public securities markets, would not only deprive the definition of meaning, it would also render superfluous the statutory examples of types of settlement payments enumerated in § 741(8).

It is axiomatic that a statute is not to be interpreted in such a way as to render any of its provisions superfluous or meaningless.

367 B.R. at 76-77 (citing *TRW, Inc.* v. *Andrews*, 534 U.S. 19, 31 (2001)).

The *Norstan* court's analysis is far more persuasive than that offered by the Bankruptcy Court in this case. *Norstan* not only gave meaning to every word contained in the relevant statutes, it also harmonized them with Congress's clear intent (as set forth *supra* Part I-B). *Norstan*'s analysis is also consistent with the general policy that avoidance powers of trustees in bankruptcy are intentionally broad in order to ensure the largest and fairest possible distribution to all creditors, and that exceptions to the trustee's avoidance powers (like § 546(e)) should be narrowly construed. *See, e.g., Bevill,* 878 F.2d at 751; *In re Bullion Reserve of N. Am.*, 922 F.2d 544, 546 (9th Cir. 1991) (noting the trustee's "broad powers" to avoid preferences and fraudulent transfers); *In re Russell*, 927 F.2d 413, 416 (8th Cir. 1991) (noting that trustee's avoidance powers are "so broad" that they may reach transfers deemed "irrevocable" under state law); *In re AppOnline.com, Inc.*, 315 B.R. 259, 282 (Bankr. E.D.N.Y. 2004) (avoidance powers are construed narrowly); *In re CIS Corp.*, 195 B.R. 251, 257 (Bankr. S.D.N.Y. 1996) (same); *Richardson* v. *FDIC* (In re *M. Blackburn Mitchell, Inc.*), 164 B.R. 117, 128 (Bankr. N.D. Cal. 1994) (same). In contrast, the court below ignored critical words of the definition of "settlement payment," and in the process reached a result that is demonstrably at odds with what Congress was trying to accomplish in enacting § 546(e).

In sum, there is only one way to reconcile the statutory text, congressional intent, bankruptcy policy, and binding case law. Cases from the Supreme Court and from the Third Circuit require that, whenever possible, statutes be read to give meaning to every

27

word they contain. *See, e.g., TRW*, 534 U.S. at 31; *Rosenberg*, 274 F.3d at 141. That principle requires that the words "in the securities trade" in § 741(8) be given meaning, and the best interpretation of those words is as a reference to the public securities markets. Section 546(e), therefore, does not exempt transactions in privately-held stocks from avoidance. That interpretation, in addition to giving effect to every word of the relevant statutes, is also the best way to bring the statutes into line with their "object and policy," *Pilot Life Ins. Co.* v. *Dedeaux*, 481 U.S. 41, 51 (1987), as clearly shown in § 546(e)'s legislative history, and in light of bankruptcy policy that exceptions to the trustee's avoidance powers are narrowly construed. Neither *Resorts* nor any other Third Circuit case has addressed the application of § 546(e) to transactions involving privately-held companies, and this Court is not bound by dicta in *Resorts* that might appear to extend the interpretation of § 741(8) to such transactions.

## II.     Actual Fraud is Not A Prerequisite for Considering the January and Rex LBOs as Single Transactions

Courts have routinely considered financial transactions comprising multiple steps, such as an LBO, as single transactions when presented with claims of fraudulent conveyance based on either constructive or actual fraud. See, *Official Comm. of Unsec. Creditors* v. *Fleet Retail Fin. Group* (In re *Hechinger Inv. Co. of Del.*), 274 B.R. 71, 81 (D. Del. 2002) ("the vast majority of courts now agree that extending fraudulent conveyance provisions to LBO transactions is proper").

Relying on the Third Circuit's seminal decision in *United States* v. *Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986), *cert. denied sub nom. McClellan Realty Co. v. U.S.*, 483 U.S. 1005 (1987), the District Court of this District has analyzed and endorsed "collapsing" the stages of a leveraged buyout as follows:

Regardless of the various complex structures of leveraged buyouts, which often involve various loans, stock purchases, mergers, and repayment obligations, courts have found that a set of transactions may be viewed as one integrated transaction if the transactions "reasonably collapse into a single integrated plan and either defraud creditors or leave the debtor with less than equivalent value post-exchange." In *Tabor Court Realty*, the Third Circuit agreed that the district court properly collapsed the steps of an LBO transaction in that case in order to determine fraudulent conveyance liability and stated that the district court "looked beyond the exchange of funds between [the lender] and the [debtors]" because "[t]he two exchanges were part of one integrated transaction."

Courts thus focus "not on the structure of the transaction but on the knowledge and intent of the parties involved in the transaction."

*Hechinger*, 274 B.R. at 90-91 (citations omitted).

In addition to *Tabor Court Realty* and *Hechinger*, numerous cases from this circuit and others have concluded that, when testing for fraudulent conveyancing, the several stages of a financed transaction should be viewed as one (see *Voest-Alpine Trading USA Corp.* v. *Vantage Steel Corp.*, 919 F.2d 206, 212-213 (3d Cir. 1990) (district court's finding that series of transactions in LBO should be telescoped "into a single consolidated unit" based on an evaluation of the "'simultaneity' and 'purpose'" of the two transactions which included collaboration of parties to the two transfers); *Moody* v. *Security Pacific Bus. Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992); *HBE Leasing Corp.* v. *Frank*, 48 F.3d 623, 635 (2d Cir. 1995) (noting, "[c]ourts have 'collapsed' a series of transactions when it appears that despite the formal structure erected and the labels attached, the segments, in reality, comprise a single integrated scheme when evaluated focusing on the knowledge and intent of the parties involved in the transaction"); *Mellon Bank* v. *Metro Communications*, 945 F.2d 635 (3d Cir. 1991), *cert. denied sub nom. Comm. Unsec. Creditors* v. *Mellon Bank*, 503 U.S. 937 (1992); *Lippi* v. *City Bank*, 955 F.2d 599, 610 (9th Cir. 1992) (Ninth Circuit, relying on *Tabor Court Realty*, collapsed a

multi-stage leveraged buyout transaction into one to analyze violation of Hawaii stock repurchase laws where lender/defendant had "knowledge of the planned purchase"); *Wieboldt Stores, Inc.* v. *Schottenstein*, 94 B.R. 488, 502 (Bankr. N.D. Ill. 1988) (noting that when collapsing multi-stage LBO, cases require "that a court should focus not on the formal structure of the transaction but rather on the knowledge or intent of the parties involved in the transaction"); *Crowthers McCall Pattern Inc.* v. *Lewis*, 129 B.R. 992 (S.D.N.Y. 1991); *Rosener* v. *Majestic Mgmt., Inc.* (In re *OODC, LLC*), 321 B.R. 128 (Bankr. D. Del. 2005); *Murphy* v. *Meritor Savings Bank (*In re *O'Day Corporation)*, 126 B.R. 370, 394 (Bankr. D. Mass. 1991) ("in analyzing the fair consideration requirement of the UFCA in the LBO context, courts not infrequently "collapse" the discrete steps employed by the parties in structuring the transaction"); and *Brandt* v. *Hicks Muse & Co., Inc.* (In re *Healthco Int'l, Inc.*), 195 B.R. 971 (Bankr. D. Mass. 1996)).

### A.    The Third Circuit Has Expressly Rejected A Transferee's Intent to Defraud as the *Sine Que Non* for Collapsing an LBO

While the bankruptcy court apparently accepted that LBOs should be collapsed in cases alleging fraudulent transfers, he misread the Third Circuit case law to impose a requirement of bad faith or actual fraud by the transferees before the stages of an LBO may be examined as one. Opinion at 14-15 ("Absent proof of intent to defraud, independent transactions will not be collapsed"). The case law cited by the court, notably *Tabor Court Realty*, in fact goes to great lengths to draw the opposite conclusion.

The Third Circuit in *Tabor Court Realty* reviewed the district court's decision setting aside certain mortgages as fraudulent conveyances pursuant to Pennsylvania's

Uniform Fraudulent Conveyance Act ("UFCA")[10]; the mortgages were given, then assigned, as part of a leveraged buyout. 803 F.2d 1288. The lender group raised two arguments on appeal that required the court to address application of the law of fraudulent conveyance to a multi-level transaction, both times the Third Circuit refused to impose motive or intent as a prerequisite to considering the serial steps of the buyout as a single transaction.

First, the lender group argued that the UFCA did not apply to their limited participation in one stage of the LBO because it had no motive to defraud the borrowers' creditors. *Id.* at 1295. Of particular importance to the Third Circuit in rejecting the lender group's argument was that, as here, the plaintiff had alleged the mortgagees' violation of a "constructive fraud" provision of the Pennsylvania fraudulent conveyance statute[11], which defines a fraudulent conveyance as one "made by a person 'who is or will

---

[10]    While the Trustees' fraudulent conveyance claims were brought pursuant to Delaware's Uniform Fraudulent Transfer Act ("UFTA"), the wording and concepts of the two are substantially similar with respect to the issues raised here. *In re Carrozzella & Richardson,* 286 B.R. 480, 483 n. 3 (D.Conn. 2002) ("With few exceptions, the basic principles governing fraudulent transfer actions are the same, regardless of the statutory basis used"); *Official Committee of Unsecured Creditors v. Welsh,* 238 B.R. 819, 823 (Bankr. W.D. Mo. 1999) (noting that cases decided under either the UFCA or UFTA were persuasive authority for similar issues arising under the fraudulent conveyance provision of the Bankruptcy Code, quoting, 5 Collier on Bankruptcy ¶ 548.01[4], p. 548-8 (15th ed. rev.1999)); *Pajaro Dunes Rental Agency, Inc. v. Spitters* (In re *Pajaro Dunes Rental Agency, Inc. ),* 174 B.R. 557 (Bankr. N. D. Cal. 1994) (noting the similarities in UFCA, UFTA, and Bankruptcy Codes and accepting case law for all in support of fraudulent conveyance claims).

[11]    The Trustee alleges constructive and fraudulent conveyance claims against the defendant shareholders pursuant to 6 Del. Code § 1304 and § 1305 (also known as the Uniform Fraudulent Transfer Act ("UFTA"), 6 Del. Code §1311), made applicable to this proceeding through 11 U.S.C. §544 of the United States Bankruptcy Code[11]. Section 1304, in relevant part, provides that a transfer is constructively fraudulent and thus may be avoided, if it is made 1) without receiving equivalent value and "the debtor . . . was engaged or about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction." §1304(a)(2)(a&b). Section 1305 allows the Trustee to avoid a transfer when,

        A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or obligation was incurred if the debtor made

be thereby rendered insolvent, is fraudulent as to creditors, *without regard to his actual intent*, if the conveyance is made . . . without a fair consideration.'" (citation omitted) (emphasis supplied). *Id.* at 1296. Fair consideration is defined by statute, "as an exchange of a fair equivalent . . . in good faith." *Id.* While the defendants urged the court to look to the lender's "*motive*" in determining its good faith, the court refused, stating, "[w]e are uneasy with such a standard because these words come very close to describing intent." *Id.* (emphasis in original). To the contrary, the Third Circuit declared, because the statute "excludes an examination of intent, it follows that 'good faith' must be something other than intent; because [the statute] also focuses on insolvency, *knowledge* of insolvency is a rational interpretation of the statutory language of lack of 'good faith.'" *Id.* (Emphasis supplied).

The lender group persisted, arguing that the two loans that comprised the LBO should not be collapsed into one for determining whether the consideration received was fairly equivalent to what the target companies gave up. *Id.* at 1302. Again, the Third Circuit squarely rejected their argument, citing the simultaneity of the various transactions and the notion that the target was merely a conduit for borrowed funds: "We are satisfied with the district court's conclusion that the funds 'merely passed through the borrowers to [the acquiring company].' This necessitates our agreement with the district court's conclusion that, for purposes of determining ITT's knowledge of the use of the proceeds under [the UFCA], there was one integral transaction." *Id.* at 1302-1303.

---

the transfer or incurred the obligation without receiving a reasonably equivalent transfer in exchange for the transfer or obligation and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation.

§ 1305(a).

Without question, the Third Circuit's *sine que non* for collapsing an LBO was neither the transferee's bad faith nor intent to defraud, but knowledge of the global deal. *Id.* at 1302, n. 8 ("Notably, [the lender group's] arguments could have some validity where the lender is *unaware of the use to which loan proceeds are put*. That is not the case here . . . Try as [the lender group] might to distance themselves from the transaction now, they cannot rewrite history" (emphasis supplied)). In fact, some courts have read *Tabor Court Realty* to say that *constructive* knowledge of the series of transfers on the part of the transferee is enough to compel collapsing. *HBE Leasing,* 48 F. 3d at 636 ("the transferee need not have actual knowledge of the scheme that renders the conveyance fraudulent. Constructive knowledge of fraudulent schemes will be attributed to transferees who were aware of circumstances that should have led them to inquire further into the circumstances of the transaction, but who failed to make inquiry," citing *Tabor Court Realty*, 803 F.2d at 1295).

In *Voest-Alpine Trading USA Corp.* v. *Vantage Steel Corp.,* 919 F.2d 206, 212-213 (3d Cir. 1990), the other case cited by Judge Gross as a basis for refusing to collapse the Plassein LBOs, the Third Circuit affirmed its position as set out in *Tabor Court Realty*, citing particularly note 8, quoted *supra*, referring to the lender's knowledge or lack thereof, as a basis for "telescoping" an LBO. *Id.* at 213. While it is true that the Third Circuit in *Voest-Alpine* found that the single integrated transaction was aimed at "depriving [the target company's] unsecured creditors of [its] assets," and functioned as a "subterfuge," the finding of the participants "actual intent" to defraud creditors was not a prerequisite to collapsing the transaction. Rather, the plaintiff alleged both actual and constructive fraudulent conveyances, and actual fraudulent intent was found and

affirmed. However, the Third Circuit made plain that it would have telescoped the multiple stages of the *Voest-Alpine* conveyance at issue even if constructive fraud was the only theory available to avoid the transfer. *Id.* at 214-215 ("Thus, even if no finding of 'actual intent' . . . had been found, the fraudulent nature of the conveyance in question would still be beyond dispute . . . This legal conclusion emerges from the district court's findings that they Stablers had arranged a series of transactions that rendered Paige insolvent through foreclosure . . .while conveying Paige's assets . . . without fair consideration"). This result makes sense. From the standpoint of the debtors' creditors, the intended benefactors of fraudulent conveyance statutes, there is no basis for distinguishing LBOs spawning fraudulent conveyances accomplished by actual fraud from those that are by statute constructively fraudulent.

**B.      Collapsing the January and August LBOs is Appropriate on the Facts Presented by the Trustee**

Here, both the January and Rex Transactions were virtually simultaneous, multi-step LBOs that were considered by the participants, including the defendant shareholders, to be components of a whole. *See* Funds Flow Memoranda, attached to the Complaint as Exhibits A & F. The Funds Flow memoranda show that all major stages of each LBO closed on the same day (January 10, 2000 and August 15, 2000, respectively). Each of the target companies was closely held by few shareholders (*see* Funds Flow Memorandum at Exhibit A to Complaint, pp. P08848 and P08849; Funds Flow Memorandum at Exhibit F to Complaint, p. P02557; Complaint at ¶¶ 40, 53 (in one case, only one, Complaint at ¶ 40), some of which had a continuing interest in the new entity (Funds Flow Memorandum at Exhibit A to Complaint, pp. P08856 and P08857 (Marshall shareholders), P08859 (Plastical shareholder)). As stated above, each defendant signed

34

shareholder agreements by which they received a premium for the simultaneous delivery of their stock in the Target Companies to Plassein. The Trustee has alleged ample facts demonstrating that the shareholders knew or should have known of all of the stages of the transaction and that, at the end of the day, the acquired Target Companies received little or no value in exchange for the substantial new burden of debt for which each became responsible as a result of the two LBOs. Furthermore, as set forth in the Funds Flow Memoranda, the components of the transaction were plainly mutually dependent – each step was critical to the occurrence and closing of the others. *Official Comm. of Unsec. Creditors of Nat'l Forge Co.* v. *Clark (In re National Forge Company)*, 344 B. R. 340, 347 (W. D. Pa. 2006) (noting that a consideration for collapsing an LBO is "whether each step would have occurred on its own or, alternatively, whether each step depended upon the occurrence of the additional steps in order to fulfill the parties' intent").

Collapsing the Plassein LBOs for purposes of determining the shareholders' liability here, where they unquestionably participated in the respective overall scheme for Plassein's two LBOs, is appropriate. "In equity, 'substance will not give way to form, [and] technical considerations will not prevent substantial justice from being done.'" *Orr* v. *Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) (where lender knew of entire restructuring plan, which was not supported by fair consideration, setting aside mortgage was proper, quoting, *Pepper* v. *Litton,* 308 U.S. 295, 305 (1939)).

Finally, the bankruptcy court states, "The Complaint fails to state a claim for avoidance of a fraudulent conveyance because the Trustee does not allege that either Plassein or any other Debtor made transfers to the Shareholders. Instead, the Trustee asserts that Packaging, a non-

debtor, through Fleet Bank, paid for the shares of the Target Companies.    Since no Debtor made a transfer, there is no legal basis for any fraudulent conveyance claim." Opinion at 14.  The bankruptcy court misreads the Complaint.

In the first instance, the Trustee has alleged that Plassein, one of the debtors, made transfers to the shareholders of the Target Companies, through Fleet Bank. Complaint at ¶¶32, 33, 52, 53.    Plassein was formerly known as Plassein Packaging Corp.("Packaging"), which is the corporate name that appears on some of the documents from the time of the transactions in 2000, which are appended to the Complaint and the Bennett Affidavit.  Thus the Debtor Plassein and Packaging are one and the same.  *See* Bennett Aff. at ¶ 11; Voluntary Petition (at Schedule 1, "List of Other Names Used by Debtors")[12].  Further, the Trustee has alleged that the Target Companies made transfers to the defendant shareholders, Complaint at ¶¶ 68, 69, 71, 74, 75, 77,80, 81, 83, 86, 87, 89, 92, 93, 95.    While tracing the transfers from the Target Companies to the defendant shareholders requires a conceptual collapse of each leveraged buyout (in January and August of 2000), as stated above, the authority for doing so is ample.

---

[12]    The Debtors' Voluntary Petition, which was filed with the United States Bankruptcy Court for the District of Delaware, is both a public record and part of the record of the underlying bankruptcy case, and therefore is properly considered on a motion to dismiss for failure to state a claim. *Oshiver* v. *Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-1385 n.2 (3d Cir. 1994) (on motion pursuant to Fed. R. Civ. P. 12(b)(6), court stated, "[w]e also may consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case"); *End of the Road Trust* v. *Terex Corporation*  (In re *Fruehauf Trailer Corporation*), 250 B.R. 168, 183 (D. Del. 2000).

**CONCLUSION**

Wherefore, William Brandt, as he is the Trustee of the Estates of Plassein International Corp., et al., respectfully requests that the Bankruptcy's Order dismissing his Complaint be *reversed.*

Respectfully submitted,

WILLIAM BRANDT, as he is the Trustee of the Estates of Plassein International Corp., *et al.*

By his attorneys,

CROSS & SIMON, LLC
Christopher P. Simon (No. 3697)
Amy Evans (No. 3829)
913 N. Market St., 11th Floor
P.O. Box 1380
Wilmington, DE 19899-1380
(302) 777-4200
(302) 777-4224 (facsimile)

-and-

HANIFY & KING
Charles R. Bennett, Jr.
Professional Corporation
One Beacon Street
Boston, MA  02108
(617) 423-0400

Dated: February 14, 2008

# Addendum



Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

C Buckley v. Goldman, Sachs & Co.
D.Mass.,2005.
Only the Westlaw citation is currently available.
      United States District Court,D. Massachusetts.
      Dennis J. BUCKLEY, as the Trustee of the Globe
      Holdings, Inc. and Globe Manufacturing Corp.
                    Litigation Trust
                          v.
           GOLDMAN, SACHS & CO., et al.
              No. Civ.A.02-CV-11497RGS.

                     May 20, 2005.

Larry Henin, Mark Weyman, Melissa Golub, Todd
D. Robichaud, Anderson, Kill & Olick, New York,
NY, Vincent F. O'Rourke, Jr., Bowditch & Dewey
LLP, Worcester, MA, for Plaintiffs.
mily C. Shanahan, John D. Donovan, Jr., Ropes &
Gray LLP, Boston, MA, Debra A. Squires-Lee,
Wilmer Cutler Pickering Hale and Dorr LLP, Richard
M. Zielinski, Goulston & Storrs, Rheba Rutkowski,
Bingham Mccutchen LLP, Paul Glickman, Glickman
Turley, LLP, David L. Evans, Hanify & King
Professional Corporation, Boston, MA, for
Defendants.

*MEMORANDUM AND ORDER ON DEFENDANTS'
          MOTIONS TO DISMISS*

STEARNS, J.
   **\*1** On July 24, 2002, Dennis Buckley, in his
capacity as the Litigation Trustee for Globe
Holdings, Inc., and Globe Manufacturing
Corporation (the Globe companies), sued thirty-six
defendants whose involvement in a recapitalization
plan and leveraged buyout (LBO) in July of 1998 is
said to have rendered the Globe companies insolvent
"before the ink was dry." The Trustee, who is seeking
to recover $300 million in damages, has brought
claims on behalf of the estates of the bankrupt debtor-
corporations and their creditors. The defendants can
be sorted into five groups, each of which will be
described. The groups in various combinations seek
to dismiss the entirety of the Trustee's Complaint,

although not always on the same grounds. After a
conference with the parties, the court agreed to hold
three separate hearings on the motions.[FN1]

         FN1. The hearings were held on May 22,
         2003, May 30, 2003, and June 14, 2004. A
         fourth hearing was held on May 27, 2004,
         on an unrelated issue raised *sua sponte* by
         the court.

   The basic facts set out in the Complaint are as
follows. Globe Holdings was a Massachusetts
corporation. Its headquarters and operating
subsidiary, Globe Manufacturing, were based in Fall
River.[FN2] For over fifty years, Globe Manufacturing
was a leading domestic manufacturer of spandex and
latex elastomeric fibers. The Globe companies were
managed by Thomas Rodgers, Jr., and several
members of his family (the Rodgers defendants).[FN3]

         FN2. Although some corporate names
         differed before the LBO, the parties use the
         post-LBO names, a practice that the court
         will follow.

         FN3. The nine Rodgers defendants include
         five individuals who held management
         positions in the Globe companies, Thomas
         Rodgers, Jr., Thomas Rodgers, III, Robert
         Bailey, Americo Reis, and Lawrence Walsh,
         and four shareholders, Maureen Bateman,
         Sara Rodgers, Robert Stoico, and Gisela
         Rodgers.

   In 1992, Goldman, Sachs & Co. (Goldman
Sachs) and five affiliated limited partnerships (the
Goldman Funds) acquired 46 percent of Globe
Holdings' stock. The purchase gave the Goldman
Funds the right to appoint three members of Globe
Holdings' board of directors. The Goldman Funds
nominated Robert Gregory, Elizabeth Cogan, and
Richard Friedman (the Goldman directors) to serve
on the board. In late 1997, the Rodgers defendants
and the Goldman Funds decided to sell their
respective interests in the Globe companies. Globe
Holdings retained Goldman Sachs as its financial

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

advisor in connection with the sale. Globe Manufacturing hired Valuation Research Corporation (VRC) to evaluate a contemplated LBO. Goldman Sachs, the Goldman Funds, the Goldman directors, and VRC comprise the Goldman defendants.

Goldman Sachs then solicited offers to purchase the Globe companies. The investment banking firm of Code Hennessy & Simmons, LLC (CHS) became interested and recommended that one of its investment funds, Code Hennessy & Simmons III LP (CHSIII), purchase the companies. CHS, CHSIII, and three managers of CHS who were involved in implementing the LBO-Andrew Code, Peter Gotsch, and Edward Lhee-comprise the CHS defendants. The CHS defendants retained the law firm of Kirkland & Ellis to provide legal advice and to prepare the necessary documents. Globe Holdings retained the law firm of Hale & Dorr to do the same. Kirkland & Ellis, Hale & Dorr, and John Burgess, a partner at Hale & Dorr, comprise the Law Firm defendants.[FN4]

> FN4. The Law Firm defendants, along with CHS, VRC, and Goldman Sachs are sometimes referred to in the briefs as the Professional defendants.

On July 31, 1998, the LBO took place. The LBO consisted of a series of transactions: Globe Manufacturing received $121.8 million from several financial institutions (the Bank Group) in the form of a Senior Credit Facility; Globe Manufacturing issued $150 million of senior subordinated notes (the Manufacturing Notes); and Globe Holdings issued $25 million worth of senior discount notes (the Holdings Notes). Globe Holdings simultaneously transferred most of its assets and liabilities to Globe Manufacturing. When all was said and done, Globe Holdings' shareholders had received $243.6 million for the tender of their shares, while Globe Manufacturing owed $120 million in short term debt and $150 million in long term debt to the Bondholders.

*2 The LBO yielded $2.3 million in management bonuses to the officers and directors of the Globe companies. The Professional defendants reaped $8.7 million in fees. Of the $243.6 million paid to the Globe shareholders, the lion's share went to the stockholders of the Goldman Funds, to the Rodgers defendants, and to certain minority shareholders. Of

the minority shareholders, Thomas Roos, Christine Fennelly, Thomas Roos and Geraldine Roos, the M. Rita Trust C and D, Alexander Rodgers, Patricia Hayes, and Daniel Hayes are named as defendants. They are referred to in the briefs as the Outside Shareholder defendants.

After the LBO, Globe Manufacturing scraped along for two and a half years before defaulting on the Senior Credit Facility and Holdings Notes. On January 31, 2001, the Globe companies filed for Chapter 11 bankruptcy in the Northern District of Alabama. On March 14, 2001, the Bankruptcy Court approved the sale of the Globe companies' remaining assets to Radicispandex Corporation for $52 million, leaving unpaid the bulk of the debt incurred as a result of the LBO. On January 23, 2002, the Bankruptcy Court approved the Globe companies' Joint Chapter 11 Plan. The Trustee maintains that under the terms of the Joint Plan, he acquired any cause of action related to the LBO owned by the debtor companies, as well as any related claims belonging to the Globe companies' creditors.

The Trustee's Complaint alleges fifteen causes of action. They are: fraudulent transfer with intent to defraud; fraudulent transfer based on constructive fraud; common-law fraud; breach of fiduciary duty; aiding and abetting breach of fiduciary duty; aiding and abetting fraud; breach of contract; negligence; negligent misrepresentation; gross negligence; professional malpractice; unjust enrichment; breach of the duty of good faith and fair dealing; unlawful distribution; and inevitably, a violation of G.L. c. 93A. The five groups of defendants have each filed motions to dismiss. Collectively, the motions attack all counts of the Complaint.

*More Definite Statement*

Defendants complain that while the Trustee purports to be acting on behalf of both the creditors of the debtor-corporations and the estates of the debtor-corporations, he has failed to specify which claims arise from which of the two groups of entities. The failure impacts upon both the defendants' claims and defenses.[FN5] The fraud claims suffer from the same lack of precision and attribution, forcing defendants to argue contingent theories of dismissal. While the Trustee's opposition clarifies the nature of the claims to some extent, the Complaint has not

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.)
(Cite as: Not Reported in F.Supp.2d)

been amended to incorporate the clarifications. Consequently, the motions to dismiss will be *ALLOWED* without prejudice, in anticipation of the filing of a more definite Amended Complaint.[FN6]

> FN5. For instance, defendants have asserted the affirmative defense of res judicata against claims brought by the Trustee on behalf of the debtor-corporations, but the Complaint does not specify the claims that are alleged to have been acquired from the corporate debtors.

> FN6. While the court could simply stop here and wait for an Amended Complaint to be filed, in the interests of avoiding further delay, the court will assume that the amendments will conform to the positions taken by the Trustee in his opposition, and will rule on the remaining motions to dismiss accordingly.

## Res Judicata

All defendants argue that the claims brought on behalf of the estates of the debtor-corporations are barred by res judicata (claim preclusion). Defendants begin with the proposition that a final judgment in bankruptcy extinguishes a debtor's claims. "Like final judgments, confirmed plans of reorganization are binding on all parties, and issues that could have been raised pertaining to such plans can be barred by *res judicata.*"*In re Heritage Hotel Partnership I,* 160 B.R. 374, 377 (9th Cir.BAP1993), quoting J.S. Gilbert, *Substantive Consolidation in Bankruptcy: A Primer,* 43 Vand. L.Rev. 207, 239 (1990). There is, however, an exception to the general rule. "Under a generally accepted exception to the res judicata doctrine, a litigant's claims are not precluded if the court in an earlier action expressly reserved the litigant's right to bring those claims in a later action."*Apparel Art Int'l, Inc. v. Amertex Enterprises Ltd.,* 48 F.3d 576, 586 (1st Cir.1995), citing *Kale v. Combined Ins. Co. of Am.,* 924 F.2d 1161, 1167 (1st Cir.1991).*Seealso Restatement (Second) of Judgments* § 26(1)(b) (1982).

**\*3** Defendants argue that the judgment approving the Globe companies' Joint Plan and creating the Litigation Trust does not fall within this exception. Relying on *D & K Properties Crystal Lake v. Mut. Life Ins. Co. of N.Y.,* 112 F.3d 257, 261 (7th Cir.1997), defendants contend that "[t]o avoid res judicata the reservation of a cause of action must be both express, as in writing, and express, as in specifically identified," the latter of which the defendants contend the Joint Plan does not do.

The Joint Plan's Reservation of Rights clause, at § VIII-D, states that:

[a]ll claims, rights to payment, causes of action, cross-claims and counterclaims of the Debtors of any kind or nature whatsoever including, without limitation, Causes of Action and Avoidance Actions, against third parties arising before the Confirmation Date that have not been disposed of prior to the Confirmation Date shall be preserved and assigned to the Litigation Trust.

The Plan then explains that the term " 'claim' has the meaning set forth in *section 101(5) of the Bankruptcy Code.*"Under the Bankruptcy Code, 11 U.S.C. § 101(5), a "claim" means:(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Causes of Action" are defined in ¶ 25 of § I-A of the Plan, as follows:[c]auses of [a]ction means all Claims and causes of action now owned or hereafter acquired by the Debtors or the Estates, or any of them, or which may be maintained by the Debtors or the Estates, or any of them, for their own benefit or for the benefit of creditors, whether arising under any contract or under the Bankruptcy Code or other federal or state law, including, without limitation, Avoidance Actions, but excluding Claims and causes of action and related recoveries (a) transferred to the Buyer under the terms of the Asset Purchase Agreement; (b) released pursuant to the Plan; and (c) constituting rights of recharacterization or subordination released pursuant to the Plan.

Similarly, "Avoidance Actions" are defined in ¶ 16 of § I-A as:any claim or cause of action of the Debtors, or either of them, or the Estates or creditors

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

thereof, or any of them, that is or may be the subject of an adversary proceeding or other action under sections 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, or other applicable law.[FN7]

> FN7. In apparent anticipation of defendants' res judicata attack, the Plan at § VIII-D(2), states:

> [t]he foregoing enumeration of potential claims and causes of action is nonexclusive and shall not constitute a limitation or waiver of any claim, right to payment, demand or cause of action not so enumerated. Such claims and causes of action shall not, under any circumstances, be waived, deemed waived or otherwise limited as a result of the failure of the Debtors to describe a particular cause of action with more specificity.... Accordingly, except as otherwise provided in the Plan, Confirmation of the Plan, approval of the Disclosure Statement, entry of the Confirmation Order, and the consummation of the Plan shall not constitute res judicata, collateral estoppel, claim preclusion or issue preclusion so as to preclude the prosecution of any claim or cause of action after Confirmation and will not in any way estop (judicially or otherwise) the Debtors or the Litigation Trustee from transferring to the Litigation Trust or the Litigation Trustee from pursuing any claim or cause of action, except for the claims and causes of action released pursuant to section VII.B of the Plan.

Defendants argue that an improperly reserved claim cannot be salvaged by a boilerplate savings clause.

Defendants argue that the court should be guided by the reasoning of *Browning v. Levy*, 283 F.3d 761, 774-775 (6th Cir.2002). In *Browning*, a reservation of rights, very much like the one at issue in the Joint Plan, was found of too high an order of generality to survive challenge. The plan in *Browning* reserved the Trustee's right to:

*4 enforce any claims ... that the Debtor or its bankruptcy estate may hold against any person or entity, including, without limitation, claims and causes of action arising under sections 542, 543, 544, 547, 548, 550, or 553 of the Bankruptcy Code.

The *Browning* court held that this "blanket reservation was of little value to the bankruptcy court and the other parties to the bankruptcy proceeding

because it did not enable the value of [the successor corporations'] claims to be taken into account in the disposition of the debtor's estate. Significantly, it neither names [the defendant law firm] nor states the factual basis for the reserved claims. We therefore conclude that [the corporation's] blanket reservation does not defeat the application of res judicata to its claims against [the law firm]."[FN8] *Id.* at 775.

> FN8. But see *In re Kmart Corp.*, 310 B.R. 107 (Bankr.N.D.Ill.2004), where after a comprehensive survey of cases, including *Browning* and *D & K Properties*, the court concluded that:

> identifying causes of action by type or category are not mere blanket reservations. Therefore, categorical reservation can effectively avoid the *res judicata* bar. Dispensing with a requirement of cataloging claims by name comports with the Court's view ... that section 1123(b)(3) does not require "specific and unequivocal" identification. It also comports with the Court's observation that the section is "broad enough to encompass both those situations where a debtor is trying to preserve a potential future claim about which the affected party has no notice and the subset of claims that have already been filed.

> *Id.*, 310 B.R. at 124.

While *Browning* is a well-reasoned case, a more recent (and for this court, controlling) decision, *In re Bankvest Capital Corp. .*, 375 F.3d 51, 59-60 (1st Cir.2004), parts company with *Browning*.

Several circuits have concluded that, pursuant to sections 1123 and 1141, confirmation of a plan is given res judicata effect, which bars a debtor or trustee from bringing avoidance actions not expressly reserved in the plan. See,e.g.,*P.A. Bergner & Co. v. Bank One, Milwaukee, N.A. (In re P.A. Bergner & Co.)*, 140 F.3d 1111, 1117-18 (7th Cir.1998); *McFarland v. Leyh (In re Texas Gen. Petroleum Corp.)*, 52 F.3d 1330, 1335 n. 4 (5th Cir.1995); *Harstad v. First American Bank (In re Harstad)*, 39 F.3d 898, 903 (8th Cir.1994); *In re Mako*, 985 F.2d 1052, 1056 (10th Cir.1993)."The requirement that retention of the avoidance powers be clear serves to protect the unsecured creditors and to ensure that post-confirmation avoidance proceedings are for their benefit."*In re Mako*, 985 F.2d at 1056 (10th Cir.1993).

Assuming, without deciding, that we follow the reasoning of these decisions, Fleet's argument fails

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

because the Plan expressly provides that Gray has the right to pursue avoidance actions:

The Liquidating Supervisor, under the supervision of the Post-Effective Date Committee ... is authorized to investigate, prosecute and, if necessary, litigate, any Cause of Action [the definition of which expressly includes avoidance actions] ... on behalf of the Debtor and shall have standing as an Estate representative to pursue any Causes of Action and Claim objections, whether initially filed by the Debtor or the Liquidating Supervisor....

Fleet contends that this language does not preserve the right to pursue claims as it fails specifically to mention the claim against Fleet. Compare *D & K Props. Crystal Lake v. Mut. Life Ins. Co. of N.Y.,* 112 F.3d 257, 260-61 (7th Cir.1997) (stating, "[a] blanket reservation that seeks to reserve all causes of action reserves nothing."). We disagree. See *Bergner,* 140 F.3d at 1117 (stating, "[t]he courts that have spoken of the need for 'specific' and 'unequivocal' language have focused on the requirement that plans unequivocally retain claims of a given type, not on any rule that individual claims must be listed specifically.") (citations omitted); *Harstad,* 39 F.3d at 903 (ruling that debtors "should have specifically reserved the right to pursue claims of this sort postconfirmation."); *Cohen v. TIC Fin. Sys. (In re Ampace Corp.),* 279 B.R. 145, 160 (Bankr.D.Del.2002) (stating, "the Bankruptcy Code contemplates that debtors may seek confirmation of their plans prior to litigating all avoidance actions ... [t]herefore, in my opinion, a general reservation in a plan of reorganization indicating the type or category of claims to be preserved should be sufficiently specific to provide creditors with notice that their claims may be challenged post-confirmation.") (citations omitted). The cases upon which Fleet primarily relies involve provisions of a far more general nature. See *D & K Properties Crystal Lake,* 112 F.3d at 259 (plan purported to reserve "all causes of action existing in favor of the Debtor."); *Harstad,* 39 F.3d at 902 (plan purported to reserve "any right of Debtors to recover assets pursuant to the provisions of the Bankruptcy Code."). The Plan, we believe, adequately preserves Gray's right to bring avoidance actions.

*5 The language of the Joint Plan is comparable to that in *Bankvest* as the reservation of rights specifically references "Avoidance Actions." Moreover, the Disclosure Statement that was attached to the Joint Plan stated that the Trustee will pursue "causes of actions" and "claims" relating to the LBO and the recapitalization of the Globe companies. Moreover, Section II.C. of the Disclosure Statement provides that:

[c]ertain entities, including the Manufacturing Bondholders Committee and Trade Creditors Committee, have asserted that the Recapitalization gave rise to fraudulent transfer claims against the selling shareholders, the Lending Group and others.... Claims related to the Recapitalization against parties other than the Released Parties are reserved and, pursuant to the Plan, shall be transferred to and pursued by the Litigation Trust for the benefit of the Debtors' creditors.

Because the Joint Plan provides sufficient notice that claims arising out of the LBO were intended to survive the bankruptcy judgment, they are not barred by res judicata.[FN9] Consequently, the defendants' motions seeking dismissal on this ground are DENIED.

> FN9. Defendants' attack on the Trustee's ability to bring claims on behalf of the corporations' creditors is similarly misplaced. Defendants contend (correctly) that a bankruptcy trustee does not stand in the shoes of the debtor's creditors. The Trustee, however, is not bringing the creditors' claims in his capacity as a bankruptcy trustee, but in his capacity as a Litigation Trustee to whom the creditor claims have been assigned. There is nothing untoward (or unusual) about a trustee acting in such a dual capacity. See *Young v. Lepone,* 305 F.3d 1 (1st Cir.2002).

*Fraudulent Transfer Claims*

The Trustee has alleged a transfer with intent to defraud in Count I and a transfer based on constructive fraud in Count II.[FN10] While the Complaint fails to specify the statutory or common-law basis for these claims, the Trustee in his opposition states that Counts I and II are brought pursuant to 11 U.S.C. § 544(b), which empowers a trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim....[FN11]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

AD000005

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.)
(Cite as: Not Reported in F.Supp.2d)

Page 6

FN10. The Trustee has pled a related claim of unjust enrichment in Count XII.

FN11. A bankruptcy trustee (or his successor) is also authorized by § 548(a) of the Bankruptcy Code to bring a fraudulent transfer claim. The claim, however, must be brought within the two-year limitations period, and is therefore not applicable to this case. 11 U.S.C. § 548(a)(1)(A).

The Rodgers defendants, the Outside Shareholder defendants, and the Goldman defendants argue that the "settlement payments" exception to § 544(b) bars the Trustee from asserting these claims.[FN12]

FN12. As the Outside Shareholder defendants are not named in Count I, they have not joined the motion to dismiss this count.

Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment ... or settlement payment, as defined in section 101 or 741 of this title, made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.
11 U.S.C. § 546(e). Defendants maintain that transfers of funds that took place in effecting the LBO were "settlement payments" made through "financial institutions" and therefore fall within the exception. See Kaiser Steel Corp. v. Charles Schwab & Co., 913 F.2d 846, 849 (10th Cir.1990) (Kaiser I); Kaiser Steel Corp. v. Pearl Brewing Co., 952 F.2d 1230, 1239-1240 (10th Cir.1991)(Kaiser II ). Unfortunately, the definition of "settlement payment" referenced by § 546(e) sheds little light on exactly what Congress intended the exception to include. It states that a

*6 "settlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.[FN13]

FN13. 11 U.S.C. § 101 is even less helpful.

11 U.S.C. § 741(8). Judge Queenan of our Bankruptcy Court has aptly observed that "[t]he statutory definition of th[e] term [settlement payment] ... is as opaque as it is circular." In re Healthco Int'l, Inc., 195 B.R. 971, 983 (Bankr.D.Mass.1996).

In a very thoughtful opinion, Zahn v. Yucaipa Capital Fund, 218 B.R. 656, 675 (D.R.I.1998), the district court noted that the only function served by the statutory definition is to "point the curious to the common use of the term in the securities trade." As the Zahn court explained.[FN14]

FN14. The extract that follows is lengthy, but I do not think I can improve on Chief Judge Lagueux's analysis.

[t]he securities industry utilizes a "clearance and settlement" system, wherein parties use intermediaries to make trades of public stock which are instantaneously credited, but in which the actual exchange of stock and consideration therefor takes place at a later date. See Wieboldt II, 131 B.R. at 664-65 [ (N.D.Ill.1991) ], (citing Neil M. Garfinkel, Note, No Way Out: Section 546(e) Is No Escape for the Public Shareholder of a Failed LBO, 1991 Colum. Bus. L.Rev. 51 (internal citations omitted) ("Note")). This later date is known as the "settlement" date; on this date the trade is "settled" by actually exchanging what was promised on the trade date. Id.

The intermediaries' role in this system is critical; typically there are several layers of brokers on each side of a trade, with a clearing agency positioned in the middle. Id. The clearing agency, on the date of the trade itself, makes entries (credits or debits) in the accounts of its members (financial institutions or brokers), which reflect the trade. Id. Thus, while settlement occurs later, the trade itself is functionally instantaneous. The system depends upon a series of guarantees, made by all parties in the chain, that they will live up to their obligations regardless of a default by another party in the chain. Id. These guarantees allow the parties to trade free of worry about events between the trade date and the settlement date.

The need to preserve the stability of this system led Congress to create the § 546(e) exception to the trustee's avoidance powers. See Jewel Recovery, L.P. v. Gordon, 196 B.R. 348, 352 (N.D.Tex.1996);

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

AD000006

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.)
(Cite as: Not Reported in F.Supp.2d)

*Wieboldt II,* 131 B.R. at 664. If the pre-bankruptcy trades by a bankrupt intermediary could be set aside, then the guarantees that allow the system to function would be threatened, the parties could not proceed with confidence, and a bankruptcy by one party in the chain could spread to other parties in the chain, threatening a collapse of the entire industry. *Id.*

Against this background, it appears unlikely that Congress intended the term "settlement payment" to cover the present transfers. True, these transfers "settled" a purchase and sale of securities. The Tenth Circuit has held that payments made by brokers to selling shareholders in an LBO are "settlement payments" covered by the § 546(e) exception. *Kaiser Steel,* 952 F.2d at 1240. Another court, however, has held that such payments were not meant to be covered by § 546(e).*Wieboldt II,* 131 B.R. at 664-65. In addition, commentators have criticized *Kaiser* for applying § 546(e) in a situation that did not implicate the concerns behind that exception. *See,e.g.,* Frank R. Kennedy & Gerald K. Smith, *Fraudulent Transfers and Obligations: Issues of Current Interest,* 43 S.C. L.Rev. 709 (1992); William C. Rand, *Comment,In re Kaiser Steel Corporation: Does Section 546(e) of the Code Apply to a Fraudulent Conveyance Made in the Form of an LBO Payment?,* 19 Fordham Urb. L.J. 87 (1991); Jane Elizabeth Kiker, Casenote, *Judicial Repeal of Fraudulent Conveyance Laws: Kaiser Steel Corp. v. Charles Schwab & Co.,913 F.2d 846 (10th Cir.1990),* 14 Hamline L.Rev. 453 (1991).

*7 In both *Kaiser* and *Wieboldt II,* the LBOs involved the clearance and settlement system; while the respective courts split on whether the LBOs were sufficiently connected to the system to justify the application of § 546(e), the system was at least involved. *Kaiser Steel,* 952 F.2d at 1235-36;*Wieboldt II,* 131 B.R. at 664-65.

Here, however, the question is not nearly as close.... The only possible link between this transaction and the securities industry is the fact that securities were sold; however, the stock at issue was not even publicly traded. The stock transfers thus had no connection whatsoever to the clearance and settlement system, and allowing avoidance would have no impact at all on that system.

*Id.,* at 675-676.[FN15]

FN15.*Seealso*In re Healthco Int'l, Inc., 195 B.R. at 983 ("Congress intended to protect ordinary course of business transfers related

to the purchase or sale of securities ... [and was] concerned that avoidance of such transfers would leave a securities clearing agency exposed on its guaranty of payment of the sales price and delivery of the securities. The payment [at issue] was a one-time distribution in complete liquidation of its stock interest. These circumstances, particularly where there is no showing of a guaranty by a securities clearing agency, are not what Congress had in mind in enacting section 546(e).").

The holding in *Zahn* is unmistakably at odds with *Kaiser,* as well as with *In re Resorts Int'l, Inc.,* 181 F.3d 505, 515 (3rd Cir.1999).[FN16] In *Resorts Int'l,* the Third Circuit was persuaded that the term "settlement payment" was expansive enough in meaning to encompass payments made to bring about an LBO.

FN16.*Seealso*Hechinger Inv. Co. of Del. v. Fleet Retail Fin. Group, 274 B.R. 71, 86-89 (D.Del.2002) (agreeing with *Kaiser* and *Resorts Int'l* ).

In the securities industry, a settlement payment is generally the transfer of cash or securities made to complete a securities transaction. *See*Kaiser Steel Corp. v. Charles Schwab & Co., 913 F.2d 846, 849 (10th Cir.1990) (citing various securities industry texts). Here, the securities passed from Lowenschuss's broker, Merrill Lynch, to the transfer bank, Chase Manhattan. Resorts wired funds to Chase which Chase then forwarded to Merrill Lynch who paid Lowenschuss. Although no clearing agency was involved in this transfer, two financial institutions-Merrill Lynch and Chase-were. Under a literal reading of section 546, therefore, this was a settlement payment "made by ... a financial institution." 11 U.S.C. § 546(e).

*Id.* at 515.Thus, the court could "see no absurd result from the application of the statute's plain language and [we] will not disregard it."[FN17]*Id.* While the Third Circuit's conclusion is etymologically defensible, as Judge Learned Hand observed "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.)
(Cite as: Not Reported in F.Supp.2d)

guide to their meaning."(Judge Hand is quoted in both *Bevill, Bresler & Schulman Asset Management Corp. v. Spencer Sav. & Loan Ass'n,* 878 F.2d 742, 750 (3rd Cir.1989), and *In re Healthco Int'l, Inc.,* 195 B.R. at 983). The object that Congress sought to accomplish by enacting § 546(e) was to protect the operation of the security industry's clearance and settlement system. That interest is not furthered in any meaningful sense by bringing an LBO like the one at issue in this case under the exemption of § 546(e) simply because funds fortuitously passed through financial institutions on their way into the hands of the defendants.[FN18]Consequently, defendants' motions to dismiss the fraudulent transfer counts will be *DENIED.*[FN19][FN20]

> FN17.*But see*Mun*ford v. Valuation Research Corp.,* 98 F.3d 604, 610 (11th Cir.1996), holding that even if a payment is a settlement payment under § 546(e), the exemption is not applicable in an LBO unless the transfer (or settlement payment) was ultimately made "by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency."Because the recipients of the allegedly fraudulent transfers in this case were the shareholders, under *Munford'*s reasoning, § 546(e) would not apply.

> FN18. The sale of securities at issue was the shareholders' tender of their shares to the Globe companies. This transaction is not the type of securities trade the avoidance of which would avert injury to the securities industry as it does not expose buyers and sellers who were strangers to the transaction to liability or loss.

> FN19. The CHS defendants point out that CHS has been improperly named in Count II. The $25 million bridge loan alleged by the Trustee to have been a fraudulent transfer was made by CHSIII and not CHS. Similarly, the CHS defendants note that the individually named CHS defendants are not alleged by the Trustee to have been recipients of the disputed funds. Both points are well taken and the court will allow the motions to dismiss Counts I and Count II, to

the extent they are alleged against these defendants.

> FN20. Defendants argue that symmetry requires that the unjust enrichment count also be dismissed if the fraudulent transfer counts are barred by § 546(e). Because the court does not agree with the latter proposition, the motion(s) to dismiss Count XII will be *DENIED.*

*Fraud and Misrepresentation*

**\*8** Defendants next attack is on the adequacy of the fraud-related allegations set out in the Complaint. The court will turn first to the arguments that concern only the CHS defendants and the Law Firm defendants. The CHS defendants argue that Count III and Count IX, which allege fraud and negligent misrepresentation, respectively, fail to attribute any misrepresentation or misstatement to any CHS defendant. This is true. Hence, the motion to dismiss Counts III and IX as to these defendants will be *ALLOWED.*Second, the Law Firm defendants, joined by CHS, argue that Counts V and VI, which allege aiding and abetting a breach of fiduciary duty and aiding and abetting fraud (Kirkland & Ellis and Hale & Dorr in Count V, and Kirkland & Ellis, Hale & Dorr, and CHS in Count VI), fail to allege that the defendants acted with unlawful intent. Paragraph 231 of the Complaint contains the only allegation of scienter pertaining to these counts. It states that "the Professional Defendants knew, or should have known, of these actions or designs by Goldman Sachs, the Officers and Director Defendants and/or Valuation Research."Defendants contend (correctly) that the law requires more than mere negligence in this regard.

The second element [of aiding and abetting] is that defendant must have an unlawful intent, i.e., knowledge that the other party is breaching a duty and the intent to assist that party's actions. [*Brown v. Perkins,* 83 Mass. (1 Allen) 89, 98 (1861) ].*See*McGra*th v. Sullivan,* 303 Mass. 327, 21 N.E.2d 533 (1939); The *American Agricultural Chemical Co. v. Robertson,* 273 Mass. 66, 172 N.E. 871 (1930)."

> *Payton v. Abbot Labs,* 512 F.Supp. 1031, 1035 (D.Mass.1981).*See also*Commerc*e Bank & Trust Co. v. Vulcan Industries, Inc.,* 2002 WL 1554389, \*2 (Mass.Sup.Ct. May 17, 2002).[FN21] Consequently, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

AD000008

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.)
(Cite as: Not Reported in F.Supp.2d)

defendants' motions to dismiss Counts V and VI will accordingly be *ALLOWED.*

> FN21. The Trustee points to (then) Judge Breyer's decision in *Maruho v. Miles*, 13 F.3d 6 (1st Cir.1993). Judge Breyer, however, supports the defendants' position. "The Massachusetts courts have made clear that a defendant 'aids and abets' a tortfeasor only if, at the least, the defendant actually *knows* about 'its substantial, supporting role in an unlawful enterprise.' " *Id.* at 10-11.

The court will now turn to the defendants' more global assault on the fraud-related claims. The defendants contend that the purported misstatements and omissions alleged are not actionable, as they fall either broadly into the category of opinion and prediction or are not alleged to have been false when made.

The misrepresentations in the LBO Offering Memorandum identified by the Trustee were as follows.
• "[M]anagement estimates that worldwide sales of spandex fiber will increase at a compound annual growth rate of 9% over the next three years and that fine denier spandex sales will exceed the overall market growth rate during this period. Complaint, ¶ 104.
• The demand for fine denier spandex has "increased faster than the overall market" and "this trend is expected to continue."Complaint, ¶ 105.
• "[T]he Company does not believe that, after giving effect to the Transactions, it (i) was or will be insolvent or rendered insolvent, (ii) was or will be engaged in a business or transaction for which its remaining assets constituted unreasonably small capital or (iii) intends or intended to incur, or believes or believed that it will or would incur, debts beyond its ability to pay such debts as they mature. These beliefs are based on the Company's operating history and analysis of internal cash flow projections and estimated values of assets and liabilities of the Company at the time of the Offering. There can be no assurance, however, that a court passing on these issues would make the same determination."Complaint, ¶ 128.[FN22]

> FN22. The Trustee also alleges, in ¶ 108 of the Complaint, that the language of the

Offering Memorandum "portray[ing] favorable near term growth" is an actionable misrepresentation. But the actual language of the Memorandum from which the "portrayal" is culled simply recites historical facts about Globe's prior record of successful penetration of the domestic spandex market. According to the Trustee, this recital implicitly promises similar success in the future. Not only is this implied promise difficult to read into the historical analysis, there is no allegation that any of the historical facts it recites are untrue.

**\*9** The Trustee also alleges that the Opinion Letter issued by VRC contained the following misrepresentations. The Opinion Letter stated that:
• "Each of (a) Holdings and its subsidiaries on a consolidated basis and (b) the Borrower [New Manufacturing] and its subsidiaries on a consolidated basis are and will be able to pay their respective debts and other liabilities (including, without limitation, the New Financing, the State Liabilities, and the Identified Contingent Liabilities) as such debts become absolute and matured in the ordinary course of business."Complaint, ¶ 114.
• It considers the company's forecasts to be "reasonable and attainable in light of current and near term economic expectations, and nothing has come to our attention that would cause [us] to believe the basic assumptions used in the forecasts were unreasonable."Complaint, ¶ 115.
• "[N]othing [has] come to [our] attention, that causes us to believe that [the Company] would not be viewed as a going concern" after the LBO. Complaint, ¶ 116.

Defendants contend that these statements, read in context with the accompanying cautionary language, are nothing more than opinions and predictions. It has long been the law that statements of a promissory nature or predictions about future events are not actionable unless at the time the statements were made the speaker knew that the predictions were false or the promise impossible to keep. *Commonwealth v. Drew*, 36 Mass. 179, 185 (1837).*See Rodowicz v. Massachusetts Mut. Life Ins. Co.*, 192 F.3d 162, 175 (1st Cir.1999) ("[F]alse statements of opinion, of conditions to exist in the future, or of matters promissory in nature 'are not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

AD000009

actionable in a claim for misrepresentation." '); *In re Fidelity/Apple Securities Litig.*, 986 F.Supp. 42, 49 (D.Mass.1997) ("[M]ere opinions, predictions about future events, and statements that are true when made, are not actionable as misrepresentations under Massachusetts law.").

The first two alleged misrepresentations alleged in the Offering Memorandum state that "management *estimates* that worldwide sales of spandex fiber will increase at a ... rate of 9%," and that "this trend [of increased demand for] fine denier spandex is *expected* to continue."[Emphasis added]. The third states that "the Company does not *believe* that, after giving effect to the Transactions, it (i) was or will be insolvent or rendered insolvent, (ii) was or will be engaged in a business or transaction for which its remaining assets constituted unreasonably small capital or (iii) intends or intended to incur, or *believes* or *believed* that it will or would incur, debts beyond its ability to pay such debts as they mature."[Emphasis added.] Under established law, these statements are not actionable.[FN23]

> FN23. Moreover, the precatory language of the Offering Memorandum specifically warned that "statements regarding the Company's future financial position, business strategy, budgets, projected costs and plans and objective[s] of management for future operations are forward looking statements ... [for which] it can give no assurance that such expectations will prove to have been correct."

The Trustee counters that "[e]ven if [a] statement is viewed as a representation as to future events, it falls within the exception to the general rule precluding recovery [if] it involves a situation 'where the parties to the transaction are not on equal footing but where one has or is in a position where he should have superior knowledge concerning the matters to which the misrepresentations relate." ' *Gopen v. American Supply Co.*, 10 Mass.App.Ct. 342, 345, 407 N.E.2d 1255 (1980), citing Williston, *Contracts* § 1496, at 373-374 (3d ed.1970).*Seealso*Stolzoff v. Waste Systems Int'l, Inc., 58 Mass.App.Ct. 747, 760-763, 792 N.E.2d 1031 (2003) (company officers falsely represented to shareholders that their business was thriving). The Trustee argues that because the defendants had superior knowledge about the market

environment in which the Globe companies operated, their predictive statements should be viewed as assertions of fact. *See*Commonwealth v. Anthony, 306 Mass. 470, 474-475, 28 N.E.2d 542 (1940); Briggs v. Carol Cars, Inc., 407 Mass. 391, 395-396, 553 N.E.2d 930 (1990). The Trustee, for example, contends that the failure to warn readers of the Offering Memorandum that an increase in foreign imports would impact the company's sales and its ability to meet its debt obligations amounts to a misrepresentation by omission. That cheaper imports compete with more expensive domestically produced goods hardly seems the kind of specialized knowledge that defendants would uniquely possess or would be beyond the ability of a reader of the Offering Memorandum to acquire. Moreover, the Offering Memorandum was not silent on the issue of competition.

\*10 The elastomeric fiber industry is highly competitive.... There can be no assurance that the Company will be able to compete successfully in the future against its competitors or that the Company will not experience increased price competition, which could materially and adversely affect the Company's results of operations, financial condition and ability to meet its obligations under the Notes.

In 1997, approximately 92% of the Company's sales were to the textile and apparel industries. These industries are highly cyclical and are characterized by rapid shifts in consumer demand, as well as competitive pressures and price and demand volatility. The demand for the Company's products is principally dependent upon the level of demand for certain types of apparel.... A reduction in the level of demand for apparel or a decrease in consumer demand for products containing elastomeric fibers could have a material adverse effect on the Company's results of operations, financial condition and ability to meet its obligations under the Notes.

This discussion of the potential effects of competition on the Globe companies' later sales would have alerted any reasonable reader to the possibility that fluctuations in the elastomeric fiber market could impact the financial health of any investment. Consequently, the motions to dismiss with respect to the alleged misrepresentations in the Offering Memorandum will be *ALLOWED*.

The conclusion is different with respect to the

AD000010

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.)
(Cite as: Not Reported in F.Supp.2d)

Page 11

VRC Opinion Letter. The statements of VRC identified in the Complaint are presented as the professional opinion of an "acknowledged leader in the rendering of insolvency opinions ... using sophisticated financial modeling."Complaint, ¶ 132. The statements attributed to VRC are not couched as future-oriented or forward looking, but as solid assurances that the debt ratio resulting from the LBO would not overburden New Manufacturing or impair its ability to service the debt. As such, these allegations survive the motions to dismiss.[FN24]

> FN24. Defendants also argue that the fraud claims are not pled with the specificity required by Rule 9(b). I am satisfied that the allegations pled in ¶¶ 111-117, 151-162 of the Complaint, are sufficiently specific with respect to the VRC Opinion Letter. See*Rodi v. Southern N.E. Sch. of Law,* 389 F.3d 5 (1st Cir.2004) (the specificity requirement in a fraud context "extends only to the particulars of the allegedly misleading statement itself"). Defendants may also prove correct in their prediction that the Trustee will be unable to prove reliance, but that issue is not now before the court.

*Duty Based Claims*

The Law Firm defendants, the Goldman defendants, the CHS defendants, and the Rodgers defendants have each moved to dismiss the duty-based claims.[FN25]The Law Firm defendants argue that the claims against them for malpractice, breach of fiduciary duty, and Chapter 93A must be dismissed because the only duty that the law firms owed was to their clients (in Kirkland & Ellis' case, CHS, and in Hale & Dorr's case, Globe Holdings). Defendants acknowledge that under Massachusetts law, an attorney may owe a duty of care to a third party whom he knows is relying on the legal services he is rendering to his client. *The Van Brode Group, Inc. v. Bowditch & Dewey,* 36 Mass.App.Ct. 509, 516, 633 N.E.2d 424 (1994). But as *Spinner v. Nutt,* 417 Mass. 549, 556, 631 N.E.2d 542 (1994), makes clear, the duty to a third party will not be imposed (even where reliance is shown) if it would conflict with the attorney's duty to his client. The Trustee's allegations against the Law Firm defendants fail to identify any duty beyond that owed by each firm to its own client. Consequently, the motion to dismiss the duty-based

claims will be *ALLOWED.*[FN26]

> FN25. The arguments of the Rodgers defendants are addressed in the context of the court's order requiring the Trustee to amend his Complaint to specifically state on whose behalf each of the Trustee's claims are brought.

> FN26. The Law Firm defendants' motion to dismiss the contract-based claims will be *ALLOWED* as the Complaint fails to identify a basis on which a contractual relationship between the defendants and the Trustee entities could be inferred. Nor is any plausible allegation made that the entities were the intended beneficiaries of a contractual relationship between any of the law firm defendants and a third party.

*11 In similar vein, the CHS defendants and the Goldman defendants argue persuasively that the Complaint fails to set forth the basis and identity of any fiduciary or contractual duty that they allegedly owed to any of the entities the Trustee represents. See*Aviall, Inc. v. Ryder Systems, Inc.,* 913 F.Supp. 826, 832 (S.D.N.Y.1996); *Page v. Frazier,* 388 Mass. 55, 64, 445 N.E.2d 148 (1983); *Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.),* 208 B.R. 288, 310 (Bankr.D.Mass.1997).[FN27] Accordingly, the motions to dismiss these claims will also be *ALLOWED.*

> FN27. Defendants also argue that CHSIII, as the buyer in the transaction, did not owe a duty to any of the seller debtor-corporations. The Trustee, however, points out that after the sale, the CHS defendants approved the $25 million loan in alleged breach of the obligations that they assumed as a result of the LBO.

*ORDER*

For the foregoing reasons, the motions to dismiss will be *ALLOWED* consistent with the rulings made within the body of this opinion.

SO ORDERED.

D.Mass.,2005.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

AD000011

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 12

Buckley v. Goldman, Sachs & Co.
Not Reported in F.Supp.2d, 2005 WL 1206865
(D.Mass.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                 Page 1
Slip Copy, 2008 WL 281972 (S.D.N.Y.)
(Cite as: Slip Copy)

**H**In re Enron Corp.
S.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
In re ENRON CORP., et al., Debtors.
Enron Corp., Plaintiff,
v.
JP Morgan Securities, Inc., et al., Defendants.
Enron Corp., Plaintiff,
v.
Mass Mutual Life Insurance Co., et al., Defendants.
**Nos. M-47 (GBD), 01-6034(AJG).**
**Adv. Nos. 03-92677 (AJG), 03-92682(AJG).**

Jan. 25, 2008.

*MEMORANDUM DECISION AND ORDER*

GEORGE B. DANIELS, District Judge.
  *1 Defendants are seeking, pursuant to 28 U.S.C. § 158(a) and Fed.R.Bankr.P. 8003, leave to appeal from the bankruptcy court's order denying their motions to dismiss the amended complaints against them in their entirety, which was entered in two companion adversary proceedings entitled *Enron Corp. v. J.P. Morgan Securities, et al.* (Adv. Pro. No.: 03-92677) and *Enron Corp. v. Mass Mutual Life Insurance Co., et al.* (Adv. Pro. No.: 03-92682). Defendants are also moving, pursuant to 28 U.S.C. § 157(d) and Fed.R.Bankr.P. 5011, for both mandatory and permissive withdrawal of the reference of these adversary proceedings to the bankruptcy court. The motions are denied in their entirety.

  In the amended complaints, the Enron Creditors Recovery Corporation ("Enron") seeks to avoid and recover a number of transfers, that occurred during a five week period immediately preceding its bankruptcy filing, claiming they constitute preferential transfers and constructive fraudulent conveyances. Enron alleges that it transferred over one billion dollars for the purpose of prepaying and/or redeeming its own short-term commercial paper. Enron also alleges that, following a number of negative public announcements bearing on Enron's financial position and its dubious accounting practices, commercial paper holders became alarmed and "urged Enron to prepay the commercial paper immediately, prior to maturity, at its 'approximate accrued par value,' *i.e.,* the price originally paid for the Enron commercial paper plus accrued interest."(Am.Compls.¶ 2). The price was allegedly significantly higher than the notes' market value. Enron contends that the prepayment of the commercial paper violated the very terms of its sale, which expressly prohibited any early redemption or prepayment by Enron.

  Defendants moved to dismiss the amended complaints, pursuant to Fed.R.Civ.P. 12(b)(6) as made applicable by Fed.R.Bankr.P. 7012(b), on the grounds that the challenged transfers are exempt from avoidance pursuant to the safe harbor provision of § 546(e) of the Bankruptcy Code.[FN1]In the absence of actual fraud, a transfer that is a "settlement payment" made, by or to a financial institution, broker or clearing house, to complete a securities transaction is, as a matter of law, protected from avoidance by safe harbor. A "settlement payment," as defined pursuant to § 741(8), "means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade."

    FN1.Section 546(e) provides, in pertinent part:
    [T]he trustee may not avoid a transfer that is a ... settlement payment, as defined in section 101 ... of this title made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title [which pertains to transfers made with actual intent to hinder, delay or defraud creditors].

  The bankruptcy court found that the subject payments were made through the Depository Trust Company ("DTC"), a clearing agency. Nevertheless, the court held that it could not be determined, as a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

AD000013

Slip Copy

Page 2

Slip Copy, 2008 WL 281972 (S.D.N.Y.)
(Cite as: Slip Copy)

matter of law, whether the challenged transfers fell within the protective scope of § 546(e) safe harbor provision, and accordingly denied defendants' motions at this stage of the proceedings. The court identified a number of existing factual issues including: whether the payments were commonly used in the securities trade so as to constitute settlement payments; whether the payments were to complete securities transactions, as oppose to the retirement of debt; and whether Enron's commercial paper is a "security" for purposes of § 547(e). Specifically the "Court conclude[d] that because the § 546(e) safe harbor only protects from avoidance those settlement payments that are 'commonly used in the securities trade' and because, on a motion to dismiss, the Court must accept Enron's allegations as true, evidence must be presented as to whether payments made with respect to short-term commercial paper prior to the maturity date, at significantly above market prices and contrary to the offering documents in the midst of coercion by the holders of the commercial paper resulting from public announcements that made clear that the company is in a severe financial crisis constitute settlement payments commonly used in the securities trade."*Enron Corp. v. J.P. Morgan Sec., Inc.* (*In re Enron Corp.*), 325 B.R. 671, 685-86 (Bankr.S.D.N.Y.2005). The bankruptcy court noted that "it is the payment as associated with the transaction that must be considered as a whole in determining whether the settlement payment is common in the securities trade."*Id.* at 686 n. 7. The court indicated that "evidence must be presented as to whether this particular transaction could be normally regarded as part of the settlement process," and specifically "whether the Transfers were the result of defendants' manipulation."*Id.* at 686 (citation and internal quotation marks omitted).

**\*2** Although the bankruptcy court also found that evidence, regarding whether the transfers were made to retire debt or trade securities, was also necessary, the court did not resolve the issue of whether safe harbor would be equally applicable regardless of whether the transfers were to repurchase the notes or to retire the debt represented by the notes. Nor did the court resolve the question of whether Enron's commercial paper qualifies as a security for purposes of § 546(e). The court indicated that this issue might be rendered moot upon a finding that the transfers were made to retire the debt.

## INTERLOCUTORY APPEAL

Defendants argue that the bankruptcy court misconstrued § 546(e) by limiting it to transactions that, in light of all attendant circumstances, could be considered "common in the securities industry." Defendants contend that, as a result, the court erroneously determined that it was a factual question whether the transfers were exempt from avoidance pursuant to § 546(e). Defendants maintain that the court made two fundamental errors of law in construing the definition of "settlement payment," set forth in § 741(8). First, they argue that the court failed to construe the statute in accordance with mandated rules of statutory construction. Consequently, it is argued that the court erroneously determined that the final clause of the catch-all provision of § 741(8), *to wit,* "commonly used in the securities trade," modifies each of the statute's preceding clauses enumerating specific types of settlement payments (*i.e.*, "preliminary," "partial," "interim," "on account," and "final"). The second claimed error, of which defendants complain, is that the bankruptcy court ignored the plain language of § 741(8), which refers solely to the method of payment rather than the type of transaction. It is argued that the court therefore erroneously concluded that the entirety of the transaction, rather than just the means of payment, must be "common" in the securities trade in order for the payment to qualify as a settlement payment.

The issue sought to be appealed by defendants is whether the bankruptcy court erred in construing § 546(e) by:

(1) holding that the last clause of the definition of "settlement payment," contained in § 741(8), modifies every other clause of that definition;

(2) holding that the transaction at issue, rather than solely the means of payment used in the transaction, must be "commonly used in the securities trade" in order for a payment to be a protected settlement payment; and

(3) holding that the determination of whether the transfer of money, by, to or through stockbrokers, financial institutions and the DTC, in exchange for commercial paper prior to the date of maturity constitutes a securities transaction is a question of fact rather than a question of law? [FN2]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

AD000014

Slip Copy
Slip Copy, 2008 WL 281972 (S.D.N.Y.)
(Cite as: Slip Copy)

Page 3

FN2. A minority of the movants are also seeking leave to appeal the bankruptcy court's denial of their motions to dismiss for lack of personal jurisdiction.

Defendants request that this Court set aside the bankruptcy court's order and grant, or remand with instructions to grant, defendants' motions to dismiss all the claims against them. Alternatively, they request that this Court clarify for the bankruptcy court what factual issues, if any, need to be resolved to determine the applicability of the safe harbor. Defendants note that, upon a reversal of the bankruptcy court's construction of § 546(e), the only remaining issue requiring resolution would be whether Enron's commercial paper is a "security;" a question of law which the bankruptcy court declined to address. Defendants assert that the commercial paper is a "security" under the plain language of the Bankruptcy Code, and hence dismissal is warranted at this time based upon the pleadings.[FN3] Nevertheless, defendants contend that, in the event that this Court finds that remand to the bankruptcy court is necessary for any factual findings, a pronouncement by this Court of the requirements for the application of the statutory safe harbor would materially advance resolution of these matters.

FN3. In defendants' separately filed motions to withdraw the bankruptcy court's references, however, defendants acknowledge that the parties have not "been able to locate controlling, or other, case authority that is squarely on point in addressing whether commercial paper such as the Enron Commercial Paper constitutes a security under either the Bankruptcy Code or Securities Law."Defendants maintain that resolution of this issue "will require substantial and material consideration[,]" and "significant interpretation of various provisions of Securities Law, and securities regulations."

*3 In determining whether to grant leave to appeal an interlocutory order of the bankruptcy court, district courts generally apply the statutory standard, set forth in 28 U.S.C. § 1292(b), governing interlocutory appeals of the district court to the Court of Appeals. See, Quigley Co. v. A.C. Coleman (In re Quigley Co.), 323 B.R. 70, 77 (S.D.N.Y.2005); XO

Commc'ns, Inc. v. Start Invs., Inc. (In re XO Commc'ns, Inc.), 2004 WL 360437, at *3 (S.D.N.Y. Feb. 26, 2004); In re Worldcom, Inc., 2003 WL 21498904, at *9 (S.D.N.Y. Jun 30, 2003). Pursuant to this standard, leave to appeal an interlocutory order requires a showing that the challenged order: (1) "involves a controlling question of law;" (2) to "which there is substantial ground for difference of opinion;" and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation."28 U.S.C. § 1292(b). Additionally, "the party seeking an interlocutory appeal has the burden of showing exceptional circumstances, to overcome the general aversion to piecemeal litigation and to show that the circumstances warrant a departure from the basic policy of postponing appellate review until after entry of a final judgment."In re Worldcom, 2003 WL 21498904, at *10 (internal quotation marks and citations omitted); see also, Koehler v. Bank of Bermuda, Ltd., 101 F.3d 863, 865 (2d Cir.1996) (Noting that "[s]ection 1292(b)'s legislative history reveals that although the law was designed as a means to make an interlocutory appeal available, it is a rare exception to the final judgment rule that generally prohibits piecemeal appeals."). Movants have failed to make the requisite showing, in each necessary respect, to warrant granting them leave to appeal.

"A question of law is deemed to be 'controlling' if reversal of the order would terminate the action, or if determination of the issue on appeal would materially affect the outcome of the litigation."See, In re 127 John St. Assocs., 2005 WL 911488, at *6 (S.D.N.Y. Apr. 18, 2005) (internal quotation marks and citations omitted). It must be purely a "question of law that the reviewing court 'could decide quickly and cleanly without having to study the record.' " Worldcom, 2003 WL 21498904, at *10 (quoting Ahrenholz v. Bd. of Trs. of Univ. of Illinois, 219 F.3d 674, 676-77 (7th Cir.2000)); see also, California Pub. Employees' Ret. Sys. v. Worldcom, Inc., 368 F.3d 86, 96 (2d Cir.2004) ("By its plain terms, Section 1292(b) may only be used to challenge legal determinations.").

The statutory definition of "settlement payment," set forth in § 741(8), has been criticized for its lack of clarity and usefulness. Rather than defining a "settlement payment" in terms of its characteristics, it

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

AD000015

is defined by reference to specific types of settlement payments recognized in the securities industry. *See eg .*, *Kipperman v. Circle Trust F.B.O. (In re Grafton Partners, L.P.),* 321 B.R. 527, 532 (B.A.P. 9th Cir.2005) ("The difficulty with the definition of 'settlement payment' is that it relies on a conclusory laundry list of securities industry terms of art that contain the words 'settlement payment' without articulating the elements of a security payment."); *Zahn v. Yucaipa Capital Fund,* 218 B.R. 656, 675 (D.R.I.1998) ( "Essentially, [the definition] provides that a settlement payment is a settlement payment, and points the curious to the common use of the term in the securities trade."). The interpretation of § 741(8) presents a legal question of statutory construction. However, where a statute, having been properly construed, fails to precisely and clearly define a term so that it can be determined as a matter of law what items are encompassed therein, examination of the factual circumstances of a particular item may be warranted.

\*4 Defendants maintain that had the bankruptcy court properly construed § 741(8), it would have found that the subject payments were settlement payments, as a matter of law, without regard to the commonality of the payment. Defendants argue that because the bankruptcy court interpreted § 741(8) without applying the "last antecedent rule" of statutory construction, as mandated by Second Circuit precedent, the court erroneously found that the statute's catchall provision, *i.e.,* "or other similar payment commonly used in the securities trade," modifies each of the prior clauses identifying specific types of payments.

The Second Circuit Court of Appeals has explained that "[u]nder the last antecedent rule, 'a limiting clause or phrase ... should ordinarily be read as modifying only the noun or phrase that it immediately follows.' " *United States v. Kerley,* 416 F.3d 176, 180 (2d Cir.2005) (*quoting Barnhart v. Thomas,* 540 U.S. 20, 26 (2003); *see also, Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.,* 186 F.3d 210, 215 (2d Cir.1999) ("When a modifier is set off from a series of antecedents by a comma, the modifier should be read to apply to each of those antecedents."). The last antecedent rule is not, despite defendants' contention, a mandatory rule of construction and it may "be overcome by other indicia of meaning ..." *Barnhart,* 540 U.S. at 26; *see also, Nobelman v.*

*American Sav. Bank,* 508 U.S. 324, 330 (1993) (Noting that, while interpreting a statute in accordance with the last antecedent rule "is quite sensible as a matter of grammar," such an interpretation is not necessarily compelled.). Hence, a judicial interpretation of a statute is not manifestly erroneously simply because it was arrived at without the benefit of the last antecedent rule.

Defendants further argue that, even if § 741(8) requires that the payment be common in the securities trade, the bankruptcy court still erred by holding that the transaction, rather than the means of payment, must be common for the safe harbor to apply. Defendants contend that this holding is not only inconsistent with the plain language of the "settlement payment" definition, which refers only to payments, but is also contrary to Congress' intent to only exclude settlement payments made with actual fraudulent intent from safe harbor.

The bankruptcy court did not hold that payments made to complete securities transactions, which are uncommon or even extraordinary, do not qualify as settlement payments. The court, instead, found that a determination of whether a settlement is common in the securities trade requires that "the payment as associated with the transaction ... be considered as a whole ..." *In re Enron Corp.,* 325 B.R. at 686 n. 7. The relevant inquiry for the bankruptcy court was not simply the commonality or routineness of the transaction as recognized in the securities industry. Rather, the court's focus was on the inherent nature of the transaction itself; specifically whether it was a trade of securities or the payment of a debt. Not every payment to complete a securities transaction constitutes a settlement payment as a matter of law. *See, Lowenschuss v. Resorts Int'l, Inc. (In re Resort Int'l Inc.),* 181 F.3d 505, 515 (3d Cir.1999) ("[T]he term 'settlement payment' is a broad one that includes *almost* all securities transactions.") (emphasis added); *see also, In re Kaiser Merger Litig.,* 168 B.R. 991, 1001 & n. 9 (D.Col.1994) (Holding that payment, which was arguably made in connection with a recognized type of securities transaction involving settlement payments, was not exempt from avoidance under safe harbor.).

\*5 Additionally, the bankruptcy court's focus was on the propriety of the transactions as it related to possible manipulation by defendants.[FN4]Where

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

AD000016

transactions are not merely unorthodox, but rather are fundamentally tainted by misconduct or impropriety, such as manipulation, deception or illegality, a payment made to effectuate such transactions has been found not to be common in the securities trade, and hence not a settlement payment. *See eg.,* *In re Grafton,* 321 B.R. at 541;*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.),* 263 B.R. 406, 481 (S.D.N.Y.2001). To afford safe harbor protection under such circumstances would be contrary to the objectives of § 546(e), to promote investor confidence by safeguarding the integrity of the marketplace, and it would undermine the spirit of the Bankruptcy Code by allowing a few individuals to reap the preferential benefit of the transfers, thereby diminishing the available assets for equitable distribution. *See, Adler Coleman,* 263 B.R. at 479, 482-83 (citation omitted).

> FN4. Defendants contend that the bankruptcy court, in referring to defendants' possible manipulation or coercion, failed to recognize that none of the defendants are alleged to have engaged in any illegal conduct. The absence of any specific allegation of manipulation or coercion in the amended complaints does not preclude the bankruptcy court from drawing an inference of such improper conduct from the pleadings. *See, Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 154 (2d Cir.2006).

The statutory interpretation of a provision of the Bankruptcy Code is a matter well within the expertise of the bankruptcy court to decide. Although there may be disagreement among courts as to the proper method of statutory interpretation to employ in construing § 741(8), defendants have failed to show that there is a substantial ground for difference of opinion as to the bankruptcy court's interpretation in the context of this case. Merely claiming that the court's interpretation was incorrect is insufficient to establish substantial grounds for difference of opinion. *See, Estevez-Yalcin v. Children's Vill.,* 2006 WL 3420833, at *4 (S.D.N.Y. Nov. 27, 2006) (quoting *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co.,* Americas, 426 F.Supp.2d 125, 129 (S.D.N.Y.2005)).

The bankruptcy court found that it was

premature, at the initial pleading stage, to decide the issue of whether the challenged transfers constitute settlement payments as a matter of law. While the bankruptcy court's ultimate determination may later be the subject for dispute, it is properly within the province of the bankruptcy court to fully consider and decide the matter upon a suitably developed record, prior to appellate review. *See generally, Mayers v. New York Cmty. Bancorp, Inc.,* 2006 WL 2013734, at *9 (E.D.N.Y. July 18, 2006) (In deciding whether to grant leave to appeal, it is appropriate to consider " 'the benefit of further factual development and a complete record on appeal, particularly in rapidly developing or unsettled areas of the law.'") (quoting *Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.,* 71 F.Supp.2d 139, 163 (E.D.N.Y.1999)). Given that the bankruptcy court intends to review what it considers to be relevant factual and legal issues, the granting of leave to appeal at this juncture will not materially advance these cases, but rather will unnecessarily delay the proceedings.

Neither the expense defendants claim they may incur as a result of extensive discovery, nor the prolonging of a final resolution of these matters, are exceptional circumstances which would otherwise warrant an interlocutory appeal. After the appropriate discovery relevant to the issues is conducted, and further findings are made by the bankruptcy judge, defendants may still seek appellate review. In fact, the issues may ultimately be resolved in their favor or rendered moot by subsequent proceedings before the bankruptcy court.

*6 Accordingly, leave to appeal is denied.[FN5]

> FN5. Leave to appeal is similarly inappropriate with regard to those defendants seeking appellate review of the bankruptcy court's pre-discovery denial of their motions to dismiss for lack of personal jurisdiction. The bankruptcy court rejected "the foreign defendants['s] alleg[ation] that they have insufficient contact with the forum to warrant a finding that they are subject to personal jurisdiction." *In re Enron Corp.,* 325 B.R. at 686 n. 8. The court "conclude[d] that, at least for the purposes of the motion to dismiss, Enron has made a prima facie showing of the minimum contacts required

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

AD000017

Slip Copy
Slip Copy, 2008 WL 281972 (S.D.N.Y.)
(Cite as: Slip Copy)

to support specific jurisdiction over those defendants."*Id.* Such a preliminary finding of jurisdiction does not relieve Enron of its ultimate, post-discovery burden of establishing jurisdiction by a preponderance of the evidence. Since a determination whether the requisite jurisdiction exists may rest on matters disclosed in discovery, appellate review, at this juncture, would be premature and would not materially advance the resolution of these matters. Given the absence of exceptional circumstances, leave to appeal the denial of the motions to dismiss for want of personal jurisdiction is unwarranted. *See eg., Koehler,* 101 F.3d at 866 (Finding. that "certification of the personal jurisdiction question at this initial stage of the proceeding in the absence of discovery and a district court hearing to determine the jurisdictional question by a preponderance of the evidence was improvidently granted [by the district court]."); *see also, Rein v. Socialist People's Libyan Arab Jamahiriya,* 162 F.3d 748, 756-66 (2d Cir.1998) (In applying the "collateral order" doctrine, the Second Circuit observed that "denials of motions to dismiss for jurisdictional reasons cannot ordinarily be the subject of interlocutory appeals" because the "denial is entirely reviewable on appeal from final judgment.").

**WITHDRAWAL OF THE BANKRUPTCY COURT REFERENCE**

Defendants are also seeking to have their discrete cases withdrawn from the bankruptcy court's long-running administration of Enron's complex bankruptcy proceeding. Defendants argue they are entitled to both mandatory and permissive withdrawal of the references to the bankruptcy court on the respective grounds that: (1) the resolution of their "settlement payment" defense will require substantial and material consideration of federal securities law, in addition to consideration of § 546(e) and related provisions of the Bankruptcy Code; and (2) defendants are entitled to a jury trial and do not consent to trial in the bankruptcy court.

Defendants argue that, since substantial and material consideration of both bankruptcy and securities law will be required to resolve the issue of whether Enron's commercial paper is a "security," withdrawal of the reference to the bankruptcy court is mandatory pursuant to 28 U.S.C. § 157(d).Section 157(d) provides that, "[t]he district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the Untied States regulating organizations or activities affecting interstate commerce."Courts have narrowly construed § 157(d)"to prevent litigants [from] using it as an 'escape hatch' out of bankruptcy court."*Enron Power Mktg., Inc. v. California Power Exch. Corp. (In re Enron Corp.),* 2004 WL 2711101, at *5 (S.D.N.Y. Nov. 23, 2004). Mandatory withdrawal is appropriate where the resolution of an issue will "require the bankruptcy court judge to engage in significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statutes."*City of New York v. Exxon Corp.,* 932 F.2d 1020, 1026 (2d Cir.1991); *see also, Shugrue v. Air Line Pilots Ass'n Int'l (In re Ionosphere Clubs, Inc.),* 922 F.2d 984, 995 (2d Cir.1990) ( " 'Withdrawal under 28 U.S.C. § 157(d) is not available merely because non-Bankruptcy Code federal statutes will be considered in the Bankruptcy Court proceeding, but is reserved for cases where substantial and material consideration of non-Bankruptcy Code federal statutes is necessary for the resolution of the proceeding' ") (*quoting In re Ionosphere Clubs, Inc.;* 103 B.R. 416, 418-19 (S.D.N.Y.1989)).

The bankruptcy court has yet to resolve the question of whether Enron's commercial paper qualifies as a security within the scope of § 546(e) of the Bankruptcy Code. The court found that it was first necessary to determine the factual issue of whether the challenged transfers were made to repurchase the notes or to retire the debt represented by the notes. The court explained that, if it were determined that the transfers were made to retire the debt, there would be no need for the court to address the question of whether Enron's commercial paper constitutes a security. Thus, defendants' withdrawal application is premised upon an issue that the bankruptcy court may never be required to consider. Mere speculation that the bankruptcy court may have to determine, at some future time, a securities law issue is an insufficient basis for withdrawing the reference. *See eg., O'Connell v. Terranova (In re Adelphi Inst., Inc.),* 112 B.R. 534, 537

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 281972 (S.D.N.Y.)
(Cite as: Slip Copy)

Page 7

(S.D.N.Y.1990); *In re Texaco, Inc.,* 84 B.R. 911, 921 (S.D.N.Y.1988); *see also, Matter of Vicars Ins. Agency, Inc.,* 96 F.3d 949, 954 (7th Cir.1996) (Finding "conjectural concern by itself ... does not necessarily trigger 'substantial and material consideration' of a non-title 11 statute."); *In re Continental Airlines,* 138 B.R. 442, 445 (D.Del.1992) ("[W]here a determination of the property of the estate does not require the interpretation of a federal law outside of the Bankruptcy Code and would render the [non-Bankruptcy Code] question raised moot, the statute does not require withdrawal."). The motions for mandatory withdrawal are denied.

   *7 Defendants also seek permissive withdrawal for "cause" based on their right to a jury trial in district court. Such a motion was previously denied without prejudice, as premature. *In re Enron Corp v. Belo Co.,* 317 B.R. 232 (S.D.N.Y.2004). The court found, that given the uncertainty as to when, if at all, the case would proceed to trial, judicial economy and the uniform administration of Enron's bankruptcy would be best served by the bankruptcy court's continued overall management of the case. *Id.* at 235.Defendants fail to proffer any new basis, factual or legal, to warrant withdrawing the reference prior to the time the cases near trial readiness. The motions for permissive withdrawal are also denied.

### CONCLUSION

   Defendants' motions for leave to appeal are denied. Defendants' further motions for withdrawal of the reference to the bankruptcy court are also denied.

   SO ORDERED:

S.D.N.Y.,2008.
In re Enron Corp.
Slip Copy, 2008 WL 281972 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

AD000019

Case 1:07-cv-00345-JJF    Document 8-2    Filed 02/14/2008    Page 21 of 40

(v) any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in clause (i), (ii), (iii), or (iv), including any guarantee or reimbursement obligation by or to a repo participant or financial participant in connection with any agreement or transaction referred to in any such clause, but not to exceed the damages in connection with any such agreement or transaction, measured in accordance with section 562 of this title; and

(B) does not include a repurchase obligation under a participation in a commercial mortgage loan.

(48) The term "securities clearing agency" means person that is registered as a clearing agency under section 17A of the Securities Exchange Act of 1934, or exempt from such registration under such section pursuant to an order of the Securities and Exchange Commission, or whose business is confined to the performance of functions of a clearing agency with respect to exempted securities, as defined in section 3(a)(12) of such Act for the purposes of such section 17A.

(48A) The term "securities self regulatory organization" means either a securities association registered with the Securities and Exchange Commission under section 15A of the Securities Exchange Act of 1934 or a national securities exchange registered with the Securities and Exchange Commission under section 6 of the Securities Exchange Act of 1934.

(49) The term "security"—
(A) includes—
(i) note;
(ii) stock;
(iii) treasury stock;
(iv) bond;
(v) debenture;
(vi) collateral trust certificate;
(vii) pre-organization certificate or subscription;
(viii) transferable share;
(ix) voting-trust certificate;
(x) certificate of deposit;
(xi) certificate of deposit for security;
(xii) investment contract or certificate of interest or participation in a profit-sharing agreement or in an oil, gas, or mineral royalty or lease, if such contract or interest is required to be the subject of a registration statement filed with the Securities and Exchange Commission under the provisions of the Securities Act of 1933, or is exempt under section 3(b) of such Act from the requirement to file such a statement;

(xiii) interest of a limited partner in a limited partnership;
(xiv) other claim or interest commonly known as "security"; and
(xv) certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase or sell, a security; but
(B) does not include—
(i) currency, check, draft, bill of exchange, or bank letter of credit;
(ii) leverage transaction, as defined in section 761 of this title;
(iii) commodity futures contract or forward contract;
(iv) option, warrant, or right to subscribe to or purchase or sell a commodity futures contract;
(v) option to purchase or sell a commodity;
(vi) contract or certificate of a kind specified in subparagraph (A)(xii) of this paragraph that is not required to be the subject of a registration statement filed with the Securities and Exchange Commission and is not exempt under section 3(b) of the Securities Act of 1933 from the requirement to file such a statement; or
(vii) debt or evidence of indebtedness for goods sold and delivered or services rendered.

(50) The term "security agreement" means agreement that creates or provides for a security interest.

(51) The term "security interest" means lien created by an agreement.

(51A) The term "settlement payment" means, for purposes of the forward contract provisions of this title, a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, a net settlement payment, or any other similar payment commonly used in the forward contract trade.

(51B) The term "single asset real estate" means real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental.

(51C) The term "small business case" means a case filed under chapter 11 of this title in which the debtor is a small business debtor.

(51D) The term "small business debtor"—
(A) subject to subparagraph (B), means a person engaged in commercial or business activities

AD000020

(1) may excuse compliance with subsection (a), (b), or (c) of this section if the interests of creditors and, if the debtor is not insolvent, of equity security holders would be better served by permitting a custodian to continue in possession, custody, or control of such property, and

(2) shall excuse compliance with subsections (a) and (b)(1) of this section if the custodian is an assignee for the benefit of the debtor's creditors that was appointed or took possession more than 120 days before the date of the filing of the petition, unless compliance with such subsections is necessary to prevent fraud or injustice.

(Pub.L. 95–598, Nov. 6, 1978, 92 Stat. 2595; Pub.L. 98–353, Title III; § 458, July 10, 1984, 98 Stat. 376; Pub.L. 103–394, Title V, § 501(d)(17), Oct. 22, 1994, 108 Stat. 4146.)

## HISTORICAL AND STATUTORY NOTES

### Revision Notes and Legislative Reports

1978 Acts. This section requires a custodian appointed before the bankruptcy case to deliver to the trustee and to account for property that has come into his possession, custody, or control as a custodian. "Property of the debtor" in subsection (a) [sic] includes property that was property of the debtor at the time the custodian took the property, but the title to which passed to the custodian. The section requires the court to protect any obligations incurred by the custodian, provide for the payment of reasonable compensation for services rendered and costs and expenses incurred by the custodian, and to surcharge the custodian for any improper or excessive disbursement, unless it has been approved by a court of competent jurisdiction. Subsection (d) reinforces the general abstention policy in § 305 by permitting the bankruptcy court to authorize the custodianship to proceed notwithstanding this section. Senate Report No. 95–989.

1984 Acts. Statements by Legislative Leaders, see 1984 U.S. Code Cong. and Adm. News, p. 576.

1994 Acts. House Report No. 103–835, see 1994 U.S. Code Cong. and Adm. News, p. 3340.

### Legislative Statements

Section 543(a) is a modification of similar provisions contained in the House bill and the Senate amendment. The provision clarifies that a custodian may always act as is necessary to preserve property of the debtor. Section 543(c)(3) excepts from surcharge a custodian that is an assignee for the benefit of creditors, who was appointed or took possession before 120 days before the date of the filing of the petition, whichever is later. The provision also prevents a custodian from being surcharged in connection with payments made in accordance with applicable law.

### Effective and Applicability Provisions

1994 Acts. Amendment by Pub.L. 103–394 effective on Oct. 22, 1994, and not to apply with respect to cases commenced under Title 11 of the United States Code before Oct. 22, 1994, see section 702 of Pub.L. 103–394, set out as a note under section 101 of this title.

1984 Acts. Amendment by Pub.L. 98–353 effective with respect to cases filed 90 days after July 10, 1984, see section

552(a)(7), formerly 553 of Pub.L. 98–353, set out as a note under section 101 of this title.

### Separability of Provisions

If any provision of or amendment made by Pub.L. 103–394 or the application of such provision or amendment to any person or circumstance is held to be unconstitutional, the remaining provisions of and amendments made by Pub.L. 103–394 and the application of such provisions and amendments to any person or circumstance shall not be affected thereby, see section 701 of Pub.L. 103–394, set out as a note under section 101 of this title.

## CROSS REFERENCES

Administrative expenses of superseded custodians, see 11 USCA § 503.

Concealment of assets, see 18 USCA § 152.

Disallowance of claim of entity from which property is recoverable, see 11 USCA § 502.

Effect of dismissal, see 11 USCA § 349.

Order of payment on claims for expenses of superseded custodians, see 11 USCA § 726.

Property recoverable by trustee as exempt, see 11 USCA § 522.

## § 544. Trustee as lien creditor and as successor to certain creditors and purchasers

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

(3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

(b)(1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a

AD000021

creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

(2) Paragraph (1) shall not apply to a transfer of a charitable contribution (as that term is defined in section 548(d)(3)) that is not covered under section 548(a)(1)(B), by reason of section 548(a)(2). Any claim by any person to recover a transferred contribution described in the preceding sentence under Federal or State law in a Federal or State court shall be preempted by the commencement of the case.

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2596; Pub.L. 98-353, Title III, § 459, July 10, 1984, 98 Stat. 377; Pub.L. 105-183, §§ 3(b), June 19, 1998, 112 Stat. 518.)

## HISTORICAL AND STATUTORY NOTES

### Revision Notes and Legislative Reports

**1978 Acts.** Subsection (a) is the "strong arm clause" of current law; now found in Bankruptcy Act § 70c [section 110(c) of former Title 11]. It gives the trustee the rights of a creditor on a simple contract with a judicial lien on the property of the debtor as of the date of the petition; of a creditor with a writ of execution against the property of the debtor unsatisfied as of the date of the petition; and a bona fide purchaser of the real property of the debtor as of the date of the petition. "Simple contract" as used here is derived from Bankruptcy Act § 60a(4) [section 96(a)(4) of former title 11]. The third status, that of a bona fide purchaser of real property, is new.

Subsection (b) is derived from current section 70e [former § 110(e) of former Title 11]. It gives the trustee the rights of actual unsecured creditors under applicable law to void transfers. It follows *Moore v. Bay*, 284 U.S. 4 (1931) [52 S.Ct. 3, 76 L.Ed. 133; 18 Am.Bankr.Rep.N.S. 675], and overrules those cases that hold section 70e [section 110(e) of former Title 11] gives the trustee the rights of secured creditors. Senate Report No. 95-989.

**1984 Acts.** Statements by Legislative Leaders, see 1984 U.S.Code Cong. and Adm.News, p. 576.

**1998 Acts.** Statement by President, see 1998 U.S. Code Cong. and Adm. News, p. 230.

### Legislative Statements

Section 544(a)(3) modifies similar provisions contained in the House bill and Senate amendment so as not to require a creditor to perform the impossible in order to perfect his interest. Both the lien creditor test in section 544(a)(1), and the bona fide purchaser test in section 544(a)(3) should not require a transferee to perfect a transfer against an entity with respect to which applicable law does not permit perfection. The avoiding powers under section 544(a)(1), (2), and (3) are new. In particular, section 544(a)(1) overrules *Pacific Finance Corp. v. Edwards*, 309 F.2d 224 (9th Cir. 1962), and *In re Federal's, Inc.*, 553 F.2d 509 (6th Cir. 1977), insofar as those cases held that the trustee did not have the status of a creditor who extended credit immediately prior to the commencement of the case.

The House amendment deletes section 544(c) of the House bill.

### Effective and Applicability Provisions

**1984 Acts.** Amendment by Pub.L. 98-353 effective with respect to cases filed 90 days after July 10, 1984, see section 552(a), formerly 553 of Pub.L. 98-353, set out as a note under section 101 of this title.

### Applicability

Pub.L. 105-183, § 5, June 19, 1998, 112 Stat. 518, provided that: "This Act and the amendments made by this Act [amending this section and sections 546, 548, 707, and 1325 of this title and enacting this note and provisions set out as notes under this section and section 101 of this title] shall apply to any case brought under an applicable provision of title 11, United States Code, [this title] that is pending or commenced on or after the date of enactment of this Act [June 19, 1998]."

### Rule of Construction

Pub.L. 105-183, § 6, June 19, 1998, 112 Stat. 519, provided that: "Nothing in the amendments made by this Act [amending this section and sections 546, 548, 707, and 1325 of this title and enacting this note and provisions set out as notes under this section and section 101 of this title] is intended to limit the applicability of the Religious Freedom Restoration Act of 1993 (42 U.S.C. 2000bb et seq.)."

## CROSS REFERENCES

Applicability of this section in Chapter nine cases, see 11 USCA § 901.

Appointment of trustee upon debtor's refusal to pursue cause of action under this section, see 11 USCA § 926.

Commencement of involuntary cases by transferees of voidable transfer, see 11 USCA § 303.

Disallowance of claims of entity that is transferee of avoidable transfer, see 11 USCA § 502.

Effect of dismissal, see 11 USCA § 349.

Exemptions, see 11 USCA § 522.

Recovery of voidable transfers in investor protection liquidation proceedings, see 15 USCA § 78fff-2.

Venue of action brought under this title by trustee as statutory successor under this section to creditors, see 28 USCA § 1409.

Voidable transfers in—

    Commodity broker liquidation cases, see 11 USCA § 764.

    Stockbroker liquidation proceedings, see 11 USCA § 749.

## § 545. Statutory liens

The trustee may avoid the fixing of a statutory lien on property of the debtor to the extent that such lien—

  (1) first becomes effective against the debtor—

    (A) when a case under this title concerning the debtor is commenced;

    (B) when an insolvency proceeding other than under this title concerning the debtor is commenced;

AD000022

Disallowance of claims of entity that is a transferee of an avoidable transfer, see 11 USCA § 502.

Effect of dismissal, see 11 USCA § 349.

Exemptions, see 11 USCA § 522.

Recovery of voidable transfers in investor protection liquidation proceedings, see 15 USCA § 78fff–2.

Voidable transfers in—

Commodity broker liquidation cases, see 11 USCA § 764.

Stockbroker liquidation cases, see 11 USCA § 749.

### § 546.  Limitations on avoiding powers

(a) An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of—

(1) the later of—

(A) 2 years after the entry of the order for relief; or

(B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or

(2) the time the case is closed or dismissed.

(b)(1) The rights and powers of a trustee under sections 544, 545, and 549 of this title are subject to any generally applicable law that—

(A) permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection; or

(B) provides for the maintenance or continuation of perfection of an interest in property to be effective against an entity that acquires rights in such property before the date on which action is taken to effect such maintenance or continuation.

(2) If—

(A) a law described in paragraph (1) requires seizure of such property or commencement of an action to accomplish such perfection, or maintenance or continuation of perfection of an interest in property; and

(B) such property has not been seized or such an action has not been commenced before the date of the filing of the petition;

such interest in such property shall be perfected, or perfection of such interest shall be maintained or continued, by giving notice within the time fixed by such law for such seizure or such commencement.

(c)(1) Except as provided in subsection (d) of this section and in section 507(c), and subject to the prior rights of a holder of a security interest in such goods or the proceeds thereof, the rights and powers of the trustee under sections 544(a), 545, 547, and 549 are subject to the right of a seller of goods that has sold

goods to the debtor, in the ordinary course of such seller's business, to reclaim such goods if the debtor has received such goods while insolvent, within 45 days before the date of the commencement of a case under this title, but such seller may not reclaim such goods unless such seller demands in writing reclamation of such goods—

(A) not later than 45 days after the date of receipt of such goods by the debtor; or

(B) not later than 20 days after the date of commencement of the case, if the 45-day period expires after the commencement of the case.

(2) If a seller of goods fails to provide notice in the manner described in paragraph (1), the seller still may assert the rights contained in section 503(b)(9).

(d) In the case of a seller who is a producer of grain sold to a grain storage facility, owned or operated by the debtor, in the ordinary course of such seller's business (as such terms are defined in section 557 of this title) or in the case of a United States fisherman who has caught fish sold to a fish processing facility owned or operated by the debtor in the ordinary course of such fisherman's business, the rights and powers of the trustee under sections 544(a), 545, 547, and 549 of this title are subject to any statutory or common law right of such producer or fisherman to reclaim such grain or fish if the debtor has received such grain or fish while insolvent, but—

(1) such producer or fisherman may not reclaim any grain or fish unless such producer or fisherman demands, in writing, reclamation of such grain or fish before ten days after receipt thereof by the debtor; and

(2) the court may deny reclamation to such a producer or fisherman with a right of reclamation that has made such a demand only if the court secures such claim by a lien.

(e) Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

AD000023

... unless the check is dishonored. Payment is considered to be made when the check is delivered for purposes of section 547(c)(1) and (2).

Section 547(c)(6) of the House bill is deleted and is treated in a different fashion in section 553 of the House amendment.

Section 547(c)(6) represents a modification of a similar provision contained in the House bill and Senate amendment. The exception relating to satisfaction of a statutory lien is deleted. The exception for a lien created under title 11 is deleted, since such a lien is a statutory lien that will not be avoidable in a subsequent bankruptcy.

Section 547(e)(1)(B) is adopted from the House bill and Senate amendment without change. It is intended that the simple contract test used in this section will be applied as under section 544(a)(1) not to require a creditor to perfect against a creditor on a simple contract in the event applicable law makes such perfection impossible. For example, a purchaser from a debtor at an improperly noticed bulk sale may take subject to the rights of a creditor on a simple contract of the debtor for 1 year after the bulk sale. Since the purchaser cannot perfect against such a creditor on a simple contract he should not be held responsible for failing to do the impossible. In the event the debtor goes into bankruptcy within a short time after the bulk sale, the trustee should not be able to use the avoiding powers under section 544(a)(1) or 547 merely because State law has made some transfers of personal property subject to the rights of a creditor on a simple contract to acquire a judicial lien with no opportunity to perfect against such a creditor.

**Preferences:** The House amendment deletes from the category of transfers on account of antecedent debts which may be avoided under the preference rules, section 547(b)(2), the exception in the Senate amendment for taxes owed to governmental authorities. However, for purposes of the "ordinary course" exception to the preference rules contained in section 547(c)(2), the House amendment specifies that the 45-day period referred to in section 547(c)(2)(B) is to begin running, in the case of taxes from the last due date, including extensions, of the return with respect to which the tax payment was made.

### Effective and Applicability Provisions

**2007 Acts.** Increase of dollar amounts by Judicial Conference of the United States by notice published Feb. 14, 2007, 72 F.R. 7082 effective April 1, 2007, and increase not applicable to cases commenced before the effective date of the adjustments, i.e., April 1, 2007. See Adjustment of Dollar Amounts, notes under 11 U.S.C.A. § 104 and this section.

**2005 Acts.** Pub.L. 109–8, Title XII, § 1213(b), Apr. 20, 2005, 119 Stat. 195, provided that: "The amendments made by this section [amending this section] shall apply to any case that is pending or commenced on or after the date of enactment of this Act [Apr. 20, 2005]."

Amendments by Pub.L. 109–8 effective, except as otherwise provided, 180 days after April 20, 2005, and inapplicable with respect to cases commenced under Title 11 before the effective date, see Pub.L. 109–8, § 1501, set out as a note under 11 U.S.C.A. § 101.

**1994 Acts.** Amendments by Pub.L. 103–394 effective on Oct. 22, 1994, and not to apply with respect to cases commenced under Title 11 of the United States Code before Oct. 22, 1994, see section 702 of Pub.L. 103–394, set out as a note under section 101 of this title.

**1986 Acts.** Amendment by Pub.L. 99–554 effective 30 days after Oct. 27, 1986, except as otherwise provided for, see section 302(a) of Pub.L. 99–554, set out as a note under section 581 of Title 28, Judiciary and Judicial Procedure.

**1984 Acts.** Amendment by Pub.L. 98–353 effective with respect to cases filed 90 days after July 10, 1984, see section 552(a), formerly 553(a), of Pub.L. 98–353, set out as a note under section 101 of this title.

### Separability of Provisions

If any provision of or amendment made by Pub.L. 103–394 or the application of such provision or amendment to any person or circumstance is held to be unconstitutional, the remaining provisions of and amendments made by Pub.L. 103–394 and the application of such provisions and amendments to any person or circumstance shall not be affected thereby, see section 701 of Pub.L. 103–394, set out as a note under section 101 of this title.

### Adjustment of Dollar Amounts

For adjustment of dollar amounts specified in subsec. (c)(9) of this section by the Judicial Conference of the United States, effective Apr. 1, 2007, see note set out under 11 U.S.C.A. § 104.

By notice published Feb. 14, 2007, 72 F.R. 7082, the Judicial Conference of the United States adjusted the dollar amounts in provisions specified in subsec. (c)(9) of this section, effective Apr. 1, 2007, as follows:

Adjusted $5,000 to $5,475.

### CROSS REFERENCES

Applicability of this section in Chapter nine cases, see 11 USCA § 901.

Appointment of trustee upon debtor's refusal to pursue cause of action under this section, see 11 USCA § 926.

Automatic stay, see 11 USCA § 362.

Commencement of involuntary cases by transferees of voidable transfers, see 11 USCA § 303.

Disallowance of claims of entity that is transferee of avoidable transfer, see 11 USCA § 502.

Effect of dismissal, see 11 USCA § 349.

Exemptions, see 11 USCA § 522.

Persons who may be debtors in Chapter nine case, see 11 USCA § 109.

Recovery of voidable transfers in investor protection liquidation proceedings, see 15 USCA § 78fff–2.

Transfers to defeat cases under this title, see 18 USCA § 152.

Voidable transfers in—

Commodity broker liquidation cases, see 11 USCA § 764.

Stockbroker liquidation cases, see 11 USCA § 749.

### § 548.  Fraudulent transfers and obligations

(a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an

AD000024

employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or, after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

(2) A transfer of a charitable contribution to a qualified religious or charitable entity or organization shall not be considered to be a transfer covered under paragraph (1)(B) in any case in which—

(A) the amount of that contribution does not exceed 15 percent of the gross annual income of the debtor for the year in which the transfer of the contribution is made; or

(B) the contribution made by a debtor exceeded the percentage amount of gross annual income specified in subparagraph (A), if the transfer was consistent with the practices of the debtor in making charitable contributions.

(b) The trustee of a partnership debtor may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, to a general partner in the debtor, if the debtor was insolvent on the date such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

(c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

(d)(1) For the purposes of this section, a transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee, but if such transfer is not so perfected before the commencement of the case, such transfer is made immediately before the date of the filing of the petition.

(2) In this section—

(A) "value" means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor;

(B) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency that receives a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, takes for value to the extent of such payment;

(C) a repo participant or financial participant that receives a margin payment, as defined in section 741 or 761 of this title, or settlement payment, as defined in section 741 of this title, in connection with a repurchase agreement, takes for value to the extent of such payment;

(D) a swap participant or financial participant that receives a transfer in connection with a swap agreement takes for value to the extent of such transfer; and

(E) a master netting agreement participant that receives a transfer in connection with a master netting agreement or any individual contract covered thereby takes for value to the extent of such transfer, except that, with respect to a transfer under any individual contract covered thereby, to the extent that such master netting agreement participant otherwise did not take (or is otherwise not deemed to have taken) such transfer for value.

(3) In this section, the term "charitable contribution" means a charitable contribution, as that term is defined in section 170(c) of the Internal Revenue Code of 1986, if that contribution—

(A) is made by a natural person; and

(B) consists of.—

AD000025

**11 § 741**                    **BANKRUPTCY CODE**                    **Title 11**

(ii) property to the extent that a customer does not have a claim against the debtor based on such property;

(5) "margin payment" means payment or deposit of cash, a security, or other property, that is commonly known to the securities trade as original margin, initial margin, maintenance margin, or variation margin, or as a mark-to-market payment, or that secures an obligation of a participant in a securities clearing agency;

(6) "net equity" means, with respect to all accounts that such customer has in the same capacity—

(A)(i) aggregate dollar balance that would remain in such accounts after the liquidation, by sale or purchase, at the time of the filing of the petition, of all securities positions in all such accounts, except any customer name securities of such customer, minus

(ii) any claim of the debtor against such customer in such capacity that would have been owing immediately after such liquidation; plus

(B) any payment by such customer to the trustee, within 60 days after notice under section 342 of this title, of any business related claim of the debtor against such customer in such capacity;

(7) "securities contract"—

(A) means—

(i) a contract for the purchase, sale, or loan of a security, a certificate of deposit, a mortgage loan, any interest in a mortgage loan, a group or index of securities, certificates of deposit, or mortgage loans or interests therein (including an interest therein or based on the value thereof), or option on any of the foregoing, including an option to purchase or sell any such security, certificate of deposit, mortgage loan, interest, group or index, or option, and including any repurchase or reverse repurchase transaction on any such security, certificate of deposit, mortgage loan, interest, group or index, or option (whether or not such repurchase or reverse repurchase transaction is a "repurchase agreement", as defined in section 101);

(ii) any option entered into on a national securities exchange relating to foreign currencies;

(iii) the guarantee (including by novation) by or to any securities clearing agency of a settlement of cash, securities, certificates of deposit, mortgage loans or interests therein, group or index of securities, or mortgage loans or interests therein (including any interest therein or based on the value thereof), or option on any of the foregoing, including an option to purchase or sell any such security, certificate of deposit, mortgage loan, interest,

group or index, or option (whether or not such settlement is in connection with any agreement or transaction referred to in clauses (i) through (xi));

(iv) any margin loan;

(v) any extension of credit for the clearance or settlement of securities transactions;

(vi) any loan transaction coupled with a securities collar transaction, any prepaid forward securities transaction, or any total return swap transaction coupled with a securities sale transaction;

(vii) any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph;

(viii) any combination of the agreements or transactions referred to in this subparagraph;

(ix) any option to enter into any agreement or transaction referred to in this subparagraph;

(x) a master agreement that provides for an agreement or transaction referred to in clause (i), (ii), (iii), (iv), (v), (vi), (vii), (viii), or (ix), together with all supplements to any such master agreement, without regard to whether the master agreement provides for an agreement or transaction that is not a securities contract under this subparagraph, except that such master agreement shall be considered to be a securities contract under this subparagraph only with respect to each agreement or transaction under such master agreement that is referred to in clause (i), (ii), (iii), (iv), (v), (vi), (vii), (viii), or (ix); or

(xi) any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in this subparagraph, including any guarantee or reimbursement obligation by or to a stockbroker, securities clearing agency, financial institution, or financial participant in connection with any agreement or transaction referred to in this subparagraph, but not to exceed the damages in connection with any such agreement or transaction, measured in accordance with section 562; and

(B) does not include any purchase, sale, or repurchase obligation under a participation in a commercial mortgage loan;

(8) "settlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade; and

(9) "SIPC" means Securities Investor Protection Corporation.

AD000026



PL 97-222, 1982 HR 4935                                            Page 1
PL 97-222, JULY 27, 1982, 96 Stat 235
**(Publication page references are not available for this document.)**

UNITED STATES PUBLIC LAWS
97th Congress - Second Session
Convening January 25, 1982

Copr. © West Group 1998.  No Claim to Orig. U.S. Govt. Work

DATA SUPPLIED BY THE U.S. DEPARTMENT OF JUSTICE. (SEE SCOPE)
Additions and Deletions are not identified in this document.

PL 97-222 (HR 4935)
JULY 27, 1982

An Act to amend title 11, United States Code, to correct technical errors, and to
clarify and make substantive changes, with respect to securities and commodities.

Be it enacted by the Senate and House of Representatives of the United States
of America in Congress assembled, That (a) section 101 of title 11, United
States Code, is amended--,

(1) by redesignating paragraphs (35), (36), (37), (38), (39), and (40) as
paragraphs (36), (37), (38), (39), (40), and (41), respectively, and

(2) by inserting after paragraph (34) the following new paragraph:

"(35) 'securities clearing agency' means person that is registered as a clearing
agency under section 17 A of the Securities Exchange Act of 1934 (15 U.S.C. 78q-1)
or whose business is confined to the performance of functions of a clearing agency
with respect to exempted securities, as defined in section 3(a)(12) of such Act (15
U.S.C. 78c(12)) for the purposes of such section 17 A;".

(b) Section 101(36)(A)(xii) of title 11, United States Code, as so redesignated,
is amended by striking out "is the subject of a registration statement" and
inserting in lieu thereof "is required to be the subject of a registration
statement".

(c) Section 101(36)(B)(iii) of title 11, United States Code, as so redesignated,
is amended by striking out "commodity" the second place it appears.

(d) Section 101(40) of title 11, United States Code, as so redesignated, is
amended to read as follows:

"(40) 'stockbroker' means person--,

"(A) with respect to which there is a customer, as defined in section 741(2) of

AD000027

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

PL 97-222, 1982 HR 4935                                                    Page 2
 PL 97-222, JULY 27, 1982, 96 Stat 235
 (Publication page references are not available for this document.)

this title;

// 11 USC 741. // and

  "(B) that is engaged in the business of effecting transactions in securities--,

   "(i) for the account of others; or

    "(ii) with members of the general public, from or for such person's own
account;".

Sec. 2. Section 103(d) of title 11, United States Code, is amended by striking out
"except with respect to section 746(c) which applies to margin payments made by any
debtor to a commodity broker or forward contract merchant".

   Sec. 3. (a) Section 362(a) of title 11, United States Code, is amended by
inserting ", or an application filed under section 5(a)(3) of the Securities
Investor Protection Act of 1970 (15 U.S.C. 78eee(a)( 3))," after "title" the first
place it appears.

   (b) Section 362(b) of title 11, United States Code, is amended by adding", or of
an application under section 5(a)(3) of the Securities Investor Protection Act of
1970 (15 U.S.C. 78eee(a)(3))," after "title" the first place it appears.

   (c) Section 362(b)(6) of title 11, United States Code, is amended to read as
follows:

  "(6) under subsection (a) of this section, of the setoff by a commodity broker,
forward contract merchant, stockbroker, or securities clearing agency of any mutual
debt and claim under or in connection with commodity contracts, as defined in
section 761(4) of this title,

// 11 USC 761. // forward contracts, or securities contracts, as defined in section
741(7) of this title, that constitutes the setoff of a claim against the debtor for
a margin payment, as defined in section 741(5) or 761(15) of this title,

// 11 USC 761. // or settlement payment, as defined in section 741(8) of this
title, arising out of commodity contracts, forward contracts, or securities
contracts against cash, securities, or other property held by such commodity
broker, forward contract merchant, stockbroker, or securities clearing agency to
margin, guarantee, or secure commodity contracts, forward contracts, or securities
contracts;".

Sec. 4. Section 546 of title 11, United States Code, is amended by adding at the
end therof the following new subsection:

  "(d) Notwithstanding sections 544, 545, 547, 548(a)(2), and 548(b) of this title,
// 11 USC 544, 545, 547, 548. // the trustee may not avoid a transfer that is a
margin payment, as defined in section 741(5) or 761(15) of this title, or
settlement payment, as defined in section 741(8) of this title, made by or to a

AD000028

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

PL 97-222, 1982 HR 4935                                                     Page 3
PL 97-222, JULY 27, 1982, 96 Stat 235
(Publication page references are not available for this document.)

commodity broker, forward contract merchant, stockbroker, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)( 1) of this title.".

Sec. 5 Section 548(d)(2)(B) of title 11, United States Code, is amended--,

  (1) by striking out "or forward contract merchant" and inserting in lieu thereof", forward contract merchant, stockbroker, or securities clearing agency",

  (2) by inserting "741(5) or" after "section",

  (3) by inserting", or settlement payment, as defined in section 741(8) of this title" after "of this title", and

  (4) by striking out "value." and inserting in lieu thereof "value to the extent of such payment.".

  Sec. 6. (a) Chapter 5 of title 11, United States Code, is amended by adding at the end thereof the following new sections:

 "Section 555. // 11 USC 555. // Contractual right to liquidate a securities contract

 " The exercise of a contractual right of a stockbroker or securities clearing agency to cause the liquidation of a securities contract, as defined in section 741(7), because of a condition of the kind specified in section 365(e)(1) of this title // 11 USC 365. // shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title unless such order is authorized under the provisions of the Securities Investor Protection Act of 1970 (15 U.S.C. 78aaa et seq.) or any statute administered by the Securities and Exchange Commission. As used in this section, the term 'contractual right' includes a right set forth in a rule or bylaw of a national securities exchange, a national securities association, or a securities clearing agency.

 "Section 556. // 11 USC 556. // Contractual right to liquidate a commodities contract or forward contract

 " The contractual right of a commodity broker or forward contract merchant to cause the liquidation of a commodity contract, as defined in section 761(4), // 11 USC 761. // or forward contract because of a condition of the kind specified in section 365(e)(1) of this title, // 11 USC 365. // and the right to a variation or maintenance margin payment received from a trustee with respect to open commodity contracts or forward contracts, shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by the order of a court in any proceeding under this title. As used in this section, the term 'contractual right' includes a right set forth in a rule or bylaw of a clearing organization or contract market or in a resolution of the governing board thereof.".

  (b) The analysis of sections for chapter 5 of title 11, United States Code, is

AD000029

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

PL 97-222, 1982 HR 4935                                                    Page 4
 PL 97-222, JULY 27, 1982, 96 Stat 235
(Publication page references are not available for this document.)

amended by adding at the end thereof the following new items:

 "555. Contractual right to liquidate a securities contract.

 "556. Contractual right to liquidate a commodity contract or forward contract.".

Sec. 7. Section 702(a)(1) of title 11, United States Code, is amended by striking
out "or 726(a)(4)" and inserting in lieu thereof "726(a)(4), 752(a), 766(h), or
766(i)".

Sec. 8. Section 741 of title 11, United States Code, is amended--,

 (1) in paragraph (4)--,

 (A) by striking out "at any time", and

 (B) in subparagraph (A)(ii) by inserting "of a customer" after "claim",

 (2) by redesignating paragraphs (5) and (6) as paragraphs (6) and (9),
respectively,

 (3) by inserting after paragraph (4) the following new paragraph:

 "(5) 'margin payment' means payment or deposit of cash, a security, or other
property, that is commonly known to the securities trade as original margin,
initial margin, maintenance margin, or variation margin, or as a mark-to-market
payment, or that secures an obligation of a participant in a securities clearing
agency;",

 (4) in paragraph (6), as so redesignated--,

 (A) by striking out "the aggregate of all of a customer's accounts that such
customer holds" and inserting in lieu thereof "all accounts of a customer that such
customer has",

 (B) in subparagraph (A)(ii) by inserting "in such capacity" after "customer", and

 (C) in subparagraph (B) by inserting "in such capacity" before the semicolon,

 (5) by inserting after paragraph (6), as so redesignated, the following new
paragraphs:

 "(7) 'securities contract' means contract for the purchase, sale, or loan of a
security, including an option for the purchase or sale of a security, or the
guarantee of any settlement of cash or securities by or to a securities clearing
agency;

 "(8) 'settlement payment' means a preliminary settlement payment, a partial
settlement payment, an interim settlement payment, a settlement payment on account,

AD000030

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

PL 97-222, 1982 HR 4935                                                                                       Page 5
PL 97-222, JULY 27, 1982, 96 Stat 235
(Publication page references are not available for this document.)

or any other similar payment commonly used in the securities trade; and", and

  (6) in paragraph (9), as so redesignated, by striking out " Security" and inserting "Securities" in lieu thereof.

Sec. 9. Section 742 of title 11, United States Code, is amended by striking out "chapter" and inserting in lieu thereof "title".

Sec. 10. Section 744 of title 11, United States Code, is amended by inserting "but" after "relief,".

Sec. 11. Section 745(c) of title 11, United States Code, is amended by striking out "A" and inserting in lieu thereof "Each".

  Sec. 12. (a) Section 746(a) of title 11, United States Code, is amended--,

  (1) by striking out "effects, with respect to cash or a security," and inserting in lieu thereof "enters into",

  (2) by striking out "with respect to such cash or security" each place it appears,

  (3) by striking out "such date" and inserting in lieu thereof "the date of the filing of the petition", and

  (4) by striking out "effected" and inserting in lieu thereof "entered into".

  (b) Section 746(b) of title 11, United States Code, is amended--,

  (1) by striking out "has a claim for" and inserting in lieu thereof  "transferred to the debtor", and

  (2) in paragraph (2) by striking out "is".

  (c) The heading for section 746 of title 11, United States Code, is amended by striking out "claim" and inserting in lieu thereof "claims".

Sec. 13. Section 747 of title 11, United States Code, is amended by striking out "such claim arose" and inserting in lieu thereof "the transaction giving rise to such claim occurred".

Sec. 14. Section 749 of title 11, United States Code, is amended--,

  (1) by striking out "Any" and inserting in lieu thereof "(a) Except as otherwise provided in this section, any",

  (2) by striking out "except" and inserting in lieu thereof "but",

  (3) by inserting "such property" after "trustee, and",

AD000031

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

PL 97-222, 1982 HR 4935                                                    Page 6
PL 97-222, JULY 27, 1982, 96 Stat 235
(Publication page references are not available for this document.)

(4) by striking out "549, or 724(a)" and inserting in lieu thereof "or 549", and

(5) by adding at the end thereof the following new subsection:

"(b) Notwithstanding section 544, 545, 547, 548, and 549 of this title, // 11 USC 544, 545, 547--549. // the trustee may not avoid a transfer made before five days after the order for relief if such transfer is approved by the Commission by rule or order, either before or after such transfer, and if such transfer is--,

"(1) a transfer of a securities contract entered into or carried by or through the debtor on behalf of a customer, and of any cash, security, or other property margining or securing such securities contract; or

"(2) the liquidation of a securities contract entered into or carried by or through the debtor on behalf of a customer.".

Sec. 15. Section 752(c) of title 11, United States Code, is amended to read as follows:

"(c) Any cash or security remaining after the liquidation of a security interest created under a security agreement made by the debtor, excluding property excluded under section 741(4)(B) of this title, // 11 USC 741. // shall be apportioned between the general estate and customer property in the same proportion as the general estate of the debtor and customer property were subject to such security interest.".

Sec. 16. Section 761 of title 11, United States Code, is amended--,

(1) in paragraph (2) by inserting "made" after "commodity contracts",

(2) in paragraph (4)--,

(A) by striking out "if the debtor is" each place it appears and inserting in lieu thereof "with respect to", and

(B) in subparagraph (D) by striking out "cleared by the debtor" and inserting in lieu thereof "cleared by such clearing organization, or commodity option traded on, or subject to the rules of, a contract market or board of trade that is cleared by such clearing organization",

(3) in paragraph (9)--,

(A) by striking out "if the debtor is" each place it appears and inserting in lieu thereof "with respect to",

(B) in subparagraph (A)--,

(i) by striking out "the debtor" each place it appears and inserting in lieu

AD000032

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

PL 97-222, 1982 HR 4935                                                    Page 7
 PL 97-222, JULY 27, 1982, 96 Stat 235
(Publication page references are not available for this document.)

thereof "such futures commission merchant", and

　　(ii) by striking out "the debtor's" and inserting in lieu thereof "such futures
commission merchant's",

　(C) in subparagraph (B)--,

　　(i) by striking out "the debtor" each place it appears and inserting in lieu
thereof "such foreign futures commission merchant", and

　　(ii) by striking out "the debtor's" and inserting in lieu thereof "such foreign
futures commission merchant's",

　(D) in subparagraph (C)--,

　　(i) by striking out "the debtor" each place it appears and inserting in lieu
thereof "such leverage transaction merchant",

　　(ii) by striking out "the debtor's" and inserting in lieu thereof "such
leverage transaction merchant's",

　　(iii) in clause (i) by inserting "or" after the semicolon, and

　　(iv) in clause (ii) by striking out "hold" and inserting in lieu
thereof  "holds",

　(E) in subparagraph (D) by striking out "the debtor" each place it appears and
inserting in lieu thereof "such clearing organization", and

　(F) in subparagraph (E)--,

　　(i) by striking out "the debtor" each place it appears and inserting in lieu
thereof "such commodity options dealer", and

　　(ii) by striking out "the debtor's" and inserting in lieu thereof "such
commodity options dealer's",

　(4) in paragraph (10) by striking out "at any time",

　(5) in paragraph (12)--,

　(A) by inserting a comma after "property", and

　(B) by striking out the comma after "credit",

　(6) in paragraph (13) by striking out "217 of the Commodity Futures Trading
Commission Act of 1974 (7 U.S.C. 15a)" and inserting in lieu thereof "19 of the
Commodity Exchange Act (7 U. S.C. 23)",

AD000033

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

PL 97-222, 1982 HR 4935
 PL 97-222, JULY 27, 1982, 96 Stat 235
(Publication page references are not available for this document.)

Page 8

(7) in paragraph (14) by striking out "that is engaged",

(8) in paragraph (15) by striking out "a daily variation settlement payment" and inserting in lieu thereof "mark-to-market payments, settlement payments, variation payments, daily settlement payments, and final settlement payments made as adjustments to settlement prices",

(9) in paragraph (16) by striking out "at any time", and

(10) in paragraph (17)--,

(A) by striking out "holds" and inserting in lieu thereof "has", and

(B) in subparagraph (A)--,

 (i) by inserting "the" after "(A)", and

  (ii) in clause (ii) by inserting "in such capacity" after "customer".

 Sec. 17. (a) Section 764(a) of title 11, United States Code, is amended--,

(1) by striking out "except" and inserting in lieu thereof "but",

(2) by inserting "such property" after "trustee, and", and

(3) by striking out "is" each place it appears and inserting in lieu thereof "shall be".

(b) Section 764(b) of title 11, United States Code, is amended by striking out "date of the filing of the petition" and inserting in lieu thereof "order for relief".

(c) Section 764(c) of title 11, United States Code, is repealed.

Sec. 18. Section 765(b) of title 11, United States Code, is amended by striking out "commitment" and inserting in lieu thereof "commodity contract".

 Sec. 19. (a) Section 766(a) of title 11, United States Code, is amended by inserting "to such customer" after "distribution".

(b) Section 766(b) of title 11, United States Code, is amended--,

(1) by striking out "that is being actively traded as of the date of the filing of the petition", and

(2) by inserting "the" after "rules of".

AD000034

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

(c) Section 766(d) of title 11, United States Code, is amended--,

(1) by striking out "such amount, then the" and inserting in lieu thereof "the amount to which the customer of the debtor is entitled under subsection (h) or (i) of this section, then such", and

(2) by inserting "then" after "trustee" the second place it appears.

(d) Section 766(h) of title 11, United States Code, is amended by adding at the end thereof the following: "notwithstanding any other provision of this subsection, a customer net equity claim based on a proprietary account, as defined by Commission rule, regulation, or order, may not be paid either in whole or in part, directly or indirectly, out of customer property unless all other customer net equity claims have been paid in full.".

Sec. 20. (a) Section 19 of the Commodity Exchange Act (7 U.S.C. 24), as added by section 302 of the Act of November 6, 1978 (Public Law 95--598; 92 Stat. 2673), is redesignated as section 20.

(b) Section 20(a)(3), as so redesignated, of the Commodity Exchange Act (7 U.S.C. 24) is amended by inserting before the semicolon the following: ", including the payment and allocation of margin with respect to commodity contracts not specifically identifiable to a particular customer pending their orderly liquidation".

Approved July 27, 1982.

LEGISLATIVE HISTORY-H.R. 4935:
  HOUSE REPORT No. 97--420 (Comm. on the Judiciary).

 CONGRESSIONAL RECORD, Vol. 128 (1982):

 Feb. 9, considered and passed House.

 July 13, considered and passed Senate.

 PL 97-222, 1982 HR 4935

 END OF DOCUMENT

AD000035

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.



6 Del.C. § 1304



West's Delaware Code Annotated <u>Currentness</u>
Title 6. Commerce and Trade



     Subtitle II.  Other Laws Relating to Commerce and Trade



     Chapter 13.  Fraudulent Transfers <u>(Refs & Annos)</u>

**§ 1304. Transfers fraudulent as to present and future creditors**

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) With actual intent to hinder, delay or defraud any creditor of the debtor;  or

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

   a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;  or

   b. Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(b) In determining actual intent under subsection (a)(1), consideration may be given, among other factors, to whether:

(1) The transfer or obligation was to an insider;

(2) The debtor retained possession or control of the property transferred after

AD000036

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**6 Del.C. § 1304**

the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred;  and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

70 Laws 1995, ch. 434, § 1, eff. July 3, 1996;  70 Laws 1995, ch. 186, § 1, eff. July 10, 1995.

HISTORICAL AND STATUTORY NOTES

**Source**
   Former 6 §§ 1304 to 1307.

LIBRARY REFERENCES

Fraudulent Conveyances        8 to 12, 64(1) to 72.
Westlaw Key Number Searches: 186k8 to 186k12;  186k64(1) to 186k72.
C.J.S. Fraudulent Conveyances §§ 2, 5 to 8, 40, 44, 82 to 87, 97, 101, 198.

RESEARCH REFERENCES

**ALR Library**

174 ALR 1373, Federal Tax Liens.

**Forms**

AD000037

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.



6 Del.C. § 1305

 West's Delaware Code Annotated <u>Currentness</u>
Title 6. Commerce and Trade

     Subtitle II.  Other Laws Relating to Commerce and Trade

     Chapter 13.  Fraudulent Transfers (Refs & Annos)

→     **§ 1305. Transfers fraudulent as to present creditors**

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent.

70 Laws 1995, ch. 434, § 1, eff. July 3, 1996.

HISTORICAL AND STATUTORY NOTES

**Source**
    Former 6 §§ 1304, 1306.

**LIBRARY REFERENCES**

Fraudulent Conveyances  8 to 11, 57(1) to 62, 73.1 to  100(3).

AD000038

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

6 Del.C. § 1311

C

West's Delaware Code Annotated Currentness
  Title 6. Commerce and Trade
    Subtitle II.  Other Laws Relating to Commerce and Trade
     Chapter 13.  Fraudulent Transfers (Refs & Annos)

      → § 1311. Short title

This chapter may be cited as the "Uniform Fraudulent Transfer Act."

70 Laws 1995, ch. 434, § 1, eff. July 3, 1996.

6 Del.C. § 1311, DE ST TI 6 § 1311

 76 Laws  2008, ch. 184. Revisions to Acts made by the Delaware Code
Revisors were unavailable at time of publication.

    Copr. © 2008 Thomson/West.

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

AD000039