# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: ) | Chapter 7 |
| ) | |
| PLASSEIN INTERNATIONAL ) | Bankr. Case No. 03-11489-KG |
| CORP., *et al.* (n/k/a PL Liquidation Corp.), ) | Jointly Administered |
| ) | |
| Debtors. ) | Adversary Proceeding |
| ) | No. 05-50692-KG |

| | |
|---|---|
| WILLIAM BRANDT, as he is ) | |
| the Trustee of the Estates of ) | |
| Plassein International Corp., *et al.*, ) | |
| ) | |
| Appellant, ) | Civil Action No. 07-345-JJF |
| ) | |
| *v.* ) | |
| ) | |
| B.A. CAPITAL CO. LP, *et al.*, ) | |
| ) | |
| Appellees. ) | |

## APPELLANT'S APPENDIX

Of Counsel:
Charles R. Bennett, Jr.
HANIFY & KING, PC
One Beacon St., 21st Floor
Boston, MA 02108
(617) 423-0400

Dated: February 14, 2008

CROSS & SIMON, LLC
Richard H. Cross, Jr. (No. 3576)
Amy Evans (No. 3829)
913 N. Market St., 11th Floor
P.O. Box 1380
Wilmington, DE 19899-1380
(302) 777-4200
(302) 777-4224 (facsimile)

# TABLE OF CONTENTS

**Tab**                                                                    **Page(s)**

A.    Voluntary Petition [D.I. No. 1 in Docket No. 03-11489] ................. A0001-A0024

B.    Complaint [D.I. No. 1] ........................................................................ A0025-A0158

C.    Application Of The Marshall Plastic Film Defendants, Pursuant
      To Federal Rule of Bankruptcy Procedure 7012(b) For Entry
      Of An Order Dismissing The Adversary Complaint As It
      Relates To The Marshall Plastic Film Defendants [D.I. No. 23] ....... A0159-A0164

D.    B.A. Capital Company LP's Motion To Dismiss Complaint
      [D.I. No. 25] ...................................................................................... A0165-A0189

E.    Defendants Charles J. Warr, Paul D. Gage, Stephen S. Wilson,
      G. Kenneth Pope, Jr., Kenneth Olender And Daniel A. Jones
      III's Motion To Dismiss [D.I. No. 26] .............................................. A0190-A0193

F.    Sam Chebeir's Motion To Dismiss [D.I. No. 28] ............................. A0194-A0197

G.    Key Packaging Defendants' Motion To Dismiss The
      Complaint [D.I. No. 30] ..................................................................... A0198-A0200

H.    Plaintiff's Consolidated Brief In Opposition To Defendants'
      Various Motions To Dismiss The Complaint [D.I. No. 37] .............. A0201-A0259

I.    Affidavit Of Charles R. Bennett, Jr., In Support of The
      Trustee's Opposition To The Defendants' Motions To Dismiss
      [D.I. No. 38] ...................................................................................... A0260-A0328

J.    Opinion granting Motions to Dismiss [D.I. No. 70] .......................... A0329-A0343

K.    Order granting Motions to Dismiss and Dismissing Adversary
      Proceeding [D.I. No. 71] .................................................................... A0344-A0345

L.    Notice of Appeal [D.I. No. 72] .......................................................... A0346-A0368

A

(Official Form 1) (9/97) FORM B1

| United States Bankruptcy Court<br>District of Delaware | Voluntary Petition |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>Plassein International Corp., a Delaware Corporation | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 6 years<br>(include married, maiden, and trade names):<br>See list attached as Schedule "1" | All Other Names used by the Joint Debtor in the last 6 years<br>(include married, maiden, and trade names): |
| Soc. Sec./Tax I.D. No. (if more than one, state all):<br>76-0625160 | Soc. Sec./Tax I.D. No. (if more than one, state all): |
| Street Address of Debtor (No. & Street, City, State, & Zip Code):<br>165 River Road<br>Willington, CT 06279 | Street Address of Joint Debtor (No. & Street, City, State, & Zip Code): |
| County of Residence or of the<br>Principal Place of Business: Tolland County | County of Residence or of the<br>Principal Place of Business: |
| Mailing Address of Debtor (if different from street address): | Mailing Address of Joint Debtor (if different from street address): |
| Location of Principal Assets of Business Debtor (If different from street address above): | |

**Information Regarding the Debtor (Check the Applicable Boxes)**

**Venue** (Check any applicable box)
- ■ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.
- ☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

| **Type of Debtor** (Check all boxes that apply) | | **Chapter or Section of Bankruptcy Code under Which the Petition is Filed** (Check one box) |
|---|---|---|
| ☐ Individual(s) | ☐ Railroad | ☐ Chapter 7    ■ Chapter 11    ☐ Chapter 13 |
| ■ Corporation | ☐ Stockbroker | ☐ Chapter 9    ☐ Chapter 12 |
| ☐ Partnership | ☐ Commodity Broker | ☐ Sec. 304 - Case ancillary to foreign proceeding |
| ☐ Other | | |

| **Nature of Debts** (Check one box) | **Filing Fee** (Check one box) |
|---|---|
| ☐ Consumer/Non-Business    ■ Business | ■ Full Filing Fee attached |
| **Chapter 11 Small Business** (Check all boxes that apply)<br>☐ Debtor is a small business as defined in 11 U.S.C. ° 101<br>☐ Debtor is and elects to be considered a small business under 11 U.S.C. ° 1121(e) (Optional) | ☐ Filing Fee to be paid in installments (Applicable to individuals only.) Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form No. 3. |

| **Statistical/Administrative Information** (Estimates only)* | THIS SPACE IS FOR COURT USE ONLY |
|---|---|
| ■ Debtor estimates that funds will be available for distribution to unsecured creditors.<br>☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors. | |

| Estimated Number of Creditors | 1-15 | 16-49 | 50-99 | 100-199 | 200-999 | 1000-over |
|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ■ |

| Estimated Assets | | | | | | | |
|---|---|---|---|---|---|---|---|
| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,000 to $100 million | More than $100 million |
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ■ | ☐ |

| Estimated Debts | | | | | | | |
|---|---|---|---|---|---|---|---|
| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | More than $100 million |
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

---

\* Debtor and affiliated debtors on a consolidated basis.

Official Form 1) (9/97)

| **Voluntary Petition**<br>*(This page must be completed and filed in every case)* | Name of Debtor(s):<br>Plassein International Corp. | **FORM B1, Page 2** |
|---|---|---|

| Location<br>Where Filed: - None - | Case Number: | Date Filed: |
|---|---|---|

| Name of Debtor: See list attached as Schedule "2" of affiliates filing Chapter 11 petitions after filing by corporate parent Plassein International Corp. | Case Number: not yet assigned | Date Filed: May 14, 2003 |
|---|---|---|
| District: Delaware | Relationship: Affiliates | Judge: not yet assigned |

### Signature(s) of Debtor(s) (Individual/Joint)

I declare under penalty of perjury that the information provided in this petition is true and correct.

[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X_____
Signature of Debtor

X_____
Signature of Joint Debtor

_____
Telephone Number (If not represented by attorney)

Date _____

### Signature of Attorney

X_____
Signature of Attorney for Debtor(s)

Adam G. Landis (No. 3407)         Daniel C. Cohn
Printed Name of Attorney for Debtor(s)      Co-Counsel

Klett Rooney Lieber & Schorling      Cohn Khoury Madoff
                                     & Whitesell LLP
Firm Name

1000 West Street, Suite 1410      101 Arch Street
Wilmington, DE 19801              Boston, MA 02110

Address

(302) 552-4200                    (617) 951-2505
Telephone Number

Date May 14, 2003

### Exhibit A

(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities and Exchange Act of 1934 and is requesting relief under chapter 11)

☐ Exhibit A is attached and made a part of this petition.

### Exhibit B

(To be completed if debtor is an individual whose debts are primarily consumer debts)

I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter.

X_____
Signature of Attorney for Debtor(s)            Date

### Signature of Debtor (Corporation/Partnership)

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X_____
Signature of Authorized Individual

V.M. Philbrook
Printed Name of Authorized Individual

President and CEO
Title of Authorized Individual

Date May 14, 2003

### Signature of Non-Attorney Petition Preparer

I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. ? 110, that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.

_____
Printed Name of Bankruptcy Petition Preparer

_____
Social Security Number

_____
Address

Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

X_____
Signature of Bankruptcy Petition Preparer

Date _____

A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. ? 110; 18 U.S.C. ? 156.

A0002

**Schedule "1"**
**List of Other Names Used by Debtors**

1. <u>Plassein International Corp.</u>

   A.   Plassein International
   B.   Plassein Packaging
   C.   Plassein Packaging Corp.

2. <u>Plassein International of Martin, Inc.</u>

   A.   Marshall Plastic Film
   B.   Marshall Plastic Film, Inc.
   C.   Plassein International
   D.   Plassein International of Martin

3. <u>Plassein International of Ontario, LLC</u>

   A.   Plassein International
   B.   Plassein International of Ontario
   C.   Plassein Transamerican, LLC
   E.   Transamerican Plastics
   F.   Transamerican Plastics, LLC

4. <u>Plassein International of Salem, Inc.</u>

   A.   Bradco
   B.   Key Packaging Industries
   C.   Key Packaging Industries, Corp.
   D.   KPI
   E.   KPI – Bradco Equipment
   F.   Plassein International
   G.   Plassein International of Salem

5.   <u>Plassein International of Spartanburg, Inc.</u>

    A.     Plassein International
    B.     Plassein International of Spartanburg
    C.     Plastical Industries
    D.     Plastical Industries, Inc.

6.   <u>Plassein International of Thomasville, Inc.</u>

    A.     Plassein International
    B.     Plassein International of Longview
    C.     Plassein International of Thomasville
    D.     Rex International
    E.     Rex International, Inc.
    F.     Rex-Rosenlew International

7.   <u>Teno Films, Incorporated</u>

    A.     Teno Films

A0004

**Schedule "2"**
**List of Affiliate Debtors**

| Debtor | Federal Tax Id. No. |
|--------|---------------------|
| Plassein International Corp. | 76-0625160 |
| Plassein International of Martin, Inc. | 38-1995946 |
| Plassein International of Ontario, LLC | 33-0886414 |
| Plassein International of Salem, Inc. | 04-2679597 |
| Plassein International of Spartanburg, Inc. | 95-4293793 |
| Plassein International of Thomasville, Inc. | 56-1267514 |
| Teno Films, Incorporated | 56-1888044 |

## UNANIMOUS CONSENT OF DIRECTORS

The undersigned, being all of the directors of Plassein International Corp. (the "Company"), a Delaware corporation, hereby consent to the adoption of the following resolutions:

RESOLVED: That the Company seek relief under Chapter 11 of the United States Bankruptcy Code;

FURTHER
RESOLVED: That V.M. Philbrook, the President and Chief Executive Officer of the Company (the "Authorized Officer") is hereby authorized (i) to prepare and file on behalf of the Company a petition for relief under Chapter 11 of the Bankruptcy Code, (ii) to execute on behalf of the Company such petition, schedules and statements as the Authorized Officer may deem necessary or appropriate in connection therewith, (iii) to cause the Company to perform its functions and duties as a debtor in possession pursuant to the applicable provisions of the Bankruptcy Code, (iv) to take such steps on behalf of the Company as may be necessary or appropriate to the Company's reorganization effort, including, without limitation, negotiating or otherwise obtaining court authority for use of cash collateral, postpetition financing, the assumption or rejection of executory contracts and unexpired leases, and the sale or other disposition of property other than in the ordinary course of business, (v) to negotiate, prepare and propose to creditors such plan as the Authorized Officer may deem to be feasible and in the best interests of the Company, (vi) to file any pleading appropriate or necessary for the Company to seek relief under any other chapter of the Bankruptcy Code, and (vii) to execute such further documents and do such further acts as the Authorized Officer may deem necessary or appropriate with respect to the foregoing, including the delegation of such foregoing authority to other officers and employees of the Company; the execution of any document or the doing of any act by the Authorized Officer in connection with such proceedings to be conclusively presumed to be authorized by this vote;

A0006

FURTHER
RESOLVED:    That the law firm of Cohn Khoury Madoff & Whitesell LLP and Daniel C.
Cohn, Esq., of that firm are hereby retained as counsel under general
retainer to represent the Company in all proceedings commenced under or
resulting from these votes, and that the Company compensate such counsel
for its services at its hourly rates in effect at the time such services are
rendered, provided that the Authorized Officer may cause the Company to
agree to pay a premium over or obtain a discount from such hourly rates
by subsequent agreement with such counsel, and to reimburse such
counsel in full for its cash disbursements and for such expenses as such
counsel customarily bills to its clients, and that the Authorized Officer is
hereby authorized to enter into such agreements as may be necessary or
appropriate to effect such retention;

FURTHER
RESOLVED:    That the law firm of Klett Rooney Lieber & Schorling and Adam G.
Landis, Esq. of that firm are hereby retained as Delaware local counsel and
general corporate, tax and real estate counsel under general retainer to
represent the Company in all proceedings commenced under or resulting
from these votes, and that the Company compensate such counsel for its
services at its hourly rates in effect at the time such services are rendered,
provided that the Authorized Officer may cause the Company to agree to
pay a premium over or obtain a discount from such hourly rates by
subsequent agreement with such counsel, and to reimburse such counsel in
full for its cash disbursements and for such expenses as such counsel
customarily bills to its clients, and that the Authorized Officer is hereby
authorized to enter into such agreements as may be necessary or
appropriate to effect such retention;

FURTHER
RESOLVED:    That the Company retain the firm of NachmanHaysBrownstein, Inc. and
Leland B. Goldberg of that firm to serve as crisis manager to the Company
in connection with the foregoing votes, and that the Authorized Officer is
hereby authorized to enter into such agreements as may be necessary or
appropriate to effect such retention; and

FURTHER
RESOLVED:    That the Company retain the firm of Mesirow Financial, Inc. and Jeffrey
A. Golman of that firm to serve as investment banker to the Company in
connection with the foregoing votes, and that the Authorized Officer is
hereby authorized to enter into such agreements as may be necessary or
appropriate to effect such retention.

This consent may be executed in one or more counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same consent.

Dated: May 14, 2003

_____
V.M. Philbrook

Peter Vandenberg, Jr.

898fdp/Plasseln (VP) (Resolution)

A0008

This consent may be executed in one or more counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same consent.

Dated: May 14, 2003

V.M. Philbrook

Peter Vandenberg, Jr.

898kip/Plaszain (VP) (Resolution)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| PLASSEIN INTERNATIONAL | ) | Case Nos. 03-_____ ( ___ ) |
| CORP., et al.[1] | ) | through 03-_____ ( ___ ) |
| | ) | (Jointly Administered) |
| Debtors | ) | |

## CONSOLIDATED LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS[2]

    Following is the consolidated list of the Debtors' creditors holding the 20 largest unsecured claims. The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in these Chapter 11 cases. The list does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101(31), or (2) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 20 largest unsecured claims.

| (1)<br>Name of creditor and complete mailing address, including zip code | (2)<br>Name, telephone and facsimile numbers and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | (3)<br>Nature of claim (trade debt, bank loan, government contract, etc.) | (4)<br>Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | (5)<br>Amount of claim [if secured, also state value of security] |
|---|---|---|---|---|
| Massachusetts Mutual Life Insurance Company<br>David L. Babson & Company, Inc.<br>1500 Main Street<br>Springfield, MA 01115 | Michael P. Hermsen, CFA<br>David L. Babson & Company<br>1500 Main Street<br>Springfield, MA 01115<br>Tel: 413-226-1615<br>Fax: 413-226-2615 | 12% Junior, 13% Senior and 15 % Junior Subordinated Debt | | 15,046,409 |
| BancBoston Ventures, Inc.<br>BancBoston Capital<br>175 Federal Street 10th Floor<br>Boston, MA 02110 | Daniel Reese<br>BancBoston Capital<br>Mail Stop MA DE 10210A<br>175 Federal Street 10th Floor<br>Boston, MA 02110<br>Tel: 617-434-2442<br>Fax: 617-434-6175 | 12% Junior, 13% Senior and 15 % Junior Subordinated Debt | | 10,831,600 |
| Libra Mezzanine Partners II, L.P.<br>Caltius Mezzanine Partners<br>11766 Wilshire Blvd., Suite 850<br>Los Angeles, CA 90025 | James Upcharch<br>Caltius Mezzanine Partners<br>11766 Wilshire Blvd., Suite 850<br>Los Angeles, CA 90025<br>Tel: 310-996-9572<br>Fax: 310-996-9577 | 13% Senior Subordinated Debt | | 5,909,200 |

---

[1] Additional debtors include all of Plassein International Corp.'s wholly-owned, domestic subsidiaries: Plassein International of Martin, Inc., Plassein International of Ontario, LLC, Plassein International of Salem, Inc., Plassein International of Spartanburg, Inc., Plassein International of Thomasville, Inc. and Teno Films, Incorporated.

[2] One or more of the Debtors, and in some cases all of the Debtors, are liable for each of the below-listed claims.

WLM45917v1

| (1)<br>Name of creditor and complete mailing address, including zip code | (2)<br>Name, telephone and facsimile numbers and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | (3)<br>Nature of claim (trade debt, bank loan, government contract, etc.) | (4)<br>Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | (5)<br>Amount of claim [if secured, also state value of security] |
|---|---|---|---|---|
| Suntrust Banks, Inc.<br>Suntrust Equity Partners<br>303 Peachtree Street NE, 25th Fl.<br>Atlanta, GA 30308 | Palmer Henson, Director<br>Suntrust Equity Partners<br>303 Peachtree Street, 25th Floor<br>Atlanta, GA 30308<br>Tel: 404-827-6531<br>Fax: 404-588-7501 | 13% Senior Subordinated Debt | | 5,909,200 |
| WCA(Private Equity), LLC<br>1170 Peachtree Street<br>Suite 1610<br>Atlanta, GA 30309 | Matt Sullivan, Managing Partner<br>Peach Tree Equity Partners<br>1170 Peachtree Street, Suite 1610<br>Atlanta, GA 30309<br>Tel: 404-253-6369<br>Fax: 404-253-6377 | 13% Senior Subordinated Debt | | 5,909,200 |
| Equistar Chemicals, LP<br>11530 Northlake Drive<br>Cincinnati, OH 45249 | Tom Rigney<br>Equistar Chemicals, LP<br>11530 Northlake Drive<br>Cincinnati, OH 45249<br>Tel: 513-530-4374<br>Fax: 513-530-4266 | Trade | | 4,507,244 |
| Exxon Mobil<br>Treasurer's Credit Department<br>13501 Katy Freeway<br>Houston, TX 77079 | Dennis Moon<br>Treasurer's Credit Department<br>Exxon Mobil<br>13501 Katy Freeway<br>Houston, TX 77079<br>Tel: 281-870-6679<br>Fax: 281-588-2525 | Trade | | 2,299,040 |
| MassMutual Corporate Investors<br>David L. Babson & Company, Inc.<br>1500 Main Street<br>Springfield, MA 01115 | Michael P. Hermsen, CFA<br>David L. Babson & Company<br>1500 Main Street<br>Springfield, MA 01115<br>Tel: 413-226-1615<br>Fax: 413-226-2615 | 12% Junior, 13% Senior and 15 % Junior Subordinated Debt | | 1,682,821 |
| MassMutual Participation Investors<br>David L. Babson & Company, Inc.<br>1500 Main Street<br>Springfield, MA 01115 | Michael P. Hermsen, CFA<br>David L. Babson & Company<br>1500 Main Street<br>Springfield, MA 01115<br>Tel: 413-226-1615<br>Fax: 413-226-2615 | 12% Junior, 13% Senior and 15 % Junior Subordinated Debt | | 890,941 |
| Sun Chemical Corp.<br>320 Forbes Blvd.<br>Mansfield, MA 02048 | Kim Howson<br>Sun Chemical Corp.<br>320 Forbes Blvd<br>Mansfield, MA 02048<br>Tel: 508-339-3526<br>Fax: 508-339-5465 | Trade | | 543,815 |
| Colortech, Inc.<br>5712 Commerce Blvd.<br>Morristown, TN 37814 | Dave Hogdahl<br>Colortech, Inc.<br>5712 Commerce Blvd.<br>Morristown, TN 37814<br>Tel: 845-398-9827<br>Fax: 845-398-9835 | Trade | | 529,290 |

A0011

| (1) Name of creditor and complete mailing address, including zip code | (2) Name, telephone and facsimile numbers and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | (3) Nature of claim (trade debt, bank loan, government contract, etc.) | (4) Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | (5) Amount of claim [if secured, also state value of security] |
|---|---|---|---|---|
| Dow Chemical Co.<br>2020 Dow Center<br>Midland, MI 48674 | Scott Crane<br>Dow Chemical Co.<br>2020 Dow Center<br>Midland, MI 48674<br>Tel: 989-636-2534<br>Fax: 989-638-9852 | Trade | | 333,908 |
| Basell<br>2727 Alliance Drive<br>Lansing, MI 48910 | Clarissa McKay<br>Basell<br>2727 Alliance Drive<br>Lansing, MI 48910<br>Tel: 517-336-4823<br>Fax: 517-336-9615 | Trade | | 247,590 |
| Ernst & Young<br>Assurance and Advisory Business Services<br>Goodwin Square<br>225 Asylum Street<br>Hartford, CT 06103 | James Searson, Managing Partner<br>Goodwin Square<br>225 Asylum Street<br>Hartford, CT 06103<br>Tel: 860-524-3128<br>Fax: 860-524-3123 | Trade | | 189,115 |
| Techmer PM<br>18420 Laurel Park Road<br>Rancho Dominguez, CA 90220 | Mark Jordan<br>Techmer PM<br>18420 Laurel Park Road<br>Rancho Dominguez, CA 90220<br>Tel: 310-639-9211<br>Fax: 310-632-6884 | Trade | | 154,306 |
| Zurich N.A.<br>c/o Marsh USA<br>Attention: Molly Bublitz<br>1166 Ave. of the Americas<br>New York, NY 10036 | Corazon Navarro (ER-Chicago)<br>Zurich N.A.<br>c/o Marsh USA<br>Attention: Molly Bublitz<br>1166 Ave. of the Americas<br>New York, NY 10036<br>Tel: 312-496-9367<br>Fax: 312-441-9520 | Insurance | | 151,126 |
| GulfStar Plastics 2001, L.L.C.<br>The GulfStar Group<br>700 Louisiana, Suite 3850<br>Houston, TX 77002 | Kent Kahle<br>The GulfStar Group<br>700 Louisiana, Suite 3850<br>Houston, TX 77002<br>Tel: 713-300-2020<br>Fax: 713-300-2021 | 15% Junior Subordinated Debt | | 149,025 |
| OPG Partners<br>c/o Tanklow, Hollender & Co.<br>450 Seventh Avenue<br>New York, NY 10123-1802 | Alex Hollender<br>OPG Partners<br>c/o Tanklow, Hollender & Co.<br>450 Seventh Avenue<br>New York, NY 10123-1802<br>Tel: 212-594-7520<br>Fax: 212-594-2368 | Trade | | 134,865 |
| Caraustar<br>1301 S. Wheeler<br>Saginaw, MI 48605 | Jody Leser<br>Caraustar<br>1301 S. Wheeler<br>Saginaw, MI 48605<br>Tel: 989-753-6435<br>Fax: 989-793-1660 | Trade | | 121,053 |

3

A0012

| (1)<br>Name of creditor and complete mailing address, including zip code | (2)<br>Name, telephone and facsimile numbers and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | (3)<br>Nature of claim (trade debt, bank loan, government contract, etc.) | (4)<br>Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | (5)<br>Amount of claim [if secured, also state value of security] |
|---|---|---|---|---|
| Cryovac Sealed Air Corp<br>Rigid Packaging Division<br>Tuckerton Road<br>Reading, PA 19605 | Bob Price<br>Cryovac Sealed Air Corp<br>Rigid Packaging Division<br>Tuckerton Road<br>Reading, PA 19605<br>Tel: 828-728-8500<br>Fax: 828-728-0114 | Trade | | 123,185 |

4

A0013

**DECLARATION UNDER PENALTY OF PERJURY ON BEHALF OF CORPORATION OR LLC**

I, V.M. Philbrook, the President of the entities named as debtors in these cases, declare under penalty of perjury that I have read the foregoing consolidated List of Creditors Holding 20 Largest Unsecured Claims and that it is true and correct to the best of my information and belief.

Date: May _14_, 2003        Signature: _____

*Penalty for making false statement or concealing property:* Fine of up to $500,000 or imprisonment for up to 5 years or both.
18 U.S.C. §§ 152 and 3571.

G:/data/898fdp\20 largest(2)

4

A0014

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re                                    )
                                         )
PLASSEIN INTERNATIONAL                   )        Chapter 11
   CORP., et al.[1]                      )
                                         )        Case Nos. 03-_____( ___ )
                                         )            through 03-_____( ___ )
                    Debtors              )        (Jointly Administered)
                                         )

## LIST OF EQUITY SECURITY HOLDERS
### [Plassein International Corp.]

I, V.M. Philbrook, President and Chief Executive Officer of Plassein International Corp.

(the "Debtor"), declare under penalty of perjury that the attached Debtor's List of Equity Security

Holders is true and complete to the best of my knowledge, information and belief.


Date: May 14, 2003                       _____
                                         V.M. Philbrook
                                         President and Chief Executive Officer


---

[1] Additional debtors include all of Plassein International Corp.'s wholly-owned, domestic subsidiaries: Plassein International of Martin, Inc., Plassein International of Ontario, LLC, Plassein International of Salem, Inc., Plassein International of Spartanburg, Inc., Plassein International of Thomasville, Inc. and Teno Films, Incorporated.

## LIST OF EQUITY SECURITY HOLDERS

Following is the list of the Debtor's equity security holder(s) which is prepared in accordance with Rule 1007(a)(3) for filing in this Chapter 11 case.

| Name and last known address or place of business of holder | Security Class | Number of Securities | Kind of Interest |
|---|---|---|---|
| GulfStar Packaging Partners, LLC<br>The Gulfstar Group Inc.<br>Attn: Kent Kahle<br>700 Louisiana Street   Suite 3800<br>Houston, TX 77002 | Class A Common | 1,848,000 | |
| GulfStar Investments, Ltd<br>The Gulfstar Group Inc.<br>Attn: Kent Kahl<br>700 Louisiana Street  Suite 3800<br>Houston, TX 77002 | Class A Common | 924,000 | |
| Timothy O'Neal<br>2413 Pelham<br>Houston, TX 77019 | Class A Common | 464,000 | |
| Eric T. Paulsen<br>2902 N. Katy-Hockley Road<br>Katy, TX 77493 | Class A Common | 464,000 | |
| Frank McNabb<br>794 Warrenville Road<br>Mansfield, CT 06250 | Class A Common | 300,000 | |
| Massachusetts Mutual Life Insurance Company<br>David L. Babson & Company, Inc.<br>Attn: Michael P. Hermsen CFA<br>1500 Main Street   Suite 2200<br>Springfield, MA 01115 | Class A Common | 1,157,168.81 | |
| MassMutual Corporate Investors<br>David L. Babson & Company, Inc.<br>Attn: Michael P. Hermsen CFA<br>1500 Main Street   Suite 2200<br>Springfield, MA 01115 | Class A Common | 129,420.13 | |
| MassMutual Participation Investors<br>David L. Babson & Company, Inc.<br>Attn: Michael P. Hermsen CFA<br>1500 Main Street   Suite 2200<br>Springfield, MA 01115 | Class A Common | 68,516.74 | |
| BancBoston Ventures, Inc.<br>BancBoston Capital<br>Attn: Daniel Reese Mail Stop MA DE 10210A<br>175 Federal Street, 10/F<br>Boston, MA 02110 | Class A Common | 1,355,105.69 | |
| Trivest Fund II, L.P.<br>C/o Trivest Partners, L.P.<br>Attn: General Counsel | Class A Common | 3,107,225.49 | |

| | | | |
|---|---|---|---|
| 2665 South Bayshore Drive Suite 800<br>Miami, FL 33133 | | | |
| Trivest Equity Partners II, Ltd.<br>C/o Trivest Partners, L.P.<br>Attn: General Counsel<br>2665 South Bayshore Drive Suite 800<br>Miami, FL 33133 | Class A Common | 820,663.52 | |
| Trivest Principals Fund II, Ltd.<br>C/o Trivest Partners, L.P.<br>Attn: General Counsel<br>2665 South Bayshore Drive Suite 800<br>Miami, FL 33133 | Class A Common | 350,857.19 | |
| The Andrew Marshall Forsberg Trust<br>C/o Andrew Marshall Forsberg, Trustee<br>904 Allegan Avenue<br>Martin, Michigan 49070 | Class A Common | 28,772.7 | |
| Trivest Fund III, L.P.<br>C/o Trivest Partners, L.P.<br>Attn: General Counsel<br>2665 South Bayshore Drive Suite 800<br>Miami, FL 33133 | Class A Common | 3,882,534.3019 | |
| Trivest Equity Partners III, Ltd.<br>C/o Trivest Partners, L.P.<br>Attn: General Counsel<br>2665 South Bayshore Drive Suite 800<br>Miami, FL 33133 | Class A Common | 152,323.3647 | |
| Trivest Fund Cayman III, L.P.<br>C/o Trivest Partners, L.P.<br>Attn: General Counsel<br>2665 South Bayshore Drive Suite 800<br>Miami, FL 33133 | Class A Common | 123,227.8906 | |
| Trivest Principals Fund III, L.P.<br>C/o Trivest Partners, L.P.<br>Attn: General Counsel<br>2665 South Bayshore Drive Suite 800<br>Miami, FL 33133 | Class A Common | 120,660.6428 | |
| **Total Class A Common Stock** | | **15,296,476.4700** | |
| Massachusetts Mutual Life Insurance<br>Company<br>David L. Babson & Company, Inc.<br>Attn: Michael P. Hermsen CFA<br>1500 Main Street  Suite 2200<br>Springfield, MA 01115 | Class B Common | 2,839,180.51 | |
| MassMutual Corporate Investors<br>David L. Babson & Company, Inc.<br>Attn: Michael P. Hermsen CFA<br>1500 Main Street  Suite 2200<br>Springfield, MA 01115 | Class B Common | 317,539.77 | |
| MassMutual Participation Investors<br>David L. Babson & Company, Inc. | Class B Common | 168,109.77 | |

| Attn: Michael P. Hermsen CFA<br>1500 Main Street  Suite 2200<br>Springfield, MA 01115 | | | |
|---|---|---|---|
| BancBoston Ventures, Inc.<br>BancBoston Capital<br>Attn: Daniel Reese<br>Mail Stop MA DE 10210A<br>175 Federal Street, 10/F<br>Boston, MA 02110 | Class B Common | 3,324,830.04 | |
| **Total Class B Common Stock** | | **6,649,660.09** | |
| GulfStar Plastics, L.L.C.<br>The Gulfstar Group Inc.<br>Attn: Kent Kahle<br>700 Louisiana Street  Suite 3800<br>Houston, TX 77002 | Class A Convertible Preferred | 800,000 | |
| Trivest Fund II, Ltd.<br>C/o Trivest Partners, L.P.<br>Attn: General Counsel<br>2665 South Bayshore Drive Suite 800<br>Miami, FL 33133 | Class A Convertible Preferred | 6,900,673 | |
| Trivest Equity Partners II, Ltd.<br>C/o Trivest Partners, L.P.<br>Attn: General Counsel<br>2665 South Bayshore Drive Suite 800<br>Miami, FL 33133 | Class A Convertible Preferred | 1,759,238 | |
| Triveset Principals Fund II, Ltd.<br>C/o Trivest Partners, L.P.<br>Attn: General Counsel<br>2665 South Bayshore Drive Suite 800<br>Miami, FL 33133 | Class A Convertible Preferred | 870,089 | |
| Frank McNabb<br>794 Warrenville Road<br>Mansfield, CT 06250 | Class A Convertible Preferred | 60,000 | |
| Richard Mosback<br>31 Maplewood Drive<br>New Milford, CT 06776 | Class A Convertible Preferred | 40,000 | |
| James Kubic<br>441 South Main Street  Unit 6<br>Manchester, CT 06040 | Class A Convertible Preferred | 20,000 | |
| James J. Lavelle<br>5 Essex Court<br>Avon, CT 06001 | Class A Convertible Preferred | 20,000 | |
| Paul D. Gage<br>615 Dorado Circle<br>High Point, NC  26265 | Class A Convertible Preferred | 196,250 | |
| Stephen S. Wilson<br>P. O. Box 931<br>Thomasville, NC 27360 | Class A Convertible Preferred | 57,500 | |
| BancBoston Ventures, Inc.<br>BancBoston Capital | Class A Convertible Preferred | 3,018,210.61 | |

| | | | | |
|---|---|---|---|---|
| Attn: Daniel Reese<br>Mail Stop MA DE 10210A<br>175 Federal Street, 10/F<br>Boston, MA 02110 | | | | |
| Massachusetts Mutual Life Insurance Company<br>David L. Babson & Company, Inc.<br>Attn: Michael P. Hermsen CFA<br>1500 Main Street   Suite 2200<br>Springfield, MA 01115 | Class A Convertible Preferred | 2,577,348.2 | | |
| MassMutual Corporate Investors<br>David L. Babson & Company, Inc.<br>Attn: Michael P. Hermsen CFA<br>1500 Main Street   Suite 2200<br>Springfield, MA 01115 | Class A Convertible Preferred | 288,255.91 | | |
| MassMutual Participation Investors<br>David L. Babson & Company, Inc.<br>Attn: Michael P. Hermsen CFA<br>1500 Main Street   Suite 2200<br>Springfield, MA 01115 | Class A Convertible Preferred | 152,606.5 | | |
| The Andrew Marshall Forsberg Trust<br>C/o Andrew Marshall Forsberg, Trustee<br>904 Allegan Avenue<br>Martin, Michigan 49070 | Class A Convertible Preferred | 42,346.38 | | |
| Trivest Fund III, L.P.<br>C/o Trivest Partners, L.P.<br>Attn: General Counsel<br>2665 South Bayshore Drive<br>Suite 800<br>Miami, FL 33133 | Class A Convertible Preferred | 8,647,522 | | |
| Trivest Equity Partners III, L.P.<br>C/o Trivest Partners, L.P.<br>Attn: General Counsel<br>2665 South Bayshore Drive Suite 800<br>Miami, FL 33133 | Class A Convertible Preferred | 339,268 | | |
| Trivest Fund Cayman III, L.P.<br>C/o Trivest Partners, L.P.<br>Attn: General Counsel<br>2665 South Bayshore Drive Suite 800<br>Miami, FL 33133 | Class A Convertible Preferred | 274,464 | | |
| Trivest Principals Fund III, L.P.<br>C/o Trivest Partners, L.P.<br>Attn: General Counsel<br>2665 South Bayshore Drive Suite 800<br>Miami, FL 33133 | Class A Convertible Preferred | 268,746 | | |
| **Total Class A Convertible Preferred** | | **26,332,517.6** | | |
| Sam Chebeir<br>Westates Holdings<br>988 Villa Montes Circle<br>Corona, CA 92879 | Class B Convertible Preferred | 5,500,000 | | |

| | | | |
|---|---|---|---|
| The Andrew Marshall Forsberg Fund<br>C/o Andrew Marshall Forsberg, Trustee<br>904 Allegan Avenue<br>Martin, Michigan 49070 | Class B Convertible<br>Preferred | 301,500 | |
| Ethel Forsberg Revocable Trust<br>C/o Andrew Marshall Forsberg, Trustee<br>904 Allegan Avenue<br>Martin, Michigan 49070 | Class B Convertible<br>Preferred | 678,000 | |
| The Janis Rae Forsberg Trust<br>C/o Andrew Marshall Forsberg, Trustee<br>904 Allegan Avenue<br>Martin, Michigan 49070 | Class B Convertible<br>Preferred | 144,000 | |
| Frank John McCarthy<br>904 E. Allegan Avenue<br>Martin, MI 49070 | Class B Convertible<br>Preferred | 376,500 | |
| **Total Class B Convertible Preferred** | | **7,000,000** | |
| GulfStar Plastics L.L.C.<br>The Gulfstar Group Inc.<br>Attn: Kent Kahle<br>700 Louisiana Street Suite 3800<br>Houston, TX 77002 | Class A Common<br>Stock Warrants | 400,000 | |
| The Andrew Marshall Forsberg Trust<br>C/o Andrew Marshall Forsberg, Trustee<br>904 Allegan Avenue<br>Martin, Michigan 49070 | Class A Common<br>Stock Warrants | 101,573.19 | |
| Ethel Forsberg Revocable Trust<br>C/o Andrew Marshall Forsberg, Trustee<br>904 Allegan Avenue<br>Martin, Michigan 49070 | Class A Common<br>Stock Warrants | 180,800 | |
| The Janis Rae Forsberg Trust<br>C/o Andrew Marshall Forsberg, Trustee<br>904 Allegan Avenue<br>Martin, Michigan 49070 | Class A Common<br>Stock Warrants | 38,400 | |
| Frank John McCarthy<br>904 E. Allegan Avenue<br>Martin, MI 49070 | Class A Common<br>Stock Warrants | 100,400 | |
| Sam Chebeir<br>Westates Holdings<br>988 Villa Montes Circle<br>Corona, CA 92879 | Class A Common<br>Stock Warrants | 1,466,666.65 | |
| Trivest Fund II, Ltd.<br>C/o Trivest Partners, L.P.<br>Attn: General Counsel<br>2665 South Bayshore Drive Suite 800<br>Miami, FL 33133 | Class A Common<br>Stock Warrants | 7,673,186.01364 | |
| Trivest Equity Partners II, Ltd.<br>C/o Trivest Partners, L.P.<br>Attn: General Counsel<br>2665 South Bayshore Drive Suite 800<br>Miami, FL 33133 | Class A Common<br>Stock Warrants | 1,956,270.40091 | |

A0020

| | | |
|---|---|---|
| Trivest Principals Fund II, Ltd.<br>C/o Trivest Partners, L.P.<br>Attn: General Counsel<br>2665 South Bayshore Drive Suite 800<br>Miami, FL 33133 | Class A Common<br>Stock Warrants | 967,493.84 |
| Transamerican Plastics Corp<br>c/o Sam Chebeir<br>Westates Holdings<br>988 Villa Montes Circle<br>Corona, CA 92879<br><br>Copy to Lon Stephens<br>Stephens & Kray<br>5000 Birch Street Suite 410<br>Newport Beach, CA 92660 | Class A Common<br>Stock Warrants | 90,909.09091 |
| Frank McNabb<br>794 Warrenville Road<br>Mansfield, CT 06250 | Class A Common<br>Stock Warrants | 30,000 |
| Richard J. Mosback<br>31 Maplewood Drive<br>New Milford, CT 06776 | Class A Common<br>Stock Warrants | 20,000 |
| James Kubik<br>441 South Main Street Unit 68<br>Manchester, CT 06040 | Class A Common<br>Stock Warrants | 12,600 |
| James J. Lavelle<br>5 Essex Court<br>Avon, CT 06001 | Class A Common<br>Stock Warrants | 10,000 |
| Paul Gage<br>615 Dorado Circle<br>High Point, NC 26265 | Class A Common<br>Stock Warrants | 98,087 |
| Stephen S. Wilson<br>P. O. Box 931<br>Thomasville, NC 27360 | Class A Common<br>Stock Warrants | 28,750 |
| BancBoston Ventures, Inc.<br>BancBoston Capital<br>Attn: Daniel Reese<br>Mail Stop MA DE 10210A<br>175 Federal Street, 10/F<br>Boston, MA 02110 | Class A Common<br>Stock Warrants | 1,509,105.31 |
| Massachusetts Mutual Life Insurance<br>Company<br>David L. Babson & Company, Inc.<br>Attn: Michael P. Hermsen CFA<br>1500 Main Street Suite 2200<br>Springfield, MA 01115 | Class A Common<br>Stock Warrants | 2,926,258.246 |
| MassMutual Corporate Investors<br>David L. Babson & Company, Inc.<br>Attn: Michael P. Hermsen CFA<br>1500 Main Street Suite 2200<br>Springfield, MA 01115 | Class A Common<br>Stock Warrants | 327,275.028 |

| | | | |
|---|---|---|---|
| MassMutual Participation Investors<br>David L. Babson & Company, Inc.<br>Attn:  Michael P. Hermsen CFA<br>1500 Main Street   Suite 2200<br>Springfield, MA 01115 | Class A Common<br>Stock Warrants | 173,342.426 | |
| Trivest Fund III, L.P.<br>C/o Trivest Partners, L.P.<br>Attn:  General Counsel<br>2665 South Bayshore Drive Suite 800<br>Miami, FL 33133 | Class A Common<br>Stock Warrants | 9,615,590.9959 | |
| Trivest Equity Partners III<br>C/o Trivest Partners, L.P.<br>Attn:  General Counsel<br>2665 South Bayshore Drive Suite 800<br>Miami, FL 33133 | Class A Common<br>Stock Warrants | 377,248.2282 | |
| Trivest Fund Cayman III, L.P.<br>C/o Trivest Partners, L.P.<br>Attn:  General Counsel<br>2665 South Bayshore Drive Suite 800<br>Miami, FL 33133 | Class A Common<br>Stock Warrants | 305,189.5791 | |
| Trivest Principals Fund III, L.P.<br>C/o Trivest Partners, L.P.<br>Attn:  General Counsel<br>2665 South Bayshore Drive Suite 800<br>Miami, FL 33133 | Class A Common<br>Stock Warrants | 298,831.4618 | |
| GulfStar Plastics 2001, L.L.C<br>The Gulfstar Group Inc.<br>Attn:  Kent Kahle<br>700 Louisiana   Suite 3850<br>Houston, TX 77002 | Class A Common<br>Stock Warrants | 325,000 | |
| **Total Class A Common Stock Warrants** | | **29,032,977.46046** | |
| Martin Mayden, Managing Partner<br>Suntrust Equity Partners<br>303 Peachtree Street, 25th fl<br>Atlanta, GA 30308 | Series A Warrants | 867,346.97 | |
| Massachusetts Mutual Life Insurance<br>Company<br>David L. Babson & Company, Inc.<br>Attn:  Michael P. Hermsen CFA<br>1295 State Street<br>Springfield, MA 0111-0001 | Series A Warrants | 1,110,983.73 | |
| MassMutual Corporate Investors<br>David L. Babson & Company, Inc.<br>Attn:  Michael P. Hermsen CFA<br>1295 State Street<br>Springfield, MA 0111-0001 | Series A Warrants | 124,254.84 | |
| MassMutual Participation Investors<br>David L. Babson & Company, Inc.<br>Attn:  Michael P. Hermsen CFA<br>1295 State Street | Series A Warrants | 65,781.88 | |

A0022

| | | | |
|---|---|---|---|
| Springfield, MA 0111-0001 | | | |
| Libra Mezzanine Partners II, L.P.<br>C/o Gregory Brackett, CFO<br>Caltius Mezzanine Partners<br>11766 Wilshire Boulevard, Suite 870<br>Los Angeles, CA 90025 | Series A Warrants | 867,346.97 | |
| BancBoston Ventures Inc.<br>BancBoston Capital<br>Attn: Daniel Reese<br>Mail Stop MA DE 10210A<br>175 Federal Street, 10/F<br>Boston, MA 02110 | Series A Warrants | 433,673.48 | |
| WCA, LLC<br>C/o Matt Sullivan<br>Peach Tree Equity Partners<br>1170 Peachtree Street, Suite 1610<br>Atlanta, GA 30309 | Series A Warrants | 867,346.97 | |
| **Total Series A Warrants** | | **4,336,734.84** | |
| Martin Mayden, Managing Partner<br>Suntrust Equity Partners<br>303 Peachtree Street, 25th fl<br>Atlanta, GA 30308 | Series B Warrants | 216,836.74 | |
| Massachusetts Mutual Life Insurance<br>Company<br>David L. Babson & Company, Inc.<br>Attn: Michael P. Hermsen CFA<br>1295 State Street<br>Springfield, MA 0111-0001 | Series B Warrants | 277,745.94 | |
| MassMutual Corporate Investors<br>David L. Babson & Company, Inc.<br>Attn: Michael P. Hermsen CFA<br>1295 State Street<br>Springfield, MA 0111-0001 | Series B Warrants | 31,063.71 | |
| MassMutual Participation Investors<br>David L. Babson & Company, Inc.<br>Attn: Michael P. Hermsen CFA<br>1295 State Street<br>Springfield, MA 0111-0001 | Series B Warrants | 16,445.47 | |
| Libra Mezzanine Partners II, L.P.<br>C/o Gregory Brackett, CFO<br>Caltius Mezzanine Partners<br>11766 Wilshire Boulevard, Suite 870<br>Los Angeles, CA 90025 | Series B Warrants | 216,836.74 | |
| BancBoston Ventures Inc.<br>BancBoston Ventures Inc.<br>BancBoston Capital<br>Attn: Daniel Reese<br>Mail Stop MA DE 10210A<br>175 Federal Street, 10/F<br>Boston, MA 02110 | Series B Warrants | 108,418.37 | |

A0023

| WCA, LLC C/o Matt Sullivan Peach Tree Equity Partners 1170 Peachtree Street, Suite 1610 Atlanta, GA 30309 | Series B Warrants | 216,836.74 | |
|---|---|---|---|
| **Total Series B Warrants** | | **1,084,183.71** | |

898fdp/equity list (Plascein)(3)

**B**

## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In Re:         ) <br> ) <br> PLASSEIN INTERNATIONAL CORP., et al.,[1] ) <br> ) <br> ) <br>         Debtors.    ) <br> ) | **Chapter 7** <br> **Case No. 03-11489 (DDS)** <br><br> **Jointly Administered.** |
| WILLIAM BRANDT, AS HE IS THE   ) <br> TRUSTEE OF THE ESTATES OF   ) <br> PLASSEIN INTERNATIONAL CORP., et al., ) <br> ) <br>         Plaintiff,    ) <br> ) <br> v.       ) <br> ) <br> B.A. CAPITAL COMPANY LP,   ) <br> THOMAS F. FAY, RUTH L. FISCHBACH, ) <br> MARK R. FREEDMAN, ROBERT N. ZEITLIN,) <br> SIDNEY ZEITLIN, ZFC ASSOCIATES INC., ) <br> WILLIAM G. RUSSELL, ROBERT N. ) <br> ZEITLIN 1999 CHARITABLE REMAINDER ) <br> UNITRUST, THE ANDREW MARSHALL ) <br> FORSBERG TRUST, ETHEL FORSBERG ) <br> REVOCABLE TRUST, JANIS RAE ) <br> FORSBERG TRUST, FRANK JOHN ) <br> McCARTHY, DANIEL R. ORRIS, ) <br> BERNADINE ORRIS, SAM CHEBEIR, ) <br> CHARLES J. WARR, PAUL D. GAGE, ) <br> STEPHEN S. WILSON, G. KENNETH ) <br> POPE JR., KENNETH OLENLER, and ) <br> DANIEL A. JONES III, ) <br> ) <br>         Defendants.    ) <br> ) | **Adv. Pro. No.** |

## COMPLAINT

---

[1] Additional Debtors include all of Plassein International Corp.'s wholly-owned, domestic subsidiaries: Plassein International of Martin, Inc., Plassein International of Ontario, LLC, Plassein International of Salem, Inc., Plassein International of Spartanburg, Inc., Plassein International of Thomasville, Inc. and Teno Films, Incorporated.

William Brandt, as he is the duly appointed and acting Chapter 7 Trustee of the Estates of the Debtors, Plassein International of Thomasville, Inc., f/k/a Rex International, Inc.; Plassein International of Ontario, LLC, f/k/a Transamerican Plastic, LLC; Plassein International of Spartanburg, Inc., f/k/a Plastical Industries Inc.; Plassein International of Martin, Inc., f/k/a Marshall Plastic Film, Inc.; Plassein International of Salem, Inc., f/k/a Key Packaging Industries Corp.; and Teno Films, Incorporated (collectively, the "Debtors"), brings this action against the Defendants as former shareholders of the Debtors whose shares of stock was acquired in two transactions the first occurring in January 2000 and the second in August 2000, the result of which was to render the Debtors insolvent.

### Parties

1.      The Plaintiff is the duly appointed and acting trustee of the Chapter 7 Estates of the Debtors, having been so appointed by order of the United States Bankruptcy Court dated February 6, 2004 (the "Trustee).

2.      The Defendant B.A. Capital Company LP is a Delaware corporation duly organized and existing having a place of business in Charlotte, NC.

3.      The Defendant Thomas F. Fay is an individual residing at 2801 Somerset Drive, #403G, Lauderdale Lakes, FL 33311.

4.      The Defendant Ruth L. Fischbach is an individual residing at 5630 Wisconsin Avenue, Apt. 1502, Chevy Chase, MD 20815.

5.      The Defendant Mark R. Freedman is an individual residing at 14 Preston Court, Swampscott, MA 01907.

6.      The Defendant Robert N. Zeitlin is an individual residing at 118 Myrtle Street, Boston, MA 02114-4403.

2

A0026

7.    The Defendant Sidney Zeitlin is an individual residing at 10175 Collins Avenue, Apt. 306, Bal Harbour, FL 33154.

8.    The Defendant ZFC Associates Inc. is a corporation duly organized and existing having a place of business at c/o Dr. Robert N. Zeitlin, 118 Myrtle Street, Boston, MA 02114-4403.

9.    The Defendant William G. Russell is an individual residing at 134 Marshview Circle, P.O. Box 80, Seabrook, NH 03874.

10.    The Defendant Robert N. Zeitlin 1999 Charitable Remainder Unitrust is a trust with addresses at c/o Dr. Robert N. Zeitlin, 118 Myrtle Street, Boston, MA 02114-4403, and c/o Mr. Alex Hollender, Tanklow, Hollender & Company, 450 Seventh Avenue, New York, NY 10122.

11.    The Defendant The Andrew Marshall Forsberg Trust is a trust with an address at c/o Andrew Marshall Forsberg, Trustee, 904 Allegan Avenue, Martin, MI 49070-0147.

12.    The Defendant Ethel Forsberg Revocable Trust is a trust with an address at c/o Andrew Marshall Forsberg, Trustee, 904 Allegan Avenue, Martin, MI 49070-0147.

13.    The Defendant Janis Rae Forsberg Trust is a trust with an address at c/o Janis Rae Forsberg, Trustee, 904 Allegan Avenue, Martin, MI 49070-0147.

14.    The Defendant Frank John McCarthy is an individual with a last known address at Marshall Plastic Film, Inc., 904 Allegan Avenue, Martin, MI 49070-0147.

15.    The Defendant Daniel R. Orris is an individual whose address is currently unknown to the Plaintiff.

16.    The Defendant Bernadine Orris is an individual whose address is currently unknown to the Plaintiff.

A0027

17.     The Defendant Sam Chebeir is an individual residing at 5601 East Ana Street, Ontario, CA 91761-8699.

18.     The Defendant Charles J. Warr is an individual whose address is currently unknown to the Plaintiff.

19.     The Defendant Paul D. Gage is an individual whose last known address was Rex International, Inc., 1308 Blair Street, Thomasville, NC 27360.

20.     The Defendant Stephen S. Wilson is an individual whose last known address was Rex International, Inc., 1308 Blair Street, Thomasville, NC 27360.

21.     The Defendant G. Kenneth Pope Jr. is an individual whose address is currently unknown to the Plaintiff.

22.     The Defendant Kenneth Olenler is an individual whose address is currently unknown to the Plaintiff.

23.     The Defendant Daniel A. Jones III is an individual whose address is currently unknown to the Plaintiff.

### Jurisdiction and Venue

24.     This Court has jurisdiction pursuant to 28 U.S.C. §§157 and 1334.

25.     This matter is core proceeding under 28 U.S.C. §157(b)(2).

26.     Venue is proper pursuant to 28 U.S.C. §§1408 and 1409.

### FACTUAL STATEMENT

### The Initial Acquisitions

27.     On June 18, 1999, Plassein International, Corp. ("Plassein") was formed as a Delaware corporation for the purpose of acquiring certain manufacturers of flexible packaging and specialty film through a series of stock acquisitions commencing with the signing of

4

acquisition agreements in June and July 1999 and the closing on those initial acquisition agreements in January of 2000.

28.     On June 19, 1999, Plassein entered into an agreement to acquire the membership of Transamerican Plastic LLC ("Transamerican") and the stock of Plastical Industries, Inc. ("Plastical").

29.     On June 24, 1999, Plassein entered into an agreement with Nor Baker Industries Limited ("Nor Baker") to acquire the stock of Nor Baker Industries Limited.

30.     On June 28, 1999, Plassein entered into an agreement to acquire the stock of Marshall Plastics Film, Inc. ("Marshall").

31.     On July 23, 1999, Plassein entered into an agreement to acquire the stock of Key Packaging Industries Corp. ("Key"). [The agreements referenced in paragraphs 28 through 31 are collectively referred to as the "June Acquisition Agreements" and the transactions consummated thereby as the "January Acquisitions."]

### Financing for the Acquisitions

32.     In November 1999, Plassein obtained a commitment from Fleet Capital Corporation as agent for itself and a group of lenders (the "Lenders") to provide financing for Plassein's acquisitions of the stock of Transamerican, Plastical, Nor Baker, Marshall, and Key (Transamerican, Plastical, Nor Baker, Marshall and Key will collectively be referred to as the "January Target Companies").

33.     On or about January 10, 2000, Plassein closed on the June Acquisition Agreements and consummated the January Acquisitions, thereby acquiring the stock of the January Target Companies.

5

34.    On June 10, 2000, in connection with and as an integral part of the January Acquisitions, Plassein, along with the January Target Companies entered into a Loan and Security Agreement with the Lenders. Pursuant to the Loan and Security Agreement, the Lenders agreed to make advances and extend credit to an aggregate of $53,000,000 to Plassein, to be secured by the assets of the January Target Companies (the "January Loan Agreement"). Pursuant to the January Loan Agreement, each of the January Target Companies were borrowers under the January Loan Agreement, with obligations for the amounts advanced thereunder. Further, each of the January Target Companies secured the January loan transaction by granting to the Lenders a security interest in all of the assets of each January Target Company.

35.    Prior to January 10, 2000, various entities affiliated with TriVest Partners (the "TriVest Entities"), which as part of the January Acquisitions would become the controlling equity owners of Plassein, agreed to provide financing to Plassein in the amount of five million dollars ($5,000,000), which advances were subordinated to the advances of the Lenders.

36.    On January 10, 2000, the TriVest Entities further agreed to purchase certain Series A convertible shares of Plassein for an aggregate purchase price of $20,000,000.

### Closing on the Acquisitions

37.    On January 10, 2000, the Lenders advanced $39,200,320 under the January Loan Agreement, of which $12,000,000 was attributable to a Term A loan, $16,000,000 was attributable to a Term B loan, $10,410,320 was attributable to a Revolver and $790,000 to a Cap Ex facility. In addition thereto, the Lenders under the January Loan Agreement issued certain commitments for the benefit of Nor Baker Ltd., a Canadian corporation, the stock of which was also being acquired by Plassein as part of the January Acquisitions.

6

A0030

38.    On January 10, 2000, TriVest Entities advanced $5,000,000 to Plassein. The debt was subordinated to that of the Lenders ("TriVest Subdebt"), and the TriVest Entities purchased the Series A convertible shares of Plassein.

39.    On January 10, 2000, $31,002,012 was disbursed to the various shareholders of the January Target Companies in accordance with the terms of the June Acquisition Agreement.

40.    The specific disbursements to the shareholders of the January Target Companies were as follows:

a.    <u>To the shareholders of Key:</u>

Thomas F. Fay ..........................................$2,829,179.34

Ruth L. Fischbach .....................................$2,706,414.19

Mark R. Freedman .......................................$69,403.19

Robert N. Zeitlin .....................................$2,188,122.12

Sidney Zeitlin...........................................$3,571,664.30

ZFC Associates Inc. ....................................$140,727.42

William G. Russell......................................$19,141.09

Robert N. Zeitlin 1999 Charitable
Remainder Unitrust.....................................<u>$518,426.87</u>

Total: ...................................................$12,043,078.52

(collectively, "Key Selling Shareholders")

b.    <u>To the Shareholders of Marshall:</u>

The Andrew Marshall Forsberg Trust......$1,016,252.90

Ethel Forsberg Revocable Trust...............$2,286,569.02

Janis Rae Forsberg Trust.............................$484,244.51

Frank John McCarthy ..............................$1,270,316.12

7

Daniel R. Orris .............................................$41,177.17

Bernadine Orris .............................................$41,177.15

Total: .......................................................$5,098,559.72

(collectively, "Marshall Selling Shareholders")

c.    To the Shareholders of Plastical/Transamerica:

Sam Chebeir ("Chebeir") ..........................$2,046,364.39

(Key Selling Shareholders, Marshall Selling Shareholders and Chebeir collectively, "Shareholders of January Target Companies")

In addition, $6,693,026.00 was disbursed to the shareholders of Nor Baker. (Nor Baker is a debtor in a liquidation proceeding in Canada.)

41.    Also, at the closing, $29,763,614 was disbursed to fund the payment of creditors holding claims secured by the assets of the January Target Companies. The payments were made to the existing secured creditors so as to discharge their liens and security interests and grant the Lenders security interests in the assets of the January Target Companies to secure Plassein's obligations to the Lenders for the advances to consummate the January Acquisitions.

42.    In addition to the foregoing disbursements to the selling shareholders and secured creditor, $5,525,751 was paid in transaction costs, and $3,030,927 was deposited in escrow subject to certain closing adjustments. A copy of the Fund Flow Memorandum detailing the receipt and disbursement of funds for the January Acquisitions is annexed hereto and incorporated by reference herein as Exhibit A.

43.    Following the closing on the January Acquisition, the January Target Companies changed their names as follows:

(a)    Transamerican Plastic, LLC to Plassein International of Ontario, Inc., which is the Debtor in Case No. 03-11492.

8

A0032

(b)    Plastical Industries Inc. to Plassein International of Spartanburg, Inc., which is the Debtor in Case No. 03-11494.

(c)    Marshall Plastic Film, Inc. to Plassein International of Martin, Inc., which is the Debtor in Case No. 03-11491.

(d)    Key Packaging Industries Corp. to Plassein International of Salem, Inc., which is the Debtor in Case No. 03-11493.

### Financial Impact upon the Companies of the Acquisition

44.    Prior to the closing, the January Target Companies had an aggregate net worth of approximately $8,800,000.    Notwithstanding an aggregate net worth of $8,800,000, the Shareholders of the January Target Companies were paid in excess of $31,000,000 for their stock or membership interest of the January Target Companies.

45.    The substantial premium paid to the shareholders of the January Target Companies was accounted on the post closing balance sheet as goodwill.  The calculation of the goodwill was a determination of the amount by which the purchase price exceeded the net assets at fair value of the company acquired.  According to balance sheets adjusted to account for the closing, aggregate goodwill was scheduled at $23,708,092, which represented the difference between the net worth of the companies acquired and the amount paid.  A copy of each adjusted balance sheet is annexed hereto and incorporated by reference herein as Exhibits B, C, D, and E.

46.    As a result of the transactions, the January Target Companies, in the aggregate and individually, were rendered insolvent in that the sum of their debts was greater than all of the assets at fair valuation.

9

47.    As a result of the January Acquisitions, the January Target Companies were to engage in a business for which the remaining assets of the January Target Companies were unreasonably small in relation to the business.

### The Rex Transaction and Deepening Insolvency

48.    On May 17, 2000, Plassein entered into an agreement with Rex International, Inc. ("Rex") to acquire Rex through a stock acquisition (the "Rex Acquisition).

49.    In connection with the Rex Acquisition, the Lenders agreed to amend the Loan Agreement to increase the amount available thereunder to $72,500,000, with the commitment that upon the closing of the Rex Acquisition, Rex would become a borrower under the January Loan Agreement and Rex would grant a security interest in its assets to secure all of the obligations of Plassein and the January Target Companies to the Lenders under the January Loan Agreement.

50.    In addition, in anticipation of the Rex Acquisition, Plassein obtained commitments for Rex to incur additional indebtedness of $36,500,000 to be subordinated to the debt of the Lenders.

51.    In addition to the subordinate debt, Plassein obtained commitments for additional purchases of its Series A convertible stock for $14,430,000.

52.    On August 15, 2000, Plassein closed on the Rex Acquisition.  Following the closing, Rex International, Inc. changed its name to Plassein International of Thomasville, Inc., which is the Debtor in Case No. 03-11495.

53.    At the closing of the Rex Acquisition, the proceeds were disbursed to the Rex Shareholders as follows:

    a.    B.A. Capital Company LP ..................................$25,491,779.76

10

A0034

b.  Heller Financial, Inc.............................................$1,577,514.94

c.  Charles J. Warr.....................................................$2,347,382.00

d.  Paul D. Gage .........................................................$366,477.36

e.  Stephen S. Wilson................................................$1,522,317.98

f.  G. Kenneth Pope Jr. ...............................................$171,507.67

g.  Kenneth Olenler.....................................................$285,786.68

h.  Daniel A. Jones III .................................................171,507.67

Total: .........................................................................$31,934,274.06

(collectively, "Rex Shareholders")

54.   In addition to the payments to the Rex Shareholders, the following payments were made at the time of the Closing of the Rex Acquisition:

a.  Payments to Existing Secured Creditors............$22,278,945.00

b.  Transaction Costs..................................................$2,700,287.00

c.  Escrows.................................................................$4,000,000.00

55.   In addition to the foregoing payments, money was disbursed to fund retention bonuses paid to certain officers of Rex.  A copy of the Fund Flow Memorandum detailing the receipt and disbursement of funds from the Rex Acquisition is annexed hereto as Exhibit F.

56.   Prior to the closing, the net worth of Rex was $3,988,557.  In exchange for that net worth of $3,988,557, the Rex Shareholders were paid $31,914,274.

57.   Rex accounted for the substantial difference between the net worth of the shareholders' equity (net value of the assets' fair value) and the purchase price by increasing goodwill by $27,724,217 to an aggregate goodwill on the Rex opening post-acquisition balance sheet of $30,863,315.  The increase in goodwill was determined by the amount by which the

11

purchase price exceeded the net value of the assets after the assets were written up to fair value. A copy of the adjusted balance sheet for Rex following the Rex Acquisition is annexed hereto and incorporated herein as Exhibit G.

58.     As a result of the Rex Acquisition, Rex's debts were greater than all of Rex's assets at fair valuation.

59.     As a result of the Rex Acquisition and the financing therefor, the debts of Rex and the January Target Companies were greater than all of their assets at fair valuation.

60.     As a result of the Rex Acquisition, Rex was engaged in a business for which the remaining assets were unreasonably small in relation to the business.

61.     As a result of the Rex Acquisition and the financing therefore, Rex and the January Target Companies were engaged in a business for which the remaining assets were unreasonably small in relation to the business.

## POST ACQUISITION FINANCIAL PERFORMANCE

62.     By at least November 14, 2001, Rex and the January Target Companies were in default of their obligations to the Lenders.  As a result of those defaults, Plassein requested and the Lenders agreed to amend the January Loan Agreement to, among other things, modify the financial covenants specified in the January Loan Agreement.

63.     Notwithstanding the amendments to the January Loan Agreements, Plassein, Rex and the January Target Companies continued in default, and at least by May 15, 2002, the Lenders were again required to amend the January Loan Agreement by reason of those defaults.

64.     Notwithstanding the various amendments to the January Loan Agreement, Plassein, Rex and the January Target Companies defaulted, and at least by February 14, 2003,

the Lenders had accelerated the debt. As a result thereof, on February 14, 2003, the Lenders, Plassein, Rex and the January Target Companies entered into a Forbearance Agreement.

65.     On May 14, 2003, Plassein, the January Target Companies and Rex each commenced proceedings under Chapter 11 of the United States Bankruptcy Code, and Nor Baker commenced an insolvency proceeding under the laws of Canada.

66.     As of the commencement of the bankruptcy cases, there existed at least one actual creditor of each of Rex and the January Target Companies which also held a claim against Rex and the January Target Companies as of the date of each of the acquisition transactions.

## COUNT I

**(The Payments to the Selling Shareholders of the January Target Companies
Under the January Acquisitions May Be Recovered as a Fraudulent Transfer
Under 6 Del. Code §§ 1304 and 1305)**

67.     The Trustee realleges and repeats the allegations contained in paragraphs 1 through 65 above and by reference incorporates them herein.

68.     The payments made to the selling shareholders in connection with the January Acquisitions as detailed in Paragraph 39 above constituted a transfer (the "January Transfers") pursuant to Title 6, Chapter 13 of the Delaware Code (hereinafter referred to as the "Fraudulent Transfer Statute").

69.     As a result of the January Transfers by the January Target Companies to the Shareholders of the January Target Companies, the January Target Companies were rendered insolvent.

70.     The January Target Companies in the aggregate did not receive reasonably equivalent value in exchange for the January Transfers to the Shareholders of the January Target Companies.

A0037

71.    As a result of the January Transfers by the January Target Companies to the Lenders, the remaining assets of the January Target Companies were unreasonably small in relation to their businesses.

72.    The January Transfers may be avoided as a fraudulent transfer as to all of the present creditors of the January Target Companies pursuant to 11 U.S.C. § 544, §§ 1304 and 1305 of the Delaware Fraudulent Transfer Statute and the lien preserved for the benefit of the Estates pursuant to 11 U.S.C. § 551.

## COUNT II

### (To Recover the Payments to the Key Selling Shareholders Under 6 Del. Code §§ 1304 and 1305)

73.    The Trustee realleges and repeats the allegations contained in paragraphs 1 through 71 above and by reference incorporates them herein.

74.    The payments to the Key Selling Shareholders as part of the January Acquisition constituted a transfer pursuant to the Fraudulent Transfer Statute.

75.    As a result of the January Acquisition and the transfers by Key to the Key Selling Shareholders, Key was rendered insolvent.

76.    Key did not receive reasonably equivalent value in exchange for the payments to the Key selling shareholders.

77.    As a result of the January Transfers by Key to the Key Selling Shareholders, the remaining assets of Key were unreasonably small in relation to the business.

78.    The payments by Key to the Key selling shareholders may be avoided as a fraudulent transfer as to all of the present creditors of Key pursuant to 11 U.S.C. § 544, §§ 1304 and 1305 of the Delaware Fraudulent Transfer Statute and recovered for the benefit of the Estates.

14

## COUNT III

### (To Recover the Payments to the Marshall Selling Shareholders
Under 6 Del. Code §§ 1304 and 1305)

79. The Trustee realleges and repeats the allegations contained in paragraphs 1 through 77 above and by reference incorporates them herein.

80. The payments to the Marshall selling shareholders as part of the January Acquisition constituted a transfer pursuant to the Fraudulent Transfer Statute.

81. As a result of the January Acquisition and the transfers by Marshall to the Marshall Selling Shareholders, Marshall was rendered insolvent.

82. Marshall did not receive reasonably equivalent value in exchange for the payments to the Marshall Selling Shareholders.

83. As a result of the January Transfers by Marshall to the Marshall Selling Shareholders, the remaining assets of Marshall were unreasonably small in relation to the business.

84. The payments by Marshall to the Marshall Selling Shareholders may be avoided as a fraudulent transfer as to all of the present creditors of Marshall pursuant to 11 U.S.C. § 544, § 1304 and § 1305 of the Delaware Fraudulent Transfer Statute and recovered for the benefit of the Estates.

## COUNT IV

### (To Recover the Payments to the Plastical Selling Shareholders
Under 6 Del. Code §§ 1304 and 1305)

85. The Trustee realleges and repeats the allegations contained in paragraphs 1 through 83 above and by reference incorporates them herein.

15

A0039

86.     The payments to the Plastical Selling Shareholders as part of the January Acquisition constituted a transfer pursuant to the Fraudulent Transfer Statute.

87.     As a result of the January Acquisition and the transfers by Plastical to Chebeir, Plastical was rendered insolvent.

88.     Plastical did not receive reasonably equivalent value in exchange for the payments to the Chebeir.

89.     As a result of the January Transfers by Plastical to Chebeir, the remaining assets of Plastical were unreasonably small in relation to the business.

90.     The payments by Plastical to Chebeir may be avoided as a fraudulent transfer as to all of the present creditors of Plastical pursuant to 11 U.S.C. § 544, and § 1304 and § 1305 of the Delaware Fraudulent Transfer Statute and recovered for the benefit of the Estates.

## COUNT V

**(The Payments made to the Rex Selling Shareholders in Connection
with the Rex Acquisition May Be Avoided as a Fraudulent Transfer
Under 6 Del. Code § 1304 and § 1305)**

91.     The Trustee realleges and repeats the allegations contained in paragraphs 1 through 89 above and by reference incorporates them herein.

92.     The payments to the Rex Shareholders as detailed in paragraph 52 above (the "August Transfers") made as part of the Rex Acquisition, constituted a transfer pursuant to the Fraudulent Transfer Statute.

93.     As a result of the August Acquisition and the August Transfers made to the Rex Shareholders, Rex was rendered insolvent.

94.     Rex did not receive reasonably equivalent value in exchange for the August Transfers and the incurrence of the obligations to the Lenders to finance same.

16

95.    As a result of the August Transfers by Rex to the Rex Shareholders, the remaining assets of Rex were unreasonably small in relation to the business.

96.    The August Transfers to the Rex Shareholders as part of the Rex Acquisition may be avoided as a fraudulent transfer as to all of the present creditors of Rex and the January Target Companies pursuant to 11 U.S.C. § 544, § 1304 and § 1305 of the Delaware Fraudulent Transfer Statute and the liens payments recovered for the benefit of the Estate.

WHEREFORE, William Brandt as he is the Trustee of the Estates of Plassein International of Martin, Inc., Plassein International of Ontario, LLC, Plassein International of Salem, Inc., Plassein International of Spartanburg, Inc., and Plassein International of Thomasville, Inc. respectfully prays the he be awarded judgments as follows:

1.    Against B.A. Capital Company LP in the amount of $25,491,779.76, plus interest and costs.

2.    Against Thomas F. Fay in the amount of $2,829,179.34, plus interest and costs.

3.    Against Ruth L. Fischbach in the amount of $2,706,414.19, plus interest and costs.

4.    Against Mark R. Freedman in the amount of $69,403.19, plus interest and costs.

5.    Against Robert N. Zeitlin in the amount of $2,188,122.12, plus interest and costs.

6.    Against Sidney Zeitlin in the amount of $3,571,664.30, plus interest and costs.

7.    Against ZFC Associates Inc. in the amount of $140,727.42, plus interest and costs.

8.    Against William G. Russell in the amount of $19,141.09, plus interest and costs.

9.    Against Robert N. Zeitlin 1999 Charitable Remainder Unitrust in the amount of $518,426.87, plus interest and costs.

17

10.    Against The Andrew Marshall Forsberg Trust in the amount of $1,016,252.90, plus interest and costs.

11.    Against Ethel Forsberg Revocable Trust in the amount of $2,286,569.02, plus interest and costs.

12.    Against Janis Rae Forsberg Trust in the amount of $484,244.51, plus interest and costs.

13.    Against Frank John McCarthy in the amount of $1,270,316.12, plus interest and costs.

14.    Against Daniel R. Orris in the amount of $41,177.17, plus interest and costs.

15.    Against Bernadine Orris in the amount of $41,177.17, plus interest and costs.

16.    Against Sam Chebeir in the amount of $2,046,364.39, plus interest and costs.

17.    Against Charles J. Warr in the amount of $2,347,382.00, plus interest and costs.

18.    Against Paul D. Gage in the amount of $366,477.36, plus interest and costs.

19.    Against Stephen S. Wilson in the amount of $1,522,317.98, plus interest and costs.

20.    Against G. Kenneth Pope Jr. in the amount of $171,507.67, plus interest and costs.

21.    Against Kenneth Olenler in the amount of $285,786.68, plus interest and costs.

22.    Against Daniel A. Jones III in the amount of $171,507.67, plus interest and costs.

A0042

23.    And such other and further relief as this Court deems just and proper.

Dated: April 1, 2005
       Wilmington, Delaware

                              CROSS & SIMON, LLC

                              By:_____
                                  Richard H. Cross, Jr. (No. 3576)
                                  Amy Evans (No. 3829)
                                  913 Market Street, Suite 1001
                                  P.O. Box 1380
                                  Wilmington, DE 19899
                                  (302) 777-4200
                                  (302) 777-4224 (Facsimile)

                                  -and-

                                  HANIFY & KING
                                  Charles R. Bennett, Jr.
                                  One Beacon Street
                                  Boston, MA 02108
                                  (617) 423-0400

                                  *Co-Counsel for William Brandt,
                                  Chapter 7 Trustee*

19

A0043

# EXHIBIT A

## PLASSEIN PACKAGING CORP.

## FUNDS FLOW MEMORANDUM

This memorandum reflects the flow of funds contemplated by

### Investment in Plassein Packaging Corp.

(a)    Series A Convertible Preferred Stock and Warrant Purchase Agreement dated as of the January 10, 2000 (the "Series A Purchase Agreement") among (i) Trivest Fund II, Ltd. ("Trivest Fund II"), Trivest Equity Partners II, Ltd. ("Trivest Equity Partners II"), Trivest Principals Fund II, Ltd. ("Trivest Principals Fund II"), Trivest Fund II, Inc. ("Trivest II") (collectively, the "Trivest Funds"), and GulfStar Plastics, L.L.C. ("GulfStar Plastics") (ii) Plassein Packaging Corp., a Delaware corporation (the "Company"), and (iii) GulfStar Plastics, L.L.C.

(b)    Note and Warrant Purchase Agreement dated as of January 10, 2000 (the "Note and Warrant Purchase Agreement") among the Company and the Trivest Funds.

(c)    the Management Agreement dated as of January 10, 2000 the "Management Agreement") between the Company and Trivest II.

### Senior Secured Financing

Loan and Security Agreement dated as of January 10, 2000 (the "Loan Agreement") among the Company, its subsidiaries, Fleet Capital Corporation, as Administrative Agent (the "Agent"), and Fleet Robertson Stephens Inc., as Arranger.

### Acquisition of Key Packaging

Stock Purchase Agreement dated as of January 10, 2000 (the "Key Packaging Stock Purchase Agreement") among (i) the Company, (ii) Key Packaging Industries, Corp., a Massachusetts corporation ("Key Packaging"), and (iii) Thomas F. Fay, Dr. Ruth L. Fischbach, Mark R. Freedman, Dr. Robert N. Zeitlin, Sidney Zeitlin, ZFC Associates Inc., William G. Russell and Robert N. Zeitlin 1999 Charitable Remainder Unitrust (collectively, the "Key Packaging Selling Shareholders").

### Acquisition of Marshall

Stock Purchase Agreement dated as of January 10, 2000 (the "Marshall Stock Purchase Agreement"), among (i) the Company, (ii) Marshall Plastic Film, Incorporated, a Michigan corporation ("Marshall"), and (iii) The Andrew Marshall Forsberg Trust, Ethel Forsberg Revocable Trust, The Janis Rae Forsberg Trust, Frank John McCarthy, Daniel R. Orris and Bernadine Orris (collectively, the "Marshall Selling Shareholders").

#### Acquisition of Nor Baker

Stock Purchase Agreement dated as of January 10, 2000 (the "Nor Baker Stock Purchase Agreement") among (i) the Company, (ii) Nor Baker Industries Limited, Nor Baker Inc., Brian E. Baker and Donald G. Baker.

#### Acquisition of Plastical/Transamerican

Acquisition Agreement dated as of January 10, 2000 (the "Plastical/TA Acquisition Agreement") among (i) the Company, (ii) Transamerican Plastics Corporation, a California corporation ("Transamerican"), (iii) Plastical Industries, Incorporated, a Delaware corporation ("Plastical"), and (iv) Sam Chebeir.

#### Wire Transfer Instructions

Exhibit A hereto sets forth the instructions for the wire transfers provided for herein.

#### Sources and Uses of Funds

Exhibit B hereto sets forth the sources and uses of funds.

#### Definitions

Capitalized terms used herein but not otherwise defined shall have the meanings provided therefor in the Purchase Agreement and as follows:

| Closing Date | January 10, 2000 |
|---|---|
| TSC | Trivest Service Corporation, as agent for the Trivest Funds |
| Funding Account | Account at Fleet Bank to which all payments to the Company will be made and from which all payments by the Company will be made.<br><br>Fleet Bank<br>Hartford, Connecticut<br>Account: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging Corp.<br>Contact: Liz Waller (770) 859-2400 |
| Escrow Agent | Chase Bank of Texas, N.A. |

2

P 08849

A0046

## Funds Flow

A.    Investment in Plassein Packaging Corp.

1.    Purchase by Trivest Funds of (i) Series A Convertible Preferred Stock, (ii) Basic Warrants, (iii) Notes and (iv) Note Warrants.

At Closing, TSC, on behalf of the Trivest Funds, shall cause to be transferred a total of $24,200,002, in immediately available funds, to the Company's Funding Account specified on Exhibit A hereto representing:

(i)    the payment by the Trivest Funds of $19,200,000 in consideration for an aggregate of 19,200,000 shares of Series A Convertible Preferred Stock of the Company pursuant to the Series A Purchase Agreement as follows:

| Trivest Fund | Shares | Purchase Price |
|---|---|---|
| Trivest Fund II | 6,951,360 | $6,951,360 |
| Trivest Equity Fund II | 1,772,160 | 1,772,160 |
| Trivest Principals Fund II | 876,480 | 876,480 |
| Trivest II | 9,600,000 | 9,600,000 |
| Total | 19,200,000 | 19,200,000 |

**plus**

(ii)    the payment by the Trivest Funds of $1.00 in consideration for Basic Warrants to purchase an aggregate of 9,600,000 shares of Common Stock of the Company pursuant to the Series A Purchase Agreement as follows:

| Trivest Fund | Shares | Purchase Price |
|---|---|---|
| Trivest Fund II | 3,475,680 | $* |
| Trivest Equity Fund II | 886,080 | * |
| Trivest Principals Fund II | 438,240 | * |
| Trivest II | 4,800,000 | * |
| Total | 9,600,000 | $1.00 |

**plus**

(iii)    the payment by the Trivest Funds of $5,000,000 in consideration for Promissory Notes of the Company in an aggregate principal amount of $5,000,000 pursuant to the Note and Warrant Purchase Agreement as follows:

3

P 08850

A0047

| Trivest Fund | Principal Amount |
|---|---|
| Trivest Fund II | $1,810,250.00 |
| Trivest Equity Fund II | 461,500.00 |
| Trivest Principals Fund II | 228,250.00 |
| Trivest II | 2,500,000.00 |
| Total | $5,000,000.00 |

plus

(iv)    the payment by the Trivest Funds of $1.00 in consideration for Note Warrants to purchase an aggregate of 909,090.90909 shares of Common Stock of the Company pursuant to the Note and Warrant Purchase Agreement as follows:

| Trivest Fund | Shares | Purchase Price |
|---|---|---|
| Trivest Fund II | 329,136.36364 | $    * |
| Trivest Equity Fund II | 83,909.09091 | * |
| Trivest Principals Fund II | 41,500.00000 | * |
| Trivest II | 454,545.45455 | * |
| Total | 909,090.90909 | $1.00 |

2.    Purchase of Series A Convertible Stock and Basic Warrants by GulfStar Plastics.

At Closing, GulfStar Plastics shall cause to be wire transferred a total of $800,000 in immediately available funds to the Company's Funding Account specified on Exhibit A hereto, representing consideration for an aggregate of 800,000 shares of Series A Convertible Preferred Stock of the Company and a Basic Warrant to purchase 400,000 shares of the Company's Common Stock pursuant to the Series A Purchase Agreement.

3.    Payment of Trivest Investment Fee.

At Closing, the Company shall cause to be wire transferred to Trivest II a total of $1,000,000, in immediately available funds, representing payment of the investment fee payable to Trivest II pursuant to the Management Agreement.

4.    Payment of Trivest Debt Financing Fee.

At Closing, the Company shall cause to be wire transferred to Trivest II a total of $100,000, in immediately available funds, representing payment of the debt financing fee payable to Trivest II pursuant to the Note and Warrant Purchase Agreement.

4

P 08851

A0048

5.     Payment of GulfStar Investment Fee.

At Closing, the Company, shall cause to be wire transferred to GulfStar Group a total of $1,000,000, in immediately available funds, representing payment of the investment fee payable to GulfStar Group.

6.     Payment of Fees and Costs of Greenberg Traurig, P.A.

At Closing, the Company, shall cause to be wire transferred to Greenberg Traurig, P.A. a total of $80,000.00, in immediately available funds, representing payment of the fees and out-of-pocket disbursements of Greenberg Traurig, P.A. pursuant to the Purchase Agreement, to the account specified on Exhibit A hereto.

7.     Payment of Fees and Costs of Andrews & Kurth L.L.P.

At Closing, the Company shall cause to be wire transferred to Andrews & Kurth L.L.P. a total of $227,731.61, in immediately available funds, representing payment of the fees and out-of-pocket disbursements of Andrews & Kurth L.L.P., to the account specified on Exhibit A hereto.

8.     Payment of Fees and Costs of Arthur Andersen

At Closing, the Company shall cause to be wire transferred to Arthur Andersen a total of $263,124.00, in immediately available funds, representing payment of the fees and out-of-pocket disbursements of Arthur Andersen, to the account specified on Exhibit A hereto.

9.     Payment of Professional Fees of Timothy F. O'Neal.

At Closing, the Company shall cause to be wire transferred to Timothy F. O'Neal a total of $156,000.00, in immediately available funds, representing payment of his professional fees, to the account specified on Exhibit A hereto.

10.     Payment of Professional Fees of Eric T. Paulsen.

At Closing, the Company shall cause to be wire transferred to Eric T. Paulsen a total of $156,000.00, in immediately available funds, representing payment of his fees, to the account specified on Exhibit A hereto.

11.     Payment of Transaction Expenses of the Company.

At Closing, a total of $779,973.46, in immediately available funds shall be wire transferred to the Company, representing reimbursement of the out-of-pocket disbursements, to the account specified on Exhibit A hereto.

5

P 08852

A0049

12.    Title Agent and Recording Fees and Costs.

At Closing, the Company shall cause to be wire transferred to Metropolitan Title Company a total of $8,862.49, in immediately available funds, representing payment of its fees and costs, to the account specified on Exhibit A hereto.

B.    Fleet Capital Loan Agreement Funding

At Closing, the Agent, on behalf of the Lenders, shall cause to be transferred a total of $37,957,820.57, in immediately available funds, to the Funding Account specified on Exhibit A hereto representing:

(i)    borrowings under the Loan Agreement as follows:

| Loan | Amount |
|------|--------|
| Term A | $12,000,000.00 |
| Term B | 16,000,000.00 |
| Revolver | 10,410,320.57 |
| Capex Line | 790,000.00 |
| Total | 39,200,320.57 |

less

(ii)    the payment by the Company of the Up Front Fee of $993,750.00 to the Agent on behalf of the Lenders.

less

(iii)    the payment by the Company of the Funding Fee of $198,750.00 to the Agent on behalf of the Lenders.

less

(iv)    the payment by the Company of the Agent's Fee of $50,000.00 to the Agent.

C.    Acquisition of Key Packaging.

1.    Payment of Purchase Price.

At Closing, the Company shall cause to be transferred a total of $12,043,078.52, in immediately available funds, to the Key Packaging Selling Shareholders to the accounts specified on Exhibit A hereto as follows:

6

P 08853

A0050

| Shareholder | Amount |
|---|---|
| Thomas F. Fay | 2,829,179.34 |
| Dr. Ruth L. Fischbach | 2,706,414.19 |
| Mark R. Freedman | 69,403.19 |
| Dr. Robert N. Zeitlin | 2,188,122.12 |
| Sidney Zeitlin | 3,571,664.30 |
| ZFC Associates Inc. | 140,727.42 |
| William G. Russell | 19,141.09 |
| Robert N. Zeitlin 1999 Charitable Remainder Unitrust | 518,426.87 |
| Total | 12,043,078.52 |

representing

(i)    the payment of the aggregate purchase price of $25,000,000.

**plus**

(ii)    the working capital adjustment under the Key Packaging Purchase Agreement of $32,394.79.

**plus**

(iii)    the Capex adjustment under the Key Packaging Purchase Agreement of $790,000.

**plus**

(iv)    breakage fee of $275,819.79 in respect of CIT Industrial Revenue Bond (see Item 5 below).

**less**

(v)    repayment of the funded indebtedness of Key Packaging of $12,053,576.06 pursuant to the Key Packaging Stock Purchase Agreement (see Item 3 below)

**less**

(v)    deposit of $1,500,000 in escrow pursuant to the Key Packaging Stock Purchase Agreement (see Item 2 below).

7

P 08854

A0051

less

(vii)   the payment of the fees and costs of Brown Brothers & Harriman, Co. of $501,560.00 (see Item 4 below).

2.   Funding of Escrow.

At Closing, the Company shall cause to be transferred a total of $1,500,000, in immediately available funds, to the Escrow Agent to the accounts specified on Exhibit A hereto.

3.   Repayment of Funded Indebtedness.

At Closing, the Company, on behalf of Key Packaging, shall cause to be transferred a total of $12,053,576.06, in immediately available funds, to the holders of funded indebtedness of Key Packaging to the accounts specified on Exhibit A hereto as follows:

| Loan | Amount |
|------|--------|
| BankBoston, N.A. (including OPG debt) | $6,235,906.71 |
| The CIT Group/Equipment Financing, Inc. | 4,181,514.61 |
| Charter Financial, Inc. Equip. Loans | 1,636,154.74 |
| Total | $12,053,576.06 |

4.   Payment of fees and costs of Brown Brothers & Harriman.

At Closing, the Company, on behalf of Key Packaging, shall cause to be transferred a total of $501,560.00, in immediately available funds, to Brown Brothers & Harriman, Co. in payment of their fees and costs to the accounts specified on Exhibit A hereto as follows:

5.   Payment of IRB Breakage Fee.

At Closing, the Company, on behalf of Key Packaging, shall cause to be transferred a total of $275,819.79, in immediately available funds, to the CIT Group/Equipment Financing, Inc. in payment of the breakage fee associated with the repayment of the Industrial Revenue Bond with such lender to the accounts specified on Exhibit A hereto.

C.   Acquisition of Marshall.

1.   Payment of Purchase Price.

At Closing, the Company shall cause to be transferred a total of $5,098,559.72, in immediately available funds, to the Marshall Selling Shareholders to the accounts specified on Exhibit A hereto as follows:

8

P 08855

A0052

| Shareholder | Amount |
|---|---|
| The Andrew Marshall Forsberg Trust | 1,016,252.90 |
| Ethel Forsberg Revocable Trust | 2,286,569.02 |
| The Janis Rae Forsberg Trust | 484,244.51 |
| Frank John McCarthy | 1,270,316.12 |
| Daniel R. and Bernadine Orris | 41,177.17 |
| Total | 5,098,559.72 |

representing:

(i)     the payment of the aggregate cash purchase price of $6,321,000.

less

(ii)     repayment of the funded indebtedness of Marshall of $1,301,018.43 pursuant to the Marshall Stock Purchase Agreement (see Item 4 below)

plus

(iii)     the Capex adjustment under the Marshall Purchase Agreement of $459,000.

less

(iv)     deposit of $500,000 in escrow pursuant to the Marshall Stock Purchase Agreement (see Item 3 below).

plus

(v)     payment to each Marshall Selling Shareholder other than the Ethel Forsberg Revocable Trust of $50,000 (for an aggregate of $200,000) in consideration of non-competition obligations under the Marshall Stock Purchase Agreement.

less

(vi)     net cash adjustment of $80,421.85 under the Marshall Stock Purchase Agreement.

2.     Issuance of Series B Convertible Preferred Stock and Warrants.

(a)     At Closing, the Company shall issue to the Marshall Selling Shareholders (other than Daniel R. and Bernadine Orris) certificates representing shares of Series B Convertible Preferred Stock as follows (all of which shares shall be pledged to the Company).

9

P 08856

A0053

| Shareholder | No. of Shares |
|---|---|
| The Andrew Marshall Forsberg Trust | 301,500 |
| Ethel Forsberg Revocable Trust | 678,000 |
| The Janis Rae Forsberg Trust | 144,000 |
| Frank John McCarthy | 376,500 |
| Total | 1,500,000 |

(b)     At Closing, the Company shall issue to the Marshall Selling Shareholders (other than Daniel R. and Bernadine Orris) Warrants to purchase an aggregate of 400,000 shares of Common Stock of the Company pursuant to the Marshal Stock Purchase Agreement as follows:

| Shareholder | No. of Shares |
|---|---|
| The Andrew Marshall Forsberg Trust | 80,400 |
| Ethel Forsberg Revocable Trust | 180,800 |
| The Janis Rae Forsberg Trust | 38,400 |
| Frank John McCarthy | 100,400 |
| Total | 400,000 |

3.     Funding of Escrow.

At Closing, the Company shall cause to be transferred a total of $500,000, in immediately available funds, to the Escrow Agent to the accounts specified on Exhibit A hereto.

4.     Repayment of Funded Indebtedness.

At Closing, the Company, on behalf of Marshall, shall cause to be transferred a total of $1,301,018.43, in immediately available funds, to the holders of funded indebtedness Marshall to the accounts specified on Exhibit A hereto as follows:

| Loan | Amount |
|---|---|
| Old Kent Bank | 1,211,665.49 |
| Dean & Margaret Gould | 89,352.94 |
| Total | 1,301,018.43 |

C.     Acquisition of Nor Baker.

1.     Payment of Purchase Price.

At Closing, the Company shall cause to be transferred a total of $6,693,026.12 (Cdn. $9,738,353.00), in immediately available funds, to Cassels Brock & Blackwell for the benefit of the Nor Baker Selling Shareholders to the accounts specified on Exhibit A hereto representing:

10

(i)     the payment of the aggregate purchase price of $12,164,944.50 (Cdn. $17,700,000).

less

(ii)     repayment of the funded indebtedness of Nor Baker of $5,446,402.06 (Cdn. $7,924,515.00) pursuant to the Nor Baker Stock Purchase Agreement (see Item 4 below)

less

(iii)     deposit of $1,030,927.84 (Cdn. $1,500,000) in escrow pursuant to the Nor Baker Stock Purchase Agreement (see Item 3 below).

plus

(iv)     payment to Nor Baker Industries Limited of $68,728.50 (Cdn. $100,000) in consideration of non-competition obligations under the Nor Baker Stock Purchase Agreement.

plus

(v)     the amount of $226,972.43 (Cdn. $330,245.00), representing (A) the amount of costs incurred by Nor Baker Inc. in connection with the purchase of the Schiavi solventless laminator identified as contract #FP-44297-C dated January 6, 1998 together with amendment #1 thereto pursuant to the Nor Baker Stock Purchase Agreement and (B) the amount of all other capital expenditures made by Nor Baker Inc. and Nor Baker Industries Limited from and after June 24, 1999 to the Closing Date which have been approved in writing by the Company (but excluding capital expenditures and other costs incurred by them in the ordinary course of business) pursuant to the Nor Baker Stock Purchase Agreement.

plus

(vi)     net cash adjustment of $540,535.91 (Cdn. $786,486.00) under the Nor Baker Stock Purchase Agreement.

plus

(vi)     adjustment of $169,166.27 (Cdn. $246,137.00) in respect of the Jaguar note receivable under the Nor Baker Stock Purchase Agreement.

3.     Funding of Escrow.

At Closing, the Company shall cause to be transferred a total of $1,030,927.84 (Cdn. $1,500,000), in immediately available funds, to the Escrow Agent to the accounts specified on Exhibit A hereto.

11

P 03858

A0055

4.    Repayment of Funded Indebtedness.

At Closing, the Company, on behalf of Nor Baker, shall cause to be transferred a total of $5,446,402.06 (Cdn. $7,924,515), in immediately available funds, to Congress Financial Corporation (Canada) of funded indebtedness of Nor Baker to the account specified on Exhibit A hereto as follows:

C.    Acquisition of Plastical/TA.

1.    Payment of Purchase Price to Sam Chebeir for all capital stock of Plastical.

(i)    At Closing, the Company shall cause to be transferred a total of $2,046,364.39, in immediately available funds, to Sam Chebeir to the account specified on Exhibit A hereto representing

(A)    the payment of the aggregate cash purchase price of $3,950,000.

less

(B)    repayment of the funded indebtedness of Plastical of $1,581,273.26 to Imperial Bank pursuant to the Plastical/TA Acquisition Agreement (see Item 3(i) below)

plus

(C)    payment to Sam Chebeir of $50,000 in consideration of non-competition obligations under the Plastical/TA Acquisition Agreement

less

(D)    net cash adjustment of $372,362.35 under the Plastical/TA Acquisition Agreement.

(ii)    At Closing, the Company shall issue to Sam Chebeir (i) a certificate representing 5,500,000 shares of Series B Convertible Preferred Stock (all of which shares shall be pledged to the Company) and (ii) a Warrant to Purchase 1,460,666.65 shares of Common Stock.

2.    Payment of Purchase Price to Transamerican for all limited liability company interests of New Transamerican LLC.

(i)    At Closing, the Company shall cause to be transferred a total of $5,138,983.39, in immediately available funds, to Transamerican to the accounts specified on Exhibit A hereto representing

12

P 08859

A0056

(A)     the payment of the aggregate cash purchase price of $9,450,000.

**less**

(B)     repayment of the funded indebtedness of Transamerican of $4,241,361.23 to Imperial Bank pursuant to the Plastical/TA Acquisition Agreement (see Item 3(ii) below)

**plus**

(C)     payment to Transamerican of $50,000 in consideration of non-competition obligations under the Plastical/TA Acquisition Agreement

**less**

(D)     net cash adjustment of $119,655.38 under the Plastical/TA Acquisition Agreement.

(ii)     At Closing, the Company shall issue to Transamerican a promissory note in the aggregate principal amount of $500,000 subject to set off pursuant to the Plastical/TA Acquisition Agreement.

(iii)     At Closing, the Company shall issue to Transamerican a Warrant to purchase 90,909.09091 shares of the Company's Common Stock.

(iv)     At Closing, the Company shall pay to Transamerican a debt financing fee of $10,000 in respect of the promissory note and related Warrant to the accounts specified on Exhibit A hereto.

3.     Repayment of Funded Indebtedness.

At Closing, the Company, on behalf of Plastical and Transamerican, shall cause to be wire transferred a total of $5,822,634.49, in immediately available funds to Imperial Bank in respect of funded indebtedness of Plastical and Transamerican as follows:

(i)     At Closing, the Company, on behalf of Plastical, shall cause to be wire transferred a total of $1,581,273.26, in immediately available funds, to Imperial Bank in respect of funded indebtedness Plastical to the account specified on Exhibit A hereto.

(ii)     At Closing, the Company, on behalf of Transamerican, shall cause to be wire transferred a total of $4,241,361.23, in immediately available funds, to Imperial Bank in respect of funded indebtedness Transamerican to the account specified on Exhibit A hereto.

13

P 08860

A0057

IN WITNESS WHEREOF, the Company has executed this Funds Flow Memorandum as of the day and year first above written.

THE COMPANY:

PLASSEIN PACKAGING CORP.

By:_____
    G. Kent Kahle
    Chairman of the Board

14

P 08361

A0058

**EXHIBIT A**
**TO**
**FUNDS FLOW MEMORANDUM**

**Wire Transfer Information**

See attached.

A-1

P 08862

A0059

Exhibit A to Funds Flow Memorandum

# PLASSEIN PACKAGING CORPORATION
## Funds Flow at Closing for:

## PLASTICAL/TRANSAMERICAN

### January 10, 2000

| | Wire From: | Wire To: | Amounts | Purpose: | Fed Ref # |
|---|---|---|---|---|---|
| **PLASTICAL:** | | | | | |
| Sender / Recipient | Fleet Bank | Sam Chehrir | $2,046,364.39 | Shareholder | |
| Account Style | Fleet Capital Corporation | Sam Chehrir | | Consideration | |
| Bank Name | Fleet Bank | Bank of America | | & | |
| Bank Location | Hartford, Ct. – 1 Constitution Plaza | Riverside, CA | | Non-Compete | |
| Account # | Acct: 936-933-7552 | Acct: 06281-02391 | | Plastical | |
| ABA for wires | ABA #: 011-900-571 | ABA #: 121-000-358 | | | |
| Attention | Reference: Plassein Packaging, | | | | |
| Additional Instructions | Corp. | Contact: Mary Valinotti (909)-686- | | | |
| | Contact: Liz Waller (770) 859- | 2590 | | | |
| | 2400 | | | | |
| Sender / Recipient | Fleet Bank | Imperial Bank | $5,822,634.49 | Note Repayment | |
| Account Style | Fleet Capital Corporation | Transamerican and Plastical | | | |
| Bank Name | Fleet Bank | Imperial Bank | | | |
| Bank Location | Hartford, Ct. – 1 Constitution Plaza | Federal Reserve Bank – Los Angeles | | | |
| Account # | Acct: 936-933-7552 | Branch | | | |
| | | Credit Acct #'s: 2560-100532 | | | |
| ABA for wires | ABA #: 011-900-571 | Loan #'s: 708054479, 708054480 | | | |
| Attention | Reference: Plassein Packaging, | ABA #: 1222-01444 | | | |
| | Corp. | Payoff Notes: Transamerican (6,5,4,3) | | | |
| | | and Plastical ( 5,4,3) | | | |
| Additional Instructions | Contact: Liz Waller (770) 859- | Attn: Payoff Dept. | | | |
| | 2400 | Contact: Laurice Peasnell (310) 417- | | | |
| | | 5872 | | | |
| **TRANSAMERICAN:** | | | | | |
| Sender / Recipient | Fleet Bank | Transamerican Plastics Corp. | $5,138,983.39 | Purchase | |
| Account Style | Fleet Capital Corporation | Transamerican Plastics Corp. | | Consideration | |
| Bank Name | Fleet Bank | Imperial Bank | | & | |
| Bank Location | Hartford, Ct. – 1 Constitution Plaza | Costa Mesa, CA | | Non-Compete | |
| Account # | Acct: 936-933-7552 | Acct: 08-223-440 | | Transamerican | |
| ABA for wires | ABA #: 011-900-571 | ABA #: 1222-01444 | | | |
| Attention | Reference: Plassein Packaging, | | | | |
| Additional Instructions | Corp. | Contact: Jamie Harney (714) 641-2210 | | | |
| | Contact: Liz Waller (770) 859- | | | | |
| | 2400 | | | | |

P 08863

| Wire From: | Wire To: | Amount: | Purpose: | Fed Ref # |
|---|---|---|---|---|
| Sub - Total Consideration: | | | | |
| Subordinated Note | | $13,007,982.27 | | |
| Total Consideration | | $500,000.00 | | |
| | | $13,507,982.27 | | |

P 08864

A0061

**PLASSEIN PACKAGING CORPORATION**
**Funds Flow at Closing for:**

**MARSHALL**

**January 18, 2000**

| Wire From | Wire To: | Amount | Purpose: | Fed Ref # |
|---|---|---|---|---|
| **Sender / Recipient** Fleet Bank **Account Style** Fleet Capital Corporation **Bank Name** Fleet Bank **Bank Location** Hartford, CL -- 1 Constitution Plaza **Account #** 936-933-7552 **ABA # for wires** ABA #: 011-900-571 **Attention** **Additional Instructions** Reference: Plassein Packaging Corp. Contact: Liz Weller (770) 859-2400 | Old Kent Bank Marshall Plastics Film, Inc. Old Kent Bank Kalamazoo, MI Obligor #: 556-7000-104 ABA #: 072400052 Attn: Margret Youngs Corporate Banking Credit Note #'s: Revolver: 26, 125 Term: 42,75,91 Operations #: 556-7000-104 Contact: Jeremy Hawk (616) 337-6764 | $1,211,665.49 | Note Repayment | |
| **Sender / Recipient** Fleet Bank **Account Style** Fleet Capital Corporation **Bank Name** Fleet Bank **Bank Location** Hartford, CL -- 1 Constitution Plaza **Account #** 936-933-7552 **ABA # for wires** ABA #: 011-900-571 **Attention** **Additional Instructions** Reference: Plassein Packaging Corp. Contact: Liz Weller (770) 859-2400 | Ethel Ann Forsberg Trust Ethel Ann Forsberg Trust Old Kent Bank & Trust Grand Rapids, MI Acct: 7505040340 ABA #: 072400052 Contact: Julie Shaw (616) 337-2682 | $2,286,569.02 | Shareholder Consideration | |
| **Sender / Recipient** Fleet Bank **Account Style** Fleet Capital Corporation **Bank Name** Fleet Bank **Bank Location** Hartford, CL -- 1 Constitution Plaza **Account #** 936-933-7552 **ABA # for wires** ABA #: 011-900-571 **Attention** **Additional Instructions** Reference: Plassein Packaging Corp. Contact: Liz Weller (770) 859-2400 | Andrew Marshall Forsberg Trust Andrew Marshall Forsberg Trust Old Kent Bank & Trust Grand Rapids, MI Acct: 7505026216 ABA #: 072400052 Contact: Julie Shaw (616) 337-2682 | $1,016,252.90 | Shareholder Consideration & Non-Compete | |
| **Sender / Recipient** Fleet Bank **Account Style** Fleet Capital Corporation **Bank Name** Fleet Bank **Bank Location** Hartford, CL -- 1 Constitution Plaza **Account #** 936-933-7552 **ABA # for wires** ABA #: 011-900-571 **Attention** **Additional Instructions** Reference: Plassein Packaging Corp. Contact: Liz Weller (770) 859-2400 | Janis R. Forsberg Trust Janis R. Forsberg Trust Old Kent Bank & Trust Grand Rapids, MI Acct: 7505040357 ABA #: 072400052 Contact: Julie Shaw (616) 337-2682 Subtotal: | $484,244.51 $4,998,731.92 | Shareholder Consideration & Non-Compete | |

P 08865

A.0062

# PLASSEIN PACKAGING CORPORATION
## Funds Flow at Closing for
## MARSHALL
### January 10, 2000

| | Wire From | Wire To | Amount | Purpose | Ref Ref # |
|---|---|---|---|---|---|
| **Sender / Recipient** Account Style, Bank Name, Bank Location, Account #, ABA for wires, Attention, Additional Instructions | Fleet Bank, Fleet Capital Corporation, Fleet Bank, Hartford, CL – 1 Constitution Plaza, Acct: 936-933-7552, ABA #: 011-900-571, Reference: Plassein Packaging, Corp., Contact: Liz Weller (770) 859-2400 | Frank J. McCarthy, Frank J. McCarthy, National City Bank, Kalamazoo, MI, Acct: 0227578608, ABA #: 072000951, Contact: Sandy Koeler (616) 672-5551 | $1,270,316.12 | Shareholder Consideration & Non-Compete | |
| **Sender / Recipient** Account Style, Bank Name, Bank Location, Account #, ABA for wires, Attention, Additional Instructions | Fleet Bank, Fleet Capital Corporation, Fleet Bank, Hartford, CL – 1 Constitution Plaza, Acct: 936-933-7552, ABA #: 011-900-571, Reference: Plassein Packaging, Corp., Contact: Liz Weller (770) 859-2400 | Daniel R. & Bernadine Orris, Daniel R. & Bernadine Orris, Bank One, Grand Rapids, MI (Division 44th, Office 60750), Acct: 2700450364388, ABA #: 072000326, Contact: Bank # 0755 Ph: (616) 771-7005 | $41,177.17 | Shareholder Consideration & Non-Compete | |
| **Sender / Recipient** Account Style, Bank Name, Bank Location, Account #, ABA for wires, Attention, Additional Instructions | Fleet Bank, Fleet Capital Corporation, Fleet Bank, Hartford, CL – 1 Constitution Plaza, Acct: 936-933-7552, ABA #: 011-900-571, Reference: Plassein Packaging, Corp., Contact: Liz Weller (770) 859-2400 | Dean & Margaret Gould, Prudential Securities, Chase Manhattan Bank, N.A., New York, NY (1 Chase Manhattan Plaza, 10081), Acct #: 066296390, ABA#: 021000021, Per Further Credit To Client #: AGF 089158, Contact: (212) 552-2222 | $89,352.94 | Note Repayment | |

| Sender / Recipient | Wire From: | Wire To: | Amount: | Purpose: | Fed Ref # |
|---|---|---|---|---|---|
| Account Style | Fleet Bank | Chase Bank of Texas, N.A. | $500,000.00 | Escrow | |
| Bank Name | Fleet Capital Corporation | Trust Clearing Account | | | |
| Bank Location | Fleet Bank | Chase Bank of Texas, N.A. | | | |
| Account # | Hartford, Ct. – 1 Constitution Plaza | Houston, TX | | | |
| | Acct: 935-933-7352 | Credit: Trust Clearing account # 00101600276 | | | |
| | | FCC: Plastofa/Marshall Plastic Film | | | |
| ABA for wires | ABA #: 011-900-571 | Escrow- | | | |
| Attention | Reference: Plastofa Packaging, | Acct: 55-03-001-2095700 | | | |
| Additional | Corp. | ABA #: 113-000-609 | | | |
| Instructions | Contact: Liz Weller (770) 859-2400 | Attn: Mona Rodgers (X6337) | | | |
| | | **Subtotal:** | $1,500,246.13 | | |
| **Total Consideration** | | | $6,899,578.15 | | |

P 08867

A0064

PLASSEIN PACKAGING CORPORATION
Funds Flow at Closing for:

NOR BAKER, INC.

January 10, 2000

**ALL WIRES TO BE SENT IN CANADIAN DOLLARS**

| | Wire From | Wire Via | Amount | Purpose | Fed Ref # |
|---|---|---|---|---|---|
| Sender / Recipient<br>Account Style<br>Bank Name<br>Bank Location<br>Account #<br>ABA for wires<br>Attention<br>Additional Instructions | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>ABA: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging, Corp.<br>Contact: Liz Walter (770) 859-2400 | Congress Financial Corporation<br>Congress Financial Corporation (Canada)<br>The Bank of Montreal<br>141 Adelaide St. West, Ste. 1500<br>Toronto, Ontario M5H3L9<br>Acct: 1239-246<br>Transit: 00022<br><br>Contact: Harry Rosenthal (416) 364-8177 | CAN$7,924,515.00 | Note Repayment | |
| Sender / Recipient<br>Account Style<br>Bank Name<br>Bank Location<br><br>Account #<br>ABA for wires<br>Attention<br>Additional Instructions | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br><br>Acct: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging, Corp.<br>Contact: Liz Walter (770) 859-2400 | Cassels Brock & Blackwell<br>Cassels Brock & Blackwell<br>Toronto Dominion Bank<br>Toronto, Ontario, Canada<br>York at 141 Adelaide St. W,<br><br>Trust Acct: 392-849<br>Transit #: 19922 (0620)<br><br>Contact: Glat (416) 982-7562 | CAN$9,734,359.00 | Shareholder<br>Consideration<br>&<br>Non-Compete | |
| Sender / Recipient<br>Account Style<br>Bank Name<br>Bank Location<br>Account #<br>ABA for wires<br>Attention<br>Additional Instructions | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>ABA: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging, Corp.<br>Contact: Liz Walter (770) 859-2400 | Royal Bank of Canada<br><br>Toronto, Canada<br>Acct: 05991219413<br>ABA: ROYCCAT2<br>In favor of: Chase Manhattan Bank London<br>Attn: Mena Rodgers (713) 216-6337 | CAN$1,500,000.00 | Escrow | |

P 08868

A0065

| Wire From | Wire To | Amount | Purpose | Fed Ref # |
|---|---|---|---|---|
| | | CAN$19,162,968.08 | | |
| Total Consideration | | | | |

P 08869

A0066

PLASSEIN PACKAGING CORPORATION
Funds Flow at Closing for:

## KEY PACKAGING INDUSTRIES, INC.

### January 10, 2000

| | Wire From | Wire To: | Amount: | Purpose: | Fed Ref # |
|---|---|---|---|---|---|
| Sender / Recipient<br>Account Style<br>Bank Name<br>Bank Location<br>Account #<br>ABA for wires<br>Attention<br>Additional<br>Instruction | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>Acct: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging,<br>Corp.<br>Contact: Liz Waller (770) 859-2400 | Wentworth Capital<br>Chetter Financial, Inc.<br>Bank of New York<br><br>Acct: 890028967<br>ABA #: 021-000-018<br>Beneficiary: Chetter Financial, Inc.<br>Vicki Turner: (603) 431-4310 | $1,636,154.74 | Note Repayment | |
| Sender / Recipient<br>Account Style<br>Bank Name<br>Bank Location<br>Account #<br><br>ABA for wires<br>Attention<br>Additional<br>Instruction | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>Acct: 936-933-7552<br><br>ABA #: 011-900-571<br>Reference: Plassein Packaging,<br>Corp.<br>Contact: Liz Waller (770) 859-2400 | Bank Boston, N.A.<br>Key Packaging Industries, Inc.<br>Bank Boston, N.A.<br><br>Reference: Key Packaging Industries --<br>Loan Account # 16036; # 16038,<br>#2001, #0000, #2010, # 2020<br>ABA #: 011-000-399<br>Attn: John Whelow -- Commercial<br>Loan Services<br>Contact: Donna Sbesina | $6,235,906.71 | Note Repayment | |
| Sender / Recipient<br>Account Style<br>Bank Name<br>Bank Location<br>Account #<br><br>ABA for wires<br>Attention<br>Additional<br>Instruction | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>Acct: 936-933-7552<br><br>ABA #: 011-900-571<br>Reference: Plassein Packaging,<br>Corp.<br>Contact: Liz Waller (770) 859-2400 | Brown Brothers Harriman & Co.<br>Brown Brothers Harriman & Co.<br>Boston<br>Citibank N.A.<br>New York, NY<br>Acct: 0925276 -- Brown Brothers<br>Harriman & Co.<br>Further Credit-Acct: 2155930 -- Brown<br>Brothers Harriman & Co. Boston<br><br>ABA#: 021000089<br>Reference: Key Packaging Industries<br>Corp.<br>Contact: | $591,560.00 | Advisors | |

P 08870

A0067

| Sender / Recipient | Wire From | Wire To | Amount | Purpose | Fed Ref # |
|---|---|---|---|---|---|
| Account Style | Fleet Bank | The CIT Group/Equipment Financing, | $4,181,514.61 | Note Repayment | |
| Bank Name | Fleet Capital Corporation | Inc. | | | |
| Bank Location | Fleet Bank | The CIT Group/Equipment Financing, | | | |
| Account # | Hartford, Ct. – 1 Constitution Plaza | Inc. | | | |
| ABA for wires | Acct: 936-933-7852 | First Union National Bank | | | |
| Attention | ABA #: 011-900-571 | Charlotte, NC | | | |
| Additional | Reference: Plassein Packaging, | Acct: 2000001099238 | | | |
| Instructions | Corp. | ABA#: 053000219 | | | |
| | Contact: Liz Walter (770) 859-2400 | Contact: Dan Narтом (770) 677-3497 – **Inform when wire is sent. Bank Phone Number: (704) 339-2200 | | | |
| | | Subtotal: | $12,555,136.06 | | |

P 08871

A0068

PLASSEIN PACKAGING CORPORATION
Funds Flow at Closing for:

KEY PACKAGING INDUSTRIES, INC.

January 10, 2000

| Sender / Recipient | Wire From: | Wire To: | Amount | Purpose | Fed Ref # |
|---|---|---|---|---|---|
| Account Style<br>Bank Name<br>Bank Location<br>Account #<br>ABA for wires<br>Attention<br>Additional Instructions | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>Acct: 936-933-7552<br>ABA #: 011-900-571<br><br>Reference: Plassein Packaging, Corp.<br>Contact: Liz Weller (770) 859-2400 | Sidney & Ruth Zaitlin<br>Sidney & Ruth Zaitlin<br>Sun Trust Bank<br>Miami, FL<br>Acct: 059900003234<br>ABA #: 066000004<br><br>Contact: Bank # (305) 591-6700 | $700,000.00 | Shareholder Consideration | |
| Account Style<br>Bank Name<br>Bank Location<br>Account #<br>ABA for wires<br>Attention<br>Additional Instructions | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>Acct: 936-933-7552<br>ABA #: 011-900-571<br><br>Reference: Plassein Packaging, Corp.<br>Contact: Liz Weller (770) 859-2400 | Sidney & Ruth Zaitlin<br>Sidney & Ruth Zaitlin<br>Bank of New York<br>ABA# 021000018<br>Paine Webber Retail<br>Acct: 890014096<br>FC Sidney & Ruth Zaitlin<br>Acct: WF 1109725<br>Contact: Herb Hollander (800) 628-0717 | $ 2,871,664.30 | Shareholder Consideration | |
| Account Style<br>Bank Name<br>Bank Location<br>Account #<br>ABA for wires<br>Attention<br>Additional Instructions | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>Acct: 936-933-7552<br>ABA #: 011-900-571<br><br>Reference: Plassein Packaging, Corp.<br>Contact: Liz Weller (770) 859-2400 | Thomas P. Fay/ Barbara X. Fay<br>Thomas P. Fay/Barbara X. Fay<br>Fleet Bank NH<br>Hampton, NH<br>Acct: 0400173389<br>ABA #: 011400495<br><br>Contact: Alyson Regan (603) 926-0070 | $2,439,179.34 | Shareholder Consideration | |
| Account Style<br>Bank Name<br>Bank Location<br>Account #<br>ABA for wires<br>Attention<br>Additional Instructions | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>Acct: 936-933-7552<br>ABA #: 011-900-571<br><br>Reference: Plassein Packaging, Corp.<br>Contact: Liz Weller (770) 859-2400 | William G. Russell/Cynthia D. Russell<br>William G. Russell/Cynthia D. Russell<br>First Ocean National Bank<br>Newburyport, MA<br>Acct: 35008004<br>ABA #: 011300123<br><br>Contact: Liz Mackay (978) 465-5555 | $19,141.09 | Shareholder Consideration | |
| | | Subtotal: | 6,419,984.63 | | |

P 08872

A0069

PLASSEIN PACKAGING CORPORATION
Funds Flow at Closing for:

KEY PACKAGING INDUSTRIES, INC.

January 10, 2000

| | Wire From: | Wire To: | Amount | Purpose | Fed Ref # |
|---|---|---|---|---|---|
| Sender / Recipient<br>Account Style<br>Bank Name<br>Bank Location<br>Account #<br>ABA for wires<br>Attention<br>Additional Instructions | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>Acct: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging, Corp.<br>Contact: Liz Waller (770) 859-2400 | Mark Freedman/Diane Freedman<br>Mark Freedman/Diane Freedman<br>Fleet Bank of MA<br>Swampscott, MA<br>Acct: 0005548707<br>ABA #: 011000138<br><br>Contact: Donna Papadopulos (888)<br>841-4000 | $69,403.19 | Shareholder<br>Consideration | |
| Sender / Recipient<br>Account Style<br>Bank Name<br>Bank Location<br>Account #<br>ABA for wires<br>Attention<br>Additional Instructions | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>Acct: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging, Corp.<br>Contact: Liz Waller (770) 859-2400 | Robert N. Zeitlin<br>Robert N. Zeitlin<br>Bank of New York<br><br>Acct: 8900114096<br>ABA #: 021000018<br>Paine Webber Resail<br>FC Robert N. Zeitlin<br>Acct: WF 10259-35<br>Contact: Herb Hollender (800) 821-<br>0717 | $2,181,122.12 | Shareholder<br>Consideration | |
| Sender / Recipient<br>Account Style<br>Bank Name<br>Bank Location<br>Account #<br>ABA for wires<br>Attention<br><br>Additional Instructions | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>Acct: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging, Corp.<br><br>Contact: Liz Waller (770) 859-2400 | Robert N. Zeitlin<br>Robert N. Zeitlin Charitable<br>Remainder Unitrust<br>Bank of New York<br><br>Acct: 8900114096<br>ABA #: 021000018<br>Paine Webber Resail<br>FC Alex Hollender TTEE FBO<br>Robert N. Zeitlin 1999 Remainder<br>Unitrust<br>Acct: WF 95614-35<br>Contact: Herb Hollender (800) 821-<br>0717<br>Subtotal: | $514,426.87 | Shareholder<br>Consideration | |
| | | | $2,776,952.18 | | |

P 08873

PLASSEIN PACKAGING CORPORATION

Funds Flow at Closing for:

## KEY PACKAGING INDUSTRIES, INC.

### January 10, 2000

| | Wire From: | Wire To: | Amount | Purpose | Fed Ref # |
|---|---|---|---|---|---|
| **Sender / Recipient**<br>**Account Style**<br>**Bank Name**<br>**Bank Location**<br>**Account #**<br>**ABA for wires**<br>**Attention**<br>**Additional Instructions** | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>Acct. #: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging, Corp.<br>Contact: Liz Waller (770) 859-2400 | ZFC Associates, Inc.<br>ZFC Associates, Inc.<br>Citibank, N.A.<br>New York, NY<br>Acct: 03094823<br>ABA #: 021000089<br>Contact: (212) 290-7700 | $140,727.42 | Shareholder<br>Consideration | |
| **Sender / Recipient**<br>**Account Style**<br>**Bank Name**<br>**Bank Location**<br>**Account #**<br><br>**ABA for wires**<br>**Attention**<br>**Additional Instructions** | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>Acct: 936-933-7552<br><br>ABA #: 011-900-571<br>Reference: Plassein Packaging, Corp.<br>Contact: Liz Waller (770) 859-2400 | Dr. Ruth L. Fleshuch<br>Dr. Ruth L. Fleshuch<br>State Street Bank and Trust<br>Company<br>Boston, MA. 02110 (225 Franklin<br>Street)<br>To Credit DDA Acct: 5673-032-8<br>Acct #: 52-0113342-2<br>ABA #: 011000028<br>Attn: Trust and Investments<br>Contact: Brian Oatice (617) 664-3354 | $2,706,414.19 | Shareholder<br>Consideration | |
| **Sender / Recipient**<br>**Account Style**<br>**Bank Name**<br>**Bank Location**<br>**Account #**<br><br><br>**ABA for wires**<br>**Attention**<br>**Additional Instructions** | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>Acct: 936-933-7552<br><br><br>ABA #: 011-900-571<br>Reference: Plassein Packaging, Corp.<br>Contact: Liz Waller (770) 859-2400 | Chase Bank of Texas, N.A.<br>Trust Clearing Account<br>Chase Bank of Texas, N.A.<br>Houston, TX<br>Credit: Trust Clearing account #<br>00101606376<br>FCC: Plassein/Key Packaging<br>Escrow<br>Acct: 55-03-001-2095900<br>ABA #: 113-000-609<br><br>Attn: Mona Rodgers (X6337)<br>Subtotal: | $1,500,000.00<br><br><br><br><br><br><br><br><br><br><br>$4,347,141.61 | Escrow | |
| **Total Consideration** | | | $26,098,314.68 | | |

P 08874

A0071

**PLASSEIN PACKAGING CORPORATION**
**Funds Flow at Closing for:**
**CLOSING AND PROFESSIONAL FEES**
**January 10, 2000**

| | Wire From | Wire To | Amount | Purpose | Fed Ref # |
|---|---|---|---|---|---|
| Sender / Recipient | Fleet Bank | The Gulfstar Group | $1,000,000.00 | Plassein Advisors | |
| Account Style | Fleet Capital Corporation | The Gulfstar Group, Inc. | | | |
| Bank Name | Fleet Bank | Bank One, N.A. | | | |
| Bank Location | Hartford, Ct. – 1 Constitution Plaza | Houston, TX | | | |
| Account # | Acct: 936-933-7552 | Acct: 1890263864 | | | |
| ABA for wires | ABA #: 011-900-571 | ABA #: 111-000-614 | | | |
| Attention | | | | | |
| Additional Instructions | Reference: Plassein Packaging, Corp. Contact: Liz Waller (770) 859-2400 | Notify Bob Phillips @ 713-751-3485 upon receipt. | | | |
| Sender / Recipient | Fleet Bank | Trivest | $1,100,000.00 | Investor | |
| Account Style | Fleet Capital Corporation | Trivest II, Inc. | | | |
| Bank Name | Fleet Bank | Northern Trust Bank of Florida, N.A. | | | |
| Bank Location | Hartford, Ct. – 1 Constitution Plaza | Miami, FL | | | |
| Account # | Acct: 936-933-7552 | Acct: 1010036137 | | | |
| ABA for wires | ABA #: 011-900-571 | ABA # 066009650 | | | |
| Attention | | Attn: Patricia Loblan | | | |
| Additional Instructions | Reference: Plassein Packaging, Corp. Contact: Liz Waller (770) 859-2400 | Contact: | | | |
| Sender / Recipient | Fleet Bank | Plassein Packaging Corp. | $779,973.46 | Cost Reimbursement | |
| Account Style | Fleet Capital Corporation | Plassein Packaging Corp. | | | |
| Bank Name | Fleet Bank | Bank One, N.A. | | | |
| Bank Location | Hartford, Ct. – 1 Constitution Plaza | Houston, TX | | | |
| Account # | Acct: 936-933-7552 | Acct: 1563038007 | | | |
| ABA for wires | ABA #: 011-900-571 | ABA #: 111-000-614 | | | |
| Attention | | | | | |
| Additional Instructions | Reference: Plassein Packaging, Corp. Contact: Liz Waller (770) 859-2400 | Notify Bob Phillips @ 713-751-3485 upon receipt. | | | |
| Sender / Recipient | Fleet Bank | Andrews & Kurth, L.L.P | $277,751.61 | Plassein Counsel | |
| Account Style | Fleet Capital Corporation | Andrews & Kurth, L.L.P | | | |
| Bank Name | Fleet Bank | Chase Bank of Texas | | | |
| Bank Location | Hartford, Ct. – 1 Constitution Plaza | Houston, TX | | | |
| Account # | Acct: 936-933-7552 | Acct: 00100184952 | | | |
| ABA for wires | ABA #: 011-900-571 | ABA #: 113000609 | | | |
| Attention | | Attn: Mary Arnold | | | |
| Additional Instructions | Reference: Plassein Packaging, Corp. Contact: Liz Waller (770) 859-2400 | Reference: Tom Mason; Matter No. 80996 | | | |

P 08875

A0072

| Sender / Recipient | Wire From: | Wire To: | Amount: | Purpose | Fed Ref # |
|---|---|---|---|---|---|
| Account # Style<br>Account Style<br>Bank Name<br>Bank Location | **Fleet Bank**<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, CL – 1 Constitution Plaza | **Arthur Andersen, LLP**<br>Arthur Andersen, LLP<br>Bank One, N.A.<br>Lockbox Remember "LB"<br>Lockbox #: 730260 | $265,724.00 | Planned Accountants | |
| Account #<br>ABA for wires<br>Attention<br>Additional<br>Instructions | Acct: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Pinnacle Packaging,<br>Corp.<br>Contact: Liz Waller (770) 859-2400 | Acct: 5901618<br>ABA #: 071000013<br>Invoice #: 536678<br>Reference Field:<br>IV0060536678LB730260<br>Contact: Greg Moore (312) 732-4111 | | | |
| | | **Subtotal:** | **3,570,459.97** | | |

P 08876

A0073

PLASSEIN PACKAGING CORPORATION
Funds Flow at Closing for:
**CLOSING AND PROFESSIONAL FEES**

**January 10, 2000**

| | Wire From | Wire To | Amount | Purpose | Fed Ref # |
|---|---|---|---|---|---|
| Sender / Recipient<br>Account Style<br>Bank Name<br>Bank Location<br>Account #<br>ABA for wires<br>Attention<br>Additional<br>Instructions | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. — 1 Constitution Plaza<br>Acct: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging,<br>Corp.<br>Contact: Liz Waller (770) 859-2400 | Timothy F. O'Neal<br>Timothy F. O'Neal or Margaret<br>Barnden O'Neal<br>Bank of America<br>Houston, TX<br>Acct: 1250780998<br>ABA #: 111-0000-25<br><br>Contact: Sherry Womack (713) 247-6318 | $156,000.00 | Professional Fees | |
| Sender / Recipient<br>Account Style<br>Bank Name<br>Bank Location<br>Account #<br>ABA for wires<br>Attention<br>Additional<br>Instructions | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. — 1 Constitution Plaza<br>Acct: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging,<br>Corp.<br>Contact: Liz Waller (770) 859-2400 | Eric T. Paulsen<br>Eric T. or Diane Paulsen<br>Comerica Bank-Texas<br>Houston, TX<br>Acct: 635204128<br>ABA #: 111-0007-53<br><br>Contact: Julie Dunn (713) 888-3605 | $156,000.00 | Professional Fees | |
| Sender / Recipient<br>Account Style<br>Bank Name<br>Bank Location<br>Account #<br>ABA for wires<br>Attention<br>Additional<br>Instructions | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. — 1 Constitution Plaza<br>Acct: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging,<br>Corp.<br>Contact: Liz Waller (770) 859-2400 | Sam Chobelr<br>Sam Chobelr<br>Bank of America<br>Riverside, CA<br>Acct: 06281-02391<br>ABA #: 121-000-358<br><br>Contact: Mary Vallecott (909)-686-2590 | $10,000.00 | Subordinated<br>Debt Fee | |
| Sender / Recipient<br>Account Style<br>Bank Name<br>Bank Location<br>Account #<br>ABA for wires<br>Attention<br>Additional<br>Instructions | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. — 1 Constitution Plaza<br>Acct: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging,<br>Corp.<br>Contact: Liz Waller (770) 859-2400 | Greenberg Traurig<br>Greenberg Traurig Trust Account<br>Sun Bank, N.A.<br>Miami, Florida (777 Brickell Av.;<br>33131)<br>Acct: 01B9-001130199<br>ABA # 060000604<br>Attn: Catherine Dieterle, Brickell<br>Office<br>Reference: Trivest/Plassein;<br>8960.01K1; M. Hein — Greenberg<br>Traurig | $80,000.00 | Trivest Counsel | |

P 08877

A0073a

| Sender / Recipient | Wire From: | Wire To: | Amount: | Purpose: | Fed Ref # |
|---|---|---|---|---|---|
| Account Style | Fleet Bank | Metropolitan Title Company | $4,962.49 | Titvest Counsel | |
| Bank Name | Fleet Capital Corporation | Reference: Title Fees & Costs | | | |
| Bank Location | Fleet Bank | Old Kent Bank of Holland | | | |
| Account # | Hartford, CL – 1 Constitution Plaza | Grand Rapids, MI (One Vandenberg | | | |
| ABA for wire | Acct: 936-933-7352 | Center) | | | |
| Attention | ABA #: 011-900-571 | Escrow Acct#: 072400052 | | | |
| Additional | Reference: Plassein Packaging, | ABA: 072400052 | | | |
| Instructions | Corp. | Trust Acct Name: Metropolitan Title | | | |
| | Contact: Liz Walter (770) 859-2400 | Co. Holland Escrow Account | | | |
| | | File No.: 08960-018300 | | | |
| | | Subtotal: | $410,962.49 | | |
| | | Total Closing Fees: | $3,781,631.56 | | |

P 08878

A0074

**PLASSEIN PACKAGING CORPORATION**
Funds Flow at Closing

### INVESTORS – INBOUND WIRES

January 10, 2000

| | Wire From | Wire To: | Amount: | Purpose | Fed Ref # |
|---|---|---|---|---|---|
| Sender / Recipient | OstiStar Plastics, L.L.C | Fleet Bank | $800,000.00 | | |
| Account Style | OstiStar Plastics, L.L.C. | Fleet Capital Corporation | | | |
| Bank Name | Bank One | Fleet Bank | | | |
| Bank Location | Houston, TX | Hartford, Ct. – 1 Constitution Plaza | | | |
| Account # | 1568038064 | Acct: 936-953-7352 | | | |
| ABA for wires | ABA #: 111-000-614 | ABA #: 011-900-571 | | | |
| Attention | | Reference: Plassein Packaging, Corp. | | | |
| Additional Instructions | | Contact: Lis Weiler (770) 859-2400 | | | |
| Sender / Recipient | Trivest | Fleet Bank | $24,200,000.00 | | |
| Account Style | Trivest II, Inc. | Fleet Capital Corporation | | | |
| Bank Name | Northern Trust Bank of Florida, N.A. | Fleet Bank | | | |
| Bank Location | Miami, FL | Hartford, Ct. – 1 Constitution Plaza | | | |
| Account # | Acct: 1010036137 | Acct: 936-953-7352 | | | |
| ABA for wires | ABA # 066000650 | ABA #: 011-900-571 | | | |
| Attention | Attn: Patricia Liebau | Reference: Plassein Packaging, Corp. | | | |
| Additional Instructions | Contact: | Contact: Lis Weiler (770) 859-2400 | | | |
| | | Total Inbound Wires: | $25,000,000.00 | | |

P 08879

A0075

# Exhibit A-1

**EXHIBIT B**
**TO**
**FUNDS FLOW MEMORANDUM**

**Sources and Uses of Funds**

**Sources**

MIAMI/HEINM/1103219/m3x09!.DOC/2/02/00

B-1

P 08880

A0077

Exhibit B
to
Funds Flow Memorandum

**SOURCES AND USES**

| Sources | Amount |
|---|---|
| Revolver draw (3) | 10,410,320.57 |
| Capex facility | 790,000.00 |
| Term A | 12,000,000.00 |
| Term B | 16,000,000.00 |
| Total Senior Credit facility | 39,200,320.57 |
| | |
| Subordinated note - Telesat | 5,080,081.00 |
| Subordinated note - Sam Chaboki (1) | 500,000.00 |
| Total Sub-debt | 5,580,081.00 |
| | |
| Equity (Series A) - Telesat | 19,200,001.00 |
| Equity (Series A) - OakTree | 800,000.00 |
| Equity (Series B) - rollover stock (1) | 7,000,000.00 |
| Total equity | 27,000,001.00 |
| | |
| **TOTAL SOURCES** | **71,300,322.37** |

| Uses | Amount | | Net Baker (CAN$) | |
|---|---|---|---|---|
| **Proceeds to Sellers:** | | | 72,800,000 | purchase price |
| Key Packaging, Inc (mud) (2) | 13,043,578.53 | | 1,362,588 | plus capex and cash adj. |
| Marshall (mud) | 5,088,508.72 | | (1,500,000) | escrow amount |
| Nor Baker (mud) | 4,485,026.12 | | (7,924,555) | indebtedness |
| Plasload (Sam Chaboki) | 2,046,366.30 | | 9,738,333 | Net proceeds to sellers |
| Transamerican (Sam Chaboki) | 5,128,983.39 | | | |
| Total proceeds to sellers. | 31,800,012.14 | | 0.667285 | CAN Xchange rate |
| | | | | |
| **Payoff of Funded Indebtedness:** | | | | |
| Key Packaging, Inc (3) | 12,053,536.06 | | | |
| Marshall | 1,301,888.45 | | | |
| Nor Baker | 5,446,402.06 | | | |
| Plasload | 1,581,272.26 | | | |
| Transamerican | 4,241,361.21 | | | |
| Total payoff of indebtedness | 24,623,631.04 | | | |
| | | | | |
| **Amounts held in Escrow:** | | | | |
| Key Packaging, Inc. | 1,500,000.00 | | | |
| Marshall | 300,000.00 | | | |
| Nor Baker | 1,250,927.84 | | | |
| Total escrow amount | 3,050,927.84 | | | |
| | | | | |
| **Non cash use of funds (1):** | | | | |
| Seller rollover stock issuance | 7,000,000.00 | | | |
| Sam Chaboki note issuance | 500,000.00 | | | |
| Total non-cash uses | 7,500,000.00 | | | |
| | | | | |
| **Transaction Expenses:** | | | | |
| Telesat fee (investment) | 1,000,000.00 | | | |
| Telesat fee (sub-debt) | 100,000.00 | | | |
| OakTree fee | 1,000,000.00 | | | |
| Sam Chaboki sub-debt fee | 10,000.00 | | | |
| OakTree expense reimbursement (4) | 779,973.46 | | | |
| Senior debt closing fee (1) | 1,192,500.00 | | will be netted from Sr debt proceeds |
| Senior debt agent's fee (1) | 50,000.00 | | will be netted from Sr debt proceeds |
| Tim O'Neal, Eric Pashea professional fees | 312,000.00 | | | |
| Arthur Anderson | 263,126.00 | | | |
| Andrews & Kurth (legal) | 227,731.61 | | | |
| Greenberg Traurig (legal) | 88,000.00 | | | |
| Title Fees | 8,952.49 | | | |
| Brown Brothers fee (sellers expense) (5) | 581,560.00 | | | |
| Total transaction expenses | 5,525,731.56 | | | |
| | | | | |
| **TOTAL USES OF FUNDS** | **71,700,322.37** | | Variance | - |

(1) Non-cash uses/value.
(2) The $300k in proceeds to Sid that was paid by company last week shows here in indebtedness.
Also, the OPG obligation ($1,134mm) is included in indebtedness.
(3) Wire will be less the $1,192,500 in up-front fees and $50,000 in agent's fee.
Total funds to come from FleetBoston:

| | Amount |
|---|---|
| Revolver | 10,410,320.57 |
| Capex | 790,000.00 |
| Term A | 12,000,000.00 |
| Term B | 16,000,000.00 |
| Closing fees and agent's fee | (1,242,500.00) |
| Total | $ 37,957,820.57 |

| | 39,200,320.57 |

(4) Represents the sum of expenses Oaxx has stated paid (per supplemental schedule).
(5) To be paid from gross proceeds to Key Packaging, Inc.

Final Sources Uses xls 1/1200

P 08881

2

A0079

Sent By: JetFax M820;    10/18/99  10:04 FAX 3052850102    TRIVEST                    @002/008
                                                              712 800 2021;    10/14/99 16:22;    JetFax_#302;Page 2/8
        Received:  10/19/99 17:54;                            3052850102 -> JetFax M820;    Page 2
        18/13/1999  18:25    3852858162                            TRIVEST INC                        PAGE  02

Trivest, Inc.

2665 South Bayshore Drive
Suite 800
Miami, Florida 33133-5462
Telephone (305) 858-2200
Facsimile (305) 285-0102

# TRIVEST

October 13, 1999

STRICTLY CONFIDENTIAL

Mr. G. Kent Kahle
Managing Director
GulfStar Group, Inc.
700 Louisiana Street, Suite 3900
Houston, Texas  77002-2731

Dear Kent:

Trivest is most interested in proceeding with a potential investment in Plasmin Packaging Corp. ("Plasmin" or the "Company") together with GulfStar Group, Inc. ("GulfStar") and the Plasmin management team ( the "Management Owners"). We are impressed with the concept you have presented to us, its future growth prospects and the senior management team you have assembled. The purpose of this letter of intent and the attached Investment Term Sheet is to set forth our agreement and understandings with respect to the proposed transaction:

1. **The Proposed Transaction**

The essential terms of the proposed transaction are as follows:

a.      Trivest Fund II, Ltd. and affiliated limited partnerships (collectively, the "Trivest Investors," or "Trivest," or the "Purchaser") will invest $15,000,000 to acquire 15,000,000 shares of newly issued Convertible Preferred Stock ($1.00 par value), for $1.00 per share, as more fully described on the attached Investment Term Sheet. The preferred stock will carry an accrued annual dividend of 8%, and both the initial and accrued shares will be convertible, at Trivest's option, into shares of common stock at a 1:1 ratio. GulfStar and the Management Owners are collectively invited to purchase up to $1,000,000 of the Convertible Preferred Stock on the same basis as Trivest. The proceeds, along with proceeds provided by debt financing, will be used by Plasmin to fund the acquisitions of Key Packaging Industries Corp., Marshall Plastic Film, Nor Baker Industries Inc., Plastical Industries Inc., and Transamerican Plastics Corp. (collectively, the "Founding Companies") and to provide for future working capital needs.

b.      We anticipate that GulfStar and the Management Owners will own 2.772 and 1.228 million shares, respectively, of common stock at close for $0.01 per share. Trivest will have a repurchase right on 0.614 million of the common shares held by the Management Owners, respectively, subject to terms more fully described on the attached Investment Term Sheet.

c.      The Management Owners will also be entitled to receive additional equity ownership in the Company pursuant to a stock option plan, that will provide the right to purchase, in the aggregate, 1,230,000 shares of the Company's common equity for $1.00 per share, as more fully described on the attached Investment Term Sheet.

P 08883

Sent by: JetFax M920    10/14/99  10:05 FAX 3052850102    TRIVEST    713 300 2021;    10/14/99 16:22;    JetFax #302;Page 3/8    002/008
Received: 10/13/99 17:35;    3052850102 -> JetFax M920;    Page 2
10/13/1999  18:25    3052850102    TRIVEST INC    PAGE  03

Mr. G. Kent Kahle
October 13, 1999
Page 2

    d.    It is contemplated that certain third party sellers of the Founding Companies (the "Sellers") will collectively receive up to 4,750,000 shares of Plassein common stock as part of the purchase consideration.

    e.    The Trivest Investors, the Company, GulfStar, the Management Owners and the Sellers will enter into mutually agreeable Shareholders' Agreements containing such provisions as are typically found in agreements relating to transactions of this type, size and complexity (including restrictions on transfer; registration rights; tag-along and take-along provisions; etc.)

**2.    Financing**

    a.    We will spend considerable time working with you, the Company, and our financing sources to develop an appropriate capital structure that will accomplish the initial purchase transactions and facilitate the growth plans of Plassein.

    Over the years Trivest has developed close working relationships with financing sources that focus on providing capital for growth-oriented acquisitions. Many of these relationships are with institutions who have invested in Trivest Fund II, Ltd. Lenders who are also limited partners with Trivest include Heller Financial, Deutsche Bank, Bank of Boston, Antares Leveraged Capital and CIBC Oppenheimer. It is possible that one or more of these institutions will provide financing for Plassein.

    b.    With respect to the Trivest Investor capital, the Trivest Investors are capitalized with assets of $216 million and invest in management buyouts and growth capital transactions involving middle market companies.

**3.    Management of Company**

    a.    We envision that Plassein will operate as a stand-alone company led by the Management Owners.

    b.    We contemplate employment agreements with Frank McNabb, Dorrance Davies and possibly other Management Owners on mutually agreeable terms.

    c.    Trivest is not involved in the day-to-day management of its portfolio companies. We, along with GulfStar, will provide support in the areas of financial planning, lender negotiations, business strategy, recruiting and acquisitions. We recognize the strong growth prospects that exist for Plassein and will assist management in developing and implementing a strategic plan to realize the Company's objectives. When appropriate, Trivest will support the Company with additional capital to fund growth and in the identification and completion of add-on acquisitions.

P 08884

A0081

Mr. G. Kent Kahle
October 13, 1999
Page 3

4.    Material Terms and Conditions of Proposal

    a.    The proposal is subject to the following conditions:

        (i)    Minimum EBITDA / EBITA: At all times from the date this letter is accepted until the consummation of the proposed transaction, trailing twelve months EBITDA and EBITA will be equal to or greater than $11.7 million and $2.6 million (the "Targets"), respectively. In the event that EBITDA and/or EBITA drops below their respective Targets, Trivest would require that the combined purchase prices paid for the Founding Companies be reduced such that the combined purchase price as a multiple of EBITDA and EBITA will be no greater than the multiples derived from the original combined purchase price divided by the Targets.

        (ii)    Due Diligence: A due diligence review shall have been completed, including a financial, legal, commercial and environmental review, and the results of such review shall be reasonably satisfactory to us.

        (iii)    Securities Purchase Agreement and related Shareholders' Agreements: The negotiation, execution and delivery of a Securities Purchase Agreement and related Shareholders' Agreements among the Purchaser, Plassein, GulfStar and the Management Owners, which will include representations, warranties, covenants and indemnities typically found in agreements relating to transactions of this type, size and complexity. The initial draft of the foregoing agreements will be prepared and delivered to Plassein by our counsel within approximately ten business days of this letter.

        (iv)    Government Approvals: Completion of all necessary governmental and regulatory filings that are required to be filed in connection with the transaction, the receipt of all applicable governmental and regulatory approvals that are required to be obtained by the Purchaser, the Company or its shareholders and the expiration of any applicable waiting periods.

        (v)    Consents: The consent, if required and if the absence of such consent would have a material adverse effect on the business, operations, assets, financial condition or prospects of the Company, of any of the Company's material lenders, vendors, lessors and service agreement partners.

        (vi)    Closing of Acquisitions: The acquisitions contemplated by the existing letters of intent between Plassein and the Sellers shall be consummated concurrently with the consummation of the transactions contemplated by the Securities Purchase Agreement.

        (vii)    Atlantis Plastics, Inc. Consent: Trivest has a contractual obligation to present all investment opportunities in the plastics business to the Board of Directors of Atlantis Plastics, Inc., a present investment portfolio company of Trivest's. The consent of Atlantis' Board of Directors must be received in order for Trivest to pursue the transaction. Trivest will use its best efforts to obtain a timely consent to pursue the Plassein investment outside of Atlantis Plastics, Inc.

    b.    From the date this letter is accepted to thirty (30) days thereafter, GulfStar and Plassein shall not, and shall cause their respective affiliates, officers, directors, employees, consultants and other agents not to, directly or indirectly, (i) take any action to solicit or initiate any

P 08885

10/13/99  10:59 FAX 3052850102                    TRIVEST                          ☒005/006
                                               713 300 2021;      10/14/99 18:28;  JetFax #292;Page 5/6
Received:  10/13/99 17:38;      3052850102 -> JetFax MENU; Page 5;
10/13/1999  18:25     3052850102
                                               TRIVEST INC                        PAGE  05

Mr. G. Kent Kahle
October 13, 1999
Page 4

"Acquisition Proposal" (as defined below), or (ii) continue, initiate or engage in negotiations with, or disclose any non-public information, other than in the ordinary course of business, relating to Plassein, or afford access to any other person or entity except Trivest, the Purchaser, and their respective representatives, provided, however, Plassein, GulfStar and their respective agents may communicate with other potential buyers to notify them that Plassein is working under an exclusive basis with a buyer. The term "Acquisition Proposal" as used herein means any offer, proposal or indication of interest in (x) the acquisition of Plassein or the Founding Companies, (y) a merger, consolidation or other business combination in which Plassein does not survive, or (z) the acquisition of any of the capital stock of the Company.

        c.      Closing will occur by the later of (i) November 30, 1999, or (ii) the receipt of all applicable governmental approvals and any applicable waiting periods.

5.      Miscellaneous

        a.      It is contemplated that this letter of intent will be entered into by 5:00PM Eastern Daylight Time on Friday, October 15, 1999. If accepted by you, this letter of intent, and any rights and obligations of any party hereunder, shall terminate if the Securities Purchase Agreement and related Shareholders' Agreements are not executed and delivered within thirty (30) days after the acceptance of this proposal. In the event this letter of intent terminates for any reason, Trivest shall only be responsible for its own costs and expenses in connection with the transactions contemplated hereby. In the event that the transaction contemplated herein is consummated, all transaction expenses incurred by Plassein, Trivest and GulfStar in connection with the transaction will be paid by Plassein from the proceeds of the financing contemplated herein.

        b.      This proposal has been reviewed at all levels within Trivest. Given the nature of our organization, Trivest does not have a formal investment committee. Rather, the personnel required to approve investments work closely throughout the acquisition process. No further approval is required on behalf of Trivest, or the Purchaser, to undertake and consummate the transactions contemplated by this letter of intent.

        c.      Except with respect to paragraph 4(b), paragraph 5(a) and this paragraph 5(c), this letter is not intended to be a binding contract. This letter is an expression of mutual intent to proceed with the drafting of the Shareholders Purchase Agreement and related Subscription and Stockholders' Agreements and collateral documents contemplated hereby in accordance with the principles stated herein.

Sent by: Jet-Fax M820    10/13/99  10:07 FAX 3052850102          TRIVEST          713 800 2021;    10/14/99 16:24;  JetFax_#392;Page 8/8
Received:  10/13/99 17:54:    30528501GB -> Jetrax M820; Page 8
10/13/1999  18:25    3052858182              TRIVEST INC              PAGE  85

Mr. G. Kent Kahle
October 13, 1999
Page 5

If you have any questions on this proposal, please feel free to call. We look forward to working with the team at Plaxein.

Sincerely,

William F. Kaciomski, Jr.
Managing Director

WFK/jkd
PLAXEIN-LTRD
cc:  Earl W. Powell
     Peter W. Klein
     Dale A. Stohr

Accepted and Agreed to by:

Plaxein Packaging Corp.

By: _____

Name: G. Kent Kahle

Title:  Chairman

Date: _____

GulfStar Group, Inc.

By: _____

Name:  G. Kent Kahle

Title:  President

Date: _____

P 08887

A0084

10/14/99  18:08  FAX 3052850102                TRIVEST                                @007/008
Received:  10/14/99  17:57;        712 300 2021;    10/14/99 18:24;   JetFax #392;Page 7/8
                                   3052850102 -> JetFax #920;  Page 7
10/12/1999   18:25    3052950102              TRIVEST INC                           PAGE  97


Investment Term Sheet


Trivest Preferred Stock:          15,000,000 shares of preferred stock purchased at par ($1.00), to generate $15
                                  million in proceeds; convertible at 1:1 to common stock at the holders' option.
                                  The Preferred Stock will accrue an annual dividend of 8%.  Management and
                                  OutSiders are invited to purchase up to 1,000,000 shares of this preferred stock
                                  on the same terms as Trivest.  Proceeds are to be used for the acquisition of
                                  platform companies and future working capital needs.

Common Stock:
   - Mgmt Initial Promote         614,000 shares of common stock purchased for par value ($0.01 per share).

   - Mgmt Incentive Promote       614,000 shares of common stock purchased for par value ($0.01 per share).
                                  Management shall purchase these shares at close, however, Trivest shall have
                                  repurchase rights for these shares, at par, should the following Target
                                  Value/Share tests not be met by the following Target Dates:

                                        # of shares        Target Value/Share *        Target Date
                                          614,000                 $4.00                4th anniversary

                                  * "Target Value / Share" shall be computed each fiscal quarter by multiplying
                                  the trailing twelve month EBITDA (EBITDA, to exclude the Trivest Annual
                                  Management Fee defined below) by 6.5x; subtracting from that product
                                  existing debt less unrestricted cash; and dividing that sum by the number of
                                  fully diluted shares.  Fully diluted shares shall give effect to the Management
                                  Incentive Promote shares being issued.

                                  In the event of a liquidity event, Trivest's repurchase right may or may not
                                  terminate based upon the implied value per fully diluted share resulting from
                                  the liquidity event.  If the implied value exceeds $4.00 per fully diluted share,
                                  Trivest's repurchase right shall expire.  If the implied value is more than $1.00
                                  and less than $4.00 per fully diluted share, Trivest's repurchase right will be
                                  adjusted to provide Management a pro-rated realization of value.

   - GS Initial Promote           2,772,000 shares of common stock purchased for par value ($0.01 per share).

   - Shares used as purchase      Up to 4,250,000 shares of common stock to be used as purchase consideration
     consideration for platform   for platform companies (based on equity splits proposed herein, 4,750,000
     companies                    shares represents 20% ownership stake for platform company sellers before
                                  giving effect to dilution resulting from management options and subordinated
                                  debt warrants).  Up to (xxx) shares of common stock shall be reserved for use
                                  as purchase consideration for future acquisitions.

Mgmt Stock Options:               An option to purchase 1,250,000 shares of common stock at $1.00 per share
                                  (1,250,000 shares represent approximately 4.75% of fully diluted ownership
                                  assuming 4,750,000 shares are issued to sellers and before giving effect to
                                  subordinated debt warrants).  This option rights shall vest ratably over the five
                                  year period (20% per year) following the acquisition of the platform
                                  companies.


P 08888

Sent by: JetFax M820    10/13/99   10:08 FAX 3052850102    TRIVEST                    ☑005/005
Received:  10/13/99 17:37;    713 300 2021;    10/14/99 16:24;  JetFax_#302;Page 8/8
           10/13/1999  18:25    3052850102    3052850102 -> JetFax M820;  Page 6
                                              TRIVEST INC                    PAGE  06

Investment Term Sheet

| | |
|---|---|
| **Board Composition:** | Trivest will maintain control of the Board until such point it has fully realized on its investment. |
| **Employment terms:** | Employment contracts with mutually satisfactory tenures and terms will be in place for key management members. |
| **Financing:** | Financing facilities must be satisfactory to Trivest. |
| **Annual Management Fee:** | Trivest will earn $300,000 per year with annual CPI increases. |
| **Transaction Fee(s):** | |
| – At closing | Trivest and GulfStar will each receive $1,000,000 at close. |
| – Future acquisitions | Trivest and GulfStar will split a Transaction Fee for each add-on acquisition as compensation for sourcing, negotiating, structuring, and financing said acquisition. Trivest will earn 75% of such fee, with GulfStar earning the remaining 25%. |

The fee shall be computed for each acquisition as follows:
- 2.0% on the first $10 million of transaction value
- 1.0% on the next $40 million of transaction value
- 0.25% on transaction value in excess of $50 million

**P 08889**

A0086

3

A0087

**Schedule 6.04**
**Series A Preferred Stock and Warrant Purchase Agreement**

**Use of Proceeds**

HOU:499796.3

P 08891

A0088

Exhibit B
to
Funds Flow Memorandum

SOURCES AND USES

| Sources | Amount | |
|---|---|---|
| Revolver draw (3) | 10,410,330.57 | |
| Capex facility | 790,000.00 | |
| Term A | 12,000,000.00 | |
| Term B | 16,000,000.00 | |
| Total Senior Credit facility | | 39,200,330.57 |
| | | |
| Subordinated note - Trivest | 5,000,000.00 | |
| Subordinated note - Sam Chehair (1) | 500,000.00 | |
| Total Sub-debt | | 5,500,000.00 |
| | | |
| Equity (Series A) - Trivest | 15,200,000.00 | |
| Equity (Series A) - GulfStar | 800,000.00 | |
| Equity (Series B) - rollover stock (1) | 7,000,000.00 | |
| Total equity | | 23,000,000.00 |
| | | |
| **TOTAL SOURCES** | | **71,300,330.57** |

| Uses | | |
|---|---|---|
| Proceeds to Sellers: | | |
| Key Packaging, Inc (Intnl) (2) | 12,043,078.52 | |
| Marshall (Intnl) | 5,695,339.72 | |
| Nor Baker (Intnl) | 4,602,436.12 | |
| Plastical (Sam Chehair) | 2,046,564.39 | |
| Transactronics (Sam Chehair) | 5,138,983.59 | |
| Total proceeds to sellers | | 31,626,012.34 |
| | | |
| Payoff of Funded Indebtedness: | | |
| Key Packaging, Inc (2) | 12,063,576.06 | |
| Marshall | 1,301,312.43 | |
| Nor Baker | 5,446,482.06 | |
| Plastical | 1,591,273.26 | |
| Transactronics | 4,241,361.23 | |
| Total payoff of indebtedness | | 24,623,434.04 |
| | | |
| Amount held in Escrow: | | |
| Key Packaging, Inc. | 1,520,000.00 | |
| Marshall | 300,000.00 | |
| Nor Baker | 1,030,927.84 | |
| Total escrow amount | | 2,850,927.84 |
| | | |
| Non cash use of funds (1): | | |
| Seller rollover stock issuance | 7,000,000.00 | |
| Sam Chehair note issuance | 500,000.00 | |
| Total non-cash uses | | 7,500,000.00 |
| | | |
| Transaction Expenses: | | |
| Trivest fee (investment) | 1,000,000.00 | |
| Trivest fee (sub-debt) | 100,000.00 | |
| GulfStar fee | 1,800,000.00 | |
| Sam Chehair sub-debt fee | 10,000.00 | |
| GulfStar expense reimbursement (4) | 779,973.44 | |
| Senior debt closing fee (1) | 1,592,508.00 | |
| Senior debt agent's fee (1) | 30,000.00 | |
| Tax O'Neal, Felix Perkins professional fees | 312,800.00 | |
| Arthur Andersin | 363,134.80 | |
| Andrews & Kurth (legal) | 227,731.61 | |
| Greenberg Taurig (legal) | 80,000.00 | |
| Title Fees | 8,362.49 | |
| Brown Brothers fee (sellers expense) (5) | 301,360.00 | |
| Total transaction expenses | | 5,525,751.95 |
| | | |
| **TOTAL USES OF FUNDS** | | **71,700,322.57** | Variance |

| | | |
|---|---|---|
| | 77,900,000 | purchase price |
| | 1,362,908 | plus capex and cash adj. |
| | (1,500,000) | escrow amount |
| | (7,924,519) | indebtedness |
| | 9,138,353 | Net proceeds to sellers |
| | 0.87295 | CAN Xchange rate |

will be netted from Sr debt proceeds
will be netted from Sr debt proceeds

(1) Non-cash proceeds.
(2) The $300K in proceeds to Sld that was paid by company but was shown here in indebtedness.
    Also, the OFU obligation ($1.13m net) is excluded in indebtedness.
(3) Wire will be less the $1,192,500 in up front fees and $30,000 in agent's fee.
    Total funds to come from FleetBoston:

| | Amount | |
|---|---|---|
| Revolver | 10,410,330.57 | |
| Capex | 790,000.00 | |
| Term A | 12,000,000.00 | |
| Term B | 16,000,000.00 | |
| Closing fees and agent's fee | (1,342,508.00) | 39,300,330.57 |
| Total | 37,857,822.57 | |

(4) Represents the sum of expenses Gstar has ahead paid (see supplemental schedule).
(5) To be paid from gross proceeds to Key Packaging, Inc.

Fleet Sources  Uses_xls 1/12/00

P 08892

A0089

PLASSEIN PACKAGING CORPORATION
Funds Flow at Closing for:

PLASTICAL/TRANSAMERICAN

January 10, 2000

| | Wire From: | Wire To: | Amount: | Purpose: | Fed Ref # |
|---|---|---|---|---|---|
| **PLASTICAL:** | | | | | |
| Sender / Recipient | Fleet Bank | Sam Chebeir | $2,046,364.39 | Shareholder Consideration & Non-Compete Plastical. | |
| Account Style | Fleet Capital Corporation | Sam Chebeir | | | |
| Bank Name | Fleet Bank | Bank of America | | | |
| Bank Location | Hartford, Ct. – 1 Constitution Plaza | Riverside, CA | | | |
| Account # | Acct: 936-933-7552 | Acct: 06281-02391 | | | |
| ABA for wires | ABA #: 011-900-571 | ABA #: 121-000-358 | | | |
| Attention | Reference: Plassein Packaging, Corp. | | | | |
| Additional Instructions | Contact: Liz Walter (770) 859-2400 | Contact: Mary Valinoti (909)-686-2590 | | | |
| Sender / Recipient | Fleet Bank | Imperial Bank | $5,822,634.49 | Note Repayment | |
| Account Style | Fleet Capital Corporation | Transamerican and Plastical | | | |
| Bank Name | Fleet Bank | Imperial Bank | | | |
| Bank Location | Hartford, Ct. – 1 Constitution Plaza | Federal Reserve Bank – Los Angeles Branch | | | |
| Account # | Acct: 936-933-7552 | Credit Acct #'s: 2560-100532 | | | |
| | | Loan #'s: 708054479, 708054480 | | | |
| ABA for wires | ABA #: 011-900-571 | ABA #: 1222-01444 | | | |
| Attention | Reference: Plassein Packaging, Corp. | Payoff Notes: Transamerican (6,5,4,3) and Plastical (5,4,3) | | | |
| | | Attn: Payoff Dept. | | | |
| Additional Instructions | Contact: Liz Walter (770) 859-2400 | Contact: Laurice Pearsall (310) 417-5872 | | | |
| **TRANSAMERICAN:** | | | | | |
| Sender / Recipient | Fleet Bank | Transamerican Plastics Corp. | $5,138,983.39 | Purchase, Consideration & Non-Compete Transamerican | |
| Account Style | Fleet Capital Corporation | Transamerican Plastics Corp. | | | |
| Bank Name | Fleet Bank | Imperial Bank | | | |
| Bank Location | Hartford, Ct. – 1 Constitution Plaza | Costa Mesa, CA | | | |
| Account # | Acct: 936-933-7552 | Acct: 06-223-440 | | | |
| ABA for wires | ABA #: 011-900-571 | ABA #: 1222-01444 | | | |
| Additional Instructions | Reference: Plassein Packaging, Corp. | | | | |
| | Contact: Liz Walter (770) 859-2400 | Contact: Jamie Harney (714) 641-2210 | | | |
| | | | | | |
| Sub - Total Consideration: | | | $13,007,982.27 | | |
| Subordinated Note | | | $500,000.00 | | |
| Total Consideration | | | $13,507,982.27 | | |

P 08893

A0090

# PLASSEIN PACKAGING CORPORATION
## Funds Flow at Closing for:
### MARSHALL
#### January 10, 2000

| Sender / Recipient | Wire From: | Wire To: | Amount: | Purpose: | Fed Ref # |
|---|---|---|---|---|---|
| Account Style<br>Bank Name<br>Bank Location<br>Account #<br>ABA for wires<br>Attention<br>Additional Instructions | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>Acct: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging, Corp.<br>Contact: Liz Walter (770) 859-2400 | Old Kent Bank<br>Marshall Plastics Film, Inc.<br>Old Kent Bank<br>Kalamazoo, MI<br>Obligor #: 556-7000-104<br>ABA #: 072400052<br>Attn: Margaret Youngs Corporate Banking<br>Credit Note #'s: Revolvers: 26, 125  Term:<br>42,75,91<br>Operations #: 556-7000-104<br>Contact: Jeremy Hawk (616) 337-6764 | $1,211,665.49 | Note Repayment | |
| Sender / Recipient<br>Account Style<br>Bank Name<br>Bank Location<br>Account #<br>ABA for wires<br>Attention<br>Additional Instructions | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>Acct: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging, Corp.<br>Contact: Liz Walter (770) 859-2400 | Ethel Ann Forsberg Trust<br>Ethel Ann Forsberg Trust<br>Old Kent Bank & Trust<br>Grand Rapids, MI<br>Acct: 7505040340<br>ABA #: 072400052<br><br>Contact: Julie Shaw (616) 337-2682 | $2,286,569.02 | Shareholder<br>Consideration | |
| Sender / Recipient<br>Account Style<br>Bank Name<br>Bank Location<br>Account #<br>ABA for wires<br>Attention<br>Additional Instructions | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>Acct: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging, Corp.<br>Contact: Liz Walter (770) 859-2400 | Andrew Marshall Forsberg Trust<br>Andrew Marshall Forsberg Trust<br>Old Kent Bank & Trust<br>Grand Rapids, MI<br>Acct: 7505026216<br>ABA #: 072400052<br><br>Contact: Julie Shaw (616) 337-2682 | $1,016,252.90 | Shareholder<br>Consideration<br>&<br>Non-Compete | |
| Sender / Recipient<br>Account Style<br>Bank Name<br>Bank Location<br>Account #<br>ABA for wires<br>Attention<br>Additional Instructions | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>Acct: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging, Corp.<br>Contact: Liz Walter (770) 859-2400 | Janis R. Forsberg Trust<br>Janis R. Forsberg Trust<br>Old Kent Bank & Trust<br>Grand Rapids, MI<br>Acct: 7505040357<br>ABA #: 072400052<br><br>Contact: Julie Shaw (616) 337-2682 | $484,244.51 | Shareholder<br>Consideration<br>&<br>Non-Compete | |
| | | Subtotal: | $4,998,731.92 | | |

P 08894

A0091

# PLASSEIN PACKAGING CORPORATION

## Funds Flow at Closing for:

## MARSHALL

### January 10, 2000

| Wire From: | Wire To: | Amount: | Purpose: | Fed Ref # |
|---|---|---|---|---|
| **Sender / Recipient:** Fleet Bank<br>**Account Style:** Fleet Capital Corporation<br>**Bank Name:** Fleet Bank<br>**Bank Location:** Hartford, Ct. -- 1 Constitution Plaza<br>**Account #:** Acct: 936-933-7552<br>**ABA for wires:** ABA #: 011-900-571<br>**Attention:**<br>**Additional Instructions:** Reference: Plassein Packaging, Corp.<br>Contact: Liz Waller (770) 859-2400 | Frank J. McCarthy<br>Frank J. McCarthy<br>National City Bank<br>Kalamazoo, MI<br>Acct: 0227578688<br>ABA #: 072000951<br><br>Contact: Sandy Roebel (616) 672-5551 | $1,270,316.12 | Shareholder Consideration & Non-Compete | |
| **Sender / Recipient:** Fleet Bank<br>**Account Style:** Fleet Capital Corporation<br>**Bank Name:** Fleet Bank<br>**Bank Location:** Hartford, Ct. -- 1 Constitution Plaza<br>**Account #:** Acct: 936-933-7552<br>**ABA for wires:** ABA #: 011-900-571<br>**Attention:**<br>**Additional Instructions:** Reference: Plassein Packaging, Corp.<br>Contact: Liz Waller (770) 859-2400 | Daniel R. & Bernadine Orris<br>Daniel R. & Bernadine Orris<br>Bank One<br>Grand Rapids, MI (Division 44th, Office #0755)<br>Acct: 270405084388<br>ABA #: 072000326<br><br>Contact: Bank. # 0755  Ph: (616) 771-7005 | $41,177.17 | Shareholder Consideration & Non-Compete | |
| **Sender / Recipient:** Fleet Bank<br>**Account Style:** Fleet Capital Corporation<br>**Bank Name:** Fleet Bank<br>**Bank Location:** Hartford, Ct. -- 1 Constitution Plaza<br>**Account #:** Acct: 936-933-7552<br>**ABA for wires:** ABA #: 011-900-571<br>**Attention:**<br>**Additional Instructions:** Reference: Plassein Packaging, Corp.<br>Contact: Liz Waller (770) 859-2400 | Dean & Margaret Gould<br>Prudential Securities<br>Chase Manhattan Bank, N.A.<br>New York, NY (1 Chase Manhattan Plaza, 10081)<br>Acct.#: 066396390<br>ABA#: 021000021<br>For Further Credit To Client #: AOF 089158<br>Contact: (212) 552-2222 | $89,352.94 | Note Repayment | |
| **Sender / Recipient:** Fleet Bank<br>**Account Style:** Fleet Capital Corporation<br>**Bank Name:** Fleet Bank<br>**Bank Location:** Hartford, Ct. -- 1 Constitution Plaza<br>**Account #:** Acct: 936-933-7552<br>**ABA #:** 011-900-571<br>**Reference:** Plassein Packaging, Corp.<br>**Contact:** Liz Waller (770) 859-2400 | Chase Bank of Texas, N.A.<br>Trust Clearing Account<br>Chase Bank of Texas, N.A.<br>Houston, TX<br>Credit: Trust Clearing account # 0010606276<br>FCC: Plassein/Marshall Plastic Film Escrow-<br>Credit: 55-03-001-20957800<br>ABA #: 113-000-609<br>Attn: Mona Rodgers (X6337) | $500,000.00 | Escrow | |
| | Subtotal: | $1,900,846.23 | | |
| P 08895 | | | | |
| **Total Consideration** | | $6,899,578.15 | | |

A.0092

# PLASSEIN PACKAGING CORPORATION
## Funds Flow at Closing for:

## NOR BAKER, INC.

### January 10, 2000

**\*\*ALL WIRES TO BE SENT IN CANADIAN DOLLARS\*\***

| | Wire From: | Wire To: | Amount: | Purpose: | Fed Ref # |
|---|---|---|---|---|---|
| **Sender / Recipient**<br>**Account Style**<br>**Bank Name**<br>**Bank Location**<br>**Account #**<br>**ABA for wires**<br>**Attention**<br>**Additional Instructions** | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>Acct: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging, Corp.<br>Contact: Liz Waller (770) 859-2400 | Congress Financial Corporation<br>Congress Financial Corporation (Canada)<br>The Bank of Montreal<br>141 Adelaide St. West, Ste. 1500<br>Toronto, Ontario M5H3L9<br>Acct: 1258-246<br>Transit: 00022<br><br>Contact: Harry Rosenfield (416) 364-8177 | CAN$7,924,515.00 | Note Repayment | |
| **Sender / Recipient**<br>**Account Style**<br>**Bank Name**<br>**Bank Location**<br><br>**Account #**<br>**ABA for wires**<br>**Attention**<br>**Additional Instructions** | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br><br>Acct: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging, Corp.<br>Contact: Liz Waller (770) 859-2400 | Cassels Brock & Blackwell<br>Cassels Brock & Blackwell<br>Toronto Dominion Bank<br>Toronto, Ontario, Canada<br>York at 141 Adelaide St. W.<br><br>Trust Acct: 392-849<br>Transit #: 19922 (0620)<br><br>Contact: Ola (416). 982-7562 | CAN$9,738,353.00 | Shareholder Consideration & Non-Compete | |
| **Sender / Recipient**<br>**Account Style**<br>**Bank Name**<br>**Bank Location**<br>**Account #**<br>**ABA for wires**<br>**Attention**<br>**Additional Instructions** | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>Acct: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging, Corp.<br>Contact: Liz Waller (770) 859-2400 | Royal Bank of Canada<br><br>Toronto, Canada<br>Acct: 09991294132<br>ABA: ROYCCAT2<br>In favor of: Chase Manhattan Bank London<br>Attn: Mona Rodgers (713) 216-6337 | CAN$1,500,000.00 | Escrow | |
| **Total Consideration** | | | CAN$19,162,968.00 | | |

P 08896

A0093

# PLASSEIN PACKAGING CORPORATION
## Funds Flow at Closing for:

## KEY PACKAGING INDUSTRIES, INC.

### January 10, 2000

| | Wire From: | Wire To: | Amount: | Purpose: | Fed Ref# |
|---|---|---|---|---|---|
| **Sender / Recipient** | Fleet Bank | Wentworth Capital | $ 1,636,154.74 | Note Repayment | |
| **Account Style** | Fleet Capital Corporation | Charter Financial, Inc. | | | |
| **Bank Name** | Fleet Bank | Bank of New York | | | |
| **Bank Location** | Hartford, Ct. – 1 Constitution Plaza | | | | |
| **Account #** | Acct: 936-933-7552 | Acct: 8900282967 | | | |
| **ABA for wires** | ABA #: 011-900-571 | ABA #: 021-000-018 | | | |
| **Attention** | Reference: Plassein Packaging, Corp. | Beneficiary: Charter Financial, Inc. | | | |
| **Additional Instructions** | Contact: Liz Waller (770) 859-2400 | Vicki Turner: (603) 433-4310 | | | |
| **Sender / Recipient** | Fleet Bank | Bank Boston, N.A. | $6,235,906.71 | Note Repayment | |
| **Account Style** | Fleet Capital Corporation | Key Packaging Industries, Inc. | | | |
| **Bank Name** | Fleet Bank | Bank Boston, N.A. | | | |
| **Bank Location** | Hartford, Ct. – 1 Constitution Plaza | | | | |
| **Account #** | Acct: 936-933-7552 | Reference: Key Packaging Industries – Loan Account # 16036; # 16038, #2001, #0000, #2010, # 2020 | | | |
| **ABA for wires** | ABA #: 011-900-571 | ABA #: 011-000-390 | | | |
| **Attention** | Reference: Plassein Packaging, Corp. | Attn: John Winslow – Commercial Loan Services | | | |
| **Additional Instructions** | Contact: Liz Waller (770) 859-2400 | Contact: Donna Sheehan | | | |
| **Sender / Recipient** | Fleet Bank | Brown Brothers Harriman & Co. | $901,560.00 | Advisors | |
| **Account Style** | Fleet Capital Corporation | Brown Brothers Harriman & Co. Boston | | | |
| **Bank Name** | Fleet Bank | Citibank N.A. | | | |
| **Bank Location** | Hartford, Ct. – 1 Constitution Plaza | New York, NY | | | |
| **Account #** | Acct: 936-933-7552 | Acct: 09250276 – Brown Brothers Harriman & Co. Further Credit-Acct: 2155950 – Brown Brothers Harriman & Co. Boston | | | |
| **ABA for wires** | ABA #: 011-900-571 | ABA#: 021000089 | | | |
| **Attention** | Reference: Plassein Packaging, Corp. | Reference: Key Packaging Industries Corp. | | | |
| **Additional Instructions** | Contact: Liz Waller (770) 859-2400 | Contact: | | | |
| **Sender / Recipient** | Fleet Bank | The CIT Group/Equipment Financing, Inc. | $4,181,514.61 | Note Repayment | |
| **Account Style** | Fleet Capital Corporation | The CIT Group/Equipment Financing, Inc. | | | |
| **Bank Name** | Fleet Bank | First Union National Bank | | | |
| **Bank Location** | Hartford, Ct. – 1 Constitution Plaza | Charlotte, NC | | | |
| **Account #** | Acct: 936-933-7552 | Acct: 2000001099238 | | | |
| **ABA for wires** | ABA #: 011-900-571 | ABAF: 053000219 | | | |
| **Attention** | Reference: Plassein Packaging, Corp. | Contact: Dan Norton (770) 677-3497 – **inform when wire is sent. Bank Phone Number: (704) 339-2200 | | | |
| **Additional Instructions** | Contact: Liz Waller (770) 859-2400 | Subtotal: | $12,955,136.06 | | |

P 08897

A0094

## PLASSEIN PACKAGING CORPORATION
### Funds Flow at Closing for:

## KEY PACKAGING INDUSTRIES, INC.

### January 10, 2000

| | Wire From: | Wire To: | Amount: | Purpose: | Fed Ref # |
|---|---|---|---|---|---|
| **Sender / Recipient**<br>**Account Style**<br>**Bank Name**<br>**Bank Location**<br>**Account #**<br>**ABA for wires**<br>**Attention**<br>**Additional Instructions** | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>Acct: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging, Corp.<br>Contact: Liz Waller (770) 859-2400 | Sidney & Ruth Zeitlin<br>Sidney & Ruth Zeitlin<br>Sun Trust Bank<br>Miami, Fl<br>Acct: 0099000638234<br>ABA #: 066000604<br><br>Contact: Bank: #1 (305) 591-6700 | $700,000.00 | Shareholder<br>Consideration | |
| **Sender / Recipient**<br>**Account Style**<br>**Bank Name**<br>**Bank Location**<br>**Account #**<br>**ABA for wires**<br>**Attention**<br>**Additional Instructions** | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>Acct: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging, Corp.<br>Contact: Liz Waller (770) 859-2400 | Sidney & Ruth Zeitlin<br>Sidney & Ruth Zeitlin<br>Bank of New York<br>ABA# 021000018<br>Paine Webber Retail<br>Acct: 8900114096<br>FC Sidney & Ruth Zeitlin<br>Acct: WF 1199735<br>Contact: Herb Hofander (800) 828-0717 | $ 2,871,664.30 | Shareholder<br>Consideration | |
| **Sender / Recipient**<br>**Account Style**<br>**Bank Name**<br>**Bank Location**<br>**Account #**<br>**ABA for wires**<br>**Attention**<br>**Additional Instructions** | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>Acct: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging, Corp.<br>Contact: Liz Waller (770) 859-2400 | Thomas F. Fay/ Barbara X. Fay<br>Thomas F. Fay/Barbara X. Fay<br>Fleet Bank NH<br>Hampton, NH<br>Acct: 0400173389<br>ABA #: 011400495<br><br>Contact: Alyson Regan (603) 926-0070 | $2,829,179.34 | Shareholder<br>Consideration | |
| **Sender / Recipient**<br>**Account Style**<br>**Bank Name**<br>**Bank Location**<br>**Account #**<br>**ABA for wires**<br>**Attention**<br>**Additional Instructions** | Fleet Bank<br>Fleet Capital Corporation<br>Fleet Bank<br>Hartford, Ct. – 1 Constitution Plaza<br>Acct: 936-933-7552<br>ABA #: 011-900-571<br>Reference: Plassein Packaging, Corp.<br>Contact: Liz Waller (770) 859-2400 | William G. Russell/Cynthia D. Russell<br>William G. Russell/Cynthia D. Russell<br>First Ocean National Bank<br>Newburyport, MA<br>Acct: 95008004<br>ABA #: 011303123<br><br>Contact: Liz Mackey (978) 465-5555 | $19,141.09 | Shareholder<br>Consideration | |
| | | **Subtotal:** | **6,419,984.33** | | |

P 08898

A0095

## PLASSEIN PACKAGING CORPORATION
### Funds Flow at Closing for:

## KEY PACKAGING INDUSTRIES, INC.

### January 10, 2000

|  | Wire From: | Wire To: | Amount: | Purpose | Fed Ref # |
|---|---|---|---|---|---|
| **Sender / Recipient** | Fleet Bank | Mark Freedman/Tinra Freedman | $69,403.19 | Shareholder Consideration |  |
| **Account Style** | Fleet Capital Corporation | Mark Freedman/Tinra Freedman |  |  |  |
| **Bank Name** | Fleet Bank | Fleet Bank of MA |  |  |  |
| **Bank Location** | Hartford, Ct. – 1 Constitution Plaza | Swampscott, MA |  |  |  |
| **Account #** | Acct: 936-933-7552 | Acct: 0003548707 |  |  |  |
| **ABA for wires** | ABA #: 011-900-571 | ABA #: 011000138 |  |  |  |
| **Attention** | Reference: Plassein Packaging, Corp. |  |  |  |  |
| **Additional Instructions** | Contact: Liz Walter (770) 859-2400 | Contact: Donna Papadopulos (800) 841-4000 |  |  |  |
| **Sender / Recipient** | Fleet Bank | Robert N. Zeitlin | $2,188,122.12 | Shareholder Consideration |  |
| **Account Style** | Fleet Capital Corporation | Robert N. Zeitlin |  |  |  |
| **Bank Name** | Fleet Bank | Bank of New York |  |  |  |
| **Bank Location** | Hartford, Ct. – 1 Constitution Plaza |  |  |  |  |
| **Account #** | Acct: 936-933-7552 | Acct: 8900114096 |  |  |  |
| **ABA for wires** | ABA #: 011-900-571 | ABA #: 021000018 |  |  |  |
| **Attention** | Reference: Plassein Packaging, Corp. | Paine Webber Retail |  |  |  |
|  |  | FC Robert N. Zeitlin |  |  |  |
|  |  | Acct: WF 10259-35 |  |  |  |
| **Additional Instructions** | Contact: Liz Walter (770) 859-2400 | Contact: Herb Hollander (800) 828-0717 |  |  |  |
| **Sender / Recipient** | Fleet Bank | Robert N. Zeitlin | $518,426.87 | Shareholder Consideration |  |
| **Account Style** | Fleet Capital Corporation | Robert N. Zeitlin Charitable Remainder Unitrust |  |  |  |
| **Bank Name** | Fleet Bank | Bank of New York |  |  |  |
| **Bank Location** | Hartford, Ct. – 1 Constitution Plaza |  |  |  |  |
| **Account #** | Acct: 936-933-7552 | Acct: 8900114096 |  |  |  |
| **ABA for wires** | ABA #: 011-900-571 | ABA #: 021000018 |  |  |  |
| **Attention** | Reference: Plassein Packaging, Corp. | Paine Webber Retail |  |  |  |
|  |  | FC Alex Hollander TTEE FBO Robert N. Zeitlin |  |  |  |
|  |  | 1999 Remainder Unitrust |  |  |  |
|  |  | Acct: WF 9561A-35 |  |  |  |
| **Additional Instructions** | Contact: Liz Walter (770) 859-2400 | Contact: Herb Hollander (800) 828-0717 |  |  |  |
|  |  | **Subtotal:** | **$2,775,952.18** |  |  |

P 08899

A0096

## PLASSEIN PACKAGING CORPORATION
### Funds Flow at Closing for:

## KEY PACKAGING INDUSTRIES, INC.

### January 10, 2000

| | Wire From: | Wire To: | Amount: | Purpose: | Fed Ref # |
|---|---|---|---|---|---|
| **Sender / Recipient** | Fleet Bank | ZFC Associates, Inc. | $140,727.42 | Shareholder Consideration | |
| **Account Style** | Fleet Capital Corporation | ZFC Associates, Inc. | | | |
| **Bank Name** | Fleet Bank | Citibank, N.A. | | | |
| **Bank Location** | Hartford, Ct. – 1 Constitution Plaza | New York, NY | | | |
| **Account #** | Acct: 936-933-7552 | Acct: 03094823 | | | |
| **ABA for wires** | ABA #: 011-900-571 | ABA #: 021000089 | | | |
| **Additional Instructions** | Reference: Plassein Packaging, Corp. Contact: Liz Waller (770) 859-2400 | Contact: (212) 290-7700 | | | |
| **Sender / Recipient** | Fleet Bank | Dr. Ruth L. Fischbuch | $2,706,414.19 | Shareholder Consideration | |
| **Account Style** | Fleet Capital Corporation | Dr. Ruth L. Fischbuch | | | |
| **Bank Name** | Fleet Bank | State Street Bank and Trust Company | | | |
| **Bank Location** | Hartford, Ct. – 1 Constitution Plaza | Boston, MA. 02110 (225 Franklin Street) To Credit DDA Acct: 5673-032-8 | | | |
| **Account #** | Acct: 936-933-7552 | Acct #: 52-011342-2 | | | |
| **ABA for wires** | ABA #: 011-900-571 | ABA #: 011000028 | | | |
| **Attention** | | Attn: Trust and Investments | | | |
| **Additional Instructions** | Reference: Plassein Packaging, Corp. Contact: Liz Waller (770) 859-2400 | Contact: Brian Caline (617) 664-3354 | | | |
| **Sender / Recipient** | Fleet Bank | Chase Bank of Texas, N.A. | $1,500,000.00 | Escrow | |
| **Account Style** | Fleet Capital Corporation | Trust Clearing Account | | | |
| **Bank Name** | Fleet Bank | Chase Bank of Texas, N.A. | | | |
| **Bank Location** | Hartford, Ct. – 1 Constitution Plaza | Houston, TX Credit: Trust Clearing account # 00101606276 FCC: Plassein/Key Packaging Escrow- | | | |
| **Account #** | Acct: 936-933-7552 | Acct: 55-03-001-2095900 | | | |
| **ABA for wires** | ABA #: 011-900-571 | ABA #: 113-000-609 | | | |
| **Attention** | | Attn: Mona Rodgers (X6337) | | | |
| **Additional Instructions** | Reference: Plassein Packaging, Corp. Contact: Liz Waller (770) 859-2400 | Subtotal: | $4,347,141.61 | | |
| **Total Consideration** | | | $26,098,314.68 | | |

P 08900

A0097

# PLASSEIN PACKAGING CORPORATION
## Funds Flow at Closing for:
## CLOSING AND PROFESSIONAL FEES
### January 10, 2000

| Sender / Recipient fields | Wire From: | Wire To: | Amount: | Purpose: | Fed Ref # |
|---|---|---|---|---|---|
| Account Style / Bank Name / Bank Location / Account # / ABA for wires / Attention / Additional Instructions | Fleet Bank / Fleet Capital Corporation / Fleet Bank / Hartford, CL – 1 Constitution Plaza / Acct: 936-933-7552 / ABA #: 011-900-571 / Reference: Plassein Packaging Corp. / Contact: Liz Waller (770) 859-2400 | The GulfStar Group / The GulfStar Group, Inc. / Bank One, N.A. / Houston, TX / Acct: 1890263864 / ABA #: 111-0001-614 / Notify Bob Phillips @ 713-751-3485 upon receipt. | $1,000,000.00 | Plassein Advisors | |
| | Fleet Bank / Fleet Capital Corporation / Fleet Bank / Hartford, CL – 1 Constitution Plaza / Acct: 936-933-7552 / ABA #: 011-900-571 / Reference: Plassein Packaging Corp. / Contact: Liz Waller (770) 859-2400 | Trivest / Trivest II, Inc. / Northern Trust Bank of Florida, N.A. / Miami, FL / Acct: 1010036137 / ABA #: 066000650 / Attn: Patricia Loblan / Contact: | $1,100,000.00 | Investor | |
| | Fleet Bank / Fleet Capital Corporation / Fleet Bank / Hartford, CL – 1 Constitution Plaza / Acct: 936-933-7552 / ABA #: 011-900-571 / Reference: Plassein Packaging Corp. / Contact: Liz Waller (770) 859-2400 | Plassein Packaging Corp. / Plassein Packaging Corp. / Bank One, N.A. / Houston, TX / Acct: 1563038007 / ABA #: 111-0001-614 / Notify Bob Phillips @ 713-751-3485 upon receipt. | $778,973.46 | Cost Reimbursement | |
| | Fleet Bank / Fleet Capital Corporation / Fleet Bank / Hartford, CL – 1 Constitution Plaza / Acct: 936-933-7552 / ABA #: 011-900-571 / Reference: Plassein Packaging Corp. / Contact: Liz Waller (770) 859-2400 | Andrews & Kurth, L.L.P / Andrews & Kurth, L.L.P / Chase Bank of Texas / Houston, TX / Acct: 00100184952 / ABA #: 113000609 / Attn: Mary Arnold / Reference: Tom Mason; Matter No. 80996 | $227,731.61 | Plassein Counsel | |
| | Fleet Bank / Fleet Capital Corporation / Fleet Bank / Hartford, CL – 1 Constitution Plaza / Acct: 936-933-7552 / ABA #: 011-900-571 / Reference: Plassein Packaging Corp. / Contact: Liz Waller (770) 859-2400 | Arthur Andersen, LLP / Arthur Andersen, LLP / Bank One, N.A. / Lockbox Separator: "LB" / Lockbox #: 730260 / Acct: 5901618 / ABA #: 071000013 / Invoice #: 576678 / Reference Field: 1V00805366781.B730260 / Contact: Greg Mone (312) 732-4111 | $263,124.00 | Plassein Accountants | |
| | | Subtotal: | 3,370,829.07 | | |

P 08901

A0098

# PLASSEIN PACKAGING CORPORATION
## Funds Flow at Closing for:
## CLOSING AND PROFESSIONAL FEES
### January 10, 2000

| | Wire From: | Wire To: | Amount | Purpose | Fed Ref # |
|---|---|---|---|---|---|
| Sender / Recipient | Fleet Bank | Timothy P. O'Neal | $156,000.00 | Professional Fees | |
| Account Style | Fleet Capital Corporation | Timothy P. O'Neal or Margaret Barradas O'Neal | | | |
| Bank Name | Fleet Bank | Bank of America | | | |
| Bank Location | Hartford, CT. – 1 Constitution Plaza | Houston, TX | | | |
| Account # | Acct: 936-933-7552 | Acct: 1250780898 | | | |
| ABA for wires | ABA #: 011-900-571 | ABA #: 111-0000-25 | | | |
| Attention | Reference: Plassein Packaging, Corp. | | | | |
| Additional Instructions | Contact: Liz Waller (770) 859-2400 | Contact: Sherry Womack (713) 247-6518 | | | |
| Sender / Recipient | Fleet Bank | Eric T. Paulien | $156,000.00 | Professional Fees | |
| Account Style | Fleet Capital Corporation | Eric T. or Diane Paulien | | | |
| Bank Name | Fleet Bank | Comerica Bank-Texas | | | |
| Bank Location | Hartford, CT. – 1 Constitution Plaza | Houston, TX | | | |
| Account # | Acct: 936-933-7552 | Acct: 6358204128 | | | |
| ABA for wires | ABA #: 011-900-571 | ABA #: 111-0007-53 | | | |
| Attention | Reference: Plassein Packaging, Corp. | | | | |
| Additional Instructions | Contact: Liz Waller (770) 859-2400 | Contact: Julie Dunn (713) 888-2605 | | | |
| Sender / Recipient | Fleet Bank | Sam Chebeir | $10,000.00 | Subordinated Debt Fee | |
| Account Style | Fleet Capital Corporation | Sam Chebeir | | | |
| Bank Name | Fleet Bank | Bank of America | | | |
| Bank Location | Hartford, CT. – 1 Constitution Plaza | Riverside, CA | | | |
| Account # | Acct: 936-933-7552 | Acct: 06281-02391 | | | |
| ABA for wires | ABA #: 011-900-571 | ABA #: 121-000-358 | | | |
| Attention | Reference: Plassein Packaging, Corp. | | | | |
| Additional Instructions | Contact: Liz Waller (770) 859-2400 | Contact: Mary Valmonti (909) 686-2590 | | | |
| Sender / Recipient | Fleet Bank | Greenberg Traurig | $80,000.00 | Trivest Counsel | |
| Account Style | Fleet Capital Corporation | Greenberg Traurig Trust Account | | | |
| Bank Name | Fleet Bank | Sun Bank, N.A. | | | |
| Bank Location | Hartford, CT. – 1 Constitution Plaza | Miami, Florida (777 Brickell Av.; 33131) | | | |
| Account # | Acct: 936-933-7552 | Acct: 0189-0011130199 | | | |
| ABA for wires | ABA #: 011-900-571 | ABA # 066000604 | | | |
| Attention | Reference: Plassein Packaging, Corp. | Attn: Catherine Dieterle, Brickell Office | | | |
| Additional Instructions | Contact: Liz Waller (770) 859-2400 | Reference: Trivest/Plassein; 8960.0183; M. Hein c/ Greenberg Traurig | | | |
| Sender / Recipient | Fleet Bank | Metropolitan Title Company | $8,862.49 | Trivest Counsel | |
| Account Style | Fleet Capital Corporation | Reference: Title Fees & Costs | | | |
| Bank Name | Fleet Bank | Old Kent Bank of Holland | | | |
| Bank Location | Hartford, CT. – 1 Constitution Plaza | Grand Rapids, MI (One Vandenberg Center) | | | |
| Account # | Acct: 936-933-7552 | Escrow Acct#: 072400052 | | | |
| ABA for wires | ABA #: 011-900-571 | ABA: 072400052 | | | |
| Attention | Reference: Plassein Packaging, Corp. | Trust Acct Name: Metropolitan Title Co. Holland Escrow Account | | | |
| Additional Instructions | Contact: Liz Waller (770) 859-2400 | File No.: 08960-0118300 | | | |
| | | Subtotal: | $410,862.49 | | |
| | | Total Closing Fees: | $3,761,591.36 | | |

## PLASSEIN PACKAGING CORPORATION
### Funds Flow at Closing

## INVESTORS – INBOUND WIRES

### January 10, 2000

|  | Wire From: | Wire To: | Amount: | Purpose: | Fed Ref # |
|---|---|---|---|---|---|
| Sender / Recipient | GulfStar Plastics, L.L.C | Fleet Bank | $800,000.00 |  |  |
| Account Style | GulfStar Plastics, L.L.C. | Fleet Capital Corporation |  |  |  |
| Bank Name | Bank One | Fleet Bank |  |  |  |
| Bank Location | Houston, TX | Hartford, Ct. – 1 Constitution Plaza |  |  |  |
| Account # | Acct: 1563018064 | Acct: 936-933-7552 |  |  |  |
| ABA for wires | ABA #: 111-000-614 | ABA #: 011-900-571 |  |  |  |
| Attention |  | Reference: Plassein Packaging, Corp. |  |  |  |
| Additional Instructions |  | Contact: Liz Weller (770) 859-2400 |  |  |  |
| Sender / Recipient | Trivest | Fleet Bank | $24,200,002.00 |  |  |
| Account Style | Trivest II, Inc. | Fleet Capital Corporation |  |  |  |
| Bank Name | Northern Trust Bank of Florida, N.A. | Fleet Bank |  |  |  |
| Bank Location | Miami, FL | Hartford, Ct. – 1 Constitution Plaza |  |  |  |
| Account # | Acct: 1010036137 | Acct: 936-933-7552 |  |  |  |
| ABA for wires | ABA # 066009650 | ABA #: 011-900-571 |  |  |  |
| Attention | Attn: Patrick Lublan | Reference: Plassein Packaging, Corp. |  |  |  |
| Additional Instructions | Contact: | Contact: Liz Weller (770) 859-2400 |  |  |  |
|  |  | Total Inbound Wires: | $25,000,002.00 |  |  |

**P 08903**

A0100

# EXHIBIT B

*final c/f*

**Key**

|  | T/B @12/31 | Audit Adj | Closing B/S | Opening Adj | Opening B/S |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **Current Assets** | | | | | |
| Cash and Cash Equivalents | (414,445) | 441,333 | 26,888 | | 26,888 |
| Accounts Receivable, net of allowances | 4,017,385 | 138,261 | 4,155,646 | (438,261) | 3,717,385 |
| Inventory | 2,332,668 | (249,804) | 2,082,864 | (40,917) | 2,041,947 |
| Prepaids & Other Current | 376,000 | 20,056 | 396,056 | | 396,056 |
| **Total Current Assets** | 6,311,607 | 349,846 | 6,661,453 | (479,178) | 6,182,275 |
| | | | | | |
| **Property and Equipment, at cost** | | | | | |
| Fixed Assets | 21,480,608 | 0 | 21,480,608 | (7,118,363) | 14,362,245 |
| Less: Accum.depreciation | (9,118,454) | 0 | (9,118,454) | 9,118,454 | 0 |
| **Net Property and Equipment** | 12,362,154 | 0 | 12,362,154 | 2,000,091 | 14,362,245 |
| | | | | | |
| Intercompany | 0 | 0 | 0 | | 0 |
| Other Assets | 9,120 | 25,748 | 34,868 | | 34,868 |
| Deferred Income Taxes | 171,000 | 103,000 | 274,000 | | 274,000 |
| Goodwill | 0 | 0 | 0 | 9,256,600 | 9,256,600 |
| | | | | | |
| **TOTAL ASSETS** | 18,853,881 | 478,594 | 19,332,475 | 10,777,513 | 30,109,988 |
| | | | | | |
| **LIABILITIES** | | | | | |
| **Current Liabilities** | | | | | |
| Accounts Payable | 1,049,882 | 280,851 | 1,330,733 | 161,279 | 1,492,012 |
| Accrued Liabilities | 1,000,821 | 85,200 | 1,086,021 | (22,323) | 1,063,698 |
| Deferred Revenue | 0 | 0 | 0 | | |
| Current Portion of Senior Debt | 0 | 0 | 0 | | |
| Current Portion of Subordinated Debt | 0 | 0 | 0 | | |
| **Total Current Liabilities** | 2,050,703 | 366,051 | 2,416,754 | 138,956 | 2,555,710 |
| | | | | | |
| Old Bank Debt | 10,574,266 | 299,538 | 10,873,804 | (10,873,804) | 0 |
| New Bank Debt | 0 | 0 | 0 | 15,120,000 | 15,120,000 |
| Senior Subordinated Debt | 0 | 0 | 0 | | 0 |
| Seller Subordinated Debt | 0 | 0 | 0 | | 0 |
| Other Long-Term Liabilities | 0 | 0 | 0 | | 0 |
| **Total Long-Term Liabilities** | 10,574,266 | 299,538 | 10,873,804 | 4,246,196 | 15,120,000 |
| | | | | | |
| Deferred Income Taxes | 796,000 | 104,000 | 900,000 | 924,544 | 1,824,544 |
| | | | | | |
| **TOTAL LIABILITIES** | 13,420,969 | 769,589 | 14,190,558 | 5,309,696 | 19,500,254 |
| | | | | | |
| **Shareholders' Equity** | | | | | |
| Common Stock | 2,373 | | 2,373 | (2,373) | 0 |
| Paid in Capital | 1,100,986 | | 1,100,986 | 9,508,748 | 10,609,734 |
| Treasury Stock | (134,061) | 0 | (134,061) | 134,061 | (0) |
| Retained Earnings | 4,463,614 | (290,995) | 4,172,619 | (4,172,619) | (0) |
| **Total Shareholders' Equity** | 5,432,912 | (290,995) | 5,141,917 | 5,467,817 | 10,609,734 |
| | | | | | |
| **TOTAL LIABILITIES AND EQUITY** | 18,853,881 | 478,594 | 19,332,475 | 10,777,513 | 30,109,988 |

P 08821

A0102

**Closing Entries - Key**

| | Db | Cr |
|---|---|---|
| **(1)** | | |
| Db: Accumulated Depreciation | 9,118,454 | |
| Cr: Fixed Assets | | 7,118,363 |
| Cr: Goodwill | | 2,000,091 |
| To record fair value of fixed assets | | |
| **(2)** | | |
| Db: Long Term Debt | 10,873,804 | |
| Db: Goodwill | 9,714,013 | |
| Db: Retained Earnings | 4,172,619 | |
| Db: Paid in Capital | 1,100,986 | |
| Db: Common Stock | 2,373 | |
| Cr: Treasury Stock | | 134,061 |
| Cr: Additional Paid-in-Capital (APIC) | | 25,729,734 |
| To book payoff of debt and pre-fair value of Goodwill | | |
| **(3)** | | |
| Db: APIC | 15,120,000 | |
| Cr: Long Term Debt | | 15,120,000 |
| To record push down of Piassein Debt | | |
| **(4)** | | |
| Db: Goodwill | 618,134 | |
| Db: Accrued Liabilities | 22,323 | |
| Cr: A/R | | 438,261 |
| Cr: Inventory | | 40,917 |
| Cr: A/P | | 161,279 |
| **(5)** | | |
| Db: Goodwill | 924,544 | |
| Cr: Lt Deferred Tax Liability | | 924,544 |
| | 51,667,250 | 51,667,250 |

## Rick Mosback

**From:**     <John_Arico/KPI%PLASSEIN@Keypackage.com>
**To:**       <rmosback@plassein.com>
**Sent:**     Thursday, January 11, 2001 5:10 PM
**Subject:**  Openning B/S Adjustments

Rick,

I adjusted the opening balance sheet for Bradco on the following items:

    Equipment invty - $40,917
    Warranty accrual - $20,000

The offset to these adjustment was goodwill.

Thanks for your help.

John

1/11/01

P 08823

A0104

A    The company has elected to write down these assets from the original value placed
     on them at the purchase date. The write down is a result of these assets being overvalued
     based upon the current market. Accordingly, the Company will book the following entry:

| Goodwill | , 135,000 | |
| Alpine #1 | | 50,000 |
| Alpine #2 | | 85,000 |

P 08824

# EXHIBIT C

A0106

*final w/tax*

Marshall

| ASSETS | T/B @12/31 | Audit Adj | Closing B/S | Opening Adj | Opening B/S |
|---|---|---|---|---|---|
| **Current Assets** | | | | | |
| Cash and Cash Equivalents | (15,352) | 15,352 | 0 | | 0 |
| Accounts Receivable, net of allowances | 1,534,204 | 59,319 | 1,593,523 | (36,500) | 1,557,023 |
| Inventory | 1,391,438 | 178,821 | 1,570,259 | | 1,570,259 |
| Prepaids & Other Current | 32,043 | (32,043) | 0 | | 0 |
| **Total Current Assets** | 2,942,333 | 221,449 | 3,163,782 | (36,500) | 3,127,282 |
| | | | | | |
| **Property and Equipment, at cost** | | | | | |
| Fixed Assets | 6,243,440 | 0 | 6,243,440 | (1,570,767) | 4,672,673 |
| Less: Accum.depreciation | (4,023,635) | 0 | (4,023,635) | 4,023,635 | 0 |
| **Net Property and Equipment** | 2,219,806 | 0 | 2,219,806 | 2,452,868 | 4,672,674 |
| | | | | | |
| Intercompany | 0 | 0 | 0 | | 0 |
| Other Assets | 151,001 | 0 | 151,001 | (92,601) | 58,400 |
| Deferred Income Taxes | 0 | 3,200 | 3,200 | | 3,200 |
| Goodwill | 0 | 0 | 0 | 3,709,477 | 3,709,477 |
| | | | | | |
| **TOTAL ASSETS** | 5,313,139 | 224,849 | 5,537,788 | 6,033,245 | 11,571,033 |
| | | | | | |
| **LIABILITIES** | | | | | |
| **Current Liabilities** | | | | | |
| Accounts Payable | 1,280,781 | 224,653 | 1,505,434 | 33,818 | 1,539,252 |
| Accrued Liabilities | 273,659 | 63,124 | 336,783 | 64,973 | 401,756 |
| Deferred Revenue | 0 | 0 | 0 | | 0 |
| Current Portion of Senior Debt | 0 | 0 | 0 | | 0 |
| Current Portion of Subordinated Debt | 0 | 0 | 0 | | 0 |
| **Total Current Liabilities** | 1,554,440 | 287,777 | 1,842,217 | 98,791 | 1,941,008 |
| | | | | | |
| Old Bank Debt | 1,385,179 | (14,112) | 1,371,067 | (1,371,067) | 0 |
| New Bank Debt | 0 | 0 | 0 | 4,930,000 | 4,930,000 |
| Senior Subordinated Debt | 0 | 0 | 0 | | 0 |
| Seller Subordinated Debt | 0 | 0 | 0 | | 0 |
| Other Long-Term Liabilities | 1,484 | 0 | 1,484 | (1,484) | 0 |
| **Total Long-Term Liabilities** | 1,386,663 | (14,112) | 1,372,551 | 3,557,449 | 4,930,000 |
| | | | | | |
| Deferred Income Taxes | 129,900 | 0 | 129,900 | 1,100,546 | 1,230,446 |
| | | | | | |
| **TOTAL LIABILITIES** | 3,071,003 | 273,665 | 3,344,668 | 4,756,787 | 8,101,454 |
| | | | | | |
| **Shareholders' Equity** | | | | | |
| Common Stock | 40,062 | 0 | 40,062 | (40,062) | 0 |
| Paid In Capital | 0 | 0 | 0 | 3,469,578 | 3,469,578 |
| Treasury Stock | 0 | 0 | 0 | | 0 |
| Retained Earnings | 2,202,072 | (49,014) | 2,153,058 | (2,153,058) | (0) |
| **Total Shareholders' Equity** | 2,242,134 | (49,014) | 2,193,120 | 1,276,458 | 3,469,578 |
| | | | | | |
| **TOTAL LIABILITIES AND EQUITY** | 5,313,137 | 224,651 | 5,537,788 | 6,033,245 | 11,571,032 |

P 08794

A0107

**Closing Entries - Marshall**

|  | Db | Cr |
|---|---|---|
| **(1)** | | |
| Db: Accumulated Depreciation | 4,023,635 | |
| Cr: Fixed Assets | | 1,570,767 |
| Cr: Goodwill | | 2,452,868 |
| To record fair value of fixed assets | | |
| **(2)** | | |
| Db: Long Term Debt | 1,371,067 | |
| Db: Goodwill | 4,835,391 | |
| Db: Common Stock | 40,062 | |
| Db: Retained Earnings | 2,153,058 | |
| Cr: Additional Paid-in-Capital (APIC) | | 8,399,578 |
| To book payoff of debt and pre-fair value of Goodwill | | |
| **(3)** | | |
| Db: APIC | 4,930,000 | |
| Cr: Long Term Debt | | 4,930,000 |
| To record push down of Plassein Debt | | |
| **(4)** | | |
| Db: Goodwill | 226,408.10 | |
| Db: Other LT Liabilities | 1,488.59 | |
| Cr: A/P | | 33,817.96 |
| Cr: Accrued liabilities | | 64,973.21 |
| Cr: Allowance for Bad Debts | | 36,500.00 |
| Cr: Other Fixed Assets | | 92,600.52 |
| **(5)** | | |
| Db: Goodwill | 1,100,546 | |
| Cr: Deferred Tax Liability | | 1,100,546 |
| | **18,681,651** | **18,681,651** |

P 08795

A0108

MARSHALL PLASTIC FILM, INC.    904 EAST ALLEGAN AVENUE, PO BOX 147,    MARTIN MI 49070-0147

*ISO9001 CERTIFIED*

# FAX

Date: 5/11/01

Number of pages including cover sheet: 3

To: *Rick*

From: *Ann*

Phone:

Fax phone:

CC:

Phone:    1-616-672-3511

Fax phone:    1-800-672-5035

**REMARKS:**  ☐ Urgent   ☐ For your review   ☐ Reply ASAP   ☐ Please comment

*Rick —*

*THESE ARE THE TWO TAX NOTICES*
*I PAID AND POSTED TO GOODWILL.*
*NOTE THAT I DID NOT PAY THE*
*FULL AMOUNT ON THE SINGLE BUSINESS —*
*I'VE ASKED THEM TO WAIVE THE*
*LATE PENALTY. I'M PRETTY CONFIDENT*
*THEY WILL. — THANKS, ANN*

faxcov.doc

P 08796

A0109

05/11/2001 16:33    16166725035        MARSHALL PLASTIC FIL        PAGE 02

Michigan Department of Treasury
C-8474 (1/94)

## SINGLE BUSINESS TAX ADJUSTMENT PAYMENT
Issued under P.A. 122 of 1941, as amended.

```
MARSHALL PLASTIC FILM          Notice Date: APRIL 30, 2001
INCORPORATED                Account Number: 38-1995946
904 E ALLEGAN               Tax Year End: NOV 98
P O BOX 147                    Refer To: AUDIT GROUP 500
MARTIN          MI 49070          Phone: (517) 373-8030
                                    Fax: (517) 241-2233
                                 Amount:          $6,672.74
```

**You must return this notice within 30 days.**

The enclosed SBT Annual Return Notice of Adjustment shows a balance due on your
account.  If you agree with the adjustments, please detach the coupon below and
send it with payment to:

Michigan Department of Treasury
P.O. Box 30059
Lansing, MI  48909

If you disagree with the adjustments, please send a letter to the address above
stating why you disagree and include information that supports your conclusions.
Include a copy of this notice with your letter and documentation.

If we do not receive this notice, with either payment or additional information
within 30 days, the account will be referred to the Collection Division and a
Notice of Intent to Assess for the amount due will be issued.  Additional penalty
and interest may also be due.

------------------------------------------------------------------------
C-8474 (1/94)    R e t u r n   T h i s   P o r t i o n   W i t h   P a y m e n t

## SINGLE BUSINESS TAX ADJUSTMENT PAYMENT

| MARSHALL PLASTIC FILM |

```
                          Notice date: APRIL 30, 2001
                       Account Number: 38-1995946
                         Tax Year End: NOV 98
                            Refer To: AUDIT GROUP 500

                              Amount:          $6,672.74
```

Mail to:

Michigan Department of Treasury
P.O. Box 30059
Lansing, MI 48909

Write Amount Paid Here

_5,893.21_

P 08797

A0110

05/11/2001  16:33    16166725035    MARSHALL PLASTIC FIL    PAGE  03

**Department of the Treasury**
**Internal Revenue Service**
CINCINNATI  OH    45999

Date of this notice:           APR.  2, 2001
Taxpayer Identifying Number    38-1995946
Form:  941          Tax Period:  DEC. 31, 1997

For assistance you may
call us at:

1-800-829-8815

MARSHALL PLASTIC FILM INC
904 E ALLEGAN
MARTIN MI  49870-9797044

STATEMENT OF ADJUSTMENT TO YOUR ACCOUNT

17141-024-63448-8

BALANCE DUE ON ACCOUNT BEFORE ADJUSTMENT         $6,582.45
LATE PAYMENT PENALTY- SEE EXPLANATION                  21.66

ADJUSTMENT COMPUTATION

TAX-DECREASE                                         $418.19

REDUCTION OF INTEREST PREVIOUSLY CHARGED              54.98
    NET ADJUSTMENT  CREDIT

BALANCE DUE                                        $6,138.94

THIS IS A RESULT OF YOUR CORRESPONDENCE DATED      FEB. 23, 2001.
TO AVOID ADDITIONAL FAILURE TO PAY PENALTY AND INTEREST, PLEASE ALLOW ENOUGH MAILING
TIME SO THAT WE RECEIVE YOUR PAYMENT BY APR. 23, 2001.  MAKE YOUR CHECK OR MONEY
ORDER PAYABLE TO THE UNITED STATES TREASURY.  SHOW YOUR TAXPAYER IDENTIFICATION
NUMBER OR YOUR IDENTIFYING NUMBER ON YOUR PAYMENT AND MAIL IT WITH THE STUB PORTION
OF THIS NOTICE.  IF YOU THINK WE MADE A MISTAKE, PLEASE CALL US AT THE NUMBER
LISTED ABOVE.  WHEN YOU CALL, PLEASE HAVE YOUR PAYMENT INFORMATION AND A COPY OF
YOUR TAX RETURN AVAILABLE.  THIS INFORMATION WILL HELP US FIND ANY PAYMENT YOU
MADE THAT WE HAVEN'T APPLIED.

ABOUT YOUR NOTICE.  THE PENALTY AND INTEREST CHARGES ON YOUR ACCOUNT ARE EXPLAINED
ON THE FOLLOWING PAGES.  IF YOU WANT A MORE DETAILED EXPLANATION OF YOUR PENALTIES
AND INTEREST, PLEASE CALL US AT THE TELEPHONE NUMBER LISTED ON THE TOP OF THIS
NOTICE.  YOU MAY CALL YOUR LOCAL IRS TELEPHONE NUMBER IF THE NUMBER SHOWN ON YOUR
NOTICE IS A LONG-DISTANCE CALL FOR YOU.  ALL DAYS MENTIONED IN THE PARAGRAPHS
BELOW ARE CALENDAR DAYS, UNLESS SPECIFICALLY STATED OTHERWISE.

    $21.66   PAYING LATE - IRC 6651

WE CHARGED A PENALTY BECAUSE, ACCORDING TO OUR RECORDS, YOU DIDN'T PAY YOUR TAX
ON TIME.  INITIALLY, THE PENALTY IS 1/2% OF THE UNPAID TAX FOR EACH MONTH OR
PART OF A MONTH YOU DIDN'T PAY YOUR TAX.

NOTE:  EFFECTIVE FOR MONTHS BEGINNING AFTER DECEMBER 31, 1999, THE FAILURE TO
PAY TAX PENALTY (FTP) FOR INDIVIDUALS, WHO FILE A RETURN OF TAX ON OR BEFORE THE
DUE DATE (INCLUDING EXTENSIONS), IS LIMITED TO HALF THE USUAL RATE (0.25% RATHER
THAN 0.5%) FOR ANY MONTH IN WHICH AN INSTALLMENT PAYMENT AGREEMENT IS IN EFFECT.

IF WE ISSUE A NOTICE OF INTENT TO LEVY AND YOU DON'T PAY THE BALANCE DUE WITHIN
10 DAYS FROM THE DATE OF THE NOTICE, THE PENALTY INCREASES TO 1% A MONTH.
NOTE:  WE WILL NOT REDUCE THE 1% FTP EVEN IF YOU FILED TIMELY AND HAVE A VALID
INSTALLMENT AGREEMENT.

THE PENALTY CAN'T BE MORE THAN 25% OF THE TAX PAID LATE.  IF YOU THINK WE SHOULD
REMOVE OR REDUCE THIS PENALTY, SEE "REMOVAL OF PENALTIES - REASONABLE CAUSE).

PAGE 1

P 08798

A0111

| | T/B @12/31 Marshall | Audit Adj Marshall | Closing B/S Marshall | Opening Adj Marshall | Opening B/S Marshall |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **Current Assets** | | | | | |
| Cash and Cash Equivalents | (15,352) | 15,352 | (0) | | (0) |
| Accounts Receivable, net of allowances | 1,534,204 | 59,319 | 1,593,523 | | 1,593,523 |
| Inventory | 1,391,436 | 178,821 | 1,570,259 | | 1,570,259 |
| Prepaids & Other Current | 32,043 | (32,043) | 0 | | 0 |
| **Total Current Assets** | 2,942,333 | 221,449 | 3,163,782 | 0 | 3,163,782 |
| | | | | | |
| **Property and Equipment, at cost** | | | | | |
| Fixed Assets | 6,243,440 | 0 | 6,243,440 | (1,570,767) | 4,672,673 |
| Less: Accum.depreciation | (4,023,637) | 0 | (4,023,637) | 4,023,637 | 0 |
| **Net Property and Equipment** | 2,219,804 | 0 | 2,219,804 | 2,452,870 | 4,672,674 |
| | | | | | |
| Intercompany | 0 | 0 | 0 | | |
| Other Assets | 151,001 | 0 | 151,001 | (92,601) | 58,400 |
| Deferred Income Taxes | 0 | 3,200 | 3,200 | | 3,200 |
| Goodwill | 0 | 0 | 0 | 2,513,702 | 2,513,702 |
| | | | | | |
| **TOTAL ASSETS** | 5,313,137 | 224,649 | 5,537,786 | 4,873,971 | 10,411,757 |
| | | | | | |
| **LIABILITIES** | | | | | |
| **Current Liabilities** | | | | | |
| Accounts Payable | 1,280,781 | 224,653 | 1,505,434 | | 1,505,434 |
| Accrued Liabilities | 273,659 | 63,124 | 336,783 | | 336,783 |
| Deferred Revenue | 0 | 0 | 0 | | 0 |
| Current Portion of Senior Debt | 0 | 0 | 0 | | 0 |
| Current Portion of Subordinated Debt | 0 | 0 | 0 | | 0 |
| **Total Current Liabilities** | 1,554,440 | 287,777 | 1,842,217 | 0 | 1,842,217 |
| | | | | | |
| Old Bank Debt | 1,385,179 | (14,112) | 1,371,067 | (1,371,067) | 0 |
| New Bank Debt | 0 | 0 | 0 | 4,120,000 | 4,120,000 |
| Senior Subordinated Debt | 0 | 0 | 0 | | 0 |
| Seller Subordinated Debt | 0 | 0 | 0 | | 0 |
| Other Long-Term Liabilities | 1,484 | 0 | 1,484 | (1,484) | 0 |
| **Total Long-Term Liabilities** | 1,386,663 | (14,112) | 1,372,551 | 2,747,449 | 4,120,000 |
| | | | | | |
| Deferred Income Taxes | 129,900 | 0 | 129,900 | | 129,900 |
| | | | | | |
| **TOTAL LIABILITIES** | 3,071,003 | 273,665 | 3,344,668 | 2,747,449 | 6,092,117 |
| | | | | | |
| **Shareholders' Equity** | | | | | |
| Common Stock | 40,062 | 0 | 40,062 | | 40,062 |
| Paid in Capital | 0 | 0 | 0 | 4,279,578 | 4,279,578 |
| Treasury Stock | 0 | 0 | 0 | | 0 |
| Retained Earnings | 2,202,072 | (49,014) | 2,153,058 | (2,153,058) | (0) |
| **Total Shareholders' Equity** | 2,242,134 | (49,014) | 2,193,120 | 2,126,520 | 4,319,640 |
| | | | | | |
| **TOTAL LIABILITIES AND EQUITY** | 5,313,137 | 224,651 | 5,537,788 | 4,873,969 | 10,411,757 |

P 08799

A0112

**Closing Entries**

| | Marshall | |
|---|---|---|
| | **Db** | **Cr** |

**(1)**

| | Db | Cr |
|---|---|---|
| Db: Accumulated Depreciation | 4,023,637 | |
| Cr: Fixed Assets | | 1,570,767 |
| Cr: Goodwill | | 2,452,870 |
| To record fair value of fixed assets | | |

**(2)**

| | Db | Cr |
|---|---|---|
| Db: Long Term Debt | 1,371,067 | |
| Db: Goodwill | 4,875,453 | |
| Db: Retained Earnings | 2,153,058 | |
| Cr: Additional Paid-in-Capital (APIC) | | 8,399,578 |
| To book payoff of debt and pre-fair value of Goodwill | | |

**(3)**

| | Db | Cr |
|---|---|---|
| Db: APIC | 4,120,000 | |
| Cr: Long Term Debt | | 4,120,000 |
| To record push down of Plassein Debt | | |

**(4)**

| | Db | Cr |
|---|---|---|
| Db: Goodwill | 91,116.93 | |
| Db: Other LT Liabilities | 1,483.59 | |
| Cr: Other Fixed Assets | | 92,600.52 |
| | 16,635,816 | 16,635,816 |

**P 08800**

A0113

```
FROM : MPF                      PHONE NO. : 1 800 672 5035        Dec. 28 2000 11:04AM P2
SPL RUN DATE: 12/01/00  11:31:45            MARSHALL PLASTIC FILM
                                  G E N E R A L   J O U R N A L   R E G I S T E R            PAGE:   1
                                           FRIDAY DECEMBER 1, 2000
                                                 LISTING #  72
```

| TRANS NO. | DATE | DESCRIPTION | REFERENCE | ORG CODE | G/L ACCT NUMBER | TITLE | DEBIT | CREDIT |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

JOURNAL CJ    GENERAL JOURNAL

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 40 | 2943.00 | ACCUMULATED DEPRE | 40496.04 | |
| 2 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 39 | 2945.01 | ACCUMULATED DEPRE | 191864.79 | |
| 3 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 39 | 2947.06 | ACCUMULATED DEPRE | 226557.67 | |
| 4 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 43 | 2949.06 | ACCUMULATED DEPRE | 3451907.00 | |
| 5 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 40 | 2953.00 | ACCUM DEPRECIATION | 21564.43 | |
| 6 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 40 | 2951.06 | ACCUMULATED DEPRE | 37299.47 | |
| 7 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 40 | 2959.91 | ACCUMULATED DEPRE | 45044.49 | |
| 8 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 39 | 2949.00 | LAND | 7779.03 | |
| 9 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 40 | 2942.00 | LAND IMPROVEMENTS | | 44504.74 |
| 10 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 43 | 2944.06 | BUILDING | 544343.04 | |
| 11 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 43 | 2946.00 | BUILDING IMPROVEM | | 345736.05 |
| 12 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 40 | 2941.00 | CONSTRUCTION IN P | | 5400.00 |
| 13 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 43 | 2959.00 | CAPITALIZED LEASE | | 45044.49 |
| 14 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 43 | 2940.00 | EQUIPMENT | | 1465504.01 |
| 15 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 28 | 2040.01 | CAPITAL MAINTENAN | 120433.21 | |
| 16 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 28 | 2052.00 | EQUIPMENT-INSULAT | 23968.70 | |
| 17 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 39 | 2190.00 | GOODWILL | | 2237448.33 |
| 18 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 43 | 2037.00 | CASH VALUE LIFE I | | 92400.52 |
| 19 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 43 | 2039.00 | CASH VALUE LIFE I | 4441.71 | |
| 20 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 40 | 3063.00 | CREDIT NAT - CLO | 8105.00 | |
| 21 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 40 | 3063.09 | CREDIT NAT - CLO ( | | 8105.00 |
| 22 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 28 | 3467.46 | CURRENT MATURITIE | 376737.00 | |
| 23 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 28 | 3467.59 | CURRENT MATURITIE | | 376737.00 |
| 24 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 25 | 3065.02 | NOTE PAYABLE DEAR | 87658.32 | |
| 25 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 40 | 3102.00 | GKB '98 TERM LOAN | 130461.27 | |
| 26 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 43 | 3104.00 | GKB '99 TERM LOAN | 500000.00 | |
| 27 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 40 | 3102.06 | GKB '98 TERM LOAN | 190947.03 | |
| 28 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 43 | 3101.00 | GKB TERM LOAN | 307720.06 | |
| 29 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 40 | 3062.02 | NOTE PAYABLE-CJ0 | | 2920.29 |
| 30 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 43 | 2063.00 | CAPITAL LEASE OBL | 4240.66 | |
| 31 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 39 | 2590.00 | GOODWILL | 4894956.24 | |
| 32 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 43 | 4007.00 | RETAINED EARNINGS | 2282971.00 | |
| 33 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 40 | 4094.00 | APIC | | 0399570.00 |
| 34 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 28 | 4094.06 | APIC | 3969500.00 | |
| 35 | 10/31/00 | CORPORATE ADJUSTMENTS | 01/10/00 | 28 | 3300.00 | LONG TERM DEBT | | 3969500.00 |

```
TOTAL NUMBER OF TRANSACTIONS...    35

   TOTAL DEBITS....    17346600.14
   TOTAL CREDITS...    37346600.14
```

P 08801

A0114

```
FROM : MPF                    PHONE NO. : 1 800 672 5035        Dec. 28 2000 11:05AM P3
CPL RUN DATE: 12/01/00 11:41:26        MARSHALL PLASTIC FILM
                              G E N E R A L   J O U R N A L   R E G I S T E R              PAGE:  1
                                      FRIDAY DECEMBER 1, 2000
                                           LISTING # 927

TRANS                                          ORG  G/L ACCT
NO.   DATE  DESCRIPTION          REFERENCE     CODE NUMBER    TITLE              DEBIT        CREDIT
=================================================================================================

JOURNAL CJ   GENERAL JOURNAL

  1  10/31/00  CORPORATE ADJUSTMENTS   01/16/00   #8   3870.00   ACCRUED INTREST     4441.71
  2  10/31/00  CORPORATE ADJUSTMENTS   01/16/00   #8   2839.00   CASH VALUE LIFE I               4441.71

TOTAL NUMBER OF TRANSACTIONS...    2

TOTAL DEBITS....    4441.71
TOTAL CREDITS...    4441.71
```

P 08802

A0115

FROM : MPF

EPL RUN DATE: 12/06/00  15:04:32

PHONE NO. : 1 800 672 5035

Dec. 28 2000 11:05AM P4

MARSHALL PLASTIC FILM

**GENERAL JOURNAL REGISTER**

WEDNESDAY DECEMBER 6, 2000

LISTING # 935

PAGE:  1

| TRANS NO. | DATE | DESCRIPTION | REFERENCE | ORG CODE | G/L ACCT NUMBER | TITLE | DEBIT | CREDIT |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

JOURNAL CJ   GENERAL JOURNAL

| 1 | 10/31/00 | COPROGATE ADJ #2 | 01/10/00 | X3 | 2046.01 | CAPITAL MAINTENAN | 120432.21 | |
| 2 | 10/31/00 | COPROGATE ADJ #2 | 01/10/00 | X5 | 2040.00 | EQUIPMENT | | 120432.21 |
| 3 | 10/31/00 | COPROGATE ADJ #2 | 01/10/00 | X4 | 2040.00 | EQUIPMENT | 122000.35 | |
| 4 | 10/31/00 | COPROGATE ADJ #2 | 01/10/00 | X5 | 2130.03 | GOODWILL | | 122000.35 |
| 5 | 10/31/00 | FED INCOME TAX PAID | 01/10/00 | X3 | 5201.01 | INTERCOMPANY ACCT | 91088.66 | |
| 6 | 10/31/00 | FED INCOME TAX PAID | 01/10/00 | X3 | 3093.05 | ACCRUED FED INCOM | | 91088.66 |
| 7 | 10/31/00 | TB BALANCE PAYABLES | 01/10/00 | X6 | 2130.00 | GOODWILL | 33817.96 | |
| 8 | 10/31/00 | TB BALANCE PAYABLES | 01/10/00 | X3 | 3040.00 | ACCOUNTS PAYABLE | | 33817.96 |

TOTAL NUMBER OF TRANSACTIONS...    8

TOTAL DEBITS....    368939.18

TOTAL CREDITS...    368939.18

P 08803

A0116

FROM : MPF          PHONE NO. : 1 800 672 5035          Dec. 28 2000 11:06AM P5

MARSHALL PLASTIC FILM
PRO FORMA BALANCE SHEET    (RPT# 958)          PAGE    1
CONSOLIDATED
WEDNESDAY DECEMBER 6, 2000

REPORT PERIOD 10/00
PERIOD ENDING 10/31/00

|  | PERIOD-TO-DATE | | | | YEAR-TO-DATE | | |
|---|---|---|---|---|---|---|---|
|  | ACTUAL | LAST YEAR | VARIANCE | % | ACTUAL | LAST YEAR | VARIANCE | % |
| **ASSETS** | | | | | | | | |
| **CURRENT ASSETS** | | | | | | | | |
| CASH ON HAND AND IN BANK | (135157.20) | (72060.57) | (63096.63) | 87.6 | (188147.24) | (261580.27) | 73433.03 | 28.1- |
| A/R LESS ALLOWANCE OF | (445795.96) | (357443.34) | (88442.62) | 24.7 | 1542283.93 | 1514498.82 | 28785.11 | 1.9 |
| DOUBTFUL ACCOUNTS +4500 | (20819.48) | (19540.62) | (19809.96) | 809.4 | 1834194.21 | 1489958.98 | (455742.77) | 30.4- |
| INVENTORY | (7323.80) | (4513.80) | (818.80) | 12.4 | 1285.30 | 9519.95 | (8234.65) | 86.5- |
| PREPAID EXPENSES | | | | | | | | |
| TOTAL CURRENT ASSETS | (709536.44) | (446877.53) | (342459.11) | 76.8 | 2390618.28 | 2752397.48 | (361799.20) | 13.1- |
| **PLANT, PROP, EQUIP & COST** | | | | | | | | |
| LAND | 7779.83 | .00 | 7779.93 | .0 | 50400.58 | 42220.47 | 7779.83 | 18.4 |
| LAND IMPROVEMENTS | (60580.74) | .00 | (60580.74) | .0 | .00 | 68580.74 | (68580.74) | 100.0- |
| BUILDINGS & IMPROVEMENTS | 218387.84 | .00 | 218387.84 | .0 | 958888.68 | 731412.16 | 218387.84 | 29.9 |
| CONSTRUCTION IN PROCESS | (5400.88) | .00 | (5400.88) | .0 | .00 | 5400.85 | (5400.80) | 100.0- |
| EQUIPMENT | (1582436.84) | 19801.93 | (1601519.79) | 392.4- | 4251292.35 | 5388279.09 | (21731.57) | 19.9- |
| VEHICLES | 302.64 | .00 | 302.64 | .0 | 66741.19 | 87492.76 | (45846.49) | 23.7- |
| CAPITALIZED LEASE VEHICLES | (45846.49) | .00 | (45846.49) | .0 | .00 | 45846.49 | (45846.49) | 100.0- |
| TOTAL PLANT, PROPERTY & EQUIP | (1467722.50) | 19801.93 | (1486684.51) | 791.7- | 5310053.54 | 6281360.21 | (963306.67) | 15.3- |
| **ACCUMULATED DEPRECIATION** | | | | | | | | |
| ACCUMULATED DEPRECIATION-LAND | 48496.84 | .00 | 48496.84 | .0 | .00 | (45485.98) | 45485.98 | 100.0- |
| ACCUMULATED DEPRECIATION-BUILDINGS & IMPROVEMENTS | 417487.40 | (1835.00) | 410522.40 | 437.0- | (16358.000) | (481563.98) | 391213.98 | 97.4- |
| EQUIPMENT | 3439722.43 | (31445.00) | 3471187.43 | 31.9- | (337588.00) | (3526847.51) | 3188547.54 | 90.4- |
| ACCUMULATED DEPRECIATION-VEHIC | 37299.49 | .00 | 37299.49 | .0 | .00 | (42851.10) | 42851.10 | 100.0- |
| ACCUMULATED DEPRECIATION-CAP-L | 45846.49 | .00 | 45846.49 | .0 | .00 | (44946.95) | 44946.95 | 100.0- |
| TOTAL ACCUMULATED DEPRECIATI | 3988051.93 | (32580.00) | 4021251.93 | 373.4- | (347850.00) | (4060035.49) | 3712185.49 | 91.4- |
| NET PLANT, PROPERTY & EQUIP | 2521129.35 | (13410.07) | 2534547.42 | 899.1- | 4978203.54 | 2221324.72 | 2748878.82 | 123.7 |
| **OTHER ASSETS** | | | | | | | | |
| INVESTMENTS IN LIMITED PART | .00 | .00 | .00 | .0 | 50400.00 | 50400.00 | .00 | .0 |
| AIR STABILIZATION EXTRUSIO | .00 | .00 | .00 | .0 | .00 | .00 | .00 | .0 |
| RECLAIM SYSTEM | .00 | .00 | .00 | .0 | .00 | .00 | .00 | .0 |
| 1989 BUSINESS PLAN | .00 | .00 | .00 | .0 | .00 | .00 | .00 | .0 |
| RAYFIELD ESTATES BEECHFIELD | .00 | .00 | .00 | .0 | .00 | .00 | .00 | .0 |
| LNLD LTD PARTNERSHIP LX DOG | .00 | .00 | .00 | .0 | .00 | 93978.63 | (93978.63) | 100.0- |
| CASH VALUE LIFE INSURANCE | (92600.52) | .00 | (92600.52) | .0 | .00 | .00 | .00 | .0 |
| GOODWILL | 2568805.52 | .00 | 2568805.52 | .0 | 2568805.52 | .00 | 2568805.52 | .0 |
| TOTAL OTHER ASSETS | 2475905.00 | .00 | 2475905.00 | .0 | 2626985.52 | 152278.63 | 2474526.84 | 423.7 |
| **TOTAL ASSETS** | 4280497.71 | (46949.60) | 4667993.31 | 15.9- | 9997727.26 | 5126180.80 | 4861626.38 | 94.8 |

P 08804

A0117

FROM : MPF    PHONE NO. : 1 800 672 5035  Dec. 28 2000 11:06AM P6

MARSHALL PLASTIC FILM
PRO FORMA BALANCE SHEET (APTD 998)
CONSOLIDATED      PAGE 2
WEDNESDAY DECEMBER 6, 2000

REPORT PERIOD 10/00
PERIOD ENDING 10/31/00

| | ACTUAL | LAST YEAR | VARIANCE | % | ACTUAL | LAST YEAR | VARIANCE | % |
|---|---|---|---|---|---|---|---|---|
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | | | | |
| **CURRENT LIABILITIES** | | | | | | | | |
| ACCOUNTS PAYABLE | (152842.39) | (27283.47) | (125558.92) | 459.8 | 675705.68 | 1046855.97 | (371150.29) | 34.6- |
| ACCRUED PAYROLL | (27013.68) | (38712.27) | 7699.29 | 25.1- | 45749.67 | 59574.64 | 961.6 |  |
| ACCRUED PAYROLL TAXES/WITHHOLD | 3041.61 | (18572.12) | 22453.73 | 129.7- | 20531.66 | 18742.34 | 1769.22 | 9.4 |
| ACCRUED PROFIT SHARING | .06 | .00 | .00 | .0 | .00 | .00 | .00 | .0 |
| ACCRUED INTEREST | (4441.71) | .00 | (4441.71) | .0 | 5940.63 | (5940.63) | 100.0- |  |
| ACCRUED DIVIDEND & DIRECTORS F | .00 | .00 | .00 | .0 | .00 | (20631.06) | 20631.06 | 100.0- |
| OTHER TAXES | (1413.65) | (1010.91) | .06 | 39.8 | 7268.63 | (3307.50) | 10575.53 | 319.7- |
| ACCRUED FED INCOME TAX | 91000.64 | 9650.98 | 82230.66 | 863.2 | 9128.74 | 284102.39 | (284102.39) | 100.0- |
| ACCRUED PROPERTY TAXES | 3166.67 | 2750.00 | 414.67 | 15.2 | 5458.67 | 28645.14 | 335.7 |  |
| ACCRUED SINGLE BUSINESS TAX | 111.08 | (380.00) | 631.08 | 122.2- | 395431.04 | 2712.08 | 208.3- |  |
| INTERCOMPANY ACCOUNT | (539554.15) | (305115.19) | (154438.96) | 40.1 | 210974.04 | (176433.00) | 44.6- |  |
| CURRENT MATURITIES OF CBL | (0185.06) | .00 | (0185.06) | .0 | .00 | 7557.97 | 100.4- |  |
| CURRENT MATURITIES - LTD | (370737.00) | .00 | (370737.00) | .0 | .00 | 356570.23 | (356570.23) | 100.0- |
| **TOTAL CURRENT LIABILITIES** | (1001170.94) | (450834.04) | (550344.90) | 122.1 | 1049435.87 | 2647991.73 | (998556.06) | 48.6- |
| **LONG TERM DEBT** | | | | | | | | |
| NOTE PAYABLE BEAM GOULD | (87658.32) | (5382.68) | (82347.44) | 552.9 | .00 | 98361.97 | (98361.97) | 100.0- |
| LONG TERM DEBT, LOANS | (835092.34) | (24173.26) | (811699.08) | 255.1 | .00 | 425625.29 | (425625.29) | 100.0- |
| LONG TERM DEBT, LEASES | 3936.34 | (648.78) | 4585.12 | 784.7- | .00 | 2284.46 | (2284.46) | 100.0- |
| LONG TERM DEBT | 3969500.00 | .00 | 3969500.00 | .0 | 3969500.00 | .00 | 3969500.00 | .0 |
| DEFERRED FEDERAL INCOME TAX | .00 | .00 | .00 | .0 | 129988.00 | 118100.05 | 11880.00 | 10.0 |
| **STOCKHOLDERS' EQUITY** | | | | | | | | |
| COMMON STOCK-PAR VALUE $1: | | | | | | | | |
| AUTHORIZED 50000 SHARES | .00 | .00 | .00 | .0 | .00 | .00 | .00 | .0 |
| TREASURY STOCK | .00 | .00 | .00 | .0 | 40662.00 | 40662.00 | .00 | .0 |
| ISSUED & OUTSTANDING 50000 | .00 | .00 | .00 | .0 | .00 | (20043.00) | 20043.00 | 100.0- |
| DIVIDENDS | .00 | .00 | .00 | .0 | -4430678.00 | .00 | 4430678.00 | .0 |
| APIC | 4430678.00 | .00 | 4430678.00 | .0 | 364751.29 | 2421758.53 | (2052967.16) | 84.8- |
| RETAINED EARNINGS | (2270295.83) | 21483.10 | (2291778.19) | 667.0 | | | | |
| **TOTAL STOCKHOLDERS' EQUITY** | 6041632.67 | 16100.50 | 6025452.17 | 239.0 | 8088391.39 | 2532049.10 | 4276292.29 | 247.9 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | 4208497.71 | (459495.60) | 4667993.31 | 15.9- | 9987727.36 | 5124106.00 | 4061626.30 | 94.6 |

P 08805

A0118

# EXHIBIT D

A0119

Plastical

| | T/B @12/31 | Audit Adj | Closing B/S | Opening Adj | Opening B/S |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **Current Assets** | | | | | |
| Cash and Cash Equivalents | (287,789) | 318,948 | 31,159 | | 31,159 |
| Accounts Receivable, net of allowances | 1,879,143 | (352,422) | 1,526,721 | | 1,526,721 |
| Inventory | 2,709,118 | 230,017 | 2,939,135 | | 2,939,135 |
| Prepaids & Other Current | 10,290 | 0 | 10,290 | | 10,290 |
| **Total Current Assets** | 4,310,762 | 196,543 | 4,507,305 | 0 | 4,507,305 |
| | | | | | |
| **Property and Equipment, at cost** | | | | | |
| Fixed Assets | 3,613,247 | 417,096 | 4,030,343 | (1,114,821) | 2,915,522 |
| Less: Accum.depreciation | (2,023,700) | 0 | (2,023,700) | 2,023,700 | 0 |
| **Net Property and Equipment** | 1,589,547 | 417,096 | 2,006,643 | 908,879 | 2,915,522 |
| | | | | | |
| Intercompany | 0 | 0 | 0 | | 0 |
| Other Assets | 5,000 | (5,000) | 0 | | 0 |
| Deferred Income Taxes | 0 | 0 | 0 | | 0 |
| Goodwill | 0 | 0 | 0 | 1,202,639 | 1,202,639 |
| | | | | | |
| **TOTAL ASSETS** | 5,905,309 | 608,639 | 6,513,948 | 2,111,518 | 8,625,466 |
| | | | | | |
| **LIABILITIES** | | | | | |
| **Current Liabilities** | | | | | |
| Accounts Payable | 961,650 | 184,802 | 1,146,452 | | 1,146,452 |
| Accrued Liabilities | 0 | 124,855 | 124,855 | (23,950) | 100,905 |
| Deferred Revenue | 0 | 0 | 0 | | 0 |
| Current Portion of Senior Debt | 0 | 0 | 0 | | 0 |
| Current Portion of Subordinated Debt | 0 | 0 | 0 | | 0 |
| **Total Current Liabilities** | 961,650 | 309,657 | 1,271,307 | (23,950) | 1,247,357 |
| | | | | | |
| Old Bank Debt | 3,297,714 | 0 | 3,297,714 | (3,297,714) | 0 |
| New Bank Debt | 0 | 0 | 0 | 7,270,000 | 7,270,000 |
| Senior Subordinated Debt | 0 | 0 | 0 | | 0 |
| Seller Subordinated Debt | 0 | 0 | 0 | | 0 |
| Other Long-Term Liabilities | 0 | 0 | 0 | | 0 |
| **Total Long-Term Liabilities** | 3,297,714 | 0 | 3,297,714 | 3,972,286 | 7,270,000 |
| | | | | | |
| Deferred Income Taxes | 0 | 0 | 0 | 337,474 | 337,474 |
| | | | | | |
| **TOTAL LIABILITIES** | 4,259,365 | 309,657 | 4,569,022 | 4,285,810 | 8,854,832 |
| | | | | | |
| **Shareholders' Equity** | | | | | |
| Common Stock | 5,000 | (5,000) | 0 | | 0 |
| Paid in Capital | 0 | 0 | 0 | (229,365) | (229,365) |
| Treasury Stock | 0 | 0 | 0 | | 0 |
| Retained Earnings | 1,640,945 | 303,982 | 1,944,927 | (1,944,927) | (0) |
| **Total Shareholders' Equity** | 1,645,945 | 298,982 | 1,944,927 | (2,174,292) | (229,365) |
| | | | | | |
| **TOTAL LIABILITIES AND EQUITY** | 5,905,309 | 608,639 | 6,513,948 | 2,111,518 | 8,625,466 |

P 08782

A0120

**Closing Entries - Plastical**

|  | Db | Cr |
|---|---|---|
| **(1)** | | |
| Db: Accumulated Depreciation | 2,023,700 | |
| Cr: Fixed Assets | | 1,114,821 |
| Cr: Goodwill | | 908,879 |
| To record fair value of fixed assets | | |
| **(2)** | | |
| Db: Long Term Debt | 3,297,714 | |
| Db: Goodwill | 1,797,994 | |
| Db: Retained Earnings | 1,944,927 | |
| Cr: Additional Paid-in-Capital (APIC) | | 7,040,635 |
| To book payoff of debt and pre-fair value of Goodwill | | |
| **(3)** | | |
| Db: APIC | 7,270,000 | |
| Cr: Long Term Debt | | 7,270,000 |
| To record push down of Plassein Debt | | |
| **(4)** | | |
| Db: Accrued Expense | 23,950 | |
| Cr: Goodwill | | 23,950 |
| **(5)** | | |
| Db: Goodwill | 337,474 | |
| Cr: Ll Deferred Tax Liability | | 337,474 |
| | **16,695,759** | **16,695,759** |

P 08783

A0121

**Plassein**

Packaging Corp.
165 River Rd.
Willington, CT
Phone: 860-429-5070
Fax: 860-429-5071

# FAX

Date: 12/28/00

To: JOHN PARKER

From: RICK MASBACK

Total Pages: 2

JOHN -

I AM ATTEMPTING TO FINALIZE THE BALANCE SHEETS TO REFLECT

OPENING ENTRIES. PLEASE REVIEW THE FOLLOWING + CHECK OUT DIFFERENCES.

I WANT EVERYTHING BOOKED BY DEC. Y/E.

① FIXED ASSETS: OPENING BALANCE OF $2915522 + CURRENT YR

ADDITIONS THRU NOV SHOULD BRING BALANCE TO $2983550.

② ACCUM DEPREC OPENING BALANCE = $0  YTD S/B 242668 = EXP.

ACCUM.

③ RETAINED EARNINGS + PAID IN CAPITAL OPENING S/B $0

④ CURRENT YR NET PROFIT - I SHOW $1931547 A DIFF OF $4043?

⑤ TO ELIMINATE PAID IN CAP + ACCUM EARNS POST THE FOLLOWING ENTRY

DB  PAID IN CAP.  4168714.99

DB  ACCUM EARN.  2158747.61

DB  GOODWILL  3045172.40

CR  ADDITIONAL PAID IN CAPITAL    9372635.00

P 08784

A0122

⑥ To Push Down Corporate Debt Post:
   Db  Additional Paid in Cap      $1,600,000
   Cr.  LTD                        $1,600,000

⑦ Any Adjustment to F/A or Accum Deprec To
   bring them in line s/b offset to Goodwill.

⑧ To accrue interest @ 10% Db Int Exp $60,000 Cr Interco

I will be on vacation the week of 1/2.
Hopefully any questions can wait till I get back
w/o messing up your B/S closing.

Rick

P 08785

A0123

12/05/2000  11:00   990988/2178          PLASTICAL



12/05/2000                         PLASTICAL INDUSTRIES INC                    Page   1
Period 01 Thru 11                          G/L ACTIVITY
9:02 AM
Company F

                                    Sorted by Main Account Number

GL Account   Post Date   Description        Entry  Per.  Srcm.  Cflow Ref.   Post      Debit           Credit

32875                    PAID IN CAPITAL                                                0.00
             02/07/2000  PAYOFF OF LOANS BY PLASEN   3472  01  M1  Yes 01-30  Yes                   3,280,834.04
                         ENDING BALANCE PERIOD 01                                                   3,288,824.54
                         ENDING BALANCE PERIOD 02                                                   3,288,824.54
             04/11/2000  TO NET ASSETS/R/UP TO PMV   11706  03  M1  Yes 03-26  Yes                  1,633,267.40
             04/12/2000  REV ALL CONVERTING DEPT     11768  03  M1  Yes 03-29  Yes                  4,433,818.70
             04/13/2000  CONR JE 3-30                11924  03  M1  Yes 03-33  Yes     4,433,818.70
             04/13/2000  REVERSE DM TO TRAPLA LLC    11966  03  M1  Yes 03-38  Yes     191,003.25
             04/14/2000  AUDITORS AJE                12219  03  M2  Yes 98-3   Yes     55,247.00
             04/14/2000  AUDITORS AJE                13222  03  M1  Yes 98-6   Yes                     15,399.00
             04/14/2000  AUDITORS AJE                13223  03  M1  Yes 98-7   Yes     206,866.00
             04/14/2000  AUDITORS AJE                13223  03  M1  Yes 99-1   Yes     31,881.00
             04/14/2000  AUDITORS AJE                13244  03  M1  Yes 99-6   Yes                     17,711.00
                         ENDING BALANCE PERIOD 03                                                   4,168,716.99
             04/15/2000  REVERSE DM TO TRAPLA LLC    11967  04  R2  Yes 03-29  Yes                    191,003.25
             04/17/2000  600321   TO REVERSE OUR D   13309  04  AP  Yes TRALLC  Yes    191,003.25
                         ENDING BALANCE PERIOD 04                                                   4,168,716.99
                         ENDING BALANCE PERIOD 05                                                   4,168,716.99
                         ENDING BALANCE PERIOD 06                                                   4,168,716.99
                         ENDING BALANCE PERIOD 07                                                   4,168,716.99
                         ENDING BALANCE PERIOD 08                                                   4,168,716.99
                         ENDING BALANCE PERIOD 09                                                   4,168,716.99
                         ENDING BALANCE PERIOD 10                                                   4,168,716.99
                         ENDING BALANCE PERIOD 11                                                   4,168,716.99

                         ACTIVITY BALANCE                                              881,616.56    5,050,329.55

                         GL BALANCE                                                    0.00          4,168,716.99

End of Report

P 08787

A0124

# EXHIBIT E

A0125

*final w/tax*

**Transamerican**

| | T/B @12/31 | Audit Adj | Closing B/S | Opening Adj | Opening B/S |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **Current Assets** | | | | | |
| Cash and Cash Equivalents | (47,530) | 53,008 | 5,478 | | 5,478 |
| Accounts Receivable, net of allowances | 2,832,123 | (1,461,307) | 1,370,816 | (218,479) | 1,152,337 |
| Inventory | 1,763,545 | (620,214) | 1,143,331 | (351,995) | 791,336 |
| Prepaids & Other Current | 29,723 | (15,814) | 13,909 | | 13,909 |
| **Total Current Assets** | 4,577,861 | (2,044,327) | 2,533,534 | (570,474) | 1,963,060 |
| | | | | | |
| **Property and Equipment, at cost** | | | | | |
| Fixed Assets | 7,745,530 | 49,246 | 7,794,776 | (3,496,760) | 4,298,016 |
| Less: Accum.depreciation | (4,821,639) | (38,864) | (4,860,503) | 4,860,503 | 0 |
| **Net Property and Equipment** | 2,923,891 | 10,382 | 2,934,273 | 1,363,743 | 4,298,016 |
| | | | | | |
| Intercompany | 12,281 | (12,281) | (0) | | (0) |
| Other Assets | 1,874,918 | (1,836,218) | 38,700 | | 38,700 |
| Deferred Income Taxes | 0 | 0 | 0 | 148,939 | 148,939 |
| Goodwill | 0 | 0 | 0 | 5,791,127 | 5,791,127 |
| | | | | | |
| **TOTAL ASSETS** | 9,388,951 | (3,882,444) | 5,506,507 | 6,733,335 | 12,239,842 |
| | | | | | |
| **LIABILITIES** | | | | | |
| **Current Liabilities** | | | | | |
| Accounts Payable | 2,011,052 | 69,965 | 2,081,017 | | 2,081,017 |
| Accrued Liabilities | 236,752 | (128,480) | 108,272 | | 108,272 |
| Deferred Revenue | 0 | 0 | 0 | | 0 |
| Current Portion of Senior Debt | 0 | 0 | 0 | | 0 |
| Current Portion of Subordinated Debt | 0 | 0 | 0 | | 0 |
| **Total Current Liabilities** | 2,247,804 | (58,515) | 2,189,289 | 0 | 2,189,289 |
| | | | | | |
| Old Bank Debt | 7,683,930 | (3,483,327) | 4,200,603 | (4,200,603) | (0) |
| New Bank Debt | 0 | 0 | 0 | 4,640,000 | 4,640,000 |
| Senior Subordinated Debt | 0 | 0 | 0 | | 0 |
| Seller Subordinated Debt | 0 | 0 | 0 | | 0 |
| Other Long-Term Liabilities | 0 | 0 | 0 | | 0 |
| **Total Long-Term Liabilities** | 7,683,930 | (3,483,327) | 4,200,603 | 439,397 | 4,640,000 |
| | | | | | |
| Deferred Income Taxes | 284,709 | (284,709) | 0 | | 0 |
| | | | | | |
| **TOTAL LIABILITIES** | 10,216,443 | (3,826,551) | 6,389,892 | 439,397 | 6,829,289 |
| | | | | | |
| **Shareholders' Equity** | | | | | |
| Common Stock | 40,000 | (40,000) | 0 | | 0 |
| Paid in Capital | 0 | 0 | 0 | 5,410,553 | 5,410,553 |
| Treasury Stock | 0 | 0 | 0 | | 0 |
| Retained Earnings | (867,493) | (15,892) | (883,385) | 883,385 | 0 |
| **Total Shareholders' Equity** | (827,493) | (55,892) | (883,385) | 6,293,938 | 5,410,553 |
| | | | | | |
| **TOTAL LIABILITIES AND EQUITY** | 9,388,950 | (3,882,443) | 5,506,507 | 6,733,335 | 12,239,842 |

**P 08792**

A0126

**Closing Entries - Transamerican**

|  | Db | Cr |
|---|---|---|
| **(1)** | | |
| Db: Accumulated Depreciation | 4,880,503 | |
| Cr: Fixed Assets | | 3,496,760 |
| Cr: Goodwill | | 1,383,743 |
| To record fair value of fixed assets | | |
| | | |
| **(2)** | | |
| Db: Long Term Debt | 4,200,603 | |
| Db: Goodwill | 6,733,335 | |
| Cr: Retained Earnings | | 883,385 |
| Cr: Additional Paid-in-Capital (APIC) | | 10,050,553 |
| To book payoff of debt and pre-fair value | | |
| of Goodwill | | |
| | | |
| **(3)** | | |
| Db: APIC | 4,640,000 | |
| Cr: Long Term Debt | | 4,640,000 |
| To record push down of Piassein Debt | | |
| | | |
| **(4)** | | |
| Db: Goodwill | 570,474 | |
| Cr: Inventory | | 351,995 |
| Cr: A/R | | 140,479 |
| Cr: Allowance for Doubtful Accts | | 78,000 |
| | | |
| Db: Deferred Tax Asset | 148,939 | |
| Cr: Goodwill | | 148,939 |
| | 21,153,854 | 21,153,854 |

P 08793

A0127

# EXHIBIT F

A0128

**PLASSEIN PACKAGING CORP.**

**ACQUISITION OF REX INTERNATIONAL, INC.**

**FUNDS FLOW MEMORANDUM
AND
LETTER OF DIRECTION**

This memorandum reflects the flow of funds contemplated by

### Equity Financing

(a)    Series A Convertible Preferred Stock, Common Stock and Warrant Purchase Agreement dated as of the August 15, 2000 (the "Series A Purchase Agreement") among (i) Plassein Packaging Corp., a Delaware corporation (the "Company"), (ii) Trivest Fund II, Ltd. ("Trivest Fund II"), Trivest Equity Partners II, Ltd. ("Trivest Equity Partners II"), Trivest Principals Fund II, Ltd. ("Trivest Principals Fund II"), Trivest Fund III, L.P. ("Trivest Fund III"), Trivest Principals Fund III, L.P. ("Trivest Principals Fund III") (collectively, the "Trivest Funds"), (iii) BancBoston Ventures, Inc. ("BancBoston Ventures, Inc.") and Mass Mutual Life Insurance Company ("MassMutual"), and (iv) Paul D. Gage, Stephen S. Wilson, and Kenneth B. Olender, (collectively, the "Management Investors").

### Senior Secured Debt Financing

Second Amended and Restated Loan and Security Agreement dated as of August 15, 2000 (the "Loan Agreement") among the Company, certain of its subsidiaries, Fleet Capital Corporation, as Administrative Agent (the "Agent"), for the financial institutions party from time to time to the Loan Agreement (the "Lenders") and the Lenders.

### Subordinated Debt Financing

Securities Purchase Agreement dated as of August 15, 2000 (the "Securities Purchase Agreement") among the Company, Mass Mutual and BancBoston Ventures, Inc..

### Acquisition of Rex International

Stock Purchase Agreement dated as of August 15, 2000 (the "Rex Stock Purchase Agreement") among (i) the Company, (ii) Rex International, Inc., a North Carolina corporation ("Rex"), and (iii) B.A. Capital Company, L.P. ("BA Capital"), (iv) Charles J. Warr, Paul D. Gage, Stephen S. Wilson, G. Kenneth Pope, Jr., Kenneth B. Olender, Daniel A. Jones III (the "Rex Management Shareholders") and (v) Heller Financial, Inc. ("Heller") (collectively, with BA Capital and the Rex Management Shareholders, the "Rex Selling Shareholders").

P 02557

A0129

| Trivest Fund | Common Stock | Purchase Price |
|---|---|---|
| Trivest Fund II | 3,107,225 | $2,251,220 |
| Trivest Equity Fund II | 820,664 | $594,580 |
| Trivest Principals Fund II | 350,857 | $254,200 |
| Trivest Fund III | 4,214,565 | $3,053,500 |
| Trivest Principals Fund III | 64,181 | $46,500 |
| Total | 8,557,492 | $6,200,000 |

less

The amount of principal on the promissory notes set forth below which shall be delivered to the Company and cancelled as consideration for a portion of the Common Stock purchased by each of the Trivest Funds as follows:

| Trivest Fund | Principal Amount of Promissory Note |
|---|---|
| Trivest Fund II | $1,810,250 |
| Trivest Equity Fund II | $461,500 |
| Trivest Principals Fund II | $228,250 |
| Trivest Fund III | $2,462,500 |
| Trivest Principals Fund III | $37,500 |
| Total | $5,000,000 |

2.    Purchase of Series A Convertible Stock, Common Stock and Basic Warrants by BancBoston Ventures, Inc. and MassMutual.

(i)    At Closing, BancBoston Ventures, Inc. shall cause to be wire transferred a total of $4,000,000 in immediately available funds to the Company's Funding Account specified on Exhibit A hereto, representing consideration for the following pursuant to the Series A Purchase Agreement:

(A)    3,018,211 shares of Series A Convertible Preferred Stock
(B)    1,355,106 shares of Common Stock
(C)    A Basic Warrant to purchase 1,509,105 shares of the Company's Common Stock

(ii)    At Closing, MassMutual shall cause to be wire transferred a total of $4,000,000 in immediately available funds to the Company's Funding Account specified on Exhibit A hereto, representing consideration for the following pursuant to the Series A Purchase Agreement:

(A)    3,018,211 shares of Series A Convertible Preferred Stock
(B)    1,355,106 shares of Common Stock

3

P 02559

A0130

   (C) A Basic Warrant to purchase 1,509,105 shares of the Company's Common Stock

  (D)

B. <u>Subordinated Debt Financing</u>

  1. <u>Purchase of Senior Subordinated Notes, Series A Warrants and Series B Warrants by SunTrust.</u>

   (i) At Closing, SunTrust shall cause to be wire transferred a total of $4,900,000 in immediately available funds to the Company's Funding Account specified on <u>Exhibit A</u> hereto, representing consideration for the following pursuant to the Securities Purchase Agreement:

   (A) Senior Subordinated Promissory Notes of the Company in the aggregate principal amount of $5,000,000.

   (B) Series A Warrants to purchase an aggregate of 867,347 shares of the Company's Common Stock.

   (C) Series B Warrants to purchase an aggregate of 216,837 shares of the Company's Common Stock.

  <u>less</u>

  (A) (D) the payment by the Company of the Up Front Fee of $100,000.

  2. <u>Purchase of Senior Subordinated Notes, Junior Subordinated Notes, Series A Warrants, Series B Warrants and Series C Warrants by BancBoston Ventures, Inc. and MassMutual.</u>

   (ii) At Closing, BancBoston Ventures, Inc. shall cause to be wire transferred a total of $12,985,000 in immediately available funds to the Company's Funding Account specified on <u>Exhibit A</u> hereto, representing consideration for the following pursuant to the Securities Purchase Agreement:

   (D) Senior Subordinated Promissory Notes of the Company in the aggregate principal amount of $7,500,000.

   (E) Junior Subordinated Promissory Notes of the Company in the aggregate principal amount of $5,750,000.

   (F) Series A Warrants to purchase an aggregate of 1,301,020 shares of the Company's Common Stock.

   (G) Series B Warrants to purchase an aggregate of 325,255 shares of the Company's Common Stock.

   (H) 3,324,830 shares of the Company's Class B Common Stock.

  <u>less</u>

  (A) (F) the payment by the Company of the Up Front Fee of $265,000

4.

P 02560

(iii)   At Closing, MassMutual shall cause to be wire transferred a total of $17,885,000 in immediately available funds to the Company's Funding Account specified on Exhibit A hereto, representing consideration for the following pursuant to the Series A Purchase Agreement:

(A)   Senior Subordinated Promissory Notes of the Company in the aggregate principal amount of $12,500,000.

(B)   Junior Subordinated Promissory Notes of the Company in the aggregate principal amount of $5,750,000.

(C)   Series A Warrants to purchase an aggregate of 2,168,367 shares of the Company's Common Stock.

(D)   Series B Warrants to purchase an aggregate of 542,092 shares of the Company's Common Stock.

(E)   3,324,830 shares of the Company's Class B Common Stock.

less

(A)   (F)   the payment by the Company of the Up Front Fee of $365,000

C.   Fleet Capital Loan Agreement Funding

At Closing, the Agent, on behalf of the Lenders, shall cause to be transferred a total of $16,088,929, in immediately available funds, to the Funding Account specified on Exhibit A hereto representing:

(i)   additional borrowings under the Loan Agreement as follows:

| Loan | Amount |
|------|--------|
| Term A | $11,355,000 |
| Term B | $6,514,535 |
| Revolver | $(1,373,106) |
| Capex Line | $0 |
| Total | $16,496,429 |

less

(ii)   the payment by the Company of the Up Front Fee of $341,250

less

(iii)   the payment by the Company of the Roll Over Fee of $66,250 to the Agent on behalf of the Lenders.

5.

P 02561

**D.**     **Acquisition of Rex.**

1.     **Payment of Purchase Price.**

At Closing, the Company shall cause to be transferred a total of $31,934,274.06, in immediately available funds, to the Rex Selling Shareholders to the accounts specified on Exhibit A hereto as follows:

| Shareholder | Amount |
|---|---|
| B.A. Capital Company, L.P. | $25,491,779.76 |
| Heller Financial, Inc. | $1,577,514.94 |
| Charles J. Warr | $2,347,382.00 |
| Paul D. Gage* | $366,477.36 |
| Stephen S. Wilson* | $1,522,317.98 |
| G. Kenneth Pope, Jr.* | $171,507.67 |
| Kenneth B. Olender* | $285,786.68 |
| Daniel A. Jones III* | $171,507.67 |
| Total | $31,934,274.06 |

*     Such amounts representing a total of $33,141,070.17 decreased by $1,206,796.11 in respect of (i) withholding on account of stock option disqualifying dispositions ($121,848.11) and (ii) the exercise price for such options for each of the following Rex Selling Shareholders ($1,084,948) as set forth below:

| Shareholder | Withholding Amount | Exercise Price |
|---|---|---|
| Paul D. Gage | $83,051.55 | $513,882 |
| Stephen S. Wilson | $14,316.88 | $137,652 |
| G. Kenneth Pope, Jr. | $8,159.89 | $141,138 |
| Kenneth B. Olender | $8,159.89 | $151,138 |
| Daniel A. Jones III | $8,159.89 | $141,138 |
| Total | $121,848.11 | $1,084,948 |

The $33,141,070.17 represents:

(i)     the payment of the aggregate purchase price of $59,544,860.

**plus**

(ii)     the tax benefit of $101,005 realizable to Rex on account of payments made simultaneous with Closing by Rex to the Rex Management Shareholders (other than Mr. Warr) pursuant to Section 3(b) of the Management Retention Incentive Agreements (see Item (vii) below).

6

P 02562

A0133

**less**

      (iii)     repayment of the funded indebtedness of Rex of $22,378,945.50 pursuant to the Rex Stock Purchase Agreement (see Item 2 below).

**plus**

      (iv)     available cash of $190,920.87.

**less**

      (v)     deposit of $4,000,000 in escrow pursuant to the Rex Stock Purchase Agreement (see Item 3 below).

**less**

      (vi)     the payment of the fees and costs of Deutsche Banc Alex.Brown of $842,343.2 (see Item 4 below).

**less**

      (vii)     the payment of the fees and costs of Kennedy Covington Lobdell & Hickman of $285,500.00 (see Item 5 below).

**less**

      (viii)   the payment of amounts due to the following Rex Selling Shareholders under Section 3(b) of the Management Retention Incentive Agreements as set forth below (see Item 6 below):

| Shareholder | Retention Bonus |
|---|---|
| Paul D. Gage | $84,676 |
| Stephen S. Wilson | $54,078 |
| G. Kenneth Pope, Jr. | $40,905 |
| Kenneth B. Olender | $55,265 |
| Daniel A. Jones III | $38,951 |
| Total | $273,875 |

**plus**

      (ix)    the exercise price of stock options held by the Rex Management Shareholders (other than Mr. Warr) of $1,084,948.

P 02563

A0134

2.    Repayment of Funded Indebtedness.

At Closing, the Company, on behalf of Rex, shall cause to be transferred a total of $22,378,945.50, in immediately available funds, to the holders of funded indebtedness of Rex to the accounts specified on Exhibit A hereto as follows:

| Loan | Amount |
|------|--------|
| Heller Financial, Inc. | $19,170,652.18 |
| BA Capital Company, L.P. | $2,387,500.00 |
| Accrued but Unpaid Dividends on Preferred to BA Capital | $23,958.32 |
| The CIT Group/Venture Capital, Inc. | $796,835.00 |
| Total | $22,378,945.50 |

3.    Funding of Escrow.

At Closing, the Company shall cause to be transferred a total of $4,000,000, in immediately available funds, to the Escrow Agent to the account specified on Exhibit A hereto.

4.    Payment of fees and costs of Deutsche Banc Alex. Brown.

At Closing, the Company, on behalf of Rex, shall cause to be transferred a total of $842,343.20, in immediately available funds, to Deutsche Banc Alex.Brown in payment of their fees and costs to the accounts specified on Exhibit A hereto as follows:

5.    Payment of fees and costs of Kennedy Covington Lobdell & Hickman.

At Closing, the Company, on behalf of Rex, shall cause to be transferred a total of $285,500.00, in immediately available funds, to Kennedy Covington Lobdell & Hickman in payment of their fees and costs to the accounts specified on Exhibit A hereto as follows:

6.    Payments Pursuant to Section 3(b) of the Management Retention Incentive Agreements:

At Closing, the Company, on behalf of Rex, shall cause to be transferred a total of $175,243.50, in immediately available funds, to the following Rex Selling Shareholders pursuant to Section 3(b) of the Management Retention Incentive Agreements (net of withholding):

| Shareholder | Retention Bonus | Less Withholding | Net Bonus |
|-------------|-----------------|------------------|-----------|
| Paul D. Gage | $84,676 | $30,017.64 | $54,658.36 |
| Stephen S. Wilson | $54,078 | $19,171.01 | $34,906.99 |
| G. Kenneth Pope, Jr. | $40,905 | $14,500.82 | $26,404.18 |
| Kenneth B. Olender | $55,265 | $19,591.44 | $35,673.56 |
| Daniel A. Jones III | $38,951 | $15,350.59 | $23,600.41 |
| Total | $273,875 | $98,631.50 | $175,243.50 |

8

P 02564

A0135

E.    Payment of Other Fees and Expenses.

1.    Payment of Trivest Transaction Fee.

At Closing, the Company shall cause to be wire transferred to Trivest Partners, L.P. a total of $972,000, in immediately available funds, representing payment of the transaction fee payable to Trivest Partners, L.P. pursuant to the Management Agreement.

2.    Payment of Fees and Costs of Greenberg Traurig

At Closing, the Company shall cause to be wire transferred to Greenberg Traurig a total of $206,500, in immediately available funds, representing payment of the fees and out-of-pocket disbursements of Greenberg Traurig to the account specified on Exhibit A hereto.

3.    Title Agent and Recording Fees and Costs.

At Closing, the Company shall cause to be wire transferred to Metropolitan Title Company a total of $12,236.49, in immediately available funds, representing payment of its fees and costs, to the account specified on Exhibit A hereto.

4.    Payment of Fees and Costs of Bingham Dana.

At Closing, the Company shall cause to be wire transferred to Bingham Dana a total of $75,000, in immediately available fund, representing payment of the fees and out-of-pocket disbursements of Bingham Dana to the account specified on Exhibit A hereto.

P 02565

A0136

FROM KENNEDY COVINGTON LOBDELL & HICKMAN, LLP    (TUE) 8. 15' 00 16:13/ST. 16:12/NO. 4862129140 P  2

**IN WITNESS WHEREOF**, the Company has executed this Funds Flow Memorandum as of the day and year first above written.

PLASSEIN PACKAGING CORP.

By: _____
    Richard J. Mosback
    Chief Financial Officer

TRIVEST FUND II, LTD.

By:  Trivest Fund II Manager, Ltd., its General Partner

    By:  Trivest Equities, Inc., its General Partner

    By: _____
        William F. Kaczynski, Jr., Managing Director

*Funds Flow*

TRIVEST EQUITY PARTNERS II, LTD.

By:  Trivest Fund II Manager, Ltd., its General Partner

    By:  Trivest Equities, Inc., its General Partner

    By: _____
        William F. Kaczynski, Jr., Managing Director

TRIVEST PRINCIPALS FUND II, LTD.

By:  Trivest Principals Fund II, Inc., its General Partner

    By: _____
        William F. Kaczynski, Jr., Managing Director

TRIVEST FUND III, L.P.

By:  Trivest III General Partner, L.P., a Delaware Limited Partnership, its General Partner

    By:  Trivest II, Inc., a Florida corporation, its General Partner

    By: _____
        William F. Kaczynski, Jr.,
        Managing Director

10

P 02566

A0137

TRIVEST PRINCIPALS FUND III, L.P.

By: TRIVEST II, Inc., a Florida corporation, its
General Partner

By: _____
William F. Kaczynski, Jr.,
Managing Director

MASSACHUSETTS MUTUAL LIFE INSURANCE
COMPANY

By: _____
Name:
Title:

MASSMUTUAL CORPORATE INVESTORS

By: _____
Name:
Title:

The foregoing is executed on behalf of MassMutual Corporate Investors, organized
under a Declaration of Trust, dated September 13, 1985, as amended from time to
time. The obligations of such Trust are not personally binding upon, nor shall resort
be had to the property of, any of the Trustees, shareholders, officers, employees or
agents of such Trust, but the Trust's property only shall be bound.

MASSMUTUAL PARTICIPATION INVESTORS

By: _____
Name:
Title:

The foregoing is executed on behalf of MassMutual Participation Investors,
organized under a Declaration of Trust, dated April 7, 1988, as amended from time
to time. The obligations of such Trust are not personally binding upon, nor shall
resort be had to the property of, any of the Trustees, shareholders, officers, employees
or agents of such Trust, but the Trust's property only shall be bound.

BANCBOSTON INVESTMENTS INC.

By: _____
Name:
Title:

11

P 02567

A0138

MASSACHUSETTS MUTUAL LIFE INSURANCE
COMPANY
By: David L. Babson & Company Inc., as
Investment Advisor

By: _____
Name:        Michael L. Klofas
Title:         Managing Director

MASSMUTUAL CORPORATE INVESTORS

By: _____
Name:        Michael L. Klofas
Title:         Vice President

The foregoing is executed on behalf of MassMutual Corporate Investors, organized under a
Declaration of Trust, dated September 13, 1985, as amended from time to time. The
obligations of such Trust are not personally binding upon, nor shall resort be had to the
property of, any of the Trustees, shareholders, officers, employees or agents of such Trust,
but the Trust's property only shall be bound.

MASSMUTUAL PARTICIPATION INVESTORS

By: _____
Name:        Michael L. Klofas
Title:         Vice President

The foregoing is executed on behalf of MassMutual Participation Investors, organized under
a Declaration of Trust, dated April 7, 1985, as amended from time to time. The obligations
of such Trust are not personally binding upon, nor shall resort be had to the property of, any
of the Trustees, shareholders, officers, employees or agents of such Trust, but the Trust's
property only shall be bound.

Funds Flow Memorandum

P 02568

A0139

BANCBOSTON VENTURES INC.

By: _Therese Allon_
Name: Therese A Nibi
Title: Director

Funds Flow Memorandum

P 02569

A0140

FROM KENNEDY COVINGTON LOBDELL & HICKMAN, LLP     (TUE) 8. 15' 00 16:14/ST. 16:12/NO. 4862123140 P 4

Aug-15-00   04:25pm   From-Covington & Hickman         +4046524150         T-098   P 002/005   F-194

TRIVEST PRINCIPALS FUND III, L.P.

By: TRIVEST II, Inc., a Florida corporation, its
    General Partner

    By: _____
        William F. Kaczynski, Jr.,
        Managing Director

BANCBOSTON CAPITAL INC.

By: _____
    Name:
    Title

MASS MUTUAL LIFE INSURANCE COMPANY

By: _____
    Name:
    Title

_____
Charles J. Warr

_____
Paul D. Gage

_____
Stephen S. Wilson

_____
Kenneth B. Olender

_____
Daniel A. Jones III

11

P 02570

A0141

FROM KENNEDY COVINGTON LOBDELL & HICKMAN LLP    (TUE) 8.15'00 16:14/ST. 16:12/NO. 4862123140 P  6

---

Charles J. Warr

---

Paul D. Gage

---

Stephen S. Wilson

---

Kenneth B. Olender

---

Daniel A. Jones III

---

G. Kenneth Pope, Jr.

REX INTERNATIONAL, INC.

By: _____

   Name:
   Title:

B.A. CAPITAL COMPANY, L.P.

By:  BA SBIC Management, LLC, General Partner

    By:  BA Equity Management, L.P., Sole Member

      By:  BA Equity Management GP, LLC,
        General Partner

        By _____

          Name:
          Title:

12

P 02571

A0142

FROM KENNEDY COVINGTON LOBDELL & HICKMAN, LLP    (TUE) 8. 15' 00 16:14/ST. 16:12/NO. 4862123140 P. 7

_____

Charles J. Warr

_____

Paul D. Gage

_____

Stephen S. Wilson

_____

Kenneth B. Olender

_____

Daniel A. Jones III

_____

G. Kenneth Pope, Jr.

REX INTERNATIONAL, INC.

By: _____
    Name:
    Title:

B.A. CAPITAL COMPANY, L.P.

By:  BA SBIC Management, LLC, General Partner

    By: BA Equity Management, L.P., Sole Member

        By: BA Equity Management GP, LLC,
            General Partner

        By _____
           Name:
           Title:

12

P 02572

A0143

FROM KENNEDY COVINGTON LOBDELL & HICKMAN, LLP    (TUE) 8. 15' 00 16:14/ST. 16:12/NO. 4862123140 P  8

HELLER FINANCIAL, INC.

By:

Name: Scott E. Gast
Title: Assistant Vice President

13

Received  Aug-15-00  10:45am    From-312 441 8278    To-HUNTON AND WILLIAMS    Page 08

P 02573

A0144

SUNTRUST BANKS, INC.

By: _____

Name: Roger  L. Dadok

Title: Group Vice President

14

P 02574

A0145

**EXHIBIT A**
**TO**
**FUNDS FLOW MEMORANDUM**

**Wire Transfer Information**

See attached.

A-1

P 02575

# PLASSEIN PACKAGING CORPORATION

## Funds Flow at Closing for
## REX INTERNATIONAL, INC.

### August 15, 2000

| | Wire From: | Wire To: | Amount: | Purpose: | Fed Ref # |
|---|---|---|---|---|---|
| Sender/Recipient | Fleet Bank | Heller Financial, Inc. | $1,577,514.94 | Shareholder Consideration | 004584 |
| Account Style | Fleet Capital Corporation | | | | |
| Bank Name | Fleet Bank | Bank One, NA | | | |
| Bank Location | Hartford, CT — 1 Constitution Plaza | Chicago, IL — (1 Bank One Plaza) | | | |
| Account # | Acct: 936-933-7552 | Acct: 55-00540 | $19,170,652.18 | Note Repayment | |
| ABA for wires | ABA #: 011-900-571 | ABA #: 0710-0001-3 | $20,748,167.12 | Total | |
| Attention: | Contact: Liz Waller (770) 859-2400) | Melissa Yolois | | | |
| Additional Instructions | Reference: Plassein Packaging, Corp. | Reference: Heller Financial, Inc./ Corporate Finance / For the benefit of: Rex International, Inb. | | | |
| Sender/Recipient | Fleet Bank | BA Capital Company, L.P. | $25,491,779.76 | Shareholder Consideration | 004590 |
| Account Style | Fleet Capital Corporation | | | | |
| Bank Name | Fleet Bank | Bank of America, N.A. | | | |
| Bank Location | Hartford, CT — 1 Constitution Plaza | Concord, CA | | | |
| Account # | Acct: 936-933-7552 | ABA #121000358 | $2,387,500.00 | Note Repayment | |
| ABA for wires | ABA #: 011-900-571 | Attn: Don Scally | $23,958.32 | Accrued Dividends | |
| Attention: | Contact: Liz Waller (770) 859-2400) | | | | |
| Additional Instructions | Reference: Plassein Packaging, Corp. | For Credit To: / BA Capital Company L.P. / Account No. 12334-30688 / Ref: Account of Rex International, Inc. | $27,903,238.08 | Total | |

A-2

P 02576

| | Wire From: | Wire To: | Amount | Purpose | Fed Ref # |
|---|---|---|---|---|---|
| **Sender/Recipient** | Fleet Bank | Charles J. Warr | $2,347,382.00 | Shareholder | 004605 |
| **Account Style** | Fleet Capital Corporation | | | Consideration & | |
| **Bank Name** | Fleet Bank | Branch Banking & Trust | | Non-Compete | |
| **Bank Location** | Hartford, CT — 1 Constitution Plaza | Thomasville, NC — 521 National Highway | | | |
| **Account #** | Acct: 936-933-7552 | Acct: 5210917049 | | | |
| **ABA for wires** | ABA #: 011-900-571 | ABA #: 053101121 | | | |
| **Attention:** | Contact: Liz Waller (770) 859-2400) | | | | |
| **Additional Instructions** | Reference: Pliassin Packaging, Corp. | | | | |
| | | | | | |
| **Sender/Recipient** | Fleet Bank | Stephen S. Wilson | $1,522,317.98 | Shareholder | 004606 |
| **Account Style** | Fleet Capital Corporation | | | Consideration & | |
| **Bank Name** | Fleet Bank | First Citizens Bank & Trust | | Non-Compete | |
| **Bank Location** | Hartford, CT — 1 Constitution Plaza | Thomasville, NC — 1035 Randolph Street | | | |
| **Account #** | Acct: 936-933-7552 | Acct: 006497262839 | $34,906.99 | Bonus | |
| **ABA for wires** | ABA #: 011-900-571 | ABA #: 053100300 | | | |
| **Attention:** | Contact: Liz Waller (770) 859-2400) | | $1,557,224.97 | Total | |
| **Additional Instructions** | Reference: Pliassin Packaging, Corp. | | | | |
| | | | | | |
| **Sender/Recipient** | Fleet Bank | Kenneth B. Olender | $285,786.68 | Shareholder | 004608 |
| **Account Style** | Fleet Capital Corporation | | | Consideration & | |
| **Bank Name** | Fleet Bank | Summit Credit Union | | Non-Compete | |
| **Bank Location** | Hartford, CT — 1 Constitution Plaza | Greensboro, NC — 800 Summit Avenue | | | |
| **Account #** | Acct: 936-933-7552 | Acct: 82971 | $35,673.56 | Bonus | |
| **ABA for wires** | ABA #: 011-900-571 | ABA #: 253176118 | | | |
| **Attention:** | Contact: Liz Waller (770) 859-2400) | | $321,460.24 | Total | |
| **Additional Instructions** | Reference: Pliassin Packaging, Corp. | | | | |
| | | | | | |
| **Sender/Recipient** | Fleet Bank | Daniel A. Jones III | $171,507.67 | Shareholder | 004609 |
| **Account Style** | Fleet Capital Corporation | | | Consideration & | |
| **Bank Name** | Fleet Bank | Bank of America | | Non-Compete | |
| **Bank Location** | Hartford, CT — 1 Constitution Plaza | | | | |
| **Account #** | Acct: 936-933-7552 | Acct: 652685843 | $23,600.41 | Bonus | |
| **ABA for wires** | ABA #: 011-900-571 | ABA #: 053000196 | | | |
| **Attention:** | Contact: Liz Waller (770) 859-2400) | | $195,108.08 | Total | |
| **Additional Instructions** | Reference: Pliassin Packaging, Corp. | | | | |

A-3

P 02577

A0148

| | Wire From: | Wire To: | Amount: | Purpose: | Fed Ref # |
|---|---|---|---|---|---|
| **Sender/Recipient** | Fleet Bank | G. Kenneth Pope, Jr. | | Shareholder | 004611 |
| **Account Style** | Fleet Capital Corporation | | $171,507.67 | Consideration & | |
| **Bank Name** | Fleet Bank | Reynolds Carolina Federal Credit Union | | Non-Compete | |
| **Bank Location** | Hartford, CT — 1 Constitution Plaza | Winston-Salem, NC | | | |
| **Account #** | Acct: 936-933-7552 | Acct: 12811005620 | | | |
| **ABA for wires** | ABA #: 011-900-571 | ABA #: 253177887 | $26,404.18 | Bonus | |
| **Attention:** | Contact: Liz Waller (770) 859-2400 | | | | |
| **Additional Instructions** | Reference: Pleasin Packaging, Corp. | | $197,911.85 | Total | |
| | | | | | |
| **Sender/Recipient** | Fleet Bank | Paul D. Gage | | Shareholder | 004613 |
| **Account Style** | Fleet Capital Corporation | | $366,477.36 | Consideration & | |
| **Bank Name** | Fleet Bank | BB&T | | Non-Compete | |
| **Bank Location** | Hartford, CT — 1 Constitution Plaza | High Point, NC — (645 N. Main Street) | | | |
| **Account #** | Acct: 936-933-7552 | Acct: 5212403459 | | | |
| **ABA for wires** | ABA #: 011-900-571 | ABA #: 053101121 | $54,658.36 | Bonus | |
| **Attention:** | Contact: Liz Waller (770) 859-2400 | | | | |
| **Additional Instructions** | Reference: Pleasin Packaging, Corp. | | $421,135.72 | Total | |
| | | | | | |
| **Sender/Recipient** | Fleet Bank | The CIT Group/Venture Capital, Inc. | | Note | 004614 |
| **Account Style** | Fleet Capital Corporation | | $796,835.00 | Repayment | |
| **Bank Name** | Fleet Bank | The Chase Manahattan Bank | | | |
| **Bank Location** | Hartford, CT — 1 Constitution Plaza | New York, NY | | | |
| **Account #** | Acct: 936-933-7552 | Acct: 026002503 | | | |
| **ABA for wires** | ABA #: 011-900-571 | ABA #: 021000021 | | | |
| **Attention:** | Contact: Liz Waller (770) 859-2400 | Attn: R. Gleichmann | | | |
| **Additional Instructions** | Reference: Pleasin Packaging, Corp. | Ref: Pay off of Rex International Subordinated Debt | | | |
| | | | | | |
| | | **Total Outbound Wires:** | $4,488,463.06 | | |

A-4

P 02578

A0149

# PLASSEIN PACKAGING CORPORATION
## Funds Flow at Closing for:
### CLOSING AND PROFESSIONAL FEES
#### August 15, 2000

| | Wire From | Wire To: | Amount: | Purpose: | Fed Ref # |
|---|---|---|---|---|---|
| Sender/Recipient | Fleet Bank | Trivest | $972,000 | Plassein | 004616 |
| Account Style | Fleet Capital Corporation | Trivest II, Inc. | | Advisors | |
| Bank Name | Fleet Bank | Northern Trust Bank of Florida, N.A. | | | |
| Bank Location | Hartford, CT — 1 Constitution Plaza | Miami, FL | | | |
| Account # | Acct: 936-933-7552 | Acct: 101008137 | | | |
| ABA for wires | ABA #: 011-900-571 | ABA #: 066009650 | | | |
| Attention: | Reference: Plassein Packaging Corp. | Attn: Patrician Lublan- | | | |
| Additional Instructions | Contact: Liz Waller (770) 859-2400) | Connel | | | |
| Sender/Recipient | Fleet Bank | Bingham Dana | $75,000 | MassMutual | 004620 |
| Account Style | Fleet Capital Corporation | | | Banc/Boston Ventures, Inc. | |
| Bank Name | Fleet Bank | Sovereign Bank New England | | Counsel | |
| Bank Location | Hartford, CT — 1 Constitution Plaza | 90 State House Sq., Hartford, CT | | | |
| Account # | Acct: 936-933-7552 | Acct.: 502-000-13097 | | | |
| ABA for wires | ABA #: 011-900-571 | ABA #: 011-075-150 | | | |
| Attention: | Contact: Liz Waller (770) 859-2400) | Reference: 71173/107769 | | | |
| Additional Instructions | Reference: Plassein Packaging Corp. | | | | |
| Sender/Recipient | Fleet Bank | Kennedy Covington Lobdell & Hickman | $285,500.00 | Res Selling | 004621 |
| Account Style | Fleet Capital Corporation | | | Shareholders' | |
| Bank Name | Fleet Bank | Bank of America | | Counsel | |
| Bank Location | Hartford, CT — 1 Constitution Plaza | Charlotte, N.C.— Main Office | | | |
| Account # | Acct: 936-933-7552 | Acct: 00000107263 | | | |
| ABA for wires | ABA #: 011-900-571 | ABA #: 053000196 | | | |
| Attention: | Contact: Liz Waller (770) 859-2400) | Attn: Elaine Freeze-Forbes 704-350-4561 | | | |
| Additional Instructions | Reference: Plassein Packaging Corp. | Kennedy Covington Lobdell & Hickman Operating Account | | | |

A-5

P 02579

| | Wire From | Wire To: | Amount: | Purpose: | Fed Ref # |
|---|---|---|---|---|---|
| | | Deutsche Banc Securities | $842,342.20 | Rex | 004615 |
| Sender/Recipient | Fleet Bank | Bank of New York | | Selling | |
| Account Style | Fleet Capital Corporation | Bank of New York | | Shareholders' | |
| Bank Name | Fleet Bank | One Wallstreet New York, New York | | Advisor | |
| Bank Location | Hartford, CT — 1 Constitution Plaza | Acct: 890-035-7654 | | | |
| Account # | Acct: 936-933-7552 | ABA # 021-000-018 | | | |
| ABA for wires | ABA #: 011-900-571 | Edith Gomez, Deutsche Banc Securities | | | |
| Attention: | Contact: Liz Waller (770) 859-2400) | Reference: Rex International Advisory | | | |
| Additional Instructions | Reference: Plassein Packaging, Corp. | | | | |
| | | | | | |
| | | Greenberg Traurig | $206,500.00 | Trivest | 004622 |
| Sender/Recipient | Fleet Bank | Greenberg Traurig Trust Account | | Counsel | |
| Account Style | Fleet Capital Corporation | Sun Bank, N.A. | | | |
| Bank Name | Fleet Bank | Miami, Florida (777 Brickell Ave.; 33131) | | | |
| Bank Location | Hartford, CT — 1 Constitution Plaza | Acct: 0189-061130199 | | | |
| Account # | Acct: 936-933-7552 | ABA #: 066000604 | | | |
| ABA for wires | ABA #: 011-900-571 | Atm: Catherine Disteria, Brickell Office | | | |
| Attention: | Contact: Liz Waller (770) 859-2400) | Reference: Trivest/Plassein; 8960.0183; | | | |
| Additional Instructions | Reference: Plassein Packaging, Corp. | M. Hein — Greenberg Traurig | | | |

A-6

P 02580

| | Wire From | Wire To | Amounts | Purpose | Fed Ref # |
|---|---|---|---|---|---|
| **Sender/Recipient** | Fleet Bank | First American Title Insurance Company | $12,236.49 | Title Fees | 004575 |
| **Account Style** | Fleet Capital Corporation | Reference: Title Fees & Costs | | | |
| **Bank Name** | Fleet Bank | Wachovia Bank, NA. | | | |
| **Bank Location** | Hartford, CT — 1 Constitution Plaza | Ft. Lauderdale, Fl. (250 E. Las Olas Blvd.) | | | |
| **Account #** | Acct. 936-933-7552 | Escrow Acct: 13 594 915 | | | |
| **ABA for wires** | ABA #: 011-900-571 | ABA #: 061000010 | | | |
| **Attention** | Contact: Liz Waller (770) 859-2400) | Contact: Tracy Bower (954) 524-4665 | | | |
| **Additional Instructions** | Reference: Plassein Packaging, Corp. | Trust Acct Name: First American Title Insurance Company | | | |
| | | | | | |
| **Sender/Recipient** | Fleet Bank | | $4,000,000 | Escrow Account | 004598 |
| **Account Style** | Fleet Capital Corporation | SunTrust Bank | | | |
| **Bank Name** | Fleet Bank | Corporate Trust Department — Center #008 | | | |
| **Bank Location** | Hartford, CT — 1 Constitution Plaza | A/C #9008000000008 | | | |
| **Account #** | Acct: 936-933-7552 | ABA #: 061000104 | | | |
| **ABA for wires** | ABA #: 011-900-571 | Attn: Rebecca Fischer | | | |
| **Attention** | Contact: Liz Waller (770) 859-2400) | Reference: Plassein Packaging Corp. | | | |
| **Additional Instructions** | Reference: Plassein Packaging, Corp. | | | | |
| | | Total Closing Fees: | $4,393,578.69 | | |

A-7

P 02581

# PLASSEIN PACKAGING CORPORATION
## Funds Flow at Closing

### INVESTORS — INBOUND WIRES
### August 15, 2000

| | Wire From | Wire To: | Amount: | Purpose: | Fed Ref # |
|---|---|---|---|---|---|
| Sender/Recipient | Trivest | Fleet Bank | $1,200,000.00 | Equity | FT0334 |
| Account Style | Trivest Partners, L.P. | Fleet Capital Corporation | | | |
| Bank Name | Northern Trust Bank of Florida, N.A. | Fleet Bank | | | |
| Bank Location | Miami, FL 33131 | Hartford, CT — 1 Constitution Plaza | | | |
| Account # | Acct: 1010049898 | Acct: 936-933-7552 | | | |
| ABA for wires | ABA #: 066009650 | ABA #: 011-900-571 | | | |
| Attention: | Attn: Patricia Lubian | Contact: Liz Waller (770) 859-2400) | | | |
| Additional Instructions | Contact: Patricia Lubian (305) 789-1129 | Reference: Plassein Packaging, Corp. | | | |
| | | | | | |
| Sender/Recipient | Ric International | Fleet Bank | $190,920.87 | Cash on hand | 11015 |
| Account Style | | Fleet Capital Corporation | | | |
| Bank Name | [NEED] | Fleet Bank | | | |
| Bank Location | | Hartford, CT — 1 Constitution Plaza | | | |
| Account # | Acct: | Acct: 936-933-7552 | | | |
| ABA for wires | ABA #: | ABA #: 011-900-571 | | | |
| Attention: | Attn: | Contact: Liz Waller (770) 859-2400) | | | |
| Additional Instructions | Contact: Sandy Wilson | Reference: Plassein Packaging, Corp. | | | |
| | | | | | |
| Sender/Recipient | BancBoston Ventures, Inc. | Fleet Bank | $12,985,000.00 | Subordinated Debt | N.A. — Intercompany transfer |
| Account Style | | Fleet Capital Corporation | | | |
| Bank Name | [NEED] | Fleet Bank | | | |
| Bank Location | | Hartford, CT — 1 Constitution Plaza | $4,000,000.00 | Equity | |
| Account # | Acct: | Acct: 936-933-7552 | | | |
| ABA for wires | ABA #: | ABA #: 011-900-571 | | | |
| Attention: | Attn: | Contact: Liz Waller (770) 859-2400) | $16,985,000.00 | Total | |
| Additional Instructions | Contact: | Reference: Plassein Packaging, Corp. | | | |

A-8

P 02582

A0153

| Sender/Recipient | Wire From | Wire To: | Amount: | Purpose: | Fed Ref # |
|---|---|---|---|---|---|
| Sender/Recipient | Mass Mutual Life Insurance Company | Fleet Bank | $17,885,000.00 | Subordinated | 08158B1OGC02 C003603 |
| Account Style: | | Fleet Capital Corporation | | Debt | 08158B1O8022C 003639 |
| Bank Name: | | Fleet Bank | | | 08158B1OGC02 C003604 |
| Bank Location | [NKMR] | Hartford, CT — 1 Constitution Plaza | | | 08158B1OGC06 C003454 |
| Account # | Acct: | Acct: 956-933-7552 | $4,000,000.00 | Equity | |
| ABA for wires | ABA #: | ABA #: 011-900-571 | | | |
| Attention: | Attn: | Contact: Liz Waller (770) 859-2400) | | | |
| Additional Instructions | Contact: | Reference: Plassein Packaging, Corp. | $21,885,000.00 | Total | |
| | | | | | |
| | | | | | |
| Sender/Recipient | SunTrust Bank | Fleet Bank | $4,900,000.00 | Subordinated | 3311 |
| Account Style | | Fleet Capital Corporation | | Debt | |
| Bank Name | | Fleet Bank | | | |
| Bank Location | [NKMR] | Hartford, CT — 1 Constitution Plaza | | | |
| Account # | Acct: | Acct: 956-933-7552 | | | |
| ABA for wires | ABA #: | ABA #: 011-900-571 | | | |
| Attention: | Attn: | Contact: Liz Waller (770) 859-2400) | | | |
| Additional Instructions | Contact: | Reference: Plassein Packaging, Corp. | | | |
| | | Total Inbound Wires: | $45,160,926.87 | Total | |

A-9

P 02583

A0154

P 02584

A0155

# EXHIBIT G

final w/ tax

| Rex | B/S @ 9/15 | Audit Adj | Closing B/S | Opening Adj | Opening B/S |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **Current Assets** | | | | | |
| Cash and Cash Equivalents | 273,506 | 0 | 273,506 | (190,921) | 82,585 |
| Accounts Receivable, net of allowances | 7,973,482 | 0 | 7,973,482 | (80,000) | 7,893,482 |
| Inventory | 6,927,033 | 0 | 6,927,033 | 619,837 | 7,546,870 |
| Prepaids & Other Current | 39,790 | 0 | 39,790 | | 39,790 |
| Total Current Assets | 15,213,811 | 0 | 15,213,811 | 348,716 | 15,562,527 |
| **Property and Equipment, at cost** | | | | | |
| Fixed Assets | 34,514,306 | 0 | 34,514,306 | (13,033,141) | 21,481,165 |
| Less: Accum.depreciation | (21,288,326) | 0 | (21,288,326) | 21,288,326 | 0 |
| Net Property and Equipment | 13,225,980 | 0 | 13,225,980 | 8,255,185 | 21,481,165 |
| Intercompany | 0 | 0 | 0 | 0 | 0 |
| Other Assets | 21,920 | 0 | 21,920 | (21,920) | 0 |
| Patents | 14,086 | 0 | 14,086 | | 14,086 |
| Lease Deposit | 2,850 | 0 | 2,850 | | 2,850 |
| Deferred Income Taxes | 292,745 | 0 | 292,745 | (166,349) | 292,745 |
| Deferred Loan Cost | 166,349 | 0 | 166,349 | (166,349) | 0 |
| Goodwill | 3,139,088 | 0 | 3,139,088 | 27,724,217 | 30,863,315 |
| **TOTAL ASSETS** | 32,086,839 | 0 | 32,086,839 | 36,149,849 | 68,216,688 |
| **LIABILITIES** | | | | | |
| **Current Liabilities** | | | | | |
| Accounts Payable | 2,840,821 | 0 | 2,840,821 | | 2,840,821 |
| Accrued Liabilities | 1,181,381 | 0 | 1,181,381 | 908,054 | 2,089,435 |
| Notes Payable | 87,998 | 0 | 87,998 | | 87,998 |
| Deferred Revenue | 0 | 0 | 0 | 100,000 | 100,000 |
| Current Portion of Senior Debt | 0 | 0 | 0 | | 0 |
| Current Portion of Subordinated Debt | 0 | 0 | 0 | | 0 |
| Total Current Liabilities | 4,109,999 | 0 | 4,109,999 | 1,008,054 | 5,118,053 |
| Old Bank Debt | 23,707,325 | 0 | 23,707,325 | (23,707,325) | 0 |
| New Bank Debt | 0 | 0 | 0 | 48,000,000 | 48,000,000 |
| Senior Subordinated Debt | 0 | 0 | 0 | | 0 |
| Seller Subordinated Debt | 0 | 0 | 0 | | 0 |
| Other Long-Term Liabilities | 0 | 0 | 0 | | 0 |
| Total Long-Term Liabilities | 23,707,325 | 0 | 23,707,325 | 24,292,675 | 48,000,000 |
| Deferred Income Taxes | 260,957 | 0 | 260,957 | 3,191,812 | 3,452,769 |
| **TOTAL LIABILITIES** | 28,078,282 | 0 | 28,078,282 | 28,492,541 | 56,570,823 |
| **Shareholders' Equity** | | | | | |
| Common Stock | 5,615,769 | 0 | 5,615,769 | (5,615,769) | 0 |
| Paid in Capital | 0 | 0 | 0 | 11,645,865 | 11,645,865 |
| Treasury Stock | (3,750,000) | 0 | (3,750,000) | 3,750,000 | 0 |
| Retained Earnings | 2,122,788 | 0 | 2,122,788 | (2,122,788) | 0 |
| Total Shareholders' Equity | 3,988,557 | 0 | 3,988,557 | 7,657,508 | 11,645,865 |
| **TOTAL LIABILITIES AND EQUITY** | 32,086,839 | 0 | 32,086,839 | 36,149,849 | 68,216,688 |

P 08825

A0157

**Closing Entries - Rex**

|  | Db | Cr |
|---|---|---|

**(1)**

| | Db | Cr |
|---|---|---|
| Db: Accumulated Depreciation | 21,288,326 | |
| Cr: Fixed Assets | | 13,033,141 |
| Cr: Goodwill | | 8,255,185 |
| To record fair value of fixed assets | | |

**(2)**

| | Db | Cr |
|---|---|---|
| Db: Long Term Debt | 23,707,325 | |
| Db: Goodwill | 31,330,346 | |
| Db: Retained Earnings | 2,122,788 | |
| Db: Reserve for LIFO | 619,637 | |
| Db: Common Stock | 608,436 | |
| Db: Preferred Stock | 5,000,000 | |
| Db: Warrants | 7,333 | |
| Cr: Treasury Stock | | 3,750,000 |
| Cr: Additional Paid-in-Capital (APIC) | | 59,645,865 |
| To book payoff of debt and pre-fair value of Goodwill | | |

**(3)**

| | Db | Cr |
|---|---|---|
| Db: APIC | 48,000,000 | |
| Cr: Long Term Debt | | 48,000,000 |
| To record push down of Plassein Debt | | |

**(4)**

| | Db | Cr |
|---|---|---|
| Db: Accrued Wages | 517,023 | |
| Db: Accrued Interest | 297,517 | |
| Db: Goodwill | 1,457,244 | |
| Cr: Deferred Income | | 100,000 |
| Cr: Accrued P/R Taxes | | 41,000 |
| Cr: Accrued Purchase adjustments | | 1,316,594 |
| Cr: Accrued Retention Bonuses | | 385,000 |
| Cr: Cash | | 190,921 |
| Cr: Allowance for Doubtful Accts | | 80,000 |
| Cr: Deferred Loan Costs | | 156,349 |
| Cr: Other Assets | | 21,920 |
| | | |
| Db: Goodwill | 3,191,812 | |
| Cr: Deferred Tax Liability | | 3,191,812 |
| | **138,147,787** | **138,147,787** |

P 08826

A.0158

C

SARNA & ASSOCIATES, PC

179 001/APP-Dismbe Adversary Complaint vF
14-Jun-05  15;41

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

----------------------------------------------------- :

IN RE: :
:
PLASSEIN INTERNATIONAL CORP., *ET AL.*,   : CHAPTER 7 CASE
: No.: 03-11489 (WS)
DEBTORS :
:
:
:
----------------------------------------------------- :
:
WILLIAM BRANDT, AS HE IS THE TRUSTEE OF THE :
ESTATES OF PLASSEIN INTERNATIONAL CORP., *ET* :
*AL.*,   : ADV. PRO. NO.
: 05-50692 (WS)
PLAINTIFF :
:
V. :
:
B.A. CAPITAL COMPANY, *ET AL.*, :
:
DEFENDANTS :.
:
----------------------------------------------------- :

## APPLICATION
## OF THE MARSHALL PLASTIC FILM DEFENDANTS, PURSUANT TO
## FEDERAL RULE OF BANKRUPTCY PROCEDURE 7012(B)
## FOR ENTRY OF AN ORDER DISMISSING THE ADVERSARY COMPLAINT
## AS IT RELATES TO THE MARSHALL PLASTIC FILM DEFENDANTS

TO THE HONORABLE WALTER SHAPERO
UNITED STATES BANKRUPTCY JUDGE:

The Andrew Marshall Forsberg Trust, The Ethel Forsberg Revocable Trust, The Janis

Rae Forsberg Trust, Frank John McCarthy, Daniel R. Orris and Bernadine Orris (collectively, the

"Marshall Plastic Film Defendants"), by their co-counsel, hereby move for Judgment on the

Pleadings and submit this Application for entry of an Order, substantially in the form attached

Page 1 of 3

SARNA & ASSOCIATES, PC
99 MAIN STREET
NYACK, NEW YORK 10960
845.348.0822
845.816.4141 – FACSIMILE

A0159

hereto as Exhibit "A" dismissing Counts I and III of the Adversary Complaint (as these Counts apply to the Marshall Plastic Film Defendants) upon which this Adversary Proceeding is based, and respectfully represent and allege as follows:

1.    Only Counts I and III of the Complaint set forth claims against the Marshall Plastic Film Defendants.

2.    Counts I and III attempt to state a cause of action for recovery of transfers under § 544 of the Bankruptcy Code and §§ 1304 and 1305 of the Delaware Fraudulent Transfer Statute and to assert a lien for the benefit of the Estates with regard to such transfers under § 551 of the Bankruptcy Code.

3.    For the reasons more fully set forth in the Brief in Support of this Motion filed herewith, Counts I and III must be dismissed because (a) the claims set forth therein are barred by § 546(e) of the Bankruptcy Code and (b) the Trustee does not have the right to bring an action under §1309 of the Delaware Fraudulent Transfer Statutes, as more fully discussed in the Memorandum of Law.

[Concluded on Next Page]

SARNA & ASSOCIATES, PC

178 001/APP-Dismiss Adversary Complaint vF
14-Jun-05 16:41

WHEREFORE, the Marshall Plastic Film Defendants are entitled to judgment on the

pleadings as a matter of law, and respectfully request that they be dismissed from this case.

Dated:   Nyack, NY           Respectfully Submitted,
         June _15_, 2005      The Andrew Marshall Forsberg Trust, The Ethel Forsberg
                              Revocable Trust, The Janis Rae Forsberg Trust, Frank John
                              McCarthy, Daniel R. Orris and Bernadine Orris
                              By their co-counsel,

                              SARNA & ASSOCIATES, PC
                              By:

                              /s/ James A. Sarna
                              James A. Sarna (JAS-6667)
                              A Member of the Firm
                              99 Main Street
                              Nyack, New York 10960
                              Telephone:   (845) 348-9822
                              Facsimile:   (845) 818-4141

                              and

Dated:   Wilmington, DE       JASPAN SCHLESINGER HOFFMAN LLP
         June _15_, 2005

                              /s/ Frederick B. Rosner
                              By:  Frederick B. Rosner (No. 3995)
                              913 North Market Street, 12th Floor
                              Wilmington, Delaware 19801
                              Telephone:   (302) 351-8000
                              Facsimile:   (302) 351-8010

SARNA & ASSOCIATES, PC
99 MAIN STREET
NYACK, NEW YORK 10960
845.348.9822
845.818.4141 – FACSIMILE

A0161

SARNA & ASSOCIATES, PC

178 091/ORD-Dismiss Adversary Complaint vF
14-Jun-05 16:35

EXHIBIT A
TO THE APPLICATION

PROPOSED ORDER DISMISSING COMPLAINT
AS IT APPLIES TO THE MARSHALL PLASTIC FILM DEFENDANTS

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

----------------------------------------------  :
IN RE:                                          :
                                                :
PLASSEIN INTERNATIONAL CORP., ET AL.,           :   CHAPTER 7 CASE
                                                :   NO.: 03-11489 (WS)
                DEBTORS                          :
                                                :
                                                :
----------------------------------------------  :
                                                :
WILLIAM BRANDT, AS HE IS THE TRUSTEE OF THE     :
ESTATES OF PLASSEIN INTERNATIONAL CORP., ET     :
AL.,                                            :   ADV. PRO. NO.
                                                :   05-50692 (WS)
                PLAINTIFF                        :
                                                :
        V.                                       :
                                                :
B.A. CAPITAL COMPANY, ET AL.,                   :
                                                :
                DEFENDANTS                       :
                                                :
----------------------------------------------  :

## ORDER DISMISSING THE ADVERSARY COMPLAINT
## AS IT RELATES TO THE MARSHALL PLASTIC FILM DEFENDANTS

Upon the Application of The Andrew Marshall Forsberg Trust, The Ethel Forsberg

Revocable Trust, The Janis Rae Forsberg Trust, Frank John McCarthy, Daniel R. Orris and

Bernadine Orris (collectively, the "Marshall Plastic Film Defendants"), dated June ___, 2005

(the "Motion to Dismiss"), for Judgment on the Pleadings and entry of an Order dismissing the

Page 1 of 3

SARNA & ASSOCIATES, PC
99 MAIN STREET
NYACK, NEW YORK 10960
845.348.9822
845.818.4141 – FACSIMILE

A0162

SARNA & ASSOCIATES, PC

178.001/ORD-Dismiss Adversary Complaint vF
14-Jan-05  15:36

Adversary Complaint upon which this Adversary Proceeding is based as it relates to the Marshall

Plastic Film Defendants (specifically, Counts I and III); and Notice of the Motion to Dismiss

having been properly given to the plaintiff, William Brandt, Trustee of the Estates of Plassein

International Corp. ("Plaintiff"), the Office of the United States Trustee and all other interested

and necessary parties; and a hearing having been held on the Motion to Dismiss on _____

____, 2005 at which time any and all objections to the Motion to Dismiss were considered and

either withdrawn or overruled; and it appearing that the relief requested by the Marshall Plastic

Film Defendants in the Motion to Dismiss is reasonable and appropriate for the reasons set forth

in the Motion to Dismiss and the accompanying Memorandum of Law and as otherwise argued

at the Hearing on the Motion to Dismiss; it is hereby

FOUND AND DETERMINED THAT the Marshall Plastic Film Defendants have

articulated good and sufficient reasons for the dismissal of the Adversary Complaint at it applies

to the Marshall Plastic Film Defendants; and it is further

FOUND AND DETERMINED THAT notice of the Motion to Dismiss was given in

accordance with all applicable provisions of the Federal and Local Bankruptcy Rules,

Bankruptcy Code and Orders of this Court; and it is further

FOUND AND DETERMINED THAT a reasonable opportunity to object or be heard

with respect to the Motion to Dismiss has been afforded to all interested persons and entities;

and it is further

FOUND AND DETERMINED THAT the Adversary Complaint filed by the Plaintiff

does not state a claim upon which relief may be granted and therefore should be dismissed as

provided in Federal Rule of Bankruptcy Procedure 7012(b) which makes Federal Rule of Civil

SARNA & ASSOCIATES, PC
99 MAIN STREET
NYACK, NEW YORK 10960
845.348.9822
845.818.4141 - FACSIMILE

Page 2 of 3

A0163

Procedure 12(b)(6) applicable to adversary proceedings.

NOW, THEREFORE, IT IS ORDERED that the Motion to Dismiss is granted in its

entirety, as set forth in detail on the record and that, as it applies to the Marshall Plastic Film

Defendants, the Adversary Complaint is dismissed in its entirety.

Dated: Wilmington, Delaware
_____ _____, 2005

_____
WALTER SHAPERO
UNITED STATES BANKRUPTCY JUDGE

SARNA & ASSOCIATES, PC
99 MAIN STREET
NYACK, NEW YORK 10960
845.348.9022
845.818.4141 -- FACSIMILE

A0164

**D**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In Re: | ) |
| | ) **Chapter 7** |
| | ) **Case No. 03-11489 (RB)** |
| **PLASSEIN INTERNATIONAL CORP., et al.,** | ) |
| | ) **Jointly Administered.** |
| Debtors. | ) |
| | ) |
| **WILLIAM BRANDT, AS HE IS THE** | ) |
| **TRUSTEE OF THE ESTATES OF** | ) |
| **PLASSEIN INTERNATIONAL CORP.,** | ) |
| **et al.,** | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **Adv. Pro. No. 05-50692-RB** |
| | ) |
| **B.A. CAPITAL COMPANY LP, et al.,** | ) |
| | ) |
| Defendants. | ) |
| | ) |

### B.A. CAPITAL COMPANY LP'S MOTION TO DISMISS COMPLAINT

B.A Capital Company LP ("BACC") moves to dismiss the complaint commencing this adversary proceeding for failure to state a claim and because the transfers at issue were settlement payments not subject to avoidance. In the event the complaint is not dismissed against it, BACC seeks severance of the claims against BACC from the claims involving a transaction with which BACC has no connection.

### BACKGROUND

#### The Allegations In The Complaint

1.      William Brandt is the Chapter 7 trustee (the "Trustee") of several debtors, including Plassein International Corp ("Plassein"). The complaint alleges that Plassein

was formed to acquire the stock of several manufacturers of flexible packaging and specialty film, presumably to gain the benefits of size, economies of scale and synergies. Complaint, par 27. The Trustee brings this action against BACC and several other defendants, under Section 544 of the Bankruptcy Code and Sections 1304 and 1305 of the Delaware Code, to avoid certain payments made to the defendants, all of whom are former shareholders of one of six companies, as payments for their stock

2.     The complaint addresses two sets of transactions, one set denoted the "January Acquisitions," which involve the acquisitions of five separate companies, and the other the "Rex Acquisition," which involves a single company  As to BACC, the complaint seeks to avoid a payment for the purchase of BACC's stock in Rex International, Inc. ("Rex"), an entity acquired by Plassein Packaging Corp ("Packaging") on August 15, 2000, pursuant to a stock purchase agreement.[1] See Complaint, pars 48-61 [2] The complaint does not describe the relationship, if any, between Packaging and any of the debtors represented by the Trustee.  Indeed, the Trustee does not allege that Packaging was a debtor

3.     The complaint alleges that Packaging, not Rex, was the transferor of the payments to BACC  See complaint, Ex F, p 6 ("At Closing, [Packaging] shall cause to be transferred a total of $31,934,274.06, in immediately available funds, to the Rex Selling Shareholders to the accounts specified on Exhibit A hereto as follows:  B A.

---

[1] After the acquisition, Rex changed its name to Plassein International of Thomasville, Inc., a debtor in these cases  For convenience, the entity will be called "Rex" in these papers, as it is in the complaint

[2] The Trustee appends a number of documents to the complaint  Only two of these, Exhibits F and G, are relevant to the Rex Transaction  Exhibit F, which is a "Funds Flow Memorandum and Letter of Direction" indicates that Rex is to be acquired by Plassein Packaging Corp. The "Funds Flow at Closing" exhibit demonstrates that certain funds were transferred from Fleet Bank, on behalf of Plassein Packaging Corp , to Bank of America, N.A., on behalf of BACC as consideration for the purchase of Rex shares, a note repayment and dividends  See Ex. F., p A-2.

A0166

Capital Company, L P $25,491,779.76")  The complaint further alleges that Rex's net worth was positive before the Rex Transaction  Id , par 56  The complaint then concludes that Rex was rendered insolvent as a consequence of the transaction, even though no causal relationship is alleged  Id , pars. 58-61  The complaint alleges that the Rex Transaction was a fraudulent conveyance as to creditors of Rex, and as to creditors of the "January Target Companies," five other companies allegedly bought prior to the acquisition of Rex by Packaging  Id , par. 96

4      Finally, the complaint alleges that Plassein's lenders agreed to increase the availability under Plassein's existing credit agreement to permit Plassein to acquire the shares of Rex, and that Plassein agreed that Rex would thereafter become a borrower and would grant a security interest in its assets.  Id., pars. 49-50.

### The Bankruptcies And This Complaint

5      The complaint alleges that Rex was in default to its lenders by November 2001, and filed a Chapter 11 bankruptcy petition on May 14, 2003, about two and a half years after the Rex Acquisition.  Complaint, par. 65  Rex's Chapter 11 case, and related cases, were apparently converted to Chapter 7, and the Trustee was appointed on February 6, 2004. Id , par 1. This complaint was filed on April 5, 2005

### ARGUMENT

### A.    The Complaint Fails To State A Claim

6      The Trustee's claims against BACC are based upon 6 Del. Code §§ 1304 and 1305, as imported through 11 U S C. § 544  Both sections require, as an essential element of a cause of action, a transfer by the debtor  However, the complaint does not allege that a debtor made a transfer to BACC.  Indeed, the documents appended to the complaint evidence the fact that none of the debtors made the transfers now sought to be

avoided.  Further, the complaint does not allege that the transferor was insolvent, or rendered insolvent, by the Rex Acquisition.  Therefore, the complaint must be dismissed for failure to state a claim.

7.    Section 1304 provides in relevant part:

(A)  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

\* \* \*

(2)  Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

a.  Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

b.  Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Section 1305 provides in relevant part:

(a)    A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Thus, the Trustee must allege that (1) the debtor made a transfer (2) for less than equivalent value and (3) the debtor was, or was rendered, insolvent.  The complaint and its exhibits demonstrate that no claim exists.

8.    First, payment for the Rex shares was made by Fleet Bank for Packaging, not Rex.  See complaint, Ex. F.  Since no transfer was made by Rex there is no basis for any fraudulent conveyance claim by creditors of Rex.

9       Second, the facts alleged in the complaint, as opposed to its conclusions, demonstrate that Rex's solvency was not affected by the Rex Acquisition. The complaint alleges that before the closing the net worth of Rex was positive. Complaint, par 56. No payments were alleged to have been made by Rex. Therefore, there could have been no change in Rex's net worth based upon this transaction, which simply changed ownership of the stock from BACC to Packaging. Consequently, the complaint fails to allege the elements of a fraudulent transfer.

**B.      The Transfers Are Settlement Payments And Are Not Subject To Avoidance**

10      The complaint alleges that transfers from Packaging to BACC in connection with BACC's sale of its stock in Rex were made through Fleet Bank, a financial institution, to settle the purchase of securities. As a consequence, the payments are settlement payments, not subject to avoidance.

11      Bankruptcy Code Section 544(b) authorizes the Trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law." However, Section 546(e) provides, in relevant part, that notwithstanding section 544, "the trustee may not avoid a transfer that is a settlement payment as defined by section 101 or 741 of this title, made by or to a .    . financial institution." Section 741(8) defines "settlement payment" as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." The term "financial institution is defined as a Federal reserve bank or an entity .    that is a commercial or savings bank .    when any

such Federal reserve bank . . . or entity is acting as agent or custodian for a customer in connection with a securities contract." 11 U.S.C. § 101(22)(i).

12    The Court of Appeals for the Third Circuit has ruled that the term "settlement payment" has an "extremely broad" meaning. <u>Bevill, Bresler & Schulman Asset Management Corp. v. Spencer Savings & Loan Ass'n</u>, 878 F.2d 742, 751 (3d Cir 1989). "[A] settlement payment is generally the transfer of cash or securities made to complete a securities transaction." <u>In re Resorts International, Inc.</u>, 181 F.3d 505, 515 (3d Cir. 1999). "So long as a financial institution is involved, the payment is an unavoidable 'settlement payment.'" <u>In re Hechinger Investment Company of Delaware</u>, 274 B.R. 71, 87 (D. Del 2002); <u>see also</u> <u>In re Loranger Manufacturing Corp.</u>, No. Bankr 01-12307JKF, ADV 03-1227JKF, 2005 WL 821265, at *9-10 (Bankr W.D. Pa. Apr. 7, 2005) (copy attached as Ex. A) (holding that debtor's leveraged buyout of defendant's shares was a "settlement payment" under 546(e) because payment was made through a financial institution, and rejecting plaintiffs' arguments that bank's involvement was "mere facilitation")

13    Here, the documents appended to the complaint demonstrate that payment to BACC was made by a financial institution, Fleet Bank, to another financial institution, Bank of America, to settle a securities transaction, the purchase of Rex's stock by Packaging from BACC. <u>See</u> Funds Flow Memorandum, Exhibit F to the complaint. Consequently, the transfers to BACC are not subject to avoidance by the Trustee, and the complaint must be dismissed.

RLF1-2886923-1

A0170

**C.    BACC Should Be Dropped As A Party Or The Claims Against It Should Be Severed**

14    In the unlikely event that this complaint is not dismissed as to BACC, the claims relating to the Rex Acquisition should be severed from the claims relating to the January Acquisitions   The transactions are separate, involve separate shareholders, and raise separate issues

15    Federal Rule of Civil Procedure 21 (FRCP 21), "Misjoinder and Non-Joinder of Parties," made applicable by Federal Rule of Bankruptcy Procedure 7021, provides that misjoined parties "may be dropped   .  by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." FRCP 21 further provides that "[a]ny claim against a [misjoined] party may be severed and proceeded with separately "  See U.S. ex rel. LaCorte v. Smithkline Beecham Clinical Labs., 149 F 3d 227, 231 n 3 (3d Cir. 1998) (claim against a party may be severed and the "severed claim proceeds as a discrete suit and results in its own final judgment from which an appeal may be taken")

16.    Misjoinder has been construed by courts as encompassing those cases that fail to satisfy the conditions for permissive joinder under Federal Rule of Civil Procedure 20(a)   See Glendora v. Malone, 917 F. Supp. 224, 227 (S D N.Y  1996)   Rule 20(a) permits joinder if the claims against defendants arise out of the same transaction or occurrence or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.  This requirement is cumulative in nature, that is, both the common question and the same transaction portions must be satisfied   King v. Pepsi Cola Metropolitan Bottling Co., 86 F.R.D. 4, 5 (E.D. Pa 1979)

RLF1-2886923-1

A0171

17.    Here, the claims arising in connection with the Rex Acquisition are asserted against parties that are not parties to the earlier transactions, and involve a completely separate set of transfers. The questions of law and fact applicable to the fraudulent transfer claims asserted against the defendants involved in the January Acquisitions are completely separate from the questions of law and fact applicable to the claim against BACC regarding the Rex Acquisition  Therefore, the claims involving the two sets of transfers should be severed

## CONCLUSION

18.    The complaint should be dismissed with prejudice for failure to state a claim and because the transfers at issue were settlement payments not subject to avoidance. In the alternative, the claims involving the separate acquisitions should be severed

OF COUNSEL:
Karen B. Wagner
Elliot Moskowitz
DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York 10017
Telephone:  (212) 450-4000
Telephone:  (212) 450-3800

Dated: Wilmington, Delaware
      June 15, 2005

Robert J. Stearn, Jr  (No  2915)
Michael J  Merchant (No. 3854)
RICHARDS, LAYTON & FINGER, P A
One Rodney Square
P O  Box 551
Wilmington, Delaware, 19899
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

Attorneys for Defendant B A  Capital
Company, LP

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | Chapter 7 |
| | ) | Case No. 03-11489 (RB) |
| **PLASSEIN INTERNATIONAL CORP., et al.,** | ) | |
| | ) | **Jointly Administered.** |
| Debtors. | ) | |
| | ) | |
| | ) | |
| **WILLIAM BRANDT, AS HE IS THE** | ) | |
| **TRUSTEE OF THE ESTATES OF** | ) | |
| **PLASSEIN INTERNATIONAL CORP.,** | ) | |
| **et al.,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adv. Pro. No. 05-50692-RB** |
| | ) | |
| **B.A. CAPITAL COMPANY LP, et al.,** | ) | |
| | ) | **Obj Deadline: 6/29/05 @ 4:00 p.m.** |
| Defendants. | ) | **Hearing Date: N/A** |
| | ) | |

### NOTICE OF B.A. CAPITAL COMPANY LP'S
### MOTION TO DISMISS COMPLAINT

PLEASE TAKE NOTICE that B.A. Capital Company LP today has filed the

attached **B.A. Capital Company LP's Motion to Dismiss Complaint** (the "Motion")

with the United States Bankruptcy Court for the District of Delaware, 824 Market Street,

3rd Floor, Wilmington, Delaware 19801

PLEASE TAKE FURTHER NOTICE that any responses or objections to the

Motion must be in writing, filed with the Clerk of the Bankruptcy Court, 824 Market

Street, 3rd Floor, Wilmington, Delaware 19801, and served upon and received by the

undersigned counsel on or before **4:00 p.m. (EDT) on June 29, 2005**

RLF1-2887128-1

IF NO OBJECTIONS TO THE MOTION ARE TIMELY FILED, SERVED AND RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

OF COUNSEL:
Karen B. Wagner
Elliot Moskowitz
DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Telephone: (212) 450-3800

Dated: Wilmington, Delaware
       June 15, 2005

Robert J. Stearn, Jr. (No. 2915)
Michael J. Merchant (No. 3854)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware, 19899
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

Attorneys for Defendant B A Capital
Company, LP

2

A0174

# EXHIBIT A

Westlaw.

2005 WL 821265                                                                    Page 1
— B.R. ——, 2005 WL 821265 (Bankr.W.D.Pa.), 44 Bankr.Ct.Dec. 159
(Cite as: 2005 WL 821265 (Bankr.W.D.Pa.))

United States Bankruptcy Court,
W.D. Pennsylvania.
In re LORANGER MANUFACTURING CORPORATION,
Debtor.
Loranger Manufacturing Corporation and the Committee of
Unsecured Creditors of
Loranger Manufacturing Corporation, Plaintiffs,
v.
PNC Bank, National Association, George P. Loranger, John
P. Loranger, Janet O.
Loranger and Schaffner, Knight, Minnaugh & Company,
P.C., Defendants.
Bankr. No. 01-12307 (JKF).
Adversary No. 03-1227 (JKF).

April 7, 2005

**Background:** Chapter 11 debtor-corporation and committee
of unsecured creditors brought adversary proceeding against
debtor's former officer, asserting claims for breach of
fiduciary duty, negligence, unjust enrichment, and
intentional and constructive fraudulent transfer. Former
officer moved to dismiss.

**Holdings:** The Bankruptcy Court, Judith K. Fitzgerald, J.,
held that:
(1) under Pennsylvania law, the discovery rule exception to
the statute of limitations defense was inapplicable to the
instant proceeding;
(2) genuine issues of material fact existed as to whether,
pursuant to the doctrine of adverse domination, the
conduct of debtor's sole officer, director, and shareholder equitably
tolled the statute of limitations on plaintiffs' tort claims
against former officer;
(3) former officer failed to establish that plaintiffs' claim for
unjust enrichment was preempted;
(4) plaintiffs failed to establish their claim for intentional
fraudulent transfer; and
(5) former officer established a "settlement payment
defense" and, thus, debtor's wire transfer of $9 million to
him could not be avoided by debtor-in-possession.
Motion granted in part and denied in part

**[1] Bankruptcy ☞2162**

51k2162 Most Cited Cases
In evaluating a motion to dismiss for failure to state a claim,
the court must assume the facts alleged in the complaint to
be true and draw all factual inferences in favor of the
non-moving party. Fed.Rules Bankr.Proc.Rule 7012(b), 11
U.S.C.A.; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[2] Bankruptcy ☞2163**
51k2163 Most Cited Cases
Party moving to dismiss for failure to state a claim has the
burden of proving that no claim has been stated. Fed.Rules
Bankr.Proc.Rule 7012(b), 11 U.S.C.A.; Fed.Rules
Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[3] Bankruptcy ☞2162**
51k2162 Most Cited Cases

**[3] Bankruptcy ☞2163**
51k2163 Most Cited Cases
To prevail on its motion to dismiss for failure to state a
claim, movant must show beyond doubt that the plaintiff
can prove no set of facts in support of his claim that would
entitle him to relief. Fed.Rules Bankr.Proc.Rule 7012(b), 11
U.S.C.A.; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[4] Limitation of Actions ☞95(1)**
241k95(1) Most Cited Cases
Under Pennsylvania law, the discovery rule exception to the
rule barring suit after the statute of limitations has expired
arises from the inability of the injured party, despite the
exercise of reasonable diligence, to know of the injury or its
cause.

**[5] Limitation of Actions ☞95(1)**
241k95(1) Most Cited Cases
Under Pennsylvania law, plaintiff's knowledge of the injury,
or imputed knowledge, is essence of discovery rule
exception to the rule barring suit after statute of limitations
has expired.

**[6] Limitation of Actions ☞95(1)**
241k95(1) Most Cited Cases
Under Pennsylvania law, the discovery rule does not apply
to extend the statutory limitations period where plaintiff
knew, or was imputed to know, of the injury.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2005 WL 821265                                                                    Page 2
— B.R. —, 2005 WL 821265 (Bankr.W.D.Pa.), 44 Bankr.Ct.Dec. 159
(Cite as: 2005 WL 821265 (Bankr.W.D.Pa.))

**[7] Limitation of Actions ☞95(18)**
241k95(18) Most Cited Cases
Under Pennsylvania law, the discovery rule exception to the statute of limitations defense was inapplicable to adversary proceeding brought by Chapter 11 debtor-corporation against its former officer; individual who was debtor's sole owner, director, and officer, and who exercised complete control over debtor during the relevant period, knew or should have known that, in exchange for its $9 million payment to former officer for his shares of stock in debtor, debtor did not receive reasonably equivalent value, this individual's knowledge of the alleged injury to debtor was imputed to the corporate body of debtor, and so, since debtor knew of any injury or potential injury of which this individual was aware, there was no injury for debtor to "discover" pursuant to the discovery rule. 42 Pa.C.S.A. § 5524(7).

**[8] Limitation of Actions ☞95(1)**
241k95(1) Most Cited Cases
Purpose of the discovery rule is to determine the accrual date of a claim, for ultimate purposes of determining, as a legal matter, when the statute of limitations begins to run.

**[9] Limitation of Actions ☞104.5**
241k104.5 Most Cited Cases
Equitable tolling steps in to toll, or stop, the running of the statute of limitations in light of established equitable considerations.

**[10] Bankruptcy ☞2164.1**
51k2164.1 Most Cited Cases
Genuine issues of material fact existed as to whether, pursuant to the doctrine of adverse domination, the conduct of Chapter 11 debtor-corporation's sole officer, director, and shareholder equitably tolled the statute of limitations on claims against debtor's former officer for breach of fiduciary duty, negligence, and unjust enrichment, precluding summary judgment in adversary proceeding brought by debtor and unsecured creditors committee.

**[11] States ☞18.5**
360k18.5 Most Cited Cases
Under the doctrine of conflict preemption, state laws that interfere with or are contrary to federal law are preempted

and without effect pursuant to the Supremacy Clause of the United States Constitution. U.S.C.A. Const. Art. 6, cl. 2.

**[12] Bankruptcy ☞2002**
51k2002 Most Cited Cases
Former officer of Chapter 11 debtor-corporation failed to establish that state-law claim for unjust enrichment brought against him by debtor and committee of unsecured creditors was preempted by the Bankruptcy Code; question was complex and rooted in constitutional law, and officer cited only one case in support of his argument, a district court decision that was neither precedential nor from the subject district. Bankr.Code, 11 U.S.C.A. § 546(e).

**[13] Corporations ☞542(1)**
101k542(1) Most Cited Cases

**[13] Corporations ☞548(9)**
101k548(9) Most Cited Cases
Intent was a necessary element of a claim for intentional fraudulent transfer made by debtor-corporation and committee of unsecured creditors against debtor's former officer, and it had to be proven by plaintiffs.

**[14] Bankruptcy ☞2649**
51k2649 Most Cited Cases
Plaintiffs' admission, in their response to settlement payment defense asserted by Chapter 11 debtor's former officer, that the transfer at issue was not made with intent to defraud was fatal to their claim for intentional fraudulent transfer against former officer.

**[15] Bankruptcy ☞2701**
51k2701 Most Cited Cases
Former officer of Chapter 11 debtor-corporation established a "settlement payment defense" to claims of intentional and constructive fraudulent transfer brought against him by debtor and committee of unsecured creditors, and so debtor's $9 million payment to him could not be avoided; plaintiffs conceded that the payment was a settlement payment and that it was not made with intent to defraud debtor's creditors, and, although plaintiffs argued that debtor, not its bank, paid the $9 million to former officer, it was undisputed that the $9 million was wire-transferred, only banks can perform wire transfers, and so payment was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2005 WL 821265                                                                 Page 3
--- B.R. ----, 2005 WL 821265 (Bankr.W.D.Pa.), 44 Bankr.Ct.Dec. 159
(Cite as: 2005 WL 821265 (Bankr.W.D.Pa.))

made "by or to" a financial institution within meaning of the Bankruptcy Code. Bankr.Code, 11 U.S.C.A. § 546(e); 12 C.F.R. § 229.2(e)(1), (II).

Gregory D. Cribbs, Norman E. Gilkey, Babst, Calland, Clements & Zomnir, PC, Pittsburgh, PA, C. Christopher Hasson, C. Christopher Hasson PC, Carnegie, PA, for debtor.

Kathleen Robb, Pittsburgh, PA, U.S. Trustee.

John Martin Gallagher, Gallagher, Sandoval, PC, Los Angeles, CA, for Michel Asfahan

Niccholas R. Pagliari, Robert P. Simons, Reed Smith LLP, Pittsburgh, PA, Kevin L. Colosimo, Pittsburgh, PA, Jill L. Locnikar, Cohen & Grigsby, Stanley A. Winikoff, Swartz Campbell LLC, Pittsburgh, PA, for defendants.

### MEMORANDUM OPINION [FN1]

JUDITH K. FITZGERALD, Bankruptcy Judge.

*1 Before the court is the motion of Defendant John P. Loranger ("J.Loranger") to dismiss the Complaint in this adversary proceeding pursuant to Fed.R.Civ.P. 12(b)(6) and Fed.R.Bankr.P. 7012(b). The court has already dismissed all claims against defendants George P. Loranger ("G.Loranger"), PNC Bank, National Association ("PNC"), and Janet O. Loranger and Plaintiffs' settlement with defendant Schaffner, Knight, Minnaugh & Co., P.C. has been approved. Therefore, J Loranger is the sole remaining Defendant. Of the nine claims brought in the Complaint, only the first five are asserted against J. Loranger.

[1][2][3] In evaluating this motion to dismiss pursuant to Rule 12(b)(6), the court must assume the facts alleged in the Complaint to be true and draw all factual inferences in favor of the non-moving party, the Plaintiffs. Schrob v. Catterson, 948 F.2d 1402, 1405 (3d Cir.1991). Defendant J. Loranger has the burden of proving that no claim has been stated. Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir.), cert. denied, 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991)(party moving for dismissal under Rule 12(b)(6) bears the burden of persuasion). To prevail, J. Loranger must show "beyond doubt that the plaintiff can prove no set of facts in support of his claim [that] would

entitle him to relief." Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The court finds that Defendant J. Loranger has not proven beyond doubt that the Plaintiffs can prove no set of facts in support of claims 1, 2 and 3 and, consequently, those claims will not be dismissed. However, for the reasons stated below, the fourth claim for intentional fraudulent transfer and fifth claim for constructive fraudulent transfer will be dismissed.

### Background

An involuntary chapter 11 petition was filed against Plaintiff/Debtor Loranger Manufacturing Corporation ("LMC") on November 19, 2001, and on November 21, 2001, LMC consented to the entry of an order for relief. Since November 21, 2001, LMC has been a Debtor-in-Possession.

The United States Trustee appointed a Statutory Committee of Unsecured Creditors on December 17, 2001. No Trustee or Examiner has been appointed in this case.

LMC manufactured highly engineered plastic and metal components and assemblies, primarily for the domestic auto industry, from its plant in Warren, Pennsylvania. At the time of the filing of the involuntary petition, LMC had approximately 300 employees.

Before the financial transactions that occurred on September 23, 1998, G. Loranger and J Loranger were the sole officers, directors and shareholders of LMC. Plaintiffs allege that the instant proceeding arose out of integrated financial transactions (the "Transactions") by which LMC borrowed $16.6 million from former defendant PNC Bank and then paid $9 million to J Loranger to redeem his 50 percent ownership of LMC.

The Complaint asserts five claims against J. Loranger: (1) breach of fiduciary duty; (2) negligence; (3) unjust enrichment; (4) intentional fraudulent transfer; and (5) constructive fraudulent transfer

*2 J. Loranger pleads a statute of limitations defense to the first three tort claims and, in regard to the fourth and fifth claims, asserts a "settlement payment" exception under § 546(e) of the Bankruptcy Code to the avoidance powers of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2005 WL 821265                                                                  Page 4
— B.R. ----, 2005 WL 821265 (Bankr.W.D Pa.), 44 Bankr.Ct.Dec. 159
(Cite as: 2005 WL 821265 (Bankr.W.D.Pa.))

the trustee/debtor-in-possession under § 544(b). Further, J. Loranger argues that the third claim for unjust enrichment is preempted by § 546(e).

Plaintiffs reply, first, that, pursuant to the "discovery rule", the earliest date that the Complaint could have been filed was the Petition Date and, consequently, that the Complaint was filed while the Pennsylvania statute of limitations was running and the Plaintiffs' first three claims for breach of fiduciary duty, negligence and unjust enrichment were timely filed. During the course of this adversary proceeding, Plaintiffs' discovery rule argument metamorphosed into an argument that the statute of limitations was tolled by the adverse domination of LMC by G. Loranger. Second, the settlement payment exception, according to the Plaintiffs, does not apply where, as here, the payment was not made "by or to" one of the listed agencies in § 546(e). Finally, inasmuch as the settlement payment exception does not apply, according to Plaintiffs, it also cannot preempt the unjust enrichment claim.

### Claims 1, 2 and 3 for Fiduciary Breach, Negligence and Unjust Enrichment and the Discovery Rule Defense

J. Loranger argues that the Pennsylvania statute of limitations on tort claims is two years and that the transactions at issue in this proceeding closed on September 23, 1998. The Plaintiffs filed their Complaint over five years after the transactions closed and, thus, three years after the statute of limitations ran on September 23, 2000. Brief in Support of Motion to Dismiss of Defendant John P. Loranger Pursuant to Federal Rule of Civil Procedure 12(b)(6)(hereinafter, "Brief in Support of Motion"), Dkt. No. 33 at 4-5. Consequently, J. Loranger moves to dismiss the first three claims on the grounds that they are time-barred under the Pennsylvania statute of limitations for tort claims, 42 Pa.C.S.A. § 5524(7)(West 2004).

Plaintiffs agree that the statute of limitations for tort claims in Pennsylvania is two years:

> Mr. Loranger asserts (and the Plaintiffs agree) that under Pennsylvania law, any action or proceeding to recover damages for injury founded on negligent, intentional or otherwise tortious conduct must be commenced within two (2) years.

Plaintiffs Brief in Opposition to (i) the Motions of Defendants John P. Loranger, Janet O. Loranger and Schaffner, Knight, Minnaugh & Company, P.C. to Dismiss the Action for Failure to State a Claim, and (ii) the Motion of Defendant PNC Bank, National Association, for Judgment on the Pleadings (hereinafter, "Plaintiffs Brief in Opposition"), Dkt. No. 47 at 4.

However, Plaintiffs contend that, under the "discovery rule", the statute of limitations did not start to run until the corporation was no longer controlled by G. Loranger (i.e., the Petition Date):

> *3 The "discovery rule" ... arises from the inability of the injured, despite the exercise of due diligence, to know of the injury or its cause .... The salient point giving rise to the equitable exception of the discovery rule is the inability, despite the exercise of diligence by the plaintiff, to know of the injury.

Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc., 503 Pa. 80, 468 A.2d 468, 471 (1983)(emphasis omitted), cited in Plaintiff's Brief in Opposition at 5.

Plaintiffs argue that only LMC can maintain an action under the first three claims of the Complaint and that LMC could not have brought an action for these three claims while G. Loranger controlled LMC. In the pleadings submitted by the Plaintiffs regarding J. Loranger's Motion to Dismiss, they did not elaborate on why LMC could not have brought these claims except to pose a question that is both rhetorical and ambiguous: "Why would he allow LMC to bring an action against him"? Plaintiffs' Brief in Opposition at 5. Besides posing their argument as a rhetorical question, both the "he" and the "him" are ambiguous. We assume that the "he" and "him"in this question refers to G. Loranger. In context, however, the "him" could apply either to G. Loranger or J. Loranger.

The court finds that the Plaintiffs' interpretation of the discovery rule is not consistent with case law.

[4][5][6] The discovery rule "arises from the inability of the injured party, despite the exercise of reasonable diligence, to know of the injury or its cause." Hayward v. Medical Center of Beaver County, 530 Pa. 320, 608 A.2d 1040, 1043 (1992)(emphasis added). See also Oshiver v. Levin,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2005 WL 821265                                                                                           Page 5
--- B.R. ----, 2005 WL 821265 (Bankr.W.D.Pa.), 44 Bankr.Ct.Dec. 159
(Cite as: 2005 WL 821265 (Bankr.W.D.Pa.))

_Fishbein, Sedran & Berman_, 38 F.3d 1380, 1390 (3d Cir.1994)("[t]he discovery rule keys on a plaintiff's cognizance, or imputed cognizance, of actual injury"). The plaintiff's knowledge of the injury, or imputed knowledge, is of the essence of the discovery rule. The discovery rule does not apply to extend the statutory limitations period where, as here, LMC knew, or was imputed to know, of the injury.

[7] For purposes of a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the court must accept as true the following facts alleged in the Complaint: (i) former defendant G. Loranger was "... at all times relevant to this action, the chairman and chief executive officer of LMC and owned one-half of the outstanding stock of LMC at the date of the Transactions" (Complaint ¶ 13); (ii) "G. Loranger ... offered to purchase J. Loranger's interest in LMC. The agreed redemption price was $9 million." (Complaint ¶ 21); (iii) as a result of the Transactions, after September 23, 1998, "G. Loranger became the sole shareholder and director of LMC and, as a result, was able to _exercise complete control over LMC_." (Complaint ¶ 44)(emphasis added). For the purposes of this motion to dismiss, therefore, the court must conclude that G. Loranger was the sole owner, director and officer of LMC from September 23, 1998 through the petition date and exercised complete control over (i.e., "dominated") LMC throughout that period.

\*4 Plaintiffs allege, and the court must accept as true for purposes of this motion to dismiss, that G. Loranger "knew or should have know [sic] that LMC received no value, and certainly not reasonably equivalent value, for the amounts that were paid to J. Loranger or in fees billed to, or paid by, LMC in connection with the Transactions." (Complaint ¶ 42). G. Loranger's knowledge of this alleged injury to LMC is imputed to the corporate body of LMC. _PNC Bank v. Housing Mortgage Corp._, 899 F.Supp. 1399, 1405 (W.D.Pa.1994)(knowledge of wrongdoing of agents who were the sole owners and shareholders and who "dominated" a corporation is imputed to the corporation). Since LMC knew of any injury or potential injury of which G. Loranger was aware, there was no injury for LMC to "discover" pursuant to the discovery rule.

The court concludes that the discovery rule exception to the statute of limitations defense is inapplicable to the instant proceeding and, therefore, the statute of limitations for the three tort claims against J. Loranger began to run on September 23, 1998. Unless some other event tolled the statute, it expired on September 23, 2000. The court now turns to the question whether G. Loranger's alleged adverse domination of LMC tolled the statute until he no longer controlled LMC.

**The Adverse Domination Argument**
"Why would he [G. Loranger] allow LMC to bring an action against him?" The court would not ordinarily consider an ambiguous rhetorical question as an adequate legal argument in response to J. Loranger's statute of limitations defense. As discussed earlier, the question was posed in the context of Plaintiffs' discovery rule argument, which the court has discredited.

However, the question itself raises the issue of G. Loranger's control of LMC and whether he used or misused that power to prevent LMC from bringing actions against himself and/or J. Loranger for fiduciary breach, negligence and unjust enrichment. Thus, the proper inquiry for the court concerning J. Loranger's statute of limitations defense is not when an injury was discovered (thereby starting the statute of limitations clock), but whether the conduct of G. Loranger equitably tolled the statute.

[8][9] The U.S. Court of Appeals for the Third Circuit cautions against confusing the discovery rule with equitable tolling:
> Underlying this difference between the discovery rule and equitable tolling is the more fundamental difference in purpose between the two rules. The purpose of the discovery rule is to determine the accrual date of a claim, for ultimate purposes of determining, as a legal matter, when the statute of limitations begins to run. Equitable tolling ... presumes claim accrual. Equitable tolling steps in to toll, or stop, the running of the statute of limitations in light of established equitable considerations.

_Oshiver, supra_, 38 F.3d at 1390.

After defendants J. Loranger, G. Loranger and PNC Bank roundly refuted Plaintiffs' discovery rule argument, the Plaintiffs metamorphosed that argument into one of adverse domination:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Westlaw.

2005 WL 821265                                                                                Page 6
--- B.R. ----, 2005 WL 821265 (Bankr.W.D.Pa.), 44 Bankr.Ct.Dec. 159
(Cite as: 2005 WL 821265 (Bankr.W.D.Pa.))

*5 The Plaintiffs have alleged that, as a result of LMC's redemption of J. Loranger's shares on September 25, 1998 and through October 21, 2002, G. Loranger controlled LMC. See Plaintiffs' Complaint ¶¶ 14, 29 and 32. Thus, while the statute of limitations with respect to LMC's claims for breach of fiduciary duty and negligence arguably began to run in September 1998, no "informed, empowered, but not culpable person," [citation omitted] existed at that time to bring the action. [Footnote omitted.] Thus, the doctrine of adverse domination tolled the statute.

Plaintiffs' Brief in Opposition to the Motion of Defendant George P. Loranger to Dismiss ("Brief in Opposition to G. Loranger Motion"), Dkt. No. 88 at 3.

Although the adverse domination theory was raised by Plaintiffs in opposition to the statute of limitations defense of defendant G. Loranger, the Plaintiffs explicitly tied G. Loranger's argument to J. Loranger's statute of limitations defense:

> [T]he only argument that is actually relevant here is the one advanced by Defendant John P. Loranger ... with respect to the Plaintiffs' claims against him for breach of fiduciary duty and negligence: namely, that the Plaintiffs' claims are barred by the statute of limitations. [FN2] However, that argument fails for the same reason that J. Loranger's fails: the doctrine of adverse domination tolled LMC's claims against G. Loranger until he no longer controlled LMC.

Brief in Opposition to G. Loranger Motion, Dkt. No. 88 at 1-2.

The court finds that the adverse domination theory raised in Plaintiffs' Brief in Opposition to G. Loranger Motion is consistent with, and explanatory of,(i) the allegations in the Complaint that G. Loranger controlled LMC and (ii) the rhetorical question in Plaintiffs' Brief in Opposition, "Why would he [G. Loranger] allow LMC to bring an action against him?" The court notes that counsel for J. Loranger was served with all documents related to the adverse domination theory and was present in the courtroom on March 26, 2004, and June 16, 2004, when counsel had opportunities to argue aspects of the adverse domination theory. Consequently, the court concludes that the Plaintiffs

raised the adverse domination theory as an objection to the statute of limitations defense asserted by J. Loranger and that J. Loranger had multiple opportunities to reply.

[10] The court does not now decide the merits of the adverse domination theory. The court notes only that the theory was a proper objection to J. Loranger's statute of limitations defense. The adverse domination theory raises numerous questions of material fact which cannot be resolved as a matter of law on a motion to dismiss. _Oxhiver, supra,_ 38 F.3d at 1391 n. 1 (all that is required to defeat a motion to dismiss is that the plaintiff plead doctrine of equitable tolling); _In re MacGregor Sporting Goods, Inc. (Levitt v. Riddell Sports, Inc.),_ 199 B.R. 502, 515 (Bankr.D.N.J.1995)("[t]he tolling principles of fraudulent concealment and adverse domination involve questions of fact which cannot be resolved as a matter of law on a motion to dismiss"); _In re Sverica Acquisition Corp. (Kaliner v. Load Rite Trailers, Inc.),_ 179 B.R. 457, 470 (Bankr.E.D.Pa.1995) ("[s]ince the Trustee has pled facts to raise a claim of control of Debtor by the ... Defendants, ..., the Court cannot dismiss the possibility that the equitable tolling doctrine of adverse domination might be applicable in this case. Given that possibility, it is inappropriate to grant the motion to dismiss [a count] as barred by the statute of limitations.")

*6 For all the above reasons, the court concludes that J. Loranger has not proven beyond doubt that the Plaintiffs can prove no set of facts in support of their first three claims for fiduciary breach, negligence and unjust enrichment. The court cannot grant J. Loranger's motion to dismiss those claims.

### Claim 3 for Unjust Enrichment

[11] J. Loranger has also objected to the third claim of unjust enrichment on the grounds that it is preempted by § 546(e) of the Bankruptcy Code. According to J. Loranger, the Plaintiffs are seeking the same remedy under their unjust enrichment claim as they seek under the fraudulent transfer claims: to avoid the transaction and recover the payment that was made in exchange for J. Loranger's shares. Claim 3, a state law claim, effectively acts as a § 544(b) fraudulent transfer claim and directly conflicts with the remedial exemption set forth in _Bankruptcy Code § 546(e)._ Under the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Westlaw.

2005 WL 821265
— B.R. ——, 2005 WL 821265 (Bankr.W.D.Pa.), 44 Bankr.Ct.Dec. 159
(Cite as: 2005 WL 821265 (Bankr.W.D.Pa.))

Page 7

doctrine of conflict preemption, state laws that interfere with or are contrary to federal law are preempted and without effect pursuant to the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, ¶ 2.

Plaintiffs reply that § 546(e) is not applicable in this case because the settlement payment was not made "by or to" one of the institutions required in § 546(e). Since § 546(e) is not applicable in this case, according to Plaintiffs, it cannot preempt the state law unjust enrichment claim.

[12] As will be explained below, the court finds that § 546(e) is applicable and bars Plaintiffs' fourth and fifth claims for fraudulent transfer. However, the court is not prepared at this time to accept J. Loranger's argument that § 546(e) preempts Plaintiffs' third claim for unjust enrichment. This is a complex question rooted in constitutional law. J. Loranger cites only one case in support of his argument, *In re Hechinger Investment Co. of Delaware, 274 B.R. 71 (D.Del.2002)*, a district court decision that is neither precedential nor from this district. Plaintiffs have not yet addressed that portion of the *Hechinger* decision that supports J. Loranger's preemption argument. The court concludes that J. Loranger has not met his burden of persuasion that, beyond doubt, the Plaintiffs can prove no set of facts in support of their claim for unjust enrichment. J. Loranger's motion to dismiss claim 3 must be denied.

**Fourth Claim for Intentional Fraudulent Transfer**

[13] Plaintiffs' fourth claim against J. Loranger is that the $9 million paid by LMC to him to redeem his shares was an intentional fraudulent transfer. *Intent* is a necessary element of this claim and must be proven by the Plaintiffs. Plaintiffs properly pleaded intent in the Complaint:

> 60. LMC made the payment [to J. Loranger] with the actual intent to hinder, delay or defraud any entity to which LMC was or became indebted to on or after the date on which the payment was made.

Complaint, ¶ 60.

[14] J. Loranger moves to dismiss the fourth and fifth claims on the grounds that the Plaintiffs base these claims on § 544(b) of the Bankruptcy Code. According to J. Loranger, the avoidance power under § 544(b) cannot be

exercised when the transactions at issue are settlement payments as described in § 546(e):

> *7 Notwithstanding sections 544, 545, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a margin payment ... or settlement payment . . made by or to a commodity broker, forward contract merchant, financial institution, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).

Plaintiffs' response to J. Loranger's settlement payment defense begins as follows:

> Thus, three conditions must be met in order for the defense to apply: first, the prepetition transfer must have been a settlement payment or a margin payment; second, the prepetition transfer must have been made by or to one of the enumerated entities; and third, the debtor transferor must not have made the transfer with the actual intent to hinder, delay or defraud creditors so that it would be avoidable under Bankruptcy Code sections 548(a)(1)(A). The Plaintiffs agree that the prepetition payment to Mr. Loranger that they seek to avoid was a "settlement payment" and that *LMC did not make the payment with the intent to defraud*. Thus, the only issue is whether the settlement payment Mr. Loranger received was "made by or to a commodity broker, forward contract merchant, financial institution, or securities clearing agency," and Mr. Loranger cannot satisfy this condition.

Plaintiffs' Brief in Opposition at 6 (emphasis added).

In their attempt to oppose J. Loranger's settlement payment defense, Plaintiffs contradict an essential element of their claim for intentional fraudulent transfer by admitting that the transfer was not made with intent to defraud. This admission is fatal and irremediable to their claim. Plaintiffs' fourth claim for intentional fraudulent transfer must be dismissed with prejudice.

As discussed below, the court finds that the fourth claim must also be dismissed because the payment to J. Loranger was a settlement payment as described in § 546(e) and, consequently, the debtor-in-possession may not avoid this transfer under § 544(b).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2005 WL 821265                                                                    Page 8
— B.R. ——, 2005 WL 821265 (Bankr.W.D.Pa.), 44 Bankr.Ct.Dec. 159
(Cite as: 2005 WL 821265 (Bankr.W.D.Pa.))

**Fifth Claim for Constructive Fraudulent Transfer**

[15] Plaintiffs' fifth claim is that the $9 million payment from LMC to J Loranger was a constructive fraudulent transfer, in that LMC received less than reasonably equivalent value for the money paid to J. Loranger, that there was at least one creditor at the time of the Transactions holding an unsecured claim against LMC within the meaning of § 502(d) of the Bankruptcy Code, and that (i) LMC was engaged in a business or transaction, or was about to engage in a business or transaction, for which any property remaining in it constituted unreasonably small capital; and/or (ii) LMC intended to incur, or believe it would incur, debts that would be beyond its ability to pay as they matured.

As discussed above, J. Loranger pleaded the settlement payment defense under § 546(e) to this claim. J. Loranger contends that the three conditions for a settlement payment defense under § 546(e) were present in the Transactions: that the $9 million payment to J. Loranger was a settlement payment, that it was made by a financial institution (PNC Bank) and that it was not made with the intent to defraud creditors. The court notes that the Plaintiffs have conceded that it was a settlement payment and (to the detriment of their fourth claim) that it was not made with intent to defraud the creditors of LMC The controversy has centered on the second condition, whether the payment was made "by or to" a financial institution.

*8 There can be no doubt that PNC Bank is a financial institution. "Defendant PNC Bank is a national banking association with its principal place of business in Pittsburgh, Pennsylvania " Complaint ¶ 12 Further, the parties do not dispute that the $9 million was wire transferred. Complaint ¶ 29.

J. Loranger argues that the $9 million settlement payment was made by PNC Bank via wire transfer to J. Loranger and thus it was a settlement payment "made by or to ... a financial institution" in fulfillment of the second and only disputed condition for a § 546(e) defense. J. Loranger bases his argument on the precedents in *In re Hechinger Investment Co. of Delaware*, 274 B.R. 71 (D.Del.2002), and *In re Resorts Int'l, Inc. (Lowenschuss v. Resorts International, Inc.)*, 181 F.3d 505 (3d Cir.), *cert. denied sub*

*nom. Sun Int'l North America, Inc. v. Lowenschuss*, 528 U.S. 1021, 120 S.Ct. 531, 145 L.Ed.2d 411 (1999). Based on the precedents in *Resorts* and *Hechinger*, J. Loranger argues that payments made by a financial institution to shareholders as part of a leveraged buy-out are settlement payments within the meaning of § 546(e) and thus not avoidable under the Bankruptcy Code.

The Plaintiffs rely on the allegation in the Complaint that LMC, not PNC Bank, paid the $9 million to J Loranger:

29 On September 25, 1998--two days after the parties closed the loan--PNC Bank used $2,642,857.08 from the Revolving Credit Facility to pay off two loans that LMC had with it. At LMC' [sic] request, PNC Bank then transferred $8.1 million in term loan proceeds and the $3,992,857.08 still available under the Revolving Credit Facility to a LMC account at PNC Bank. Thereafter, LMC wired [sic] transferred $9 million from its account to J. Loranger.

Complaint ¶ 29. In addition to the alleged fact in the Complaint that LMC paid J. Loranger, the Plaintiffs also argue that *Resorts* can be distinguished from the case at bar: Lowenschuss tendered his shares ... to Merrill Lynch, his broker, who in turn tendered them to Chase Manhattan Bank, Resort's Transfer Agent for the merger. As it regularly did, Chase forwarded a list of the tendering shareholders to Resorts and asked Resorts to wire funds to the payment account. Approximately two weeks after the tender, Resort's treasurer authorized the transfer of funds to Chase. Chase then delivered a check to Merrill Lynch for $3,805,200.00, which was paid over to Lowenschuss. *Resorts, supra*, 181 F.3d at 508-09. Here the Plaintiffs argue that the *Resorts* case involved multiple payments by financial institutions in an intermediary capacity (payment of Resorts to Chase, payment of Chase to Merrill Lynch, and payment of Merrill Lynch to Lowenschuss) In the instant case, LMC paid J. Loranger without any intervening financial institution. In a footnote, the Plaintiffs appear to acknowledge that PNC was involved, but only in its capacity as a bank that facilitates a wire transfer and Plaintiffs argue that there is no reported case that has extended the protection of section 546(e) to a bank that merely facilitates a wire transfer.

© 2005 Thomson/West No Claim to Orig. U.S. Govt. Works.

Westlaw.

2005 WL 821265                                                                                    Page 9
--- B.R. ----, 2005 WL 821265 (Bankr.W.D.Pa.), 44 Bankr Ct.Dec. 159
(Cite as: 2005 WL 821265 (Bankr.W.D.Pa.))

**\*9** J. Loranger responds that the allegation in the Complaint that LMC paid J. Loranger directly is a "factual and legal impossibility" [FN3] in that only a bank can make a wire transfer and, thus, a wire transfer is always made "by or to a ... financial institution." J. Loranger demands that the court take judicial notice of Title 12 of the Code of Federal Regulations, where a wire transfer is defined as an

.. unconditional order to a bank to pay a fixed or determinable amount of money to a beneficiary upon receipt or on a day stated in the order, that is transmitted by electronic or other means through Fedwire, the Clearing House Interbank Payments System, other similar network, between banks, or on the books of a bank.

12 C.F.R. § 229.2(*ll*), cited in Reply to Plaintiffs' Brief, Dkt. No. 53 at 5. Because a wire transfer requires a bank to perform the transfer, LMC could not have paid J. Loranger directly. J. Loranger also opposes the footnote comment by the Plaintiffs that there is no reported case that has extended the protection of § 546(e) to a bank that merely facilitates a wire transfer. J. Loranger cites *Resorts*, where funds were wire transferred and the Court of Appeals held that the funds thus transferred were settlement payments under § 546(e).

The court takes judicial notice of 12 C.F.R. § 229.2(*ll*) where the above definition of a wire transfer occurs. The court also takes judicial notice of 12 C.F.R. § 229.2(e)(1) where, for the purposes of a wire transfer, a "bank" is defined:

Bank means--

(1) An insured bank as defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C.1813) ....

The court finds that PNC Bank, N.A., unquestionably meets this definition of a bank for the purposes of a wire transfer. Further, the court has examined all definitions of a bank within 12 C.F.R. § 229.2(e) and finds that neither J. Loranger, G. Loranger nor LMC meets the definition of a bank for wire transfer purposes.

The court has examined Plaintiffs' arguments that PNC's involvement was incidental or mere facilitation. None of these arguments can overcome the clear counsel of the Court of Appeals for the Third Circuit in *Resorts* that the plain meaning of § 546(e) governs its interpretation:

Despite the fact that payments to shareholders in an LBO are not the most common securities transaction, we see no absurd result from the application of the statute's plain language and will not disregard it.

*Resorts* at 516.

Therefore, the court finds that, based on the allegations in the Complaint and the federal regulations that govern wire transfers, the debtor, LMC, must have made an unconditional order to PNC Bank to pay $9 million by wire transfer for the benefit of J. Loranger. The court must also agree with J. Loranger that Plaintiffs' allegation that "LMC paid Mr. Loranger directly" (Plaintiffs' Brief in Opposition at 7) is a factual and legal impossibility. A wire transfer was involved, and only banks (as defined in 12 C.F.R. § 229.2(e)) can perform wire transfers. Thus, the $9 million payment to J. Loranger was a securities settlement payment in a leveraged buyout, and it was made by PNC Bank, a financial institution as defined in § 546(e). Defendant J. Loranger has successfully pleaded a settlement payment defense under § 546(e) to Plaintiffs' fourth and fifth claims for fraudulent transfer.

**Conclusion**

**\*10** The court finds that Defendant J. Loranger has not established that the Plaintiffs can prove no set of facts in support of claims 1, 2 and 3 and, consequently, those claims will not be dismissed. However, because Plaintiffs concede that "LMC did not make the payment [to J. Loranger] with the intent to defraud", thus denying an essential element of their fourth claim for intentional fraudulent transfer under § 544(b), Plaintiffs' fourth claim must be dismissed with prejudice. Defendant J. Loranger has also established that Claims 4 and 5 are barred by the settlement payment exception of § 546(e), and these claims will be dismissed.

FN1. This memorandum opinion constitutes the court's findings of fact and conclusions of law. The court's jurisdiction is not at issue.

FN2. [The above citation from Plaintiffs' Brief in Opposition to G. Loranger Motion includes the following internal footnote]: The Plaintiffs' First Cause of Action (Breach of Fiduciary Duty) and their second (Negligence) seek to recover against

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Westlaw.

2005 WL 821265                                                                                         Page 10
--- B.R. ---, 2005 WL 821265 (Bankr.W.D.Pa.), 44 Bankr.Ct.Dec. 159
(Cite as: 2005 WL 821265 (Bankr.W.D.Pa.))

both G. Loranger and J. Loranger.

FN3. Reply to Plaintiffs' Brief in Opposition to the
Motion of Defendant John P. Loranger to Dismiss
the Action for Failure to State a Claim (hereinafter,
"Reply to Plaintiffs' Brief"), Dkt. No. 53 at 5.

--- B.R. ---, 2005 WL 821265 (Bankr.W.D.Pa.), 44
Bankr.Ct.Dec. 159

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

RLF1-2886923-1

A0186

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | Chapter 7 |
| | ) | Case No. 03-11489 (RB) |
| PLASSEIN INTERNATIONAL CORP., et al., | ) | |
| | ) | Jointly Administered. |
| Debtors. | ) | |
| | ) | |
| WILLIAM BRANDT, AS HE IS THE | ) | |
| TRUSTEE OF THE ESTATES OF | ) | |
| PLASSEIN INTERNATIONAL CORP., | ) | |
| et al., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 05-50692-RB |
| | ) | |
| B.A. CAPITAL COMPANY LP, et al., | ) | |
| | ) | |
| Defendants. | ) | |

ORDER GRANTING B.A. CAPITAL COMPANY
LP'S MOTION TO DISMISS COMPLAINT

The Court having considered B.A. Capital Company LP's Motion to Dismiss
Complaint (the "Motion"); the Court having determined that due and sufficient notice of
the Motion has been given and that no further notice of the Motion is required; and the
Court having determined that good and adequate cause exists for approval of the Motion;

**IT IS HEREBY ORDERED** that the Motion is granted  Plaintiff's Complaint is
dismissed with prejudice

Dated: _____, 2005
      Wilmington, Delaware

                    THE HONORABLE RANDOLPH BAXTER
                    UNITED STATES BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | Chapter 7 |
| | ) | Case No. 03-11489 (RB) |
| PLASSEIN INTERNATIONAL CORP., et al., | ) | |
| | ) | Jointly Administered. |
| Debtors. | ) | |
| | ) | |
| WILLIAM BRANDT, AS HE IS THE | ) | |
| TRUSTEE OF THE ESTATES OF | ) | |
| PLASSEIN INTERNATIONAL CORP., | ) | |
| et al., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 05-50692-RB |
| | ) | |
| B.A. CAPITAL COMPANY LP, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing **B.A. Capital Company LP's**

**Motion to Dismiss Complaint** was served via hand delivery on June 15, 2005 to:

Amy Elizabeth Evans
Cross & Simon LLC
913 N. Market Street
Suite 1001
PO Box 1380
Wilmington, DE 19899

William Bowden
Ricardo Palacio
Ashby & Geddes, P. A.
222 Delaware Avenue, 17th Floor
Wilmington, DE 19801

Frederick B. Rosner
Jaspan Schlesinger Hoffman
913 Market Street, 12th Floor
Wilmington, DE 19801

Laurie Selber Silverstein
Potter Anderson & Corroon LLP
1313 N. Market St.
Hercules Plaza, 6th Floor
Wilmington, DE 19801

RLF1-2887178-1

A0188

With copies via Federal Express to:

James A. Sarna                         Charles R. Bennett, Jr.
Sarna & Associates, P.C.               Hanify & King
99 Main Street                         One Beacon Street
Nyack, New York 10960                  Boston, MA 02108

_____
Michael J. Merchant (No. 3854)

RLF1-2887178-1

A0189

**E**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>PLASSEIN INTERNATIONAL CORP., et al.,<br><br>        Debtors. | Chapter 7<br>Case No. 03-11489 (WS)<br><br>Jointly Administered |
| WILLIAM BRANDT, as he is the Trustee of the Estates of Plassein International Corp., et al.,<br><br>        Plaintiff,<br><br>   v.<br><br>B.A. CAPITAL COMPANY LP, et al.,<br><br>        Defendants. | Adv. Proc. No. 05-50692 (WS) |

### DEFENDANTS CHARLES J. WARR, PAUL D. GAGE, STEPHEN S. WILSON, G. KENNETH POPE JR., KENNETH OLENDER AND DANIEL A. JONES III'S MOTION TO DISMISS

Defendant Charles J. Warr, Paul D. Gage, Stephen S. Wilson, G. Kenneth Pope Jr., Kenneth Olender and Daniel A. Jones III (collectively, the "Rex Defendants") respectfully move this Court, under and pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7012, to dismiss (the "Motion") the Complaint (the "Complaint") of William Brandt, Trustee of the Estates of Plassein International Corp. This Court should dismiss the Complaint as it fails to state a claim upon which relief can be granted. Moreover, the Court should dismiss the Complaint as the underlying, alleged fraudulent transfer is a "settlement payment" under 11 U.S.C. § 546(e) and, therefore, may not be avoided. In support of this Motion, the Rex Defendants rely upon and

A0190

incorporate herein by reference their Opening Brief in Support of their Motion to Dismiss, filed contemporaneously herewith.

WHEREFORE, the Rex Defendants respectfully request that this Court enter an order in the form attached, (i) granting the Motion, (ii) dismissing the Complaint, with prejudice, and (iii) granting such other relief as the Court deems necessary or appropriate.

ASHBY & GEDDES, P.A.

William P. Bowden (No. 2553)
Ricardo Palacio (No. 3765)
Andrew D. Cordo (No. 4534)
222 Delaware Avenue
17th Floor, P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

*Attorneys for Charles J. Warr, Paul D. Gage,*
*Stephen S. Wilson, G. Kenneth Pope Jr.,*
*Kenneth Olender and Daniel A. Jones III*

Dated: June 15, 2005

2

A0191

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>PLASSEIN INTERNATIONAL CORP., et al.,<br><br>                    Debtors. | Chapter 7<br>Case No. 03-11489 (WS)<br><br>Jointly Administered |
| WILLIAM BRANDT, as he is the Trustee of the Estates of Plassein International Corp., et al.,<br><br>                    Plaintiff,<br><br>     v.<br><br>B.A. CAPITAL COMPANY LP, et al.,<br><br>                    Defendants. | Adv. Proc. No. 05-50692 (WS) |

### ORDER GRANTING
### DEFENDANTS CHARLES J. WARR, PAUL D. GAGE, STEPHEN S. WILSON, G. KENNETH POPE JR., KENNETH OLENDER AND DANIEL A. JONES III'S MOTION TO DISMISS

AND NOW, this _____ day of _____, 2005, the Court having considered Defendants Charles J. Warr, Paul D. Gage, Stephen S. Wilson, G. Kenneth Pope Jr., Kenneth Olender and Daniel A. Jones III's (the "Rex Defendants") Motion to Dismiss (the "Motion"), and the submissions of the parties, IT IS HEREBY ORDERED THAT:

1.     The Motion and the relief sought therein are GRANTED; and

2.     The Trustee's Complaint commencing the above-captioned adversary proceeding is DISMISSED WITH PREJUDICE as against the Rex Defendants.

 

_____
United States Bankruptcy Judge

A0192

## CERTIFICATE OF SERVICE

I, Andrew D. Cordo, Esquire hereby certify that, on the 15th day of June, 2005, I caused a true and correct copy of the attached *Defendant's Charles J. Warr, Paul D. Gauge, Stephen S. Winslow, G. Kenneth Pope Jr., Kenneth Olender and Daniel A. Jones III's Motion to Dismiss* to be served upon the below listed counsel in the manner so indicated.

Andrew D. Cordo (I.D. #4534)

158540v1

**HAND DELIVERY**
Amy Elizabeth Evans, Esq.
Cross & Simon LLC
913 N. Market Street
Suite 1001
Wilmington, DE 19899

**HAND DELIVERY**
Frederick B. Rosner, Esq.
Jaspan Schlesinger Hoffman
913 Market Street, 12th Floor
Wilmington, DE 19801

**HAND DELIVERY**
Robert J. Stearn Jr., Esq.
Michael J. Merchant, Esq.
Richards Layton & Finger PA
One Rodney Square
Wilmington, DE 19899

**HAND DELIVERY**
Laurie Selber Silverstein, Esq.
Potter Anderson & Corroon
LLP
1313 N. Market Street
Hercules Plaza, 6th Floor
Wilmington, DE 19801

**HAND DELIVERY**
Eric D. Schwartz, Esq.
Alicia B. Davis
Morris Nichols Arsht &
Tunnell
1201 N. Market Street
18th Floor
Wilmington, DE 19899

**U.S. MAIL**
James A. Sarna, Esq.
Sarna & Associates, PC
99 Main Street
Nyack, NY 10960

**U.S. MAIL**
Charles R. Bennett, Jr. , Esq.
Andrew G. Lizotte, Esq.
Hanify & King PC
One Beacon Street
Boston, MA 02108

**U.S. MAIL**
Karen E. Wagner, Esq.
Elliot Moskowitz, Esq.
Davis Polk & Wardell
450 Lexington Avenue
New York, NY 10017

**U.S. MAIL**
Richard A. Johnston, Esq.
Wilmer Cutler Pickering Hale
& Dorr LLP
60 State Street
Boston, MA 02109

**U.S. MAIL**
Lawarence M. Brenton,Esq.
Early Lennon Crocker &
Bartosiewicz PLC
900 Comerica Building
Kalamazoo, Michigan 49007

A0193

**F**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>PLASSEIN INTERNATIONAL CORP., et al.,<br><br>　　　　　　　Debtors. | Chapter 7<br>Case No. 03-11489 (WS)<br><br>Jointly Administered |
| WILLIAM BRANDT, as he is the Trustee of the Estates of Plassein International Corp., et al.,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>B.A. CAPITAL COMPANY LP, et al.,<br><br>　　　　　　　Defendants. | Adv. Proc. No. 05-50692 (WS) |

## SAM CHEBEIR'S MOTION TO DISMISS

Defendant Sam Chebeir respectfully moves the Court, under and pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7012, to dismiss (the "Motion") the Complaint (the "Complaint") of William Brandt, Trustee of the Estates of Plassein International Corp. This Court should dismiss the Complaint as it fails to state a claim upon which relief can be granted. Moreover, this Court should dismiss the Complaint as the underlying, alleged fraudulent transfers is a "settlement payment" under 11 U.S.C. § 546(e) and, therefore, may not be avoided. In support of this Motion, Chebeir relies upon and incorporates herein by reference his Opening Brief in Support of his Motion to Dismiss, filed contemporaneously herewith.

WHEREFORE, Chebeir respectfully requests that this Court enter an order in the form attached, (i) granting the Motion, (ii) dismissing the Complaint, with prejudice, and (iii) granting such other relief as the Court deems necessary or appropriate.

ASHBY & GEDDES, P.A.

William P. Bowden (No. 2553)
Ricardo Palacio (No. 3765)
Andrew D. Cordo (No. 4534)
222 Delaware Avenue
17th Floor, P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

*Attorneys for Sam Chebeir*

Date: June 15, 2005
158101.2

2

A0195

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>PLASSEIN INTERNATIONAL CORP., et al.,<br><br>    Debtors. | Chapter 7<br>Case No. 03-11489 (WS)<br><br>Jointly Administered |
| WILLIAM BRANDT, as he is the Trustee of the Estates of Plassein International Corp., et al.,<br><br>    Plaintiff,<br><br>  v.<br><br>B.A. CAPITAL COMPANY LP, et al.,<br><br>    Defendants. | <br><br><br><br>Adv. Proc. No. 05-50692 (WS) |

### ORDER GRANTING
### SAM CHEBEIR'S MOTION TO DISMISS

AND NOW, this _____ day of _____, 2005, the Court having considered Sam Chebeir's Motion to Dismiss (the "Motion"), and the submissions of the parties, IT IS HEREBY ORDERED THAT:

1.  The Motion and the relief sought therein are GRANTED; and

2.  The Trustee's Complaint commencing the above-captioned adversary proceeding is DISMISSED WITH PREJUDICE as against Chebeir.

           _____
           United States Bankruptcy Judge

A0196

## CERTIFICATE OF SERVICE

I, Andrew D. Cordo, Esquire hereby certify that, on the 15th day of June, 2005, I caused a true and correct copy of the attached *Sam Cheiber's Motion to Dismiss* to be served upon the below listed counsel in the manner so indicated.

Andrew D. Cordo (I.D. #4534)

158540v1

**HAND DELIVERY**
Amy Elizabeth Evans, Esq.
Cross & Simon LLC
913 N. Market Street
Suite 1001
Wilmington, DE 19899

**HAND DELIVERY**
Frederick B. Rosner, Esq.
Jaspan Schlesinger Hoffman
913 Market Street, 12th Floor
Wilmington, DE 19801

**HAND DELIVERY**
Robert J. Stearn Jr., Esq.
Michael J. Merchant, Esq.
Richards Layton & Finger PA
One Rodney Square
Wilmington, DE 19899

**HAND DELIVERY**
Laurie Selber Silverstein, Esq.
Potter Anderson & Corroon LLP
1313 N. Market Street
Hercules Plaza, 6th Floor
Wilmington, DE 19801

**HAND DELIVERY**
Eric D. Schwartz, Esq.
Alicia B. Davis
Morris Nichols Arsht & Tunnell
1201 N. Market Street
18th Floor
Wilmington, DE 19899

**U.S. MAIL**
James A. Sarna, Esq.
Sarna & Associates, PC
99 Main Street
Nyack, NY 10960

**U.S. MAIL**
Charles R. Bennett, Jr. , Esq.
Andrew G. Lizotte, Esq.
Hanify & King PC
One Beacon Street
Boston, MA 02108

**U.S. MAIL**
Karen E. Wagner, Esq.
Elliot Moskowitz, Esq.
Davis Polk & Wardell
450 Lexington Avenue
New York, NY 10017

**U.S. MAIL**
Richard A. Johnston, Esq.
Wilmer Cutler Pickering Hale & Dorr LLP
60 State Street
Boston, MA 02109

**U.S. MAIL**
Lawarence M. Brenton, Esq.
Early Lennon Crocker & Bartosiewicz PLC
900 Comerica Building
Kalamazoo, Michigan 49007

G

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In Re: | Chapter 7 |
| | Case No. 03-11489 (DDS) |
| PLASSEIN INTERNATIONAL CORP., *et al.*, | Jointly Administered. |
| Debtors. | |

| | |
|---|---|
| WILLIAM BRANDT, AS HE IS THE TRUSTEE OF THE ESTATES OF PLASSEIN INTERNATIONAL CORP., *et al.*, | |
| Plaintiff, | Adv. Pro. No. 05-50692 (DDS) |
| v. | |
| B.A. CAPITAL COMPANY LP, THOMAS F. FAY, RUTH L. FISCHBACH, MARK R. FREEDMAN, ROBERT N. ZEITLIN, SIDNEY ZEITLIN, ZFC ASSOCIATES, INC., WILLIAM G. RUSSELL, ROBERT N. ZEITLIN 1999 CHARITABLE REMAINDER UNITRUST, THE ANDREW MARSHALL FORSBERG TRUST, ETHEL FORSBERG REVOCABLE TRUST, JANIS RAE FORSBERG TRUST, FRANK JOHN McCARTHY, DANIEL R. ORRIS, BERNADINE ORRIS, SAM CHEBEIR, CHARLES J. WARR, PAUL D. GAGE, STEPHEN S. WILSON, G. KENNETH POPE JR., KENNETH OLENLER and DANIEL A. JONES III, | |
| Defendants. | |

**KEY PACKAGING DEFENDANTS'**
**MOTION TO DISMISS THE COMPLAINT**

Defendants Thomas F. Fay, Ruth L. Fischbach, Mark R. Freedman, Robert N. Zeitlin,

Sidney Zeitlin, ZFC Associates, Inc., William G. Russell, and Robert N. Zeitlin 1999 Charitable

Remainder Unitrust, former shareholders of Key Packaging Industries Corporation (collectively

the "Key Packaging Defendants") hereby move to dismiss the complaint of Plaintiff William

Brandt, as Trustee of the Estates of Plassein International Corp., et al.  The basis for the motion

is set forth in the Key Packaging Defendants' Opening Brief in Support of Motion to Dismiss the

Complaint, which is being filed contemporaneously herewith.

POTTER ANDERSON & CORROON LLP

By: _Rebecca S. Beste_

Laurie Selber Silverstein (2396)
Rebecca S. Beste (4154)
1313 North Market Street, 6th Floor
P. O. Box 951
Wilmington, DE  19899-0951
(302) 984-6000 (telephone)
(302) 658-1192 (facsimile)

Of Counsel:

Richard A. Johnston
Mark C. Fleming
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000 (telephone)
(617) 526-5000 (facsimile)

Attorneys for Thomas F. Fay, Ruth L. Fischbach,
Mark R. Freedman, Robert N. Zeitlin, Sidney
Zeitlin, ZFC Associates, Inc., William G. Russell,
and Robert N. Zeitlin 1999 Charitable Remainder
Unitrust

Dated:  June 15, 2005

PA&C-686523

- 2 -

A0199

# CERTIFICATE OF SERVICE

I, Rebecca S. Beste, hereby certify that I am not less than 18 years of age and that

on this 15th day of June, 2005, I caused a true and correct copy of the within **Key Packaging**

**Defendants' Motion to Dismiss the Complaint** to be served by hand delivery upon the

following:

Amy Elizabeth Evans, Esquire
Cross & Simon LLC
913 N. Market Street, Suite 1380
Wilmington, DE 19899

Frederick B. Rosner, Esquire
Jaspan Schlesinger Hoffman
913 Market Street, 12th Floor
Wilmington, DE 19801

Michael Joseph Merchant, Esquire
Richards Layton & Finger, P.A.
One Rodney Square
Wilmington, DE 19899

Ricardo Palacio, Esquire
Ashby & Geddes, P.A.
222 Delaware Avenue, 17th Floor
Wilmington, DE 19801

Richard J. Stearn Jr., Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE 19899

*Rebecca S. Beste*
Rebecca S. Beste

PA&C-686763

A0200

**H**

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| *In re*: | ) | |
| | ) | |
| PLASSEIN INTERNATIONAL | ) | Chapter 7 |
| CORP., *et al.*,[1] | ) | |
| | ) | Case No. 03-11489 (WS) |
| Debtors. | ) | |
| | ) | Jointly Administered |
| | ) | |
| | ) | |
| WILLIAM BRANDT, as he is | ) | |
| the Trustee of the Estates of | ) | |
| Plassein International Corp., *et al.*, | ) | Adversary Proceeding |
| | ) | No. 05-50692 (WS) |
| Plaintiff, | ) | |
| | ) | |
| *v.* | ) | Related Docket #'s 23, 25, 26, 28, 30 |
| | ) | |
| B.A. CAPITAL CO. LP, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S CONSOLIDATED BRIEF IN OPPOSITION TO
## DEFENDANTS' VARIOUS MOTIONS TO DISMISS THE COMPLAINT

Of Counsel:
Charles R. Bennett, Jr.
HANIFY & KING, PC
One Beacon St., 21st Floor
Boston, MA 02108
(617) 423-0400

Dated: July 15, 2005

CROSS & SIMON, LLC
Richard H. Cross, Jr. (No. 3576)
Amy Evans (No. 3829)
913 N. Market St., 11th Floor
P.O. Box 1380
Wilmington, DE 19899-1380
(302) 777-4200
(302) 777-4224 (facsimile)

---

[1] Additional Debtors include all of Plassein International Corp.'s wholly-owned domestic subsidiaries: Plassein International of Martin, Inc.; Plassein International of Ontario, LLC; Plassein International of Salem, Inc.; Plassein International of Spartanburg, Inc.; Plassein International of Thomasville, Inc.; and Teno Films, Inc.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................ii

NATURE AND STAGE OF PROCEEDING .....................................................1

SUMMARY OF ARGUMENT ...........................................................................3

STATEMENT OF FACTS ..................................................................................4

ARGUMENT .......................................................................................................9

    I.    Section 546(e) Is Not Applicable to the Transfers At Issue Here......................9

        A.  The Text, History and Purpose of §§ 546(e) and 741(8)
        Demonstrate That They Do Not Apply To Privately Held Stocks ..................12

        B.  Case Law and Common Sense Confirm That § 546(e)
        Should Not Be Applied To These Facts ..........................................................19

    II.    Defendants' Remaining Arguments Are Without Merit...................................26

        A.  The Complaint Adequately Pleads Fraudulent Transfers ...........................26

            1.  Identity of the "Debtor" ...............................................................26

            2.  Solvency.........................................................................................29

        B.  The Fraudulent Transfer Actions Are Timely ...........................................31

        C.  It Is Premature To Discuss Severance .......................................................31

CONCLUSION...................................................................................................32

A0202

## TABLE OF AUTHORITIES

<u>Cases</u>

*Bevill, Bresler & Schulman Asset Mgmt. Corp.* v. *Spencer Sav. & Loan Ass'n,*
878 F.2d 742 (3d Cir. 1989)..................................................................................10,23,24

*Brandt* v. *Hicks Muse & Co., Inc.* (In re *Healthco Int'l, Inc.*), 195 B.R. 971
(Bankr. D. Mass. 1996)..........................................................................................28

*Buckley* v. *Goldman, Sachs & Co.,* No. 02-CV-11497-RGS,
2005 WL 1206865 (D. Mass. May 20, 2005) ......................................................14

*Cerro Metal Products* v. *Marshall,* 620 F.2d 964 (3d Cir. 1980).......................21

*Conley* v. *Gibson,* 355 U.S. 41 (1957) ................................................................9

*Crowthers McCall Pattern Inc.* v. *Lewis,* 129 B.R. 992 (S.D.N.Y. 1991) ........28

*FAG Italia S.p.A.* v. *United States,* 291 F.3d 806 (Fed. Cir. 2002) ...................18

*Grasso* v. *IRS,* 785 F.2d 70 (3d Cir. 1986) .......................................................20

*Griffin* v. *Oceanic Contractors, Inc.,* 458 U.S. 564 (1982) ..............................18

*Hubbard* v. *Taylor,* 399 F.3d 150 (3d Cir. 2005) .............................................21

In re *AppOnline.com,* 315 B.R. 259 (Bankr. E.D.N.Y. 2004) ............................25

In re *Bullion Reserve of N. Am.,* 922 F.2d 544 (9th Cir. 1991) .........................24

In re *Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410 (3d Cir. 1997) ...........4

In re *CIS Corp.,* 195 B.R. 251 (Bankr. S.D.N.Y. 1996) ....................................25

In re *Dry Wall Supply, Inc.,* 111 B.R. 933 (D. Colo. 1990)...............................31

In re *Financial Mgmt. Sciences,* 261 B.R. 150 (Bankr. W.D. Pa. 2001)............16

In re *G-I Holdings, Inc.,* 313 B.R. 612 (Bankr. D.N.J. 2004)............................31

In re *Hechinger Inv. Co. of Del., Inc.,* 335 F.3d 243, 253 (3d Cir. 2003) .........18

In re *Kaiser Merger Litigation,* 168 B.R. 991 (D. Colo. 1994) .........................31

In re *Martin,* 142 B.R. 260 (Bankr. N.D. Ill. 1992) ..........................................31

A0203

*In re Russell*, 927 F.2d 413 (8th Cir. 1991) .........................................................................24

*In re Spatz*, 222 B.R. 157 (N.D. Ill. 1998) .........................................................................31

*In re Topcor, Inc.*, 132 B.R. 119 (Bankr. N.D. Tex. 1991).................................................30

*Jewel Recovery, L.P. v. Gordon*, 196 B.R. 348 (N.D. Tex. 1996) ........................10, 19, 26

*Kaiser Steel Corp. v. Charles Schwab & Co., Inc.*,
913 F.2d 846 (10th Cir. 1990) .........................................................................................24

*Kaiser Steel Corp. v. Pearl Brewing Co.* (In re *Kaiser Steel Corp.*),
952 F.2d 1230 (10th Cir. 1991), *cert. denied*, 505 U.S. 1213 (1992)................13,16,20,23

*Kipperman v. Circle Trust* (In re *Grafton Partners, L.P.*), 321 B.R. 527
(B.A.P. 9th Cir. 2005) ...................................................................12,14,15,16,18,20

*Lexington Nat. Ins. Corp. v. Ranger Ins. Co.*, 326 F.3d 416 (3d Cir. 2003) ........................4

*Loranger Mfg. Corp. v. PNC Bank* (In re *Loranger Mfg. Corp.*),
324 B.R. 575 (Bankr. W.D. Pa. 2005)...................................................................10,19,24

*Lowenschuss v. Resorts Int'l, Inc.* (In re *Resorts Int'l, Inc.*), 181 F.3d 505
(3d Cir.), *cert. denied*, 528 U.S. 1021 (1999) ............................................................*passim*

*Lowenschuss v. Resorts Int'l, Inc.*, 194 B.R. 339 (D.N.J. 1996) ........................................20

*McLellan v. Mississippi Power & Light Co.*, 545 F.2d 919 (5th Cir. 1977) .....................18

*Mellon Bank v. Metro Communications*, 945 F.2d 635 (3d Cir. 1991),
*cert. denied*, 503 U.S. 937 (1992) ...................................................................................28

*Moody v. Security Pacific Bus. Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).......................28

*Munford v. Valuation Research Corp.* (In re *Munford, Inc.*), 98 F.3d 604
(11th Cir. 1996), *cert. denied*, 522 U.S. 1068 (1998) ..................................................10,21

*Official Comm. of Unsecured Creditors v. Asea Brown Boveri, Inc.*
(In re *Grand Eagle Cos., Inc.*), 288 B.R. 484 (Bankr. N.D. Ohio 2003).................11,19,25

*Official Committee of Unsecured Creditors v. Fleet Retail Fin. Group*
(In re *Hechinger Investment Co. of Del., Ltd.*), 274 B.R. 71 (D. Del. 2002)......20,23,27,28

*Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987) .........................................................23

A0204

*Richardson* v. *FDIC* (In re *M. Blackburn Mitchell, Inc.*),
164 B.R. 117 (Bankr. N.D. Cal. 1994) ...............................................................25

*Rosenberg* v. *XM Ventures*, 274 F.3d 137 (3d Cir. 2001) ...........................................21,23

*Rosener* v. *Majestic Mgmt., Inc.* (In re *OODC, LLC*),
321 B.R. 128 (Bankr. D. Del. 2005) ...................................................................28

*Schrob* v. *Catterson*, 948 F.2d 1402 (3d Cir. 1991) .............................................9

*U.S. Express Lines, Ltd.* v. *Higgins*, 281 F.3d 383 (3d Cir. 2002) ........................................4

*United States* v. *Hodge*, 321 F.3d 429 (3d Cir. 2003) .......................................18

*United States* v. *Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986),
*cert. denied*, 483 U.S. 1005 (1987) .....................................................................27

*Wieboldt Stores, Inc.* v. *Schottenstein*, 94 B.R. 488 (N.D. Ill. 1988) .................................28

*Wieboldt Stores, Inc.* v. *Schottenstein*, 131 B.R. 655 (N.D. Ill. 1991) ...............10,13,15,20

*Zahn* v. *Yucaipa Capital Fund*, 218 B.R. 656 (D.R.I. 1998)..............................10,13,15,20

**Statutes**     .

11 U.S.C. § 101(22) ...................................................................................10

11 U.S.C. § 101(48) ...................................................................................17

11 U.S.C. § 544 .........................................................................................31

11 U.S.C. § 546(a)(1)(A) ...........................................................................31

11 U.S.C. § 546(e) ..............................................................................*passim*

11 U.S.C. § 548(a)(1)(A) ...........................................................................9

11 U.S.C. § 741(5) ...............................................................................11,17

11 U.S.C. § 741(8) ..............................................................................*passim*

Bankruptcy Amendments and Federal Judgeship Act of 1984,
Pub. L. 98-353, 98 Stat. 333 ......................................................................15

Pub. L. 97-222, 96 Stat. 235 (1982)......................................................12,15,18

iv

**Other Authorities**

Black's Law Dictionary (8th ed. 2004)..................................................................16

Downes & Goodman, Dictionary of Finance and Investment Terms (4th ed. 1995)........17

Garfinkel, Note, *No Way Out: Section 546(e) Is No Escape for the Public Shareholder of a Failed LBO*, 1991 Colum. Bus. L. Rev. 51, 64-65 (1991)......................13

H.R. Rep. No. 420, 97th Cong., 2d Sess. (1982), *reprinted in* 1982 U.S.C.C.A.N. 583 ...........................................................................14,22

Merriam-Webster's Collegiate Dictionary (10th ed. 2001)................................................16

Munn *et al.*, Encyclopedia of Banking & Finance (9th ed. 1991)......................................17

v

## NATURE AND STAGE OF PROCEEDING

Plaintiff William Brandt respectfully submits this consolidated brief in opposition to the motions to dismiss filed by Defendant B.A. Capital Co., LP ("B.A."); Defendants Fay, Fischbach, Freedman, R. Zeitlin, S. Zeitlin, ZFC Associates, Inc., Russell, and Robert N. Zeitlin 1999 Charitable Remainder Unitrust (collectively, the "Key Defendants"); Defendants Andrew Marshall Forsberg Trust, Ethel Forsberg Revocable Trust, Janis Rae Forsberg Trust, McCarthy, D. Orris, and B. Orris (collectively, the "Marshall Defendants"); Defendant Sam Chebeir ("Chebeir"); and Defendants Warr, Gage, Wilson, Pope, Olender, and Jones (collectively, the "Rex Defendants").

Plaintiff has alleged that each of these Defendants has received a fraudulent transfer pursuant to 11 U.S.C. § 544 and the Delaware fraudulent transfer law. In response, Defendants seek to invoke 11 U.S.C. § 546(e), a section of the Bankruptcy Code designed to ensure the smooth functioning of the "clearance and settlement" system utilized in the market for publicly-traded securities, to dismiss this case. Notably, not one of the Defendants is able to muster any explanation as to *why* § 546(e) should apply here; their only argument is that the case law demands it.

Defendants misread the relevant statutes and seek to extend the case law well beyond its present boundaries, contrary to the general principle that exceptions to the trustee's broad avoidance powers should be narrowly construed. Without question, § 546(e) is designed to protect the complex system of guarantees and margin payments that make up the clearance and settlement system for publicly traded securities. The transactions at issue here involved only the stock of *privately held* companies, and therefore did not implicate that system at all. Moreover, the shares of stock at issue here

1

A0207

were transferred directly from the sellers to the buyers with no intermediary. The only involvement of a "financial institution" was Fleet Bank's execution of a series of wire transfers of funds from one bank account to another; it never had custody or control of a single share of stock.

With the exception of one Bankruptcy Court decision from Pennsylvania, no court has applied § 546(e) to facts like these. This Court should not do so either. The result Defendants seek is compelled neither by the statutory language nor by the cases (including in particular *Lowenschuss* v. *Resorts Int'l, Inc.* (In re *Resorts Int'l, Inc.*), 181 F.3d 505 (3d Cir.), *cert. denied*, 528 U.S. 1021 (1999)). Moreover, it makes absolutely no sense, as many other courts have recognized.

Various Defendants also raise other arguments in favor of their motions to dismiss, none of which has merit. Accordingly, this Court should deny the motions to dismiss and allow this case to proceed to trial.

The stage of this proceeding is that Defendants have filed motions to dismiss the Complaint for failure to state a claim upon which relief can be granted. Because the Defendants have filed motions to dismiss, all well-pleaded allegations of the Complaint must be taken as true, and all reasonable inferences must be construed in the light most favorable to Plaintiff. *U.S. Express Lines, Ltd.* v. *Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).

2

A0208

## SUMMARY OF ARGUMENT

I.      Section 546(e) of the Bankruptcy Code does not apply to the transactions at issue here.  Under the plain language of § 741(8), only "settlement payments" commonly made in "the securities trade," i.e., with respect to publicly-traded securities, fall within § 546(e).  The statute's legislative history and the policy underlying it support this interpretation, as does the case law.  Because none of the stock of the companies at issue here was publicly traded, § 546(e) has no application.

II.     Defendants' remaining arguments lack merit.

A.     The Complaint adequately pleads claims for fraudulent transfers under Delaware law.  The Third Circuit and numerous other courts have allowed leveraged buyouts of the kind at issue here to be "collapsed" to reflect the reality of the transaction and have not allowed recipients of fraudulent transfers to escape the legal consequences of their actions by elevating form over substance; this Court should do the same.  And the Complaint's allegations as to solvency are more than adequate.

B.     These claims are timely because the bankruptcy petition was filed within four years of the date on which the fraudulent transfers occurred, and this action was filed within two years of the petition date, as required by 11 U.S.C. § 546(a)(1)(A).

C.     The issue of severance is premature at this stage of the proceedings.  Plaintiff's counsel is prepared to discuss severance if these motions to dismiss are denied.

3

A0209

## STATEMENT OF FACTS

The following narrative summary of facts is taken directly from the Complaint (dated April 1, 2005) and from the attachments thereto. Certain additional information relevant to the issues raised by Defendants is set forth in the Affidavit of Charles R. Bennett, Jr. ("Bennett Aff."), filed simultaneously herewith, to which is attached excerpts from documents "'integral to or explicitly relied upon in the complaint,'" *U.S. Express Lines, Ltd.* v. *Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) (quoting In re *Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)), namely, certain closing documents from the acquisitions at issue here, including the Stock Purchase Agreements for certain companies, and the Loan Agreement and Second Amended and Restated Loan and Security Agreement among the lenders, Plassein Packaging Corp., and certain companies. *See also Lexington Nat. Ins. Corp.* v. *Ranger Ins. Co.*, 326 F.3d 416, 418-19 (3d Cir. 2003) (approving consideration of affidavits on a motion to dismiss).

Debtor Plassein International Corp. ("Plassein") was formed in 1999 (and was then known as "Plassein Packaging Corp.," *see* Bennett Aff. ¶ 11) for the purpose of acquiring several privately held manufacturers of flexible packaging and specialty film. The acquisitions all took the familiar form of a leveraged buyout ("LBO"): a group of lenders agreed to advance funds and extend credit to Plassein in exchange for security interests in the target companies' assets and promises by the target companies to repay the loans, and Plassein then used those funds to acquire the stock of the target companies and to pay off the companies' existing secured debt. The target companies were not merged into Plassein; instead, they changed their names but continued in operation as

4

separate corporate entities, each obligated to repay the advances used by Plassein to acquire its stock and pay off its debts.

The LBO transactions proceeded in two phases. On January 10, 2000, Plassein closed on acquisitions of the stock of Plastical Industries, Inc. ("Plastical," n/k/a Plassein International of Spartanburg, Inc.), Nor Baker Industries, Ltd. ("Nor Baker," now in liquidation in Canada); Marshall Plastics Film, Inc. ("Marshall," n/k/a Plassein International of Martin, Inc.); and Key Packaging Industries Corp. ("Key," n/k/a Plassein International of Salem, Inc.), and of the assets of Transamerican Plastic LLC ("Transamerican," n/k/a Plassein International of Ontario, Inc.) (collectively, the "January Target Companies"). Following these acquisitions, each of the January Target Companies became jointly and severally liable for the entire debt incurred to finance the transactions, and each granted a security interest in all of its assets to secure that debt. Complaint ¶ 33; Bennett Aff. ¶ 8; Bennett Aff. Ex. C p. 4 (defining "Borrower" as each of the January Target Companies); *id.* Ex. C § 2.3(a) (providing that each "Borrower" holds a "joint and several obligation" for "[t]he outstanding principal amount of all the Revolving Credit Loans"); *id.* Ex. C, ex. A-1 ("Form of Revolving Credit Note") (providing that all the January Target Companies "hereby jointly and severally unconditionally promise to pay..."); *id.* Ex. C, ex. A-2 (same for "Form of Swingline Note"); *id.* Ex. C, ex. B-1 (same for "Form of Term Note A"); *id.* Ex. C, ex. B-2 (same for "Form of Term Note B"); *id.* Ex. C, ex. B-3 (same for "Form of Capex Note").

In a separate transaction, which closed on August 15, 2000, Plassein acquired the stock of Rex International, Inc. ("Rex," n/k/a Plassein International of Thomasville, Inc.). Following the Rex transaction, Rex became liable not only for the debt incurred in the

5

course of Plassein's acquisition of the Rex stock, but Rex also became a "borrower" under the loan agreement for the acquisition of the January Target Companies. Complaint ¶ 48. Rex granted a security interest in all of its assets to secure all of those obligations. *Id.* Thus, after the Rex transaction, Rex and each of the January Target Companies were jointly and severally liable for the entire debt incurred to acquire both Rex and all of the January Target Companies. *Id.*; Bennett Aff. ¶¶ 9-10; Bennett Aff. Ex. D p. 4 (defining "Borrower" as each of the January Target Companies plus Rex); *id.* Ex. D § 2.3(a) (providing that each "Borrower" holds a "joint and several obligation" for "[t]he outstanding principal amount of all the Revolving Credit Loans"); *id.* Ex. D, ex. A-1 ("Form of Second Amended and Restated Revolving Credit Note") (providing that all the January Target Companies and Rex "hereby jointly and severally unconditionally promise to pay…"); *id.* Ex. D, ex. A-2 (same for "Form of Second Amended and Restated Swingline Note"); *id.* Ex. D, ex. B-1 (same for "Form of Second Amended and Restated Term Note A"); *id.* Ex. D, ex. B-2 (same for "Form of Second Amended and Restated Term Note B"); *id.* Ex. D, ex. B-3 (same for "Form of Second Amended and Restated Capex Note").

With respect to each transaction, the selling shareholders received a substantial premium for their shares, which was accounted on the post-closing balance sheets as "goodwill." And with respect to each transaction, each target company was rendered insolvent in that the sum of its debts was greater than the value of its assets at fair valuation. Furthermore, as a result of the transactions, each company was engaged in a business for which its remaining assets were unreasonably small.

6

The closing documents for the January Target Companies provide that the stock certificates are to be delivered directly to the buyer with no intermediary. For example, the Stock Purchase Agreement for Key provides that "at the Closing ... the Stockholders will sell, transfer, convey, assign and deliver to the Purchaser the Shares and the certificates representing the Shares, together with stock powers duly endorsed by the Stockholders ...." Further, the stockholders represented and warranted that "[a]ll outstanding shares of Company Stock to be conveyed by a Stockholder pursuant to Section 3 are owned by such Stockholder free and clear...." Bennett Aff. Ex. A (Key Stock Purchase Agreement §§ 3.2 and 5.3). The pertinent language for each of the other January Target Companies is similar. *Id.* ¶ 3.

The closing documents for the Rex transaction also provide for a transfer of stock from seller to buyer with no intermediary. Section 1.04 of the Rex Stock Purchase Agreement provides that "at the Closing ... each of the Sellers will deliver to the Buyer stock and warrant certificate representing all of his or its Company Shares, endorsed in Blank or accompanied by duly executed assignment documents...." Bennett Aff. Ex. B (Rex Stock Purchase Agreement § 1.04).

Thus, for each closing at issue in this case, the selling shareholders delivered their shares of stock directly to Plassein. Plassein, in exchange, instructed Fleet Bank ("Fleet") to execute a wire transfer of funds from Plassein's account to the accounts of the various shareholders and secured creditors of the target companies. Fleet never had custody or control of any shares of stock; it simply transferred money at the request of its customer. Bennett Aff. ¶¶ 4(c), 6(c). All of the shares that changed hands in these transactions were of privately held companies; the public securities markets were not implicated in any

7

respect by any of the Plassein transactions. Bennett Aff. ¶¶ 4(a)-(b), 6(a)-(b); *see also id.* Ex. A, first paragraph (noting that the eight named Stockholders of Key "are the owners of all the issued and outstanding capital stock of the Company"); *id.* Ex. B, ¶ A (noting that seven of the eight named Sellers of Rex shares "own all the outstanding capital stock of the Company").

Following several months of defaults, debt accelerations, forbearance agreements, and other negotiations among the companies and the lenders, Plassein, Rex, and the January Target Companies filed Chapter 11 bankruptcy petitions in the Bankruptcy Court for the District of Delaware on May 14, 2003, and Nor Baker commenced an insolvency proceeding in Canada on the same date. Following the cases' conversion to Chapter 7, Plaintiff Brandt was appointed trustee of all of the debtors' estates on February 6, 2004. He initiated this action on or about April 1, 2005.

## ARGUMENT

The familiar legal standard on motions to dismiss is that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley* v. *Gibson*, 355 U.S. 41, 45 (1957). In evaluating such motions, the court must assume that all facts alleged in the plaintiff's Complaint are true, and must give Plaintiff "the benefit of every favorable inference that can be drawn from those allegations." *Schrob* v. *Catterson*, 948 F.2d 1402, 1405 (3d Cir. 1991).

## I.    Section 546(e) Is Not Applicable to the Transfers At Issue Here

Defendants' principal argument is that § 546(e)[2] renders the transfers at issue here exempt from avoidance. Section 546(e) provides in pertinent part that, absent actual fraud under § 548(a)(1)(A), "the trustee may not avoid a transfer that is a ... settlement payment, as defined in section 101 or 741 ..., made by or to a ... financial institution ...." Section 741(8) defines "settlement payment" as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade."

It is, of course, undisputed that each of the fraudulent transfers alleged here was accomplished via wire transfer from Fleet Bank to the selling shareholder in exchange for the shareholder's delivering its shares of stock directly to Plassein. Defendants therefore adopt the following syllogism: the transfers here are payments in exchange for shares of

---

[2] Throughout this brief statutes identified only by section number ("§ __") are from the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

9

A0215

stock, so they are "settlement payments"; Fleet Bank is a "financial institution" (*see* 11 U.S.C. § 101(22)), so the payments were "made by or to a … financial institution"; therefore, the transfers fall within § 546(e) and are not avoidable. For the reasons set forth herein, this simplistic syllogism is faulty.

Defendants rely heavily on the Third Circuit's decision in *Lowenschuss* v. *Resorts Int'l, Inc.* (In re *Resorts Int'l, Inc.*), 181 F.3d 505 (3d Cir.), *cert. denied*, 528 U.S. 1021 (1999), which applied § 546(e) to a leveraged buyout ("LBO") of a publicly-held company based on its "extremely broad" reading of the statutory text.[3] But the Third Circuit has never considered whether § 546(e) also applies to an LBO involving *privately held* companies – its two pronouncements on the Bankruptcy Code's definition of "settlement payment," *Resorts* and *Bevill, Bresler & Schulman Asset Mgmt. Corp.* v. *Spencer Sav. & Loan Ass'n*, 878 F.2d 742 (3d Cir. 1989), both concerned securities in the public markets, so the issue never arose in those cases. In fact, every LBO case cited by Defendants or located by our research in which a § 546(e) defense was successful – with a single exception, *Loranger Mfg. Corp.* v. *PNC Bank* (In re *Loranger Mfg. Corp.*), 324 B.R. 575 (Bankr. W.D. Pa. 2005) – has involved publicly traded securities. And several courts, when asked to apply § 546(e) outside the public securities markets, have declined to do so. *See, e.g., Kipperman* v. *Circle Trust* (In re *Grafton Partners, L.P.*), 321 B.R. 527 (B.A.P. 9th Cir. 2005); *Zahn* v. *Yucaipa Capital Fund*, 218 B.R. 656 (D.R.I. 1998); *Wieboldt Stores, Inc.* v. *Schottenstein*, 131 B.R. 655 (N.D. Ill. 1991); *Jewel Recovery,*

---

[3] Some courts, and several commentators, have rejected the application of § 546(e) to LBO payments even for public companies. In addition, the Eleventh Circuit in *Munford* v. *Valuation Research Corp.* (In re *Munford, Inc.*), 98 F.3d 604 (11th Cir. 1996), *cert. denied*, 522 U.S. 1068 (1998), concluded that when a "financial institution" is "nothing more than an intermediary or conduit" in an LBO, the transfers from the institution do not meet § 546(e)'s requirement of a "settlement payment … made by or to" a "financial institution." 98 F.3d at 610. However, *Resorts* rejected *Munford*'s analysis. *See* 181 F.3d at 516. While we of course recognize that this Court is bound to follow *Resorts*, we expressly reserve the right to argue to the Third Circuit that *Resorts* should be reconsidered, should this case reach that court.

10

*L.P.* v. *Gordon*, 196 B.R. 348 (N.D. Tex. 1996); *Official Comm. of Unsecured Creditors*

v. *Asea Brown Boveri, Inc.* (In re *Grand Eagle Cos., Inc.*), 288 B.R. 484 (Bankr. N.D.

Ohio 2003). Indeed, faced with an argument similar to that urged by Defendants on facts

quite similar to those of this case, one court responded as follows:

> Such a simplistic reading of § 546(e) ignores the meaning of the term "settlement
> payment" within the securities industry and would, essentially, convert that
> statutory provision into a blanket transactional cleansing mechanism for any
> entity savvy enough to funnel payments for the purchase and sale of privately
> held stock through a financial institution.

*Grand Eagle*, 288 B.R. at 494.

As explained below, Congress intended § 546(e) to apply only to transactions

involving publicly-traded securities, and § 741(8)'s plain language reflects that intention

by limiting the definition of "settlement payment" to "payments commonly used *in the*

*securities trade*" (emphasis added). The most natural reading of the term "the securities

trade" in both § 741(8) and § 741(5) (defining "margin payment"), and the reading that

best reflects Congress's intent, is as a reference to the public securities markets.

Defendants' argument, like the argument rejected in *Grand Eagle* and other cases,

ignores the purpose of § 546(e), and ignores essential statutory text – namely, the

restriction of "settlement payment" to payments that are common in "the securities

trade," 11 U.S.C. § 741(8) – that limits the application of § 546(e) to publicly-traded

securities.

This Court should decline to follow the *Loranger* decision, in which the issue in

this case was not even squarely addressed (as explained *infra*). Instead, this Court should

follow the weight of authority that the exemption in § 546(e) does not apply to privately

11

held stocks, and therefore that the § 546(e) exemption is not available to Defendants in this case.

### A.    The Text, History and Purpose of §§ 546(e) and 741(8) Demonstrate That They Do Not Apply To Privately Held Stocks

To understand why § 546(e) should have no application here, it is necessary to consider why that section appears in the Bankruptcy Code at all.    Section 546(e) (originally designated § 546(d)) was introduced into the Code in 1982 as part of Pub. L. 97-222, 96 Stat. 235 (1982), which was "a package of amendments designed to protect the carefully-regulated mechanisms for clearing trades in securities and commodities *in the public markets* from dysfunction that could result from the automatic stay and from certain trustee avoiding powers."    *Kipperman* v. *Circle Trust* (In re *Grafton Partners, L.P.*), 321 B.R. 527, 532-33 (B.A.P. 9th Cir. 2005) (emphasis added).    Those "carefully-regulated mechanisms," known as the "clearance and settlement system," are the means by which virtually all trades in public securities are accomplished.    The system works roughly as follows:

> [T]ypically, when a customer wishes to buy a security, he or she places an order with his or her broker, who purchases the security from another broker, who is acting on behalf of a party who has placed an order to sell.    Once the trade has been agreed upon, the process by which the security is delivered in exchange for the purchase price is known as "clearance and settlement."    The clearing agency compares the trades its member brokers have made to arrive at an accounting of the day's transactions, which it then uses to establish each broker's money and securities settlement obligations.    Finally, the trades are "settled" – funds and securities are delivered in satisfaction of the obligations.

> One of the keys to the success of this system is that each participant in the chain guarantees that he or she will make good on his or her obligation.    The buying broker guarantees that he or she will deliver funds in exchange for the securities. The selling broker guarantees he will deliver the security in exchange for funds. Because the comparison and settlement process is not instantaneous, however, the clearing agency must guarantee to the seller that it will deliver the funds, and it must also guarantee to the buyer that it will deliver the securities.    In the event of

A0218

> a default by any party in the chain, the clearing agency must still make good on its guarantee, which it can do by calling on a backup clearing fund provided by its members. Brokers and other intermediaries require collateralization of their respective risks by means of various types of margin payments. This system depends upon the availability of the respective guarantees to the clearing agency; without them, the potential exposure is tremendous.

Garfinkel, Note, *No Way Out: Section 546(e) Is No Escape for the Public Shareholder of a Failed LBO*, 1991 Colum. Bus. L. Rev. 51, 64–65 (1991) (footnotes omitted) (citing, *inter alia*, congressional hearings on the need for the 1982 amendments) [hereinafter "Garfinkel"]; *see also, e.g., Kaiser Steel Corp.* v. *Pearl Brewing Co.* (In re *Kaiser Steel Corp.*), 952 F.2d 1230, 1237 n.4 (10th Cir. 1991) (describing the system of interrelated guarantees and margin payments), *cert. denied*, 505 U.S. 1213 (1992); *Zahn* v. *Yucaipa Capital Fund*, 218 B.R. 656, 675-76 (D.R.I. 1998) (same; citing Garfinkel); *Wieboldt Stores, Inc.* v. *Schottenstein*, 131 B.R. 655, 663-64 & nn.9-10 (N.D. Ill. 1991) (same; citing Garfinkel). The system of interdependent guarantees and margin payments gives rise to the danger that a bankruptcy could pose to the affected market:

> If the pre-bankruptcy trades by a bankrupt intermediary could be set aside, then the guarantees that allow the system to function would be threatened, the parties could not proceed with confidence, and a bankruptcy by one party in the chain could spread to other parties in the chain, threatening a collapse of the entire industry.

*Zahn*, 218 B.R. at 676; *see also, e.g.,* Garfinkel, *supra*, at 65 ("If the trustee can recover as a preference, or avoid as a fraudulent conveyance, any of the types of payments that are used to secure the obligations of the market participants – and minimize the risk for the clearing agency – one participant's bankruptcy might trigger a ripple effect that spreads throughout the securities industry. In order for the system to work smoothly, the parties must be able to assume that the margin and settlement payments are valid, and will not be subject to subsequent attack.") (footnote omitted).

13

In light of these concerns, Congress concluded that the protections already present in the 1978 version of the Code for the commodities market should be extended to the public securities market. The legislative history explains the purpose of the 1982 amendments:

> The commodities and securities markets operate through a complex system of accounts and guarantees. Because of the structure of the clearing systems in these industries and the sometimes volatile nature [of] the markets, certain protections are necessary to prevent the insolvency of one commodity or security firm from spreading to other firms and possibl[y] threatening the collapse of the affected market.
>
> ....
>
> The thrust of several of the amendments ... is to clarify and, in some instances, broaden the commodities market protections and expressly extend similar protections to the securities market.

H.R. Rep. No. 420, 97th Cong., 2d Sess., at 1-2 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583, 583. With respect to § 546(e), the legislative history explains:

> Section 546([e]), together with provisions of section 548, prohibits a trustee from avoiding a transfer that is a margin payment to a commodity broker or forward contract merchant or is *a settlement payment made by a clearing organization*, except where the transfer was made with intent to hinder, delay, or defraud other creditors and was not taken in good faith.

*Id.* at 3, 1982 U.S.C.C.A.N. at 585 (emphasis added). Thus, as one district court recently observed, "[t]he object that Congress sought to accomplish by enacting § 546(e) was to protect the operation of the security industry's clearance and settlement system." *Buckley v. Goldman, Sachs & Co.*, No. 02-CV-11497-RGS, 2005 WL 1206865, at *7 (D. Mass. May 20, 2005).

Of course, the clearance and settlement system operates only with respect to securities that are publicly traded. *See, e.g., Grafton Partners*, 321 B.R. at 532-33; Munn *et al.*, Encyclopedia of Banking & Finance 937 (9th ed. 1991) (showing flow chart of clearance and settlement system as part of definition of "securities markets" that refers

14

only to public markets) (attached as Ex. A). There is, therefore, no indication in the legislative history that Congress saw any need to exempt from avoidance transfers in privately held stocks.

The original version of § 546(e) did not contain a reference to "financial institutions";[4] that reference was added by the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. 98-353, § 461(d), 98 Stat. 333, 377. There is no legislative history explaining the addition of "financial institutions" to the list of entities protected by § 546(e). "The absence of an explanation why a 'financial institution' needed to become a protected entity implies that the change was regarded as neither significant, nor controversial." *Grafton Partners*, 321 B.R. at 538.

The Code's definition of "settlement payment" was added as part of the same 1982 package of amendments that added § 546(e) to the Code. *See* Pub. L. 97-222, § 8, 96 Stat. 235 (1982). That definition, as subsequently amended,[5] now reads:

> "settlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.

11 U.S.C. § 741(8). This definition, although "extremely broad," *Resorts*, 181 F.3d at 515, has been described as "circular and cryptic" because it contains within it the very term it purports to be defining. *Zahn*, 218 B.R. at 675; *see also, e.g., Wieboldt*, 131 B.R.

---

[4] Section 546(e) (then numbered 546(d)) as originally added read:
> Notwithstanding sections 544, 545, 547, 548(a)(2), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 741(5) or 761(15) of this title, or settlement payment, as defined in section 741(8) of this title, made by or to a commodity broker, forward contract merchant, stockbroker, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1) of this title.

Pub. L. 97-222, § 4, 96 Stat. 235 (1982).

[5] The original version read "'settlement payment' means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, or any other similar payment commonly used in the securities trade." Pub. L. 97-222, § 8, 96 Stat. 235 (1982). A subsequent amendment added "a final settlement payment."

15

at 663; In re *Financial Mgmt. Sciences*, 261 B.R. 150, 154 (Bankr. W.D. Pa. 2001) ("This 'definition' is unilluminating in that the *definiendum* appears as a term in the *definiens*."). However, courts have focused on the definition's final clause – "any other similar payment commonly used in the securities trade" – as a way of giving the definition some content. "Whatever else a settlement payment may be, it is *restricted to the securities trade* and must be 'commonly used.'"   *Grafton Partners*, 321 B.R. at 538 (emphasis added); *see also, e.g., Kaiser*, 952 F.2d at 1237 ("The clear aim of the definition is to encompass all 'settlement payments' commonly used *in the securities trade*.") (emphasis added).

The term "the securities trade" in § 741(8) is not defined, but it is best read as referring to the industry dealing in publicly-traded securities. "Trade," when used as a noun (as it is in § 741(8)), means "the business of buying and selling or bartering commodities" and is synonymous with "business" or "market." Merriam-Webster's Collegiate Dictionary 1246 (10th ed. 2001); *see also* Black's Law Dictionary 1529 (8th ed. 2004) (defining "trade" as "the business of buying and selling or bartering goods and services"). Thus, the "securities trade" means, essentially, the "securities business" or "securities market," and naturally refers only to the "business of buying and selling" publicly-traded securities, since there is by definition no organized "market" for securities that are not available to the public.

Further support for this reading comes from the fact that § 546(e), in addition to applying to "settlement payments," also applies to "margin payments," which are defined as payments "commonly known to *the securities trade* as original margin, initial margin, maintenance margin, or variation margin, or as a mark-to-market payment, or that secures

16

an obligation of a participant in a securities clearing agency." § 741(5) (emphasis added).[6] These terms have no meaning outside the markets for publicly-traded securities, as is evident from the securities industry's definitions of several terms relating to margins and margin payments, all of which depend on the notion of a current "market value" for a particular security. For example, "margin" is measured "by the ratio between the customer's equity and the current market value of the purchased securities," Munn *et al.*, Encyclopedia of Banking & Finance 640 (9th ed. 1991); to "mark to the market" means to "adjust the valuation of a security or portfolio to reflect current market values," Downes & Goodman, Dictionary of Finance and Investment Terms 327 (4th ed. 1995); "minimum maintenance" is the level of equity that must be maintained in a margin account as measured by "the market value of eligible securities long or short in customers' accounts," *id.* at 334; and a "margin call" is a demand by a broker for additional security or partial payment "in order to offset or make good a loss in the value of the collateral due to a decline in the market price of securities pledged," Munn *et al.*, *supra*, at 644 (excerpts from Munn *et al.* and Downes & Goodman are attached hereto as Exhibits A and B respectively). In addition, the term "margin security," which refers to the types of securities that may be bought and sold in margin accounts, is defined to include only securities that trade in public markets. Downes & Goodman, *supra*, at 321-22 (listing four types of publicly-traded securities). None of these definitions can be sensibly applied to securities that are not publicly traded.

---

[6] "Securities clearing agency" is a defined term meaning "person that is registered as a clearing agency under section 17A of the Securities Exchange Act of 1934, or whose business is confined to the performance of functions of a clearing agency with respect to exempted securities, as defined in section 3a(12) of such Act for the purposes of such section 17A." § 101(48).

A0223

The term "the securities trade" in § 741(5) therefore must refer specifically, and only, to the industry that deals in publicly-traded securities. Sections 741(5) and 741(8) were enacted simultaneously, *see* Pub. L. 97-222, § 8, 96 Stat. 235 (1982), so the usual rule that identical words in the same statute have the same meaning, *see, e.g.,* In re *Hechinger Inv. Co. of Del., Inc.,* 335 F.3d 243, 253 (3d Cir. 2003) (citing cases), applies with particular force here, *see, e.g., FAG Italia S.p.A.* v. *United States,* 291 F.3d 806, 820 (Fed. Cir. 2002); *McLellan* v. *Mississippi Power & Light Co.,* 545 F.2d 919, 938 (5th Cir. 1977). The definition of "margin payment" thus provides further evidence that the term "the securities trade" in § 741(8) limits the definition of "settlement payment" to transactions in publicly-traded securities.

To the extent that the Court finds the term "the securities trade" to be ambiguous despite the foregoing, resort to the statute's legislative history is appropriate. *See, e.g., United States* v. *Hodge,* 321 F.3d 429, 437 (3d Cir. 2003) ("When the language of a statute is ambiguous, we look to its legislative history to deduce its purpose.") (citing cases). The Third Circuit has also emphasized that it "will not read a statute to produce absurd or unintended results 'demonstrably at odds with the intentions of its drafters.'" *Id.* (quoting *Griffin* v. *Oceanic Contractors, Inc.,* 458 U.S. 564, 571 (1982)). Here, the legislative history and the intent of Congress in drafting § 546(e) are particularly clear. As set forth at length *supra,* Congress's exclusive focus in the legislative history was on the clearance and settlement system applicable to exchanges of publicly-traded securities. That focus has led several courts to conclude, consistently with the reading proposed here, that there can only be a "settlement payment" as defined in § 741(8) when the market for publicly-traded securities is involved. *See, e.g., Grafton Partners,* 321 B.R. at

18

A0224

539 ("[C]ommon elements in decisions finding that there is not a protected settlement payment are that the securities involved are not publicly traded and public markets are not utilized."); *Jewel Recovery, L.P.* v. *Gordon*, 196 B.R. 348, 353 (N.D. Tex. 1996) (limiting § 546(e) to transactions "in the public market"); *Official Comm. of Unsecured Creditors* v. *Asea Brown Boveri, Inc.* (In re *Grand Eagle Cos., Inc.*), 288 B.R. 484, 494 (Bankr. N.D. Ohio 2003) ("§ 546(e) has been applied to the purchase and sale of stock of publicly traded companies.").

In sum, Congress's intention to apply § 546(e) only to transactions in publicly-traded securities is manifest in the legislative history, and is consistent with common sense – the trustee's avoidance powers are intentionally broad, and there is no reason to exempt transactions in privately-held stocks from those powers. Congress enacted its intention into law by expressly defining the terms "settlement payment" and "margin payment" only as those terms are used in "the securities trade," i.e., the industry that deals in publicly-traded securities. Section 546(e) therefore has no application where only privately-held stocks are involved, and this Court should so rule.

### B.    Case Law and Common Sense Confirm That § 546(e) Should Not Be Applied To These Facts

This case, as noted in the Statement of Facts, *supra*, concerns the exchange of shares of stock that were not publicly traded, and transfers by an institution whose only role in the transaction was to transfer money from one bank account to another. With a single exception – *Loranger Mfg. Corp.* v. *PNC Bank* (In re *Loranger Mfg. Corp.*), 324 B.R. 575 (Bankr. W.D. Pa. 2005) – we have found no case that has applied § 546(e) in similar circumstances. All other cases that have accepted a § 546(e) defense to an attempt to recover LBO transfers have concerned publicly traded stocks, and have

19

involved payments from institutions that at least had possession of the relevant shares at some point during the transactions. *See, e.g., Kaiser Steel Corp.*, 952 F.2d at 1235-36; *Resorts*, 181 F.3d at 508-09; *Official Committee of Unsecured Creditors* v. *Fleet Retail Fin. Group* (In re *Hechinger Investment Co. of Del., Ltd.*), 274 B.R. 71, 76-79 (D. Del. 2002). *Loranger* is distinguishable because in that case the plaintiff had *conceded* that the payment in question was a "settlement payment" and argued only that there was no payment "by or to" a "financial institution." *Id.* at 584.

Defendants nonetheless insist that the Third Circuit's *Resorts* case compels the result they seek. They are wrong. *Resorts* concerned the LBO of a publicly-held company, Resorts International, Inc. *See Lowenschuss* v. *Resorts Int'l, Inc.*, 194 B.R. 339, 344 (D.N.J. 1996) (noting that prior to the LBO Resorts International was "a publicly-owned company"); *see also Grafton*, 321 B.R. at 539 (listing *Resorts* among cases that "have involved publicly traded securities in public markets in which an intermediary played a role"). The Third Circuit discussed the transfer at issue as follows:

> Here, the securities passed from [shareholder]'s broker, Merrill Lynch, to the transfer bank, Chase Manhattan. Resorts wired funds to Chase which Chase then forwarded them [sic] to Merrill Lynch who paid [shareholder]. Although no clearing agency was involved in this transfer, two financial institutions – Merrill Lynch and Chase – were. Under a literal reading of section 546, therefore, this was a settlement payment "made by ... a financial institution." 11 U.S.C. § 546(e).

181 F.3d at 515. Of course, the court had no occasion to consider whether § 741(8) applied to privately-held stocks, since Resorts was a public company. The court did consider, and rejected, the proposition adopted in *Zahn* v. *Yucaipa Capital Corp.*, 218 B.R. at 676, and *Wieboldt Stores, Inc.* v. *Schottenstein*, 131 B.R. at 664-65, that only payments that directly implicate the clearance and settlement system should be deemed

20

A0226

"settlement payments." *See Resorts,* 181 F.3d at 515-16. The court also rejected the Eleventh Circuit case of *Munford* v. *Valuation Research Corp.,* 98 F.3d 604 (11th Cir. 1996), *cert. denied,* 522 U.S. 1068 (1998), which held that § 546(e) was not implicated if the financial institution acted as a mere "intermediary or conduit" for the funds or shares that passed through its hands in the course of the LBO. 181 F.3d at 516. The Third Circuit emphasized that it was bound by the "plain language of the statute," and concluded that "section 546 applies to this transaction and prevents its avoidance under section 548(a)(1)(B)." *Id.* at 515-16.

The Third Circuit's rejection of *Zahn, Wieboldt,* and *Munford* does not resolve this case.[7] To the contrary, the Third Circuit's emphasis on the "plain language of the statute" renders it essential that this Court give content to *all* portions of the relevant statutory texts. *See, e.g., Rosenberg* v. *XM Ventures,* 274 F.3d 137, 141 (3d Cir. 2001) (noting that courts should "give meaning to every word which Congress used") (citing cases). *Zahn, Wieboldt,* and *Munford* all failed to base their holdings on the language of the statutes they were interpreting, instead resting their conclusions on policy considerations derived from the statutes' legislative history. It was this mode of analysis that *Resorts* rejected. *Zahn,* for example, after reviewing the legislative history and concluding that Congress intended § 546(e) to protect the clearance and settlement

---

[7] Certain broad language in *Resorts,* such as "[a] payment for shares during an LBO is obviously a common securities transaction, and we therefore hold that it is also a settlement payment for the purposes of section 546(e)," 181 F.3d at 516, could encompass this case if taken out of context. But, as noted in the text, the question whether § 546(e) applies to privately-held stocks did not arise in *Resorts.* Broad language in a judicial opinion, however clearly it may seem to apply to a different situation, cannot be read to have determined an issue that was not presented to the court. *See, e.g., Hubbard* v. *Taylor,* 399 F.3d 150, 163 (3d Cir. 2005) (noting that issue in a previous case "was not before us and we did not decide it" despite language that seemed to address it); *Grasso* v. *IRS,* 785 F.2d 70, 74 n.3 (3d Cir. 1986) (rejecting suggestion that prior case had decided issue that "was patently not before the court" despite language seeming to address it); *Cerro Metal Products* v. *Marshall,* 620 F.2d 964, 978 (3d Cir. 1980) (statements pertaining to issues not decided are dictum because "the precise issue [is not] before the court.").

A0227

system, and noting that the transaction before it "had no connection whatsoever to the clearance and settlement system," 218 B.R. at 676, simply concluded that "[i]t thus appears highly unlikely that Congress would intend these transfers to be covered as 'settlement payments.'" *Id.* at 677 (citing cases relying on "the statutory scheme" and "what Congress had in mind" in reaching similar conclusions). Similarly, *Wieboldt* noted that avoiding the transfers at issue "poses no significant threat to those in the clearance and settlement chain," 131 B.R. at 664, and from that concluded that "the section's legislative history, when combined with consideration of the system which Section 546(e) was designed to protect, convince this court that Section 546(e) does not bar the Trustee's claims ....," *id.* at 665. *Munford*, too, reached a conclusion that "is not explicit in section 546." *Resorts*, 181 F.3d at 516.

The Third Circuit has thus made clear that it will not allow legislative history and policy considerations to override a statute's plain language. But, as explained above, the statute's plain language *does* distinguish transactions involving publicly-traded securities from transactions involving shares of privately-held corporations. By limiting the definition of "settlement payment" to "payments commonly used *in the securities trade*," § 741(8) (emphasis added), Congress plainly expressed its intention to exempt from the trustee's avoidance powers only transactions that involve publicly-traded securities, consistent with its intent (as shown by the legislative history) to "minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." H.R. Rep. No. 420, 97th Cong., 2d Sess., at 1 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583, 583.

22

Thus, unlike *Zahn, Wieboldt,* and *Munford,* this Court need not rely only on legislative history and policy considerations. To the contrary, this Court can, and should, rely on § 741(8)'s express limitation of "settlement payments" to payments "commonly used in the securities trade" to restrict the § 546(e) exemption to publicly-traded securities. That reading "give[s] meaning to every word which Congress used," *Rosenberg* v. *XM Ventures,* 274 F.3d 137, 141 (3d Cir. 2001) (citing cases), and it is also faithful to the "object and policy" of the statute, *Pilot Life Ins. Co.* v. *Dedeaux,* 481 U.S. 41, 51 (1987), as reflected in the legislative history. Nothing in *Resorts* is to the contrary.

The cases relied upon by Defendants other than *Resorts,* such as *Bevill* and *Hechinger,* are simply not applicable, nor are other commonly-cited cases such as the Tenth Circuit's decision in *Kaiser.* *Kaiser* and *Hechinger* both concerned LBOs of publicly-held companies, *see Kaiser,* 952 F.2d at 1235; *Hechinger,* 274 B.R. at 76-77, so as with *Resorts,* the question whether a transfer in exchange for shares of a privately-held corporation could constitute a "settlement payment" never arose. And *Bevill,* in addition to also concerning publicly-traded securities, arose in the very different context of repurchase (or "repo") agreements. *See Bevill* 878 F.2d at 743-44 (describing the repo transactions at issue, which involved government securities). None of these cases offers any support for applying § 546(e) to LBO transactions in privately-held stocks. Indeed, in an earlier opinion arising out of the Kaiser Steel LBO and bankruptcy, the Tenth Circuit actually undercuts Defendants' position. In that case, Kaiser, a publicly-traded company (before the LBO), urged that its LBO should not be considered a "securities transaction" for purposes of § 546(e). The Court rejected the argument in a footnote: "That LBOs *of publicly-traded companies* are securities transactions is shown by the fact

23

that they are within the purview of the Securities and Exchange Commission." *Kaiser Steel Corp.* v. *Charles Schwab & Co., Inc.*, 913 F.2d 846, 850 n.8 (10th Cir. 1990) (emphasis added). Clearly, the Court left open the possibility that LBOs of privately-held companies might not fall within § 546(e).

Defendants are left only with *Loranger*. That case did apply § 546(e) to a transaction involving a privately-held corporation. However, it did so *without ever considering* the key issue here, namely, whether the definition of "settlement payment" extends to transactions in shares that are not publicly traded. This is because the plaintiff in *Loranger* "*conceded* that [the transfer at issue] was a settlement payment." *Loranger,* 324 B.R. at 584 (emphasis added). Indeed, the court never even cites the definition of "settlement payment" in § 741(8), instead focusing entirely on whether the transaction was "by or to" a "financial institution." *See Loranger,* 324 B.R. at 583-86. We do not know why the plaintiffs in *Loranger* conceded what would seem to be their strongest argument, but their concession to a bankruptcy court in Pennsylvania has no relevance to this Court's analysis of § 741(8).

There is, in sum, no reason based on the statutory text or the case law that this Court should apply § 546(e) to the facts before it. And there are very good reasons not to do so, above and beyond the facts that such an application would be contrary to the statutory text and that Congress never intended § 546(e) to reach transactions like these. First, the avoidance powers of trustees in bankruptcy are intentionally broad in order to ensure the largest and fairest possible distribution to all creditors. *See, e.g., Bevill,* 878 F.2d at 751; In re *Bullion Reserve of N. Am.,* 922 F.2d 544, 546 (9th Cir. 1991) (noting the trustee's "broad powers" to avoid preferences and fraudulent transfers); In re *Russell,*

24

927 F.2d 413, 416 (8th Cir. 1991) (noting that trustee's avoidance powers are "so broad" that they may reach transfers deemed "irrevocable" under state law). Courts therefore recognize that exceptions to the avoidance powers – of which § 546(e) is one – are to be narrowly construed. *See, e.g.,* In re *AppOnline.com*, 315 B.R. 259, 282 (Bankr. E.D.N.Y. 2004); In re *CIS Corp.*, 195 B.R. 251, 257 (Bankr. S.D.N.Y. 1996); *Richardson* v. *FDIC* (In re *M. Blackburn Mitchell, Inc.*), 164 B.R. 117, 128 (Bankr. N.D. Cal. 1994). Defendants seek precisely the opposite: they seek the *broadest* possible construction of § 546(e)'s exception to the trustee's avoidance powers, beyond where any case has taken it and beyond what the statute requires or permits. And they seek this overbroad construction without even bothering to explain why Congress might have wanted to create such a massive loophole. Defendants' proposed reading of § 546(e) is contrary both to the statutory text, as explained above, and to the normal principles governing construction of the Bankruptcy Code.

Second, as noted in the Statement of Facts, *supra*, the only involvement of a "financial institution" in the Plassein transactions was Fleet's role in executing wire transfers. But a wire transfer is simply an efficient way of getting money from one party's bank account to another's. The Plassein transactions would have been no different if, instead of utilizing a wire transfer, Plassein had brought a suitcase full of cash to the closing. Had Plassein done so, however, there would have been no argument for applying § 546(e), because there would have been no payment "by or to" a "financial institution." It seems highly unlikely that Congress intended to allow a bankruptcy trustee to avoid a fraudulent transfer made in cash, but to exempt from avoidance the very same transaction if executed by wire transfer. *See, e.g., Grand Eagle*, 288 B.R. at 494

25

A0231

(noting that overbroad application of § 546(e) would "convert that statutory provision into a blanket transaction cleansing mechanism for any entity savvy enough to funnel payments for the purchase and sale of privately held stock through a financial institution"); *Jewel Recovery*, 196 B.R. at 353 ("The affirmative application of § 546(e) to this transaction would serve to sanction the practice of structuring private stock purchases in an effort to circumvent the avoidance section, merely by utilizing a financial institution.").

In sum, applying § 546(e) to transactions in privately held stock is inconsistent with the statutory text, and serves no purpose that is anywhere evident in the legislative history or elsewhere. Instead, it unduly restricts the intentionally broad reach of the trustee's avoidance powers, to the detriment of creditors and the bankruptcy estate, with no corresponding benefits. This Court should decline the invitation to adopt a reading of § 546(e) that has neither text, case law, nor policy to commend it.

## II.     Defendants' Remaining Arguments Are Without Merit

In addition to the § 546(e) argument, various Defendants have raised other reasons for dismissal, none of which has merit. We briefly address each.

### A.     The Complaint Adequately Pleads Fraudulent Transfers

#### 1.     Identity of the "Debtor"

The Key Defendants, Chebeir, the Rex Defendants, and B.A. all argue that the Complaint fails to satisfy the Delaware fraudulent transfer statute's requirement that "the debtor" be the one making the fraudulent transfer. Since Plassein, rather than Rex (as to B.A. and the Rex Defendants), Key (as to the Key Defendants), or Plastical (as to

26

Chebeir) was the one buying the stock, they say, there were no "transfers" from the companies rendered insolvent as a result of the transactions.[8]

Defendants in fraudulent transfer actions arising out of LBOs routinely raise arguments along these lines, seeking to elevate the formal structure of an LBO over the substance of what actually happened in order to shield themselves from the legal consequences of their conduct. Acceptance of these arguments would render fraudulent transfer laws inapplicable to LBOs because, "[g]enerally speaking, an LBO is a method of acquiring a company by which the acquiring company leverages (i.e., borrows against) the assets of the target company to finance the purchase of the target company's shares from the selling shareholders." *Official Committee of Unsecured Creditors* v. *Fleet Retail Fin. Group* (In re *Hechinger Investment Co. of Del.*), 274 B.R. 71, 81 (D.Del. 2002). Since the target company of an LBO was not the one purchasing the shares – even though it *was* the one pledging its assets and incurring a huge liability to finance the purchase – it is possible to argue that, in a purely formalistic sense, the target company made no "transfer" to the selling shareholders, and the Defendants have so argued here.

However, formalism has not won the day – "the vast majority of courts now agree that extending fraudulent conveyance provisions to LBO transactions is proper." *Hechinger*, 274 B.R. at 81. Relying on the Third Circuit's seminal decision in *United States* v. *Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986), *cert. denied*, 483 U.S. 1005 (1987), the District Court of this District has analyzed the legal context as follows:

> Regardless of the various complex structures of leveraged buyouts, which often involve various loans, stock purchases, mergers, and repayment obligations, courts have found that a set of transactions may be viewed as one integrated

---

[8] B.A. also seems to argue that Plassein Packaging Corp. is not a debtor. *See* B.A. Brief at 3-4. That is incorrect because, as noted in the Statement of Facts, the Debtor Plassein International Corp. was formerly known as Plassein Packaging Corp. *See* Bennett Aff. ¶ 11.

A0233

transaction if the transactions "reasonably collapse into a single integrated plan and either defraud creditors or leave the debtor with less than equivalent value post-exchange." In *Tabor Court Realty*, the Third Circuit agreed that the district court properly collapsed the steps of an LBO transaction in that case in order to determine fraudulent conveyance liability and stated that the district court "looked beyond the exchange of funds between [the lender] and the [debtors]" because "[t]he two exchanges were part of one integrated transaction."

Courts thus focus "not on the structure of the transaction but on the knowledge and intent of the parties involved in the transaction."

*Hechinger*, 274 B.R. at 90-91 (citations omitted). Here, as alleged in the Complaint, each

LBO "reasonably collapse[s] into a single integrated plan," and each LBO left each target

company with less than reasonably equivalent value post-exchange (*see* discussion of

solvency, *infra* Part II-A-2).

Thus, under *Tabor Court Realty, Hechinger*, and numerous other cases from this

circuit and others (including *Moody* v. *Security Pacific Bus. Credit, Inc.*, 971 F.2d 1056

(3d Cir. 1992); *Mellon Bank* v. *Metro Communications*, 945 F.2d 635 (3d Cir. 1991),

*cert. denied*, 503 U.S. 937 (1992); *Wieboldt Stores, Inc.* v. *Schottenstein*, 94 B.R. 488

(N.D. Ill. 1988); *Crowthers McCall Pattern Inc.* v. *Lewis*, 129 B.R. 992 (S.D.N.Y. 1991);

*Rosener* v. *Majestic Mgmt., Inc.* (In re *OODC, LLC*), 321 B.R. 128 (Bankr. D. Del.

2005); and *Brandt* v. *Hicks Muse & Co., Inc.* (In re *Healthco Int'l, Inc.*), 195 B.R. 971

(Bankr. D. Mass. 1996)), ample legal authority exists to "collapse" the LBO transactions

at issue here for purposes of the fraudulent transfer laws. To the extent that any of the

Defendants have factual claims that they think might render collapsing these transactions

inappropriate as to them, they are free to raise such claims at a later stage of these

proceedings. But Defendants' motions to dismiss on this ground must fail because, under

the cases cited above and the facts alleged in the Complaint, it is clearly possible for

Plaintiff to prove a set of facts that would entitle him to relief. Like the LBOs in those

28

cases, each LBO at issue here is properly viewed as an "integrated transaction," which renders Defendants potentially liable for the fraudulent transfers alleged in the Complaint.

### 2. Solvency

Chebeir, the Rex Defendants, and B.A. question whether Plastical's or Rex's solvency was "affected" by the transactions, noting that "no payments were alleged to have been made by Rex." B.A. Brief at 5, ¶ 9; *see also, e.g.,* Chebeir Brief at 5 ("there could have been no change in Plastical's net worth because of [Plassein]'s payments to Chebeir"). But this is simply a reflection of these Defendants' formalistic approach to LBOs that has been debunked by the cases cited *supra* Part II-A-1. Moreover, the Complaint clearly *does* allege that Rex and Plastical (as well as the other target companies) assumed massive liabilities in the course of the transactions, including not only the financing for the acquisition of their own stock but also their agreement to become jointly and severally liable for the debt incurred to acquire Rex and all the January Target Companies. Complaint ¶¶ 33, 48-49; Bennett Aff. Exs. C, D. Thus, as to Rex, when the meaningless "goodwill" is ignored (*see* Complaint ¶ 56), Rex's liabilities following the transaction exceeded its assets by nearly $20 million, due in large part to the $48 million of "new bank debt." Complaint Ex. G. And as to Plastical, the assumption of over $7 million of "new bank debt" (which understates the actual liability, *see* the discussion of Key's solvency *infra*) resulted in Plastical's liabilities exceeding its assets by $229,365, even counting the "goodwill." Complaint Ex. D. These facts are more than enough to substantiate the Complaint's allegations as to Rex's and Plastical's

A0235

solvency (which must in any event be taken as true), *see* Complaint ¶¶ 45-46, 57-60, for purposes of a motion to dismiss.

The Key Defendants also question the Complaint's solvency allegations, claiming that even if goodwill is ignored, Key still had a positive net worth of $1,353,134 after the transaction according to the balance sheet shown at Complaint Ex. B. Key Brief at 13. Key's claim is incorrect because the balance sheet does not accurately reflect the full extent of the obligation incurred by Key as a result of the January transactions. In particular, the balance sheet reflects only $15,120,000 in "new bank debt," which is roughly the amount needed to purchase Key's shares and discharge certain of Key's outstanding liabilities. In fact, however, Key became jointly and severally liable (with the other January Target Companies) for the *entire* debt incurred in the course of acquiring *all* the January Target Companies under the January Loan Agreement, as set forth in Complaint ¶ 33; *see also* Bennett Aff. Ex. C. At least $39 million was advanced under the January Loan Agreement to acquire the January Target Companies, Complaint ¶ 36, so Key's actual liability was far in excess of the $15,120,000 reflected on the balance sheet. As with the other Defendants, these facts are more than adequate to substantiate the Complaint's allegations as to Key's insolvency, *see* Complaint ¶¶ 45-46, 58, 60, for purposes of a motion to dismiss. If any of these Defendants wish to contest Plaintiff's allegations as to the companies' solvency as a factual matter, a motion to dismiss is obviously not the place to do so, since at this stage all of the Complaint's allegations, including those as to solvency, must be taken as true.

A0236

**B.    The Fraudulent Transfer Actions Are Timely**

The Marshall Defendants urge dismissal because this action was initiated more than four years after the transfers at issue, and the Delaware UFTA has a four-year limitations period. The Marshall Defendants overlook § 546(a)(1)(A) of the Bankruptcy Code, which provides that the trustee has two years *from the petition date* in which to bring avoidance actions under the "strong arm" power of § 544. As long as the state limitations period had not expired *as of the petition date*, a § 544 action like this one is timely if brought within § 546(a)(1)(A)'s two-year period. *See, e.g.,* In re *Spatz,* 222 B.R. 157, 164-65 & nn.12-13 (N.D. Ill. 1998); In re *Kaiser Merger Litigation,* 168 B.R. 991, 1002 n.11 (D. Colo. 1994); In re *Dry Wall Supply, Inc.,* 111 B.R. 933, 936-37 (D. Colo. 1990); In re *G-I Holdings, Inc.,* 313 B.R. 612, 646 (Bankr. D.N.J. 2004); In re *Martin,* 142 B.R. 260, 265 (Bankr. N.D. Ill. 1992); In re *Topcor, Inc.,* 132 B.R. 119 (Bankr. N.D. Tex. 1991).

This action meets § 546(a)(1)(A)'s requirements. The Marshall transactions closed on or about January 10, 2000. Plassein's petition date was May 14, 2003, less than four years later, so a fraudulent transfer action was timely under Delaware law as of the petition date. And this adversary proceeding was commenced on April 1, 2005, comfortably within § 546(a)(1)(A)'s limitation period of two years from the petition date.

**C.    It Is Premature To Discuss Severance**

Finally, Defendant B.A., whose involvement is limited to the Rex transaction, urges that the action against it should be severed from the actions against the shareholders of the January Target Companies. It is inappropriate and premature to raise this issue in a

31

A0237

motion to dismiss. Assuming that the Court denies B.A.'s motion to dismiss, Plaintiff's

counsel is prepared to confer with counsel for B.A. regarding severance.

## CONCLUSION

For the foregoing reasons, all of the Defendants' motions to dismiss the

Complaint should be denied.

Respectfully submitted,

WILLIAM BRANDT, as he is the Trustee of the
Estates of Plassein International Corp., *et al.*

By his attorneys,

CROSS & SIMON, LLC

By: /s/ Amy Evans
    Richard H. Cross, Jr. (No. 3576)
    Amy Evans (No. 3829)
    913 N. Market St., 11th Floor
    P.O. Box 1380
    Wilmington, DE 19899-1380
    (302) 777-4200
    (302) 777-4224 (facsimile)

Of Counsel:

Charles R. Bennett, Jr.
HANIFY & KING
Professional Corporation
One Beacon Street
Boston, MA 02108
(617) 423-0400

Dated: July 15, 2005

A0238

# EXHIBIT "A"

A0239

# ENCYCLOPEDIA OF

c.1

# Banking & Finance



NINTH EDITION
REVISED AND EXPANDED

GLENN G. MUNN
F. L. GARCIA
CHARLES J. WOELFEL

St James Press

Chicago and London

A0240

MANIFEST

conceptualized as a set of interrelated systems, each with its set of inputs, processing, and outputs. How systems operate and how systems interface with each other and the external environment are major interests of information systems theories.

Quantitative management science focuses on decision making and uses economic effectiveness criteria measured in terms of costs as a major objective. Mathematical models and computers provide powerful analytical tools and techniques which are widely used in quantitative management science's approach to management.

BIBLIOGRAPHY

Baker, Kenneth R. and Dean H. Kropp, *Management Science*. John Wiley & Sons, New York, 1985.

**MANIFEST**  A formal schedule or statement of a cargo taken on board a ship, prepared by the manifest clerks under the direction of the ship's master. It is in reality a summary of all the bills of lading covering the ship's cargo and is at once an operating, clearance, entry, and accounting document. Its preparation is required and its form prescribed by the United States and by governments of the various foreign countries. A manifest is sworn to before the customs officials of the port of debarkation. One copy is forwarded to the customs officials at the port of entry, another to the ship owners, and a third retained as a part of the records of the ship.

**MANIPULATION**  In the broadest sense, the artificial advancing and depressing of prices by those who have the ability to do so. The course of prices on an organized market could be artificially influenced in greater or lesser degree by numerous devices, including pools (inside and outside), rings, cliques, wash sales, matched orders, bucketing corners, and unlisting legitimate securities, as well as by disseminating tips, false reports, or "alleged information." Manipulative practices on national securities exchanges are prohibited by Sections 9 and 10 of the Securities Exchange Act of 1934, and such practices on commodity exchanges are prohibited by Sections 4b and 4c of the Commodity Exchange Act. In addition to being subject to such regulation by the Securities and Exchange Commission and the Commodity Futures Trading Commission, securities exchanges and commodity markets by rules of their own prohibit such practices and engage in self-policing. Despite such regulation and self-policing, the spreading of tips and rumors is quite impossible to prevent, so that the best protection against such still remains to inquire into the sources of information so as to distinguish between fact and rumor. The ultimate purpose of manipulation is to profit at the expense of the lambs (inexperienced speculators). Excessive or improvident speculation, whether based on unfounded rumor or on established facts, is not manipulation.

*See* BUCKET SHOP, CLIQUE, CORNER, MATCHED ORDERS, POOL, RING, TIP, WASH SALE.

**MANUALS**  Periodic publications containing financial statistics and other descriptive information and used as reference sources by brokerage firms, financial institutions and investors. The term particularly refers to the services published by the leading publishers of factual and interpretive investment data—STANDARD & POOR'S CORPORATION (Standard & Poor's Corp., subsidiary of McGraw-Hill Inc.) and Moody's (MOODY'S INVESTOR SERVICE, INC., subsidiary of Dun & Bradstreet, Inc.) A summary of these services follows.

Standard & Poor's. Publication services include *The Outlook* (weekly investment advisory service); *S&P Investment Advisory Survey* (weekly); *Stock Guide*; *Stock Summary*; *Bond Guide*; *Industry Surveys* (with complementing Statistical Section); *Corporation Records* (six volumes and Daily New Section), the basic reference for factual financial information on corporations); *Earnings Forecaster* (weekly new and revised earnings estimates on various companies); *Standard N.Y.S.E. Stock Reports*; *American Stock Exchange Stock Reports*; *Unlisted Stock Reports*; *Facts and Forecasts* (daily); *Bond Outlook*; *Municipal Bond Selector*; *Opportunities in Convertible Bonds*; *Convertible Bond Reports*; *Analysts Handbook*; *Transportation Service*; *Dividend Record*; *Status of Bonds*; *Called Bond Record*; *Registered Bond Interest Record*; *CUSIP Master Directory*; *Poor's Register of Corporations, Directors and Executives*; *Security Dealers Directory*; *Commercial Paper Reports Service*; *International Stock Report*; *Financial Green Book* (monthly summary of most recent financial results and market data on leading foreign and domestic stocks and bond issues); *Review of Securities Regulations*; *Trendline Publications* (daily basis) *Stock Charts*; *Current Market*

*Perspective*; and OTC [over-the-counter] *Chart Manual*. Computer-derived and automated services include ISL [Investment Securities Laboratory] Punched Cards; Corporate Pricing Service; ISL Price Tapes; Punched Card Dividend Service; Municipal Pricing and Leasing Service; Punched Card Registered Bond Interest Service; Punched Card Index Library; ISL Stock Price Books; and While's Tax Exempt Bond Market Ratings. An affiliated company, Standard & Poor's Counseling Corp., provides individual and institutional clients with a continuing, personalized, and confidential investment service.

Moody's. Moody's bound volumes, supplemented by news supplements for ring binders, include *Municipals and Government*, *Public Utilities*, *Transportation*, *Industrial*, *Banks and Finance*, and OTC [over-the-counter] *Industrials*. Other factual services include *Moody's Dividend Record and Bond Record*; *Moody's Stock Guide*; *Moody's Bond Guide*; and *Moody's Handbook of Common Stocks*. Advisory and interpretive services include Stock Survey; Bond Survey; Moody's Advisory Reports; Moody's Personal Management Service; Moody's Supervisory Service for Banks and Trust Companies; and Moody's Estate and Trust Service.

Other. Among other financial publications in active use with brokerage firms, institutions, and investors are

Alfred M. Best Co.—*Best's Insurance Reports* [manuals] on *Life, Fire and Marine, and Casualty and Surety Companies*; *Best's Digest of Insurance Stocks*.
Bond Buyer—*Directory of Municipal Bond Dealers*; *Municipal Bond Sales Book*.
Commerce Clearing House, Inc.—Loose-leaf tax and business law reporting service.
Commodity Research Bureau, Inc.—*Commodity Yearbook*.
Dun & Bradstreet Publications Corp.—*Exporter's Encyclopedia*.
Fairchild Publications—*Fairchild's Financial Manuals*; *Industrial Textile Directory*.
Financial Information, Inc.—Daily Called Bond Service; Financial Daily Card Service, Financial Stock Guide.
Robert D. Fisher—Manuals on obsolete securities.
Fitch Investors Service, Inc.—Fitch Rating Register.
Monthly Stock Digest Service.
National Quotation Bureau—National Daily Quotation Service; National Quotation Bond Summary; National Stock Summary; National Municipal Bond Summary.
R. L. Polk & Co.—*Polk Bankers' Encyclopedia*.
Prentice-Hall, Inc.—Loose-leaf services on taxes and regulation.
Rand McNally & Co.—*Rand McNally Bankers' Directory*.
Research Institute of America, Inc.—Investors Service; *Tax Guide*.
The Spectator—*The Spectator Magazine; Insurance Yearbook*.
United Business Service—Weekly service on business and investing developments.
Value Line (Arnold Bernhard & Co., Inc.)—Value Line Investment Survey; Value Line Convertible Survey; Value Line OTC [over-the-counter] Special Situations Service.
Walker's Manuals—*Walker's Manual of Western Corporation and Securities*; *Vol. I, Financials*; *Vol. II, Industrial and General* (with annual supplements), *Walker's Weekly Newsletter*.

*See* BUSINESS FORECASTING SERVICES, FINANCIAL MAGAZINES, FINANCIAL NEWSPAPERS, MERCANTILE AGENCIES.

**MAPS**  Market auction preferred stock.  *See* FINANCIAL INSTRUMENTS: RECENT INNOVATIONS.

**MARGIN**  Legally, a payment on account of a purchase, conferring ownership with its attendant risks and privileges upon the buyer, but subjecting him to a lien on the purchase to the extent that credit is advanced to finance the full purchase price secured by the purchase. Such margins are dollar margins; e.g., where a customer deposits in a brokerage account $1,000 on the purchase of 100 shares of a stock at $25 per share, his dollar margin is $10 per share or ten points. Equity margins—the type specified by the margin requirements regulation of the Board of Governors of the Federal Reserve System and by stock brokers in modern times—are measured not by the amount of cash deposited on the purchase but by the ratio between the customer's equity and the current market value of the purchased securities (on which the lending broker has a lien for the credit extended). Equity margins may be computed readily by the appended formula:

A0241

MARGIN ACCOUNT

$$\frac{\text{Current market value of the security purchased} - \text{Debit balance}}{\text{Current market value of the collateral}} = \text{Equity margin}$$

Thus, if 100 shares of stock were bought at a total purchase cost (including commissions) of $50 per share on 50% margin, the current market value of the collateral (the stock bought) is pledged for the margin credit) of $5,000, unless the debit balance (the amount owed by the buyer for the margin credit extended, which will be charged interest monthly) of $2,500, divided by the current market value of the shares ($5,000) indicates percentage margin of 50%. Should the market price decline to $40 per share, the percentage margin would be 37.5% (new current market value of $4,000, minus the debit balance of $2,500 [ignoring interest], divided by current market value of $4,000).

A further distinction as to margin is the difference between initial margins and maintenance margins. Margin requirements prescribed by the Federal Reserve Board of Governors are only initial margins (although the board has the power to prescribe maintenance margins); should the market price of stock bought on margin decline subsequent to purchase, the account would become restricted, but the board's regulations do not require the posting of additional equity by the purchaser to restore the percentage margin to the initial margin. However, Regulation T of the board of governors does not prevent a brokerage firm from imposing additional requirements, particularly maintenance requirements. Rule 431 of the New York Stock Exchange (NYSE) provides a maintenance margin rate that must be applied by a broker; and Section 220.7(e) of Regulation T provides that nothing in the regulation shall prevent brokerage firms from imposing maintenance requirements.

For the purpose of effecting new securities, transactions and commitments, the NYSE rule requires that margin shall be at least the greater of the amount specified in the regulations of the Board of Governors of the Federal Reserve System or by the above NYSE requirements, or such great amount as the exchange may from time to time require for specific securities, with a minimum equity in the account of at least $2,000 except that cash need not be deposited in excess of the cost of any security purchased. These minimum equity and purchase provisions shall not apply to "when distributed" securities in cash accounts and the exercise of rights to subscribe.

In addition to assigning a current loan value to margin stock generally, Regulations T and U of the board of governors permit special loan values for convertible bonds and stock acquired through the exercise of subscription rights.

Margin requirements of both the Board of Governors of the Federal Reserve System and the New York Stock exchange also apply to shortsales. In figuring percentage margins on short sales the following formula may be used:

$$\frac{\text{Net proceeds of short sale} + \text{Initial Margin}}{\text{Current market value of stock}} - 1 = \text{Percentage margin}$$

Thus if 100 shares of a stock are sold short at $50 per share net (net proceeds after deduction of commissions, stock transfer tax, and SEC fee).

$$\frac{\$5,000 + \$2,500}{\$5,000} - 1 = 50\%$$

Subsequently, should the stock rise (unfavorable for the short seller) to $55 per share, the percentage margin would then be

$$\frac{\$5,000 + \$2,500}{\$5,500} - 1 = 36.4\%$$

BIBLIOGRAPHY

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM. *Annual Report.*
CURLEY, M. T. *Understanding and Using Margin,* 1969.

**MARGIN ACCOUNT**    Customers buying stocks on MARGIN or engaging in short sales must have a general account (sometimes called a margin account), which also may be used for cash transactions. the strictly cash account permits only cash transactions.

In opening the general account, the customer signs the customer's agreement or margin agreement, which provides for the following standardized clauses:

1. *Hypothecation and rehypothecation clause:* "Any and all securities or commodities, or contracts relating thereto, nor or hereafter held or carried by you in any of any accounts (either individually or jointly with others), are to be held by you as security for the repayment of any liability to you in any of said accounts, with the right on your part to transfer moneys or securities from any one of my accounts to another when in your judgement such transfer may be necessary, and all such securities and commodities may, from time to time, and without notice, be pledged and repledged by you, either separately or in common with other securities or commodities, for any amount due upon my account(s), or for any greater amount, without retaining in your possession or control for delivery a like amount of similar securities or commodities."

Hypothecation is the pledge of the securities to the broker as collateral for credit extended on margin purchases. Rehypothecation, in turn, is the use by the broker of the securities thus pledged to obtain security loans from banks. It is a rule of the New York Stock exchange that a member may not pledge a customer's securities for more than is "fair and reasonable in view of the indebtedness of the said customer to the said member firm or corporation." It will be noticed also that the above clause permits commingling of the customer's securities by the broker for the purpose of obtaining security loans from banks. Commingling consent must be expressly given by the customer.

2. "You shall have the right, whenever in your discretion you consider it necessary for your protection, or in the event that a petition in bankruptcy or for appointment of a receiver is filed by or against me or an attachment is levied against any account(s) with you (whether carried individually or jointly with others), to buy any or all securities and commodities which may be short in such demand for margin or additional margin, notice of sale or purchase, or other notice or advertisement, and any such sales or purchases may be made at your discretion on any exchange or other market where such business is then usually transacted, or at public auction or private sale; and in case of a sale at public auction or on an exchange, you may be the purchasers for your own account, it being understood that a prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered herein provided, and it being further understood that I shall at all times be liable for the payment of any debit balance owing in any of my accounts with you upon demand, and that I shall be liable for any deficiency remaining in any such account(s) in the event of the liquidation thereof in whole or in part by you or by me." Although this language permits the broker to sell out a margin customer without notice and thus is a one-sided agreement (most customers do not bother to read the fine print of these provisions), in practice brokers do give notice on calls for more margin and notice of sale.

3. "The monthly debit balance in my account(s) shall be charged, in accordance with your usual custom, with interest at a rate which shall include the average rate paid by you on your general loans during the period covered by such balances respectively and any extra rates caused by market stringency, together with a charge to cover your credit service and facilities."

In practice, interest on debit balances on small accounts or accounts with low activity tends to be somewhat higher than the current cost of credit to the broker, with the larger and more active accounts being given the benefit of variations in the cost of money to the broker. Interest compounds unless paid.

A0242

MARGINAL ANALYSIS

4. "All communications, whether by mail, telegraph, telephone, messenger, or otherwise, sent to me at my address as given to you from time to time shall constitute personal delivery to me." This provision covers the provision of law otherwise that call for margin and notice of sale must reach the attention of the customer.

*See* MARGIN BUYING.

**MARGINAL ANALYSIS**    Marginal analysis is the single most pervasive concept in economics. Decision making is described in terms of marginal benefits and marginal costs, that is the additional (marginal means additional) benefits associated with a decision and the additional costs associated with that same decision.

This marginal rule is applicable to a number of important economic questions. Marginal benefits and costs are considered when deciding how to allocate scarce resources (land, labor, air, water, etc.). Similarly, firms seeking to maximize profits do so by producing a level of output where marginal revenue equals the marginal cost of production. Also, decisions between alternative investments are made on the basis of the marginal return from each.

**MARGINAL EFFICIENCY OF CAPITAL**    That rate of discount which equates present value of net expected revenue from an investment of capital to its cost; a Keynesian concept. The concept plays a major role in the Keynesian theory of investment; the level of investment is determined by the marginal efficiency of capital relative to the rate of interest. If the marginal efficiency rate is higher than the rate of interest, investment will be stimulated; if not, investment will be discouraged. A fall in the rate of interest will stimulate investment, assuming the decline is below the given marginal efficiency rate. Marginal efficiency returns should then rise (based on higher anticipations of returns from investment), and such rise above a given prevailing rate of interest will stimulate investment.

The concept is based on the ordinary mathematical technique of computing present value of a given series of returns discounted at a specified discount rate. If an investment in equipment costs $4,450 and is expected to yield returns of $1,000 per year for five years, such returns,

$$\frac{\$1,000}{1+r},\ \frac{\$1,000}{(1+r)^2},\ \frac{\$1,000}{(1+r)^3},\ \frac{\$1,000}{(1+r)^4},\ \text{and}\ \frac{\$1,000}{(1+r)^5}$$

will equate with the cost of $4,450 for the investment if the rate of discount (marginal efficiency of capital) is 4%. If the prevailing interest cost of money to finance such investment is actually below 4%, the investment will be stimulated; if it is above 4%, the investment will be discouraged.

In income-expenditure analysis, the marginal efficiency of capital is a prime factor in determining whether businesses are going to borrow and invest. The rate of interest is a passive factor because businesses do not borrow merely because the interest rate is low. A stable and material gap between the marginal efficiency of capital and the rate of return will result in an increase in the level of economic activity.

The marginal efficiency of capital is determined to some extent by the expectation of profits compared to the replacement cost of capital assets. The marginal efficiency of capital can ordinarily be improved by an increase in productivity, sales, or prices, or by a decrease in the costs of production. Generally, it is the relationship between the marginal efficiency of capital and the rate of interest that causes expansion, equilibrium, or contraction in the economy.

The term net expected revenue anticipations refer to net return over depreciation. Productivity theories of investment and their justification of interest date back at least to the work of the famous Austrian Bohm-Bawerk and the early work of Dr. Irving Fisher of Yale, but in the Keynesian schema the marginal efficiency of capital was adopted as one of the three major aspects of the Keynesian model, the other two being the liquidity preference concept of determination of interest rates and the consumption function.

*See* KEYNESIAN ECONOMICS.

**MARGINAL PRODUCT**    The additional output produced by an additional unit of input. For example, the marginal product of labor is the additional output produced by adding one additional

unit of labor to the production process, holding capital fixed. The marginal product of capital is the additional output produced by adding one additional unit of capital—to the production process, holding labor fixed.

**MARGINAL PRODUCTIVITY THEORY OF INCOME DISTRIBUTION**    John Bates Clark (1847-1938) advocated in *The Distribution of Wealth* (1899) that factors of production should be paid according to their marginal product. Those factors contributing more to output should be rewarded accordingly. While this proposition is the basis for much of modern microeconomic theory, it is difficult to translate Clark's prescription into practice owing to the difficulty in measuring marginal products precisely.

**MARGINAL PROPENSITY TO CONSUME OR SAVE**    The portion of each additional dollar earned that consumers allocate to consumption as opposed to savings. Thus, the marginal propensity to consume (mpc) plus the marginal propensity to save (mps) sum to unity:

$$mpc + mps = 1.$$

In the U.S. economy, the mpc has historically been about .90. It has averaged slightly higher than .90 during the 1980s.

**MARGINAL REVENUE**    The additional revenue earned by a firm from selling one additional unit of its product. If a product can always be sold at the same price, then the additional revenue earned from selling one additional unit of the product equals the product's price. In general, however, a firm will have to lower its price to increase its quantity demanded (according to the law of demand); therefore, marginal revenue will decrease as additional units are sold. For a firm to maximize profit, economics teaches that the firm should produce to the point where marginal revenue equals marginal cost.

**MARGINAL ROAD**    A railroad whose earnings available for charges just about cover fixed charges, thus rendering it vulnerable to any decline in earning power. Bonds of marginal roads are in the speculative class and normally sell at large discounts.

*See* RAILROAD BONDS.

**MARGIN BUYING**    When the purchaser furnishes only a specified fraction of the total purchase price of the securities bought and the broker furnishes the balance, charging interest on that amount (the debit balance) until the customer either sells the stock or pays off the loan and thus takes up the stock. The broker in turn may obtain the funds for carrying margin accounts from banks by rehypothecating the securities bought on MARGIN by customers with the customer's permission, granted in advance in the customer's agreement for opening a MARGIN ACCOUNT.

With the passage of the SECURITIES EXCHANGE ACT OF 1934, on June 6, 1934, margin requirements on national securities exchanges became subject to regulation by the Board of Governors of the Federal Reserve System, Section 7 (a) of the act states the objective of such regulation:

"For the purpose of preventing the excessive use of credit for the purchase or carrying of securities, the Federal Reserve Board shall, prior to the effective date of this section and from time to time hereafter, prescribe rules and regulations with respect to the amount of credit that may be initially extended and subsequently maintained on any security (other than an exempted security) registered on a national securities exchange." The purpose is to prevent the excessive use of credit, not to influence the level or trend of stock prices. Also, the board is given power in that act to prescribe initial as well as maintenance margins; it has prescribed only initial margins from the beginning of such regulation.

Regulation T of the board of governors, pursuant to Sections 7 and 8(a) of the act, became effective October 1, 1934. It applies to extension and maintenance of credit by every member of a national securities exchange and to every broker and dealer who transacts a business in securities through the medium of any such member.

On May 1, 1936, Regulation U of the board of governors, pursuant to Section 7 of the Securities Exchange Act of 1934, became effective. It applied to loans by banks for the purpose of purchasing or carrying any stock registered on a national securities exchange.

---

ENCYCLOPEDIA OF BANKING AND FINANCE

642

A0243

Regulation G of the board of governors, "Collection of Noncash Items," was revoked effective September 1, 1967, when the board of governors concurrently revised its Regulation J, "Collection of Checks and Other Items by Federal Reserve Banks." A new regulation G was promulgated by the board of governors, effective March 11, 1968, applicable to credit by persons other than banks, brokers, or dealers for the purpose of purchasing or carrying registered equity securities.

Regulation X of the board of governors was adopted by the board in 1971 to carry out provisions of the Foreign Bank Secrecy Act of 1970. Regulation X implements Section 7(f) of the act and generally applies to borrowers obtaining credit from within the United States or borrowers obtaining credit from outside the United States who are (1) United States Persons, (2) foreign persons controlled by United States persons, or (3) foreign persons acting on behalf of or in conjunction with United States persons.

Special margin requirements for bonds convertible into stocks were also adopted by the board of governors effective March 11, 1968.

Effective July 8, 1969, Regulations T, U, and G were amended principally to implement the provisions of P.L. 90-437, adopted in 1968, which authorized the board of governors to expand the margin regulations to cover credit extended for the purchase of over-the-counter stocks having specified market activity characteristics and company size and stock distribution criteria, and bonds convertible into such stocks (the board of governors issues the limit of such specific over-the-counter stocks).

Regulations T, U, G, and X limit the amount of credit to purchase and carry margin stocks that may be extended on securities as collateral by prescribing a maximum loan value, which is the specified percentage of the market value of the collateral at the time the credit is extended; thus margin requirements are the difference between the market value (100%) and the maximum loan value.

Brokers. Section 8 of the act makes it unlawful for any member of a national securities exchange, or any broker or dealer transacting business in securities through the medium of any such member, to borrow in the ordinary course of business on any security (other than an exempted security) registered on a national securities exchange except (1) from or through a member bank of the Federal Reserve System, (2) from any nonmember bank which shall have filed with the Board of Governors of the Federal Reserve System an agreement undertaking to comply with all provisions of the act, or (3) in accordance with such rules and regulations of the board of governors permitting loans between such members and such brokers or dealers.

Exempt securities (U.S. government securities, direct or guaranteed; state and municipal securities; etc.) are not subject to the margin requirements of Regulation T. Thus the much lower margins prescribed by the New York Stock Exchange would apply to its members as minimum margins on such exempt securities.

Banks. Since members of national securities exchanges and brokers or dealers doing business through them must borrow from member banks of the Federal Reserve System or nonmember banks which have agreed to abide by the act, the Board of Governors of the Federal Reserve System comprehensively controls stock market credit at the bank level by Regulation U, which reaches borrowing by brokers and direct borrowing by customers on purpose loans (loans to finance the purchasing or carrying of securities on margin).

Regulation U controls loans from banks by brokers both for the latter's own accounts and for the purpose of financing customers' margin accounts; loans to brokers for their own accounts are subject to the Regulation U margin requirement (set by the board of governors), but loans to brokers representing rehypothecation of customers' securities carried for the account of such customers are not subject to Regulation U margin requirement (set by the board of governors), instead being subject to the bank's own voluntary margin requirements (varying with the quality, mix, and market characteristics of the securities offered as collateral), which normally are less than the board's margin requirement.

Other bank loans on securities collateral exempt from the Regulation U requirement on margin include loans by banks to any bank, loans to dealers to aid in the distribution of securities to customers (not through an exchange), loans to brokers and dealers to meet emergencies, day loans, loans to finance arbitrage transactions of customers of the broker, or loans to odd-lot dealers.

Nonpurpose loans, i.e., loans not for the purpose of purchasing or carrying securities on margin, are exempt from Regulation U

margins, the bank's own voluntary margins applying, even if the securities are registered on a national securities exchange and nonexempt if used for purpose loans. Such loans are extended to firms and individuals for a variety of purposes. An administrative problem arises in connection with proper policing of such nonpurpose loans to ensure that this type of loan on securities does not develop into a loophole for circumvention of Regulation U.

Regulation U applies specifically to the making by banks of any loans secured directly or indirectly by any stock for the purpose of purchasing or carrying any stock registered on a national securities exchange. Thus, it does not apply if the purpose is to finance the purchase or carrying of any bond registered on a national securities exchange, or any unlisted stocks or bonds. The bank's own voluntary margins would apply in such cases. For example, convertible bonds listed on a national securities exchange could be purchased by an individual and financed by a bank loan at the bank's own margin requirement, and Regulation U would not apply even if the convertible bonds were converted into a stock listed on a national securities exchange during the duration of the loan.

Other Lenders. Persons other than banks, brokers, or dealers who in the ordinary course of business extend or arrange to extend credit totaling $50,000 or more in any calendar quarter, or have outstanding at any time during the calendar quarter a total of $100,000 or more in such credit, secured directly or indirectly, in whole or in part, by collateral that includes any registered equity securities, are subject to the provisions of Regulation G, including registration with the Board of Governors of the Federal Reserve System through the district Federal Reserve bank. Among the provisions of the regulation is that Regulation G lenders obtain from the borrower a signed statement providing for, among other things, an indication of the purpose of any stock-secured loan, that they determine in good faith that the statement was correct, and that they sign it as so accepted. This requirement also applies to banks (Regulation U), but since loans by brokers or dealers generally are for the purpose of purchasing or carrying securities, no statement of purpose would ordinarily be required in their case.

Regulation X. Title III of the Foreign Bank Secrecy Act (P.L. 91-508) which was enacted October 26, 1970 to become effective November 1, 1971, made margin regulations of the Board of Governors of the Federal Reserve System for the first time directly applicable to U.S. borrowers and to foreign borrowers controlled by them, or acting for them. In July 1971, the board of governors published for comment proposed amendments to its Regulation T, U, and G, to implement the new statute. The board of governors reports that the comments received prompted it instead to combine the changes in a new regulation, designated Regulation X.

The board of governors summarizes Regulation X as in essence providing that subject borrowers obtaining credit in the U.S. or abroad must comply with the margin regulations applicable to the lender, or if none applies, they must treat the borrowing as if it were subject to Regulation G, the margin regulation applicable to extensions of credit by persons other than banks, brokers, or dealers. Exemptions were provided for (1) individuals permanently resident abroad who obtain $5,000 or less in purpose credit (for the purpose of purchasing or carrying securities on margin) at any one time or in any one year, (2) foreign subsidiaries of U.S. corporations making markets in Eurobonds, and (3) extraordinary circumstances in which the board of governors may deem it justifiable to grant individual exemptions by order, if the obtaining of the credit is consonant with the purpose of the Foreign Bank Secrecy Act.

Leverage in Margin Buying. With high margin requirements, the leverage possible on margin trading is low. The purpose of buying on margin is to increase the possibility of gain with available cash. The advantage of buying on margin can be illustrated by the following example. Assume a speculator with cash of $10,000 wishes to purchase as much as possible of a certain stock selling at $100 per share. If he bought the stock for cash and delivery, he would be able to buy only 100 shares (ignoring commission costs). On a 10% margin, however, such as prevailed in the late 1920s, he would be able to buy 1,000 shares, the broker putting up $9,000 and the speculator $1,000 per 100 shares. In this way, the speculator could purchase ten times as much stock as he could by purchasing it outright. If the stock rises one point, a profit of $1,000 is made, whereas in an outright purchase the profit would be only $100. This advantage of leveraged possibility of gain, however, is offset by the disadvantage of equal possibility of loss, and therein lies the danger of low margins. If the stock declines one point, the speculator loses

## MARGIN CALL

$1,000. The broker will carry the stock provided there is adequate margin to protect the account; a broker will rarely carry a stock until the minimum maintenance (percentage) margin of the New York Stock Exchange is reached (25%), particularly in an active and rapidly declining market.

When a customer's percentage equity in a margin account falls below a level considered adequate by the broker, a MARGIN CALL is sent to the customer; if there is not a prompt response, the broker has the right to sell out the customer either wholly or partially, the latter in order to restore the account to a properly margined position. The customer under New York Stock Exchange rule may not be permitted by a member firm to make a practice of effecting transactions requiring initial or additional margin and then furnishing such margin by liquidation of the same securities or other securities. The required margin must be delivered as promptly as possible, but in any event before the end of the four full business days following the date of the transaction. Cash will of course cover the margin call; if securities are used, these must be listed securities with the necessary loan value; e.g. with 50% margins, the loan value is 50% of market value of such securities tendered in response to a margin call.

Restricted Accounts. An unrestricted account is one whose percentage equity is at least the prevailing board of governors' initial margin. A restricted account is one whose equity percentage has dropped below the initial margin; the board's regulation does not require that a margin call be sent to the customer to restore the margin to the initial margin level, but it does restrict the freedom of action of the customer with respect to such an account. Some of the restrictions are as follows.

The general rule is that no withdrawal of cash or registered or exempted securities will be permitted if the adjusted debit balance of the account would exceed the maximum loan value of the securities in the account after such withdrawal.

The following exceptions to the general rule are available only in the event no cash or securities need to be deposited in the account in connection with a transaction on a previous day, and none would need to be deposited thereafter in connection with any withdrawal of cash or securities on the current day:

1. Registered or exempted securities may be withdrawn upon the deposit in the account of cash (or registered or exempted securities counted at their maximum loan value) at least equal to the retention requirement (50% of current market value for registered securities other than exempted issues and maximum loan value for exempted securities) of the securities withdrawn.

2. Cash may be withdrawn upon the deposit in the account of registered or exempted securities having a maximum loan value at least equal to the amount of cash withdrawn.

3. Upon the sale (other than short sale) of registered or exempted securities in the account, there may be withdrawn in cash an amount equal to the difference between current market value of the securities sold and the retention requirement of those securities.

Substitutions in a restricted account, i. e., changes in holdings by purchases and sales on the same day, may be made provided the net result would not cause any change in the status of the account in regard to existing margin requirements.

Special subscription accounts, in connection with the exercise of stockholders' rights to subscribe to additional shares, call for satisfaction of initial and maintenance margin requirements and thereafter for four quarterly payments equal to 25% of the difference between initial equity in the account and initial margin percentage of market value of the stock at the time of the subscription.

Special miscellaneous accounts may be credited with the excess over margin requirements in a margin account occurring by reason of a rise in market value (which must be withdrawn on the same day it occurs) or dividends (which must be withdrawn in 35 days).

NYSE Margin Trading. The New York Stock Exchange (NYSE) points out that prior to July 8, 1969, brokers were permitted to extend regulated credit on stocks and convertible bonds listed or traded only on registered exchanges. Effective July 8, 1969, the Federal Reserve amended the regulations to permit brokers also to extend regulated credit on a selected list of stocks traded over the counter (OTC). OTC margin stocks are those determined by the Board of Governors of the Federal Reserve System to have characteristics similar to stock registered on national exchanges.

Margin customers whose equity is below the prevailing federal initial margin requirement are considered restricted. Retention requirements determine the amount of funds that restricted margin customers must apply to their debit balance following a sale of margined securities.

In addition to federal regulations of margin credit, the NYSE has certain credit requirements of its own. No person may open a margin account with a member firm without depositing a minimum amount or its equivalent in securities. The exchange also sets requirements for the maintenance of margins, as distinguished from the initial margin requirements of the Federal Reserve Board. Generally speaking, a customer's equity may at no time be less than 25% of the market value of securities carried. (Member organizations frequently have house rules which are higher than 25%.) Should his equity fall below this level, the customer is required to put up more margin or the securities are sold by the broker. Also, the exchange may impose higher margin requirements in special circumstances on individual issues which show a combination of volume, price variation, and turnover of unusual dimensions.

These requirements are intended to discourage the use of credit for undue speculation in certain issues and to assist in maintaining fair and orderly markets. Also, customers whose accounts show a pattern of "day trading"—i.e., purchasing and selling the same listed issue on the same day—are required to have the appropriate margin in their accounts before transactions in securities subject to the special margin requirement can be effected. Generally, the NYSE has imposed special margin requirements infrequently since 1972. In 1980, one issue had a 100% requirement for a short period early in the year.

Commodity Margins. In speculative commodity futures trading, the situation is essentially different from that in securities because of the character of futures trading. All such trading is done on margin unless and until delivery of the cash commodity should occur. Original margins, usually averaging about 15% of the original purchase or sale, are required by futures commission houses, and additional margin is called for whenever price declines reduce the margin, usually to 75% of the original requirements. Should, in his judgment, the speculator accept delivery of the actual commodity, much more substantial margin is required. The commodity exchanges generally prescribe minimum margins, and futures commission houses are free to require higher margins than the minimum. In commodity exchange regulation, margins are not prescribed by the Commodity Futures Trading Commission, but regulation includes restriction on daily trading limits, as well as the maximum long or short positions that may be held by any speculative account at any time in any one commodity and the amount of speculative trading that may be done by any person on any one day. The segregation of funds belonging to customers, including margins deposited and profits on past transactions, is required on the books of futures commission houses.

Summary. Margin buying has been criticized in the past, at times of severe declines in securities, as a factor exaggerating price movements and as a factor involving undue use of bank credit for such speculative purposes. Congress, instead of abolishing it and thus eliminating a type of activity making for broader markets, placed it under regulation (Securities Exchange Act of 1934) so that unduly low margins and excessive use of bank credit might be prevented.

**MARGIN CALL**    A notice sent by a broker to a customer, or by a bank to a borrowing banker, requiring additional security or a partial payment of a loan in order to offset or make good a loss in the value of the collateral due to a decline in the market price of securities pledged. The following is an example of a typical margin notice:

"As the present market value of the securities pledged to us as collateral against your indebtedness is not sufficient to give the customary margin, please send us at once additional satisfactory securities or cash to make good the margin, and oblige."

The additional margin should be forthcoming immediately. If not, the broker or the bank has the right, in accordance with the loan or margin agreement, to sell the securities pledged in order to satisfy the loan and any interest due, returning the remaining balance if any, or charging a deficiency to the borrower.

*See* MARGIN ACCOUNT.

**ENCYCLOPEDIA OF BANKING AND FINANCE**

failed. Nor is there a limit on the distribution, pro rata to customers, of remaining cash and securities of customers held by the firm.

The money required to protect customers beyond that which is available from the property in the possession of a failed broker-dealer is advanced by the SIPC from a fund maintained for that purpose. Sources for the SIPC fund are assessments collected from SIPC members and interest on investments made in U.S. government securities. If the need arises, the SECURITIES AND EXCHANGE COMMISSION (SEC) has the authority to lend the SIPC up to $1 billion, which the SEC in turn would borrow from the U.S. Treasury.

From 1971 through 1977, the statute required the SIPC to assess members 0.5% of their gross revenues from the securities business to build up the SIPC fund. The fund achieved the statutory minimum level of $150 million in 1977, and assessments were reduced during the first half of 1978 and eliminated during the second half of 1978. Beginning in 1979, each member's annual assessment became $25. The SIPC fund aggregated $390 million in cash and U.S. government securities on December 31, 1987. The highest amount advanced for customer protection in a single year up to that date was $35 million (1973). Net SIPC advances for customer protection totaled $63 million since SIPC's inception in 1981. Net SIPC advances for customer protection totaled $218 million since 1970; by contrast, the fund earned interest of $249 million during the same period.

Under the law, all registered broker-dealers and members of national securities exchanges must be members of the SIPC unless exempt under the act. Except are broker-dealers who deal exclusively in the distribution of shares of registered open-end investment companies or unit investment trusts, in the sale of variable annuities and of insurance, or in the business of rendering investment advisory services to one or more registered investment companies or insurance company separate accounts. Persons whose principal business, in the determination of the SIPC, taking into account business of affiliated entities, is conducted outside the United States and its territories and possessions are also exempt.

The self-regulatory organizations—the exchanges and the National Association of Securities Dealers, Inc. (NASD)—and the SEC report to the SIPC concerning member broker-dealers who are or are approaching financial difficulty. If SIPC determines that the customers of a member require the protection afforded by the act, the SIPC initiates steps to commence a customer protection proceeding. This requires that the SIPC apply to a federal district court for the appointment of a trustee to carry out the liquidation, although under certain circumstances the SIPC may pay customer claims directly. Stronger brokerage firms have been able to withstand the vicissitudes of the market because of refinements in the self-regulatory organizations, modernization of member operations, higher minimum capital requirements, and more stringent requirements for entry into the securities business. Nevertheless, as the result of the collapse of the boom in speculative low-priced new issues, the number of securities firm failures was reported to be increasing in early 1982. Although these failures were of relatively small firms, advances from the SIPC's fund to liquidation trustees reportedly had caused a decline in the fund from $215.7 million at mid-year 1981 to some $160 million as of March, 1982.

As a result, the SIPC obtained SEC approval in February 1982, to assess each member 0.25% of its gross revenues from securities operations, which could mean a substantial increase from the low $25 per year rate prevailing in recent years. Assessments at that level commenced in May 1983, and continued until April 1986, when assessments were set at $100 per annum for each SIPC member. On April 1, 1986, SIPC also entered into an agreement with a consortium of banks for a confirmed line of credit in the amount of $500 million. That agreement runs until March 31, 1989.

Organization. A board of seven directors determines policies of the SIPC and governs operations. Five directors are appointed by the President of the United States, subject to Senate approval. Three of the five directors represent the securities industry, and two are from the general public. One director is appointed by the secretary of the Treasury and one by the Federal Reserve Board from among the officers and employees of those organizations. The chairman, who is the SIPC's chief executive officer, and the vice-chairman are designated by the President from the public directors.

The headquarters of the SIPC is in Suite 800, 805 Fifteenth Street, N.W., Washington, D.C. 20005, where copies of their copyrighted brochure, "How SIPC Protects You," may be obtained.

Pre-SIPC Situation. Prior to the SIPC assumption of responsibility for the protection of its members' securities customers, more than 160 NEW YORK STOCK EXCHANGE member firms—and an undisclosed but presumably larger number of non-NYSE brokerage firms—went out of business. Most of the NYSE firms either merged with or were acquired by other NYSE firms, often through arrangements facilitated or initiated by the exchange itself. Some 80 firms dissolved, retired from the securities business, or self-liquidated, without "undue public concern or inconvenience to customers." In most of the remaining situations, mergers or acquisitions were also arranged "without serious inconvenience to customers." Public attention, however, did focus on the affairs of 17 particular firms that got into difficulties.

The principal instrument of the exchange's voluntary financial assistance to customers of member firms in liquidation had been the special trust fund, originally established by the exchange in 1964. The special trust fund reached an initial goal of $10 million, supplemented by $15 million in standby credit, in 1965. The fund was augmented by an exchange contribution of $5 million at the end of 1969, at which time the standby credit was reduced to $10 million. In June, 1970, the program was expanded to $55 million to permit assistance to firms that had recently been placed in liquidation by the exchange.

When Congress passed the Securities Investor Protection Act at the end of December, 1970, the New York Stock Exchange announced the termination of its voluntary customer assistance program and planned the phasing out of the special trust fund. The exchange, however, would fulfill its prior commitments with respect to firms already in its customer assistance program at that time.

**SECURITIES LEDGER**  A ledger in which transactions in bonds or other securities are recorded. Accounts are classified alphabetically, according to the name of the security. The information that a typical securities ledger contains is shown by the headings of the columns in the form below.

| DR | CR |
|---|---|
| Date of purchase | Date of sale |
| Descriptive details | Descriptive details |
| Pare value | Par value |
| Unit purchasing price | Proceeds of sale |
| Commission | Commission |
| Total cost | Interest accrued |
| Accrued interest paid | General ledger account cr. |
| Balance: | Interest credited |
| (a) Par | Profit or loss |
| (b) Money | Disposition |
| Trading value | Remarks |
| Book value | |
| Remarks | |

**SECURITIES MARKETS**  Security transactions take place in either the primary market or the secondary market. In the primary market, the purchaser gives the original issuer of the security cash in exchange for the security. In a primary market, the original security issuer receives cash; the public now holds a security that did not previously exist. Weekly T-bill offerings by the U.S. Treasury and municipal bond sales by a city occur in the primary market. Following the primary offering of a security, the security is said to trade in the secondary markets between members of the public. The NEW YORK STOCK EXCHANGE, the AMERICAN STOCK EXCHANGE, and the OVER-THE-COUNTER market are considered secondary markets.

Investment bankers specialize in the creation and placement of securities in the primary market. These organizations provide advice, underwriting, and distribution services to their clients. The advice provided by investment bankers usually relates to the type of security offering (debt or equity), the timing of the offering, the legal characteristics of the issue, and the price at which the security can be sold.

Underwriting refers to the investment bankers' practice of absorbing the price risks the issuer is unwilling to accept. Underwriting takes various forms:

1. *Firm commitment:* The underwriter commits to purchase the full amount of the issue from the seller at an agreed-upon price.

A0246

SECURITIES REGULATIONS

The banker then reoffers the security to the public. The underwriter's spread represents compensation to the underwriter. The investment banker frequently forms a purchase group consisting of other investment bankers who participate in the purchase of the security. The lead underwriter is primarily responsible for negotiating the agreement with the issuer and maintaining the records.

2. *Standby agreement:* The underwriter agrees to help sell the new issue for a given period of time. After this period passes (often 30 days), the underwriter is required to purchase any unsold securities at a predetermined price. Standby agreements are frequently used in stock sales that utilize a rights offering.

3. *Best-effort basis:* The banker acts as a broker and returns unsold securities to the issuer. The banker assumes no risk for unsold securities. Best-effort underwriting is often used when the issuer is confident that the issue can be sold or when the issuer is relatively small and unestablished.

Securities are distributed by various methods. Some issuers market their issues directly to the public (for example, the U.S. government). Common stock offerings using rights can often be marketed directly by the issuer. Syndicates consisting of investment bankers are often formed to assist in the distribution of securities. Members of the purchase syndicate frequently develop a selling group that actively distributes the securities to their clients. The selling group usually consists of members of the purchase group and various retail brokerage houses. A selling group agreement establishes the term of the agreement; the division of the underwriter spread among the manager, the purchase group, and the selling group; and the accounting procedures. The agreement requires that no member will sell beneath the offering price. During the early days of the offering to the public, the managing underwriter may stabilize the market by purchasing the security at a fixed price—a form of legal price manipulation.

Private placements refer to the distribution of securities to fewer than 25 private buyers. Private placements do not require registration with the SEC. Bond issues are frequently distributed through private placements.

The established stock exchanges and the over-the-counter market represent the secondary markets. On the New York Stock Exchange, members are classified as:

1. *Commission brokers:* partners in a brokerage firm who execute orders for their clients on the floor of the exchange.

2. *Floor brokers:* commission brokers who handle overflow transactions with the commission brokers.

3. *Floor traders:* members who buy and sell solely for their own account.

4. *Specialists:* members who are assigned a number of stocks in which they act as brokers by maintaining a limit book and as dealers by selling and buying shares in which they specialize. Specialists provide a continuous and liquid market in securities.

Stock and bond transactions that are not handled on one of the organized exchanges are traded in the over-the-counter (OTC) market. This market is not centrally located but consists of a network of brokers and dealers who communicate by telephone or computer terminals. Mutual fund shares, many bank and finance stock, most corporate bonds, and U.S. government and municipal obligations are traded in the OTC market.

A third market in securities refers to OTC transactions in a security that is also traded on an organized exchange. Institutional investors often trade large blocks of stock in this market. Negotiated fees are typical in this market.

A fourth market in securities refers to transactions that occur directly between a buyer and a seller of a large block of securities. In the fourth market, brokers and dealers are eliminated. A wire network provides current information subscribers are willing to buy or sell at specified prices.

Securities commissions have been negotiated rates since May 1, 1985. However, brokerage firms establish firmwide rates for various types of transactions and classes of customers. Discount brokerage firms offer low commissions but provide little, if any, investment counseling and advice.

Flow charts of a trade execution and of the clearing process are appended.

Trade Execution



Source: Robert C. Radcliffe, *Investment: Concept, Analysis, and Strategy,* Scott, Foresman and Company, Glenview, IL, 1982.

SECURITIES REGULATIONS    *See* COMPTROLLER'S REGULATIONS, INVESTMENT SECURITIES, LIFE INSURANCE COMPANY INVESTMENTS, SAVINGS BANK INVESTMENTS, TRUST FUND INVESTMENTS.

SECURITIZATION    The pooling and repackaging of similar loans into marketable securities that can be sold to investors. Many types of loans are currently being securitized: residential mortgage loans, automobile, and other commercial loans. Securitization is distinguished from whole loans and loan participations.

Securitization provides a process for improving the liquidity of assets and capital-to-asset ratios while increasing earnings. Fees obtained through securitization increase a bank's earnings. Savings in regulatory costs and in economies of scale are also possible. Securitization can enable banks to reduce credit risks associated with variable-rate loans.

Securitization can result in the deterioration of bank assets because investors require high-quality loans. The purchaser must usually depend on the originator or some other party for servicing, which can be a disadvantage.

BIBLIOGRAPHY

MORRIS, D. *Selling and Securitizing Commercial Bank Assets,* 1988.
PAVEL, C. "Securitization." *Economic Review,* 1986.
ROSENTHAL, J., and OCAMPO, J. *Securitization of Credit,* 1988.

**Clearing Process**



*Source:* Robert C. Radcliffe, *Investment: Concept, Analysis, and Strategy,* Scott, Foresman and Company, Glenview, IL., 1982.

**SECURITY**    A pledge of property or of good faith for the payment of a debt.

There are two classes of security: collateral or property security and personal security. Collateral security is any property, negotiable interest, or documentary evidence of a claim against, or ownership in property, conveying title to the holder as a pledge for the repayment of money lent, or as guarantee for the performance of a contract.

Personal security is the GUARANTY of the payment of money by one person for another person whose credit standing is not sufficient to justify the credit on his single name. In personal security, there is no pledge of property, but simply the signature (endorsement, guaranty, or SURETY) of some person having financial responsibility. Personal security, therefore, is only valuable where the person's moral standing is high.

Banking laws permit banks to make loans without security within generally applicable restrictions, and the basic use of CREDIT calls for unsecured loans where the credit risk so justifies. Where the credit risk is high, a protective device is the pledge of specific collateral; it does not eliminate the credit risk, but it provides the additional recourse to the pledged property and the status of secured creditorship in the event of default. Unsecured loans are justified on the basis of high credit ratings indicated by reliable financial statements. In countries where business renders financial statements unreliable, the secured loan is typical.

The wide diversification of secured bank lending in recent years is indicated by the types of specific collateral or property security for bank loans, including bonds, stocks, notes, trade acceptances, bank acceptances, bills of lading, warehouse receipts, certificates of deposit, mortgages on real estate, chattel mortgages, assigned book accounts (accounts receivable), assigned syndicate agreements, trust receipts, assignable insurance policies having cash surrender values, SAVINGS passbooks, etc..

*See* HYPOTHECATION, REHYPOTHECATE.

BIBLIOGRAPHY

BANK ADMINISTRATION INSTITUTE.  *1988 LD. Checking Guide.*  Bank Administration Institute, Rolling Meadows, IL, 1988.

**SECURITY AFFILIATES**    The affiliate securities companies of commercial banks that prior to the Banking Act of 1933 engaged in a general securities business, including underwriting and purchasing and selling of securities, both as dealers and brokers.

The forerunner of the security affiliates was the First Security Co., organized by the First National Bank of the City of New York in 1908, when it was found that nothing in the national banking laws prohibited the formation and operation of such affiliates. The greatest popularity of security affiliates developed in the 1920s, when leading banks organized such companies in order to participate in the then highly profitable securities business. The depositors of the bank were generally utilized as a primary line of customers by the security affiliate.

With collapse of the security markets following 1929, many of the security affiliates became a drain on their parent banks; in some cases, such as was the case of the BANK OF UNITED STATES (New York), which closed its doors in December, 1930, the drain proved fatal. Accordingly, the Banking Act of 1933, passed June 16, 1933, required that within one year after passage of the act, security affiliates should be divorced from banks. It had been the general practice to have each share of bank stock carry with it a proportionate interest in the security affiliate by trusteeing the security affiliate's stock for the benefit of the bank stockholders.

**SECURITY ANALYSIS**    The dissection of all pertinent data of individual companies—nature of the business, position in the industry, quality, demand for and diversity of products, capability of management, financial condition, capital structure, record of past earnings in relation to sales and investment, current and prospective earnings, relative stability of sales, earnings and  payments, book as well as "hidden" asset values, yields, price-earnings relationships, and developments within the company and industry. The objectives of security analysis are a determination of the grade of the specific security and the determination of valuation therefor (current comparative valuation and "normal" value judgment).

*See* INVESTMENT, SPECULATION.

BIBLIOGRAPHY

PESSIN, A. H. *Fundamentals of the Securities Industry.*  New York Institute of Finance, New York, NY, 1985.

**SECURITY LOANS**    Loans secured by the pledge of securities collateral. Loans by banks on securities for the purpose of purchasing or carrying listed stocks on margin are subject to Regulation U of the Board of Governors of the Federal Reserve System, requiring the same initial margin requirements as for loans to brokers to finance such customers under Regulation T of the board and as for credit extended by lenders other than banks, brokers, or dealers under Regulation G of the board. The margin requirement has fluctuated over the years from a low of 25% in 1934 to 100% (no margin), in accordance with the board's view as to proper margin in the light of the overall credit position. By curbing the leverage provided by margin buying, margin regulation tends to be a stabilizing influence on the market; conversely, a reduction in margin requirements adds to such leveraged buying power. Because of relatively high margin requirements in recent years, security loans have not been the problem they were in the late 1920s, when brokers' loans by banks reached record totals, with banks attracted by high rates and allowed to act for "others" in placing such loans.

An additional direct power to curb the volume of security loans is vested in the Board of Governors of the Federal Reserve System by

ENCYCLOPEDIA OF BANKING AND FINANCE

A0248

# EXHIBIT "B"

A0249

HILL & BARLOW

FEB   8 1996

LIBRARY

# Dictionary of Finance and Investment Terms

## Fourth Edition

**John Downes**
Editor, *Beating the Dow*
Former Vice President, AVCO Financial Services, Inc.
Office for Economic Development, City of New York

**Jordan Elliot Goodman**
Senior Finance and Investment Reporter
*Money* Magazine, Time-Warner Incorporated
Commentator
Cable News Network, Financial News Network,
Mutual Broadcasting System



SOCIAL LAW LIBRARY
1804
BOSTON

BARRON'S

ansportation, or financial companies. *See*
ERAGES; FORTUNE 500.

MENT BOND (IDB) type of MUNICIPAL
nance FIXED ASSETS that are then leased to
ents AMORTIZE the debt. IDBs were tradi-
rs, but under the TAX REFORM ACT OF 1986,
plus) became taxable effective August 15,
all issues for commercial and manufactur-
ed after 1986 and 1989 respectively. Also,
nks lost their 80% interest deductibility on

ON monthly statistic released by the FED-
he total output of all U.S. factories and
a key ECONOMIC INDICATOR.

BOND *see* INDUSTRIAL DEVELOPMENT BOND.

MARKET failure of investors to recognize
ond has good prospects or may be headed
he EFFICIENT MARKET theory, current prices
t securities. But some say that those who
st can profit by exploiting that information;
m firms with a large growth potential most
inefficiency, they say.

SUPPLY *see* ELASTICITY OF DEMAND OR

UMENT case made by developing sectors
industries need protection against interna-
they establish themselves. In response to
t may enact a TARIFF or import duty to stifle
nfant industry argument is frequently made
are trying to lessen their dependence on the
azil, for example, such infant industries as
ne that they need protection until their tech-
narketing prowess are sufficient to enable
blished foreigners.

es of goods and services, as happens when
e to the supply of goods on the market—in
ney chasing too few goods. Moderate infla-
of economic growth. Hyperinflation, with
t or more, causes people to lose confidence
eir assets in hard assets like real estate or
. their value in inflationary times. *See also*
AND-PULL INFLATION.

**INFLATION ACCOUNTING** showing the effects of inflation in finan-
cial statements. The Financial Accounting Standards Board (FASB)
requires major companies to supplement their traditional financial
reporting with information showing the effects of inflation. The ruling
applies to public companies having inventories and fixed assets of more
than $125 million or total assets of more than $1 billion.

**INFLATION HEDGE** investment designed to protect against the loss of
purchasing power from inflation. Traditionally, gold and real estate
have a reputation as good inflation hedges, though growth in stocks
also can offset inflation in the long run. Money market funds, which
pay higher yields as interest rates rise during inflationary times, can
also be a good inflation hedge. In the case of hyperinflation, hard
assets such as precious metals and real estate are normally viewed as
inflation hedges, while the value of paper-based assets such as stocks,
bonds, and currency erodes rapidly.

**INFLATION RATE** rate of change in prices. Two primary U.S. indica-
tors of the inflation rate are the CONSUMER PRICE INDEX and the PRO-
DUCER PRICE INDEX, which track changes in prices paid by consumers
and by producers. The rate can be calculated on an annual, monthly, or
other basis.

**INFLATION RISK** *see* RISK.

**INFLEXIBLE EXPENSES** *see* FLEXIBLE EXPENSES.

**INFRASTRUCTURE** a nation's basic system of transportation, commu-
nication, and other aspects of its physical plant. Building and main-
taining road, bridge, sewage, and electrical systems provides millions
of jobs nationwide. For developing countries, building an infrastructure
is a first step in economic development.

**INGOT** bar of metal. The Federal Reserve System's gold reserves are
stored in ingot form. Individual investors may take delivery of an
ingot of a precious metal such as gold or silver or may buy a certifi-
cate entitling them to a share in an ingot.

**INHERITANCE** part of an estate acquired by an HEIR.

**INHERITANCE TAX RETURN** state counterpart to the federal ESTATE
TAX return, required of the executor or administrator to determine the
amount of state tax due on the inheritance.

**INITIAL MARGIN** amount of cash or eligible securities required to be
deposited with a broker before engaging in margin transactions. A
margin transaction is one in which the broker extends credit to the cus-
tomer in a margin account. Under REGULATION T of the Federal
Reserve Board, the initial margin is currently 50% of the purchase
price when buying eligible stock or convertible bonds or 50% of the
proceeds of a short sale. *See also* MAINTENANCE REQUIREMENT; MARGIN
CALL; MARGIN REQUIREMENT; MARGIN SECURITY.

A0251

**MANIPULATION**                                             **318**

maturity for common stock having a market value equal to the princi-pal amount of the notes. If the holder of the notes does not choose to receive equities at maturity, the issuer will sell the equity on behalf of the holder. Another type, *equity commitment notes*, does not require the holder to purchase equity with the notes but rather commits the issuer to redeem the notes with the proceeds of an equity issue at some future date. The Federal Reserve requires issuers to fund a third of the equity in the first four years, another third in the second four years, and the balance by maturity in the third four years. CAPS are still another form of mandatory convertible.

**MANIPULATION** buying or selling a security to create a false appear-ance of active trading and thus influence other investors to buy or sell shares. This may be done by one person or by a group acting in con-cert. Those found guilty of manipulation are subject to criminal and civil penalties. *See also* MINI-MANIPULATION.

**MAPLE LEAF** bullion coin minted by the government of Canada in gold (99.99% pure), silver (99.99% pure) and platinum (99.95% pure). The gold and platinum coins are available in one ounce, one-half ounce, one-quarter ounce, one-tenth ounce, one-fifteenth ounce and one-twentieth ounce sizes. The silver coin is available only in the one-ounce size. The Maple Leaf is actively traded throughout the world along with the American Eagle, South African Kruggerand, and other coins. The Maple Leaf usually sells at a slight premium to the bullion value of the coin. *See also* GOLD COIN.

**MARGIN**
In general: amount a customer deposits with a broker when borrow-ing from the broker to buy securities. Under Federal Reserve Board regulation, the initial margin required since 1945 has ranged from 50 to 100 percent of the security's purchase price. In the mid-1990s the minimum was 50% of the purchase or short sale price, in cash or eli-gible securities, with a minimum of $2000. Thereafter, MINIMUM MAIN-TENANCE requirements are imposed by the National Association of Securities Dealers (NASD) and the New York Stock Exchange, and by the individual brokerage firm, whose requirement is typically higher.
Banking: difference between the current market value of collateral backing a loan and the face value of the loan. For instance, if a $100,000 loan is backed by $50,000 in collateral, the margin is $50,000.
Corporate finance: difference between the price received by a com-pany for its products and services and the cost of producing them. Also known as *gross profit margin*.
Futures trading: good-faith deposit an investor must put up when buying or selling a contract. If the futures price moves adversely, the investor must put up more money to meet margin requirements.

**MARGINABLE SECURITIES** see MARGIN SECURITY.

A0252

aving a market value equal to the princi-
e holder of the notes does not choose to
he issuer will sell the equity on behalf of
*uity commitment notes,* does not require
y with the notes but rather commits the
h the proceeds of an equity issue at some
rve requires issuers to fund a third of the
, another third in the second four years,
r in the third four years. CAPS are still
onvertible.

elling a security to create a false appear-
s influence other investors to buy or sell
one person or by a group acting in con-
nanipulation are subject to criminal and
MANIPULATION.

inted by the government of Canada in
.99% pure) and platinum (99.95% pure).
s are available in one ounce, one-half
ie-tenth ounce, one-fifteenth ounce and
e silver coin is available only in the one-
is actively traded throughout the world
le, South African Kruggerand, and other
r sells at a slight premium to the bullion
.D COIN.

er deposits with a broker when borrow-
ecurities. Under Federal Reserve Board
required since 1945 has ranged from 50
''s purchase price. In the mid-1990s the
chase or short sale price, in cash or eli-
.m of $2000. Thereafter, MINIMUM MAIN-
.posed by the National Association of
d the New York Stock Exchange, and by
. whose requirement is typically higher.
. the current market value of collateral
. value of the loan. For instance, if a
. $50,000 in collateral, the margin is

e between the price received by a com-
es and the cost of producing them. Also

deposit an investor must put up when
f the futures price moves adversely, the
ney to meet margin requirements.

; see MARGIN SECURITY.

**MARGIN ACCOUNT** brokerage account allowing customers to buy secu-
rities with money borrowed from the broker. Margin accounts are gov-
erned by REGULATION T, by the National Association of Securities Dealers
(NASD), by the New York Stock Exchange, and by individual brokerage
house rules. Margin requirements can be met with cash or with eligible
securities. In the case of securities sold short, an equal amount of the
same securities is normally borrowed without interest from another bro-
ker to cover the sale, while the proceeds are kept in escrow as collateral
for the lending broker. *See also* MINIMUM MAINTENANCE.

**MARGIN AGREEMENT** document that spells out the rules governing
a MARGIN ACCOUNT, including the HYPOTHECATION of securities, how
much equity the customer must keep in the account, and the interest
rate on margin loans. Also known as a *hypothecation agreement.*

**MARGINAL COST** increase or decrease in the total costs of a business
firm as the result of one more or one less unit of output. Also called
*incremental cost* or *differential cost.* Determining marginal cost is
important in deciding whether or not to vary a rate of production. In
most manufacturing firms, marginal costs decrease as the volume of
output increases due to economies of scale, which include factors such
as bulk discounts on raw materials, specialization of labor, and more
efficient use of machinery. At some point, however, diseconomies of
scale enter in and marginal costs begin to rise; diseconomies include
factors like more intense managerial supervision to control a larger
work force, higher raw materials costs because local supplies have
been exhausted, and generally less efficient input. The marginal cost
curve is typically U-shaped on a graph.



**MARGINAL COST**



ntimum output when marginal cost coin-
cost. Thus, at less than optimum output,
uction will result in a marginal unit cost
cost; production in excess of the opti-
ginal cost higher than average total unit
t a price higher than marginal unit cost
the manufacturer even though the sales
total unit cost; marginal cost is thus the
can be made without adding to the pro-
m his profits.

**)F CAPITAL** annual percentage yield
mit of capital. It is also known as *mar-
natural interest rate, net capital produc-
cost*. The significance of the concept to
ents the market rate of interest at which
capital investment. If the market rate is
ot pay to undertake a project that has a
n over 10% would be acceptable. In a
al efficiency of capital influences long-
rs because of the law of diminishing
l on capital. As the highest yielding pro-
capital moves into lower yielding pro-
As market rates fall, investors are able
eviously uneconomical. This process is
*roductivity* or *declining marginal effi-*

e in total revenue caused by one addi-
culated by determining the difference
troduced before and after a one-unit
on. As long as the price of a product is
revenue are the same; for example, if
at a constant price of $10 apiece, a
baseball bat) translates into an increase
is often the case that additional output
reduced, and that leads to a considera-
lded cost of producing one more unit.
able when marginal cost exceeds mar-
ould result in a loss. Conversely, when-
ds marginal cost, it is advisable to
fits are maximized at the rate of output
marginal cost.

t of tax imposed on an additional dol-
essive income tax system, the marginal
s. Economists believing in SUPPLY-SIDE
es the incentive to be productive and
t. In urging that marginal tax rates be

cut for individuals and businesses, they argue that the resulting increased work effort and business investment would reduce STAGFLA- TION. *See also* FLAT TAX.

**MARGINAL UTILITY** in economics, the addition to total satisfaction from goods or services (called *utility*) that is derived from consuming one more unit of that good or service.

**MARGIN CALL** demand that a customer deposit enough money or securities to bring a margin account up to the INITIAL MARGIN or MINI- MUM MAINTENANCE requirements. If a customer fails to respond, secu- rities in the account may be liquidated. *See also* FIVE HUNDRED DOLLAR RULE; SELL OUT.

**MARGIN DEPARTMENT** section within a brokerage firm that moni- tors customer compliance with margin regulations, keeping track of debits and credits, short sales, and purchases of stock on margin, and all other extensions of credit by the broker. Also known as the *credit department. See also* MARK TO THE MARKET.

**MARGIN OF PROFIT** relationship of gross profits to net sales. Returns and allowances are subtracted from gross sales to arrive at net sales. Cost of goods sold (sometimes including depreciation) is sub- tracted from net sales to arrive at gross profit. Gross profit is divided by net sales to get the profit margin, which is sometimes called the *gross margin.* The result is a ratio, and the term is also written as *mar- gin of profit ratio.*

   The term profit margin is less frequently used to mean the *net margin,* obtained by deducting operating expenses in addition to cost of goods sold and dividing the result by net sales. Operating expenses are usually shown on profit and loss statements as "selling, general and administrative (SG&A) expenses."

   Both gross and net profit margins, when compared with prior periods and with industry statistics, can be revealing in terms of a firm's operating efficiency and pricing policies and its ability to com- pete successfully with other companies in its field.

**MARGIN REQUIREMENT** minimum amount that a client must deposit in the form of cash or eligible securities in a margin account as spelled out in REGULATION T of the Federal Reserve Board. Reg T requires a minimum of $2000 or 50% of the purchase price of eligible securities bought on margin or 50% of the proceeds of short sales. Also called INITIAL MARGIN. *See also* MARGIN; MARGIN SECURITY; MINI- MUM MAINTENANCE; SELLING SHORT.

**MARGIN SECURITY** security that may be bought or sold in a margin account. REGULATION T defines margin securities as (1) any *registered security* (a LISTED SECURITY or a security having UNLISTED TRADING priv- ileges); (2) any *OTC margin stock* or *OTC margin bond,* which are defined as any UNLISTED SECURITY that the Federal Reserve Board (FRB) periodically identifies as having the investor interest, marketability,

A0254

MARITAL DEDUCTION                                          322

disclosure, and solid financial position of a listed security; (3) any OTC security designated as qualified for trading in the NATIONAL MARKET SYSTEM under a plan approved by the Securities and Exchange Commission; (4) any mutual fund or unit investment trust registered under the Investment Company Act of 1940. Other securities that are not EXEMPT SECURITIES must be transacted in cash.

**MARITAL DEDUCTION** provision in the federal estate and gift tax law allowing spouses to transfer unlimited amounts of property to each other free of tax. Such transfers may be made during the life or at the death of the transferor, and are intended to treat a couple as an economic unit for transfer tax purposes. Although the deduction is unlimited, passing all assets to a spouse may create transfer tax problems in the surviving spouse's estate; planners should try to fully use each spouse's UNIFIED CREDIT, which offsets up to $600,000 in transfers, and equalize the rate of transfer taxes for both spouses to reduce taxes for the couple.

## MARKDOWN

1. amount subtracted from the selling price, when a customer sells securities to a dealer in the OVER THE COUNTER market. Had the securities been purchased from the dealer, the customer would have paid a *markup*, or an amount added to the purchase price. The National Association of Securities Dealers (NASD) RULES OF FAIR PRACTICE established 5% as a reasonable guideline in markups and markdowns, though many factors enter into the question of fairness, and exceptions are common.
2. reduction in the price at which the underwriters offer municipal bonds after the market has shown a lack of interest at the original price.
3. downward adjustment of the value of securities by banks and investment firms, based on a decline in market quotations.
4. reduction in the original retail selling price, which was determined by adding a percentage factor, called a markon, to the cost of the merchandise. Anything added to the markon is called a markup, and the term markdown does not apply unless the price is dropped below the original selling price.

## MARKET

1. public place where products or services are bought and sold, directly or through intermediaries. Also called *marketplace*.
2. aggregate of people with the present or potential ability and desire to purchase a product or service; equivalent to demand.
3. securities markets in the aggregate, or the New York Stock Exchange in particular.
4. short for *market value*, the value of an asset based on the price it would command on the open market, usually as determined by the MARKET PRICE at which similar assets have recently been bought and sold.
5. as a verb, to sell. *See also* MARKETING.

A0255

sales of a particular company

tional investors, made follow-
creasing the buyer's position
ng interest. The second offer-
han the original tender offer.

buy or sell securities, in light
of the economy and the direc-
tions such as the direction of
nvestors in mutual funds may
s by switching from a stock
: fund and back again, as the

r of a securities market. The
. market makers are trading
is; it is bad when trading is
de.

hich buyers and sellers trade
be absence of a market price,
vould be warranted in paying
ided both parties were fully
ntarily.

ecurity—as indicated by the

a valuing inventory or mar-
he conservative accounting
Vhile cost is simply acquisi-
selling price less estimated
nd, in the case of an unfin-
oduction. The market value
wer than the cost at which a

: index whose components
:t value of their outstanding
'ed index. The impact of a
to the issue's overall market
mber of shares outstanding.
: Index (AMVI) has more
ng of each stock constantly
d the number of shares out-
ith the price moves of the

**MARKING UP OR DOWN** increasing or decreasing the price of a secu-
rity based on supply and demand forces. A securities dealer may mark
-up the price of a stock or bond if prices are rising, and may be forced
to mark it down if demand is declining. The markup is the difference,
or spread, between the price the dealer paid for the security and the
price at which he sells it to the retail customer. See also MARKDOWN.

**MARK TO THE MARKET**
1. adjust the valuation of a security or portfolio to reflect current mar-
   ket values. For example, MARGIN ACCOUNTS are marked to the mar-
   ket to ensure compliance with maintenance requirements. OPTION
   and FUTURES CONTACTS are marked to the market at year end with
   PAPER PROFIT OR LOSS recognized for tax purposes.
2. in a MUTUAL FUND, the daily net asset value reported to sharehold-
   ers is the result of marking the fund's current portfolio to current
   market prices.

**MARKUP** see MARKDOWN.

**MARRIAGE PENALTY** effect of a tax code that makes a married cou-
ple pay more than the same two people would pay if unmarried and
filing singly. For example, the REVENUE RECONCILIATION ACT OF 1993
may penalize low-end taxpayers whose combined income disqualifies
them for the EARNED INCOME CREDIT they would have received as sin-
gle taxpayers. High-end married taxpayers, on the other hand, may
find that, combined, their incomes become subject to the SURTAX on
incomes over $250,000.

**MARRIED PUT** option to sell a certain number of securities at a par-
ticular price by a specified time, bought simultaneously with securities
of the underlying company so as to hedge the price paid for the secu-
rities. See also OPTION; PUT OPTION.

**MASTER LIMITED PARTNERSHIP (MLP)** public LIMITED PARTNER-
SHIP composed of corporate assets spun off (roll out) or private limited
partnerships (roll up) with income, capital gains, and/or TAX SHELTER
orientations. Interests are represented by depositary receipts traded in
the SECONDARY MARKET. Investors thus enjoy LIQUIDITY. Flow-through
tax benefits, previously possible within PASSIVE income restrictions,
were limited by tax legislation passed in 1987 that will treat most
MLPs as corporations after a GRANDFATHER CLAUSE expires in 1998.

**MATCHED AND LOST** report of the results of flipping a coin by two
securities brokers locked in competition to execute equal trades.

**MATCHED BOOK** term used for the accounts of securities dealers
when their borrowing costs are equal to the interest earned on loans to
customers and other brokers.

**MATCHED MATURITIES** coordination of the maturities of a finan-
cial institution's assets (such as loans) and liabilities (such as certifi-
cates of deposit and money-market accounts). For instance, a savings

**MILL**                                                                     334

Consiglio di Borsa, the Italian Stock Exchange Council, which instituted computerized trading and a block market. The regional exchanges are located in Rome, Turin, Genoa, Bologna, Florence, Naples, Palermo, Trieste, and Venice. Electronic trading is conducted Monday through Friday from 8:45 A.M. to 10 A.M. (order entry, automatic fixing of opening price), and from 10 A.M. to 4 P.M. (continuous trading with automatic matching of buy and sell orders). An open outcry system is used in the second market, from 9 A.M. to 10 A.M. Milan's second market, Mercato Ristretto, is the largest in the country. Trades are settled on a monthly basis between 15 and 45 days after the trade date.

**MILL** one-tenth of a cent, the unit most often used in expressing property tax rates. For example, if a town's tax rate is 5 mills per dollar of assessed valuation, and the assessed valuation of a piece of property is $100,000, the tax is $500, or 0.005 times $100,000.

**MINI-MANIPULATION** trading in a security underlying an option contract so as to manipulate the stock's price, thus causing an increase in the value of the options. In this way the manipulator's profit can be multiplied many times, since a large position in options can be purchased with a relatively small amount of money.

**MINIMUM FLUCTUATION** smallest possible price movement of a security or options or futures contract. For example, most stocks on the New York Stock Exchange trade with a minimum fluctuation of one-eighth of a point. Some low-priced options contracts trade with a minimum fluctuation of one-sixteenth of a point. Minimum fluctuations are set by the securities, futures, or options exchanges regulating each security or contract. Also called MINIMUM TICK.

**MINIMUM MAINTENANCE** equity level that must be maintained in brokerage customers' margin accounts, as required by the New York Stock Exchange (NYSE), the National Association of Securities Dealers (NASD), and individual brokerage firms. Under REGULATION T, $2000 in cash or securities must be deposited with a broker before *any* credit can be extended; then an INITIAL MARGIN requirement must be met, currently 50% of the market value of eligible securities long or short in customers' accounts. The NYSE and NASD, going a step further, both require that a margin be *maintained* equal to 25% of the market value of securities in margin accounts. Brokerage firm requirements are typically a more conservative 30%. When the market value of margined securities falls below these minimums a MARGIN CALL goes out requesting additional equity. If the customer fails to comply, the broker may sell the margined stock and close the customer out. *See also* MARGIN REQUIREMENT; MARGIN SECURITY; MARK TO THE MARKET; SELL OUT.

**MINIMUM PAYMENT** minimum amount that a consumer is required to pay on a revolving charge account in order to keep the account in good standing. If the minimum payment is not made, late payment

A0257

## CERTIFICATE OF SERVICE

I, Amy Evans, hereby certify that on July 15, 2005 I caused to be served a true and correct copy of the Plaintiff's Consolidated Brief in Opposition to Defendants' Various Motions to Dismiss upon the attached service list as indicated.


/s/Amy Evans
Amy Evans (Bar I.D. No. 3829)

A0258

## SERVICE LIST

**VIA HAND DELIVERY**
Frederick B. Rosner, Esq.
Jaspan Schlesinger Hoffman
913 Market Street, 12th Floor
Wilmington, DE 19801

Ricardo Palacio, Esq
Ashby & Geddes, P. A.
222 Delaware Avenue
17th Floor
Wilmington, DE 19801

Laurie Selber Silverstien, Esq.
Potter Anderson & Caorroon LLP
1313 N Market Street, 6th Floor
Wilmington, DE 19801

Ricardo Palacio, Esq.
Ashby & Geddes, P.A.
222 Delaware Ave.
17th Floor
Wilmington, DE 19801

**VIA FIRST CLASS U.S. MAIL**
Richard A. Johnston, Esq.
Mark A. Fleming, Esq.
Wilmer Cutler Pickering  Hale and Dorr LLP
60 State Street
Boston, MA 02109

James A. Sarna, Esq.
Sarna & Associates, PC
99 Main Street
Nyack, NY 10960

Lawarence M. Brenton, Esq.
Early Lennon Crocker & Bartosiewicz PLC
900 Comerica Building
Kalmazoo, Michigan 49007

Charles R. Bennett, Jr., Esq.
Hanify & King PC
One Beacon Street
Boston, MA 02108

**I**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | ) |
| | ) |
| | ) |
| PLASSEIN INTERNATIONAL | ) Chapter 11 |
| CORP., *et al.*,[1] | ) |
| | ) Case No. 03-11489 (WS) |
| Debtors. | ) |
| | ) Jointly Administered |
| | ) |
| | ) |
| WILLIAM BRANDT, as he is | ) |
| the Trustee of the Estates of | ) |
| Plassein International Corp., *et al.*, | ) |
| | ) Adversary Proceeding |
| | ) No. 05-50692 (WS) |
| Plaintiff, | ) |
| | ) |
| *v.* | ) |
| | ) Related Docket #'s 23, 25, 26, 28, 30 |
| B.A. CAPITAL CO. LP, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

### AFFIDAVIT OF CHARLES R. BENNETT, JR., IN SUPPORT OF THE TRUSTEE'S OPPOSITION TO THE DEFENDANTS' MOTIONS TO DISMISS

I, Charles R. Bennett, Jr., being duly sworn, depose and state that:

1.    I am an attorney who has been admitted *pro hac vice* to practice before the courts of this district in connection with the above matter. I and the firm of Hanify & King, P.C. were retained initially as special counsel to the Committee of Unsecured Creditors, then as general counsel to the Committee of Unsecured Creditors, and are now

---

[1] Additional Debtors include all of Plassein International Corp.'s wholly-owned domestic subsidiaries: Plassein International of Martin, Inc.; Plassein International of Ontario, LLC; Plassein International of Salem, Inc.; Plassein International of Spartanburg, Inc.; Plassein International of Thomasville, Inc.; and Teno Films, Inc.

serving as counsel to William Brandt, as he is the duly appointed and acting Trustee of the Chapter 7 Estates of Plassein International Corp. and its domestic subsidiaries.

      2.     In my role as counsel, I have obtained from, among others, the Debtor and Fleet Capital Corporation, as agent for the Lenders, various documents and agreements, including but not limited to the closing documents for the acquisition which occurred on January 10, 2000, by and among Plassein Packaging Corp. ("Purchaser") and, Key Packaging Industries Corp., Marshall Plastic Film Incorporated, Plastical Industries Incorporated, Transamerican Plastic Corporation, Transamerican Plastic, LLC, and other entities ("January Target Companies") ("January Acquisition"). Included within the documents so provided were the Stock Purchase Agreements.

      3.     Annexed hereto as Exhibit A is a true and accurate selection of certain pages of the Stock Purchase Agreement for the Key Packaging Industries Corp. acquisition. The Stock Purchase Agreements for the other January Target Companies are substantially in the same form.

      4.     Also contained within the closing binders for the January 2000 Acquisition were copies of the Stock Assignment and Stock Certificates from stockholders for each of the January Target Companies, each directly selling, assigning and transferring the shares to Plassein Packaging Corp. The documents and the representations and warranties contained therein reflect:

           (a)    the January Target Companies each had a very limited number of stockholders (see Exhibit A annexed and Paragraph 40 of the Complaint),

2

(b)    the stock of the January Target Companies was not publicly traded, and

(c)    the stock was delivered directly to the Purchaser at the closing without any intermediary.

5.    As counsel, I was also provided with the documents for the August 15, 2000 closing for the acquisition of the stock of Rex International, Inc. ("Rex") ("Rex Acquisition"). A true and accurate copy of the selected portions of the Stock Purchase Agreement is annexed hereto as Exhibit B.

6.    Also contained within the closing binder for the Rex Acquisition were copies of the Stock Assignment and Stock Certificates each directly selling, assigning and transferring the shares from the Rex Stockholders to Plassein Packaging Corp. The documents and the representations and warranties contained therein reflect:

(a)    Rex had a very limited number of stockholders (see Exhibit B annexed and Paragraph 53 of the Complaint),

(b)    the stock of Rex was not publicly traded, and

(c)    the stock was delivered directly to the Purchaser at the closing without any intermediary.

7.    As counsel, I was also provided with copies of the documents evidencing the loan by and among the "Lenders" and Plassein Packaging Corp., Key Packaging Industries Corp, Plastical Industries Incorporated and Transamerican Plastic, LLC ("Borrowers") and the Second Amended and Restated Loan and Security Agreement among the "Lenders", the Borrowers and Rex International, Inc. Attached hereto as

3

A0262

<u>Exhibits C and D</u> are selected portions of the Loan Agreement and Second Amended and Restated Loan and Security Agreement.

8.    Pursuant to the Loan Agreement, the January Target Companies were jointly and severally liable for the aggregate amount of the borrowing under the Loan Agreement.

9.    Pursuant to the Second Amended and Restated Loan Agreement, the January Target Companies were jointly and severally liable for the aggregate amount of the borrowing under the Second Amended and Restated Loan Agreement.

10.    Pursuant to the Second Amended and Restated Loan Agreement, Rex was liable for the aggregate amount borrowed thereunder, including the amounts advanced pursuant to the Loan and Security Agreement.

11.    According to the Schedules and Statement of Affairs which were filed by Plassein International Corp. in connection with the commencement of its case before this Court, the Debtor Plassein International Corp. was formerly known as Plassein Packaging Corp.  Plassein Packaging Corp. changed its name to Plassein International Corp. following the closing on the January and August acquisitions.

*Signed under the pains and penalties of perjury this 1?^(th) day of July, 2005.*

Charles R. Bennett, Jr.

::ODMA\PCDOCS\DOCS\434232\1

4

# EXHIBIT "A"

# STOCK PURCHASE AGREEMENT

**THIS STOCK PURCHASE AGREEMENT** (this "Agreement") is made as of the 10th day of January, 2000 by and among (i) Plassein Packaging Corp., a Delaware corporation (the "Purchaser"), Key Packaging Industries, Corp., a Massachusetts corporation (the "Company"), Thomas F. Fay, Dr. Ruth L. Fischbach, Mark R. Freedman, Dr. Robert N. Zeitlin, Sidney Zeitlin, ZFC Associates Inc., William G. Russell and Robert N. Zeitlin 1999 Charitable Remainder Unitrust (collectively, the "Stockholders"), who are the owners of all the issued and outstanding capital stock of the Company.

## RECITALS

**WHEREAS**, the Stockholders desire to sell, and the Purchaser desires to purchase, all of the issued and outstanding capital stock of the Company upon the terms and conditions set forth in this Agreement;

**NOW, THEREFORE**, in consideration of the premises and of the mutual representations, warranties, covenants, and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereto hereby agree as follows:

## 1. DEFINITIONS

Unless the context otherwise requires, capitalized terms used in this Agreement or in any schedule, or annex attached hereto and not otherwise defined shall have the following meanings for all purposes of this Agreement.

"*AAA*" has the meaning set forth in Section 15.14.

"*Accounting Arbitrator*" has the meaning set forth in Section 3.3.

"*Actual Knowledge*" means actual knowledge, and for purposes of this Agreement, a Person shall be deemed to have actual knowledge of all matters which such Person should have known, or would have learned, in the ordinary course of managing the affairs of the Company to the standards of the reasonably prudent businessman.

"*Affiliate*" means any other Person that directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, a Person.

"*Agreement*" has the meaning set forth in the first paragraph of this Agreement.

"*Annex*" means each Annex attached hereto that represents a document relevant to the transactions contemplated in this Agreement.

"*A/R Aging Report*" has the meaning set forth in Section 5.11.

A0265

## 2. OTHER ACQUISITIONS; TAX FAVORED TREATMENT.

The Purchaser has entered into agreements or letters of intent with respect to the acquisition, by stock purchase or asset purchase, of companies engaged in the Business, including the Company. While it is intended that the transactions contemplated by such other agreements or letters of intent (the "Other Transactions") may partially qualify as a tax-free transfer of property under Code Section 351, the Stockholders acknowledge that the transactions contemplated by this Agreement are not intended to qualify for a tax-free transfer of property under Code Section 351, and the Purchaser makes no representation or warranty as to the tax treatment of the transactions contemplated hereby. The Purchaser acknowledges that, except as set forth in Section 10.11, its obligation to close the transaction described herein shall not be conditional on, or in any way affected by, the Other Transactions.

## 3. PURCHASE AND SALE; CONSIDERATION FOR SHARES.

3.1 <u>Payments Simultaneously with Closing.</u> Simultaneously with the Closing, the Stockholders shall pay, or caused to be paid, all amounts owing to the Company, pursuant to any account receivable, note receivable indebtedness, borrowing or advance, by any of the Stockholders or any Affiliate of the Stockholders. Simultaneously with the Closing, the Company and the Stockholders shall cause to be paid all liabilities and obligations owed by the Company to financial institutions, lenders or to any Stockholder or any Affiliate of the Company that are listed on Schedule 3.1(a), excluding any prepayment premiums, penalties, deferred charges or similar fees and expenses resulting from the payment of such liabilities and obligations, other than (i) trade payables incurred in the ordinary course of business which are payable to Persons other than any of the Stockholders or any Affiliate of the Company, (ii) borrowings of $795,000 incurred to finance the purchase of equipment specified on Schedule 3.1(b) and (iii) additional borrowings of up to $1,500,000 to fund seasonal working capital to the extent that the aggregate amount of borrowings under the Company's revolving credit facility as reflected on the Closing Date Balance Sheet (as hereinafter defined) exceeds the amount of borrowings under the Company's revolving credit facility on June 30, 1999 as reflected on the Balance Sheet and assuming that all other working capital accounts are handled in the ordinary course of business. For purposes of this Section 3.1, the amount of borrowings under the revolving credit facility shall be defined as the amount then outstanding on the revolving credit facility less the then outstanding checks drawn on such revolving credit facility which such outstanding checks will be paid in the ordinary course of business.

3.2 <u>Purchase Price.</u> Pursuant to the terms of this Agreement, at the Closing, (i) the Stockholders will sell, transfer, convey, assign and deliver to the Purchaser the Shares and the certificates representing the Shares, together with stock powers duly endorsed by the Stockholders and spousal consents in substantially the form of Annex 1, and (ii) the Purchaser will purchase the Shares from the Stockholders for an aggregate consideration consisting of cash, payable by wire transfer of immediately available funds, in the amount of Twenty-Five Million Dollars ($25,000,000), subject to adjustment as provided in Section 3.3 hereof, of which One Million Five Hundred Thousand Dollars ($1,500,000) shall be deposited at the Closing into an escrow account

A0266

equity reflected in the Balance Sheet by more than $250,000, the full amount of such excess, together with simple interest thereon from the Closing Date at the rate of 8% per annum (calculated on the basis of a 365-day year), shall be remitted by the Purchaser to the Stockholders within ten (10) Business Days thereafter, with each Stockholder to receive the amount of such excess multiplied by the Stockholder's Percentage of such Stockholder. All costs and expenses related to the resolution of a Disputed Accounting Matter shall be paid (i) by the Stockholders if the determination of the Final Closing Date Stockholders' Equity results in the Stockholders being obligated to remit any amount to the Purchaser under this Section and (ii) by the Purchaser in all other instances.

## 4. CLOSING

The Closing of the transactions contemplated by this Agreement (the "Closing") shall take place on January 10, 2000, or such other date as the parties hereto may mutually agree upon (the "Closing Date"), at the offices of Andrews & Kurth L.L.P. at 4200 Chase Tower, 600 Travis, Houston, Texas 77002.

## 5. REPRESENTATIONS, WARRANTIES, COVENANTS AND AGREEMENTS OF COMPANY AND THE STOCKHOLDERS

The Company and each Stockholder represent, warrant, covenant and agree that (i) the representations and warranties in this Section 5 are true and correct at the date of this Agreement and, subject to Section 8.7, shall be true at the Closing Date and (ii) the covenants and agreements in this Section 5 shall be complied with or performed at and as of the Closing Date. All such representations, warranties, covenants and agreements are joint and several, and each party's respective liability with respect to its breach is limited in accordance with Section 15.5 hereof.

5.1    Corporate Matters. The Company is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation, and is duly qualified to do business and is in good standing under the laws of each jurisdiction where such qualification is required, except where the failure to be so qualified would not have a material adverse effect on the business, operations, affairs, prospects, properties, assets or condition (financial or otherwise), of the Company. Schedule 5.1(i) sets forth the jurisdiction in which the Company is incorporated and each such jurisdiction in which the Company is qualified to do business. True, complete and correct copies of the Charter Documents and Bylaws, each as amended, of the Company are attached hereto as Schedule 5.1(ii). The stock records of the Company, as heretofore made available to the Purchaser, are true, correct and complete in all material respects. To the knowledge of the Company and each Stockholder, there are no minutes in the possession of the Company or the Stockholders which have not been made available to the Purchaser, and all of such minutes are true, correct and complete in all material respects.

5.2    Authorization. The Company has all requisite corporate power and authority to conduct its business as presently conducted and to enter into this Agreement and to perform its obligations hereunder. Subject to the specific limitation on remedies set forth in Section 14.5, each

A0267

Stockholder has the full capacity, legal right, power and authority to enter into this Agreement and the Escrow Agreement. The execution and delivery by the Company of this Agreement and its consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action of the Company. This Agreement has been duly executed and delivered by the Company and each of the Stockholders and constitutes a legal, valid and binding obligation of the Company and each of the Stockholders, enforceable against each of them in accordance with its terms. Upon execution and delivery by the Stockholders at the Closing, the Escrow Agreement will have been duly executed and delivered by each of the Stockholders and will constitute a legal, valid and binding obligation of each of the Stockholders, enforceable against each of them in accordance with its terms.

5.3    Capital Stock of the Company. The authorized capital stock of the Company consists of 250,000 Class A Shares and 40,000 Class B Shares, of which 200,000 Class A Shares and 25,342 Class B Shares are issued and outstanding, and such shares are owned of record by the Stockholders in the amounts set forth on Schedule 5.3. All outstanding shares of Company Stock to be conveyed by a Stockholder pursuant to Section 3 are owned by such Stockholder free and clear of all mortgages, pledges, liens, security interests, restrictions, conditional sales agreements, charges, encumbrances and claims of every kind (collectively, the "Liens") and are not subject to any voting trust or shareholders' or other similar agreement. All of the issued and outstanding shares of Company Stock (i) have been duly authorized and validly issued and (ii) are fully paid and nonassessable. Further, the Shares were offered, issued, sold and delivered by the Company in compliance with all applicable state and Federal securities laws, and none of such Shares was issued in violation of the preemptive rights of any Person.

5.4    Transactions in Capital Stock. The Company has no treasury stock. Except as set forth on Schedule 5.4(i), (a) no option, warrant, call, conversion right or commitment of any kind exists which obligates the Company to issue or sell any of its authorized but unissued capital stock and (b) the Company has no obligation (contingent or otherwise) to purchase, redeem or otherwise acquire any of its equity securities or any interests therein or to pay any dividend or make any distribution in respect thereof. Schedule 5.4(ii) includes true, correct and complete copies of all stock option or stock purchase plans, including a list of all outstanding options, warrants or other rights to acquire shares of Company Stock, if any exist. There are no voting trusts, proxies or other agreements or understandings to which the Company or any of the Stockholders is a party or is bound with respect to the voting, sale or transfer of any shares of capital stock of the Company.

5.5    Competing Lines of Business; Related Party Transactions. Except as set forth on Schedule 5.5, none of the Stockholders, and no other Affiliate of the Company, owns, directly or indirectly, any interest in, or is an officer, director, employee or consultant of or otherwise receives remuneration from, any Person engaged in the Business (other than the Company) or any lessor, lessee, customer or supplier of the Company. Except as set forth on Schedule 5.5, since July 1, 1997, no officer, director, Stockholder or Affiliate of the Company has had any interest in any property, real or personal, tangible or intangible, used in or pertaining to the Company's business.

A0268

# EXHIBIT "B"

# STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (the "Agreement") is made this ___ day of August, 2000, by and among Plassein Packaging Corp., a Delaware corporation (the "Buyer"), BA Capital Company, L.P., a Delaware limited partnership and successor by merger to NationsBanc Capital Corporation ("BA Capital"), Heller Financial, Inc., a Delaware corporation ("Heller"), and Charles J. Warr, a North Carolina resident, Stephen S. Wilson, a North Carolina resident, Kenneth B. Olender, a North Carolina resident, Daniel A. Jones III, a North Carolina resident, G. Kenneth Pope, Jr., a North Carolina resident and Paul D. Gage, a North Carolina resident (individually a "Seller" and collectively the "Sellers") and, solely with respect to the termination of certain agreements pursuant to Section 1.08 below, Rex International, Inc., a North Carolina corporation (the "Company").

## Preliminary Statement

A.     The Sellers (except Heller) own all the outstanding capital stock of the Company, which designs, manufactures, markets and sells plastic shipping sacks and specialty and stretch films for commercial and industrial applications (the "Business"). The Sellers (except Heller) desire to sell, and the Buyer desires to buy, all of the outstanding capital stock of the Company on the terms and conditions set forth below.

B.     Heller has certain Equity Rights (as defined below) pursuant to that certain Capital Appreciation Rights Agreement (the "CAR Agreement") between Heller and the Company dated as of December 17, 1993. The Company and Heller desire to terminate the CAR Agreement and Heller's Equity Rights in consideration for the payments to Heller as a Seller hereunder.

C.     Certain of the Sellers have options to purchase shares of common stock of the Company, which options are being exercised immediately prior to the Closing (as hereinafter defined).

**NOW, THEREFORE,** the Sellers and the Buyer agree as follows:

## ARTICLE 1.     PURCHASE AND SALE OF COMPANY SHARES.

Section 1.01     Basic Transaction.  On and subject to the terms and conditions of this Agreement, at the Closing referred to in Section 1.03 hereof, the Buyer agrees to purchase from each of the Sellers (except Heller), and each of the Sellers (except Heller) agrees to sell to the Buyer, all of his or its capital stock and warrants of the Company free and clear of any and all restrictions on transfer (other than restrictions under the Securities Act of 1933, as amended (the "Securities Act") and state securities laws), liens, mortgages, taxes, charges, security interests, encumbrances, options, warrants, purchase rights, contracts, commitments, equities, claims, demands or other restrictions (other than restrictions under the Securities Act and state securities laws) or limitations whatsoever ("Liens") other than those arising from acts of the Buyer, which together with the other Sellers' capital stock and warrants will constitute all the capital stock and

through (ix) above guaranteed by the Company, (xi) indebtedness of the type described in clauses (i) through (viii) above secured by any Lien upon property owned by the Company, (xii) interest expense accrued but unpaid, and (xiii) all prepayment premiums on or relating to any indebtedness described in clauses (i) through (viii) above.

Section 1.03  The Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Kennedy Covington Lobdell & Hickman, L.L.P., which is located in the Bank of America Corporate Center, 100 North Tryon Street, Charlotte, North Carolina, commencing at 10:00 a.m. local time promptly following the satisfaction or waiver of all conditions to the obligations of the parties to consummate the transactions contemplated hereby (other than conditions with respect to actions the respective parties will take at the Closing itself) or, at the request of the Buyer, at the offices of counsel to any lender providing financing in connection with the transactions contemplated hereby or such other date and/or place as the Buyer and the Sellers whose aggregate proportionate percentages as set forth on Schedule 1.02(a) is equal to or greater than 66-2/3% (the "Requisite Sellers") may mutually determine (the "Closing Date").

Section 1.04  Deliveries at the Closing.  At the Closing, (i) the Sellers will deliver to the Buyer the various certificates, instruments, and documents referred to in Article 6 and Article 7 below, (ii) the Buyer will deliver to the Sellers the various certificates, instruments, and documents referred to in Article 6 and Article 8 below, (iii) each of the Sellers will deliver to the Buyer stock and warrant certificates representing all of his or its Company Shares, endorsed in blank or accompanied by duly executed assignment documents, and (iv) the Buyer will deliver to each of the Sellers the consideration specified in Section 1.02 above.

Section 1.05  Indemnification Escrow.  Subject to Section 1.07(d), the indemnification escrow shall be available for indemnification obligations of the Sellers under Article 9.  On the "Release Date" as provided in the Indemnity Escrow Agreement, all amounts then remaining in escrow pursuant to the Indemnity Escrow Agreement, less the amount thereof, if any, with respect to which the Buyer has submitted a claim prior to such date in accordance with the Indemnity Escrow Agreement, shall be released to the Sellers in proportion to their proportionate percentages as set forth in Schedule 1.02(a).

Section 1.06  Payment of Estimated Purchase Price.  At the Closing, the Buyer shall pay to the Sellers the Estimated Purchase Price (as defined below) by wire transfer of immediately available funds (i) in the amount of $4,000,000, to the escrow agent provided for in an escrow agreement substantially in the form of Exhibit A hereto (the "Indemnity Escrow Agreement"), (ii) in the amount of $273,875 representing amounts required to be paid to Stephen S. Wilson, Kenneth B. Olender, Daniel A. Jones, III, G. Kenneth Pope, Jr. and Paul D. Gage, at the Closing pursuant to Section 3(b) of the Company Sale and Retention Incentive Agreements dated as of March 28, 2000 between the Company and such individuals, as amended (the "Management Retention Incentive Agreements"), to the accounts specified prior to the Closing by such individuals, and (iii) the remaining amount, to the account or accounts specified by the Sellers prior to Closing.  At Closing, the Buyer shall also pay or cause the Company to pay (a) all obligations of the Company to Heller under the Credit Agreement dated as of December 17, 1993 between the Company and Heller, as amended (the "Credit Agreement"), (b) all accrued

3

instrument, or other arrangement to which the Seller is a party or by which he or it is bound or to which any of his or its assets is subject. The Seller need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency, other than the filing of a Notification and Report Form with the Federal Trade Commission and the Department of Justice pursuant to the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended (the "HSR Act"), in connection with the execution and delivery of this Agreement or in order to consummate the transactions contemplated by this Agreement.

Section 2.04   Brokers or Finders.  Except as disclosed on Schedule 2.04, the Seller has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which the Buyer could become liable or obligated.

Section 2.05   Company Shares.  The Seller holds of record and owns beneficially the number of Company Shares set forth next to his or its name in Schedule 2.06, and, except as disclosed on Schedule 2.05, holds and owns and has good title to such Company Shares held by the Seller free and clear of any Liens. Except as disclosed on Schedule 2.06, the Seller is not a party to any option, warrant, purchase right, Equity Right or other contract or commitment that could require the Seller to sell, transfer, or otherwise dispose of any capital stock of the Company (other than this Agreement). Except as disclosed on Schedule 2.06, the Seller is not a party to any voting trust, proxy, or other agreement or understanding with respect to the voting of any capital stock of the Company. Upon delivery to Buyer at the Closing of the certificates representing the Company Shares, accompanied by stock powers duly endorsed to the Buyer, good and valid title to the Company Shares will pass to Buyer, free and clear of all Liens of any kind, other than those arising from acts of the Buyer.

Section 2.06   Capitalization.   The authorized, issued and outstanding capital stock options, and warrants of the Company and the Subsidiary is as set forth on Schedule 2.06. Except as set forth on Schedule 2.06, there is no existing option, warrant, call, commitment, Equity Right or other agreement to which the Company or the Subsidiary are a party requiring, and there are no convertible securities of the Company or the Subsidiary outstanding which upon conversion would require, the issuance of any additional shares of capital stock or other securities convertible into capital stock of the Company or the Subsidiary. All of the Company Shares have been duly authorized, validly issued, fully paid and non-assessable and were not issued in violation of (i) any preemptive or other rights of any person or entity to acquire securities of the Company, or (ii) applicable federal or state securities laws and the rules and regulations promulgated thereunder. The outstanding shares of capital stock or equity interests of the Subsidiary are validly issued, fully paid and non-assessable, and all such shares or other equity interests represented as being owned by Company are owned by it free and clear of any and all Liens of any kind whatsoever, except as set forth in Schedule 2.06 hereto.

8

A0272

knowledge of such counsel, any material agreement or instrument to which any Principal Party or their properties is bound; (c) cause or permit the acceleration of the maturity of any debt or obligation of the Company or the Subsidiary pursuant to, or cause or permit any party to terminate, any agreement described in clause (b) above; (d) to the knowledge of such counsel, result in the creation or imposition of any Encumbrance upon any of the assets of the Company or of the Subsidiary; (e) constitute a violation by any Principal Party of any applicable federal or state law or regulation or (f) to the knowledge of such counsel, violate any judgment, order, injunction, decree or award of any federal or state court or governmental agency against, or binding upon, any Principal Party or any of their properties;

(f)     The execution and delivery of this Agreement and the Escrow Agreement by each of the Sellers and the Company and the performance of the obligations of each of the Sellers and the Company under this Agreement and the Escrow Agreement do not require any consents, approvals, authorizations, registrations, declarations or filings by any of the Sellers or the Company under any statute, rule or regulation applicable to any of the Sellers or the Company, except for consents, approvals, authorizations, registrations, declarations or filings as (i) have been obtained or made prior to the Closing Date or which are not required to be made until after the Closing Date or (ii) with respect to which the failure to obtain or make does not affect the validity of this Agreement or the Escrow Agreement and would not have (A) a Material Adverse Effect or (B) a material adverse effect on the ability of any of the Sellers or the Company to consummate the transactions provided for in this Agreement;

(g)     To the knowledge of such counsel, except as set forth in Schedule 3.10 of this Agreement, there are no claims, suits, investigations, proceedings or inquiries against the Company or the Sellers pending or threatened in any court or before any governmental authority, or before any arbitrator, relating to or affecting the Company or its assets or business or any labor dispute that, if adversely determined, would have a Material Adverse Effect or could materially impair the consummation of the transactions contemplated by this Agreement;

(h)     The Company Shares to be sold by the Sellers have been duly authorized by the Company and are validly issued, fully paid and nonassessable and were not issued in violation of any statutory or, to our knowledge, contractual preemptive rights;

(i)     The Sellers are the sole registered and, to the knowledge of such counsel, beneficial holders of the Company Shares to be sold by the Sellers and, upon payment for and delivery of the Company Shares in accordance with the Agreement, to the knowledge of such counsel, the Buyer will acquire all rights of the Sellers in the Company Shares free and clear of all Liens, other than those arising from acts of the Buyer;

(j)     The authorized capital stock of the Company consists of 3,178,572 shares of Class A Common Stock, of which 413,282 shares are outstanding, 3,178,572 shares of Class B Common Stock, of which 375,000 shares are outstanding, 357,143 shares of Series A Preferred Stock, of which 357,143 shares are outstanding and 714,286 shares of Series B Preferred Stock, of which 714,286 shares are outstanding.  The authorized capital stock of the Subsidiary consists of 5,000 shares of Common Stock, of which 1,000 shares are issued and outstanding and held of record and, to the knowledge of such counsel, beneficially by the Company.  Except for BA

28

Capital's warrants to purchase 678,571 shares of the Company's Class A Common Stock, there are no authorized or, to our knowledge, any other, outstanding options, warrants or convertible securities or other rights (preemptive or otherwise) under which the Company or the Subsidiary may be obligated to issue or sell any shares of capital stock or any other security convertible into, or exercisable for, Company or Subsidiary capital stock; and

   (k) To the knowledge of such counsel, none of the transactions contemplated by this Agreement will terminate or violate, either by virtue of the terms thereof or because of the non-assignability thereof, any Company Permit, except where such termination or violation would not have a Material Adverse Effect.

  Any of such opinions may be given by Kennedy Covington Lobdell & Hickman, L.L.P. or by other counsel, including internal counsel of any Seller, with sufficient knowledge relevant to such Seller to deliver any or all of the foregoing opinions. Any opinion may expressly rely as to matters of fact upon certificates furnished by appropriate officers of the Seller, the Company or the Subsidiary or appropriate government officials and may include such qualifications as are customary for opinions of this type.

  Section 7.04 <u>Payoff of Debt</u>. The Company or the Buyer shall have paid in full, whether then due or not, all Funded Debt, including all obligations of the Company under (i) the Notes (as defined in the Note Purchase Agreement), (ii) accrued dividends payable to the Sellers and (iii) the Credit Agreement, in each case with a corresponding decrease in the Purchase Price. Buyer shall have received copies of "payoff" or "estoppel" letters or other evidence, reasonably satisfactory to it, of each of the foregoing.

  Section 7.05 <u>Corporate Action</u>. The Company and the Subsidiary shall have furnished Buyer with a certified copy of their Charters, Bylaws and all necessary corporate or organizational action on their behalf approving its respective execution, delivery and performance of this Agreement, as well as the shareholder and board approval of (i) the acceleration of any stock options and (ii) the Retention Incentive Agreements, including the payment of any bonus to any officer or employee of the Company related to the successful completion of the transactions contemplated by this Agreement including, but not limited to, any "parachute payment" within the meaning of Section 280G of the Code.

  Section 7.06 <u>Consents</u>. Buyer shall have received written evidence, in form and substance satisfactory to Buyer, of the consent to the transactions contemplated by this Agreement of all governmental, quasi-governmental and private third parties (including, without limitation, persons or other entities leasing real or personal property to the Company) where the absence of any such consent would result in a violation of law or a breach or default under any agreement set forth on <u>Schedule 3.05</u>.

  Section 7.07 <u>Company Stock Options</u>. All options (except the Warrants held by BA Capital) to purchase common stock or other securities of the Company, including but not limited to, all stock options issued pursuant to the Company's 1993 Stock Option Plan, shall have been exercised by the holders thereof and all continuing obligations of the Company as well as all other entitlements of the option holders thereunder shall be unconditionally waived and released

A0274

Environmental Law. Aside from such right to indemnification, the Buyer hereby waives any right, whether arising at law or in equity, to seek contribution, cost recovery, damages, or any other recourse or remedy from any and all of the Sellers, and hereby releases the Sellers from any claim, demand or liability, with respect to any such environmental matter (including without limitation any arising under any Environmental Law and including without limitation any arising under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), any analogous state law, or the common law.

### ARTICLE 10.  MISCELLANEOUS.

Section 10.01 <u>Notices</u>. All notices, requests, demands and other communications hereunder shall be in writing (including telecopy or similar writing) and shall be given,

| | |
|---|---|
| If to the Buyer: | Plassein Packaging Corp.<br>165 River Road<br>Suite 2<br>Willington, Connecticut 06279<br>Attention: Mr. Frank McNabb, Chief Executive Officer<br>Telecopy: (860) 429-5071 |
| with a copy to: | Trivest, Inc.<br>2665 South Bayshore Drive<br>Suite 800<br>Miami, Florida 33133-3462<br>Attention: Mr. William F. Kaczynski, Jr., Managing Director<br>Telecopy: (305) 285-0102 |
| *and* | Greenberg Traurig, P.A.<br>1221 Brickell Avenue<br>Miami, Florida 33131<br>Attention: Michael Hein, Esq.<br>Telecopy: (305) 579-0717 |
| If to the Sellers: | B.A. Capital Company, L.P.<br>Bank of America Corporate Center<br>25th Floor<br>100 North Tryon Street<br>Charlotte, North Carolina 28255<br>Attention: Mr. J. Travis Hain, Managing Director<br>Telecopy: (704) 386-6432 |

36

A0275

## Schedule 1.02(a)

**Sellers Proportionate Percentages**

| | |
|---|---|
| B.A. Capital Company, L.P. | 76.919% |
| Charles J. Warr | 7.083% |
| Stephen S. Wilson | 5.052% |
| Kenneth B. Olender | 1.343% |
| Daniel A. Jones III | .968% |
| G. Kenneth Pope, Jr. | .968% |
| Paul D. Gage | 2.907% |
| Heller Financial, Inc. | 4.760% |

# EXHIBIT "C"

A0277

[Execution Copy]

$53,000,000

## LOAN AND SECURITY AGREEMENT

Dated as of January 10, 2000

Between

PLASSEIN PACKAGING CORP.
KEY PACKAGING INDUSTRIES, CORP.
MARSHALL PLASTIC FILM, INCORPORATED
PLASTICAL INDUSTRIES, INCORPORATED
TRANSAMERICAN PLASTICS, L.L.C.
(the Borrowers)

NOR BAKER INC.
(NB Acquisition Corp.)
(the Canadian Borrower)

and

THE FINANCIAL INSTITUTIONS PARTY
HERETO FROM TIME TO TIME
(the Lenders)

and

FLEET CAPITAL CORPORATION
(the Administrative Agent)

FLEET ROBERTSON STEPHENS INC.
(the Arranger)

160717.axa

P 00757

A0278

(b)    an "employee pension benefit plan" as defined in Section 3(2) of ERISA as to which the Borrower or (if such plan is subject to Title IV of ERISA) any Related Company is or within the past six years has been such an "employer."

"Borrower" means each of Plassein, Key Packaging, Marshall, Plastical and Transamerican, and each other Person a party to this Agreement as a "Borrower."

"Borrowers' Representative" means Plassein and each successor in such capacity appointed pursuant to Section 5.17.

"Borrowing" means the borrowing of Loans under a single Facility and of a single Type, made by all Lenders on a single date and, in the case of Eurodollar Rate Loans, having a single Interest Period.

"Borrowing Base" means at any time an amount equal to the lesser of:

(a)    the Revolving Credit Facility, minus the sum of (i) the Letter of Credit Reserve, (ii) the Canada Reserve as defined in clause (a) of the definition thereof and (iii) the Environmental Compliance Reserve, and

(b)    an amount equal to

(i)    85% of the face value of Eligible Receivables due and owing at such time, plus

(ii)    55% of the lesser of cost determined on a FIFO (or first-in-first-out) accounting basis and fair market value of Eligible Inventory at such time, minus

(iii)    the sum of

(A)    the Letter of Credit Reserve,

(B)    the Canada Reserve,

(C)    the CBB Reserve, and

(D)    the Environmental Compliance Reserve.

"Borrowing Base Certificate" means a certificate in the form attached hereto as Exhibit C or in such other form as may be acceptable to the Borrowers' Representative and the Administrative Agent.

"Business Day" means any day other than a Saturday, Sunday or other day on which banks in Boston, Massachusetts or Hartford, Connecticut (and, when used with respect to the

160717.txt

4

P 00768

A0279

threat of Release or minimize the further Release of Contaminants so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; or (iii) perform pre-remedial studies and investigations and post-remedial monitoring and care.

"Required Lenders" means, at any time, any combination of Lenders whose combined Proportionate Shares at such time are greater than 51%.

"Restricted Distribution" by any Person means (i) the retirement, redemption, purchase, or other acquisition or retirement for value of any capital stock or other equity securities (except equity securities acquired on the conversion thereof into other equity securities of such Person) or equity interests or partnership or member interests issued by such Person, (ii) the declaration or payment of any dividend or distribution in cash or property on or with respect to any such securities (other than dividends payable solely in shares of its capital stock), equity interests or partnership or member interests, excluding, however, any such dividend, distribution or payment to any Borrower by any Subsidiary of such Borrower or to the Canadian Borrower by any of its Subsidiaries, (iii) any loan or advance by such Person to, or other investment by such Person in, the holder of any of such securities, equity interests or partnership or member interests and any forgiveness or cancellation of such loan or advance, and (iv) any other payment by such Person in respect of such securities, equity interests or partnership or member interests.

"Restricted Payment" means (i) any redemption or prepayment or other retirement, prior to the stated maturity thereof or prior to the due date of any regularly scheduled installment or amortization payment with respect thereto, of any Debt (other than the Loans, the Interim Canadian Loans and the Canadian Financing), (ii) the payment by any Person of the principal amount of or interest on any Indebtedness (other than trade debt) owing to an Affiliate of such Person or to an Affiliate of any such Affiliate and (iii) the payment of any management, consulting or similar fee by any Person to any Affiliate of such Person.

"Revolving Credit Facility" means the credit facility providing for Revolving Credit Loans based upon the Borrowing Base and described in Section 2.1 up to an aggregate principal amount at any one time outstanding not to exceed $20,000,000 or such lesser or greater amount as shall be agreed upon from time to time in writing by the Administrative Agent, the Lenders, the Canadian Borrower and the Borrowers.

"Revolving Credit Lender" means each Lender having a Commitment under the Revolving Credit Facility or, if the Commitments are terminated, having outstanding Revolving Credit Loans.

"Revolving Credit Loans" means Loans made to the Borrowers pursuant to Section 2.1.

"Revolving Credit Note" means each Revolving Credit Note made by the Borrowers payable to the order of a Lender evidencing the joint and several obligation of the Borrowers to pay the aggregate unpaid principal amount of the Loans made to them by such Lender under the

160717.sns

36

P 00800

A0280

"Term Loan" means, as the context requires, one or all of Term Loan A and Term Loan B, as well as the aggregate Loans outstanding under the Term Loan Facilities and refers to both Eurodollar Rate Term Loans and the Base Rate Term Loans.

"Term Loan A" means the aggregate Loans outstanding under the Term Loan A Facility and refers to both Eurodollar Rate Term Loans A and the Base Rate Term Loan A.

"Term Loan A Facility" means the credit facility described in Section 4.1(a) providing for Term Loan A in the principal amount of $9,500,000.

"Term Loan B" means the aggregate Loans outstanding under the Term Loan B Facility and refers to both Eurodollar Rate Term Loans B and the Base Rate Term Loan B.

"Term Loan B Facility" means the credit facility described in Section 4.1(b) providing for Term Loan B in the principal amount of $8,500,000.

"Term Loan Facility" means the Term Loan A Facility or the Term Loan B Facility, and "Term Loan Facilities" means both facilities.

"Term Loan Lender" means each Lender holding any outstanding Term Loan and "Term Loan A Lender" and "Term Loan B Lender" each means a Term Loan Lender under the designated Term Loan Facility.

"Term Note" means any of the Term Notes A and the Term Notes B, and "Term Notes" means more than one such Note.

"Term Note A" means each Term Note A made by the Borrowers payable to the order of a Lender evidencing the joint and several obligation of the Borrowers to pay the aggregate unpaid principal amount of the Loans made to them by such Lender under the Term Loan A Facility (and any promissory note or notes that may be issued from time to time in substitution, renewal, extension, replacement or exchange therefor whether payable to such Lender or to a different Lender in connection with a Person becoming a Lender after the Effective Date or otherwise) substantially in the form of Exhibit B-1 hereto, with all blanks properly completed, either as originally executed or as the same may from time to time be supplemented, modified, amended, renewed, extended or refinanced.

"Term Note B" means each Term Note B made by the Borrowers payable to the order of a Lender evidencing the joint and several obligation of the Borrowers to pay the aggregate unpaid principal amount of the Loans made to them by such Lender under the Term Loan B Facility (and any promissory note or notes that may be issued from time to time in substitution, renewal, extension, replacement or exchange therefor whether payable to such Lender or to a different Lender in connection with a Person becoming a Lender after the Effective Date or otherwise) substantially in the form of Exhibit B-2 hereto, with all blanks properly completed,

P 00804

A0281

## ARTICLE 2

## REVOLVING CREDIT FACILITY

SECTION 2.1  Revolving Credit Loans.  Upon the terms and subject to the conditions of, and in reliance upon the representations and warranties made under, this Agreement, each Revolving Credit Lender agrees, severally, but not jointly, to make Revolving Credit Loans under the Revolving Credit Facility to the Borrowers from time to time from the Effective Date to but not including the Termination Date, as requested or deemed requested by the Borrowers' Representative in accordance with the terms of Section 2.2, in amounts equal to such Lender's Proportionate Share of each Revolving Credit Loan requested or deemed requested hereunder up to an aggregate amount at any one time outstanding equal to such Lender's Proportionate Share of the Borrowing Base; provided, however, that the aggregate principal amount of all outstanding Revolving Credit Loans (after giving effect to the Loans requested or deemed requested) shall not exceed the Revolving Credit Facility minus the Letter of Credit Reserve, minus the Canada Reserve (in an amount determined in accordance with clause (a) of the definition thereof), minus the aggregate outstanding principal amount of any Swingline Loans. It is expressly understood and agreed that the Lenders may and at present intend to use the Borrowing Base as a maximum ceiling on Loans made to the Borrowers under the Revolving Credit Facility; provided, however, that it is agreed that should the aggregate outstanding amount of such Loans exceed the ceiling so determined or any other limitation set forth in this Agreement, such Loans shall nevertheless constitute Secured Obligations and, as such, shall be entitled to all benefits thereof and security therefor. The principal amount of any Loans made under the Revolving Credit Facility which is repaid may be reborrowed by the Borrowers, subject to the terms and conditions of this Agreement, in accordance with the terms of this Section 2.1. The Administrative Agent's and each Revolving Credit Lender's books and records reflecting the date and the amount of each Loan made under the Revolving Credit Facility and each repayment of principal thereof shall constitute *prima facie* evidence of the accuracy of the information contained therein, subject to the provisions of Section 5.7.

SECTION 2.2   Borrowing Requests. Requests for Borrowings under the Revolving Credit Facility (other than the Initial Loans which shall be the subject of the Initial Notice of Borrowing referred to in Section 6.1(e)) shall be made by delivery or deemed delivery of a Notice of Borrowing, given or deemed given, by the Borrowers' Representative, in the manner specified in Section 5.3. The Administrative Agent shall notify the Revolving Credit Lenders promptly (and in any event not later than the Business Day prior to the proposed Borrowing date) of each Notice of Borrowing given or deemed given. Not later than 1:30 p.m. on the proposed Borrowing date, each Revolving Credit Lender will make available to the Administrative Agent, for the account of the Borrowers, in funds immediately available to the Administrative Agent, such Lender's Proportionate Share of such Revolving Credit Loan. The Borrowers hereby irrevocably authorize the Administrative Agent to disburse the proceeds of each Borrowing requested, or deemed to be requested, pursuant to this Section 2.2 by wire transfer or other

160717.exe

46

P 00810

A0282

appropriate means to such account of a Borrower as may be agreed upon by the Borrowers' Representative and the Administrative Agent from time to time or, in the case of the proceeds of each Borrowing deemed requested under **Section 5.3(a)**, by way of direct payment of the relevant Secured Obligation.

SECTION 2.3  Repayment of Revolving Credit Loans.  The Revolving Credit Loans will be repaid as follows:

(a)    The outstanding principal amount of all the Revolving Credit Loans is due and payable, and shall be repaid by the Borrowers in full, as their joint and several obligation, not later than the Termination Date;

(b)    Subject to the provisions of **Section 5.8**, if at any time the aggregate outstanding unpaid principal amount of the Revolving Credit Loans exceeds the Borrowing Base in effect at such time minus the aggregate outstanding principal amount of all Swingline Loans, the Borrowers shall (unless a payment is made by the Borrowers pursuant to **Section 2A.3** or **Section 2A.4** that eliminates such excess) immediately repay the Revolving Credit Loans in an amount sufficient to reduce the aggregate unpaid principal amount of such Revolving Credit Loans by an amount equal to such excess, together with accrued and unpaid interest on the amount so repaid to the date of repayment; and

(c)    The Borrowers hereby instruct the Administrative Agent to repay the Revolving Credit Loans outstanding on any day in an amount equal to the amount (if any) received by the Administrative Agent on such day pursuant to **Section 9.15(b)**.

Repayments made pursuant to **Sections 2.3(b) and (c)** shall be applied first to the Base Rate Revolving Credit Loans and then to Eurodollar Rate Revolving Credit Loans.

SECTION 2.4   Revolving Credit Note.  Each Revolving Credit Lender's Revolving Credit Loans and the joint and several obligation of the Borrowers to repay such Revolving Credit Loans shall also be evidenced by a Revolving Credit Note payable to the order of such Lender.  Each Revolving Credit Note shall be dated the Effective Date (or later "effective date" under any Assignment and Acceptance) and be duly and validly executed and delivered by the Borrowers.

SECTION 2.5   Extension of Revolving Credit Facility.  Upon the request of the Borrowers, the Lenders may, in their sole discretion, agree to extend the Termination Date by an instrument in writing signed by the Administrative Agent and all Lenders.

160717.xxs

P 00811

A0283

## ARTICLE 2A

## SWINGLINE FACILITY

SECTION 2A.1  Swingline Loans.  Upon the terms and subject to the conditions of, and in reliance upon the representations and warranties made under, this Agreement, the Swingline Lender shall make Swingline Loans to the Borrowers from time to time, from and after the Effective Date until the Termination Date, as requested by the Borrowers in accordance with the terms of Section 2A.2, up to an aggregate principal amount of Swingline Loans at any time outstanding not to exceed the lesser of (i) the Swingline Facility and (ii) the Borrowing Base minus the aggregate principal amount of outstanding Revolving Credit Loans.  The Swingline Loans will be deemed to be usage of the Revolving Credit Facility for the purpose of calculating availability pursuant to Section 2.1, but will not reduce the Swingline Lender's obligation to lend its Proportionate Share of the remaining unused Revolving Credit Facility.

SECTION 2A.2  Making Swingline Loans.  Upon request of the Borrowers' Representative, the Swingline Lender shall promptly notify the Borrowers' Representative and the Administrative Agent of the quoted rate of interest applicable on any Business Day to a proposed Swingline Loan (such rate of interest, a "Quoted Rate").  Requests for Swingline Loans shall be made not later than 1:00 p.m. on the Business Day of the proposed Swingline Loan by delivery by telex, telegraph, telecopy or telephone of a request therefor by Borrowers' Representative to the Administrative Agent and the Swingline Lender.  Each such notice (a "Swingline Loan Request") shall specify (i) the proposed borrowing date, (ii) the amount of Swingline Loan requested, (iii) the applicable Quoted Rate, and (iv) the applicable Swingline Loan Maturity.  Not later than 6:00 p.m. on the date specified for any Swingline Loan, the Swingline Lender shall make available such Swingline Loan in immediately available funds to the Administrative Agent.  After the Administrative Agent's receipt of such funds and upon fulfillment of the applicable conditions set forth in Article 6, the Administrative Agent will, and the Borrowers hereby irrevocably authorize the Administrative Agent to, disburse the proceeds of each Swingline Loan by making such funds available to the Borrowers by wire transfer to such account of a Borrower as the Borrowers' Representative and the Administrative Agent may agree from time to time.

SECTION 2A.3  Repayment of Swingline Loans.  The principal amount of each Swingline Loan shall be repaid by the Borrowers in full on the applicable Swingline Loan Maturity, together with accrued and unpaid interest thereon to such date.

SECTION 2A.4  Prepayment.  If at any time the aggregate unpaid principal amount of Swingline Loans outstanding to the Borrowers from the Swingline Lender exceeds the amount set forth in the first sentence of Section 2A.1, the Borrowers shall pay to the Administrative Agent for the account of the Swingline Lender on demand by the Administrative Agent, an amount equal to such excess, together with accrued and unpaid interest on the principal amount

160717.xxx

48

P 00812

A0284

prepaid to the date of prepayment. Notwithstanding the foregoing, no such prepayment shall be required if the Borrowers shall have made an appropriate prepayment in accordance with the provisions of **Section 2.3(b)**.

SECTION 2A.5  <u>Swingline Note</u>.  The Swingline Loans made by the Swingline Lender and the obligation of the Borrowers to repay such Loans shall be evidenced by, and be repayable in accordance with the terms of, a single Swingline Note, made by the Borrowers payable to the order of the Swingline Lender. The Swingline Note shall be dated the Effective Date and be duly and validly executed and delivered by the Borrowers.

SECTION 2A.6  <u>Settlement with Other Lenders</u>.  All payments of principal, interest and any other amount with respect to such Swingline Loan shall be payable to and received by the Administrative Agent for the account of the Swingline Lender. Upon demand by the Swingline Lender, with notice thereof to the Administrative Agent, and notwithstanding the occurrence and continuation at the time of such demand of any Default or Event of Default, each Revolving Credit Lender shall make a Base Rate Revolving Credit Loan in the amount of its Revolving Credit Facility Percentage of the outstanding Swingline Loans for the account of the Borrowers, the proceeds of which shall be paid over to the Swingline Lender and applied to the repayment of such Swingline Loans. Any payments received by the Administrative Agent prior to such repayment by the Revolving Credit Lenders which in accordance with the terms of this Agreement are to be applied to the reduction of the outstanding principal balance of Swingline Loans shall be paid over to the Swingline Lender and so applied.

160717.exe

49

P 00813

A0285

EXHIBIT A-1

## FORM OF REVOLVING CREDIT NOTE

$_____

Atlanta, Georgia
January ___, 2000

FOR VALUE RECEIVED, the undersigned, KEY PACKAGING INDUSTRIES, CORP., a Massachusetts corporation, MARSHALL PLASTIC FILM, INCORPORATED, a Michigan corporation, PLASSEIN PACKAGING CORP., a Delaware corporation, PLASTICAL INDUSTRIES, INCORPORATED, a Delaware corporation, and TRANSAMERICAN PLASTICS, L.L.C., a Delaware limited liability company (collectively, the "Borrowers"), hereby jointly and severally unconditionally promise to pay to the order of _____ (the "Lender") at the offices of Fleet Capital Corporation, a Rhode Island corporation, as administrative agent for the Lenders (together with its successor agents, the "Administrative Agent") located at 300 Galleria Parkway, Suite 800, Atlanta, Georgia, 30339, or at such other place within the United States as shall be designated from time to time by the Administrative Agent, on the Termination Date, the principal amount of _____ AND _____/100 DOLLARS ($_____), or such lesser principal amount as may then constitute the aggregate unpaid balance of all Revolving Credit Loans made by the Lender to the Borrowers pursuant to the Loan Agreement (as hereinafter defined), in lawful money of the United States of America in federal or other immediately available funds.

The Borrowers also jointly and severally unconditionally promise to pay interest on the unpaid principal amount of this Note outstanding from time to time for each day from the date hereof until such principal amount is paid in full (whether upon maturity, by reason of acceleration or otherwise) at the rates per annum and on the dates specified in the Loan Agreement applicable from time to time in accordance with the provisions thereof. Nothing contained in this Note or in the Loan Agreement shall be deemed to establish or require the payment of a rate of interest in excess of the maximum rate permitted by any Applicable Law. In the event that any rate of interest required to be paid hereunder exceeds the maximum rate permitted by Applicable Law, the provisions of the Loan Agreement relating to the payment of interest under such circumstances shall control.

This Note is one of the Revolving Credit Notes referred to in that certain Loan and Security Agreement dated as of January ___, 2000 (as amended, modified, supplemented or restated from time to time, the "Loan Agreement"; unless otherwise defined herein, terms defined therein being used in this Note as therein defined), by and among the Borrowers, certain Affiliates of the Borrowers, the Lender, the other financial institutions party thereto from time to time and the Administrative Agent, is subject to, and entitled to, all provisions and benefits of the Loan Documents, is secured by the Collateral and other property as provided in the Loan Documents, is subject to optional and mandatory prepayment in whole or in part and is subject to acceleration prior to maturity upon the occurrence of one or more Events of Default, all as provided in the Loan Documents.

Presentment for payment, demand, protest and notice of demand, notice of dishonor, notice of non-payment and all other notices are hereby waived by the Borrowers, except to the

166466

P 00932

A0286

extent expressly provided in the Loan Agreement. No failure to exercise, and no delay in exercising, any rights hereunder on the part of the holder hereof shall operate as a waiver of such rights.

The Borrowers hereby jointly and severally agree to pay on demand all costs and expenses incurred in collecting the Secured Obligations hereunder or in enforcing or attempting to enforce any of the Lender's rights hereunder, including, but not limited to, reasonable attorneys' fees and expenses actually incurred if collected by or through an attorney, whether or not suit is filed.

**The provisions of Section 16.5 of the Loan Agreement are hereby expressly incorporated herein.**

**This Note shall be governed by, and construed in accordance with, the laws of the State of Georgia without giving effect to the conflict of laws principles thereof.**

[signatures appear on following page]

166466

2

P 00933

A0287

IN WITNESS WHEREOF, the undersigned have executed this Revolving Credit Note as of the day and year first above written.

BORROWERS:

KEY PACKAGING INDUSTRIES, CORP.

By:_____
Name:_____
Title:_____


MARSHALL PLASTIC FILM, INCORPORATED

By:_____
Name:_____
Title:_____


PLASSEIN PACKAGING CORP.

By:_____
Name:_____
Title:_____


PLASTICAL INDUSTRIES, INCORPORATED

By:_____
Name:_____
Title:_____


TRANSAMERICAN PLASTICS, L.L.C.

By:_____
Name:_____
Title:_____


166466

P 00934

A0288

**EXHIBIT A-2**

**FORM OF SWINGLINE NOTE**

$_____

Atlanta, Georgia
January ____, 2000

FOR VALUE RECEIVED, the undersigned, KEY PACKAGING INDUSTRIES, CORP., a Massachusetts corporation, MARSHALL PLASTIC FILM, INCORPORATED, a Michigan corporation, PLASSEIN PACKAGING CORP., a Delaware corporation, PLASTICAL INDUSTRIES, INCORPORATED, a Delaware corporation, and TRANSAMERICAN PLASTICS, L.L.C., a Delaware limited liability company (collectively, the "Borrowers"), hereby jointly and severally unconditionally promise to pay to the order of _____ (the "Swingline Lender") at the offices of Fleet Capital Corporation, a Rhode Island corporation, as administrative agent for the Lenders (together with its successor agents, the "Administrative Agent") located at 300 Galleria Parkway, Suite 800, Atlanta, Georgia, 30339, or at such other place within the United States as shall be designated from time to time by the Administrative Agent, on the Termination Date, the principal amount of _____ AND _____/100 DOLLARS ($_____), or such lesser principal amount as may then constitute the aggregate unpaid balance of all Swingline Loans made by the Swingline Lender to the Borrowers pursuant to the Loan Agreement (as hereinafter defined), in lawful money of the United States of America in federal or other immediately available funds.

The Borrowers also jointly and severally unconditionally promise to pay interest on the unpaid principal amount of this Note outstanding from time to time for each day from the date hereof until such principal amount is paid in full (whether upon maturity, by reason of acceleration or otherwise) at the rates per annum and on the dates specified in the Loan Agreement applicable from time to time in accordance with the provisions thereof. Nothing contained in this Note or in the Loan Agreement shall be deemed to establish or require the payment of a rate of interest in excess of the maximum rate permitted by any Applicable Law. In the event that any rate of interest required to be paid hereunder exceeds the maximum rate permitted by Applicable Law, the provisions of the Loan Agreement relating to the payment of interest under such circumstances shall control.

This Note is one of the Swingline Notes referred to in that certain Loan and Security Agreement dated as of January ____, 2000 (as amended, modified, supplemented or restated from time to time, the "Loan Agreement"; unless otherwise defined herein, terms defined therein being used in this Note as therein defined), by and among the Borrowers, certain Affiliates of the Borrowers, the Swingline Lender, the other financial institutions party thereto from time to time and the Administrative Agent, is subject to, and entitled to, all provisions and benefits of the Loan Documents, is secured by the Collateral and other property as provided in the Loan Documents, is subject to optional and mandatory prepayment in whole or in part and is subject to

166482

P 00935

A0289

acceleration prior to maturity upon the occurrence of one or more Events of Default, all as provided in the Loan Documents.

Presentment for payment, demand, protest and notice of demand, notice of dishonor, notice of non-payment and all other notices are hereby waived by the Borrowers, except to the extent expressly provided in the Loan Agreement. No failure to exercise, and no delay in exercising, any rights hereunder on the part of the holder hereof shall operate as a waiver of such rights.

The Borrowers hereby jointly and severally agree to pay on demand all costs and expenses incurred in collecting the Secured Obligations hereunder or in enforcing or attempting to enforce any of the Swingline Lender's rights hereunder, including, but not limited to, reasonable attorneys' fees and expenses actually incurred if collected by or through an attorney, whether or not suit is filed.

**The provisions of Section 16.5 of the Loan Agreement are hereby expressly incorporated herein.**

**This Note shall be governed by, and construed in accordance with, the laws of the State of Georgia without giving effect to the conflict of laws principles thereof.**

[signatures appear on following page]

166482

2

P 00936

A0290

IN WITNESS WHEREOF, the undersigned have executed this Swingline Note as of the day and year first above written.

BORROWERS:

KEY PACKAGING INDUSTRIES, CORP.

By:_____
Name:_____
Title:_____


MARSHALL PLASTIC FILM, INCORPORATED


By:_____
Name:_____
Title:_____


PLASSEIN PACKAGING CORP.


By:_____
Name:_____
Title:_____

PLASTICAL INDUSTRIES, INCORPORATED


By:_____
Name:_____
Title:_____


TRANSAMERICAN PLASTICS, L.L.C


By:_____
Name:_____
Title:_____


166482

3

P 00937

A0291

EXHIBIT B-1

## FORM OF TERM NOTE A

$_____

Atlanta, Georgia
January ___, 2000

      FOR VALUE RECEIVED, the undersigned, KEY PACKAGING INDUSTRIES, CORP., a Massachusetts corporation, MARSHALL PLASTIC FILM, INCORPORATED, a Michigan corporation, PLASSEIN PACKAGING CORP., a Delaware corporation, PLASTICAL INDUSTRIES, INCORPORATED, a Delaware corporation, and TRANSAMERICAN PLASTICS, L.L.C., a Delaware limited liability company (collectively, the "Borrowers"), hereby jointly and severally unconditionally promise to pay to the order of _____ (the "Lender") at the offices of Fleet Capital Corporation, a Rhode Island Corporation, as administrative agent for the Lenders (together with its successor agents, the "Administrative Agent"), located at 300 Galleria Parkway, Suite 800, Atlanta, Georgia, 30339, or at such other place within the United States as shall be designated from time to time by the Administrative Agent, the principal amount of _____ AND _____/100 DOLLARS ($_____), constituting the Term Loan A made by the Lender to the Borrowers pursuant to the Loan Agreement (as hereinafter defined), in lawful money of the United States of America in federal or other immediately available funds, in such amounts and on the dates specified in the Loan Agreement applicable from time to time in accordance with the provisions thereof.

      The Borrowers also jointly and severally unconditionally promise to pay interest on the unpaid principal amount of this Note for each day from the date hereof until payment thereof in full (whether upon maturity, by reason of acceleration or otherwise) at the rates per annum and on the dates specified in the Loan Agreement applicable from time to time in accordance with the provisions thereof. Nothing contained in this Note or in the Loan Agreement shall be deemed to establish or require the payment of a rate of interest in excess of the maximum rate permitted by any Applicable Law. In the event that any rate of interest required to be paid hereunder exceeds the maximum rate permitted by Applicable Law, the provisions of the Loan Agreement relating to the payment of interest under such circumstances shall control.

      This Note is one of the Term Notes referred to in that certain Loan and Security Agreement dated as of January ___, 2000 (as amended, modified, supplemented or restated from time to time, the "Loan Agreement"; unless otherwise defined herein, terms defined therein being used in this Note as therein defined) by and among the Borrowers, certain Affiliates of the Borrowers, the Lender, the other financial institutions party thereto from time to time and the Administrative Agent, is subject to, and entitled to, all provisions and benefits of the Loan Documents, is secured by the Collateral and other property as provided in the Loan Documents, is subject to optional and mandatory prepayment in whole or in part and is subject to acceleration prior to maturity upon the occurrence of one or more Events of Default, all as provided in the Loan Documents.

166485

P 00938

A0292

Presentment for payment, demand, protest and notice of demand, notice of dishonor and notice of non-payment and all other notices are hereby waived by the Borrowers except to the extent expressly provided in the Loan Agreement. No failure to exercise, and no delay in exercising any rights hereunder on the part of the holder hereof shall operate as a waiver of such rights.

The Borrowers hereby jointly and severally agree to pay on demand all costs and expenses incurred in collecting the Secured Obligations hereunder or in enforcing or attempting to enforce any of the Lender's rights hereunder, including, but not limited to, reasonable attorneys' fees and expenses actually incurred if collected by or through an attorney, whether or not suit is filed.

The provisions of Section 16.5 of the Loan Agreement are hereby expressly incorporated by reference herein.

This Note shall be governed by, and construed in accordance with, the laws of the State of Georgia without giving effect to the conflict of laws principles thereof.

[signatures appear on following page]

166485

P 00939

A0293

IN WITNESS WHEREOF, the undersigned have executed this Term Note A as of the day and year first above written.

BORROWERS:

KEY PACKAGING INDUSTRIES, CORP.

By:_____
Name:_____
Title:_____


MARSHALL PLASTIC FILM, INCORPORATED


By:_____
Name:_____
Title:_____


PLASSEIN PACKAGING CORP.


By:_____
Name:_____
Title:_____


PLASTICAL INDUSTRIES, INCORPORATED


By:_____
Name:_____
Title:_____

TRANSAMERICAN PLASTICS, L.L.C.


By:_____
Name:_____
Title:_____

166485

P 00940

A0294

EXHIBIT B-2

## FORM OF TERM NOTE B

$_____

Atlanta, Georgia
January ___, 2000

FOR VALUE RECEIVED, the undersigned, KEY PACKAGING INDUSTRIES, CORP., a Massachusetts corporation, MARSHALL PLASTIC FILM, INCORPORATED, a Michigan corporation, PLASSEIN PACKAGING CORP., a Delaware corporation, PLASTICAL INDUSTRIES, INCORPORATED, a Delaware corporation, and TRANSAMERICAN PLASTICS, L.L.C., a Delaware limited liability company (collectively, the "Borrowers"), hereby jointly and severally unconditionally promise to pay to the order of _____ (the "Lender") at the offices of Fleet Capital Corporation, a Rhode Island corporation, as administrative agent for the Lenders (together with its successor agents, the "Administrative Agent"), located at 300 Galleria Parkway, Suite 800, Atlanta, Georgia 30339 or at such other place within the United States as shall be designated from time to time by the Administrative Agent, the principal amount of _____ AND _____/100 DOLLARS ($_____), constituting the Term Loan B made by the Lender to the Borrowers pursuant to the Loan Agreement (as hereinafter defined), in lawful money of the United States of America in federal or other immediately available funds, in such amounts and on the dates specified in the Loan Agreement applicable from time to time in accordance with the provisions thereof.

The Borrowers also jointly and severally unconditionally promise to pay interest on the unpaid principal amount of this Note for each day from the date hereof until payment thereof in full (whether upon maturity, by reason of acceleration or otherwise) at the rates per annum and on the dates specified in the Loan Agreement applicable from time to time in accordance with the provisions thereof. Nothing contained in this Note or in the Loan Agreement shall be deemed to establish or require the payment of a rate of interest in excess of the maximum rate permitted by any Applicable Law. In the event that any rate of interest required to be paid hereunder exceeds the maximum rate permitted by Applicable Law, the provisions of the Loan Agreement relating to the payment of interest under such circumstances shall control.

This Note is one of the Term Notes referred to in that certain Loan and Security Agreement dated as of January ___, 2000 (as amended, modified, supplemented or restated from time to time, the "Loan Agreement"; unless otherwise defined herein, terms defined therein being used in this Note as therein defined) by and among the Borrowers, certain Affiliates of the Borrowers, the Lender, the other financial institutions party thereto from time to time and the Administrative Agent, is subject to, and entitled to, all provisions and benefits of the Loan Documents, is secured by the Collateral and other property as provided in the Loan Documents, is subject to optional and mandatory prepayment in whole or in part and is subject to acceleration

166492

P 00941

A0295

prior to maturity upon the occurrence of one or more Events of Default, all as provided in the Loan Documents.

Presentment for payment, demand, protest and notice of demand, notice of dishonor and notice of non-payment and all other notices are hereby waived by the Borrowers except to the extent expressly provided in the Loan Agreement. No failure to exercise, and no delay in exercising any rights hereunder on the part of the holder hereof shall operate as a waiver of such rights.

The Borrowers hereby jointly and severally agree to pay on demand all costs and expenses incurred in collecting the Secured Obligations hereunder or in enforcing or attempting to enforce any of the Lender's rights hereunder, including, but not limited to, reasonable attorneys' fees and expenses actually incurred if collected by or through an attorney, whether or not suit is filed.

**The provisions of Section 16.5 of the Loan Agreement are hereby expressly incorporated by reference herein.**

**This Note shall be governed by, and construed in accordance with, the laws of the State of Georgia without giving effect to the conflict of laws principles thereof.**

[signatures appear on following page]

166492

P 00942

A0296

**IN WITNESS WHEREOF**, the undersigned have executed this Term Note B as of the day and year first above written.

BORROWERS:

KEY PACKAGING INDUSTRIES, CORP.

By:_____
Name:_____
Title:_____

MARSHALL PLASTIC FILM, INCORPORATED

By:_____
Name:_____
Title:_____

PLASSEIN PACKAGING CORP.

By:_____
Name:_____
Title:_____

PLASTICAL INDUSTRIES, INCORPORATED

By:_____
Name:_____
Title:_____

TRANSAMERICAN PLASTICS, L.L.C.

By:_____
Name:_____
Title:_____

166492

P 00943

A0297

EXHIBIT B-3

## FORM OF
## CAPEX NOTE

$_____                                    Atlanta, Georgia
                                                January ___, 2000

      FOR VALUE RECEIVED, KEY PACKAGING INDUSTRIES, CORP., a Massachusetts corporation, MARSHALL PLASTIC FILM, INCORPORATED, a Michigan corporation, PLASSEIN PACKAGING CORP., a Delaware corporation, PLASTICAL INDUSTRIES, INCORPORATED a Delaware corporation, and TRANSAMERICAN PLASTICS, L.L.C., a Delaware limited liability company (collectively, the "Borrowers"), hereby jointly and severally unconditionally promise to pay to the order of _____ (the "Lender") at the offices of Fleet Capital Corporation, a Rhode Island corporation, as administrative agent for the Lenders (together with its successor agents, the "Administrative Agent") located at 300 Galleria Parkway, Suite 800, Atlanta, Georgia 30339, or at such other place within the United States as shall be designated from time to time by the Lender, the principal amount of _____
_____ AND NO/100 DOLLARS ($_____), or, such lesser principal amount as may then constitute the aggregate principal balance of all advances constituting part of the Capex Loans made by the Lender to the Borrowers pursuant to the Loan Agreement (as hereinafter defined) in lawful money of the United States of America, in federal or other immediately available funds, in such amounts and on the dates specified in the Loan Agreement applicable from time to time and otherwise in accordance with the provisions thereof.

      The Borrowers also jointly and severally unconditionally promise to pay interest on the unpaid principal amount outstanding for each Note constituting part of a Capex Loan, from time to time for each day from the date of disbursement until such principal amount is paid in full of each Loan (whether at maturity, by reason of acceleration or otherwise) at the rates per annum and on the dates specified in the Loan Agreement applicable from time to time in accordance with the provisions thereof. Nothing contained in this Capex Note shall be deemed to establish or require the payment of a rate of interest in excess of the maximum rate permitted by any Applicable Law. In the event that any rate of interest required to be paid hereunder exceeds the maximum rate permitted by Applicable Law, the provisions of the Loan Agreement relating to the payment of interest under such circumstances shall control.

      This Note is one of the Capex Notes referred to in that certain Loan and Security Agreement dated as of January __, 2000 (as amended, modified, supplemented or restated from time to time, the "Loan Agreement"; unless otherwise defined herein, terms defined therein being used in this Note as therein defined), by and among the Borrowers, certain Affiliates of the Borrower, the Lender, the other financial institutions party thereto from time to time and the Administrative Agent, is subject to, and entitled to, all provisions and benefits of the Loan Documents, is secured by the Collateral and other property as provided in the Loan Documents, is subject to optional and mandatory prepayment in whole or in part and is subject to acceleration

167807

prior to maturity upon the occurrence of one of more Events of Default, all as provided in the Loan Documents.

Presentment for payment, demand, protest and notice of demand, notice of dishonor and notice of nonpayment and all other notices are hereby waived by the Borrowers to the fullest extent permitted by Applicable Law. No failure to exercise, and no delay in exercising any rights hereunder on the part of the holder hereof shall operate as a waiver of such rights.

The Borrowers hereby jointly and severally agree to pay on demand all costs and expenses incurred in collecting the Secured Obligations hereunder or in enforcing or attempting to enforce any of the Lender's rights hereunder, including, but not limited to, reasonable attorneys' fees and expenses if collected by or through an attorney, whether or not suit is filed.

All Loans made by the Lender to the Borrowers hereunder and all payments made on account of principal hereof shall be recorded by the Lender and, prior to any transfer hereof, endorsed on the grid attached hereto which is part of this Capex Note. This Capex Note shall be used to record all such loans and payments on account of principal and other information until it is surrendered to the Borrowers by the Lender, and it shall remain in effect even though there may be periods prior to such surrender when no Loans are outstanding hereunder.

The provisions of Section 16.5 of the Loan Agreement are hereby expressly incorporated by reference herein.

This Capex Note shall be governed by and construed in accordance with the laws of the State of Georgia.

[signatures appear on following page]

167807

P 00945

A0299

IN WITNESS WHEREOF, the undersigned have executed this Capex Note as of the date and year first above written.

BORROWERS:

KEY PACKAGING INDUSTRIES, CORP.

By:_____
Name:_____
Title:_____

MARSHALL PLASTIC FILM, INCORPORATED

By:_____
Name:_____
Title:_____

PLASSEIN PACKAGING CORP.

By:_____
Name:_____
Title:_____

PLASTICAL INDUSTRIES, INCORPORATED

By:_____
Name:_____
Title:_____

TRANSAMERICAN PLASTICS, L.L.C.

By:_____
Name:_____
Title:_____

167807

P 00946

A0300

# EXHIBIT "D"

A0301

**[EXECUTION COPY]**

$72,500,000

### SECOND AMENDED AND RESTATED
### LOAN AND SECURITY AGREEMENT
Dated as of August 15, 2000

Between

**PLASSEIN PACKAGING CORP.**
**KEY PACKAGING INDUSTRIES, CORP.**
**MARSHALL PLASTIC FILM, INCORPORATED**
**PLASTICAL INDUSTRIES, INCORPORATED**
**TRANSAMERICAN PLASTICS, L.L.C.**
**REX INTERNATIONAL, INC.**
(the Borrowers)

**NOR BAKER INC.**
(the Canadian Borrower)

and

**THE FINANCIAL INSTITUTIONS PARTY**
**HERETO FROM TIME TO TIME**
(the Lenders)

and

**FLEET CAPITAL CORPORATION**
(the Administrative Agent)

**HELLER FINANCIAL, INC.**
(the Syndication Agent)

**WACHOVIA BANK, N.A.**
(the Documentation Agent)

**FLEETBOSTON ROBERTSON STEPHENS INC.**
(the Arranger)

# SECOND AMENDED AND RESTATED
# LOAN AND SECURITY AGREEMENT

### Dated as of August 15 , 2000

THE SECOND AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT is made as of August 15, 2000 by and among PLASSEIN PACKAGING CORP., a Delaware corporation, KEY PACKAGING INDUSTRIES, CORP., a Massachusetts corporation, MARSHALL PLASTIC FILM, INCORPORATED, a Michigan corporation, NOR BAKER INC., an Ontario (Canada) corporation, PLASTICAL INDUSTRIES, INCORPORATED, a Delaware corporation, TRANSAMERICAN PLASTICS, L.L.C., a Delaware limited liability company, REX INTERNATIONAL, INC. a North Carolina corporation, the financial institutions party to this Agreement from time to time as the Lenders, HELLER FINANCIAL, INC., as syndication agent, WACHOVIA BANK, N.A., as documentation agent, and FLEET CAPITAL CORPORATION, a Rhode Island corporation, as administrative agent for the Lenders.

### Preliminary Statement

The Borrowers, the Canadian Borrower, the Agents and the Lenders are parties to a Loan and Security Agreement dated as of January 10, 2000 as amended and restated in its entirety by an Amended and Restated Loan and Security Agreement dated as of March 1, 2000 (as in effect on the date hereof, the "Existing Loan Agreement").

At the request of the Borrowers and the Canadian Borrower, the parties to the Existing Loan Agreement have agreed to increase the amount available to be borrowed on a revolving credit and term basis for the purpose, among others, to provide a portion of the financing for the Acquisition by Plassein of the capital stock of Rex, which shall become a Borrower hereunder, modify certain covenants and make other changes to the Existing Loan Agreement, and for the convenience of the parties, to effect such increase, addition, modifications and other changes by amending and restating the Existing Loan Agreement in its entirety as hereinafter set forth, upon and subject to all of the terms, conditions and provisions hereof. This amendment and restatement is not intended to be, and shall not be deemed or construed as, a repayment or novation of the Debt outstanding under the Existing Loan Agreement.

Accordingly, in consideration of the Existing Loan Agreement, the financial accommodations outstanding thereunder, the mutual promises hereinafter set forth and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

P 03420

A0303

disposition of worn-out and obsolete Equipment and Inventory no longer useful in the Borrowers' or the Canadian Borrower's business, as the case may be, consistent with past practices of the Borrowers and the Canadian Borrower.

"Assignment and Acceptance" means an assignment and acceptance in the form attached hereto as Exhibit D assigning all or a portion of a Lender's interests, rights and obligations under this Agreement pursuant to Section 14.1.

"Base Rate" means at any time an interest rate per annum equal to the greater of (i) the rate of interest publicly announced from time to time by Fleet National Bank at its head office in Boston, Massachusetts as its "base" rate as in effect at such time, and (ii) the Federal Funds Effective Rate plus 1/2 of 1% per annum (rounded upward, if necessary, to the next 1/8 of 1%).

"Base Rate Capex Loan" means each Base Rate Loan outstanding under the Capex Facility.

"Base Rate Loan" means each Borrowing of Loans bearing interest determined with reference to the Base Rate and a specified principal amount of such Loans outstanding.

"Base Rate Revolving Credit Loans" means each Base Rate Loan outstanding under the Revolving Credit Facility.

"Base Rate Term Loan" means each Base Rate Loan outstanding under the Term Loan A Facility or the Term Loan B Facility.

"Base Rate Term Loan A" means the Base Rate Loan outstanding under the Term Loan A Facility.

"Base Rate Term Loan B" means the Base Rate Loan outstanding under the Term Loan B Facility.

"Benefit Plan" means, whether established before or after the Agreement Date and excluding any Multiemployer Plan,

(a)    a "welfare plan" as defined in Section 3(1) of ERISA as to which the Borrower is an "employer" as defined in Section 3(5) of ERISA, and

(b)    an "employee pension benefit plan" as defined in Section 3(2) of ERISA as to which the Borrower or (if such plan is subject to Title IV of ERISA) any Related Company is or within the past six years has been such an "employer."

"Borrower" means each of Plassein, Key Packaging, Marshall, Plastical, Transamerican and Rex and each other Person a party to this Agreement as a "Borrower."

4

P 03423

A0304

owing to an Affiliate of such Person or to an Affiliate of any such Affiliate, and (iv) the payment of any management, consulting or similar fee by any Person to any Affiliate of such Person.

"Retention Incentive Agreements" means, collectively, (i) the Company Sale and Retention Incentive Agreements each dated as of March 28, 2000 between Rex and each of Kenneth B. Olender, Stephen S. Wilson, Daniel A. Jones, III, G. Kenneth Pope, Jr. and Paul Gage and (ii) the Company Sale and Retention Incentive Agreements each dated as of January 28, 2000 between Rex and each of Ben Parsons, Chris Findley, Jason Watson, Dave Holt, Rosemary Callahan, George Warren, Jeff Spencer, Rod Reeves, Al Denton, Roger Lebel, Bill Bahr, Craig Miller and Darrel Warr.

"Revolving Credit Facility" means the credit facility providing for Revolving Credit Loans based upon the Borrowing Base and described in Section 2.1 up to an aggregate principal amount at any one time outstanding not to exceed $22,500,000 or such lesser or greater amount as shall be agreed upon from time to time in writing by the Administrative Agent, the Lenders, the Canadian Borrower and the Borrowers.

"Revolving Credit Lender" means each Lender having a Commitment under the Revolving Credit Facility or, if the Commitments are terminated, having outstanding Revolving Credit Loans.

"Revolving Credit Loans" means (i) any Revolving Credit Loan outstanding under and as defined in the Existing Loan Agreement and (ii) Loans made to the Borrowers pursuant to Section 2.1.

"Revolving Credit Note" means each Revolving Credit Note made by the Borrowers payable to the order of a Lender evidencing the joint and several obligation of the Borrowers to pay the aggregate unpaid principal amount of the Loans made to them by such Lender under the Revolving Credit Facility (and any promissory note or notes that may be issued from time to time in substitution, renewal, extension, replacement or exchange therefor whether payable to such Lender or to a different Lender in connection with a Person becoming a Lender after the Effective Date or otherwise) substantially in the form of Exhibit A-1 hereto, with all blanks properly completed, either as originally executed or as the same may from time to time be supplemented, modified, amended, renewed, extended or refinanced.

"Rex" means Rex International, Inc., a North Carolina corporation and (from and after the Effective Date) a Wholly Owned Subsidiary of Plassein.

"Rex Acquisition" means the Acquisition by Plassein of 100% of the capital stock of Rex pursuant to the Rex Acquisition Agreement.

"Rex Acquisition Agreement" means the Stock Purchase Agreement dated as of August __, 2000 by and among Plassein, Rex, BA Capital Company, L.P. and the other selling shareholders of Rex named therein.

37

A0305

"Subsidiary Guarantor" means Vizo-Bag, Teno and any other Subsidiary that becomes a Guarantor in accordance with the provisions of Section 10.11.

"Supporting Letter of Credit" has the meaning set forth in Section 3.9.

"Swingline Facility" means an amount equal to $3,000,000.

"Swingline Lender" means FCC and each Lender that succeeds to such capacity with the consent of the Administrative Agent.

"Swingline Loan" means each advance by the Swingline Lender to the Borrowers pursuant to Section 2A.1.

"Swingline Loan Maturity" means as to each Swingline Loan, the date such Loan is due as specified by the Borrowers in the related Swingline Loan Request, which shall be a Business Day not more than seven days after the borrowing date of such Swingline Loan.

"Swingline Loan Request" has the meaning set forth in Section 2A.2.

"Swingline Note" means the Swingline Note made by the Borrowers payable to the order of the Swingline Lender evidencing the joint and several obligation of the Borrowers to pay the aggregate unpaid principal amount of the Swingline Loans made to them by the Swingline Lender under the Swingline Facility (and any promissory note that may be issued from time to time in substitution, renewal, extension, replacement or exchange therefor) substantially in the form of Exhibit A-2 hereto, with all blanks properly completed, either as originally executed or as the same may from time to time be supplemented, modified, amended, renewed, extended or refinanced.

"Syndication Agent" means Heller Financial, Inc.

"Taxes" means any present or future taxes, levies, imposts, duties, assessments, deductions, withholdings or other charges of whatever nature, including income, receipts, excise, property, sales, use, transfer, license, payroll, withholding, social security and franchise taxes now or hereafter imposed or levied by the United States or any state, provincial, local or foreign government or by any department, agency or other political subdivision or taxing authority thereof or therein and all interest, penalties, expenses, additions to tax and similar liabilities with respect thereto, but excluding, in the case of each Lender, taxes imposed on or measured by the net income or overall gross receipts of such Lender.

"Teno" means Teno Films, Incorporated, a North Carolina corporation and Wholly Owned Subsidiary of Plassein.

P 03460

A0306

"Teno Guaranty" means the Guaranty Agreement dated on or about the Effective Date, made by Teno in favor of the Administrative Agent, whereby Teno guarantees the payment and performance by the Borrowers of their respective obligations hereunder.

"Teno Security Agreement" means the Guarantor Security Agreement dated on or about the Effective Date, executed and delivered by Teno in favor of the Administrative Agent.

"Term Loan" means, as the context requires, one or all of Term Loan A and Term Loan B, as well as the aggregate Loans outstanding under the Term Loan Facilities and refers to both Eurodollar Rate Term Loans and the Base Rate Term Loans.

"Term Loan A" means the aggregate Loans outstanding under the Term Loan A Facility and refers to both Eurodollar Rate Term Loans A and the Base Rate Term Loan A.

"Term Loan A Facility" means the credit facility described in Section 4.1(a) providing for Term Loan A in the aggregate principal amount of $22,500,000, less the amount of the Canada Term A Support L/C.

"Term Loan B" means the aggregate Loans outstanding under the Term Loan B Facility and refers to both Eurodollar Rate Term Loans B and the Base Rate Term Loan B.

"Term Loan B Facility" means the credit facility described in Section 4.1(b) providing for Term Loan B in the aggregate principal amount of $22,500,000, less the amount of the Canada Term B Support L/C.

"Term Loan Facility" means the Term Loan A Facility or the Term Loan B Facility, and "Term Loan Facilities" means both facilities.

"Term Loan Lender" means each Lender holding any outstanding Term Loan and "Term Loan A Lender" and "Term Loan B Lender" each means a Term Loan Lender under the designated Term Loan Facility.

"Term Note" means any of the Term Notes A and the Term Notes B, and "Term Notes" means more than one such Note.

"Term Note A" means each Term Note A made by the Borrowers payable to the order of a Lender evidencing the joint and several obligation of the Borrowers to pay the aggregate unpaid principal amount of the Loans made to them by such Lender under the Term Loan A Facility (and any promissory note or notes that may be issued from time to time in substitution, renewal, extension, replacement or exchange therefor whether payable to such Lender or to a different Lender in connection with a Person becoming a Lender after the Effective Date or otherwise) substantially in the form of Exhibit B-1 hereto, with all blanks properly completed, either as originally executed or as the same may from time to time be supplemented, modified, amended, renewed, extended or refinanced.

42

P 03461

A0307

## ARTICLE 2

## REVOLVING CREDIT FACILITY

SECTION 2.1 <u>Revolving Credit Loans</u>. Upon the terms and subject to the conditions of, and in reliance upon the representations and warranties made under, this Agreement, each Revolving Credit Lender agrees, severally, but not jointly, to make Revolving Credit Loans under the Revolving Credit Facility to the Borrowers from time to time from the Effective Date to but not including the Termination Date, as requested or deemed requested by the Borrowers' Representative in accordance with the terms of Section 2.2, in amounts equal to such Lender's Proportionate Share of each Revolving Credit Loan requested or deemed requested hereunder up to an aggregate amount at any one time outstanding equal to such Lender's Proportionate Share of the Borrowing Base; provided, however, that the aggregate principal amount of all outstanding Revolving Credit Loans (after giving effect to the Loans requested or deemed requested) shall not exceed the Revolving Credit Facility minus the Letter of Credit Reserve, minus the aggregate outstanding principal amount of any Swingline Loans. It is expressly understood and agreed that the Lenders may and at present intend to use the Borrowing Base as a maximum ceiling on Loans made to the Borrowers under the Revolving Credit Facility; provided, however, that it is agreed that should the aggregate outstanding amount of such Loans exceed the ceiling so determined or any other limitation set forth in this Agreement (including in Section 5.9(e)), such Loans shall nevertheless constitute Secured Obligations and, as such, shall be entitled to all benefits thereof and security therefor. The principal amount of any Loans made under the Revolving Credit Facility which is repaid may be reborrowed by the Borrowers, subject to the terms and conditions of this Agreement, in accordance with the terms of this Section 2.1. The Administrative Agent's and each Revolving Credit Lender's books and records reflecting the date and the amount of each Loan made under the Revolving Credit Facility and each repayment of principal thereof shall constitute *prima facie* evidence of the accuracy of the information contained therein, subject to the provisions of Section 5.7.

SECTION 2.2 <u>Borrowing Requests</u>. Requests for Borrowings under the Revolving Credit Facility shall be made by delivery or deemed delivery of a Notice of Borrowing, given or deemed given, by the Borrowers' Representative, in the manner specified in Section 5.3. The Administrative Agent shall notify the Revolving Credit Lenders promptly (and in any event not later than the Business Day prior to the proposed Borrowing date) of each Notice of Borrowing given or deemed given. Not later than 1:30 p.m. on the proposed Borrowing date, each Revolving Credit Lender will make available to the Administrative Agent, for the account of the Borrowers, in funds immediately available to the Administrative Agent, such Lender's Proportionate Share of such Revolving Credit Loan. The Borrowers hereby irrevocably authorize the Administrative Agent to disburse the proceeds of each Borrowing requested, or deemed to be requested, pursuant to this Section 2.2 by wire transfer or other appropriate means to such account of a Borrower as may be agreed upon by the Borrowers' Representative and the Administrative Agent from time to time or, in the case of the proceeds of each Borrowing

49

P 03468

A0308

deemed requested under Section 5.3(a), by way of direct payment of the relevant Secured Obligation.

SECTION 2.3  Repayment of Revolving Credit Loans.  The Revolving Credit Loans will be repaid as follows:

(a)    The outstanding principal amount of all the Revolving Credit Loans is due and payable, and shall be repaid by the Borrowers in full, as their joint and several obligation, not later than the Termination Date;

(b)    Subject to the provisions of Section 5.8, if at any time the aggregate outstanding unpaid principal amount of the Revolving Credit Loans exceeds the Borrowing Base in effect at such time minus the aggregate outstanding principal amount of all Swingline Loans, the Borrowers shall (unless a payment is made by the Borrowers pursuant to Section 2A.3 or Section 2A.4 that eliminates such excess) immediately repay the Revolving Credit Loans in an amount sufficient to reduce the aggregate unpaid principal amount of such Revolving Credit Loans by an amount equal to such excess, together with accrued and unpaid interest on the amount so repaid to the date of repayment; and

(c)    The Borrowers hereby instruct the Administrative Agent to repay the Revolving Credit Loans outstanding on any day in an amount equal to the amount (if any) received by the Administrative Agent on such day pursuant to Section 9.15(b).

Repayments made pursuant to Sections 2.3(b) and (c) shall be applied first to the Base Rate Revolving Credit Loans and then to Eurodollar Rate Revolving Credit Loans.

SECTION 2.4  Revolving Credit Note.  Each Revolving Credit Lender's Revolving Credit Loans and the joint and several obligation of the Borrowers to repay such Revolving Credit Loans shall also be evidenced by a Revolving Credit Note payable to the order of such Lender. Each Revolving Credit Note shall be dated the Effective Date (or later "effective date" under any Assignment and Acceptance) and be duly and validly executed and delivered by the Borrowers.

SECTION 2.5  Extension of Revolving Credit Facility.  Upon the request of the Borrowers, the Lenders may, in their sole discretion, agree to extend the Termination Date by an instrument in writing signed by the Administrative Agent and all Lenders.

P. 03469

A0309

## ARTICLE 2A

## SWINGLINE FACILITY

SECTION 2A.1  Swingline Loans.  Upon the terms and subject to the conditions of, and in reliance upon the representations and warranties made under, this Agreement, the Swingline Lender shall make Swingline Loans to the Borrowers from time to time, from and after the Effective Date until the Termination Date, as requested by the Borrowers in accordance with the terms of Section 2A.2, up to an aggregate principal amount of Swingline Loans at any time outstanding not to exceed the lesser of (i) the Swingline Facility and (ii) the Borrowing Base minus the aggregate principal amount of outstanding Revolving Credit Loans.  The Swingline Loans will be deemed to be usage of the Revolving Credit Facility for the purpose of calculating availability pursuant to Section 2.1, but will not reduce the Swingline Lender's obligation to lend its Proportionate Share of the remaining unused Revolving Credit Facility.

SECTION 2A.2  Making Swingline Loans.  Upon request of the Borrowers' Representative, the Swingline Lender shall promptly notify the Borrowers' Representative and the Administrative Agent of the quoted rate of interest applicable on any Business Day to a proposed Swingline Loan (such rate of interest, a "Quoted Rate").  Requests for Swingline Loans shall be made not later than 1:00 p.m. on the Business Day of the proposed Swingline Loan by delivery by telex, telegraph, telecopy or telephone of a request therefor by Borrowers' Representative to the Administrative Agent and the Swingline Lender.  Each such notice (a "Swingline Loan Request") shall specify (i) the proposed borrowing date, (ii) the amount of Swingline Loan requested, (iii) the applicable Quoted Rate, and (iv) the applicable Swingline Loan Maturity.  Not later than 6:00 p.m. on the date specified for any Swingline Loan, the Swingline Lender shall make available such Swingline Loan in immediately available funds to the Administrative Agent.  After the Administrative Agent's receipt of such funds and upon fulfillment of the applicable conditions set forth in Article 6, the Administrative Agent will, and the Borrowers hereby irrevocably authorize the Administrative Agent to, disburse the proceeds of each Swingline Loan by making such funds available to the Borrowers by wire transfer to such account of a Borrower as the Borrowers' Representative and the Administrative Agent may agree from time to time.

SECTION 2A.3  Repayment of Swingline Loans.  The principal amount of each Swingline Loan shall be repaid by the Borrowers in full on the applicable Swingline Loan Maturity, together with accrued and unpaid interest thereon to such date.

SECTION 2A.4  Prepayment.  If at any time the aggregate unpaid principal amount of Swingline Loans outstanding to the Borrowers from the Swingline Lender exceeds the amount set forth in the first sentence of Section 2A.1, the Borrowers shall pay to the Administrative Agent for the account of the Swingline Lender on demand by the Administrative Agent, an amount equal to such excess, together with accrued and unpaid interest on the principal amount prepaid to the date of prepayment.  Notwithstanding the foregoing, no such prepayment shall be

51

P 03470

A0310

**EXHIBIT A-1**

## FORM OF SECOND AMENDED AND RESTATED REVOLVING CREDIT NOTE

Atlanta, Georgia
August ___, 2000

$_____

FOR VALUE RECEIVED, the undersigned, PLASSEIN PACKAGING CORP., a Delaware corporation, KEY PACKAGING INDUSTRIES, CORP., a Massachusetts corporation, MARSHALL PLASTIC FILM, INCORPORATED, a Michigan corporation, PLASTICAL INDUSTRIES, INCORPORATED, a Delaware corporation, TRANSAMERICAN PLASTICS, L.L.C., a Delaware limited liability company, and REX INTERNATIONAL, INC., a North Carolina corporation (collectively, the "Borrowers"), hereby jointly and severally unconditionally promise to pay to the order of _____ (the "Lender") at the offices of Fleet Capital Corporation, a Rhode Island corporation, as administrative agent for the Lenders (together with its successor administrative agents, the "Administrative Agent") located at 300 Galleria Parkway, Suite 800, Atlanta, Georgia, 30339, or at such other place within the United States as shall be designated from time to time by the Administrative Agent, on the Termination Date, the principal amount of _____ AND _____/100 DOLLARS ($_____), or such lesser principal amount as may then constitute the aggregate unpaid balance of all Revolving Credit Loans made by the Lender to the Borrowers pursuant to the Loan Agreement (as hereinafter defined), in lawful money of the United States of America in federal or other immediately available funds.

The Borrowers also jointly and severally unconditionally promise to pay interest on the unpaid principal amount of this Note outstanding from time to time for each day from the date hereof until such principal amount is paid in full (whether upon maturity, by reason of acceleration or otherwise) at the rates per annum and on the dates specified in the Loan Agreement applicable from time to time in accordance with the provisions thereof. Nothing contained in this Note or in the Loan Agreement shall be deemed to establish or require the payment of a rate of interest in excess of the maximum rate permitted by any Applicable Law. In the event that any rate of interest required to be paid hereunder exceeds the maximum rate permitted by Applicable Law, the provisions of the Loan Agreement relating to the payment of interest under such circumstances shall control.

This Note is one of the Revolving Credit Notes referred to in that certain Second Amended and Restated Loan and Security Agreement dated as of August ___, 2000 (as amended, modified, supplemented or restated from time to time, the "Loan Agreement"; unless otherwise defined herein, terms defined therein being used in this Note as therein defined), by and among the Borrowers, an Affiliate of the Borrowers, the Lender, the other financial institutions party thereto from time to time and the Administrative Agent, is subject to, and entitled to, all provisions and benefits of the Loan Documents, is secured by the Collateral and other property as provided in the Loan Documents, is subject to optional and mandatory prepayment in whole or in part and is subject to acceleration prior to maturity upon the occurrence of one or more Events of Default, all as provided in the Loan Documents.

210134

P 03594

This Second Amended and Restated Revolving Credit Note is made by the Borrowers in favor of the Lender in substitution and exchange for the Amended and Restated Revolving Credit Note dated March 1, 2000 payable to the order of the Lender in the original aggregate principal amount of $_____, but not in extinguishment or as a novation of the Debt evidenced by such Note.

Presentment for payment, demand, protest and notice of demand, notice of dishonor, notice of non-payment and all other notices are hereby waived by the Borrowers, except to the extent expressly provided in the Loan Agreement. No failure to exercise, and no delay in exercising, any rights hereunder on the part of the holder hereof shall operate as a waiver of such rights.

The Borrowers hereby jointly and severally agree to pay on demand all costs and expenses incurred in collecting the Secured Obligations hereunder or in enforcing or attempting to enforce any of the Lender's rights hereunder, including, but not limited to, reasonable attorneys' fees and expenses actually incurred if collected by or through an attorney, whether or not suit is filed.

**The provisions of Section 16.5 of the Loan Agreement are hereby expressly incorporated herein.**

**This Note shall be governed by, and construed in accordance with, the laws of the State of Georgia without giving effect to the conflict of laws principles thereof.**

[signatures appear on following page]

210134

2

P 03595

A0312

IN WITNESS WHEREOF, the undersigned have executed this Revolving Credit Note as of the day and year first above written.

BORROWERS:

PLASSEIN PACKAGING CORP.

By: _____
    Richard J. Mosback
    Chief Financial Officer

KEY PACKAGING INDUSTRIES, CORP.

By: _____
    Richard J. Mosback
    Chief Financial Officer

MARSHALL PLASTIC FILM, INCORPORATED

By: _____
    Richard J. Mosback
    Chief Financial Officer

PLASTICAL INDUSTRIES, INCORPORATED

By: _____
    Richard J. Mosback
    Chief Financial Officer

TRANSAMERICAN PLASTICS, L.L.C.

By: _____
    Richard J. Mosback
    Chief Financial Officer

REX INTERNATIONAL, INC.

By: _____
    Stephen S. Wilson
    Chief Financial Officer

210134

3

P 03596

A0313

**EXHIBIT A-2**

## FORM OF SECOND AMENDED AND RESTATED SWINGLINE NOTE

$3,000,000

Atlanta, Georgia<br>August ___, 2000

FOR VALUE RECEIVED, the undersigned, PLASSEIN PACKAGING CORP., a Delaware corporation, KEY PACKAGING INDUSTRIES, CORP., a Massachusetts corporation, MARSHALL PLASTIC FILM, INCORPORATED, a Michigan corporation, PLASTICAL INDUSTRIES, INCORPORATED, a Delaware corporation, TRANSAMERICAN PLASTICS, L.L.C., a Delaware limited liability company, and REX INTERNATIONAL, INC., a North Carolina corporation (collectively, the "Borrowers"), hereby jointly and severally unconditionally promise to pay to the order of FLEET CAPITAL CORPORATION (the "Swingline Lender") at the offices of Fleet Capital Corporation, a Rhode Island corporation, as administrative agent for the Lenders (together with its successor administrative agents, the "Administrative Agent") located at 300 Galleria Parkway, Suite 800, Atlanta, Georgia, 30339, or at such other place within the United States as shall be designated from time to time by the Administrative Agent, on the Termination Date, the principal amount of THREE MILLION AND NO/100 DOLLARS ($3,000,000), or such lesser principal amount as may then constitute the aggregate unpaid balance of all Swingline Loans made by the Swingline Lender to the Borrowers pursuant to the Loan Agreement (as hereinafter defined), in lawful money of the United States of America in federal or other immediately available funds.

The Borrowers also jointly and severally unconditionally promise to pay interest on the unpaid principal amount of this Note outstanding from time to time for each day from the date hereof until such principal amount is paid in full (whether upon maturity, by reason of acceleration or otherwise) at the rates per annum and on the dates specified in the Loan Agreement applicable from time to time in accordance with the provisions thereof. Nothing contained in this Note or in the Loan Agreement shall be deemed to establish or require the payment of a rate of interest in excess of the maximum rate permitted by any Applicable Law. In the event that any rate of interest required to be paid hereunder exceeds the maximum rate permitted by Applicable Law, the provisions of the Loan Agreement relating to the payment of interest under such circumstances shall control.

This Note is the Swingline Note referred to in that certain Second Amended and Restated Loan and Security Agreement dated as of August ___, 2000 (as amended, modified, supplemented or restated from time to time, the "Loan Agreement"; unless otherwise defined herein, terms defined therein being used in this Note as therein defined), by and among the Borrowers, an Affiliate of the Borrowers, the Swingline Lender, the other financial institutions party thereto from time to time and the Administrative Agent, is subject to, and entitled to, all provisions and benefits of the Loan Documents, is secured by the Collateral and other property as provided in the Loan Documents, is subject to optional and mandatory prepayment in whole or in part and is subject to acceleration prior to maturity upon the occurrence of one or more Events of Default, all as provided in the Loan Documents.

210130.

P 03597

A0314

This Second Amended and Restated Swingline Note is made by the Borrowers in favor of the Swingline Lender in substitution and exchange for the Amended and Restated Swingline Note dated March 1, 2000 payable to the order of Swingline Lender in the original aggregate principal amount of $3,000,000, but not in extinguishment or as a novation of the Debt evidenced by such Note.

Presentment for payment, demand, protest and notice of demand, notice of dishonor, notice of non-payment and all other notices are hereby waived by the Borrowers, except to the extent expressly provided in the Loan Agreement. No failure to exercise, and no delay in exercising, any rights hereunder on the part of the holder hereof shall operate as a waiver of such rights.

The Borrowers hereby jointly and severally agree to pay on demand all costs and expenses incurred in collecting the Secured Obligations hereunder or in enforcing or attempting to enforce any of the Swingline Lender's rights hereunder, including, but not limited to, reasonable attorneys' fees and expenses actually incurred if collected by or through an attorney, whether or not suit is filed.

The provisions of Section 16.5 of the Loan Agreement are hereby expressly incorporated herein.

This Note shall be governed by, and construed in accordance with, the laws of the State of Georgia without giving effect to the conflict of laws principles thereof.

[signatures appear on following page]

210130

2

P 03598

A0315

IN WITNESS WHEREOF, the undersigned have executed this Revolving Credit Note as of the day and year first above written.

BORROWERS:

PLASSEIN PACKAGING CORP.

By:_____
 Richard J. Mosback
 Chief Financial Officer

KEY PACKAGING INDUSTRIES, CORP.

By:_____
 Richard J. Mosback
 Chief Financial Officer

MARSHALL PLASTIC FILM, INCORPORATED

By:_____
 Richard J. Mosback
 Chief Financial Officer

PLASTICAL INDUSTRIES, INCORPORATED

By:_____
 Richard J. Mosback
 Chief Financial Officer

TRANSAMERICAN PLASTICS, L.L.C.

By:_____
 Richard J. Mosback
 Chief Financial Officer

REX INTERNATIONAL, INC.

By:_____
 Stephen S. Wilson
 Chief Financial Officer

210130

3

P 03599

A0316

**EXHIBIT B-1**

## FORM OF SECOND AMENDED AND RESTATED TERM NOTE A

Atlanta, Georgia

$ _____    August ___, 2000

FOR VALUE RECEIVED, the undersigned, PLASSEIN PACKAGING CORP., a Delaware corporation, KEY PACKAGING INDUSTRIES, CORP., a Massachusetts corporation, MARSHALL PLASTIC FILM, INCORPORATED, a Michigan corporation, PLASTICAL INDUSTRIES, INCORPORATED, a Delaware corporation, TRANSAMERICAN PLASTICS, L.L.C., a Delaware limited liability company, and REX INTERNATIONAL, INC., a North Carolina corporation (collectively, the "Borrowers"), hereby jointly and severally unconditionally promise to pay to the order of _____ (the "Lender") at the offices of Fleet Capital Corporation, a Rhode Island Corporation, as administrative agent for the Lenders (together with its successor administrative agents, the "Administrative Agent"), located at 300 Galleria Parkway, Suite 800, Atlanta, Georgia, 30339, or at such other place within the United States as shall be designated from time to time by the Administrative Agent, the principal amount of _____ AND _____/100 DOLLARS ($_____), constituting the Term Loan A made by the Lender to the Borrowers pursuant to the Loan Agreement (as hereinafter defined), in lawful money of the United States of America in federal or other immediately available funds, in such amounts and on the dates specified in the Loan Agreement applicable from time to time in accordance with the provisions thereof.

The Borrowers also jointly and severally unconditionally promise to pay interest on the unpaid principal amount of this Note for each day from the date hereof until payment thereof in full (whether upon maturity, by reason of acceleration or otherwise) at the rates per annum and on the dates specified in the Loan Agreement applicable from time to time in accordance with the provisions thereof. Nothing contained in this Note or in the Loan Agreement shall be deemed to establish or require the payment of a rate of interest in excess of the maximum rate permitted by any Applicable Law. In the event that any rate of interest required to be paid hereunder exceeds the maximum rate permitted by Applicable Law, the provisions of the Loan Agreement relating to the payment of interest under such circumstances shall control.

This Note is one of the Term Notes A referred to in that certain Second Amended and Restated Loan and Security Agreement dated as of August ___, 2000 (as amended, modified, supplemented or restated from time to time, the "Loan Agreement"; unless otherwise defined herein, terms defined therein being used in this Note as therein defined) by and among the Borrowers, an Affiliate of the Borrowers, the Lender, the other financial institutions party thereto from time to time and the Administrative Agent, is subject to, and entitled to, all provisions and benefits of the Loan Documents, is secured by the Collateral and other property as provided in the Loan Documents, is subject to optional and mandatory prepayment in whole or in part and is subject to acceleration prior to maturity upon the occurrence of one or more Events of Default, all as provided in the Loan Documents.

210126

P 03600

A0317

This Second Amended and Restated Term Note A is made by the Borrowers in favor of the Lender in substitution and exchange for the Amended and Restated Term Note A dated March 1, 2000 payable to the order of the Lender in the original aggregate principal amount of $_____, but not in extinguishment or as a novation of the Debt evidenced by such Note.

Presentment for payment, demand, protest and notice of demand, notice of dishonor and notice of non-payment and all other notices are hereby waived by the Borrowers except to the extent expressly provided in the Loan Agreement. No failure to exercise, and no delay in exercising any rights hereunder on the part of the holder hereof shall operate as a waiver of such rights.

The Borrowers hereby jointly and severally agree to pay on demand all costs and expenses incurred in collecting the Secured Obligations hereunder or in enforcing or attempting to enforce any of the Lender's rights hereunder, including, but not limited to, reasonable attorneys' fees and expenses actually incurred if collected by or through an attorney, whether or not suit is filed.

The provisions of Section 16.5 of the Loan Agreement are hereby expressly incorporated by reference herein.

This Note shall be governed by, and construed in accordance with, the laws of the State of Georgia without giving effect to the conflict of laws principles thereof.

[signatures appear on following page]

210126

2

P 03601

A0318

IN WITNESS WHEREOF, the undersigned have executed this Revolving Credit Note as of the day and year first above written.

BORROWERS:

PLASSEIN PACKAGING CORP.

By:_____
    Richard J. Mosback
    Chief Financial Officer

KEY PACKAGING INDUSTRIES, CORP.

By:_____
    Richard J. Mosback
    Chief Financial Officer

MARSHALL PLASTIC FILM, INCORPORATED

By:_____
    Richard J. Mosback
    Chief Financial Officer

PLASTICAL INDUSTRIES, INCORPORATED

By:_____
    Richard J. Mosback
    Chief Financial Officer

TRANSAMERICAN PLASTICS, L.L.C.

By:_____
    Richard J. Mosback
    Chief Financial Officer

REX INTERNATIONAL, INC.

By:_____
    Stephen S. Wilson
    Chief Financial Officer

210126

3

P 03602

A0319

EXHIBIT B-2

## FORM OF SECOND AMENDED AND RESTATED TERM NOTE B

Atlanta, Georgia
August ___, 2000

$_____

FOR VALUE RECEIVED, the undersigned, PLASSEIN PACKAGING CORP., a Delaware corporation, KEY PACKAGING INDUSTRIES, CORP., a Massachusetts corporation, MARSHALL PLASTIC FILM, INCORPORATED, a Michigan corporation, PLASTICAL INDUSTRIES, INCORPORATED, a Delaware corporation, TRANSAMERICAN PLASTICS, L.L.C., a Delaware limited liability company, and REX INTERNATIONAL, INC., a North Carolina corporation (collectively, the "Borrowers"), hereby jointly and severally unconditionally promise to pay to the order of _____ (the "Lender") at the offices of Fleet Capital Corporation, a Rhode Island corporation, as administrative agent for the Lenders (together with its successor administrative agents, the "Administrative Agent"), located at 300 Galleria Parkway, Suite 800, Atlanta, Georgia 30339 or at such other place within the United States as shall be designated from time to time by the Administrative Agent, the principal amount of _____ AND _____/100 DOLLARS ($_____), constituting the Term Loan B made by the Lender to the Borrowers pursuant to the Loan Agreement (as hereinafter defined), in lawful money of the United States of America in federal or other immediately available funds, in such amounts and on the dates specified in the Loan Agreement applicable from time to time in accordance with the provisions thereof.

The Borrowers also jointly and severally unconditionally promise to pay interest on the unpaid principal amount of this Note for each day from the date hereof until payment thereof in full (whether upon maturity, by reason of acceleration or otherwise) at the rates per annum and on the dates specified in the Loan Agreement applicable from time to time in accordance with the provisions thereof. Nothing contained in this Note or in the Loan Agreement shall be deemed to establish or require the payment of a rate of interest in excess of the maximum rate permitted by any Applicable Law. In the event that any rate of interest required to be paid hereunder exceeds the maximum rate permitted by Applicable Law, the provisions of the Loan Agreement relating to the payment of interest under such circumstances shall control.

This Note is one of the Term Notes B referred to in that certain Second Amended and Restated Loan and Security Agreement dated as of August ___, 2000 (as amended, modified, supplemented or restated from time to time, the "Loan Agreement"; unless otherwise defined herein, terms defined therein being used in this Note as therein defined) by and among the Borrowers, an Affiliate of the Borrowers, the Lender, the other financial institutions party thereto from time to time and the Administrative Agent, is subject to, and entitled to, all provisions and benefits of the Loan Documents, is secured by the Collateral and other property as provided in the Loan Documents, is subject to optional and mandatory prepayment in whole or in part and is subject to acceleration prior to maturity upon the occurrence of one or more Events of Default, all as provided in the Loan Documents.

210129

P 03603

This Second Amended and Restated Term Note B is made by the Borrowers in favor of the Lender in substitution and exchange for the Amended and Restated Term Note B dated March 1, 2000 payable to the order of the Lender in the original aggregate principal amount of $_____, but not in extinguishment or as a novation of the Debt evidenced by such Note.

Presentment for payment, demand, protest and notice of demand, notice of dishonor and notice of non-payment and all other notices are hereby waived by the Borrowers except to the extent expressly provided in the Loan Agreement. No failure to exercise, and no delay in exercising any rights hereunder on the part of the holder hereof shall operate as a waiver of such rights.

The Borrowers hereby jointly and severally agree to pay on demand all costs and expenses incurred in collecting the Secured Obligations hereunder or in enforcing or attempting to enforce any of the Lender's rights hereunder, including, but not limited to, reasonable attorneys' fees and expenses actually incurred if collected by or through an attorney, whether or not suit is filed.

**The provisions of Section 16.5 of the Loan Agreement are hereby expressly incorporated by reference herein.**

**This Note shall be governed by, and construed in accordance with, the laws of the State of Georgia without giving effect to the conflict of laws principles thereof.**

[signatures appear on following page]

210129

2

P 03604

A0321

IN WITNESS WHEREOF, the undersigned have executed this Revolving Credit Note as of the day and year first above written.

BORROWERS:

PLASSEIN PACKAGING CORP.

By:_____
    Richard J. Mosback
    Chief Financial Officer

KEY PACKAGING INDUSTRIES, CORP.

By:_____
    Richard J. Mosback
    Chief Financial Officer

MARSHALL PLASTIC FILM, INCORPORATED

By:_____
    Richard J. Mosback
    Chief Financial Officer

PLASTICAL INDUSTRIES, INCORPORATED

By:_____
    Richard J. Mosback
    Chief Financial Officer

TRANSAMERICAN PLASTICS, L.L.C.

By:_____
    Richard J. Mosback
    Chief Financial Officer

REX INTERNATIONAL, INC.

By:_____
    Stephen S. Wilson
    Chief Financial Officer

210129

3

P 03605

A0322

EXHIBIT B-3

## FORM OF SECOND AMENDED AND RESTATED CAPEX NOTE

Atlanta, Georgia
August ___, 2000

$_____

FOR VALUE RECEIVED, the undersigned, PLASSEIN PACKAGING CORP., a Delaware corporation, KEY PACKAGING INDUSTRIES, CORP., a Massachusetts corporation, MARSHALL PLASTIC FILM, INCORPORATED, a Michigan corporation, PLASTICAL INDUSTRIES, INCORPORATED, a Delaware corporation, TRANSAMERICAN PLASTICS, L.L.C., a Delaware limited liability company, and REX INTERNATIONAL, INC., a North Carolina corporation (collectively, the "Borrowers"), hereby jointly and severally unconditionally promise to pay to the order of _____ (the "Lender") at the offices of Fleet Capital Corporation, a Rhode Island corporation, as administrative agent for the Lenders (together with its successor administrative agents, the "Administrative Agent") located at 300 Galleria Parkway, Suite 800, Atlanta, Georgia 30339, or at such other place within the United States as shall be designated from time to time by the Lender, the principal amount of _____ _____ AND NO/100 DOLLARS ($_____), or, such lesser principal amount as may then constitute the aggregate principal balance of all advances constituting part of the Capex Loans made by the Lender to the Borrowers pursuant to the Loan Agreement (as hereinafter defined) in lawful money of the United States of America, in federal or other immediately available funds, in such amounts and on the dates specified in the Loan Agreement applicable from time to time and otherwise in accordance with the provisions thereof.

The Borrowers also jointly and severally unconditionally promise to pay interest on the unpaid principal amount outstanding for each Note constituting part of a Capex Loan, from time to time for each day from the date of disbursement until such principal amount is paid in full of each Loan (whether at maturity, by reason of acceleration or otherwise) at the rates per annum and on the dates specified in the Loan Agreement applicable from time to time in accordance with the provisions thereof. Nothing contained in this Capex Note shall be deemed to establish or require the payment of a rate of interest in excess of the maximum rate permitted by any Applicable Law. In the event that any rate of interest required to be paid hereunder exceeds the maximum rate permitted by Applicable Law, the provisions of the Loan Agreement relating to the payment of interest under such circumstances shall control.

This Note is one of the Capex Notes referred to in that certain Second Amended and Restated Loan and Security Agreement dated as of August ___, 2000 (as amended, modified, supplemented or restated from time to time, the "Loan Agreement"; unless otherwise defined herein, terms defined therein being used in this Note as therein defined), by and among the Borrowers, an Affiliate of the Borrowers, the Lender, the other financial institutions party thereto from time to time and the Administrative Agent, is subject to, and entitled to, all provisions and benefits of the Loan Documents, is secured by the Collateral and other property as provided in the Loan Documents, is subject to optional and mandatory prepayment in whole or in part and is

210131

subject to acceleration prior to maturity upon the occurrence of one of more Events of Default, all as provided in the Loan Documents.

This Second Amended and Restated Capex Note is made by the Borrowers in favor of the Lender in substitution and exchange for the Amended and Restated Capex Note dated March 1, 2000 payable to the order of the Lender in the original aggregate principal amount of $_____, but not in extinguishment or as a novation of the Debt evidenced by such Note.

Presentment for payment, demand, protest and notice of demand, notice of dishonor and notice of nonpayment and all other notices are hereby waived by the Borrowers to the fullest extent permitted by Applicable Law. No failure to exercise, and no delay in exercising any rights hereunder on the part of the holder hereof shall operate as a waiver of such rights.

The Borrowers hereby jointly and severally agree to pay on demand all costs and expenses incurred in collecting the Secured Obligations hereunder or in enforcing or attempting to enforce any of the Lender's rights hereunder, including, but not limited to, reasonable attorneys' fees and expenses if collected by or through an attorney, whether or not suit is filed.

The provisions of Section 16.5 of the Loan Agreement are hereby expressly incorporated by reference herein.

This Capex Note shall be governed by and construed in accordance with the laws of the State of Georgia without giving effect to the conflict of laws principles thereof.

[signatures appear on following page]

210131

2

P 03607

A0324

IN WITNESS WHEREOF, the undersigned have executed this Revolving Credit Note as of the day and year first above written.

BORROWERS:

PLASSEIN PACKAGING CORP.

By:_____
    Richard J. Mosback
    Chief Financial Officer

KEY PACKAGING INDUSTRIES, CORP.

By:_____
    Richard J. Mosback
    Chief Financial Officer

MARSHALL PLASTIC FILM, INCORPORATED

By:_____
    Richard J. Mosback
    Chief Financial Officer

PLASTICAL INDUSTRIES, INCORPORATED

By:_____
    Richard J. Mosback
    Chief Financial Officer

TRANSAMERICAN PLASTICS, L.L.C.

By:_____
    Richard J. Mosback
    Chief Financial Officer

REX INTERNATIONAL, INC.

By:_____
    Stephen S. Wilson
    Chief Financial Officer

210131

3

P 03608

A0325

EXHIBIT C

## FORM OF BORROWING BASE CERTIFICATE

Reference is made to the Second Amended and Restated Loan and Security Agreement dated as of August ____, 2000 (the "Loan Agreement") between Plassein Packaging Corp., a Delaware corporation, Key Packaging Industries, Corp., a Massachusetts corporation, Marshall Plastic Film, Incorporated, a Michigan corporation, Plastical Industries, Incorporated, a Delaware corporation, Transamerican Plastics, L.L.C. a Delaware limited liability company, Rex International, Inc., a North Carolina corporation (collectively, the "Borrowers"), Nor Baker Inc., an Ontario (Canada) corporation, the financial institutions parties thereto from time to time (the "Lenders") and Fleet Capital Corporation, a Rhode Island corporation, as administrative agent for the Lenders (the "Administrative Agent"). Terms used herein that are defined in the Loan Agreement are used with the meanings therein ascribed to them.

This certificate is furnished to the Lenders by the Borrowers in accordance with their obligations under Section 9.11(c) of the Loan Agreement. The Borrowers certify that (a) the computation of the Borrowing Base attached hereto complies with all the applicable provisions of the Loan Agreement, and (b) the data has been prepared from the books of account and records of the Borrowers in accordance with GAAP and present fairly and accurately the status of the Borrowers' accounts as at _____ ____, 200__.

Date:_____

PLASSEIN PACKAGING CORP., for itself and
          as Borrowers' Representative

By:_____
   Name:_____
   Title:_____

211495

P 03609

A0326

<u>CERTIFICATE OF SERVICE</u>

I, Amy Evans, hereby certify that on July 15, 2005 I caused to be served a true and correct copy of the Affidavit of Charles R. Bennett, Jr. in Support of the Trustee's Opposition to Defendants' Motions to Dismiss upon the attached service list as indicated.


   /s/Amy Evans_____
   Amy Evans (Bar I.D. No. 3829)

A0327

## SERVICE LIST

**<u>VIA HAND DELIVERY</u>**
Frederick B. Rosner, Esq.
Jaspan Schlesinger Hoffman
913 Market Street, 12th Floor
Wilmington, DE 19801

Ricardo Palacio, Esq
Ashby & Geddes, P. A.
222 Delaware Avenue
17th Floor
Wilmington, DE 19801

Laurie Selber Silverstien, Esq.
Potter Anderson & Caorroon LLP
1313 N Market Street, 6th Floor
Wilmington, DE 19801

Ricardo Palacio, Esq.
Ashby & Geddes, P.A.
222 Delaware Ave.
17th Floor
Wilmington, DE 19801

**<u>VIA FIRST CLASS U.S. MAIL</u>**
Richard A. Johnston, Esq.
Mark A. Fleming, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109

James A. Sarna, Esq.
Sarna & Associates, PC
99 Main Street
Nyack, NY 10960

Lawarence M. Brenton, Esq.
Early Lennon Crocker & Bartosiewicz PLC
900 Comerica Building
Kalmazoo, Michigan 49007

Charles R. Bennett, Jr., Esq.
Hanify & King PC
One Beacon Street
Boston, MA 02108

**J**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 7 |
|  | ) |  |
| Plassein International Corporation, *et. al.,* | ) | Case No. 03-11489 (KG) |
| (n/k/a PL Liquidation Corp.), | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) |  |
| WILLIAM BRANDT, as he is the | ) |  |
| Trustee of the Estates of | ) |  |
| Plassein International Corp., *et al.,* | ) |  |
|  | ) | Adversary Proceeding Number |
| Plaintiff, | ) |  |
|  | ) | A 05-50692 (KG) |
| v. | ) |  |
|  | ) |  |
| B.A. Capital Company LP, *et al.,* | ) | Related Document Nos: 22, 23, |
|  | ) | 25, 26, 27, 28, 29, 30, 31, 37, 43, |
| Defendants. | ) | 44, 45, 46, 47 |
|  | ) |  |

## OPINION [1]

## INTRODUCTION

In January and August, 2000, Plassein International Corporation ("Plassein" or "Debtors") acquired five privately held corporations by purchasing the shares of the companies' respective shareholders. The Chapter 7 trustee, William Brandt ("the Trustee") has brought suit against the selling shareholders who are named defendants ("the Shareholders" or "Defendants") (see pp. 4-5 *infra*) seeking to avoid the transfers made to the

---

[1] This Opinion constitutes the findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

Shareholders, claiming they were fraudulent conveyances pursuant to 11 U.S.C. § 544 and applicable Delaware law.

Before the Court are Motions to Dismiss the Complaint ("the Motions") filed by the Shareholders pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable to this adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7012(b).  The Motions are based upon the same grounds and, therefore, for efficiency and because the Motions are essentially identical, the Court will deal with the Motions together.  First, Defendants argue that the Trustee alleges in the Complaint that a non-debtor made the transfers and the applicable statute requires that a debtor make the transfers for a cause of action to exist.  Secondly, Defendants argue that because the payments they received were payments on account of a securities transaction made by wire transfers from a financial institution, the transfers were "settlement payments" and thereby exempt from avoidance pursuant to 11 U.S.C. § 546(e).

## JURISDICTION

The Court's jurisdiction rests upon 28 U.S.C. §§ 157 and 1334.  The adversary proceeding is a core matter under 28 U.S.C. § 157(b)(2); and venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTS

Debtor Plassein International Corporation[2] was formed in 1999 to acquire several

---

[2] References to Plassein in the transactions at issue are for convenience.  In the Complaint, debtors refer to Plassein as the acquiror.  In fact, the closing documents show clearly that it was

2

A0330

privately held manufacturers of flexible packaging and specialty film ("the Target Companies"). (Complaint ¶ 27) Plassein made the acquisitions through a series of leveraged buyouts ("LBO") whereby a group of lenders advanced funds and extended credit to Packaging in exchange for security interests in the Target Companies' assets and promises by the Target Companies to repay the loans. Packaging then used those funds to acquire the stock of the Target Companies and to pay off the Target Companies' existing secured debt. (Compl. ¶¶ 32-34 and 49.) The Target Companies were each privately owned companies (Compl. ¶ 27) and, as such, their stock was not traded in the public securities markets. The Target Companies were not merged into Plassein but changed their names and continued to operate as separate entities.

The LBO transactions proceeded in two phases. In the first phase on January 10, 2000, Packaging closed on acquisitions of the stock of: (a) Plastical Industries, Inc. ("Plastical," n/k/a Plassein International of Spartanburg, Inc.); (b) Nor Baker Industries, Ltd. ("Nor Baker," now in liquidation in Canada); (c) Marshall Plastics Film, Inc. ("Marshall," n/k/a Plassein International of Martin, Inc.); and (d) Key Packaging Industries Corp. ("Key," n/k/a Plassein International of Salem, Inc.). Plassein purchased the assets of Transamerican Plastic LLC ("Transamerican," n/k/a Plassein International of Ontario, Inc.). Following these acquisitions, the Target Companies purchased in the first phase became jointly and severally liable for the entire debt incurred to finance the transactions, and all granted a

---

Plassein Packaging Corporation ("Packaging") which participated in the closings of the acquisitions and whose funds Fleet Bank wired.

3

security interest in all of their assets to secure that debt. (Compl. ¶ 33.)

In the second phase, on August 15, 2000, Packaging acquired the stock of Rex International, Inc. ("Rex," n/k/a Plassein International of Thomasville, Inc.). Following the Rex transaction, Rex became liable not only for the debt incurred in the course of Plassein's acquisition of the Rex stock, but also for the January Acquisitions. (Compl. ¶ 48.) Thus, the Target Companies were jointly and severally liable for the entire debt incurred in the acquisitions.

Plassein alleges that the Shareholders received a substantial premium for their shares, which was accounted for on the post-closing balance sheets as "goodwill." (Compl. ¶¶ 45 and 57.) Plassein further claims that each transaction rendered each acquired company insolvent, in that, the sum of their debts was greater than the value of their assets at fair valuation. (Compl. ¶¶ 46 and 58-61.)

The Complaint contains the details of the transfers from Packaging to the Shareholders as follows:

a. <u>To the Shareholders of Key</u>:

| | | | |
|---|---|---|---|
| Thomas F. Fay | . . . . . . . . . . . $2,829,179.34 | Sidney Zeitlin | . . . . . . . $3,571,664.30 |
| Ruth L. Fishback | . . . . . . . . . $2,706,414.19 | ZFC Associates Inc. | . . . . . $140,727.42 |
| Mark R. Freedman | . . . . . . . . . . . . $69,403.19 | William G. Russell | . . . . . . $19,141.09 |
| Robert N. Zeitlin | . . . . . . . . . $2,188,122.12 | Robert N. Zeitlin 1999 Charitable Remainder Unitrust | . . . . $518,426.87 |

Total: . . . . . . . . . . . . . . . . . <u>$12,043,078.52</u>

4

b. __To the Shareholders of Marshall__

| | | | |
|---|---|---|---|
| The Andrew Marshall Forsberg Trust | $1,016,252.90 | Frank John McCarthy | $1,270,316.12 |
| Ethel Forsberg Revocable Trust | $2,286,569.02 | Daniel R. Orris | $41,177.17 |
| Janis Rae Forsberg Trust | $484,244.51 | Bernadine Orris | $41,177.15 |
| Total: | __$5,098,559.72__ | | |

c.    __To the Shareholders of Plastical/Transamerican:__

Sam Chebeir ......... $2,046,364.39

d.    __To the Shareholders of Rex:__

| | | | |
|---|---|---|---|
| B.A. Capital Company LP | $25,491,779.76 | Stephen S. Wilson | $1,522,317.98 |
| Heller Financial, Inc. | $2,347,382.00 | G. Kenneth Pope Jr. | $171,507.67 |
| Charles J. Warr | $366,477.36 | Kenneth Olenler | $285,786.68 |
| Paul D. Gage | $1,522,317.98 | Daniel A. Jones III | $171,507.67 |
| Total | __$31,934,274.06__ | | |

(Compl., ¶ 40, Exhibit B.)

The Trustee's records of the transfers at issue confirm that non-debtor Packaging, and not Plassein or any of Debtors, made the transfers to the Shareholders. (Compl., Ex. B.) The records also indicate that Fleet Bank transferred the funds by wire. (Id.)

Plassein and the Target Companies filed Chapter 11 bankruptcy petitions on May 14, 2003, and Nor Baker commenced an insolvency proceeding in Canada on the same date. Following the conversions of the cases to Chapter 7, William Brandt was appointed trustee

A0333

of Debtors' estates on February 6, 2004.

## THE PARTIES' POSITIONS

### A.     The Trustee's Claims

The Trustee's case against the Shareholders, at its essence, is that in acquiring the

Shareholders' stock in the Target Companies, Plassein and the other Debtors were rendered

insolvent and did not receive reasonably equivalent value in the acquisitions.  Thus, the

Trustee seeks to avoid the transfers to the Shareholders as fraudulent transfers pursuant to

the Bankruptcy Code, 11 U.S.C. § 544, and Delaware law, 6 Del. C. §§ 1304 and 1305.

### B.     The Shareholders' Defenses

The Shareholders raise two separate defenses.[3]  First, under Delaware law, it is the

debtor that must make the transfer to establish a fraudulent conveyance; and Plassein

Packaging Corp., who made the transfers, was not a debtor.  Second, under the Bankruptcy

Code, 11 U.S.C. § 546(e), the transfers are exempt from avoidance because they qualify as

settlement payments by a financial institution.

## DECISION

### A.     Legal Standard for Motion to Dismiss

A motion to dismiss for failure to state a claim upon which relief can be granted under

FED. R. CIV. P. 12(b)(6), tests the sufficiency of the complaint.  *Kost v. Kozakiewicz*, 1 F.3d

---

[3] The Shareholders also argue in their Motions to Dismiss that the transfers did not render Debtors insolvent. The issue of insolvency is highly factual and may not be appropriate for decision at this early stage of the case. The Court will not, and need not, decide whether or not the transfers rendered debtors insolvent.

6

A0334

176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the Court accepts as true all allegations in the complaint and all reasonable inferences drawn from it are considered in the light most favorable to the plaintiff. *Morse v. Lower Merion School District*, 132 F.3d 902, 905 (3d Cir. 1997). A motion to dismiss should be granted when it is clear that under any possible set of facts alleged in the complaint, the plaintiff would still not be entitled to judgment. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Official Committee of Unsecured Creditors v. Fleet Retail Finance Group* (*In re Hechinger Investment Company of Delaware*), 274 B.R. 71, 80 (D.Del. 2002) (dismissing portions of a complaint for failure to state a claim because the transfers in question were settlement payments and were not fraudulent).

### B.    The Transfers to the Defendants are Settlement Payments, Not Subject to Avoidance

The Trustee alleges that the underlying transfers/payments from Packaging to Defendants for their stock were made by wire transfer through Fleet Bank. The Court finds that the transfers are "settlement payments" within the meaning of section 546(e) of the Bankruptcy Code and therefore, are not subject to avoidance.

Section 544(b) of the Bankruptcy Code authorizes the Trustee to "avoid any transfer of interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law." 11 U.S.C. § 544(b). Section 546(e), however, provides that, notwithstanding section 544, "the trustee may not avoid a transfer that is a . . . settlement payment, as defined by section 101 or 741 of [the Bankruptcy Code], made by or to a . . .

7

A0335

financial institution." 11 U.S.C. § 546(e).

A "settlement payment" is defined under section 741(8) of the Bankruptcy Code to include "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8). Put simply, "a settlement payment is generally the transfer of cash or securities made to complete a securities transaction." *Lowenschuss v. Resorts International, Inc. (In re Resorts International, Inc.)*, 181 F.3d 505, 515 (3d Cir. 1999). The Court of Appeals for the Third Circuit has repeatedly held that this definition is "extremely broad" and encompasses almost all securities transactions. *In re Resorts International*, 181 F.3d at 515 (quoting *Bevill, Bresler & Schulman Asset Management Corporation v. Spencer Savings & Loan Association*, 878 F.2d 742, 751 (3d Cir. 1989)). In *Resorts*, the Court of Appeals held that payment to a shareholder for his shares as part of a leveraged buyout was "obviously a common securities transaction" and, therefore, a settlement payment under section 546(e). *In re Resorts International*, 181 F.3d at 516; *see also Hechinger*, 274 B.R. at 87 (applying *Resorts* and holding that payment for shares of stock was an unavoidable settlement payment).

The second prong of section 546(e) requires that payment for the securities must be made by or to a financial institution. "So long as a financial institution is involved, the payment is an unavoidable 'settlement payment.'" *Hechinger*, 274 B.R. at 87. The term "financial institution" is defined under the Bankruptcy Code as "a Federal Reserve bank or

8

A0336

an entity that is a commercial or savings bank . . . when any such Federal Reserve bank . . . or entity is acting as agent or custodian for a customer . . . in connection with a securities contract." 11 U.S.C. § 101(22)(A). This requirement is satisfied when a leveraged buyout payment is made by wire transfer. *In re Resorts International*, 181 F.3d. at 515. Indeed, federal regulations require that a wire transfer *must* be performed by a bank; thus, a wire transfer must be made through a financial institution. *See In re Loranger Mfg. Corp.*, 324 B.R. 575 (Bankr.W.D.Pa. 2005) (taking judicial notice of federal regulation requiring that a wire transfer must be accomplished by a bank, rejecting plaintiff's arguments that bank's involvement was "mere facilitation" and holding that debtor's leveraged buyout of defendant's shares was a "settlement payment" under § 546(e) because payment was made by wire transfer).

The transactions between Defendants and Packaging are indistinguishable from the stock purchases held to be unavoidable settlement payments in *Resorts*. In *Resorts*, Resorts' shares were purchased by Griffco Acquisition Corporation in an LBO. Resorts erroneously authorized a wire transfer to be paid to a shareholder through Chase Manhattan Bank. Resorts later filed for Chapter 11 bankruptcy protection, and the Trustee sought to recover the funds as an avoidable transfer. The shareholder argued that the wire transfer was a "settlement payment" and therefore unavoidable under § 546(e). The Court of Appeals looked to the plain language of the statute and held that the payment for the shares was a settlement payment for the purposes of section 546(e), and therefore not avoidable. *In re*

9

*Resorts International*, 181 F.3d at 515-516.

Here, there is no dispute that the payments to the Shareholders were made by Fleet Bank, a financial institution, to other financial institutions in order to settle securities transactions, namely, Packaging's purchase of stock of the Target Companies. *Resorts* dispels any doubt that the transfers to the Shareholders were settlement payments. In the securitites industry, a settlement payment is generally the transfer of cash or securities made to complete a securities transaction. *Id.* at 515. Accordingly, section 546(e) applies to the transactions at issue and the wire transfers executed by Fleet Bank are unavoidable.

However, the Trustee endeavors to limit the application of *Resorts* to publicly traded securities. The Trustee argues that Section 546(e) was enacted for protecting the operation of the security industry's clearance and settlement system which operates only with respect to securities that are publicly traded. The Trustee thus argues that section 546(e) applies only to publicly traded securities. The Trustee relies on two cases in support of his argument, *Zahn v. Yucaipa Capital Fund*, 218 B.R. 656 (D.R.I. 1998) and *Wieboldt Stores, Inc. v. Schottenstein*, 131 B.R. 655 (N.D. Ill. 1991). *Zahn* and *Wieboldt Stores* both held that LBO payments were not covered by section 546(e) because "'the system of intermediaries and guarantees' that normal securities transactions involve is not in play in an LBO." *In re Resorts International*, 181 F.3d at 515 (citing *Zahn*, 218 B.R. at 676).

The Trustee's argument, however, was expressly rejected by *Resorts*. "Although no clearing agency was involved in this transfer, two financial institutions - Merrill Lynch and

10

A0338

Chase - were.  Under a literal reading of section 546(e), therefore, this was a settlement payment 'made by . . . a financial institution.'" *In re Resorts International* 181 F.3d at 515 (quoting 11 U.S.C. § 546(e)).  The *Resorts* Court considered and rejected *Zahn* and *Weibloldt Stores*, holding that the plain language of the statute trumped extraneous considerations, and concluding that "the term 'settlement payment' is a broad one that includes almost all securities transactions." *In re Resorts International*, 181 F.3d at 515-516.

Furthermore, the Trustee does not point the Court to any Third Circuit decision that limits application of *Resorts* to public companies.  However, the *Resorts* Court relied on *In re Kaiser Steel Corporation*, 952 F.2d 1230 (10th Cir. 1991), that held that the term "settlement payment" applied to a repurchase agreement, which was found not to be "a 'trade' entered into on an exchange." *Kaiser Steel*, 952 F.2d at 1239.  The Court in *Resorts* acknowledged that commentators were critical of *Kaiser Steel* for applying section 546 to a transaction involving an LBO because it did not involve the public trading system and thus did not reflect Congressional intent.  *In re Resorts International*, 181 F.3d at 516,  n.10.  However, the Court of Appeals held firm that the plain language of the statute mandated the "logical conclusion" that the section 546(e) exemption extends to all securities transactions, whether the securities at issue are publicly traded or are securities traded outside the public trading system.  *Id.*

More recent case law within the Third Circuit follows the *Resorts* analysis.  *See In re Loranger Mfg. Corp.*, 324 B.R. 575, 584-85 (Bankr.W.D.Pa. 2005) (holding that $9 million

11

A0339

payment to defendant in a leveraged buyout for shares that were not publicly traded was unavoidable under section 546(e)); *Official Committee of Unsecured Creditors of The IT Group v. Acres of Diamonds, L.P., (In re The IT Group, Inc.)*, 2006 WL 3833933 (Bankr. D.Del. 2006). In *The IT Group*, the post-confirmation trust sued to avoid and recover a fraudulent conveyance in the amount of $575,000 for the purchase of stock in a privately held company. In granting summary judgment and finding the transaction was not avoidable, the Court unequivocally held that "the term settlement payment is to be applied broadly to any transfer of stock or cash to pay for stock." *Id.* at *4. Chief Judge Walrath applied the settlement payment exemption to privately held securities even though the transaction did not involve a true financial intermediary or securities clearing agency, finding that:

> Although this case does not involve a leveraged buyout, publicly traded stock, or a clearing agency, the Third Circuit's holding in *Resorts* mandates a conclusion that section 546(e) is broad enough to protect from avoidance a "settlement payment . . . made by . . . [a] financial institution."

*Id.* (citations omitted).

It is therefore certain that Defendants have met all of the requirements for the section 546(e) safe harbor from fraudulent transfer liability. The broad application of what constitutes a settlement payment mandated in *Resorts* covers even transactions which, as here, are LBO purchases of non-public securities. *Id.*

**C.     The Complaint Fails to State a Claim for Fraudulent Conveyance**

The Trustee's claims against Defendants are also based upon sections 1304 and 1305

12

A0340

of the Delaware Code, which are applicable to this proceeding pursuant to section 544 of the

Bankruptcy Code.

Section 1304 of the Delaware Code provides in relevant part,

> (A)    A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> ***
>
> (2)    Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
>> a.    Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>
>> b.    Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

6 Del.C. § 1304.  Section 1305 of the Delaware Code provides in relevant part,

> (a)    A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

6 Del.C. § 1305.  Thus, in order to state a claim under section 1304 and 1305, the Trustee

must allege that (i) the debtor made a transfer (ii) for less than reasonably equivalent value

13

A0341

and (iii) the debtor was, or was rendered, insolvent thereby.

The Complaint fails to state a claim for avoidance of a fraudulent conveyance because the Trustee does not allege that either Plassein or any other Debtor made any transfers to the Shareholders. Instead the Trustee asserts that Packaging, a non-debtor, through Fleet Bank, paid for the shares of the Target Companies. Since no Debtor made a transfer, there is no legal basis for any fraudulent conveyance claim.

The Trustee seeks to avoid the implications that Packaging is not a debtor by arguing that the transactions are a single integrated plan and there is authority to "collapse" the transaction to determine fraudulent conveyance liability. *See, e.g., Hechinger*, 274 B.R. at 91.

The Court agrees with Defendants that the allegations contained within the Complaint do not serve as a basis for collapsing the transactions. Absent proof of intent to defraud, independent transactions will not be collapsed. *Compare, e.g., U.S. v. Gleneagles Investment Co., Inc.*, 565 F.Supp. 556 (M.D. Pa. 1983); 571 F.Supp. 935 (M.D. Pa. 1983); 584 F.Supp. 671 (M.D. Pa. 1984); aff'd sub nom, *U.S. v. Tabor Court Realty Corporation*, 803 F.2d 1288 (3d Cir. 1986) (sustaining collapse of various transactions where parties acted in bad faith); *Voest-Alpine Trading USA Corporation v. Vantage Steel Corp.*, 919 F.2d 206 (3d Cir. 1990) (upholding finding that several transactions at the same time were a single integrated transaction that functioned as a subterfuge and damaged unsecured creditors).

The Complaint does not allege fraud or bad faith, and at oral argument, the Trustee

14

A0342

conceded he is not claiming actual fraud. The Complaint also does not allege any relationship whatsoever among the transactions or the Shareholders. Moreover, there are no allegations calling into question the good faith of the Shareholders.

## CONCLUSION

The *Resorts* decision stands firmly between the Trustee and the successful prosecution of the alleged fraudulent conveyance claims. The Trustee concedes that *Resorts* controls the outcome of the pending motion to dismiss. *Resorts*, in turn, has been extended in cases such as *Loranger* and *The IT Group*. All of these cases clearly establish that the transfers at issue are exempt from avoidance under section 544 of the Bankruptcy Code. Therefore, the Court will **GRANT** the Motions to Dismiss.

An appropriate Order follows.

Dated: April 20, 2007

Kevin Gross
United States Bankruptcy Judge

15

A0343

**K**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| PLASSEIN INTERNATIONAL CORP., et al., | ) Case No. 03-11489(KG) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| ———————————————————— | ) |
| | ) |
| WILLIAM BRANDT, AS HE IS THE | ) |
| TRUSTEE OF THE ESTATES OF PLASSEIN | ) |
| INTERNATIONAL CORP., et al. | ) |
| | ) |
| v. | ) Adv. Proc. No. 05-50692(KG) |
| | ) |
| B.A. CAPITAL COMPANY LP, | ) |
| THOMAS F. FAY, RUTH L. FISCHBACH, | ) |
| MARK R. FREEDMAN, ROBERT N. ZEITLIN, | ) |
| SIDNEY ZEITLIN, ZFC ASSOCIATES, INC., | ) |
| WILLIAM G. RUSSELL, ROBERT N. ZEITLIN | ) |
| 1999 CHARITABLE REMAINER UNITRUST, | ) |
| THE ANDREW MARSHALL FORSBERG | ) |
| TRUST, ETHEL FORSBERG REVOCABLE | ) |
| TRUST, JANIS RAE FORSBERG TRUST, | ) |
| FRANK JOHN MCCARTHY, DANIEL R. | ) |
| ORRIS, BERNADINE ORRIS, SAM CHEBEIR, | ) |
| CHARLES J. WARR, PAUL D. GAGE, | ) |
| STEPHEN S. WILSON, G. KENNETH POPE JR., | ) |
| KENNETH OLENLER and | ) |
| DANIEL A. JONES III, | ) |
| | ) |
| Defendants. | ) |
| ———————————————————— | ) |

## ORDER

AND NOW, this 20th day of April, 2007, after consideration of the defendant's

motions for dismissal of the plaintiffs' adversary complaint against them, for the reasons set

forth in the accompanying Opinion of even date, it is hereby,

ORDERED that the adversary proceeding is dismissed.


Kevin Gross
United States Bankruptcy Judge


cc:    Robert J. Stearn, Jr., Esquire
       Laurie Schenker Polleck, Esquire
       Laurie Selber Silverstein, Esquire
       Ricardo Palacio, Esquire
       Richard H. Cross, Jr., Esquire


2

A0345

L

# IN THE UNITED STATES BANKUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Plassein International Corporation, *et al.*, | ) | Case No. 03-11489 (KG) |
| (n/k/a PL Liquidation Corp.), | ) | |
| | ) | Jointly Administered |
| Debtors.[1] | ) | |
| _____ | ) | |
| | ) | |
| WILLIAM BRANDT, as he is the | ) | |
| Trustee of the Estates of Plassein | ) | |
| International Corp., *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. Proc. No. 05-50692 (KG) |
| | ) | |
| B.A. Capital Company LP, | ) | |
| The Andrew Marshall Forsberg Trust, | ) | |
| Ethel Forsberg Revocable Trust, | ) | |
| Janis Rae Forsberg Trust, | ) | |
| Frank John McCarthy, Daniel R. Orris, | ) | |
| Bernadine Orris, Charles J. Warr, | ) | |
| Paul D. Gage, Stephen S. Wilson, | ) | |
| G. Kenneth Pope, Jr., Kenneth Olenler, | ) | |
| Daniel A. Jones, III, Sam Chebeir, | ) | |
| Thomas F. Fay, Ruth L. Fischbach, | ) | |
| Mark R. Freedman, Robert N. Zeitlin, | ) | |
| Sidney Zeitlin, ZFC Associates, Inc., | ) | |
| William G. Russell, Robert N. Zeitlin 1999 | ) | |
| Charitable Remainer Unitrust, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## NOTICE OF APPEAL

---

[1] The Debtors are Plassein International Corporation, Plassein International of Thomasville, Inc., f/k/a Rex International, Inc.; Plassein International of Ontario, LLC, f/k/a Transamerican Plastic, LLC; Plassein International of Spartanburg, Inc., f/k/a Plastical Industries Inc.; Plassein International of Martin, Inc., f/k/a Marshall Plastic Film, Inc.; Plassein International of Salem, Inc., f/k/a Key Packaging Industries Corp.; and Teno Films, Incorporated.

William Brandt, as Trustee of the Estates of Plassein International Corp., *et al.*, by and through undersigned counsel, appeals under 28 *U.S.C.* § 158(a) the order of the Honorable Kevin Gross entered in the above-captioned adversary proceeding on April 20, 2007 [D.I. No. 71; related D.I. No. 70], a copy of the order and opinion is attached hereto as Exhibit A.

The names of all parties to the order appealed from and the names , addresses, and telephone numbers of their respective attorneys are as follows:

| **Party** | **Counsel** |
|---|---|
| B.A. Capital Company LP | **Karen E. Wagner** <br> **Elliot Moskowitz** <br> Davis Polk & Wardwell <br> 450 Lexington Avenue <br> NY, NY 10017 <br> (T) 212-450-4000 <br> (F) 212-450-3800 |
| | **Robert J. Stearn Jr.** <br> Richards Layton & Finger, P.A. <br> One Rodney Square <br> 920 North King Street <br> Wilmington, DE 19801 <br> (T) 302-651-7700 <br> (F) 302-651-7701 |
| The Andrew Marshall Forsberg Trust; <br> Ethel Forsberg Revocable Trust; <br> Janis Rae Forsberg Trust; <br> Frank John McCarthy; <br> Daniel R. Orris; <br> Bernadine Orris. | **James A. Sarna, Esquire** <br> Sarna & Associates, PC <br> 99 Main Street <br> Nyack, NY 10960 <br> (T) 845-348-9822 <br> (F) 845-818-4141 |
| | **Laurie Polleck** <br> Jaspan Schlesinger Hoffman <br> 913 North Market Street, <br> 12th Floor <br> Wilmington, DE 19801 <br> 302-351-8000 <br> Fax : 302-351-8010 |

2

A0347

| **Party** | **Counsel** |
|---|---|
| Charles J. Warr;<br>Paul D. Gage;<br>Stephen S. Wilson;<br>G. Kenneth Pope, Jr.;<br>Kenneth Olenler;<br>Daniel A. Jones, III;<br>Sam Chebeir. | **Ricardo Palacio, Esq**<br>Ashby & Geddes, P. A.<br>500 Delaware Avenue,<br>8th Floor<br>Wilmington, DE 19801<br>(T) 302-654-1888<br>(F) 302-654-2067 |
| Thomas F. Fay;<br>Ruth L. Fischbach;<br>Mark R. Freedman;<br>Robert N. Zeitlin;<br>Sidney Zeitlin;<br>ZFC Associates, Inc.;<br>William G. Russell;<br>Robert N. Zeitlin 1999 Charitable<br>Remainer Unitrust. | **Richard A. Johnston, Esq.**<br>**Mark A. Fleming, Esq.**<br>Wilmer Cutler Pickering  Hale<br>and Dorr LLP<br>60 State Street<br>Boston, MA 02109<br>(T) 617-526-6000<br>(F) 617-526-5000<br><br>**Laurie Selber Silverstein, Esq.**<br>Potter Anderson & Corroon LLP<br>1313 N. Market St.<br>Hercules Plaza<br>6th Floor<br>Wilmington, DE 19801<br>(T) 302 984-6000<br>(F) 302-658-1192 |

[INTENTIONALLY LEFT BLANK]

A0348

Dated: April 27, 2007                       CROSS & SIMON, LLC
       Wilmington, Delaware

                              By:  /s/ Christopher P. Simon
                                  Christopher P. Simon (No. 3697)
                                  Amy E. Evans (No. 3829)
                                  913 North Market Street, 11th Floor
                                  P.O. Box 1380
                                  Wilmington, Delaware  19899-1380
                                  (302) 777-4200

                                  -and-

                                  Charles R. Bennett, Jr.
                                  HANIFY & KING, P.C.
                                  One Beacon Street
                                  Boston, MA  02108
                                  (617) 423-0400

                                  Attorneys for William Brandt, as Trustee of
                                  the Estates of Plassein International Corp., *et
al.*

4

A0349

# Exhibit  A

A0350

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| PLASSEIN INTERNATIONAL CORP., et al., | ) Case No. 03-11489(KG) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| _____ | ) |
| | ) |
| WILLIAM BRANDT, AS HE IS THE | ) |
| TRUSTEE OF THE ESTATES OF PLASSEIN | ) |
| INTERNATIONAL CORP., et al. | ) |
| | ) |
| v. | ) Adv. Proc. No. 05-50692(KG) |
| | ) |
| B.A. CAPITAL COMPANY LP, | ) |
| THOMAS F. FAY, RUTH L. FISCHBACH, | ) |
| MARK R. FREEDMAN, ROBERT N. ZEITLIN, | ) |
| SIDNEY ZEITLIN, ZFC ASSOCIATES, INC., | ) |
| WILLIAM G. RUSSELL, ROBERT N. ZEITLIN | ) |
| 1999 CHARITABLE REMAINER UNITRUST, | ) |
| THE ANDREW MARSHALL FORSBERG | ) |
| TRUST, ETHEL FORSBERG REVOCABLE | ) |
| TRUST, JANIS RAE FORSBERG TRUST, | ) |
| FRANK JOHN MCCARTHY, DANIEL R. | ) |
| ORRIS, BERNADINE ORRIS, SAM CHEBEIR, | ) |
| CHARLES J. WARR, PAUL D. GAGE, | ) |
| STEPHEN S. WILSON, G. KENNETH POPE JR., | ) |
| KENNETH OLENLER and | ) |
| DANIEL A. JONES III, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

## ORDER

AND NOW, this 20th day of April, 2007, after consideration of the defendant's

motions for dismissal of the plaintiffs' adversary complaint against them, for the reasons set

forth in the accompanying Opinion of even date, it is hereby,

A0351

ORDERED that the adversary proceeding is dismissed.


Kevin Gross
United States Bankruptcy Judge


cc:    Robert J. Stearn, Jr., Esquire
       Laurie Schenker Polleck, Esquire
       Laurie Selber Silverstein, Esquire
       Ricardo Palacio, Esquire
       Richard H. Cross, Jr., Esquire

2

A0352

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Plassein International Corporation, *et. al.*, | ) | Case No. 03-11489 (KG) |
| (n/k/a PL Liquidation Corp.), | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| _____ | ) | |
| WILLIAM BRANDT, as he is the | ) | |
| Trustee of the Estates of | ) | |
| Plassein International Corp., *et al.*, | ) | |
| | ) | Adversary Proceeding Number |
| Plaintiff, | ) | |
| | ) | A 05-50692 (KG) |
| v. | ) | |
| | ) | |
| B.A. Capital Company LP, *et al.*, | ) | Related Document Nos: 22, 23, |
| | ) | 25, 26, 27, 28, 29, 30, 31, 37, 43, |
| Defendants. | ) | 44, 45, 46, 47 |
| _____ | ) | |

## OPINION [1]

## INTRODUCTION

In January and August, 2000, Plassein International Corporation ("Plassein" or "Debtors") acquired five privately held corporations by purchasing the shares of the companies' respective shareholders. The Chapter 7 trustee, William Brandt ("the Trustee") has brought suit against the selling shareholders who are named defendants ("the Shareholders" or "Defendants") (see pp. 4-5 *infra*) seeking to avoid the transfers made to the

---

[1] This Opinion constitutes the findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

Shareholders, claiming they were fraudulent conveyances pursuant to 11 U.S.C. § 544 and applicable Delaware law.

Before the Court are Motions to Dismiss the Complaint ("the Motions") filed by the Shareholders pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable to this adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7012(b). The Motions are based upon the same grounds and, therefore, for efficiency and because the Motions are essentially identical, the Court will deal with the Motions together. First, Defendants argue that the Trustee alleges in the Complaint that a non-debtor made the transfers and the applicable statute requires that a debtor make the transfers for a cause of action to exist. Secondly, Defendants argue that because the payments they received were payments on account of a securities transaction made by wire transfers from a financial institution, the transfers were "settlement payments" and thereby exempt from avoidance pursuant to 11 U.S.C. § 546(e).

## JURISDICTION

The Court's jurisdiction rests upon 28 U.S.C. §§ 157 and 1334. The adversary proceeding is a core matter under 28 U.S.C. § 157(b)(2); and venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTS

Debtor Plassein International Corporation[2] was formed in 1999 to acquire several

---

[2] References to Plassein in the transactions at issue are for convenience. In the Complaint, debtors refer to Plassein as the acquiror. In fact, the closing documents show clearly that it was

2

privately held manufacturers of flexible packaging and specialty film ("the Target Companies"). (Complaint ¶ 27) Plassein made the acquisitions through a series of leveraged buyouts ("LBO") whereby a group of lenders advanced funds and extended credit to Packaging in exchange for security interests in the Target Companies' assets and promises by the Target Companies to repay the loans. Packaging then used those funds to acquire the stock of the Target Companies and to pay off the Target Companies' existing secured debt. (Compl. ¶¶ 32-34 and 49.) The Target Companies were each privately owned companies (Compl. ¶ 27) and, as such, their stock was not traded in the public securities markets. The Target Companies were not merged into Plassein but changed their names and continued to operate as separate entities.

The LBO transactions proceeded in two phases. In the first phase on January 10, 2000, Packaging closed on acquisitions of the stock of: (a) Plastical Industries, Inc. ("Plastical," n/k/a Plassein International of Spartanburg, Inc.); (b) Nor Baker Industries, Ltd. ("Nor Baker," now in liquidation in Canada); (c) Marshall Plastics Film, Inc. ("Marshall," n/k/a Plassein International of Martin, Inc.); and (d) Key Packaging Industries Corp. ("Key," n/k/a Plassein International of Salem, Inc.). Plassein purchased the assets of Transamerican Plastic LLC ("Transamerican," n/k/a Plassein International of Ontario, Inc.). Following these acquisitions, the Target Companies purchased in the first phase became jointly and severally liable for the entire debt incurred to finance the transactions, and all granted a

---

Plassein Packaging Corporation ("Packaging") which participated in the closings of the acquisitions and whose funds Fleet Bank wired.

3

security interest in all of their assets to secure that debt. (Compl. ¶ 33.)

In the second phase, on August 15, 2000, Packaging acquired the stock of Rex International, Inc. ("Rex," n/k/a Plassein International of Thomasville, Inc.). Following the Rex transaction, Rex became liable not only for the debt incurred in the course of Plassein's acquisition of the Rex stock, but also for the January Acquisitions. (Compl. ¶ 48.) Thus, the Target Companies were jointly and severally liable for the entire debt incurred in the acquisitions.

Plassein alleges that the Shareholders received a substantial premium for their shares, which was accounted for on the post-closing balance sheets as "goodwill." (Compl. ¶¶ 45 and 57.) Plassein further claims that each transaction rendered each acquired company insolvent, in that, the sum of their debts was greater than the value of their assets at fair valuation. (Compl. ¶¶ 46 and 58-61.)

The Complaint contains the details of the transfers from Packaging to the Shareholders as follows:

a. To the Shareholders of Key:

Thomas F. Fay . . . . . . . . . . . $2,829,179.34    Sidney Zeitlin . . . . . . . $3,571,664.30

Ruth L. Fishback . . . . . . . . . $2,706,414.19    ZFC Associates Inc. . . . . $140,727.42

Mark R. Freedman . . . . . . . . . . . $69,403.19    William G. Russell . . . . . . $19,141.09

Robert N. Zeitlin . . . . . . . . . $2,188,122.12    Robert N. Zeitlin 1999 Charitable
                                                     Remainder Unitrust . . . . $518,426.87

Total: . . . . . . . . . . . . . . . . $12,043,078.52

4

b.  <u>To the Shareholders of Marshall</u>

The Andrew Marshall
Forsberg Trust . . . . . . . . . . . $1,016,252.90    Frank John McCarthy .  $1,270,316.12

Ethel Forsberg Revocable
Trust . . . . . . . . . . . . . . . . . . . . $2,286,569.02    Daniel R. Orris . . . . . . . . $41,177.17

Janis Rae Forsberg Trust . . . . . . $484,244.51    Bernadine Orris . . . . . . . . $41,177.15

Total: . . . . . . . . . . . . . . . . . . <u>$5,098,559.72</u>

c.    <u>To the Shareholders of Plastical/Transamerican:</u>

Sam Chebeir  . . . . . . . . . $2,046,364.39

d.    <u>To the Shareholders of Rex:</u>

B.A. Capital
Company LP  . . . . . . . . . $25,491,779.76    Stephen S. Wilson  . . . . . . $1,522,317.98

Heller Financial, Inc. . . . . $2,347,382.00    G. Kenneth Pope Jr. . . . . . . . $171,507.67

Charles J. Warr . . . . . . . . . . $366,477.36    Kenneth Olenler . . . . . . . . . $285,786.68

Paul D. Gage . . . . . . . . . $1,522,317.98    Daniel A. Jones III . . . . . . . . $171,507.67

Total . . . . . . . . . . . . . . . . <u>$31,934,274.06</u>

(Compl., ¶ 40, Exhibit B.)

The Trustee's records of the transfers at issue confirm that non-debtor Packaging, and
not Plassein or any of Debtors, made the transfers to the Shareholders. (Compl., Ex. B.) The
records also indicate that Fleet Bank transferred the funds by wire.  (Id.)

Plassein and the Target Companies filed Chapter 11 bankruptcy petitions on May 14,
2003, and Nor Baker commenced an insolvency proceeding in Canada on the same date.
Following the conversions of the cases to Chapter 7, William Brandt was appointed trustee

A0357

of Debtors' estates on February 6, 2004.

## THE PARTIES' POSITIONS

### A.     The Trustee's Claims

The Trustee's case against the Shareholders, at its essence, is that in acquiring the

Shareholders' stock in the Target Companies, Plassein and the other Debtors were rendered

insolvent and did not receive reasonably equivalent value in the acquisitions.  Thus, the

Trustee seeks to avoid the transfers to the Shareholders as fraudulent transfers pursuant to

the Bankruptcy Code, 11 U.S.C. § 544, and Delaware law, 6 Del. C. §§ 1304 and 1305.

### B.     The Shareholders' Defenses

The Shareholders raise two separate defenses.[3]  First, under Delaware law, it is the

debtor that must make the transfer to establish a fraudulent conveyance; and Plassein

Packaging Corp., who made the transfers, was not a debtor.  Second, under the Bankruptcy

Code, 11 U.S.C. § 546(e), the transfers are exempt from avoidance because they qualify as

settlement payments by a financial institution.

## DECISION

### A.     Legal Standard for Motion to Dismiss

A motion to dismiss for failure to state a claim upon which relief can be granted under

FED. R. CIV. P. 12(b)(6), tests the sufficiency of the complaint.  *Kost v. Kozakiewicz*, 1 F.3d

---

[3]  The Shareholders also argue in their Motions to Dismiss that the transfers did not render Debtors insolvent.  The issue of insolvency is highly factual and may not be appropriate for decision at this early stage of the case.  The Court will not, and need not, decide whether or not the transfers rendered debtors insolvent.

6

A0358

176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the Court accepts as true all allegations in the complaint and all reasonable inferences drawn from it are considered in the light most favorable to the plaintiff. *Morse v. Lower Merion School District*, 132 F.3d 902, 905 (3d Cir. 1997). A motion to dismiss should be granted when it is clear that under any possible set of facts alleged in the complaint, the plaintiff would still not be entitled to judgment. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Official Committee of Unsecured Creditors v. Fleet Retail Finance Group* (*In re Hechinger Investment Company of Delaware*), 274 B.R. 71, 80 (D.Del. 2002) (dismissing portions of a complaint for failure to state a claim because the transfers in question were settlement payments and were not fraudulent).

**B.    The Transfers to the Defendants are Settlement Payments, Not Subject to Avoidance**

The Trustee alleges that the underlying transfers/payments from Packaging to Defendants for their stock were made by wire transfer through Fleet Bank. The Court finds that the transfers are "settlement payments" within the meaning of section 546(e) of the Bankruptcy Code and therefore, are not subject to avoidance.

Section 544(b) of the Bankruptcy Code authorizes the Trustee to "avoid any transfer of interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law." 11 U.S.C. § 544(b). Section 546(e), however, provides that, notwithstanding section 544, "the trustee may not avoid a transfer that is a . . . settlement payment, as defined by section 101 or 741 of [the Bankruptcy Code], made by or to a . . .

7

A0359

financial institution." 11 U.S.C. § 546(e).

A "settlement payment" is defined under section 741(8) of the Bankruptcy Code to include "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8). Put simply, "a settlement payment is generally the transfer of cash or securities made to complete a securities transaction." *Lowenschuss v. Resorts International, Inc. (In re Resorts International, Inc.)*, 181 F.3d 505, 515 (3d Cir. 1999). The Court of Appeals for the Third Circuit has repeatedly held that this definition is "extremely broad" and encompasses almost all securities transactions. *In re Resorts International*, 181 F.3d at 515 (quoting *Bevill, Bresler & Schulman Asset Management Corporation v. Spencer Savings & Loan Association*, 878 F.2d 742, 751 (3d Cir. 1989)). In *Resorts*, the Court of Appeals held that payment to a shareholder for his shares as part of a leveraged buyout was "obviously a common securities transaction" and, therefore, a settlement payment under section 546(e). *In re Resorts International*, 181 F.3d at 516; *see also Hechinger*, 274 B.R. at 87 (applying *Resorts* and holding that payment for shares of stock was an unavoidable settlement payment).

The second prong of section 546(e) requires that payment for the securities must be made by or to a financial institution. "So long as a financial institution is involved, the payment is an unavoidable 'settlement payment.'" *Hechinger*, 274 B.R. at 87. The term "financial institution" is defined under the Bankruptcy Code as "a Federal Reserve bank or

8

an entity that is a commercial or savings bank . . . when any such Federal Reserve bank . . . or entity is acting as agent or custodian for a customer . . . in connection with a securities contract." 11 U.S.C. § 101(22)(A). This requirement is satisfied when a leveraged buyout payment is made by wire transfer. *In re Resorts International*, 181 F.3d. at 515. Indeed, federal regulations require that a wire transfer *must* be performed by a bank; thus, a wire transfer must be made through a financial institution. *See In re Loranger Mfg. Corp.*, 324 B.R. 575 (Bankr.W.D.Pa. 2005) (taking judicial notice of federal regulation requiring that a wire transfer must be accomplished by a bank, rejecting plaintiff's arguments that bank's involvement was "mere facilitation"and holding that debtor's leveraged buyout of defendant's shares was a "settlement payment" under § 546(e) because payment was made by wire transfer).

The transactions between Defendants and Packaging are indistinguishable from the stock purchases held to be unavoidable settlement payments in *Resorts*. In *Resorts*, Resorts' shares were purchased by Griffco Acquisition Corporation in an LBO. Resorts erroneously authorized a wire transfer to be paid to a shareholder through Chase Manhattan Bank. Resorts later filed for Chapter 11 bankruptcy protection, and the Trustee sought to recover the funds as an avoidable transfer. The shareholder argued that the wire transfer was a "settlement payment" and therefore unavoidable under § 546(e). The Court of Appeals looked to the plain language of the statute and held that the payment for the shares was a settlement payment for the purposes of section 546(e), and therefore not avoidable. *In re*

9

*Resorts International*, 181 F.3d at 515-516.

Here, there is no dispute that the payments to the Shareholders were made by Fleet Bank, a financial institution, to other financial institutions in order to settle securities transactions, namely, Packaging's purchase of stock of the Target Companies. *Resorts* dispels any doubt that the transfers to the Shareholders were settlement payments. In the securitites industry, a settlement payment is generally the transfer of cash or securities made to complete a securities transaction. *Id.* at 515. Accordingly, section 546(e) applies to the transactions at issue and the wire transfers executed by Fleet Bank are unavoidable.

However, the Trustee endeavors to limit the application of *Resorts* to publicly traded securities. The Trustee argues that Section 546(e) was enacted for protecting the operation of the security industry's clearance and settlement system which operates only with respect to securities that are publicly traded. The Trustee thus argues that section 546(e) applies only to publicly traded securities. The Trustee relies on two cases in support of his argument, *Zahn v. Yucaipa Capital Fund*, 218 B.R. 656 (D.R.I. 1998) and *Wieboldt Stores, Inc. v. Schottenstein*, 131 B.R. 655 (N.D. Ill. 1991). *Zahn* and *Wieboldt Stores* both held that LBO payments were not covered by section 546(e) because "'the system of intermediaries and guarantees' that normal securities transactions involve is not in play in an LBO." *In re Resorts International*, 181 F.3d at 515 (citing *Zahn*, 218 B.R. at 676).

The Trustee's argument, however, was expressly rejected by *Resorts*. "Although no clearing agency was involved in this transfer, two financial institutions - Merrill Lynch and

10

A0362

Chase - were.  Under a literal reading of section 546(e), therefore, this was a settlement payment 'made by . . . a financial institution.'" *In re Resorts International* 181 F.3d at 515 (quoting 11 U.S.C. § 546(e)).  The *Resorts* Court considered and rejected *Zahn* and *Weibloldt Stores*, holding that the plain language of the statute trumped extraneous considerations, and concluding that "the term 'settlement payment' is a broad one that includes almost all securities transactions." *In re Resorts International*, 181 F.3d at 515-516.

Furthermore, the Trustee does not point the Court to any Third Circuit decision that limits application of *Resorts* to public companies.  However, the *Resorts* Court relied on *In re Kaiser Steel Corporation*, 952 F.2d 1230 (10th Cir. 1991), that held that the term "settlement payment" applied to a repurchase agreement, which was found not to be "a 'trade' entered into on an exchange." *Kaiser Steel*, 952 F.2d at 1239.  The Court in *Resorts* acknowledged that commentators were critical of *Kaiser Steel* for applying section 546 to a transaction involving an LBO because it did not involve the public trading system and thus did not reflect Congressional intent.  *In re Resorts International*, 181 F.3d at 516,  n.10.  However, the Court of Appeals held firm that the plain language of the statute mandated the "logical conclusion" that the section 546(e) exemption extends to all securities transactions, whether the securities at issue are publicly traded or are securities traded outside the public trading system.  *Id.*

More recent case law within the Third Circuit follows the *Resorts* analysis.  *See In re Loranger Mfg. Corp.*, 324 B.R. 575, 584-85 (Bankr.W.D.Pa. 2005) (holding that $9 million

11

A0363

payment to defendant in a leveraged buyout for shares that were not publicly traded was unavoidable under section 546(e)); *Official Committee of Unsecured Creditors of The IT Group v. Acres of Diamonds, L.P.*, (*In re The IT Group, Inc.*), 2006 WL 3833933 (Bankr. D.Del. 2006). In *The IT Group*, the post-confirmation trust sued to avoid and recover a fraudulent conveyance in the amount of $575,000 for the purchase of stock in a privately held company. In granting summary judgment and finding the transaction was not avoidable, the Court unequivocally held that "the term settlement payment is to be applied broadly to any transfer of stock or cash to pay for stock." *Id*. at *4. Chief Judge Walrath applied the settlement payment exemption to privately held securities even though the transaction did not involve a true financial intermediary or securities clearing agency, finding that:

> Although this case does not involve a leveraged buyout, publicly traded stock, or a clearing agency, the Third Circuit's holding in *Resorts* mandates a conclusion that section 546(e) is broad enough to protect from avoidance a "settlement payment . . . made by . . . [a] financial institution."

*Id.* (citations omitted).

It is therefore certain that Defendants have met all of the requirements for the section 546(e) safe harbor from fraudulent transfer liability. The broad application of what constitutes a settlement payment mandated in *Resorts* covers even transactions which, as here, are LBO purchases of non-public securities. *Id.*

**C.    The Complaint Fails to State a Claim for Fraudulent Conveyance**

The Trustee's claims against Defendants are also based upon sections 1304 and 1305

12

A0364

of the Delaware Code, which are applicable to this proceeding pursuant to section 544 of the

Bankruptcy Code.

Section 1304 of the Delaware Code provides in relevant part,

> (A)    A transfer made or obligation incurred by a debtor is
> fraudulent as to a creditor, whether the creditor's claim arose
> before or after the transfer was made or the obligation was
> incurred, if the debtor made the transfer or incurred the
> obligation:
>
> ***
>
> (2)    Without receiving a reasonably equivalent value in
> exchange for the transfer or obligation, and the debtor:
>
>> a.    Was engaged or was about to engage in a
>> business or a transaction for which the
>> remaining assets of the debtor were
>> unreasonably small in relation to the
>> business or transaction; or
>>
>> b.    Intended to incur, or believed or
>> reasonably should have believed that the
>> debtor would incur, debts beyond the
>> debtor's ability to pay as they became due.

6 Del.C. § 1304.  Section 1305 of the Delaware Code provides in relevant part,

> (a)    A transfer made or obligation incurred by a debtor is
> fraudulent as to a creditor whose claim arose before the transfer
> was made or the obligation was incurred if the debtor made the
> transfer or incurred the obligation without receiving a
> reasonably equivalent value in exchange for the transfer or
> obligation and the debtor was insolvent at that time or the debtor
> became insolvent as a result of the transfer or obligation.

6 Del.C. § 1305.  Thus, in order to state a claim under section 1304 and 1305, the Trustee

must allege that (i) the debtor made a transfer (ii) for less than reasonably equivalent value

13

and (iii) the debtor was, or was rendered, insolvent thereby.

The Complaint fails to state a claim for avoidance of a fraudulent conveyance because the Trustee does not allege that either Plassein or any other Debtor made any transfers to the Shareholders. Instead the Trustee asserts that Packaging, a non-debtor, through Fleet Bank, paid for the shares of the Target Companies. Since no Debtor made a transfer, there is no legal basis for any fraudulent conveyance claim.

The Trustee seeks to avoid the implications that Packaging is not a debtor by arguing that the transactions are a single integrated plan and there is authority to "collapse" the transaction to determine fraudulent conveyance liability. *See, e.g., Hechinger*, 274 B.R. at 91.

The Court agrees with Defendants that the allegations contained within the Complaint do not serve as a basis for collapsing the transactions. Absent proof of intent to defraud, independent transactions will not be collapsed. *Compare, e.g., U.S. v. Gleneagles Investment Co., Inc.*, 565 F.Supp. 556 (M.D. Pa. 1983); 571 F.Supp. 935 (M.D. Pa. 1983); 584 F.Supp. 671 (M.D. Pa. 1984); aff'd sub nom, *U.S. v. Tabor Court Realty Corporation*, 803 F.2d 1288 (3d Cir. 1986) (sustaining collapse of various transactions where parties acted in bad faith); *Voest-Alpine Trading USA Corporation v. Vantage Steel Corp.*, 919 F.2d 206 (3d Cir. 1990) (upholding finding that several transactions at the same time were a single integrated transaction that functioned as a subterfuge and damaged unsecured creditors).

The Complaint does not allege fraud or bad faith, and at oral argument, the Trustee

14

conceded he is not claiming actual fraud. The Complaint also does not allege any relationship whatsoever among the transactions or the Shareholders. Moreover, there are no allegations calling into question the good faith of the Shareholders.

## CONCLUSION

The *Resorts* decision stands firmly between the Trustee and the successful prosecution of the alleged fraudulent conveyance claims. The Trustee concedes that *Resorts* controls the outcome of the pending motion to dismiss. *Resorts*, in turn, has been extended in cases such as *Loranger* and *The IT Group*. All of these cases clearly establish that the transfers at issue are exempt from avoidance under section 544 of the Bankruptcy Code. Therefore, the Court will **GRANT** the Motions to Dismiss.

An appropriate Order follows.


Dated: April 20, 2007

Kevin Gross
United States Bankruptcy Judge


15

A0367

## CERTIFICATE OF SERVICE

I, Christopher P. Simon, Esquire, hereby certify that on April 27, 2007, I caused a copy of

the Notice of Appeal to be served upon the following as indicated:

**VIA HAND DELIVERY**
Laurie Selber Silverstein, Esq.
Potter Anderson & Corroon LLP
1313 North Market Street, 6th Floor
Wilmington, DE 19801

**VIA U.S. MAIL**
Richard A. Johnston, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109

**VIA HAND DELIVERY**
Ricardo Palacio, Esq.
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

**VIA U.S. MAIL**
Karen E. Wagner, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

**VIA HAND DELIVERY**
Robert J. Stearn, Jr., Esq.
Richards Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

**VIA U.S. MAIL**
James A. Sarna, Esq.
Sarna & Associates, PC
99 Main Street
Nyack, NY 10960

**VIA HAND DELIVERY**
Laurie Polleck, Esq.
Jaspan Schlesinger Hoffman LLP
913 North Market Street, 12th Floor
Wilmington, DE 19801

  /s/ Christopher P. Simon
Christopher P. Simon (No. 3697)

A0368