## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| In Re:<br><br>**PLASSEIN INTERNATIONAL CORP., et al.,**<br><br>Debtors. | **Chapter 7**<br>**Bankr. Case No. 03-11489-KG**<br>**Jointly Administered**<br><br>**Adv. Pro. No. 05-50692-KG** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| **WILLIAM BRANDT, AS HE IS THE**<br>**TRUSTEE OF THE ESTATES OF**<br>**PLASSEIN INTERNATIONAL CORP.,**<br>**et al.,**<br><br>Appellant,<br><br>v.<br><br>**B.A. CAPITAL COMPANY LP, et al.,**<br><br>Appellees. | **Civil Action No. 07-345-JJF** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

## APPELLEE B.A. CAPITAL COMPANY LP'S OPPOSITION BRIEF

RICHARDS, LAYTON & FINGER, P.A.
Robert J. Stearn, Jr. (No. 2915)
Lee E. Kaufman (No. 4877)
One Rodney Square
920 N. King Street
Wilmington, Delaware, 19801
Tel.  (302) 651-7700
Fax (302) 651-7701

OF COUNSEL:

DAVIS POLK & WARDWELL
Karen E. Wagner
Elliot Moskowitz
450 Lexington Avenue
New York, New York 10017
Tel.  (212) 450-4404
Fax  (212) 450-3404

Dated:  March 10, 2008          *Attorneys for B.A. Capital Company LP*

# TABLE OF CONTENTS

PAGE

Introduction.................................................................................................................. 1

Issues Presented for Review ........................................................................................ 2

Counter-Statement of the Case .................................................................................... 2

    A.    The Allegations in the Complaint ............................................................. 2

    B.    The Bankruptcies and This Complaint ...................................................... 4

    C.    The Proceedings in the Bankruptcy Court Below...................................... 4

Standard of Review....................................................................................................... 5

Argument ...................................................................................................................... 6

    A.    The Third Circuit's Binding Decision in *Resorts* Mandates Dismissal of Claims Against BACC.......................................................................... 6

    B.    The Complaint Fails to Allege Fundamental Facts, and It Is Too Late to Allege Them Now................................................................................. 12

    C.    The Rex Transaction Should Not Be "Collapsed"................................... 14

Conclusion ................................................................................................................. 17

# TABLE OF AUTHORITIES

PAGE

## CASES

*Bright v. Westmoreland County*, 380 F.3d 729 (3d Cir. 2004)..........................................5

*City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256 (3d Cir. 1998)........................5

*Grant, Inc. v. Great Bay Casino Corp.*, 232 F.3d 173 (3d Cir. 2000)................................5

*In re Borden Chemicals and Plastics Op. Lim. Partnership*,
     336 B.R. 214 (Bankr. D. Del. 2006) ....................................................................... 9-10

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997)........................13

*In re Hechinger Invest.Co. of Delaware*, 274 B.R. 71 (D. Del. 2002) ........................12, 15

*In re Kaiser Aluminum Corp.*, 343 B.R. 88 (D. Del. 2006)................................................5

*In re Kaiser Steel Corp.*, 952 F.2d 1230 (10th Cir. 1991)...................................................9

*In re Loranger Mfg. Corp.*, 324 B.R. 575 (Bankr. W.D. Pa. 2005)..................................10

*In re National Forge Co.*, 344 B.R. 340 (W.D. Pa. 2006).................................9, 10, 14, 15

*In re Olympic Natural Gas Co.*, 294 F.3d 737 (5th Cir. 2002)..........................................11

*In re OODC, LLC*, 321 B.R. 128 (Bankr. D. Del. 2005)...................................................15

*In re Plassein Int'l Corp.*, 366 B.R. 318 (Bankr. D. Del. 2007)................................ *passim*

*In re R.M.L., Inc.*, 92 F.3d 139 (3d Cir. 1996)............................................................ 15-16

*In re Resorts International, Inc.*, 181 F.3d 505 (3d Cir. 1999)................................... *passim*

*In re Surrick*, 338 F.3d 224, 237 (3d Cir. 2003) ..............................................................13

*In re The IT Group, Inc.*, 359 B.R. 97 (Bankr. D. Del. 2006) .....................................10, 11

*Kuntz v. Saul, Ewing, Remick & Saul (In re Grand Union Co.)*, 200 B.R. 101 (D.
     Del. 1996) ............................................................................................................. 13-14

*Lexington Nat'l Ins. Corp. v. Ranger Ins. Co.*, 326 F.3d 416 (3d Cir. 2003) ...................13

*Munford v. Valuation Research Corp.*, 98 F.3d 604 (11th Cir. 1996)................................8

*Peltz v. Hatten,*
    279 B.R. 710 (D. Del. 2002), *aff'd*, 60 F. App'x 401 (3d Cir. 2003) ..........................16

*Pension Benefit Guaranty Corp. v. White Consol. Indus.,*
    998 F.2d 1192 (3d Cir. 1993)........................................................................................13

*QSI Holdings, Inc. v. Alford,*
    No. 1:06-CV-876, 2007 WL 4557855 (W.D. Mich. Dec. 21, 2007)............................11

*TWA Inc. Post-Confirmation Estate v. Marsh USA Inc.*
    *(In re TWA Post-Confirmation Estate)*, 305 B.R. 228 (Bankr. D. Del. 2004).............13

*U.S. v. Gleneagles Investment Co.*, 565 F. Supp. 556 (M.D. Pa. 1983) .............................14

*U.S. v. Gleneagles Investment Co.*, 571 F. Supp. 935 (M.D. Pa. 1983) .............................14

*U.S. v. Gleneagles Investment Co.*, 584 F. Supp. 671 (M.D. Pa. 1984);
    *aff'd sub nom, U.S. v. Tabor Court Realty*, 803 F.2d 1288 (3d Cir. 1986)..................14

*U.S. v. Tabor Court Realty*, 803 F.2d 1288 (3d Cir. 1986)..........................................14, 15

*Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.,*
    919 F.2d 206 (3d Cir. 1990)........................................................................................14

*Wieboldt Stores, Inc. v. Schottenstein*, 131 B.R. 655 (N.D. Ill. 1991)..................................8

*Zahn v. Yucaipa Capital Fund*, 218 B.R. 656 (D.R.I. 1998) .................................................8

<u>STATUTES AND RULES</u>

11 U.S.C. § 101.........................................................................................................................6

11 U.S.C. § 544..............................................................................................................2, 6, 12

11 U.S.C. § 546(e) ...........................................................................................................*passim*

11 U.S.C. § 741 .........................................................................................................................6

6 Del. Code § 1304 ...............................................................................................................2, 12

6 Del. Code § 1305 ...............................................................................................................2, 12

<u>OTHER AUTHORITIES</u>

5A Wright & Miller, *Federal Practice and Procedure,*
    § 1357, at 299 (2d ed. 1990) ........................................................................................13

Edward R. Morrison & Joerg Riegel, Financial Contracts and the
    New Bankruptcy Code, 13 ABI L. Rev. at 641 (Jan. 25, 2006) ...................................11

Defendant-Appellee B.A. Capital Company LP ("BACC") respectfully submits this brief in opposition to the appeal by Plaintiff-Appellant William Brandt, Trustee of the Estates of Plassein International Corp. (the "Trustee").

## INTRODUCTION

In the Trustee's words, "[t]he Third Circuit has . . . made clear that it will not allow legislative history and policy considerations to override a statute's plain language." App. Br. at 21. Yet, the Trustee urges this Court to do just that. He invites this Court to ignore controlling Third Circuit precedent construing the plain language of Section 546(e), and to issue a ruling based upon either the Trustee's interpretation of legislative history, or decisions in other jurisdictions that the Third Circuit has expressly rejected. The Court below declined the Trustee's invitation. This Court should do the same.

The Court below also held that, because the Complaint failed to allege that any debtor had made the transfers at issue, no fraudulent transfer claim was stated. On this appeal, the Trustee asks this Court to rule that his faulty pleading was corrected by his opposition brief, an affidavit, documents not cited to the Court below, or the "collapsing" theory. The Trustee's error cannot be fixed by extraneous statements, and Courts in the Third Circuit have repeatedly held that, absent proof of intent to defraud or bad faith, independent transactions will not be "collapsed." Because the Trustee's Complaint fails to allege that BACC acted with intent to defraud or in bad faith, the Court below properly rejected this argument.

## ISSUES PRESENTED FOR REVIEW

1.     Did the Bankruptcy Court correctly rule that, under the Third Circuit's decision in In re Resorts International, Inc., 181 F.3d 505 (3d Cir. 1999), the plain language of Section 546(e) of the Bankruptcy Code precludes avoidance of a settlement payment even if it did not involve the security industry's clearance and settlement system?

2.     Did the Bankruptcy Court correctly conclude that the Complaint failed to state a claim under 6 Del. Code Ann. §§ 1304 and 1305 (2005) because it does not allege a transfer "by a debtor" that rendered "the debtor" insolvent?

## COUNTER-STATEMENT OF THE CASE

### A.     The Allegations in the Complaint

Appellant is the Chapter 7 trustee of several debtors, including Plassein International Corp. ("Plassein"). According to the Complaint, Plassein was formed to acquire the stock of several manufacturers of flexible packaging and specialty film, presumably to gain the benefits of size, economies of scale and synergies. Complaint, ¶ 27 (A0028-29). The Trustee brought this action against BACC and several other defendants, under Section 544 of the Bankruptcy Code and Sections 1304 and 1305 of the Delaware Code, to avoid certain payments made to the defendants, all of whom are former shareholders of one of six companies, as payments for their stock.

The Complaint addressed two sets of transactions, one set denoted the "January Acquisitions," involving the acquisitions of five separate companies, and the other the "Rex Acquisition," involving a single company. As to BACC, the Complaint sought to avoid a payment for the purchase of BACC's stock in Rex International, Inc. ("Rex"), an

2

entity acquired by Plassein Packaging Corp. ("Packaging") on August 15, 2000, pursuant to a stock purchase agreement.[1]  See Complaint, ¶¶ 48-61 (A0034-36).[2]  The Complaint did not describe the relationship, if any, between Packaging and any of the debtors represented by the Trustee, and did not allege that Packaging was a debtor.

The Complaint alleged that Packaging, not Rex, was the transferor of the payments to BACC.  See Complaint, Ex. F, p.6 (A0133) ("At Closing, [Packaging] shall cause to be transferred a total of $31,934,274.06, in immediately available funds, to the Rex Selling Shareholders to the accounts specified on Exhibit A hereto as follows: B.A. Capital Company, L.P. $25,491,779.76").  The Complaint further alleged that Rex's net worth was positive before the Rex Acquisition.  Id. at ¶ 56 (A0035).  The Complaint then concluded that Rex was rendered insolvent as a consequence of the transaction, even though no causal relationship is alleged.  Id. at ¶¶ 58-61 (A0036).  The Complaint alleged that the Rex Transaction was a fraudulent conveyance as to creditors of Rex, and as to creditors of the "January Target Companies," five other companies allegedly bought prior to the acquisition of Rex by Packaging.  Id. at ¶ 96 (A0041).

Finally, the Complaint alleged that Plassein's lenders provided a benefit to Plassein by agreeing to increase availability under Plassein's existing credit agreement to permit Plassein to acquire the shares of Rex, and that Plassein agreed that Rex would

---

[1] After the acquisition, Rex changed its name to Plassein International of Thomasville, Inc., a debtor in these cases.  See Complaint, ¶ 52 (A0034).  For convenience, the entity will be called "Rex" in these papers, as it is in the Complaint.

[2] The Trustee appended a number of documents to the Complaint.  Only two of these, Exhibits F and G, are relevant to the Rex Transaction.  Exhibit F, which is a "Funds Flow Memorandum and Letter of Direction" indicates that Rex is to be acquired by Plassein Packaging Corp.  The "Funds Flow at Closing" exhibit demonstrates that certain funds were transferred from Fleet Bank, on behalf of Plassein Packaging Corp., to Bank of America, N.A., on behalf of BACC as consideration for the purchase of Rex shares, a note repayment and dividends.  See, Ex. F., p. A-2 (A0147).

3

thereafter become a borrower and would grant a security interest in its assets. Id. at ¶¶ 49-50 (A0034).

**B.      The Bankruptcies and This Complaint**

The Complaint alleged that Rex was in default to its lenders by November 2001, and filed a Chapter 11 bankruptcy petition on May 14, 2003, about two and a half years after the Rex Acquisition. Id. at ¶ 65 (A0037). Rex's Chapter 11 case, and related cases, were apparently converted to Chapter 7, and the Trustee was appointed on February 6, 2004. Id. at ¶ 1 (A0026). This Complaint was filed on April 5, 2005.

**C.      The Proceedings in the Bankruptcy Court Below**

On June 15, 2005, BACC and certain other defendants filed motions to dismiss the Complaint. Oral argument was heard on September 30, 2005 before visiting U.S. Bankruptcy Judge Walter Shapero, and the case remained pending for more than 18 months. On April 17, 2006, the matter was assigned to U.S. Bankruptcy Judge Kevin Gross. Oral argument was heard again on April 7, 2007. On April 20, 2007, Judge Gross dismissed the Complaint in its entirety on three grounds.

First, the Court held that, consistent with controlling Third Circuit precedent, the transfers at issue were settlement payments not subject to avoidance under Section 546(e) of the Bankruptcy Code. The Court held that the Trustee's argument that § 546(e) applies only to transactions involving publicly traded securities "was expressly rejected by [In re Resorts Intl., Inc., 181 F.3d 505 (3d Cir. 1999) (Resorts")]." In re Plassein Int'l Corp., 366 B.R. 318, 324 (Bankr. D. Del. 2007). Second, the Court held that the Complaint failed to state a claim for a fraudulent conveyance because it failed to allege that the transferor, Packaging, was a debtor. Id. Finally, the Court held that "the

4

allegations contained within the Complaint do not serve as a basis for collapsing the transactions" because the Trustee did not allege either fraud or bad faith, which are prerequisites for claims to be collapsed. Id.

On April 27, 2007, the Trustee filed a notice of appeal, and on January 30, 2008 this Court issued a Scheduling Order (subsequently amended). Pursuant to the Scheduling Order, on February 14, 2008, the Trustee filed Appellants' Opening Brief.

## STANDARD OF REVIEW

In reviewing the decision of a Bankruptcy Court on a motion to dismiss, the District Court "applies a plenary review to the Bankruptcy Court's legal conclusions." In re Kaiser Aluminum Corp., 343 B.R. 88, 93 (D. Del. 2006). While the Court is required "to accept as true all factual allegations in the complaint, [it] 'need not accept as true unsupported conclusions and unwarranted inferences.'" Grant, Inc. v. Great Bay Casino Corp., 232 F.3d 173, 183-84 (3d Cir. 2000) (quoting City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 263 n.13 (3d Cir. 1998)); see also Bright v. Westmoreland County, 380 F.3d 729, 735 (3d Cir. 2004) ("courts can and should reject legal conclusions, unsupported conclusions, unwarranted references, unwarranted deductions, footless conclusions of law, and sweeping legal conclusions in the form of factual allegations") (citation and internal quotation marks omitted).

5

## ARGUMENT

### A.    The Third Circuit's Binding Decision in *Resorts* Mandates Dismissal of Claims Against BACC

Bankruptcy Code Section 544(b) authorizes the Trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law."[3]  However, Section 546(e) provides, in relevant part, that notwithstanding Section 544, "the trustee may not avoid a transfer that is a . . . settlement payment as defined by section 101 or 741 of this title, made by or to a . . . financial institution."  Section 741(8) defines "settlement payment" as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade."[4]  In the Court below, BACC argued that the transfer at issue was a settlement payment; the Trustee disagreed; relying on Resorts, the Bankruptcy Court agreed with BACC and dismissed the Complaint.

The Court below correctly held that the Third Circuit's decision in Resorts was dispositive as to the application of Section 546(e) to preclude avoidance of the transfers alleged in the Complaint.  In Resorts, a shareholder refused to tender his shares into a leveraged buyout ("LBO").  Resorts, 181 F.3d at 508.  Litigation commenced, and while it was pending, Resorts erroneously authorized a wire transfer to be paid to the shareholder through Chase Manhattan Bank.  Id. at 509.  Resorts later filed for Chapter

---

[3] Citations are to the Bankruptcy Code as it existed in 2005, when the Complaint was filed.

[4] The term "financial institution is defined as a Federal reserve bank or an entity . . . that is a commercial or savings bank . . . when any such Federal reserve bank . . . or entity is acting as agent or custodian for a customer in connection with a securities contract." 11 U.S.C. § 101(22)(A)(i). There is no dispute that the payments at issue were made by a financial institution.

6

11 bankruptcy protection, and the Trustee sought to recover the funds as an avoidable transfer. Id. The shareholder argued that the wire transfer was a "settlement payment" that could not be avoided under Section 546(e). The Third Circuit, looking to "the plain language of the statute," held that the payment for shares was a settlement payment for the purposes of Section 546(e). Id. at 515-516.

Here, there is no dispute that the payment to BACC was made by a financial institution, Fleet Bank, to settle a securities transaction, the purchase of Rex's stock by Packaging from BACC. See Funds Flow Memorandum, Exhibit F to the Complaint (A0147); see also App. Br. at 8; Resorts, 181 F.3d at 515 ("In the securities industry, a settlement payment is generally the transfer of cash or securities made to complete a securities transaction."). Accordingly, Section 546(e) applies to this transaction and the wire transfer executed by Fleet Bank may not be avoided.

In his appeal, the Trustee urges this Court, as he urged the Court below, to ignore Resorts and reach a contrary conclusion based on arguments that were expressly rejected by the Third Circuit. He argues that Section 546(e) was enacted "to protect the operation of the security industry's clearance and settlement system," and "[o]f course, the clearance and settlement system operates only with respect to securities that are publicly traded." App. Br. at 18. Therefore, goes the argument, Section 546(e) applies only to transfers of publicly traded securities. Id.

But the fundamental assumption underlying this argument – that Section 546(e) applies only to transactions involving "the security industry's clearance and settlement system" – was considered and rejected in Resorts: "Although no clearing agency was involved in this transfer, two financial institutions – Merrill Lynch and Chase – were.

7

Under a literal reading of Section 546(e), therefore, this was a settlement payment 'made by . . . a financial institution.'" Resorts, 181 F.3d at 515. And that is precisely what the Court below held. See In re Plassein, 366 B.R. at 324 ("The Trustee's argument . . . was expressly rejected by Resorts.").

The cases relied on by the Trustee – Zahn v. Yucaipa Capital Fund, 218 B.R. 656 (D.R.I. 1998) and Wieboldt Stores, Inc. v. Schottenstein, 131 B.R. 655 (N.D. Ill. 1991) – were also expressly rejected in Resorts. These cases held that LBO payments were not covered by Section 546(e) because "'the system of intermediaries and guarantees' that normal securities transactions involve is not in play in an LBO." Resorts, 181 F.3d at 515 (quoting Zahn, 218 B.R. at 676). The Resorts court, ruling that the plain language of the statute trumped extraneous considerations, considered and rejected these cases, concluding that "the term 'settlement payment' is a broad one that includes almost all securities transactions." Resorts, 181 F.3d at 515-516.[5]

The Trustee attempts to distinguish Resorts by adopting the following syllogism: since Resorts involved the stock of a company that was publicly traded, it must be that Section 546(e) applies "only to transactions involving publicly traded securities." App. Br. at 11.[6] Nothing in the Resorts decision supports that contention. As Judge Gross

---

[5] The Trustee concedes that these cases have been rejected by Resorts, but insists that they "failed to base their holdings on the language of the statutes they were interpreting," and it was only "this mode of analysis that Resorts rejected." App. Br. at 21. But these decisions contain extensive statutory analysis. See Zahn, 218 B.R. at 675-678; Wieboldt, 131 B.R. at 663 ("the court begins with the language of the statute"). The Resorts decision specifically discussed these cases and rejected them; consequently they are not good law in the Third Circuit. See Resorts, 181 F.3d at 515-516 (rejecting Zahn and Wieboldt). Indeed, the Court in Resorts was "more persuaded by the dissent" in one of the cases relied on by the Trustee. See Resorts, 181 F.3d at 516 (citing dissent in Munford v. Valuation Research Corp., 98 F.3d 604 (11th Cir. 1996) (emphasis added)).

[6] The Trustee supplies a lengthy and irrelevant exegesis about "margin" payments, contending that concepts related to "margin" "have no meaning outside the market for publicly traded securities[.]" App. Br. at 13. He cites the Encyclopedia of Banking & Finance and the Dictionary of Finance and Investment

noted, "the Trustee does not point the Court to any Third Circuit decision that limits application of <u>Resorts</u> to public companies." <u>In re Plassein</u>, 366 B.R. at 324. Moreover, as the Court below observed, the <u>Resorts</u> Court relied on <u>In re Kaiser Steel Corp.</u>, 952 F.2d 1230 (10th Cir. 1991), which held that the term "settlement payment" applied to a repurchase agreement, which was found not to be "a 'trade' entered into on an exchange." <u>Kaiser Steel</u>, 952 F.2d at 1239. The <u>Resorts</u> Court noted that "a number of commentators have criticized <u>Kaiser Steel</u> for applying section 546 to a transaction that did not implicate the concerns that Congress had in creating the law," <u>Resorts,</u> 181 F.3d at 516 n.10, but nonetheless held that the plain language of the statute mandated this "logical conclusion."

The Trustee's assertion that "[t]he question remains open in this Circuit," App. Br. at 19, is therefore wishful thinking, as is apparent upon review of other cases in the Circuit. For example, in <u>In re National Forge Co.</u>, 344 B.R. 340 (W.D. Pa. 2006) the Court addressed at length whether redemption payments made to shareholders through a financial institution in connection with an employee stock ownership plan transaction were protected from avoidance by Section 546(e). The Court exhaustively analyzed the principal cases relied on by the Trustee, and concluded that it was bound by the <u>Resorts</u> decision to rule that claims for constructive and actual fraud in regard to the redemption payments are barred by Section 546(e). <u>National Forge</u>, 344 B.R. at 352-366. <u>See also</u>

---

Terms. <u>See</u> A0239-57. But the Dictionary states that margin securities include both registered and over the counter securities. <u>See</u> p. 321 (A0254). Further, this case has nothing to do with margin payments – it involves settlement payments. The Encyclopedia defines "Settlement" as, *inter alia*, "the striking of a balance between two or more parties having mutual dealings with one another and the payment of the debit balance by the debtor (debtors) to the creditor (creditors)." <u>See</u> p. 1047 (the relevant page was not included in the Appendix, and is attached hereto for the Court's convenience as Ex. A). Payments through the clearinghouses are but one of three applications of the word. <u>Id</u>.

9

In re Borden Chemicals and Plastics Op. Lim. Partnership, 336 B.R. 214, 223 (Bankr. D. Del. 2006) (holding that Section 546(e) broadly applied to protect payment under forward contract).

Importantly, National Forge held that section 546(e) applied notwithstanding the fact that the challenged transaction involved "privately held corporate stock, " 344 B.R. at 361; that Resorts involved "publicly traded securities . . . does not appear to have been a determinative factor." Id. at 365.  See also In re Loranger Mfg. Corp., 324 B.R. 575, 584-85 (Bankr. W.D. Pa. 2005) (Section 546(e) precluded avoidance of $9 million payment to defendant in a leveraged buyout for shares that were not publicly traded).[7]

More recently, in In re The IT Group, Inc., 359 B.R. 97 (Bankr. D. Del. 2006), the plaintiff trust sought to avoid a wire transfer in which the defendant was paid $575,000 for shares of a privately held company.  Id. at 98.  Defendant argued that the transfer was a "settlement payment" that could not be avoided under Section 546(e) and the Third Circuit's decision in Resorts.  Id. at 99-100.  The trust urged the Court "to consider Congressional intent and conclude that the transfer . . . is not a protected settlement payment because it did not involve the public stock market" or otherwise involve the public securities markets, citing the same cases in other jurisdictions cited by the Trustee here.  Id. at 100.  Rejecting the trust's argument, the Court held:

---

[7] Beyond Third Circuit precedent and statutory construction, the legislative history supports the application of § 546(e) to transactions other than ones involving publicly traded securities.  Inasmuch as § 546(e) was enacted to preserve the stability of the financial markets and to prevent the insolvency of one firm from spreading to others, the statute should have equal application to public and private transactions. Large financial institutions – such as Fleet Bank and Bank of America, the financial institutions in this case – execute hundreds and perhaps thousands of wire transfers each day.  If these transactions can be unwound months and even years down the line by the fortuity of the nature of the transaction underlying the transfer, and the further fortuity of the bankruptcy of some participant to that underlying transaction, the predictability that supports the stability of the banking system will be threatened.

"The cases cited by the Trust, however, are not from this Circuit and, therefore, not binding on this Court, while the cases that support [defendant's] argument are. Therefore, even if this Court were persuaded by the analysis in the cases cited by the Trust, it would still be compelled to follow Third Circuit precedent. . . . The analysis performed by the Third Circuit in <u>Resorts</u> makes it abundantly clear that the term settlement payment is to be applied broadly to <u>any transfer of stock or cash to pay for stock</u>. . . . Additionally, the Third Circuit did not consider it a worthy distinguishing factor that the stock was sold privately rather than on the public stock market." (<u>Id.</u> at 101 (citing <u>Resorts</u>)) (emphasis supplied). [8]

In other jurisdictions, courts that are persuaded by the reasoning of <u>Resorts</u> have reached similar conclusions about the congressionally intended breadth of Section 546(e). For example, in <u>QSI Holdings, Inc. v. Alford</u>, No. 1:06-CV-876, 2007 WL 4557855, at *7-8 (W.D. Mich. Dec. 21, 2007) the Court held that Section 546(e) protected payments to shareholders in connection with a leveraged buyout – again, of a "privately held corporation," where payments were made to a financial institution as disbursing agent. <u>Id.</u> at *1. Rejecting the very arguments and cases relied on by the Trustee here, the Court held that "nothing in the plain language of the statutes limits the application of the [546(e)] exemption to public transactions." <u>Id.</u> at *7.[9] <u>Cf.</u> <u>In re Olympic Natural Gas Co.</u>, 294 F.3d 737, 741-42 and n.5 (5th Cir. 2002) (applying Section 546(e) to payment made on non-public "forward contract," stating that "Congress sought to prevent the

---

[8] In his brief to this Court, the Trustee attempts to distinguish the <u>IT Group</u> decision by urging that the Court in that case rejected only a "mode of analysis," but that the "textual argument" the Trustee advances here was "not even consider[ed]." App. Br. at 24. However, below the Trustee more candidly acknowledged that <u>IT Group</u> could not be reconciled with his position: "Now I understand that my argument is now directly contrary to the position taken by Judge Walrath in the IT Group case. All I can say on that point, Your Honor, is I think Judge Walrath was wrong, and I would ask you to find different from her." Transcript dated Apr. 12, 2007 (attached hereto as Ex. B), at 29.

[9] Commentators have also been critical of attempts to use legislative history to support the distinctions the Trustee seeks to make here. <u>See</u> Edward R. Morrison & Joerg Riegel, Financial Contracts and the New Bankruptcy Code, ABI Law Review, 13:641 at 664-64 (Jan. 25, 2006) ("Arguments of this sort rely exclusively on intuitions about public policy, not the text of the Code. . . . [T]here is little to commend to a rule that varies the Code's protections based on (a court's assessment of) its importance to market stability").

11

'ripple effect' created by the 'insolvency of one commodity or security firm from

spreading to other firms and possibly threatening the collapse of the affected industry,'"

so "[b]y including references to both the commodities and the securities markets, it seems

clear that Congress meant to exclude from the stay and avoidance provisions both on-

market, and the corresponding off-market, transactions").

Even the Trustee "recognize[s] that this Court is bound to follow Resorts[.]"

App. Br. at 20 n.7. "No matter what this court's view is of the correctness of the holding

in Resorts International, this court is not free to disregard controlling case law of this

circuit." In re Hechinger Invest.Co. of Delaware, 274 B.R. 71, 86 (D. Del. 2002).

Accordingly, the Court should affirm the Bankruptcy Court's dismissal of the claims

asserted against BACC.

**B.      The Complaint Fails to Allege Fundamental Facts,
          and It Is Too Late to Allege Them Now**

The Trustee's claims against BACC are based upon 6 Del. Code §§ 1304 and

1305, as made applicable by 11 U.S.C. § 544. These sections require allegation of a

transfer by the debtor as an essential element of a fraudulent transfer cause of action. The

Complaint failed to allege that the transferor, Packaging, was a debtor. As the Court

below held, the Complaint failed to state a claim where "no debtor made a transfer."

Plassein, 366 B.R. at 326.

The Trustee does not deny that the Complaint failed to allege that Packaging was

a debtor. Instead, the Trustee contends that the Court below "misread[] the Complaint,"

App. Br. at 36, because it failed to credit the Trustee's assertion in a brief and an affidavit

that "Plassein was formerly known as Plassein Packaging Company," and failed to search

through more than one hundred pages of exhibits to the Complaint for documents that

12

purportedly suggest that "Debtor Plassein and Packaging are one and the same." App. Br. at 36.

But the Court below was required to rule on the sufficiency of the Complaint based upon that pleading alone. See, e.g., TWA Inc. Post-Confirmation Estate v. Marsh USA Inc. (In re TWA Post-Confirmation Estate), 305 B.R. 228, 232 (Bankr. D. Del. 2004) ("a 'party cannot amend its [insufficient] complaint by a response or affidavit filed in opposition to a motion to dismiss'") (citations omitted). A pleading deficiency cannot be corrected by statements in motion papers. "To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." Pension Benefit Guaranty Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993); see also 5A Wright & Miller, Federal Practice and Procedure, § 1357, at 299 (2d ed. 1990).[10] In addition, the Trustee asks this Court to review Schedule 1 of the Debtor's Voluntary Petition, App. Br. at 36 & n.12, but he failed to cite to this document or identify this point to the Court below and cannot do so for the first time on appeal. See, e.g., In re Surrick, 338 F.3d 224, 237 (3d Cir. 2003) ("We need not address the merits of [appellant's] third and final argument . . . as he failed to adequately raise it before the District Court."); Kuntz v. Saul, Ewing, Remick & Saul (In re Grand Union Co.), 200 B.R. 101, 106 (D. Del. 1996) ("Appellant

---

[10] The cases cited by the Trustee in the Court below (see A. 210) are inapposite, as they concern either the attachment of documents to a motion to dismiss, In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997), or the use of an affidavit by a plaintiff to respond to a new issue raised on the motion to dismiss. See Lexington Nat'l Ins. Corp. v. Ranger Ins. Co., 326 F.3d 416, 419 (3d Cir. 2003). In addition, in Lexington, the Court considered the documents but noted that this was being done "without apparent objection of the parties." 326 F.3d at 418. Here, BACC objects to the belated use of documents that should have been appended to the Complaint. See In re TWA, 305 B.R. at 233 ("TWA relies on the November 22, 2002 letter to provide the specifics necessary to survive a motion to dismiss. Although it was referred to in the complaint, the letter was not part of the complaint nor incorporated by reference; it is attached as an exhibit to TWA's response to the motions to dismiss. Such a response cannot be used to cure the defects of a complaint.").

never presented to the Bankruptcy Court five of the six issues he now raises on appeal. Thus, appellant has not properly preserved these issues for appeal."). Accordingly, the Court below properly dismissed the Trustee's claims based on "the allegations contained within the Complaint." Plassein, 366 B.R. at 326.

**C.      The Rex Transaction Should Not Be "Collapsed"**

Below, the Trustee sought to avoid the consequences of his failure to allege that a debtor made the transfer by arguing that the Rex Acquisition and any subsequent refinancing by Plassein should be "collapsed," or considered a single transfer. The Bankruptcy Court correctly held that because the Trustee failed to allege that BACC acted with an intent to defraud or in bad faith, "the allegations contained within the Complaint do not serve as a basis for collapsing the transactions." Plassein, 366 B.R. at 326.

Courts in the Third Circuit have repeatedly found that, absent proof of intent to defraud or bad faith, otherwise separate transactions will not be collapsed. See, e.g., U.S. v. Gleneagles Investment Co., 565 F. Supp. 556 (M.D. Pa. 1983); 571 F. Supp. 935 (M.D. Pa. 1983); 584 F. Supp. 671 (M.D. Pa. 1984); aff'd sub nom, U.S. v. Tabor Court Realty, 803 F.2d 1288 (3d Cir. 1986) (sustaining collapse of various transactions where a party "did not act in good faith"); Voest-Alpine Trading USA Corp. v. Vantage Steel Corp., 919 F.2d 206 (3d Cir. 1990) (upholding finding that several transactions at the same time were a single integrated transaction that functioned as a subterfuge and damaged unsecured creditors); National Forge, 344 B.R. at 347 ("In determining whether a series of transactions should be 'collapsed' into a single integrated one, courts focus not on the form of the transaction but on its substance-especially the knowledge and intent of

14

the parties involved in the transaction <u>and whether there was an overall scheme to</u>

<u>defraud creditors.</u>") (emphasis added); <u>Hechinger</u>, 274 B.R. at 91 ("Courts . . . focus not

on the structure of the transaction but the knowledge and intent of the parties involved in

the transaction.") (citation and internal quotation marks omitted); <u>In re OODC, LLC</u>, 321

B.R. 128, 138 (Bankr. D. Del. 2005) ("In deciding whether to 'collapse' a series of

transactions into one integrated transaction, the issue is . . . whether there was an overall

scheme to defraud the estate and its creditors by depleting all the assets through the use of

a leveraged buyout.").[11]

Here, there is no allegation of intent, bad faith or any scheme to defraud – the

Trustee at oral argument agreed that no such claim is made.  Transcript dated April 12,

2007, at 29-30.  In addition, the Complaint alleges that Plassein was formed to acquire

manufacturers of flexible packaging and specialty film for strategic business reasons.

Complaint, ¶ 27 (A0028-29).  The Third Circuit has held that, even if such a business

strategy fails, one cannot conclude in hindsight that no value was conferred on a

transferor, let alone that the failure is evidence of bad faith.  <u>See</u>, <u>e.g.</u>, <u>In re R.M.L., Inc.</u>,

92 F.3d 139, 152 (3d Cir. 1996) ("[T]he mere expectation that the fusion of two

companies would produce a strong synergy (an expectation that turned out to [be]

---

[11] The Trustee attempts to distinguish <u>Tabor Court Realty</u> and its progeny by suggesting that all
that is required to collapse a transaction is a party's "knowledge of a global deal."  App. Br. at 33.  But the
Trustee disregards the <u>Tabor Court Realty</u> Court's lengthy recitation – and affirmance – of the factual
findings of the court below, which concluded, <u>inter alia</u>, that the transferor in that case, IIT: "knew or
strongly suspected that the imposition of the loan obligations secured by the mortgages and guarantee
mortgages would probably render insolvent both the [borrower] and each individual member thereof.  In
addition, IIT was fully aware that no individual member of the [borrower] would receive fair consideration
within the meaning of the Act in exchange for the loan obligations to IIT.  Thus, we conclude that IIT does
not meet the standard of good faith under Section 353(a) of the Act." <u>Tabor Court Realty</u>, 803 F.2d 1295-
96  By contrast, the Trustee has never alleged that BACC acted with intent to defraud or in bad faith.  In
addition, the Trustee cites to <u>National Forge</u> (App. Br. at 35), but that decision directly undermines his
position, holding that transactions will be collapsed only upon a finding of an "overall scheme to defraud
creditors." <u>Id.</u>, 344 B.R. at 347.  The Complaint here contains no such allegation, nor could it.

inaccurate in hindsight) would suffice to confer 'value' so long as the expectation was 'legitimate and reasonable.'").

In addition, the Complaint alleges that thirty-three months passed between the Rex Acquisition and the Chapter 11 filing, and nearly five years before the cases were converted.  Fraudulent transfer law does not allow a debtor to retrade a transaction struck in good faith just because it turns out badly, several years later.  Peltz v. Hatten, 279 B.R. 710, 738 (D. Del. 2002), aff'd, 60 F. App'x 401 (3d Cir. 2003).

Finally, the Trustee points to no theory that would permit "collapsing" the earlier transactions with the Rex Acquisition.  The creditors of the January Target Companies could have had no claim to assets of Rex prior to the Rex Acquisition, and therefore have no claim against BACC, which sold its stock prior to the time that any such claim could have arisen.

## CONCLUSION

BACC respectfully requests that the Court affirm the Bankruptcy Court's

dismissal of the Complaint against BACC.

Dated:    Wilmington, Delaware
          March 10, 2008


                              By:  Robert J. Stearn
                                   Robert J. Stearn, Jr. (No. 2915)
                                   Lee E. Kaufman (No. 4877)
                                   RICHARDS, LAYTON &
                                        FINGER, P.A.
                                   One Rodney Square
                                   920 N. King Street
                                   Wilmington, Delaware, 19801
                                   (302) 651-7700
                                   (302) 651-7701


OF COUNSEL:

                              Karen E. Wagner
                              Elliot Moskowitz
                              DAVIS POLK & WARDWELL
                              450 Lexington Avenue
                              New York, New York  10017
                              (212) 450-4000

                              *Attorneys for B.A. Capital Company LP*

17

# EXHIBIT A

# ENCYCLOPEDIA OF

# Banking & Finance

## TENTH EDITION

# CHARLES J. WOELFEL

*A BANKLINE PUBLICATION*
**PROBUS PUBLISHING COMPANY**
Chicago, Illinois
Cambridge, England

# BANKLINE™

Copyright © 1924, 1927, 1931, 1937, 1949, 1962, 1973, 1983, 1991, 1994, Glenn G. Munn, F. L. Garcia and Charles J. Woelfel.

ALL RIGHTS RESERVED. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher and the author.

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the author and the publisher are not engaged in rendering legal, accounting, or other professional service.

Material from *The Statesman's Yearbook, 1992–93*, by Hunter (editor), © 1993. Reprinted with permission of St. Martin's Press, Incorporated.

Material of various FASB documents, copyrighted by Financial Accounting Standards Board, 401 Merritt 7, P.O. Box 5116, Norwalk CT 06856-5115 USA, are reprinted with permission. Copies of the complete documents are available from the FASB.

Authorization to photocopy items for internal or personal use, or the internal or personal use of specific clients, is granted by PROBUS PUBLISHING COMPANY, provided that the U.S. $7.00 per page fee is paid directly to Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA 01923, USA; Phone: 1-508-750-8400. For those organizations that have been granted a photo-copy license by CCC, a separate system of payment has been arranged. The fee code for users of the Transactional Reporting Service is 1-55738-398-7/94/$00.00 + $7.00.

ISBN 1-55738-396-0

Printed in the United States of America

BB

1 2 3 4 5 6 7 8 9 0

**Probus books are available at quantity discounts when purchased for business, educational, or sales promotional use. For more information, please call the Director, Corporate/Institutional Sales at (800) 998-4644, or write:**

**Director, Corporate/Institutional Sales**
**Probus Publishing Company**
**1925 N. Clybourn Avenue**
**Chicago, IL 60614**
**PHONE (800) 998-4644    FAX (312) 868-6250**

**SET OF BILLS** *See* FIRST OF EXCHANGE.

**SET OF EXCHANGE** *See* BILLS IN A SET, FIRST OF EXCHANGE.

**SETTLED PRODUCTION** The steady or even rate of flow of an oil well, indicative of large reserve supplies.

**SETTLEMENT** This term has three applications.
1. In general, the striking of a balance between two or more parties having mutual dealings with one another and the payment of the debit balance by the debtor (debtors) to the creditor (creditors).
2. The striking of balances among members of a CLEARINGHOUSE association.
3. The process by which purchases and sales of securities among brokers are determined and the balances paid off at the stock exchange clearinghouse; the process by which interbroker, nonclearinghouse securities transactions or produce exchange trans, actions are paid off.

*See* SETTLEMENT DAYS, TRADING METHODS.

**SETTLEMENT CLERK** In banking practice, the name given to the clerk who receives packages of checks delivered from each presenting bank and determines the total amount of checks so presented at the CLEARINGHOUSE each day. The settlement clerk is the representative of the bank at the clearinghouse and reports to the clearinghouse manager the total of checks presented by and against the bank, leading to the determination of the debit or credit balance.

**SETTLEMENT DAYS** On the London Stock Exchange, settlements of security transactions are regularly made twice a month, once about the middle of the month and once at the end of the month. Transactions "for cash" are settled by immediate payment, regardless of the regular settlement day.

Each settlement requires three days: the first is known as contango day (also continuation, carrying over, or making-up day), the second is name or ticket day, and the third is pay day, i.e., settlement day proper. All transactions, except for cash, occurring between settlement days must be paid for and delivered in accordance with the brokers' contracts at the next settlement period.

The advantage of periodic settlements, as compared with the daily settlements made in America, is the saving of time to brokers in making deliveries and payments.

**SETTLEMENT RISK** The possibility that operational difficulties will interrupt delivery of funds even where the counterparty is able to perform.
*See* RISK.

**SETTLOR** A trustor, donor, or creator; one who creates a voluntary TRUST—i.e., one who "settles" an income, or other benefit, on a beneficiary.
*See* LIVING TRUST.

**SEVERANCE TAX** A tax levied on the mining or extraction of a natural resource such as gas, oil, or coal. It is assessed on the value of the product extracted or on the volume extracted.
*See* TAXES.

**SEWER BONDS** Municipal or semimunicipal bonds, the proceeds of which are used in the construction of sewers.
*See* MUNICIPAL BONDS.

**SEXUAL HARASSMENT** Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature (Equal Employment Opportunity Commission). Sexual harassment is sometimes recognized as a "bargain" (*quid pro quo*) or as environmental sexual harassment. Such behaviors constitute sexual harassment when submission to such conduct is made either (1) implicitly or explicitly a term or condition of employment or (2) submission or rejection of such conduct by an individual is used as the basis for employment decisions affecting such an individual (quid pro quo). If such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creates an intimidating, hostile, or offensive work environment, such behaviors constitute sexual harassment.

Sexual harassment in the United States is generally considered a violation of law or regulation:
- *Title VII of the Civil Rights Act of 1964* Specifically prohibits employment discrimination based on religion, color, national origin, race and sex. The Equal Employment Opportunity Commission, a federal agency, enforces sexual harassment guidelines.
- *Title IX of the Education Amendments of 1972* Prohibits sexual harassment of students in any part of any higher education institution receiving federal funds.
- *Executive Order 11246* Prohibits discrimination in employment by federal contractors or sub-contractors who employ 50 or more persons with $50,000 or more in contractual obligations.
- *In Meritor Savings Bank, FSB V. Vinson (June, 1986)* U.S Supreme Court rules unanimously that sexual harassment, which causes a hostile or offensive work environment, is a violation of Title VII, even if it does not result in job or promotion loss.

Sexual harassment does not fall within the range of personal, private relationships. It occurs when a person with power abuses that power to intimidate, coerce, or humiliate someone because of gender or sexual preference. It is a breach of the trust that normally exists among members of a company. Sexual harassment creates confusion because of the boundary between roles and relationship is blurred.

Factors that make sexual harassment likely to occur include ambiguity in relationships (supervisor/employee), low respect for individuals, poor working relationships or environment, and myths about male and female roles, feelings, desires, needs and other factors.

Liability insurance is available to cover limited aspects of sexual harassment including bodily injury, property damages, civil rights, and constitutional claims. Claims not covered include claims resulting from either sexual abuse or from a licentious, immoral, or sexual act.

Banks and other companies should develop policy and procedure statements related to sexual harassment and undue favoritism based on sex. Sexual harassment and assignment or suggestion of rewards and punishments on the basis of sex or sexuality have no place in the work environment and should be prohibited. Such relationships are improper when they influence or could reasonably be expected to influence decisions or actions in employment-related matters. Careful inquiry with appropriate safeguards insuring individual rights and confidentiality should follow reasonable allegations of conduct prohibited under a policy statement. Appropriate penalties should be determined under normal procedures insuring due process. Those who invoke the policy should be protected from retaliatory acts. Information concerning complaints arising under it should be treated responsibly. Malicious or frivolous claims of harassment or favoritism should be prohibited and, if substantiated, result in disciplinary action. Responsibility for implementation of the policy and procedures for review should be clearly identified in policy and procedure statements.
*See* CIVIL RIGHTS, HARASSMENT.

BIBLIOGRAPHY:
BNA POLICY AND PRACTICE SERIES. *Fair Employment Practices.* The Bureau of National Affairs, Inc., Washington, DC, 1992.
KOEN, CLIFFORD M. "Labor Relations—Sexual Harassment Claims Stem From a Hostile Work Environment," *Personnel Journal,* August, 1990.
MCCANN, N. D., and MCGINN, T. A. *Harassed: 100 Women Define Inappropriate Behavior in the Workplace.* Business One Irwin, Homewood, IL, 1992.
WAGNER, ELLEN. *Sexual Harassment in the Workplace.* AMACOM, 1992.

**SFAS No. 105 DISCLOSURE OF INFORMATION ABOUT FINANCIAL INSTRUMENTS WITH OFF-BALANCE SHEET RISK AND FINANCIAL INSTRUMENTS WITH CONCENTRATION OF CREDIT RISK.** *See* FINANCIAL INSTRUMENTS.

# EXHIBIT B

1

UNITED STATES BANKRUPTCY COURT

DELAWARE DISTRICT OF DELAWARE

Case No. 03-11489

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


PLASSEIN INTERNATIONAL CORP., ET. AL.,


        Debtor.


- - - - - - - - - - - - - - - - - - -x



            United States Bankruptcy Court

            844 King Street

            Wilmington, Delaware


            April 12, 2007

            3:00 PM


B E F O R E:

HON. KEVIN GROSS

U.S. BANKRUPTCY JUDGE

2

1

2    HEARING re:  Motion to Dismiss Adversary Proceeding against

3    William A. Brandt, Trustee of the Estates of Plassein

4    International Corp.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  Hana Copperman

25

3

```
 1
 2   A P P E A R A N C E S :
 3   HANIFY AND KING, P.C.
 4        Attorneys for William A. Brandt, Chapter 7 Trustee
 5        Professional Corporation
 6        One Beacon Street
 7        Boston, MA 02108
 8   BY:  CHARLES R. BENNETT, JR., ESQ. (TELEPHONICALLY)
 9
10   RICHARDS, LAYTON AND FINGER, P.A.
11        Attorneys for BA Capital Company
12        One Rodney Square
13        920 North King Street
14        Wilmington, DE 19801
15
16   BY:  ROBERT J. STEARN, JR., ESQ.
17
18   DAVIS, POLK AND WARDWELL
19        Attorneys for BA Capital Company
20        450 Lexington Avenue
21        New York, NY 10017
22
23   BY:  KAREN E. WAGNER, ESQ.
24
25
```

4

```
1
2    CROSS AND SIMON, LLC
3          Attorneys for William A. Brandt, Chapter 7 Trustee
4          913 North Market Street
5          P.O. Box 1380
6          Wilmington, DE 19899-1380
7
8    BY:   AMY EVANS, ESQ.
9
10   ASHBY AND GEDDES
11         Attorneys for Certain Rex shareholders and Sam Chebeir
12         500 Delaware Avenue
13         P.O. Box 1150
14         Wilmington, DE 19899
15   BY:   RICARDO PALACIO, ESQ.
16
17   POTTER, ANDERSON and CORROON, LLP
18         Attorneys for Key Packaging Defendants
19         Hercules Plaza
20         1313 North Market Street
21         P.O. Box 551
22         Wilmington, DE 19899
23
24   BY:   DAVID J. BALDWIN, ESQ.
25
```

```
                                                          5
1

2    SARNA AND ASSOCIATES, P.C.

3         Attorneys for Defendant, Marshall Plastic Film

4         888 Seventh Avenue

5         New York, NY 10106

6

7    BY:    JAMES A. SARNA, ESQ.

8

9    WILMER, CUTLER, PICKERING, HALE AND DORR, LLP

10        Attorneys for Key Packaging defendants

11        60 State Street

12        Boston, MA 02109

13

14   BY:    RICHARD JOHNSTON, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```

6

P R O C E E D I N G S

1

2          THE COURT:  Good afternoon, counsel.  You may be

3   seated.  Welcome.  I think, besides counsel in the courtroom,

4   Mr. Bennett is on the telephone.  Is that correct?

5          MR. BENNETT:  That's correct, Your Honor.  Thank you

6   for accommodating me.

7          THE COURT:  Certainly.  And I begin with a little bit

8   of an explanation and an apology, because clearly this case

9   should have been decided long ago.  And you were all here

10  months before on oral argument in the matter.  And it was a

11  long time ago.  And Judge Shapiro -- who's a visiting Judge --

12  and just so you understand I kept asking where he was in his

13  decision.  And he kept deferring me that he was working on

14  the -- with the issue shortly.  And I received that assurance

15  several times.  And finally I decided that it just -- I just

16  had to set it down for oral argument.  And I advised him and

17  explained to him that if he were to issue an opinion, then

18  obviously oral argument could be cancelled.  He told me to

19  continue to work on the case, and no opinion has been

20  forthcoming, so here we are.  And I -- again, I do apologize.

21  I was a roaming Judge in those days, and I think I was

22  extremely deferential to even a visiting Judge who had really

23  given a lot of his time and effort for our benefit.  And we

24  were appreciative of that.  And also he was, you know, an

25  experienced judge, but I wish he could have done things a

7

1    little bit sooner, and here we are today.  And I assure you

2    that you'll get a decision quickly in this case.  So with that,

3    why don't we begin?  Mr. Stearn, good afternoon.

4            MR. STEARN:  Good afternoon, Your Honor.  Good to see

5    you again.

6            THE COURT:  Good to see you.  Thank you.

7            MR. STEARN:  May it please the Court, for the record,

8    Bob Stearn from Richards, Layton and Finger, here on behalf of

9    defendant BA Capital Company, Your Honor.  As you know, there's

10   a single matter on the docket today.  It's the motion to

11   dismiss -- motions to dismiss, --

12           THE COURT:  Yes.

13           MR. STEARN:  -- by various defendants, in the

14   adversary number 05-50692.  As Your Honor knows there's

15   multiple defendants who read Otto Reeves.  We have, as you see,

16   many similar arguments in our briefs, so what we've decided to

17   do, in an effort to avoid repetition, perhaps be more

18   efficient, is we're going to divide the arguments up amongst

19   counsel, Your Honor, and although there may be some inevitable

20   duplication, we're going to do our best to avoid that.  In

21   essence we're going below -- for example, BA Capital will not

22   make every argument in its brief today.  We'll be relying, to

23   some extent, on the arguments of our counsel or our

24   codefendants, and also on our briefs --

25           THE COURT:  Yes.

8

1          MR. STEARN: -- for the arguments that we don't make

2     today.  And that's true of every defendant.

3          THE COURT:  The briefs were very good.  And we read

4     them very carefully in the cases, so I think we are extremely

5     well prepared for the argument.

6          MR. STEARN:  Thank you, Your Honor.  I'd like to

7     start by introducing my co-counsel, Ms. Karen Wagner, of Davis

8     Polk.

9          THE COURT:  Welcome, Ms. Wagner.  It's good to have

10    you.

11         MS. WAGNER:  Thanks.

12         MR. STEARN:  Ms. Wagner will present an argument

13    today on behalf of BA Capital.

14         THE COURT:  Yes.

15         MR. STEARN:  And I think at this point I should turn

16    the podium over to some of my friends so they can make their

17    introductions as well.

18         THE COURT:  Thank you.

19         MR. STEARN:  Thank you.

20         THE COURT:  Thank you, Mr. Stearn.  Good to see you.

21    Mr. Baldwin.  Good afternoon.

22         MR. BALDWIN:  Good afternoon, Your Honor.  David

23    Baldwin of Potter, Anderson and Corroon.  I represent what

24    we've described as the Key Packaging defendants.  With me is

25    co-counsel who's been admitted pro hac vice, Mr. Richard

9

1    Johnston of --

2              THE COURT:  Welcome to you.

3              MR. JOHNSTON:  Thank you, Your Honor.

4              MR. BALDWIN:  Thank you, Your Honor.

5              THE COURT:  Thank you, Mr. Baldwin.

6              MR. SARNA:  Good morning, Your Honor.  Good

7    afternoon.

8              THE COURT:  Good afternoon.  Yes.

9              MR. SARNA:  Jacob Sarna of Sarna and Associates, P.C.

10   representing the Marshall Plastic Film defendant.

11             THE COURT:  Thank you.  Welcome to you too, of

12   course.  Mr. Palacio?

13             MR. PALACIO:  Good afternoon, Your Honor.

14             THE COURT:  Are you the newest partner in the

15   courtroom, I guess?

16             MR. PALACIO:  Thank you, Your Honor.  I appreciate

17   that.

18             THE COURT:  Congratulations.

19             MR. PALACIO:  Thank you very much.  I do appreciate

20   that, indeed.  For the record, part of the law firm of Ashby

21   and Geddes of behalf of what I'll call certain Rex shareholders

22   as well as Sam Chebeir.  Thank you, Your Honor.

23             THE COURT:  Thank you.  Ms. Wagner, are you going to

24   begin?

25             MS. WAGNER:  I will.  Thank you very much.

10

1          THE COURT:  Thank you.

2          MS. WAGNER:  Your Honor, as you have heard I will be

3    addressing the question of Section 546(e) of the bankruptcy

4    code.

5          THE COURT:  Yes.

6          MS. WAGNER:  Your Honor, I know you have read all the

7    briefs carefully.  I will quickly try to summarize what's in

8    the complaint, and then summarize my argument.  And if at some

9    point you think I'm telling you more than you need to know,

10   just tell me to move on.

11         THE COURT:  It's really my style to kind of let

12   counsel argue and ask questions if I have any particular

13   questions and not to argue with counsel.  They are here with a

14   plan.  I just decide.

15         MS. WAGNER:  All right.  Well that's certainly a fine

16   role for you, Your Honor.  Your Honor, as you know from reading

17   the complaint, in January of 2000 the company called Plassein

18   Packaging Corporation acquired some other companies, also in

19   the packaging industry, and in August, 2000 acquired yet

20   another one.  The complaint, by the trustee in this case,

21   alleges that although the company operated for about three

22   years after that time, that those transactions were fraudulent

23   conveyances, constructive fraudulent conveyances.  There's no

24   claim here of intentional fraud.

25         THE COURT:  All right.

VERITEXT

11

1       MS. WAGNER:  And it seeks to avoid the transactions

2   pursuant to which the stock of these corporations was acquired

3   by Plassein.  There's no dispute here, Your Honor, that each of

4   these transactions occurred by virtue of a wire transfer

5   pursuant to which funds were transferred from the acquiring

6   corporation through a financial institution, Fleet Bank, to the

7   selling shareholders.  And in some cases the funds were

8   transferred to another financial institution for the selling

9   shareholder and then, for example, in the Bank of America

10  Capital Corp. company case the funds came from Fleet Bank, went

11  to Bank of America for the account of Bank of America Capital

12  Corporation.  There were two financial institutions involved.

13      THE COURT:  But I assume it would be your position

14  that it wouldn't matter if there were just Fleet --

15      MS. WAGNER:  Certainly not.

16      THE COURT: -- for purposes of your position.

17      MS. WAGNER:  If there's any financial institution

18  involved, we would argue, certainly, that 546(e) applies to

19  block any claim for fraudulent conveyance.  Now, indeed, Your

20  Honor, as you know from reading our briefs, it is our position

21  that this Court is bound by the decision of Resorts

22  International in the Third Circuit in which the Third Circuit

23  took an extremely literal view of the application of Section

24  546(e).  In that case there was a holder of stock of a public

25  company who inadvertently tendered stock for transfer, and was

12

1    paid, and later on the issuer, Resorts, filed for bankruptcy

2    and sought to recover the payment as an avoidable transfer.

3    The Court of Appeals began its decision by saying we mean every

4    statutory interpretation by looking to the claim language of

5    the statute.  When the statute is clear, when the language is

6    clear, no further inquiry is necessary unless applying the

7    blind language leads to an absurd result.  The Court went on to

8    note that the definition of settlement payment, which is the

9    kind of transaction that is protected under Section 546(e), is

10   extremely broad.  And said, in the securities industry a

11   settlement payment is generally the transfer of cash or

12   securities made to complete a securities transaction.  That is,

13   of course, what happened here, Your Honor.

14           The Court found that even though there was no

15   institution involved in that case from the clearing system, no

16   stockbroker, that was not relevant to its analysis.  The Court

17   said that under a literal reading of Section 546 this was a

18   settlement payment made by a financial institution, and held

19   that since there was no absurd result from that literal

20   application of the statute the Court was bound to apply the

21   statute and held that the transaction was protected from

22   avoidance.  And we certainly argue, Your Honor, that here as

23   Yourtz decrees that the transfers here must be protected from

24   avoidance.  Now the trustee argued a number of things a while

25   ago.  Some of which, of course, we responded to, most of them

13

1    in our brief.  One of them is that Section 546(e) should only

2    apply to the securities industry clearance and settlement

3    system.  Your Honor, that argument was expressly rejected by

4    the third circuit in the Resorts case, which said that if a

5    financial institution is involved that is sufficient.  It is

6    not necessary that a stockbroker be involved.

7            The next argument, which is really a restatement of

8    that one, is that you must read into the definition of

9    settlement payment.  Some requirement that the payment actually

10   be made for the purchase of publicly traded securities.  And

11   again, Your Honor, that is not something that is written in the

12   statute, and the Third Circuit's Resorts' decision would

13   suggest you are not intended to read extraneous language into

14   that decision.  And indeed, Resorts rejected similar arguments

15   that had been made.  And holdings, in fact, by other courts, as

16   on versus Yucaipa Capital and the

17            THE COURT:  Wieboldt.

18            MS. WAGNER:  Wieboldt case.  And they rejected those

19   arguments, so again, I think those arguments are out of this

20   case.

21            Thereafter, after the Third Circuit's decision, and

22   before our argument last time, the Hechinger company case,

23   which is cited in our briefs also found that the decision in

24   Resorts was extremely broad, and if a financial institution was

25   involved then the transfer of funds or securities was immune

14

1   from avoidance.  At the time of the briefing last time, there

2   was only one case that had addressed the question of whether

3   securities of a privately held entity would also be entitled to

4   this protection, and that was the Loranger case, which held

5   that 546(e) was applicable.  And that the trustee's brief

6   forced an issue with that case.  But since the time of the

7   disbriefing in that case there have been a number of other

8   decisions which have held the same thing.  One of them is the

9   IT Group case, which was decided by Judge Walrath.  In this

10  district, who held that Section 546(e) applies even though, and

11  I quote, "the case does not involve a leveraged buyout,

12  publicly traded stock, or a clearing agency".  She too felt

13  bound by the literal application of the Resorts' decision to

14  apply 546(e) to a transfer of funds for stock of privately held

15  enterprise.  And that case was very similar to the one here in

16  that one entity was buying stock of another company.  Then

17  there was the National Forge decision which was in the Western

18  District of Pennsylvania, which was a -- again, a privately

19  held company's securities case.  It was the redemption of

20  certain securities in connection with the creation of an ESOP.

21  And there the Court went at great length into all the decisions

22  having to do with this issue, with the application of 546(e)

23  generally to albios or other transactions, private, public,

24  everything.  And that Court, too, concluded after a very

25  lengthy analysis that the Resorts decision was literal and had

VERITEXT

15

1  to be applied, and it should be applied, and would be applied

2  in that case.  Other districts, too, have reached the same

3  conclusion.  The Quality Stores case, which we've also provided

4  to the Court, which is the same thing conclusion -- it is not

5  bound by Resorts -- but that Court is not bound by Resorts but

6  certainly felt compelled to follow the reasoning and the logic

7  in the Resorts' decision.

8          Finally, the trustee argues if you find 546(e)

9  ambiguous, you should look to legislative history, and has a

10  long discussion of legislative history and capital markets

11  issues.  Your Honor, I think that the decision on Resorts would

12  tell you that 546(e) is not ambiguous.  There is no reason to

13  go back to the legislative history or to decisions of other

14  Courts or anywhere.  It's very clear on its face what it means.

15  Many Courts have now held it.  It's very clear what it means.

16  And therefore, I think as the Hechinger Court noted, the courts

17  of this district are not free to disregard the controlling law

18  of the circuit.  The controlling law of the circuit is the

19  Resorts case and, Your Honor, we respectfully suggest that that

20  applies here, and therefore dismissal of the complaint is

21  warranted.

22          THE COURT:  Thank you, Ms. Wagner.

23          MS. WAGNER:  Thank you, Your Honor.

24          MR. JOHNSTON:  Your Honor, good afternoon.

25          THE COURT:  Good afternoon.

16

1          MR. JOHNSTON:  I, along with Mr. Bob, will represent

2    the scope of Key Packaging shareholders headed by Dr. Robert

3    Zeitlin and a variety of other, mostly family members.  The key

4    shareholders, as I'll refer to them, Your Honor, fully endorse

5    what Ms. Wagner has argued with respect to 546(e).  The key

6    shareholders support for this position is articulated, I think

7    at length, in the two briefs we've filed, as well as in two

8    letters which I've sent to follow up on letters that Ms. Wagner

9    sent to Judge Shapiro.  Now, I'm not sure whether my letters

10   made it into the record, but they both went to Judge Shapiro,

11   and they've both been included in the binder that, I think, you

12   received.

13          THE COURT:  Yes.  Yes.

14          MR. JOHNSTON:  And I don't think there is any

15   question on the part of counsel that my letters went to the

16   book.  I don't intend to reiterate Ms. Wagner's arguments nor

17   the arguments in the briefs about 546(e) other than to submit

18   that Resorts is the binding precedent in this Circuit.  This

19   Court is, we submit, bound to follow the Resorts precedent.

20   And that the Resorts precedent does provide for full -- what's

21   been referred to in cases as safe harbor community -- for the

22   transactions involved here, because the transactions involved

23   financial institutions.  I intend to focus my remarks, not on

24   546(e) but on a separate statutory argument which is

25   dispositive with respect to all of the defendants.  And that

17

1   defense arises out of Section 1304(a) of the Delaware

2   Fraudulent Conveyance Act.  I hasten to add, Your Honor, that

3   the Section 1304(a) argument is independent of, and in

4   addition, to the federal 546(e) ground.  Either of these

5   grounds, in and of themselves, are sufficient to require

6   dismissal of the complaint.  We submit that together they are

7   insurmountable to the trustee.  Although the 1304(a) argument

8   applies to all of the defendants, I would be speaking

9   specifically about the details of the Key Packaging

10  transaction, by way of illustration, and I suspect that my

11  brothers will chime in to the extent that their transactions

12  may be somewhat different, but I think that most proper

13  transactions share similar patterns, and the argument is pretty

14  much applicable to all of them.

15          First Your Honor, a few undisputed facts with respect

16  to Key Packaging transaction.  As set forth in the first few

17  substantive paragraphs of the complaint, and I would refer you

18  specifically to paragraphs 37 and 32.  In May 1999 and early

19  2000 Plassein Packaging, which was backed by venture capital

20  firms and banks, was organized for the purpose of acquiring a

21  series of small existing packaging companies.  Undoubtedly, as

22  the Court can expect, Plassein Packaging expected, through

23  synergies and economies of scale, to do better as a combined

24  company than the six companies had done individually.  The Key

25  Packaging shareholders were basically older individuals, in

**VERITEXT**

18

1    their sixties, and in some cases even older than that, from the

2    same basic family.  A company -- Key Packaging -- had been in

3    the family for a long time.  And they were attracted to the

4    idea of being able to sell out to another better financed and

5    well-heeled company and use the money for retirement purposes

6    and avoid all of the hassles of having to operate, from long

7    distance, a company.

8             THE COURT:  And then these were totally arms length

9    transactions?

10            MR. JOHNSTON:  Oh, yes.  Yeah.  There is no

11   allegation --

12            THE COURT:  No.

13            MR. JOHNSTON: -- nor are there any facts to suggest

14   that there was any overlapping between the Plassein Packaging

15   side and the Key Packaging side.

16            THE COURT:  Right

17            MR. JOHNSTON:  And the negotiations, in fact, went on

18   for several months.  I believe there were investment bankers on

19   both sides of the transaction.  In January of 2000 Plassein

20   Packaging paid approximately 25,000,000 dollars to Key

21   Packaging.  Of that amount, half went to pay off existing debt.

22   So at the closing the Key shareholders, the people I represent,

23   received a net of approximately 12,000,000 dollars for all of

24   their stock in Key Packaging.

25            At the same time, as Ms. Wagner said, Plassein

19

1   Packaging also bought a couple of other companies. And, to

2   follow up on your earlier question, there was no connection

3   between Key Packaging and any of those other companies. They

4   came, basically, from different parts of the country. They

5   were in different, although somewhat similar manufacturing

6   lines. All of them, way one or another, in packaging or foam

7   products.

8          As soon as the transaction was signed in January of

9   2000, most of the Key shareholders, and certainly all of the

10  family member shareholders, immediately left having anything to

11  do with Key Packaging. Plassein Packaging, which was the

12  acquiring company, proceeded to operate Key Packaging as well

13  as some of these other companies.

14         In August of 2000 Plassein Packaging, as Ms. Wagner

15  alluded to, purchased another company. In all, Plassein

16  Packaging spent a total of about 100,000,000 dollars to

17  acquire, I believe, six different plastic manufacturing

18  companies by the end of 2000.

19         It wasn't until November of 2001 that the complaint

20  alleges that Plassein, or the constituent companies, first

21  defaulted on any obligations. And it wasn't until May of 2003,

22  more than three years after the Key Packaging acquisition, that

23  the Chapter 11 was filed.

24         To say the least, the Key Packaging shareholders are

25  now shocked, not to mention dismayed, to find themselves the

20

1    defendants in a suit alleging that the money they received

2    after a long, hard, good faith negotiation for the sale of a

3    solid manufacturing company, is supposedly a fraudulent

4    conveyance.

5            Well, Your Honor, as a matter of law, the trustee has

6    not alleged sufficient facts to make the transaction a

7    fraudulent conveyance.  Quite simply, the claim doesn't fit the

8    statutory fraudulent conveyance requirements under Section

9    1304(a).  I would point out for the Court, although I'm sure

10   the Court is quite familiar with the statute, but it permits a

11   creditor to avoid a transfer, by a debtor, if the debtor made

12   the transfer without receiving reasonably equivalent value, and

13   if, essentially, the transaction rendered the transfer or

14   insolvent.  The key words for the purposes of the 1304(a)

15   analysis are transfer by a debtor.  Here, the complaint

16   alleges, and it's in paragraphs 46 and 69, that Key Packaging,

17   as the so-called January target company, was rendered

18   insolvent.  The trustee's brief, at page 6, makes the same

19   point, that each of the January target companies were

20   supposedly rendered insolvent.  However, the trustee alleges

21   that the various January target companies are, for the purpose

22   of this complaint, debtors.  However the trustee does not

23   satisfy the pleading requirements statute, because he does

24   allege that the debtors, i.e. Key Packaging, made the requisite

25   transfer.

21

1          The complaint does not seek to blame a transfer by

2   the debtor, namely Key Packaging.  All of the documents, all of

3   the relevant documents attached to the complaint by the

4   trustee, show that the transfer of funds to the Key Packaging

5   shareholders were made by Plassein.

6          If you look in particular at the funds flow

7   memorandum, which was attached as Exhibit A to the complaint,

8   the memorandum shows that the outside equity investments and

9   the loan proceeds were delivered to Plassein Packaging.  And

10  that Plassein Packaging made the payments to the various

11  shareholders including the Key Packaging shareholders.  And I

12  can point you, as our brief does, to several specific pages

13  within the funds flow memorandum which corroborate that it was

14  Plassein that made the payments.  For example, in Exhibit A,

15  the funds memorandum, page 08853, says that the company, which

16  is the shorthand for Plassein Packaging --

17          THE COURT:  Right.

18          MR. JOHNSTON:  -- shall cause 12,000,000 dollars and

19  change to be paid to Key Packaging shareholders.  Pages number

20  08872 and 73 show the money coming from Plassein Packaging's

21  account to the Key shareholders in the amount of about

22  12,000,000 dollars.  And Exhibit A1, which seems to be in some

23  ways a repeat of some of the documents in Exhibit A, at pages

24  08898 and 8899 confer that Plassein received funds and then

25  paid out, through its bank, 12,000,000 dollars in cash to the

22

1    Key Packaging shareholders.

2            The trustee has conceded at page 27 of his brief that

3    none of the companies in the January transactions, that

4    supposedly were rendered insolvent by the transaction, made

5    payments to the Key shareholders or any of the other package

6    shareholders, for that matter.  Rather the trustee is stuck

7    with the fact that Plassein Packaging made the payments.

8    There's no allegation in the complaint that Plassein Packaging,

9    in making their payment, rendered itself insolvent.  And since

10   it's clear that fraudulent conveyance statute refers to

11   transfers by a debtor which rendered that debtor insolvent the

12   trustee's complaint is defective as a matter of law.  Now the

13   trustee's response is to say to you that the Court should

14   ignore the language of the statute and allow him to challenge

15   transfers by entities other than a debtor, i.e. be able to

16   challenge a payment made by Plassein by supposedly collapsing

17   various transactions into one.  However none of the cases that

18   he cites in this proposition are apposite.

19           THE COURT:  Do you inquire actual fraud?

20           MR. JOHNSTON:  Well, yes.  I mean the first case that

21   he relies on, which is Hechinger, didn't even involve the

22   fraudulent conveyance statute.  It had to do with fiduciary

23   duty.  He does cite a couple of other cases that discuss

24   collapsing in a LBO situation.  But in each one of those cases,

25   whether it be Tabor, whether it be Wieboldt stores, whether it

23

1   be Rosner, all of those cases require that the plaintiff allege

2   actual fraud, actual intent, actual knowledge that the

3   resulting transaction would lead to an insolvent debt.

4           And I might also add to that list of cases one that

5   wasn't cited by the trustee, because it's a more recent case

6   that was referred to in Ms. Wagner's letters and also in her

7   argument today, the National Forge case.  That case did talk

8   about Plassein as well, but it said that the Courts have to

9   focus on the knowledge and the intent of the parties and

10  whether there was, quote, an overall scheme to defraud the

11  creditors.

12          But by contrast, the trustee here has alleged nothing

13  of the sort.  The trustee alleges that Plassein Packaging was

14  formed for the purpose of acquiring multiple manufacturing

15  companies, presumably, as I said before, to take advantage of

16  synergies and economies of scale.  There is nothing but benign

17  business purpose in that allegation.  There's no allegation or

18  complaint that the transaction should be collapsed.  There's no

19  allegation that the Key shareholders intended to do anything

20  other than sell out to a better financed, larger company.

21  There's no allegation that Key shareholders knew or had any

22  suspicion that the transactions would somehow result in Key

23  Packaging being insolvent.  There's no allegation of fraud.

24  And even if one might try to contend, as perhaps Mr. Bennett

25  will do in a few minutes, there is an allegation of fraud in

VERITEXT

24

1    the complaint by intuition or inference or otherwise, it would

2    fail to meet the pleading by fraud particularity requirements

3    of Rule 9(b).

4        THE COURT:  And there is no allegation that the

5    shareholders were acting in consort with one another?

6        MR. JOHNSTON:  There are allegations.

7        THE COURT:  Among the various companies.

8        MR. JOHNSTON:  Correct.  And as I said earlier, there

9    is absolutely no connection among any of those companies.  They

10   are all totally separate, independent companies and independent

11   shareholders.  What the trustee seems to have said, and he says

12   so on page 28 of his brief, is well, if the defendant's state

13   that they know actual claims to render the collapsing theory

14   inappropriate, they're free to raise those facts later on in

15   the proceedings.  But what the trustee ignores, Your Honor, is

16   that it is his responsibility to allege facts that weren't

17   collapsing, such as fraudulent intent or actions on the part of

18   the Key shareholders that reflect fraudulent intentions.

19   That's something he's totally failed to do.  Rather than it

20   being the responsibility of the defendants to try to respond

21   with facts to allegations that aren't sufficient.  The trustee

22   simply has things backwards.  Until he alleges sufficient

23   things to bring the case within the rubric of collapsing,

24   there's no responsibility on the part of the defendants to

25   raise facts to rebut collapsing.

25

1          Moreover, Your Honor, the trustee isn't arguing just

2     for the collapse of transactions.  He's essentially arguing for

3     the collapse of companies.  He is suggesting, without having

4     argued, or piercing of the corporate veil, that Plassein and

5     Key Packaging and the other target companies as well should

6     somehow be seen as one company, even though for months those

7     companies were negotiating on opposite sides of quite separate

8     tables.  Because as I understand it there were separate

9     negotiations between Key Packaging, Plassein and the other

10    target companies.  And each one of them took their own course

11    and their own length of time.  Without any basis for piercing

12    of the corporate veil their simply is no basis for positive

13    action against the defendants, inasmuch as the trustee has not

14    satisfied the requirements of collapsing.  Or indeed for a

15    fraudulent conveyance plan.  The case should be discussed,

16    therefore, for failure to plead a fraudulent transfer by 8(f).

17         Your Honor, the Key shareholders also have a second

18    state law argument based on the requirement that the debtor be

19    insolvent at the time that the transfer took place.  And we

20    have argued that the trustee's own attachments to the plate

21    demonstrate that Key Packaging was not insolvent as of the time

22    of the transfer, either just before or just after.  We made the

23    point in the briefs.  I'm not going to belabor it here.  Unless

24    the Court has any questions I'm prepared to rely on our briefs

25    for that point.  So, in summary, Your Honor, on behalf of the

26

1   Key Packaging defendants, we submit that Section 546(e) defense

2   defeats the trustee's claims with respect to all of the

3   defendants, and certainly with respect to the Key Packaging

4   defendants.

5           In addition, the fact that it was Plassein Packaging

6   that made the payments to the Key Packaging shareholders,

7   rather than Key Packaging, defeats the fraudulent conveyance

8   plan as a second statutory basis.

9           Therefore all the claims against Dr. Zeitlin and his

10  other Key Packaging defendants should be dismissed.  Thank you

11  very much.

12          THE COURT:  Thank you very much, Mr. Johnston.  Mr.

13  Sarna?

14          MR. SARNA:  Thank you, Your Honor.  It's not often

15  that an attorney gets to say me too.  And it's not often that

16  an attorney actually takes advantage of the opportunity to be

17  brief.  But I will say both me too and be brief.  The only

18  thing that I would add here is that when we were here last

19  time, and in the trustee's response to the various motions to

20  dismiss, the trustee has himself conceded that this Court is

21  bound to follow Resorts.  An he has then reserved the right to

22  make an argument that that decision ought to be reconsidered

23  and modified to the Circuit Court.  That's on page ten in

24  footnote number 3.  So I would just want to make sure that's on

25  the record.  Point that out.  Say me too and I'll leave it to

27

1   someone else.

2           THE COURT:  Thank you.  Thank you.  Mr. Palacio, good

3   afternoon and was it you who made, or your colleagues who made,

4   the statute of limitations argument?

5           MR. PALACIO:  I don't believe that was ours.  It was

6   Marshall Plastic.

7           THE COURT:  It was?  Okay.

8           MR. SARNA:  And I believe that that's already been

9   addressed, and so we --

10          THE COURT:  We've thrown that argument.

11          MR. SARNA:  We're being especially brief.

12          THE COURT:  Okay.  Thank you, Mr.Sarno.

13          MR. PALACIO:  Your Honor, I will be equally as brief

14  by joining all the arguments already expressed as those

15  arguments apply to our cases and specific facts as we believe

16  they are completely applicable, and therefore I'll rest on the

17  arguments made.  Your Honor, I simply rest this point to make

18  that point on the record and second, reserve my right on

19  rebuttal to be heard, if the Court deems it appropriate.

20          THE COURT:  Thank you very much, Mr. Palacio.  I

21  think we've now heard from all the defendants, and I'm going to

22  turn the argument over to Mr. Bennett.  And I would note to

23  you, that I think those of us who knew him know that then Judge

24  McKelvey was no shrinking violet and he recognized that whether

25  he thought this work was right or wrong it was -- he was not

28

1    free to disregard it. And I guess my question for you, Mr.

2    Bennett, is, you know, in a few weeks I'm going off to a

3    conference, a Third Circuit conference -- and tell me why, if I

4    follow your arguments, it will be my last Third Circuit

5    conference.

6         MR. BENNETT: Hey, Your Honor. My position is that,

7    as set forth in our brief, that Resorts establishes the

8    application of 546(e) to a settlement payment, establishes that

9    a leveraged buyout can fall within the purview of 546(e). It

10   does run contrary to a number of other decisions, but

11   unfortunately for the trustee's case those other decisions are

12   all outside the Third Circuit, and if I want to completely

13   reverse Resorts, I agree that I need to do that in front of the

14   Third Circuit. However, we did argue that there is an

15   exception open in Resorts, which is that it needs to be a

16   situation -- or the factual presentation needs to be one in

17   which the public is involved in which there is public

18   securities being traded, transacted, sold, bought or paid for.

19   And that a purely private transaction, such as the one that's

20   before you today, where the only involvement of any entity that

21   would be done within the purview of a settlement payment, is

22   Fleet acting as a financial institution. But solely acting to

23   transfer funds by wire transfer out of the buyer's account into

24   the seller's account. That that transaction was not covered by

25   Resorts, was not governed by Resorts, and therefore you would

29

1    be free to determine that this case could go forward, because

2    it's not a settlement payment contemplated either by the

3    statute or by Resorts.  Now I understand that my argument is

4    now directly contrary to the position taken by Judge Walrath in

5    the IT Group case.  All I can say on that point, Your Honor, is

6    I think Judge Walrath was wrong, and I would ask you to find

7    different from her.  And find that in a purely private

8    transaction 546(e) is not applicable.

9             THE COURT:  Okay.  And as far as your position is

10   concerned, you're not challenging that Fleet Bank is a

11   financial institution within the definition of a 546?

12            MR. BENNETT:  I am not challenging that Fleet is a

13   financial institution as defined by, I think it's 10122.  But

14   that it is not in the context of what it did in this case.  It

15   was certainly not acting to transfer securities or act in a

16   capacity as a custodian or other holder of securities.  So it

17   was not in any way acting under any of the commonly referred to

18   provisions under 741, such as a clearing.  It was not acting,

19   certainly, as a clearing house or otherwise.  That it had a

20   limited role solely to effectuate the wire transfer.

21            THE COURT:  And are you alleging -- I don't see it

22   under plaintiff or any allegation of actual fraud.

23            MR. BENNETT:  No, Your Honor, there is none.  It's

24   based on a constructive fraud.

25            THE COURT:  Okay.  Okay.  I think I understand your

VERITEXT

30

1    position and it's essentially that if I have ever found the

2    Third Circuit to reconsider its decision of the Resorts case.

3    Or to -- (Indiscernible) the Resorts decision to public

4    trading.

5              MR. BENNETT:  That is correct, Your Honor.

6              THE COURT:  Okay.

7              MR. BENNETT:  I don't know to what extent you wish me

8    to address Attorney Johnston's argument, though, for the Key

9    Shareholders on the application of 1304.  To the extent that

10   you wish to hear anything on that, I'd be referred to the

11   Hechinger's case, which is a Third Circuit Case, and their

12   definition of the application of the facts to almost identical

13   to these facts, define them as a leveraged buyout.  And finding

14   that the fraudulent conveyance law would be applicable.  I'm

15   not asserting that there was any actual intent, but that's not

16   necessary.  You can find constructive intent where, as they

17   defined in Hechinger's, the acquiring company's assets are

18   leveraged -- I'm sorry the target company's assets are

19   leveraged for the purposes of borrowing and paying off the

20   selling shareholders.  Thank you, Your Honor.

21             THE COURT:  Thank you, Mr. Bennett.  Mr. Johnston,

22   perhaps you could just address that final fling on the

23   Hechinger's decision and the Delaware code Section 1304(a).

24             MR. JOHNSTON:  Your Honor, I think I would simply say

25   that the Hechinger case did not involve a fraudulent conveyance

31

1    claim, as such, but rather involved the application of the

2    future A to E law, so it would be my view that Hechinger is not

3    applicable in this case.  I did address some of the other cases

4    that dealt with fraudulent conveyance claims, and in each one

5    of those the Court required a showing of intent or fraud or a

6    scheme on the part of the defendants.  And that's simply not

7    present in this case.

8              THE COURT:  Thank you, Mr. Johnston.

9              MR. JOHNSTON:  And Your Honor, just one further

10   point.  I have not yet submitted a form order as I know at

11   least one of the other defendants did, and so if at some point

12   it becomes appropriate I would happily do so.

13             THE COURT:  If need be I'll ask your local counsel to

14   do that for Mr. Baldwin, but I would anticipate doing the form

15   work myself.  But I appreciate the offer.

16             MR. JOHNSTON:  Thank you very much.

17             THE COURT:  Is there anything further from anyone?

18   Well I appreciate it.  And as I told you I've read the briefs

19   carefully, and named many of the cases, and given the long

20   delay, given the fact that I know that crisis effect that Mr.

21   Bennett may be trying to take this matter upon further, I think

22   I would like to issue, at least, a fairly careful written

23   opinion, but having read the arguments and heard argument, in

24   particular the oral argument, I've not been dissuaded from my

25   view that dismissal is going to be appropriate -- is

32

1  appropriate in this case.  And I will be, as I said, writing

2  the -- the date for taking your opinion, Mr. Bennett, doesn't

3  run until I actually issue the order -- but I haven't read

4  anything that convinces me that this isn't a settlement payment

5  which the Resorts case covers.  And I also appreciate -- I do

6  want to look again a little more carefully and go back and look

7  at the Delaware code Section II fraudulent conveyances 1304.  I

8  believe that Mr. Johnston has made a good point on that as

9  well.  I just want to take another look at that position before

10  I make a decision, but regardless of where I come out on the

11  Delaware code provision, the state provision, I just think that

12  under the bankruptcy statute, the plaintiff has not made out a

13  case which should proceed and then that will be what we've been

14  receiving from the immersion orders so that we can move things

15  along here.  I appreciate everyone's patience, and we'll stand

16  on recess.  Thank you very much, counsel.

17          MR. SPEAKER:  Thank you, Your Honor.

18          MR. SPEAKER:  Thank you.

19          MR. SPEAKER:  Thank you, Your Honor.

20      (Time noted:  3:40 PM)

21

22

23

24

25

33

1

2                        C E R T I F I C A T I O N

3

4       I, Hana Copperman, court approved transcriber, certify that the

5       foregoing is a correct transcript from the official electronic

6       sound recording of the proceedings in the above-entitled

7       matter.

8
        Hana Copperman    Digitally signed by Hana Copperman
                          DN: cn=Hana Copperman, c=US
9                         Reason: I am the author of this document
                          Date: 2007.05.23 11:27:02 -04'00'      May 21, 2007___

10      Signature of Transcriber              Date

11

12      Hana Copperman_____

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT C

Westlaw.

--- B.R. ----

--- B.R. ----, 2007 WL 4557855 (W.D.Mich.)

**(Cite as: --- B.R. ----)**

Page 1

**H**

QSI Holdings, Inc. v. Alford

W.D.Mich.,2007.

Only the Westlaw citation is currently available.

United States District Court,W.D.

Michigan,Southern Division.

QSI HOLDINGS, INC. and Quality Stores, Inc.,

Plaintiffs-Appellants,

v.

Cheryl A. ALFORD et al., Defendants-Appellees.

**No. 1:06-CV-876.**

**Bankruptcy Adversary No. 03-88912.**

Dec. 21, 2007.

**Background:** Chapter 11 debtors brought adversary proceeding to recover, on a constructive fraudulent transfer theory, payments previously made to corporate debtor's shareholders in connection with leveraged buyout (LBO) of corporate debtor's stock, and shareholders asserted defense based on statutory limitation on trustee's avoidance power for "settlement payments" made by or to, of for benefit of, a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency. The Bankruptcy Court, James D. Gregg, J., 355 B.R. 629, gran ted shareholders' motion for summary judgment, and debtors appealed.

**Holdings:** The District Court, Janet T. Neff, J., held that:

(1) payments that corporation's shareholders received, after tendering their shares to bank which had agreed to act as disbursing agent in connection with leveraged buyout (LBO) of corporation's stock, qualified as "settlement payments"; and

(2) payments were "made by" a financial institution, i.e., by bank that agreed to act as disbursing agent, regardless of whether bank had acquired any beneficial interest in funds prior to disbursing them.

Affirmed.

**[1] Bankruptcy 51 ⚬⇒3782**

51 Bankruptcy

    51XIX Review

        51XIX(B) Review of Bankruptcy Court

            51k3782 k. Conclusions of Law; De Novo

Review. Most Cited Cases

On appeal, district court reviews bankruptcy court's conclusions of law de novo.

**[2] Bankruptcy 51 ⚬⇒3782**

51 Bankruptcy

    51XIX Review

        51XIX(B) Review of Bankruptcy Court

            51k3782 k. Conclusions of Law; De Novo

Review. Most Cited Cases

Issues of statutory interpretation are questions of law, a bankruptcy court's conclusions on which are subject to de novo review.

**[3] Federal Civil Procedure 170A ⚬⇒2533.1**

170A Federal Civil Procedure

    170AXVII Judgment

        170AXVII(C) Summary Judgment

            170AXVII(C)3 Proceedings

                170Ak2533 Motion

                    170Ak2533.1 k. In General. Most

Cited Cases

Court may enter summary judgment sua sponte in favor of nonmoving party, as long as the losing party was on notice to present all desired evidence on matter at issue.

**[4] Statutes 361 ⚬⇒181(1)**

361 Statutes

    361VI Construction and Operation

        361VI(A) General Rules of Construction

            361k180 Intention of Legislature

                361k181 In General

                    361k181(1) k. In General. Most

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2007 WL 4557855 (W.D.Mich.)
**(Cite as: --- B.R. ----)**

Cited Cases

**Statutes 361 ☞188**

361 Statutes
 361VI Construction and Operation
  361VI(A) General Rules of Construction
   361k187 Meaning of Language
    361k188 k. In General. Most Cited Cases

**Statutes 361 ☞217.4**

361 Statutes
 361VI Construction and Operation
  361VI(A) General Rules of Construction
   361k213 Extrinsic Aids to Construction
    361k217.4 k. Legislative History in General. Most Cited Cases
When interpreting statute, courts must first consider plain language of statute, and resort to review of Congressional intent or legislative history only when language of statute is not clear.

**[5] Statutes 361 ☞188**

361 Statutes
 361VI Construction and Operation
  361VI(A) General Rules of Construction
   361k187 Meaning of Language
    361k188 k. In General. Most Cited Cases
If language of statute is clear, then court should look no further than plain language of statute when interpreting it.

**[6] Statutes 361 ☞190**

361 Statutes
 361VI Construction and Operation
  361VI(A) General Rules of Construction
   361k187 Meaning of Language
    361k190 k. Existence of Ambiguity. Most Cited Cases
Only if statute is inescapably ambiguous should court look to other persuasive authority in attempt to discern legislative meaning.

**[7] Statutes 361 ☞190**

361 Statutes
 361VI Construction and Operation
  361VI(A) General Rules of Construction
   361k187 Meaning of Language
    361k190 k. Existence of Ambiguity. Most Cited Cases
Persuasive authority to which court may look for aid in construing ambiguous statute can include other statutes, interpretations by other courts, legislative history, policy rationales, and context in which statute was enacted.

**[8] Bankruptcy 51 ☞2701**

51 Bankruptcy
 51V The Estate
  51V(H) Avoidance Rights
   51V(H)1 In General
    51k2701 k. Avoidance Rights and Limits Thereon, in General. Most Cited Cases
Statutory limitation on trustee's avoidance powers, to prevent trustee from avoiding, other than as actually fraudulent to creditors, transfers that are in nature of margin or settlement payments made by or to, or for benefit of, commodity broker or other enumerated parties, is exception to public policy underlying avoidance provisions of the Bankruptcy Code, which is meant to prevent debtor from diminishing the funds generally available for distribution to creditors, in favor of policy of maintaining stability in securities market. 11 U.S.C.A. § 546(e).

**[9] Bankruptcy 51 ☞2701**

51 Bankruptcy
 51V The Estate
  51V(H) Avoidance Rights
   51V(H)1 In General
    51k2701 k. Avoidance Rights and Limits Thereon, in General. Most Cited Cases
Statutory limitation on trustee's avoidance powers, to prevent trustee from avoiding, other than as actually fraudulent to creditors, transfers that are in nature of margin or settlement payments made by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2007 WL 4557855 (W.D.Mich.)
**(Cite as: --- B.R. ----)**

or to, or for benefit of, commodity broker or other enumerated parties, effectively provides a "safe harbor" for certain types of transactions in order to protect the nation's financial markets from instability caused by reversal of settled securities transactions. 11 U.S.C.A. § 546(e).

**[10] Statutes 361 ☜181(2)**

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k180 Intention of Legislature
        361k181 In General
          361k181(2) k. Effect and Consequences. Most Cited Cases
In interpreting statute, court may consider other persuasive evidence of legislative intent, even when language of statute is unambiguous, if enforcing the words of statute as written would lead to absurd result.

**[11] Statutes 361 ☜181(2)**

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k180 Intention of Legislature
        361k181 In General
          361k181(2) k. Effect and Consequences. Most Cited Cases

**Statutes 361 ☜184**

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k180 Intention of Legislature
        361k184 k. Policy and Purpose of Act. Most Cited Cases
While it is axiomatic that, when legislative scheme is coherent and consistent, court need not inquire beyond text of statute, courts may look beyond printed word to the law as whole and its purposes and policy, so as to determine what particular legislative intent may apply, in those cases in which

plain language of statute, even if literally applicable, would yield absurd results at odds with statutory design.

**[12] Bankruptcy 51 ☜2701**

51 Bankruptcy
  51V The Estate
    51V(H) Avoidance Rights
      51V(H)1 In General
        51k2701 k. Avoidance Rights and Limits Thereon, in General. Most Cited Cases
Payments that corporation's shareholders received, after tendering their shares to bank which had agreed to act as disbursing agent in connection with leveraged buyout (LBO) of corporation's stock, qualified as "settlement payments," as that term was used in bankruptcy statute prohibiting trustee from avoiding, on constructive fraudulent transfer theory, any "settlement payment" made by or to, or for benefit of, a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency; there was nothing in plain language of statute suggesting that term should be restricted only to payments made in settlement of stock transactions conducted in public securities market. 11 U.S.C.A. § 546(e).

**[13] Bankruptcy 51 ☜2701**

51 Bankruptcy
  51V The Estate
    51V(H) Avoidance Rights
      51V(H)1 In General
        51k2701 k. Avoidance Rights and Limits Thereon, in General. Most Cited Cases
Term "settlement payment," as used in bankruptcy statute prohibiting trustee from avoiding, on constructive fraudulent transfer theory, any "settlement payment" made by or to, or for benefit of, a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, is not by its plain language limited only to public transactions. 11 U.S.C.A. § 546(e).

**[14] Statutes 361 ☜188**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2007 WL 4557855 (W.D.Mich.)
(Cite as: --- B.R. ----)

Page 4

361 Statutes
   361VI Construction and Operation
     361VI(A) General Rules of Construction
       361k187 Meaning of Language
         361k188 k. In General. Most Cited Cases

**Statutes 361 ⊕⇒189**

361 Statutes
   361VI Construction and Operation
     361VI(A) General Rules of Construction
       361k187 Meaning of Language
         361k189 k. Literal and Grammatical
Interpretation. Most Cited Cases
Plain meaning of legislation should be conclusive, except in those rare cases in which literal application of statute will produce a result demonstrably at odds with intentions of its drafters; in such cases, intention of drafters, rather than strict statutory language, controls.

**[15] Bankruptcy 51 ⊕⇒2701**

51 Bankruptcy
   51V The Estate
     51V(H) Avoidance Rights
       51V(H)1 In General
         51k2701 k. Avoidance Rights and
Limits Thereon, in General. Most Cited Cases
Payments that corporation's shareholders received, after tendering their shares to bank that had agreed to act as disbursing agent in connection with leveraged buyout (LBO) of corporation's stock, qualified as settlement payments "made by" a financial institution, i.e., by bank that agreed to act as disbursing agent, for purpose of bankruptcy statute prohibiting trustee from avoiding, on constructive fraudulent transfer theory, any settlement payment made by or to, or for benefit of, a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, regardless of whether bank had acquired any beneficial interest in funds prior to disbursing them; statute did not require financial institution to acquire any beneficial interest in funds that it disbursed, in order for stat-

ute to apply. 11 U.S.C.A. § 546(e).

Benjamin M. Mather, Michael H. Reed, Pepper Hamilton, LLP, Philadelphia, PA, Glenn M. Kurtz, White & Case, LLP, New York, NY, Hannah Mufson McCollum, Robert Steven Hertzberg, Pepper Hamilton, LLP, Detroit, MI, John K. Cunningham, Matthew Brown, White & Case, LLP, Miami, FL, for Appellants.
Robert H. Skilton, III, Michael Brian O'Neal, Warner Norcross & Judd, LLP, Mary A. Owens, Flickinger Plachta Murphy & Duba, PC, Thomas P. Sarb, Boyd A. Henderson, Miller Johnson, PLC, Dennis Sherman Shimmell, Jr., Shimmell Law Offices, Grand Rapids, MI, W. Brad Groom, Parmenter O'Toole, David L. Bossenbroek, Gary T. Britton, Britton & Bossenbroek, PC, William R. Sininger, Williams, Hughes, Corwin & Sininger, PC, Muskegon, MI, John A. Watts, Allegan, MI, Adam B. Landon, Critchfield, Critchfield & Johnson Ltd., Mount Vernon, OH, J. Richard Colbeck, Attorney at Law, Coldwater, MI, for Appellees.
Marley J. Hilts, Sunfield, MI, pro se.
Kelvin J. Koehler, Forest, OH, pro se.
Herbert J. Launder, Findlay, OH, pro se.
David J. McGettigan, Muskegon, MI, pro se.
Althea L. Rawlins, Marion, OH, pro se.
Leonard J. Sorrell, Marblehead, OH, pro se.
Carol A. Werstler, Leesberg, IN, pro se.
Timothy D. McLaughlin, Mt. Vernon, OH, pro se.
Nathan C. Boehm, Jenera, OH, pro se.
Carolyn A. Brant, Piqua, OH, pro se.
Timothy N. Bublitz, Findlay, OH, pro se.
Gerald L. Disbennett, Spring Lake, MI, pro se.
Jan M. Drerup, Perrysburg, OH, pro se.
Keith E. Dunn, Tipp City, OH, pro se.
Roland L. Falkowski, Muskegon, MI, pro se.
David T. Ferenczy, Alliance, OH, pro se.
Edward M. Finsel, Findlay, OH, pro se.
John M. Haller, Byron Center, MI, pro se.
James C. Hammitt, Muskegon, MI, pro se.
Donald M. Harris, Jr., Pontiac, MI, pro se.
Ronald G. Kelbley, Findlay, OH, pro se.
Jeffrey L. Ludwig, Laporte, IN, pro se.
Gregory A. Mann, Farmington, MN, pro se.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2007 WL 4557855 (W.D.Mich.)
**(Cite as: --- B.R. ----)**

Roger M. McKee, Muskegon, MI, pro se.
Richard L. McLouth, Algona, IA, pro se.
David J. McPherson, Muskegon, MI, pro se.
Elizabeth A. Morrow, Niles, MI, pro se.
Daniel L. Patterson, Uhrichsville, OH, pro se.
Stephen M. Pauline, Leipsic, OH, pro se.
Tom R. Puckett, Fruitport, MI, pro se.
Bonnie L. Pursley, Findlay, OH, pro se.
Mary A. Romans, Lancaster, OH, pro se.
Mark J. Sheneman, Muskegon, MI, pro se.
H. Thomas Shull, N. Baltimore, OH, pro se.
Dora A. Spotts, New Madison, OH, pro se.
Charles J. Trautwein, Findlay, OH, pro se.
Daniel M. Laville, Grand Rapids, MI, pro se.

### *OPINION*

JANET T. NEFF, District Judge.

**\*1** Plaintiffs Q.S.I. Holdings, Inc. and Quality Stores, Inc. appeal from an order of the bankruptcy court granting summary judgment in favor of defendants in a post-judgment adversary proceeding brought by plaintiffs. *In re Quality Stores, Inc.,* 355 B.R. 629 (Bankr.W.D.Mich.2006). Plaintiffs sought avoidance of payments made to defendants, former shareholders of the debtor Quality Stores, Inc., in a leveraged buy-out [FN1] ( LBO) of Quality Stores by Central Tractor and Farm Country, Inc. and its affiliate, CT Holdings, Inc. The bankruptcy court concluded that the LBO payments to defendants were "settlement payments" made by a "financial institution" under 11 U.S.C. § 546(e) of the Bankruptcy Code,[FN2] and therefore were exempt from avoidance in bankruptcy. For the reasons that follow, this Court affirms the decision of the bankruptcy court.

### I. Facts

The bankruptcy court set forth the uncontested facts for purposes of the motion for summary judgment. Those underlying facts are not at issue on appeal and are adopted by this Court as follows:

Quality [Stores] was a privately held corporation that operated a chain of retail stores specializ-

ing in agricultural and related products. In 1999, Quality and certain of Quality's principal shareholders entered into a merger agreement with Central Tractor Farm and Country, Inc. ("Central Tractor") and its parent company, CT Holdings, Inc. (collectively the "CT Parties"). Pursuant to the agreement, Quality was to merge with and into Central Tractor, with the surviving entity changing its name to Quality Stores, Inc. The agreement also called for Quality's shareholders to be paid, in cash or stock, for their respective equity interests. The assets of both Quality and Central Tractor were pledged as collateral for the loan that was obtained and partially utilized to pay the Quality shareholders.

The total purchase price for the LBO was approximately $208 million. Of this amount, Quality's shareholders were to receive $111.5 million in cash with $91.8 million of stock in CT Holdings, Inc. Central Tractor also agreed to assume and pay $42.1 million of Quality's existing indebtedness.

The Quality LBO involved both individual shareholders and company employees who were shareholders by virtue of their participation in Quality's Employee Stock Ownership Trust ("ESOT"). To effectuate the securities transaction contemplated by the LBO, the CT Parties made a $111.5 [million] cash payment to their exchange agent, HSBC Bank USA ("HSBC Bank"). HSBC Bank collected the shares of Quality stock from individual shareholders. It then transferred the securities to the CT Parties and distributed the cash, or shares in CT Holdings, Inc., to the individual shareholders.

For the ESOT shareholders, many of whom were lesser paid and mid-level Quality employees, the settlement process involved one additional step. Most of the ESOT stock was held by the ESOT trustee, LaSalle Bank. LaSalle Bank tendered the shares of Quality stock to HSBC Bank and received the cash consideration.[2] The ESOT was eventually terminated and the funds were distributed by LaSalle Bank to the ESOT participants.

**\*2** As a result of the merger, Quality incurred substantial integration costs. The merged company

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2007 WL 4557855 (W.D.Mich.)
(Cite as: --- B.R. ----)

Page 6

also implemented a costly expansion plan which aggressively contemplated the opening of twenty-five to fifty new stores each year. These business decisions, and others, contributed to continuing financial difficulties which eventually led a group of petitioning creditors to file an involuntary bankruptcy petition against Quality during October 2001. In response, before an order for relief was entered. Quality filed a voluntary petition under chapter 11 on November 1, 2001.

The Plaintiffs filed this fraudulent conveyance action on October 31, 2003. The complaint, as amended, alleges that the Defendants gave less than reasonably equivalent value when they tendered their Quality stock for cash as part of the LBO. The complaint further alleges that the LBO left Quality with unreasonably small capital and caused it to incur debts beyond its ability to pay. The Plaintiffs seek to avoid and recover the LBO transfers as constructively fraudulent conveyances pursuant to 11 U.S.C. § 544, § 550, and the Michigan Uniform Fraudulent Transfer Act, Mich. Comp. Laws Ann. §§ 566.31 *et seq.* The Defendants' motions for summary judgment assert that the LBO transfers were settlement payments made by a financial institution. Therefore, the Defendants seek dismissal of this adversary proceeding because they contend that the transfers are exempt from avoidance under § 546(e).

---

> FN2 LaSalle Bank determined that it was in the best interests of the ESOT participants to receive cash, rather than shares in CT Holdings, Inc. Presumably, this was a decision that LaSalle Bank could legally make.

---

*In re Quality Stores, Inc.,* 355 B.R. at 631-632.

Following a thorough analysis of the relevant statutes and decisions from our sister circuits, the bankruptcy court granted the moving defendants' motions for summary judgment. *Id.* at 632-636.Fur-

ther, because the § 546(e) defense applied equally to all defendants in the adversary proceeding, the court sua sponte granted summary judgment in favor of the nonmoving defendants. *In re Quality Stores, Inc.,* 355 B.R. at 636.

## II. Standard of Review

[1][2] On appeal to this Court from a bankruptcy court's final order or judgment, the bankruptcy court's conclusions of law are reviewed de novo. *In re Rowell,* 359 F.Supp.2d 645, 647 (W.D.Mich.2004). Issues of statutory interpretation are questions of law, and are thus subject to the de novo standard. *Kessler, Inc. v. United States Trustee (In re Kessler),* 142 B.R. 796, 799 (W.D.Mich.1992). The district court may affirm, modify, or reverse a bankruptcy's judge's judgment, order, or decree or remand with instructions for further proceedings. FED. R. BANKR. P. 8013.

[3]"Rule 56 of the Federal Rules of Civil Procedures [sic] governs summary judgment motions in bankruptcy court adversary proceedings."*In re Rowell,* 359 F.Supp.2d at 647 (citing FED. R. BANKR. P. 7056). A motion for summary judgment is properly granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). A court may enter summary judgment sua sponte in favor of a nonmoving party so long as the losing party was on notice to present all desired evidence on the matter at issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Salehpour v. Univ. of Tennessee,* 159 F.3d 199, 204 (6th Cir.1998).

## III. Discussion

*3 This appeal brings the Court to an uncertain intersection of bankruptcy law and securities law. *See Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.),* 181 F.3d 505, 515 (3d Cir.1999); *Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer S & L Ass'n (In re Bevill, Bresler & Schulman Asset*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2007 WL 4557855 (W.D.Mich.)
**(Cite as: --- B.R. ----)**

*Mgmt. Corp.),* 878 F.2d 742, 751 (3d Cir.1989). At issue are provisions in the Bankruptcy Code providing for an exemption to avoidance for "settlement payments" in the securities trade, made by or to a financial institution pursuant to 11 U.S.C. § 546(e), which provides:

Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, *the trustee may not avoid a transfer that is a* margin payment, as defined in section 101, 741, or 761 of this title, or *settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of)* a commodity broker, forward contract merchant, stockbroker, *financial institution,* financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A)[FN3] of this title. (Emphasis added.)

The Bankruptcy Code, 11 U.S.C. § 741,[FN4] defines "settlement payment" for purposes of § 546(e): " 'settlement payment' means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade."11 U.S.C. § 741(8).

The key question for decision is whether the term "settlement payment" as defined exempts the payments made in the LBO of Quality Stores, Inc., to acquire the privately held shares of stock. This is an issue of first impression in the Sixth Circuit. While other courts have addressed aspects of this question, including whether the term "settlement payment" includes payments made in an LBO of a public company, and whether the term may include payment for privately held securities, the bankruptcy court's decision in this case charts new territory regarding the extent of the § 546(e) exemption. Having fully considered the statutory language, and the legal and historical context of § 546(e), this Court is persuaded that no principled basis exists for denying application of the exemption in this case.

### Question of Statutory Interpretation

[4][5][6][7] This appeal presents an issue of statutory interpretation. When interpreting a statute, courts must first consider the plain language of the statute, and resort to a review of congressional intent or legislative history only when the language of the statute is not clear.*In re Comshare, Inc., Securities Litigation,* 183 F.3d 542, 549 (6th Cir.1999).

*4 As with any question of statutory interpretation, we must first look to the language of the statute itself. If the language of the statute is clear, then the inquiry is complete, and the court should look no further. Only if the statute is "inescapably ambiguous" should a court look to other persuasive authority in an attempt to discern legislative meaning. Persuasive authority can include other statutes, interpretations by other courts, legislative history, policy rationales, and the context in which the statute was passed.

*Brilliance Audio, Inc. v. Haights Cross Commc'ns, Inc.,* 474 F.3d 365, 371-372 (6th Cir.2007) (citations omitted).

### Background and Purpose of the Section 546(e) Exemption

[8]Section 546(e) exempts from avoidance, either as preferences or fraudulent transfers under state law and federal bankruptcy law, certain transfers by debtors that meet the statutory requirements. This exemption is an exception to public policy underlying the avoidance provisions in the Bankruptcy Code-intended to prevent a debtor from diminishing funds that are generally available for distribution to creditors-in favor of a policy of maintaining stability in the securities market. *Kaiser*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2007 WL 4557855 (W.D.Mich.)
**(Cite as: --- B.R. ----)**

Page 8

*Steel Corp. v. Charles Schwab & Co., Inc. (In re Kaiser Steel Corp.),* 913 F.2d 846, 849 (10th Cir.1990) (*"Kaiser I"* ); *In re Chase & Sanborn Corp.,* 813 F.2d 1177, 1181 (11th Cir.1987).

[9] The § 546(e) exemption effectively provides a "safe harbor" for certain types of transactions since its purpose is " 'to protect the nation's financial markets from the instability caused by the reversal of settled securities transactions.' " *Enron Corp. v. Credit Suisse First Boston Int'l (In re Enron Corp.),* 328 B.R. 58, 66 (Bankr.S.D.N.Y.2005) (quoting *Kaiser I,* 913 F.2d at 848). Congress enacted the "safe harbor" provisions of § 546(e) to " 'ensure that the avoiding powers of a trustee are not construed to permit margin or settlement payments to be set aside except in cases of fraud [by the purchaser].' " *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.,* 878 F.2d at 751 (quoting H.R. REP. NO. 97-420 (1982) ("1982 House Report"), *reprinted in*1982 U.S.Code Cong. & Admin. News 583, 583).

When first enacted in 1978, the exemption applied to only the commodities market.[FN8]*Kaiser I,* 913 F.2d at 848-849;*In re Enron Corp.,* 328 B.R. at 66 (2005). The commodities exemption was limited to margin payments to brokers and settlement payments from clearing organizations, and the term "settlement payment" was not defined. *Kaiser I,* 913 F.2d at 849. In 1982, however, Congress was concerned with the volatile nature of the commodities and securities markets, and "so former section 764(c) was replaced by sections 546(e) and 741(5) and (8)'to clarify and, in some instances, broaden the commodities market protections and expressly extend similar protections to the securities market."'*Kaiser I,* 913 F.2d at 849 (quoting 1982 House Report); *see also In re Bevill, Bresler & Schulman Asset Mgmt. Corp.,* 878 F.2d at 747. The 1982 amendments expanded the exemption to include margin and settlement payments to and from brokers, clearing organizations, and financial institutions. *Kaiser I,* 913 F.2d at 849.

**\*5** Thus, while the Bankruptcy Code gives broad powers to a trustee to avoid transactions involving preferential or fraudulent transfers that deplete the bankruptcy estate, the enactment of § 546(e) also acknowledges that avoidance of settled securities transactions could wreak havoc on the already volatile commodities and securities markets. *Kaiser I,* 913 F.2d at 849;*In re Bevill, Bresler & Schulman Asset Mgmt. Corp.,* 878 F.2d at 751. The "ripple effect" from a major bankruptcy affecting the commodities and securities markets could potentially displace many investments and threaten the solvency of many additional institutions. *Kaiser I,* 913 F.2d at 849;*In re Bevill, Bresler & Schulman Asset Mgmt. Corp.,* 878 F.2d at 751. In short, § 546(e) protects the nation's financial markets from the instability that would be caused by the reversal of settled securities transactions. *Kaiser I,* 913 F.2d at 848. It also creates the tension between these two areas of law that leads to the instant litigation.

While the purpose of the § 546(e) exemption is easily understood from a policy standpoint, it has proved far more difficult to understand in practical application. Given the cross purposes of bankruptcy creditors and former shareholders or other prebankruptcy payment recipients, the § 546(e) exemption has become a battleground of semantics and legal frameworks as litigants and the courts attempt to establish its limits within the statutory language. Despite numerous cases that have considered the statutory language and legislative history of §§ 546(e) and 741(8) in an attempt to discern the Congressional intent, little has been gleaned to formulate any decisive standard to determine which transactions fall within the exemption. Consequently, some 25 years after the enactment of the exemption from avoidance for settlement payments in the securities trade, the courts continue to be a forum for disputes over the construction of § § 546(e) and 741(8). This case is a prime example of the search for a judicial resolution of the correct statutory application.

*Arguments*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The parties are diametrically opposed on issues of legal analysis as well as outcome. Plaintiffs argue that the § 546(e) exemption for settlement payments is limited to publicly traded securities and that Congress did not intend to exempt transactions such as an LBO of privately held stock because such payments are not "commonly used in the securities trade," as defined in § 741(8). Defendants respond that the statutory definition of "settlement payment" has been broadly construed based on the plain language of the statute and that a substantial majority of circuit courts that have ruled on this issue have held that the § 546(e) exemption applies even when the securities are privately held and the centralized clearance system is not involved.

Plaintiffs further argue that the expansive view of the § 546(e) exemption advocated by the Third and Tenth Circuits, and followed by the bankruptcy court in this case, is erroneous in the context of this case, "a one-off private transaction involving privately-held stock."They contend that the statutory definition of "settlement payment" is inherently ambiguous, which requires that the court look beyond the text to resolve the ambiguity and determine legislative intent. Defendants respond that, as the bankruptcy court reasoned, the plain meaning of the statutes is clear and unambiguous, and consideration of the legislative history is unwarranted; no further inquiry by the court is necessary unless applying the plain language leads to an absurd result, which in this case it does not.

*Analysis*

**\*6** [10][11] In attempting to discern the limits of the § 546(e) exemption, the Court must first look to the statutory language. Only if the statutory language is unclear is resort to a review of congressional intent or legislative history permissible. *In re Comshare, Inc.,* 183 F.3d at 549."Only if the statute is 'inescapably ambiguous' should a court look to other persuasive authority in an attempt to discern legislative meaning."*Brilliance Audio, Inc.,* 474 F.3d at 371-372 (citations omitted). Nonetheless,

even where the language of the statute is unambiguous, courts may still consider legislative intent if enforcing the words as written would lead to an absurd result: FN6

[W]hile it is axiomatic that where the legislative scheme is coherent and consistent the court need not inquire beyond the text of the statute, in cases where the plain language, even if literally applicable, would yield absurd results at odds with the statutory design, courts may look beyond the printed word to the law as a whole and its purposes and policy, so as to determine what particular legislative intent may apply.

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.),* 263 B.R. 406, 478 (S.D.N.Y.2001).

[12][13] Looking to the § 741(8) definition of "settlement payment," it is beyond dispute that the statute lacks sufficient definition to determine precisely what constitutes a "settlement payment" in any specific context: " 'settlement payment' means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade."11 U.S.C. § 741(8). The courts have struggled to remedy this lack of specificity by applying various rules of construction or analytical frameworks to develop some logical approach to practical application of the definition. Compare *Kaiser I,* 913 F.2d at 848 (the definition, while somewhat circular is "extremely broad" and clearly includes anything that may be considered a settlement payment) with *Official Comm. of Unsecured Creditors v. ASEA Brown Boveri, Inc. (In re Grand Eagle Cos., Inc.),* 288 B.R. 484, 492 (Bankr.N.D.Ohio 2003) ("reflexive aspect of this provision, i.e., defining the meaning of 'settlement payment' by listing a variety of types of 'settlement payments,' requires the reader to consider extrinsic information and the final modifying phrase"); and *Oficial Comm. of Un secured Cr editors o f Nors tan Apparel Shops, Inc. v. Lattman (In re Norstan Ap-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2007 WL 4557855 (W.D.Mich.)
(Cite as: --- B.R. ----)

Page 10

*parel Shops, Inc.*), 367 B.R. 68, 76 (Bankr.E.D.N.Y.2007) (the concluding phrase "or any other similar payment commonly used in the securities trade" modifies the definition of settlement payment "because in its absence of the concluding phrase, the statutory definition contained in § 741(8) would be, in effect, a meaningless tautology").

Absent clear statutory guidance concerning the extent of the § 546(e) exemption, two contrary views of the § 546(e) exemption for settlement payments have evolved. Under the broader view, the exemption includes any payment normally regarded as part of the settlement process because the plain language of the statute does not limit the exemption to transactions involving only publicly traded securities. *See, e.g., Jonas v. Resolution Trust Corp. (In re Comark),* 971 F.2d 322, 326 (9th Cir.1992) (joining the Third and Tenth Circuits in broadly defining the term settlement payment to include transfers that are normally regarded as part of the settlement process); *Official Comm. of Unsecured Creditors of The IT Group, Inc. v. Acres of Diamonds, L.P., (In re The IT Group, Inc.),* 359 B.R. 97, 101 (Bankr.D.Del.2006) ("the term settlement payment is to be applied broadly to any transfer of stock or cash to pay for stock," and the fact that the stock was sold privately rather than on the public stock market is not a distinguishing factor).

*7 The contrary view, argued by plaintiffs, is that the settlement payment exemption is limited to publicly traded securities and that Congress did not intend to exempt transactions such as an LBO of privately held stock. *See, e.g., In re Norstan Apparel Shops, Inc.,* 367 B.R. at 75-76 (quoting *In re Adler, Coleman Clearing Corp.,* 263 B.R. at 478) (internal quotations omitted) ("while the term 'settlement payment' as used in § 546(e)'is to be read broadly, the term is not boundless,' " and thus it must read to include only a transaction involving the public securities market).

In this case, the bankruptcy court adopted the former view and granted summary judgment for de-

fendants on the basis that the definition of settlement payment in § 741(8) has been recognized as "extremely broad," and that the Tenth Circuit Court of Appeals, as well as other courts, have applied this broad definition of "settlement payment" to transfers of consideration made in connection with an LBO. *In re Quality Stores, Inc.,* 355 B.R. at 633 (quoting *Kaiser I,* 913 F.2d at 848 and citing additionally *In re Resorts Int'l, Inc.,* 181 F.3d at 515-516); and *In re Comark,* 971 F.2d at 326;*see also Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.) ("Kaiser II"),* 952 F.2d 1230 (10th Cir.1991). This Court finds no error in the bankruptcy court's general reasoning and conclusion.

As the bankruptcy court noted, the Tenth Circuit has held that payments made to shareholders through their securities broker, Charles Schwab & Co., were "settlement payments" exempt from avoidance under § 546(e).*In re Quality Stores, Inc.,* 355 B.R. at 633 (citing *Kaiser I* ). Further, in *Kaiser II,* the court extended its holding to include transfers made from the disbursing agent directly to individual shareholders. *In re Quality Stores, Inc.,* 355 B.R. at 633. And in both cases the Tenth Circuit relied on the definition of settlement payment found in § 741(8), concluding that the definition was intended to include any transfer that would be considered a settlement payment in the securities industry. *In re Quality Stores, Inc.,* 355 B.R. at 633. Because the securities industry generally defines settlement as "the completion of a securities transaction,"*Kaiser I,* 913 F.2d at 849, interpreting "settlement payment" to include the transfer of consideration in an LBO is consistent with the securities industry definition of "settlement." *In re Quality Stores, Inc.,* 355 B.R. at 633-634.

Further, nothing in the plain language of the statutes limits the application of the exemption to public transactions. As defendants point out (Df. Brief 16), decisions of the Fifth and Ninth Circuits have determined that transactions involving "repos" and forward contracts are subject to the § 546(e)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2007 WL 4557855 (W.D.Mich.)
(Cite as: --- B.R. ----)

Page 11

exemption regardless whether the transactions involved public or private securities and whether the transactions would trigger the centralized clearance system if avoided by the trustee in bankruptcy. *In re Comark,* 971 F.2d 322;*Williams v. Morgan Stanley Capital Group, Inc. (In re Olympic Natural Gas Co.),* 294 F.3d 737 (5th Cir.2002).

**\*8** Contrary to plaintiffs' arguments, the statutory language is not "inescapably ambiguous." Merely because the statutory definition is broad does not render it ambiguous. In defining what constitutes a settlement payment, Congress chose an inclusive, rather than exclusive definition. The statutory definition is more in the nature of a "catch-all," which leaves to the courts the task of winnowing out those transactions that do not comport with the statutory provisions or Congressional intent and thus lead to an absurd result.

In this case, there are no exceptional circumstances to depart from the generally accepted broad view of the term "settlement payment." Given the plain language of the statute, the case law, and the circumstances of this case, the payments to defendants must be deemed to fall within the § 546(e) exemption for a "settlement payment." This Court finds no error in the bankruptcy court's conclusion that the payments made to defendants to effect the LBO are settlement payments as defined in § 741(8).

[14] Plaintiffs nonetheless argue that even if the language is not ambiguous, it leads to an absurd result in this case, and thus should not be enforced. "The plain meaning of legislation should be conclusive, except in 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'In such cases, the intention of the drafters, rather than the strict language, controls."*United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242-243, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). (citations omitted). Plaintiffs contend that the bankruptcy court's decision leads to an unreasonable result by permitting shareholders to retain otherwise

voidable payments and granting them priority over the creditors without effectuating Congress' intent of promoting stable financial markets. (Pl. Brief 22.) To do so, they argue, "conflicts with the Bankruptcy Code's design to augment property of the estate for the benefit of creditors and accord priority to the rights of creditors over the interests of equity security holders."(*Id.*)

This Court finds no such infirmity in applying the exemption in the circumstances of this case. The record reflects that one of the creditors seeking the benefit of avoidance in fact provided financing for the LBO of Quality Stores, and thus would have been fully aware of the financial context of the LBO. This undermines any argument that the equities rest with creditors as opposed to the approximately 170 shareholders, *In re Quality Stores, Inc.,* 355 B.R. at 631, many of whom are mid- and lower-level ESOT employee-shareholders, whose stock payments would be voided in favor of the creditors.

Moreover, plaintiffs provide no support for their contention that applying the exemption does not further Congressional intent to promote stability in the financial and securities markets. Given the multitude of shareholders involved in this case, many of whom likely reinvested the proceeds, it is questionable whether the undoing of the hundreds of transactions would not cause some disruption in the securities market.

**\*9** [15] Finally, regarding plaintiffs' claim that the court erred in determining that the settlement payments were "transfers" m ade "by" a "financial institution," the bankruptcy court's reasoning and conclusion are likewise sound. Plaintiffs have raised no persuasive basis for reversing the bankruptcy court's finding that the payments made to defendants were made "by ... a financial institution" pursuant to § 546(e), and thus protected from avoidance. On appeal, as before the bankruptcy court, plaintiffs argued that the transfers at issue were not made "by ... a financial institution" pursuant to § 546(e) because the disbursing agent never

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

acquired a beneficial interest in the LBO consideration. *Munford v. Valuation Research Corp. (In re Munford, Inc.),* 98 F.3d 604 (11th Cir.1996). In *Munford,* a divided court found that the bank responsible for conveying payments was not a "transferee" b ecause it never acquired a beneficial interest in the funds.*Id.* at 610.The holding in *Munford,* which requires that the disbursing agent acquire a beneficial interest in the LBO consideration for the § 546(e) exemption to apply, is not supported by the plain language of the statute.

This Court agrees with the bankruptcy court that although the result in *Munford* may be viewed as fair, there is no requirement in § 546(e) that a financial institution acquire a beneficial interest in the funds it handles for § 546(e) to apply. Accordingly, the courts may not impose policy limitations not expressly stated in the statute. *In re Quality Stores, Inc.,* 355 B.R. at 635-636.

To the extent that plaintiffs assert that upholding the exemption in this case creates the potential for widespread abuse of the § 546(e) exemption, this Court finds the concern overstated. Plaintiffs argue that the bankruptcy court's application of § 546(e) leads to an absurd result-the "unfettered ability of troubled companies to cash-out their shareholders before bankruptcy, to the detriment of the companies' creditors," which circumvents other provisions of the Bankruptcy Code. (Pl. Brief 38). In the absence of clear statutory guidance concerning the extent of the § 546(e) exemption, the courts have effectively resorted to a case-by-case determination of the merits of exemption. The result is a spectrum of decisions finding transactions of varying types within the purview of the settlement payment exemption, while excluding others. The result is a "broad, but not boundless" interpretation of the exemption by the courts. *See In re Norstan Apparel Shops, Inc.,* 3 67 B.R. at 76;*In re A dler, Coleman Clearing Corp.,* 263 B.R. at 478. And while the bankruptcy and securities systems, like any complex scheme, are targets for abuse, in those transactions in which such abuse seems evident, a statutory

safety valve exists. The courts have generally determined that, by definition, a settlement payment must be commonly used in the securities trade. *Kaiser II,* 952 F.2d at 1237. It is therefore unlikely that a transaction that is a clear abuse of the exemption could be said to be commonly used in the securities trade. *See, e .g., Kipperman v. Circle Trust F.B.O. (In re Grafton Partners, L.P.),* 321 B.R. 527, 539, 541 (B.A.P. 9th Cir.2005) (transactions in illegally unregistered securities are not "commonly used in the securities trade")."[D]ecisions that involve outright illegality or transparent manipulation reject § 546(e) protection."*Id.* Accordingly, until such time as Congress deems it prudent or necessary to amend the statute, the courts will continue to winnow out those exceptional cases at the far end of the spectrum where the exemption is unwarranted.FN7

### IV. Conclusion

**\*10** This Court finds no basis for reversal of the grant of summary judgment in favor of defendants. The plain language of the statute neither limits application of the term "settlement payment" to transactions involving only publicly traded securities nor does it exclude LBO payments. And there is no convincing support for plaintiffs' claim that enforcing the plain and unambiguous provisions of the statute conflicts with Congress' intent in enacting the statute and thus leads to an absurd result. "[G]iven the fact that disruption in the securities industry-an inevitable result if leveraged buy outs can freely be unwound years after they occurred-is also a harm the statute was designed to avoid," no absurd result occurs. *Kaiser II,* 952 F.2d at 1241. The statute must be enforced in accordance with its plain language.

> FN1."A 'leveraged buyout' occurs when a group of investors acquires the stock of a company with borrowed money that is secured by the assets of the company to be purchased."The debt is subsequently repaid with money generated by the acquired

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

company's operations or assets. The new debt creates a financial burden on the acquired company and limits its ability to secure additional financing to survive an economic downturn, which in turn can force the new company into bankruptcy, even as a result of a small decline in cash flow. 19 FORDHAM URB. L.J. 87, 87 n. 1 (1991).

FN2. The court noted that the Bankruptcy Code is contained in 11 U.S .C. §§ 101-1330 and that the 2005 amendments to the Code, commonly referred to as "BAPCPA," were inapplicable to this adversary proceeding.*In re Quality Stores, Inc.,* 355 B.R. at 631 n. 1. The parties do not contend otherwise on appeal.

FN3.Section 548(a)(1)(A) pertains to intentional fraudulent transfers and is inapplicable to this case.

FN4. The definition in § 101(51A) applies to forward contract provisions under the Bankruptcy Code and is inapplicable to the circumstances of this case.

FN5.*See*11 U.S.C. § 764(c) (repealed 1982). The exemption was a response to *Seligson v. New York Produce Exchange,* 394 F.Supp. 125 (S.D.N.Y.1975), which held that a trustee could recover a margin payment made to a commodities clearinghouse. *Kaiser I,* 913 F.2d at 849 n. 4 (citing White, *The Commodity-Related Provisions of the Bankruptcy Act of 1978,* 34 Rec. Bar. A. Bar City of New York 262, 269-271 (1979)).

FN6. Defendants question whether this standard remains valid in light of recent Supreme Court decisions, e.g., *Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005), which they assert require federal courts to interpret statutes in accordance with the plain language and meaning without referring to legislative history or other extrinsic evidence. This issue need not be resolved because, as discussed, *infra,* the application of the plain meaning does not lead to an absurd result in this case.

FN7. A series of cases in the Enron bankruptcy proceedings bears out the of the validity of this conclusion in practice. In four cases, the bankruptcy court, Arthur J. Gonzalez, J. applied the statutory framework to the facts of each case, reaching different results in determining whether the transactions qualified as settlement payments. *Enron Corp. v . Int'l F in. Corp. (In re Enron Corp.),* 341 B.R. 451 (Bankr.S.D.N.Y.2006) (prepetition payments to acquire notes from trust in excess of value to protect credit rating were in the nature of settlement payments); *In re Enron Corp.,* 328 B.R. 58 (debtor's payment to acquire its own shares did not qualify as settlement payment); *Enron Corp. v. J.P Morgan Sec., Inc. (In re Enron Corp.),* 325 B.R. 671 (Bankr.S.D.N.Y.2005) (whether payments made for short term commercial paper before maturity date, at significantly above-market prices and contrary to the offering documents, were settlement payments was a factual issue requiring trial); *Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.),* 323 B.R. 857 (Bankr.S.D.N.Y.2005) (payment made to acquire own shares when debtor was insolvent or rendered insolvent by the transaction would not qualify as settlement payment).

W.D.Mich.,2007.
QSI Holdings, Inc. v. Alford
--- B.R. ----, 2007 WL 4557855 (W.D.Mich.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Robert J. Stearn, Jr., do hereby certify that on March 10, 2008, I caused a copy

of the foregoing **Appellee B.A. Capital Company LP's Opposition Brief** to be served

in the manner indicated upon the following counsel:


***Via Hand Delivery***
Laurie Selber Silverstein
Potter Anderson & Corroon LLP
1313 North Market Street, 6th Floor
Wilmington, DE 19801

Richard Palacio
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

Amy E. Evans
Cross & Simon LLC
913 North Market Street
11th Floor
P. O. Box 1380
Wilmington, DE 19899

Laurie S. Polleck
Jaspan Schlessing Hoffman
913 Market Street
12th Floor
Wilmington, DE 19801

***Via First Class Mail***
Richard A. Johnston
WilmerHale
60 State Street
Boston, MA 02109

Charles R. Bennett, Jr.
Hanity & King, P.C.
One Beacon Street
Boston, MA 02108

James A. Sarna
Sarna & Associates, P.C.
99 Main Street
Nyack, NY 10960


_____
Robert J. Stearn, Jr. (No. 2915)