## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 03-11489 (KG) |
| PLASSEIN INTERNATIONAL CORP., et al., | ) | Jointly Administered. |
| | ) | |
| Debtors. | ) | Adv. Pro. No. 05-50692 (KG) |
| | ) | |
| | ) | |
| WILLIAM BRANDT, AS HE IS THE | ) | |
| TRUSTEE OF THE ESTATES OF | ) | |
| PLASSEIN INTERNATIONAL CORP., et al. | ) | |
| | ) | |
| Appellant, | ) | Civil Action No. 07-345 (JFF) |
| | ) | |
| v. | ) | |
| | ) | |
| B.A. CAPITAL COMPANY, et al. | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

## ANSWERING BRIEF OF APPELLEES KEY PACKAGING SHAREHOLDERS

POTTER ANDERSON & CORROON LLP
Laurie Selber Silverstein (2396)
Gabriel R. MacConaill (4734)
1313 North Market Street, 6th Floor
P. O. Box 951
Wilmington, DE  19899-0951
(302) 984-6000 (telephone)
(302) 658-1192 (facsimile)

Of Counsel:

WILMER CUTLER PICKERING
  HALE AND DORR LLP
Richard A. Johnston
Mark C. Fleming
Jeffrey Gleason
60 State Street
Boston, Massachusetts 02109
(617) 526-6000 (telephone)
(617) 526-5000 (facsimile)

Dated: March 10, 2008

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

ISSUES PRESENTED FOR REVIEW ........................................................................ 1

NATURE AND STAGE OF THE PROCEEDINGS ..................................................... 2

STATEMENT OF FACTS ............................................................................................ 3

SUMMARY OF ARGUMENT ..................................................................................... 6

ARGUMENT ................................................................................................................. 8

     I.      SECTION 546(e) BARS AVOIDANCE OF THE SETTLEMENT
            PAYMENTS IN THIS CASE .................................................................... 8

          A.     The Text Of Section 546(e) Is Not Limited To "Publicly-Traded
               Securities" ..................................................................................... 8

          B.     Case Law Provides No Basis For Imposing An Atextual "Publicly-Traded"
               Limitation ...................................................................................... 9

          C.     The Trustee's Reading Of "Securities Trade" Is Unpersuasive .................... 14

          D.     In Addition To Being An Inappropriate Consideration,
               The Legislative History Of Section 546(e) Does Not Support
               The Trustee's Argument ................................................................. 18

     II.     THE TRUSTEE FAILED TO STATE A CLAIM UNDER THE DELAWARE
            STATUTE ................................................................................................. 20

          A.     The Complaint Does Not Allege A Transfer By A Debtor That Rendered
               That Debtor Insolvent ................................................................... 20

          B.     The Statutory "Debtor" Requirement Cannot Be Satisfied By "Collapsing"
               The Transactions At Issue .............................................................. 22

     III.    THE TRANSFERS DID NOT RENDER KEY PACKAGING
            INSOLVENT ............................................................................................ 31

CONCLUSION .............................................................................................................. 33

i

**TABLE OF AUTHORITIES**

CASES

*Badaracco v. C.I.R. Deleet Merchandising Corp.*,
464 U.S. 386 (1983)................................................................15

*Baylis v. Taylor*,
475 F. Supp. 2d 484 (D. Del. 2007)........................................27

*BCP Liquidating LLC v. Bridgeline Gas Marketing LLC*
(*In re Borden Chemicals & Plastics Op. Lim. Partnership*), 336 B.R. 214 (Bankr. D. Del. 2006)................................................................14

*Bevill, Bresler & Schulman Asset Management Corp. v. Spencer Savings & Loan Association*, 878 F.2d 742 (3d Cir. 1989)..............................11

*Brandt v. B.A. Capital Co. LP*
(*In re Plassein Int'l Corp.*), 366 B.R. 318 (Bankr. D. Del. 2007) .................... *passim*

*Brandt v. Hicks Muse & Co.*
(*In re Healthco International, Inc.*), 195 B.R. 971 (Bankr. D. Mass. 1996) ...........23

*CIR v. Ridgeway's Estate*,
291 F.2d 257 (3d Cir. 1961)........................................................11

*In re Comark*,
971 F.2d 322, 325 (9th Cir. 1992) .............................................10

*Crowthers McCall Pattern Inc. v. Lewis*,
129 B.R. 992 (S.D.N.Y. 1991)...................................................23

*Harrison v. PPG Indus., Inc.*,
446 U.S. 578 (1980)....................................................................19

*HBE Leasing Corp. v. Frank*,
48 F.3d 623 (2d Cir. 1995)..........................................................23

*Hughes v. BCI Int'l Holdings, Inc.*,
452 F. Supp. 2d 290 (S.D.N.Y. 2006)........................................16

*In re Owens Corning*,
419 F.3d 195 (3d Cir. 2005).......................................................22

*Kaiser Steel Corp. v. Pearl Brewing Co.*, 952 F.2d 1230 (10th Cir. 1991)............10, 11

*Kuntz v. Saul, Ewing, Remick & Saul*
(*In re Grand Union Co.*), 200 B.R. 101 (D. Del. 1996) .........................................29

*Lippi v. City Bank,*
    955 F.2d 599 (9th Cir. 1992) ................................................................................24

*Loranger Manufacturing. Corp. v. PNC Bank (In re Loranger Manufacturing. Corp.),*
    324 B.R. 575 (W.D. Pa. 2005)...............................................................................13

*Lowenschuss v. Resorts International, Inc. (In re Resorts International, Inc.),* 181 F.3d
    505 (3d Cir. 1999)............................................................................................ *passim*

*Mellon Bank, N.A. v. Metro Communications, Inc.,*
    945 F.2d 635 (3d Cir. 1991)............................................................................9, 23

*Moody v. Security Pacific Business Credit, Inc.,*
    971 F.2d 1056 (3d Cir. 1992)..........................................................................23, 24

*Mullins v. Burtch (In re Paradise & Assocs., Inc.),* 249 B.R. 360 (D. Del. 2000) ........................29

*Murphy v. Meritor Savings Bank,*
    126 B.R. 370 (Bankr. D. Mass. 1991) ....................................................................23

*Official Committee of Unsecured Creditors v. Fleet Retail Finance Group*
    *(In re Hechinger Investment. Co. of Delaware., Inc.),* 274 B.R. 71 (D. Del. 2002)...............24

*Official Committee of Unsecured Creditors of The IT Group, Inc. v. Acres of Diamonds,*
    *L.P. (In re The IT Group, Inc.),* 359 B.R. 97 (Bankr. D. Del. 2006) ........................................13

*Official Committee of Unsecured Creditors of National Forge Co. v. Clark*
    *(In re National Forge Co.),* 344 B.R. 340 (W.D. Pa. 2006) ...............................................13, 14

*Official Committee of Unsecured Creditors of Norstan Apparel Shops, Inc. v. Lattman*
    *(In re Norstan Apparel Shops, Inc.),* 367 B.R. 68 (Bankr. E.D.N.Y. 2007) ...........................14

*Pension Benefit Guar. Corp. v. White Consol. Indus.,*
    998 F.2d 1192 (3d Cir. 1993)................................................................................26

*Pittston Coal Group v. Sebben,*
    488 U.S. 105 (1988)............................................................................................19

*Posman v. Bankers Trust Co. (In re Lomas Financial Corp.),* No. Adv. A-97-245, 1999
    WL 33742299 (Bankr. D. Del. July 28, 1999).......................................................27

*QSI Holdings, Inc. v. Alford,*
    No. 1:06-CV-876, 2007 WL 4557855 (W.D. Mich. Dec. 21, 2007)....................12, 13, 14, 20

*Rosenberg v. XM Ventures,*
    274 F.3d 137 (3d Cir. 2001).................................................................................11

*Rosener v. Majestic Mgmt. (In re OODC, LLC),* 321 B.R. 128 (Bankr. D. Del. 2005) ...............24

*TWA Inc. Post-Confirmation Estate v. Marsh USA Inc.* (*In re TWA Post Confirmation Estate*), 305 B.R. 228 (Bankr. D. Del. 2004)...........................................................................27

*U.S. Express Lines, Ltd. v. Higgins,*
281 F.3d 383 (3d Cir. 2002)..........................................................................................3

*United States v. Tabor Court Realty Corp.,*
803 F.2d 1288 (3d Cir. 1986).......................................................................................23

*Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.,*
919 F.2d 206 (3d Cir. 1990).......................................................................................24-5

*Wieboldt Stores, Inc. v. Schottenstein,*
131 B.R. 655 (N.D. Ill. 1991) ..................................................................................10, 18

*Wieboldt Stores, Inc. v. Schottenstein,*
94 B.R. 488 (Bankr. N.D. Ill. 1988) .............................................................................25

*Williams v. Morgan Stanley Capital Group, Inc.* (*In re Olympic Natural Gas Co.*), 294 F.3d 737 (5th Cir. 2002) .........................................................................................12

*Zahn v. Yucaipa Capital Fund,*
218 B.R. 656 (D.R.I. 1998).......................................................................................10, 18

**STATUTES**

11 U.S.C. § 544.........................................................................................................2, 8

11 U.S.C. § 544(b)(1) ....................................................................................................8

11 U.S.C. § 546(e) ................................................................................................*passim*

11 U.S.C. § 546(f)........................................................................................................11

11 U.S.C. § 548(a)(1)(A)................................................................................................9

11 U.S.C. §741(8) .......................................................................................................17

15 U.S.C. § 78c(a)(4)(B)(vii)........................................................................................15

15 U.S.C. § 78c(a)(4)(C)...............................................................................................15

15 U.S.C. § 78m(h)(8) ..................................................................................................15

28 U.S.C. § 157(b)(1) ....................................................................................................2

28 U.S.C. § 157(b)(2)(H)................................................................................................2

6 Del. Code Ann. § 1302(a) .........................................................................................32

6 Del. Code Ann. §1304 ...................................................................................1, 2, 7, 20, 21

6 Del. Code Ann. § 1304(a)(2) ...................................................................................32

6 Del. Code Ann. § 1305 ...............................................................................1, 2, 7, 21

6 Del. Code Ann. § 1305(a) ........................................................................................32

Mass. Gen. L. c. 93A § 1 .............................................................................................16

Mass. Gen. L. c. 110 § 401(k).......................................................................................16

## OTHER AUTHORITIES

Fed. R. Bankr. P. 7012(b) ...............................................................................................2

Fed. R. Civ. P. 12(b)(6)..............................................................................................2, 3

128 Cong. Rec. 1262-1263 (1982)................................................................................20

H.R. Rep. No. 97-420 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583 ...........................20

Munn et al., *Encyclopedia of Banking & Finance* 936 (9th ed. 1991) ..........................16

## ISSUES PRESENTED FOR REVIEW

I.     Whether the Bankruptcy Court correctly followed the Third Circuit's precedent in *Lowenschuss v. Resorts International, Inc. (In re Resorts International, Inc.)*, 181 F.3d 505 (3d Cir. 1999), in holding that 11 U.S.C. § 546(e) precludes avoidance in bankruptcy of transfers of funds by a financial institution to accomplish the purchase of securities in a leveraged buy-out.

II.     Whether the Bankruptcy Court correctly concluded that the Complaint fails to state a claim under 6 Del. Code Ann. §§ 1304, 1305 (2005) because it does not allege a transfer "by a debtor" that rendered "the debtor" insolvent.

III.    In the alternative, whether the Complaint fails to state a claim against the Key Packaging Shareholders because its attachments admit that Key Packaging was not rendered insolvent by any transfer to the Key Packaging Shareholders.

## NATURE AND STAGE OF THE PROCEEDINGS

This adversary proceeding is a "core" proceeding under 28 U.S.C. § 157(b)(2)(H).

Pursuant to 11 U.S.C. § 544, Appellant William Brandt, Trustee of the estate of Chapter 7

Debtor Key Packaging Industries Corporation (now known as Plassein International of Salem,

Inc.) ("Key Packaging") and several other companies, commenced this action before the

Bankruptcy Court. Through this action, Brandt (the "Trustee") seeks to avoid certain transfers

made by a financial institution to the former shareholders of Key Packaging (the "Key Packaging

Shareholders")[1] from the account of a different company, Plassein Packaging Corporation. The

Trustee claims that the transfers to the Key Packaging Shareholders were fraudulent conveyances

under 6 Del. Code Ann. §§ 1304, 1305 (the "Delaware Statute"). The Trustee raised similar

claims against the other appellees in this case arising out of other transfers. The Bankruptcy

Court had jurisdiction pursuant to 28 U.S.C. § 157(b)(1).

The Key Packaging Shareholders moved to dismiss the Complaint pursuant to Fed. R.

Bankr. P. 7012(b) and Fed. R. Civ. P. 12(b)(6), as did the other appellees. The Bankruptcy Court

granted those motions and entered a final order dismissing the proceeding on April 20, 2007.

*Brandt v. B.A. Capital Co. LP* (*In re Plassein Int'l Corp.*), 366 B.R. 318 (Bankr. D. Del. 2007).

The Bankruptcy Court offered two separate grounds for dismissing the action. First, it held that

11 U.S.C. § 546(e) rendered the transfers at issue unavoidable. Second, it concluded that the

Trustee's Complaint failed to state a claim under the Delaware Statute. The Trustee filed a

timely notice of appeal on April 27, 2007 and an Opening Brief on February 14, 2008.

---

[1] The Key Packaging Shareholders are: Thomas F. Fay, Ruth L. Fischbach, Mark R.
Freedman, Robert N. Zeitlin, Sidney Zeitlin, ZFC Associates, Inc., William G. Russell, and
Robert N. Zeitlin 1999 Charitable Remainder Unitrust.

## STATEMENT OF FACTS[2]

On June 18, 1999, Plassein International Corporation ("Plassein") was formed for the purpose of acquiring certain manufacturers of flexible packaging and specialty film. Appellant's Appendix ("App.") A0028 (Compl. ¶ 27). On July 23, 1999, Plassein entered into an agreement to purchase the stock of Key Packaging. App. A0029 (Compl. ¶ 31). In November 1999, Plassein obtained a commitment from Fleet Capital Corporation as agent for itself and a group of lenders (the "Lenders") to provide financing for Plassein's acquisitions of Key Packaging and several other companies (collectively the "January Target Companies"[3]). App. A0029 (Compl. ¶ 32). The controlling equity owners of Plassein also provided $25 million in financing to Plassein. App. A0030 (Compl. ¶¶ 35-36).

On or about January 10, 2000, Plassein acquired the stock of Key Packaging and the other January Target Companies. App. A0029 (Compl. ¶ 28-30, 33). Fleet Bank made wire payments from an account owned by Plassein Packaging Corporation[4] to each of the Key Packaging Shareholders as "Shareholder Consideration." App. A0095-0097 (Compl. Ex. A). Fleet Bank also made wire transfers totaling over $12 million to a number of Key Packaging's

---

[2] The facts on which the Key Packaging Shareholders rely for purposes of this brief are taken entirely from the Complaint and the exhibits attached thereto. In reviewing the Bankruptcy Court's grant of the Key Packaging Shareholders' motion to dismiss, this Court may consider the facts set forth in the exhibits to the Complaint, as well as the Complaint itself. *See* Appellant's Appendix A0032-0033 (Compl. ¶¶ 42, 45) (incorporating exhibits by reference); *U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) ("When considering a Rule 12(b)(6) motion, courts accept as true the allegations in the complaint and its attachments[.]"). The Key Packaging Shareholders' references to the allegations in the Complaint and its attached exhibits do not constitute an admission of any such allegations.

[3] In addition to Key Packaging, the January Target Companies are: Plastical Industries, Inc. (n/k/a Plassein International of Spartanburg, Inc.); Nor Baker Industries, Ltd.; Marshall Plastics Film, Inc. (n/k/a Plassein International of Martin, Inc.); and Transamerican Plastics LLC (n/k/a Plassein International of Ontario, Inc.). App. A0029 (Compl. ¶¶ 28-31).

[4] The Complaint does not allege any relationship between Plassein International Corporation and Plassein Packaging Corporation.

secured creditors in repayment of Key Packaging's debts. App. A0032 (Compl. ¶ 41); App. A0094 (Compl. Ex. A). There is no allegation that the Key Packaging Shareholders retained any shares or interest in Key Packaging or Plassein after the acquisition.

At the conclusion of the acquisition, after closing adjustments, Key Packaging's balance sheet showed assets of $30,109,988. App. A0102 (Compl. Ex. B). Key Packaging's liabilities at that time were only $19,500,254. *Id.* Key Packaging therefore had a surplus of $10,609,734. *Id.* Even excluding goodwill, Key Packaging still had a surplus of $1,353,134. *Id.*

Following this transaction, Plassein and the newly-acquired Key Packaging entered into a loan and security agreement with the Lenders, pursuant to which the Lenders agreed to make advances and extend credit to Plassein (the "January Loan Agreement"). App. A0030 (Compl. ¶ 34). Key Packaging became a borrower with obligations for the amounts advanced, and Key Packaging granted the Lenders a security interest in all of its assets. *Id.* There is no allegation, however, that the Key Packaging Shareholders either signed this Loan Agreement or were even aware that the Agreement would call for pledging Key Packaging assets to secure loans to acquire the other January Target Companies. Nor is it alleged that the Key Packaging Shareholders were aware of the existing assets and liabilities of the other January Target Companies at the time of the Key Packaging January Loan Agreement.

After January 10, 2000, Key Packaging's name was changed to Plassein International of Salem, Inc., and it continued to operate in the packaging business. App. A0033 (Compl. ¶ 43). There is no allegation that the Key Packaging Shareholders had any involvement in the continued operations of Key Packaging.

Over four months after closing on the Key Packaging acquisition, on May 17, 2000, Plassein entered into an agreement with Rex International, Inc. ("Rex") to acquire Rex through a

-4-

stock acquisition (the "Rex Acquisition"). App. A0034 (Compl. ¶ 48). In connection with the Rex Acquisition, the Lenders agreed to increase the credit available to Plassein under the January Loan Agreement to $72,500,000. In exchange, Rex agreed to become a borrower under the January Loan Agreement and to grant a security interest in its assets to secure the obligations of Plassein and the January Target Companies to the Lenders under that Loan Agreement. *Id.* (Compl. ¶ 49). Plassein also obtained commitments for Rex to incur additional indebtedness of $36,500,000 to be subordinated to the debt of the Lenders. App. A0034 (Compl. ¶ 50). At the closing of the Rex Acquisition, on August 15, 2000, Plassein paid out roughly $60 million, including over $22 million to Rex's existing creditors and nearly $32 million to shareholders of Rex. App. A0034-0035 (Compl. ¶¶ 53-54).

The Rex Acquisition took place more than seven months after Plassein had purchased the Key Packaging Shareholders' interest in Key Packaging. App. A0029 (Compl. ¶ 33); A0034 (Compl. ¶ 52). The Complaint contains no allegation that the Key Packaging Shareholders had any involvement with Plassein at that time, that they were aware of this subsequent Rex Acquisition, or that they intended to participate in the financing of it. Nor does the Complaint allege that the Key Packaging Shareholders either executed or intended to execute a loan agreement in connection with the Rex Acquisition.

Key Packaging and Plassein operated for more than three years after the January 2000 acquisitions—until May 2003—before filing for bankruptcy. App. A0037 (Compl. ¶ 65).[5]

---

[5] According to the Complaint, Rex and the January Target Companies were in default to the Lenders by November 2001—still nearly two years after the January 2000 acquisition. App. A0036 (Compl. ¶ 62).

## SUMMARY OF ARGUMENT

I.      The Bankruptcy Court correctly held that section 546(e) of the Bankruptcy Code renders the transfers at issue unavoidable.  There is no dispute that section 546(e) protects "settlement payments" from avoidance in bankruptcy proceedings, and the Third Circuit has held unequivocally that a payment for shares during a leveraged buyout ("LBO") is "a settlement payment" under section 546(e).  *See Lowenschuss v. Resorts Int'l, Inc.* (*In re Resorts Int'l, Inc.*), 181 F.3d 505 (3d Cir. 1999).  Because the payments at issue were made by a financial institution for shares purchased in an LBO—a fact the Trustee concedes—they are unavoidable.

The Trustee argues that section 546(e) applies only to payments for publicly-traded securities, but no such restriction appears in the text.  The overwhelming majority of courts to address the issue have rejected the Trustee's position.  The Trustee tries to read the words "securities trade" as limited to the business of publicly-traded securities—a reading contradicted by the Trustee's own sources—but this argument does not assist the Trustee, because a wire transfer to pay for the purchase of shares in a LBO is a payment "commonly used" in the trade in public securities.  *See Resorts*, 181 F.3d at 514, 516.  The Trustee does not suggest otherwise.

The Trustee's remaining arguments concerning section 546(e) are based entirely on legislative history, from which the Trustee tries to extract a congressional intent to deny protection to private transactions.  As the Trustee acknowledges, the Third Circuit refused to consult legislative history in construing section 546(e).  The Trustee offers no basis for finding the statute ambiguous, nor does he argue that the plain language produces an absurd result.  And even if the Trustee's reliance on legislative history argument were not foreclosed by *Resorts*— and it is—the Trustee has identified no statement suggesting that Congress actually intended to exclude privately-traded securities from the protections of section 546(e).  Nothing in the brief legislative history of section 546(e) is inconsistent with the Bankruptcy Court's holding.

II.    The Bankruptcy Court also correctly held that the Trustee failed to state a claim under 6 Del. Code Ann. §§ 1304, 1305, which require that the transfer at issue be (1) made "by a debtor" and (2) render that same "debtor" insolvent. The Complaint does not allege a transfer by the "debtor" in the case (here, Key Packaging), nor does it allege that any such transfer rendered Key Packaging insolvent. Indeed, the Complaint does not allege that Key Packaging made *any* transfer to the Key Packaging Shareholders. Rather, the transfer was made from an account belonging to Plassein Packaging Corporation. The Complaint does not allege that Plassein Packaging became insolvent as a result of that transfer; indeed, the Complaint does not even include Plassein Packaging—or, for that matter, Plassein International Corporation—as a "debtor" on whose behalf the suit is brought.

The Trustee all but admits this deficiency, contending that several transactions need to be "collapsed" in order to satisfy the statutory "debtor" requirement. Appellant's Opening Brief ("Br.") 36. As the Bankruptcy Court found, the Complaint does not plead any basis for "collapsing" transactions in this case. *Brandt v. B.A. Capital Co. LP (In re Plassein Int'l Corp.)*, 366 B.R. 318, 326 (Bankr. D. Del. 2007). Accordingly, the Bankruptcy Court was correct to dismiss the case for failure to state a fraudulent transfer under the Delaware Statute.

III.    Although the Bankruptcy Court did not need to reach the point, there is another reason to dismiss the claims against the Key Packaging Shareholders. The Exhibits attached to and incorporated by reference into the Complaint confirm that Key Packaging remained solvent after Plassein acquired it. App. A0102 (Compl. Ex. B) (confirming that Key Packaging had a surplus of $10,609,734 after its acquisition). Failure to plead Key Packaging's insolvency or insufficient assets to continue its business similarly doom the Trustee's Complaint.

## ARGUMENT

I.    **SECTION 546(e) BARS AVOIDANCE OF THE SETTLEMENT PAYMENTS IN THIS CASE**

The Bankruptcy Court correctly held that Third Circuit precedent mandates a dismissal of the Trustee's claims.  As the Bankruptcy Court found, the "transactions between Defendants and [Plassein] Packaging are indistinguishable from the stock purchases held to be unavoidable settlement payments in *Resorts*." *Brandt v. B.A. Capital Co. LP* (*In re Plassein Int'l Corp.*), 366 B.R. 318, 323 (Bankr. D. Del. 2007).  The payments at issue in this case, just as the payments in *Resorts*, were made by a financial institution, Fleet Bank, for the sale of stock in an LBO.  The Court should affirm the Bankruptcy Court's ruling that the payments at issue are settlement payments protected from avoidance by 11 U.S.C. § 546(e).

A.    **The Text Of Section 546(e) Is Not Limited To "Publicly-Traded Securities"**

Section 544 of the Bankruptcy Code permits a trustee to avoid transfers by the debtor that are voidable under applicable non-bankruptcy law.[6]  However, that power is explicitly limited by section 546(e), which states in relevant part:

> Notwithstanding sections 544 [and other sections] of this title, . . . the trustee may not avoid a transfer that is a . . . settlement payment, as defined in section 101 or 741 of this title, made by or to a . . . financial institution . . . that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).  Section 741(8) of the Bankruptcy Code defines a "settlement payment" as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, *or any other similar payment commonly used in the securities trade*." *Id.* (emphasis added).  Applying the plain language of

---

[6] *See* 11 U.S.C. § 544(b)(1) ("[T]he trustee may avoid any transfer of an interest of the debtor or in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim[.]").

the statute, the Third Circuit held that a settlement payment "is generally the transfer of cash or securities made to complete a securities transaction." *Resorts*, 181 F.3d at 515.

There can be no doubt that the transfers to the Key Packaging Shareholders fall within this definition. Plassein's purchase of Key Packaging was, as the Trustee concedes, an LBO: "the acquisition of a company ('target corporation') in which a substantial portion of the purchase price paid for the stock of a target corporation is borrowed and where the loan is secured by the target corporation's assets." *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 645 (3d Cir. 1991). The Third Circuit expressly concluded that wire payments made by a bank to shareholders to complete an LBO are "settlement payment[s] [made] by . . . a . . . financial institution" within the meaning of section 546(e) and are therefore immune from a fraudulent conveyance claim. *Resorts*, 181 F.3d at 515 (internal quotation marks omitted).[7]

The Trustee does not dispute that the transaction at issue involved a "transfer of cash" to complete a "securities transaction" or that the payments he seeks to avoid occurred as part of an LBO. Nor does he dispute that the payment was made by a "financial institution." Therefore, under section 546(e) and Third Circuit precedent, the payments to the Key Packaging Shareholders were "settlement payment[s]" and thus are not avoidable.

### B.    Case Law Provides No Basis For Imposing An Atextual "Publicly-Traded" Limitation

The Trustee contends (Br. 10) that this case differs from *Resorts* because the Key Packaging shares were not "publicly traded." Yet the *Resorts* court at no point suggested that such a fact would be relevant under section 546(e). On the contrary, as the Trustee

---

[7] The only exception to section 546(e) is a transfer made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." 11 U.S.C. § 548(a)(1)(A). Because the Complaint does not rely on section 548(a)(1)(A) and does not plead actual intent to defraud, this exception does not apply to this case.

-9-

acknowledges (Br. 20-21), the *Resorts* court considered and rejected decisions from other jurisdictions that relied on a public/private distinction. *See Zahn v. Yucaipa Capital Fund*, 218 B.R. 656 (D.R.I. 1998); *Wieboldt Stores, Inc. v. Schottenstein*, 131 B.R. 655 (N.D. Ill. 1991). The Third Circuit noted that the "reasoning of these courts is essentially that 'the system of intermediaries and guarantees' that normal securities transactions involve is not in play in an LBO." *Resorts*, 181 F.3d at 515 (citation omitted). The Third Circuit also considered the position, advanced by the Trustee here, that section 546(e) should not be applied to "a transaction that did not implicate the concerns that Congress had in creating the law." *Id.* at 516 n.10. The Third Circuit rejected both arguments in favor of the statute's plain language, pursuant to which "a payment for shares during an LBO is obviously a common securities transaction" and is therefore "a settlement payment for the purposes of section 546(e)." *Id.* at 516.

The Trustee suggests (Br. 21) that the Third Circuit's rejection of *Zahn* and *Wieboldt* might be limited to the "mode of analysis" those cases used—*i.e.*, "resting their conclusions on policy considerations derived from the statute's legislative history." The Third Circuit's criticism of *Zahn* and *Wieboldt* did not mention a "mode of analysis" (whatever that may mean); rather, it rejected the *holding* of those cases. The Third Circuit embraced the conclusion of other courts of appeals, namely that "[i]ncluding payments made during LBOs within the scope of the [section 546(e)] definition is consistent with the broad meaning" of the statutory term "settlement payment." *Resorts*, 181 F.3d at 515-516 (citing *Kaiser Steel Corp. v. Pearl Brewing Co.*, 952 F.2d 1230, 1239-1240 (10th Cir. 1991); *In re Comark*, 971 F.2d 322, 325 (9th Cir. 1992)). The Third Circuit did not suggest that it would have reached a different conclusion had the securities at issue not been publicly traded.

Furthermore, the Third Circuit has explicitly held that Congress's use of the same words "settlement payment" in the provision immediately following section 546(e) includes transactions that do *not* involve public securities exchanges. In *Bevill, Bresler & Schulman Asset Management Corp. v. Spencer Savings & Loan Ass'n*, 878 F.2d 742, 744 (3d Cir. 1989), the Third Circuit held that the term "settlement payment" in section 546(f) includes payments made in connection with repurchase ("repo") agreements. A repo agreement "is not a 'trade' entered into on an exchange." *Kaiser Steel*, 952 F.2d at 1239 (holding that "settlement payment" included repurchase agreements). Given that the Third Circuit has held that the term "settlement payment" in section 546(f) included payments made in settlement of non-public repo transactions, it would be illogical to exclude payments for non-public securities from the meaning of the very same term in section 546(e). *See Rosenberg v. XM Ventures*, 274 F.3d 137, 144 (3d Cir. 2001) (holding that "Congress intended to attribute the same meaning to [the term] person as it had in the preceding subsection"); *see also CIR v. Ridgeway's Estate*, 291 F.2d 257, 259 (3d Cir. 1961) ("Where a word or phrase is used in different parts of the same statute, it will be presumed to have the same meaning throughout.").[8]

Moreover, in the commodities context, at least one other court of appeals has rejected the Trustee's position that Congress intended to exclude private transactions from the protections of section 546(e). In a case in which a trustee sought to avoid payments made by the debtor to Morgan Stanley pursuant to a natural gas sales and purchase contract, the Fifth Circuit, citing

---

[8] Sections 546(e) and (f) both limit the powers of the trustee to avoid transactions and are drafted in highly similar terms. Subsection (f) provides that: "Notwithstanding section 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 741 or 761 of this title, or *settlement payment, as defined in section 741 of this title, made by or to a repo participant* or financial participant, in connection with a repurchase agreement and that is made before the commencement of the case, except under section 548(a)(1)(A) of this title." 11 U.S.C. § 546(f) (emphasis added).

*Resorts*, "reject[ed] the Trustee's argument that in order to be exempt from avoidance, a

settlement payment must . . . be cleared or settled through a centralized system." *Williams v.*

*Morgan Stanley Capital Group, Inc.* (*In re Olympic Natural Gas Co.*), 294 F.3d 737, 742 (5th

Cir. 2002) (internal quotation marks omitted).  The trustee in *Olympic Natural Gas* made the

identical argument to the one the Trustee makes in this case, asserting that Congress intended

that section 546(e) apply only to transactions that utilize public exchanges.  The Fifth Circuit

rejected this argument, noting that "[b]y including references to both the commodities and the

securities markets, it seems clear that Congress meant to exclude from the stay and avoidance

provisions *both on-market, and the corresponding off-market transactions.*"  *Id.* at 742 n.5

(emphasis added).  Given the Trustee's concession that the 1982 amendment to section 546(e)

was designed to extend the protections already present in the commodities trade to the securities

trade (App. A0218-0220 (Pl.'s Consolidated Br. in Opp. to Defs.' Various Mots. to Dismiss the

Compl. ("Opp." or "Opposition"))), the rejection of a public/private distinction for commodities

cases in *Olympic Natural Gas* further compels dismissal of the Complaint here.

　　　The overwhelming weight of case law supports the Bankruptcy Court's conclusion.  The

most recent district court decision to address the application of section 546(e) to private

securities transactions likewise followed *Resorts*—even though the court was not bound to do so,

as the case arose in the Sixth Circuit.  In *QSI Holdings, Inc. v. Alford*, No. 1:06-CV-876, 2007

WL 4557855 (W.D. Mich. Dec. 21, 2007), the plaintiff contended that "the § 546(e) exemption

for settlement payments is limited to publicly traded securities and that Congress did not intend

to exempt transactions such as an LBO of privately held stock because such payments are not

'commonly used in the securities trade,' as defined in § 741(8)."  *Id.* at *5.  The *QSI* court

rejected the plaintiff's proposed distinction, holding "nothing in the plain language of [sections 546(e) and 741(8)] limits the application of the exemption to public transactions." *Id.* at *7.

Not surprisingly, other courts in this Circuit have had no difficulty concluding, as the Bankruptcy Court did below, that section 546(e) applies to LBOs involving nonpublic securities transactions. In *Official Committee of Unsecured Creditors of The IT Group, Inc. v. Acres of Diamonds, L.P. (In re The IT Group, Inc.)*, 359 B.R. 97 (Bankr. D. Del. 2006), the court held that the Third Circuit's conclusion in *Resorts* applies with equal force to an LBO of a private company. The plaintiff debtor in that case made the same argument the Trustee makes to this Court: that legislative intent behind section 546(e) precluded its application to securities not traded on a public market. *Id.* at 100-101. Rejecting this argument, the *IT Group* court held that "[t]he analysis performed by the Third Circuit in *Resorts* makes it abundantly clear that the term settlement payment is to be applied broadly to *any transfer of stock or cash to pay for stock*[.] Additionally, the Third Circuit did not consider [it] a worthy distinguishing factor that the stock was sold privately rather than on the public stock market." *Id.* at 101 (emphasis added). When confronted with this decision at oral argument below, the Trustee conceded that he could not distinguish this case from *IT Group* and thus stated that he could only ask the Bankruptcy Court to find that *IT Group* was wrongly decided. Ex. A (Tr. of Mot. to Dismiss Oral Arg.).[9]

*Loranger Manufacturing Corp. v. PNC Bank (In re Loranger Manufacturing Corp.)*, 324 B.R. 575, 586 (Bankr. W.D. Pa. 2005), likewise applied the protections of section 546(e) to a transaction involving a privately-held company. The same is true of *Official Committee of Unsecured Creditors of National Forge Co. v. Clark (In re National Forge Co.)*, 344 B.R. 340

---

[9] The Trustee has since changed his position and argues for the first time to this Court (Br. 24) that *IT Group* is distinguishable because the opinion "does not address the argument that the statutory definition of 'settlement payment' expressly excludes transactions in privately-held stocks." That argument is meritless, for the reasons discussed in Part I.C below.

(W.D. Pa. 2006), which the Trustee acknowledges held that "section 546(e) applies to transactions in privately-held stocks." Br. 25. Likewise, the Bankruptcy Court in *BCP Liquidating LLC v. Bridgeline Gas Marketing LLC (In re Borden Chemicals & Plastics Operations Ltd. Partnership)*, 336 B.R. 214, 223 (Bankr. D. Del. 2006)—which the Trustee does not address—held that section 546(e) protected payments made as part of forward contracts, which are not traded on public securities markets.

In response to *Resorts* and the subsequent cases applying *Resorts* to settlement payments for privately-held stock, the Trustee cites a decision of a bankruptcy court in New York, *Official Committee of Unsecured Creditors of Norstan Apparel Shops, Inc. v. Lattman (In re Norstan Apparel Shops, Inc.)*, 367 B.R. 68 (Bankr. E.D.N.Y. 2007). While *Norstan* does reach the result urged by the Trustee, it does so only by consulting legislative history. And the *Norstan* court's ultimate conclusion—that the "securities trade . . . plainly means the public securities market" (*id.* at 76)—is unaccompanied by either citation or analysis and, moreover, directly contradicts the reasoning of *Resorts*. As the *QSI* court recognized, *Norstan* represents the "contrary view" to that of the Third Circuit. 2007 WL 4557855, at *7. Indeed, the *Norstan* court expressly *rejects Resorts*. 367 B.R. at 75. The clear weight of binding and persuasive authority supports the Bankruptcy Court's ruling below.

### C.    The Trustee's Reading Of "Securities Trade" Is Unpersuasive

The Trustee attempts to avoid *Resorts* and its progeny by pointing to the words "in the securities trade" in section 741(8) (defining a "settlement payment") and arguing that "the best interpretation of those words is as a reference to the public securities markets." Br. 28. According to the Trustee, his interpretation is "the best way to bring the statutes into line with their object and policy." Br. 28 (internal quotation marks omitted). The Trustee's argument fails for at least five reasons.

*First*, the language of section 546(e) simply does not differentiate between publicly-traded and privately-traded securities. As the Key Packaging Shareholders demonstrated below—and the Trustee has never disputed—Congress has repeatedly shown that it is capable of making that distinction when it wishes. *Compare* 15 U.S.C. § 78c(a)(4)(B)(vii) ("Private securities offerings") *with* 15 U.S.C. § 78c(a)(4)(C) (providing that particular provisions "shall not apply if the activities described in such provisions result in the trade in the United States of any security that is a publicly-traded security"); *see also* 15 U.S.C. § 78m(h)(8) ("the term 'publicly traded security' means any equity security . . . listed, or admitted to unlisted trading privileges, on a national securities exchange, or quoted in an automated interdealer quotation system"). Therefore, it is clear that "[w]hen Congress intends" to distinguish between privately-traded and publicly-traded securities "it knows how unambiguously to accomplish that result." *Badaracco v. C.I.R. Deleet Merch. Corp.*, 464 U.S. 386, 395 (1983). Congress did not make such a distinction in section 546(e), and this Court should decline the Trustee's invitation to write his desired limitation into the statute where Congress has not done so. *See id.*

*Second*, the Trustee's assertion that the words "securities trade" are "best read" as including only sales of publicly-traded securities (Br. 12) is contradicted by the Trustee's own cited definitions of the word "trade," which themselves include sales *outside* of a publicly regulated market. The Trustee defines "trade" as "the business of buying and selling or bartering commodities" and "the business of buying and selling or bartering goods and services." Br. 13 (citing dictionaries). But neither definition excludes private sales outside of a regulated market. Rather, the Trustee's definitions of "trade" are met whenever commodities, goods or services are bought or sold as part of a business. Clearly those conditions were present when the Key

Packaging Shareholders sold their stock to Plassein after an arm's length negotiation.[10] Neither of the Trustee's definitions suggests that an exchange of goods or services that occurs privately is any less a "trade" or "business" than an exchange that occurs in a public market. On the contrary, it is generally understood that private sales are "business" as well. *See, e.g., Hughes v. BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290, 300-301 (S.D.N.Y. 2006) (activities associated with the purchase of private companies "constitute a transaction of business in New York"); Mass. Gen. L. c. 93A § 1 (for purposes of consumer protection statute "'trade' and 'commerce' shall include . . . the offering for sale [or] the sale . . . of . . . any [private or public] security," (citing Mass. Gen. Laws c. 110A § 401(k)).) There is no reason to suppose that Congress believed that the term "securities trade" excluded the trade in non-public securities.

*Third*, even accepting the Trustee's attempt to equate the "securities trade" with a "securities market" (Br. 13), there still is no support for the Trustee's effort to exclude privately-traded securities. The Trustee argues (*id.*) that a "securities market" "naturally refers" only to the buying and selling of publicly-traded securities, since there is no "organized" market for nonpublic securities. But securities markets are defined more broadly than the market for public securities. Indeed, the Trustee's own source describes "Securities Markets" to include "private placements." App. A0247 (Munn et al., *Encyclopedia of Banking & Finance* 936 (9th ed. 1991)). As the Trustee's source explains, "[p]rivate placements refer to the distribution of securities to fewer than 25 *private* buyers." *Id.* (emphasis added). Thus, "securities markets" and, by the Trustee's own logic, "securities trade" are *not* limited to publicly-traded securities. The Trustee does not even acknowledge, let alone respond to, this adverse definition in his own

---

[10] There can be no dispute that Plassein bought the Key Packaging stock for business purposes. According to the Complaint, Plassein was formed expressly for the purpose of acquiring various manufacturers of flexible packaging and specialty film by means of purchasing securities that were not traded on public exchanges. *See* App. A0028-0029 (Compl. ¶ 27).

source, even though the Key Packaging Shareholders pointed it out in prior briefing. *See* Key Packaging Defs.' Reply in Supp. of Mot. to Dismiss 10 (attached hereto as Ex. B).[11]

*Fourth*, while acknowledging that every word of a statute must be given meaning where possible (Br. 27-28), the Trustee's argument would eliminate words from the statute. The Trustee reads the definition of a "settlement payment" as though it were restricted to a "payment in the securities trade." But the Bankruptcy Code is not so limited; it speaks of payments "*commonly used* in the securities trade." 11 U.S.C. § 741(8) (emphasis added). Even accepting arguendo the Trustee's argument that "securities trade" means only "public securities trade," the statute would still be satisfied by payments made outside the public securities trade, as long as the payment was one *commonly used* in that trade. The *Resorts* court held that the transaction at issue in that case—payment of cash for shares of stock in an LBO—was "commonly used in the securities trade." 181 F.3d at 514, 516 (internal quotation marks omitted). The Trustee does not dispute that the payment to the Key Packaging Shareholders—a wire transfer in consideration for the purchase of shares in an LBO—was a payment "commonly used" in the securities trade, even if the "trade" is limited to public securities. Indeed, the Trustee does not appear to ascribe any meaning whatsoever to the words "commonly used." The Trustee's inability to account for those words in his supposed "plain language" argument demonstrates its incorrectness.

---

[11] The Trustee points out that the statutory definition of a different term ("margin payment") also refers to the "securities trade" and argues that margin payments arise only in the context of publicly-traded securities. Br. 13 (citing 11 U.S.C. § 741(5)). But this proves at most that the "securities trade" *includes* the trade of public securities, a proposition that nobody disputes and that in no way supports the Trustee's position that it *excludes* trades in all other securities. Similarly, the fact that the "securities trade" includes LBOs of public companies that are regulated by the Securities and Exchange Commission (Br. 13) says nothing about whether the "securities trade" excludes all other LBOs.

*Finally*, the Trustee suggests that the term "securities trade" might be ambiguous (Br. 15), although he provides no support for a claim of ambiguity. The Trustee's argument fails, particularly given that the Third Circuit has considered the meaning of "settlement payment" and ruled, without any finding of ambiguity, that it includes payments made to settle an LBO. *Resorts*, 181 F.3d at 516. Even if *Resorts* did not clear up any purported "ambiguity" about the meaning of "securities trade"—and it did—the Court need look no further than the definitions that the Trustee has provided, which show that the sale of securities qualifies as the "securities trade" regardless of whether those securities happen to be traded on a public exchange.[12]

Indeed, the Trustee does not offer a single relevant distinction between publicly—and privately—held shares that would justify a departure from Third Circuit precedent. The Trustee's only apparent basis for drawing such a distinction is one that the *Resorts* court rejected: that only publicly-traded securities implicate the settlement and clearance systems. The transaction in *Resorts* did not implicate these systems, yet the Third Circuit still found it unavoidable. 181 F.3d at 515-516. The Trustee's purported distinction between this case and the facts in *Resorts* is no more meaningful than the fact that *Resorts* involved a hotel chain whereas this case involves a packaging company.

**D.    In Addition To Being An Inappropriate Consideration, The Legislative History Of Section 546(e) Does Not Support The Trustee's Argument**

Although the Trustee acknowledges that "the Third Circuit has thus made it clear that it will not allow legislative history and policy considerations to override a statute's plain language"

---

[12] The Trustee again relies on *Zahn* and *Wieboldt*, which he admits the Third Circuit rejected, to argue that the definition of a "settlement payment" is "circular and cryptic" because it contains the term to be defined. Br. 21. This argument is a red herring, as the Trustee implicitly acknowledges: any circularity is avoided by analyzing whether the payment at issue was a "payment commonly used in the securities trade," as the Third Circuit did in *Resorts*.

(Br. 21), the Trustee inexplicably relies on the very analysis he acknowledges is not proper: using legislative history to override a statute's plain language. Even if recourse to legislative history were appropriate here—and it is not—the Trustee identifies *not one* statement in the legislative history suggesting that section 546(e) is limited to publicly-traded securities and does not apply to private sales. The Trustee's basis for the assertion that Congress intended section 546(e) to apply "only" to publicly-traded securities (Br. 18) consists solely of references to *one* purpose of the statute—protection of the system of intermediaries. The Trustee essentially contends that Congress's failure to set down other statutory purposes in the legislative history acts as a limitation on the statute's plain language. As the Supreme Court has stated, however, parties cannot rely on what "Congress did *not* say" as a means to interpret statutory language:

> [I]t would be a strange canon of statutory construction that would require
> Congress to state in committee reports or elsewhere in its deliberations
> that which is obvious on the face of a statute. In ascertaining the meaning
> of a statute, a court cannot, in the manner of Sherlock Holmes, pursue the
> theory of the dog that did not bark.

*Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 592 (1980); *see also Pittston Coal Group v. Sebben*, 488 U.S. 105, 115 (1988) ("It is not the law that a statute can have no effects which are not explicitly mentioned in [the] legislative history[.]"). The Trustee similarly seeks to characterize Congress as having had an exclusive focus on publicly-traded securities in enacting section 546(e) (Br. 18), but he fails to cite to anything in the legislative history by which Congress disclaims the pursuit of other (perhaps secondary) purposes. Indeed, the legislative history of

section 546(e) is decidedly sparse; Congress may have left much unsaid, particularly given that

the statutory language is unambiguous[13].

As *Resorts* found, the best indication of Congress's intent is the statutory language. The

fact that the Trustee's legislative history argument rests not on statements made during the

legislative process, but on speculation the Trustee bases on what was *not* said, demonstrates the

weakness of the Trustee's position. This Court should reject the Trustee's attempt to ignore the

statutory language and affirm the decision of the Bankruptcy Court.

## II.    THE TRUSTEE FAILED TO STATE A CLAIM UNDER THE DELAWARE STATUTE

### A.    The Complaint Does Not Allege A Transfer By A Debtor That Rendered That Debtor Insolvent

The Bankruptcy Court correctly held that the Trustee's Complaint failed to state a claim

under the Delaware Statute. Section 1304 provides, in relevant part:

> (a) A transfer made or obligation *incurred by a debtor* is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or

---

[13] The legislative history of the 1982 amendments to the Bankruptcy Code includes only one committee report, which is six pages long and contains only two paragraphs discussing section 546(e). H.R. Rep. No. 97-420 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583. The Congressional Record shows only three Representatives speaking to the entire bill, and only two of them mentioned section 546(e), and then only in one sentence each recapitulating the language of the provision. 128 Cong. Rec. 1262-1263 (1982) (statements of Reps. Edwards and McClory).

While it is inappropriate to speculate as to Congress's reasons for drafting section 546(e) as broadly as it did, several policy reasons are plausible. For instance, Congress might have preferred to have a uniform rule for all securities transactions settled through financial institutions, regardless of the nature of the particular securities. Congress might also have intended to encourage the use of financial institutions in private sales of securities in order to regularize such transactions. Congress might also have wished to protect sellers of securities from opportunistic debtors later seeking to undo securities transactions negotiated in good faith. As the *QSI* court noted, "[g]iven the multitude of shareholders involved in this case, many of whom likely reinvested the proceeds, it is questionable whether the undoing of the hundreds of transactions would not cause some disruption[s] in the securities market." 2007 WL 4557855, at *8.

> incurred the obligation:
> (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, *and the debtor:*
> (a) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> (b) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(emphasis added).  Section 1305 provides in relevant part:

> (a) A transfer made or obligation *incurred by a debtor* is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation *and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.*

(emphasis added).  The Bankruptcy Court accordingly found that the Trustee was required to "allege that (i) *a debtor* made a transfer (ii) for less than reasonably equivalent value and (iii) *the debtor* was, or was rendered, insolvent thereby."  *Plassein*, 366 B.R. at 325 (emphasis added).

In this case, the Trustee seeks to avoid a transfer incurred not by the debtor, Key Packaging, but by *Plassein Packaging Corporation*, a separate company.  App. A0095-0096 (Compl. Ex. A).  The Complaint nowhere suggests that Plassein Packaging's payment to the Key Packaging Shareholders rendered *Plassein Packaging* insolvent.  The Trustee tellingly did not even bring the Complaint in his capacity as trustee of the estate of Plassein Packaging; the Complaint recites only Key Packaging and the other Target Companies as "debtors."  App. A0026 (Compl. preamble).  Nor does the Complaint allege that Key Packaging ever transferred funds or assets to the Key Packaging Shareholders.  As the Bankruptcy Court rightly noted,

"[s]ince no Debtor made a transfer, there is no legal basis for any fraudulent conveyance claim."

*Plassein*, 366 B.R. at 325.[14]

**B.    The Statutory "Debtor" Requirement Cannot Be Satisfied By "Collapsing" The Transactions At Issue**

In his Opening Brief, the Trustee does not dispute that the Delaware Statute requires that a *debtor* make the transfer that renders the *same debtor* insolvent. Nor does he contend that he has alleged that such a transfer took place in this case. Instead, he argues only that the statutory requirement of a transfer by a "debtor" that makes the same debtor insolvent can be satisfied by "collapsing" the transactions at issue in this case. But as the Bankruptcy Court found, there is no basis for any "collapsing" here.

---

[14] The Trustee faults the Bankruptcy Court for stating that, according to the Complaint, "Plassein Packaging Corporation" owned the accounts that funded the transfers and that Plassein Packaging Corporation is not alleged to be a debtor. The Trustee argues that Plassein International Corporation and Plassein Packaging are the same entity (Br. 36), yet this information is notably not in the Complaint. The Bankruptcy Court can therefore be excused for thinking that they were separate.

More importantly, however, the Complaint does not allege that either Plassein Packaging or Plassein International is a debtor in the Key Packaging bankruptcy proceeding. The only debtor in the Key Packaging bankruptcy is Key Packaging itself, now known as Plassein International of Salem, Inc. *See* Order Directing Joint Administration of Chapter 11 Cases [D.I.4] (Ex. C hereto) ¶ 4. While the Bankruptcy Court consolidated the separate bankruptcy cases of the various Target Companies for administrative purposes, it stated explicitly that the consolidation was not for substantive purposes. *Id.* ¶ 5; *see In re Owens Corning*, 419 F.3d 195, 203-204 (3d Cir. 2005) (absence of formal substantive consolidation of bankruptcy cases means they must be treated separately). Furthermore, the Complaint's preamble makes clear that Trustee brought this action as trustee of "the Debtors"—a term that, as the Complaint defines it, *does not* include Plassein International Corp. or Plassein Packaging Corp. *See* App. A0026 (Compl. preamble). The Trustee's argument that he has alleged that "one of the debtors" made the transfer (Br. 36) is thus simply incorrect.

Moreover, the Delaware Statute does not allow for the avoidance of a transfer made by *any* debtor. Rather, it requires an allegation that the same debtor that made the transfer be thereby rendered insolvent. Even if the Trustee had pled that "Plassein Packaging" was a debtor—which he did not—his claim would still fail as a matter of law because he did not plead that the transfer rendered "Plassein Packaging" insolvent.

The Trustee has not identified any case law suggesting that the statute's "debtor" requirement can be avoided by "collapsing" two separate *companies* that negotiated at arm's length (as opposed to "collapsing" multiple interrelated *transactions* made by the same company). Most of the Trustee's authorities clearly indicate that the transfer at issue was made by the "debtor" that became insolvent. As the Key Packaging Shareholders pointed out to the Bankruptcy Court and the Trustee has not disputed, the challenged conveyances in *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986), were clearly made by the *debtor* companies to a mortgage lender called IIT. *See id.* at 1295. *Tabor* is thus not informative on the "debtor" question at issue in this case. The Trustee admits as much (Br. 32), noting that the *Tabor* decision decided "whether the consideration received was fairly equivalent to what the target companies gave up," not whether the transferring company was in fact a "debtor" that was rendered insolvent by the transfer.

Similarly, in *Crowthers McCall Pattern Inc. v. Lewis*, 129 B.R. 992, 996 (S.D.N.Y. 1991), the plaintiff properly alleged that the challenged transfer was made by the debtor, Crowthers McCall Pattern, which was thereby rendered insolvent. The same is true for *Mellon Bank, N.A. v. Metro Communications*, 945 F.2d 635 (3d Cir. 1991) (reversing district court's finding of fraudulent conveyance where debtor, Metro, was alleged to have granted a security interest that rendered it insolvent); *Murphy v. Meritor Savings Bank*, 126 B.R. 370, 392 (Bankr. D. Mass. 1991) (trustee alleged that transfer made by debtor, O'Day, rendered it insolvent); *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 629-630 (2d Cir. 1995) (debtor Enterprises made transfers that were allegedly fraudulent); and *Brandt v. Hicks Muse & Co. (In re Healthco International, Inc.*), 195 B.R. 971, 980 (Bankr. D. Mass. 1996) (complaint alleged that debtor Healthco International, Inc. made payments that rendered it insolvent). The Trustee's citation to *Moody v.*

-23-

*Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992) is curious, as the Third

Circuit upheld the lower court's *dismissal* of a fraudulent conveyance claim. *Id.* at 1059.

    *Official Committee of Unsecured Creditors v. Fleet Retail Finance Group* (*In re*

*Hechinger Investment Co. of Delaware, Inc.*), 274 B.R. 71 (D. Del. 2002), does not address

whether or not the "collapsing" of multiple companies can compensate for the failure to plead a

transfer by and insolvency of the same "debtor" under the Delaware Statute. Rather, *Hechinger*

focused on the common law fiduciary duties of the directors of an insolvent company to the

committee of unsecured creditors—a point the Key Packaging Shareholders made in briefing and

at oral argument below and to which the Trustee has no response. *See* Reply 14 (Ex. B hereto);

*Hechinger*, 274 B.R. at 89-91. *Lippi v. City Bank*, 955 F.2d 599 (9th Cir. 1992), is similarly

inapposite, as it addressed whether a debtor violated a Hawaiian statute prohibiting a corporation

from purchasing its own shares under certain conditions. There was no discussion of the

requirements of a transfer by a "debtor" in a fraudulent conveyance action. *See id.* at 610.

    Moreover, even if the "collapsing" of transactions could satisfy the statute's "debtor"

requirement, the Trustee's cases all make clear that "collapsing" is appropriate only where the

parties intentionally structure the transaction to defraud creditors. *See Rosener v. Majestic*

*Mgmt.* (*In re OODC, LLC*), 321 B.R. 128, 138 (Bankr. D. Del. 2005) ("In deciding whether to

'collapse' a series of transactions into one integrated transaction, the issue is . . . whether there

was an overall scheme to defraud the estate and its creditors by depleting all the assets through

the use of a leveraged buyout."). The Trustee has conceded that he does not allege such bad faith

on the part of the Key Packaging Shareholders. *Plassein*, 366 B.R. at 326.

    The Trustee cites *Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206

(3d Cir. 1990), yet he recognizes that the Third Circuit found that "the single integrated

transaction [*i.e.*, after multiple interrelated transactions were "collapsed"] was aimed at 'depriving [the target company's] unsecured creditors of [its] assets,' and functioned as a 'subterfuge.'" Br. 33 (citing *Voest-Alpine*, 919 F.2d at 212-213). Unlike the present case, the transferee in *Voest-Alpine*, Vantage, was a shell company that was set up by its controlling shareholders, the Stablers, for the purpose of transferring assets from another company that the Stablers owned, Paige, so as to free those assets from Paige's creditors. 919 F.2d at 208-209. Given the "abundant" facts confirming that the transactions amounted to "subterfuge" (*id.* at 212), the court found that "Vantage was the Stablers' instrument for acquiring Paige's assets at less than fair value *and* free from claims by unsecured creditors[,] while, at the same time, securing the Stablers' own equity position." *Id.* at 211 (citations omitted, emphasis in original).

*Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488 (Bankr. N.D. Ill. 1988), is similarly inapposite. In that case, the Bankruptcy Court for the Northern District of Illinois "collapsed" multiple transactions into one only where the "complaint allege[d] clearly that [the] participants in the LBO negotiations attempted to structure the LBO with the requisite knowledge and contemplation that the full transaction, tender offer and LBO, be completed." *Id.* at 502. In reaching its conclusion, the *Wieboldt* court relied on the fact that the transferees *knew that the debtor was insolvent at the time of the transfer* and that the LBO would put further financial stress on debtor. *Id.* In addition, it was established that attorneys advised the debtor of "fraudulent conveyance laws and suggested that they structure the LBO so as to avoid liability." *Id.* The Trustee has not alleged facts even approaching those in the *Wieboldt*.

As the Trustee acknowledges, even the most liberal reading of the caselaw requires, at a minimum, a showing that the transferee had knowledge of and intent to participate in a global scheme of which the various transfers to be collapsed were a part. Br. 33 ("Without question the

-25-

Third Circuit's *sine qua non* for collapsing an LBO was . . . knowledge and intent of the global deal."). But the Complaint does not allege that the Key Packaging Shareholders knew of and intended to participate in any "global deal." The allegations in this case do not justify collapsing the transactions at issue, whether under a theory of actual fraud, which the Trustee has disavowed, or a theory of "constructive" fraud, which is unsupported by the Complaint.

In his brief in this Court, the Trustee argues for the first time that the Key Packaging Shareholders were aware of the various other transactions he seeks to collapse. In support of this newfound argument, the Trustee relies on two sources, neither of which supports his argument. The Trustee's first source is the Funds Flow Memorandum attached as Exhibit A to the Complaint. *See* Br. 34. Nowhere in that document, however, is there even a hint that the Key Packaging Shareholders were aware of any aspect of the transactions besides the sale of Key Packaging to Plassein. Indeed, the Funds Flow Memorandum is unexecuted and contains only one signature line for the chairman of the board of "Plassein Packaging Corp." App. A0058 (Compl. Ex. A). Nothing in the Complaint or its attachments suggests—and the Trustee does not argue—that the Key Packaging Shareholders even saw, much less reviewed or approved, the Funds Flow Memorandum at the time of the acquisition.

The Trustee's second source is his own counsel's affidavit, which the Trustee submitted to the Bankruptcy Court only in response to the motion to dismiss. The Bankruptcy Court did not rely on these extraneous materials, and this Court should not either. It is far too late for the Trustee to amend his complaint, and he cannot supplement its allegations through affidavits in an effort to avoid dismissal. *See, e.g., Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of

-26-

public record."); *Baylis v. Taylor*, 475 F. Supp. 2d 484, 489 (D. Del. 2007) ("When ruling on a motion to dismiss, the court considers the allegations on the face of the amended complaint."); *TWA Inc. Post-Confirmation Estate v. Marsh USA Inc.* (*In re TWA Post Confirmation Estate*), 305 B.R. 228, 232 (Bankr. D. Del. 2004) (a "party cannot amend its [insufficient] complaint by response or affidavit filed in opposition to a motion to dismiss") (internal quotation marks omitted); *Posman v. Bankers Trust Co.* (*In re Lomas Financial Corp.*), No. Adv. A-97-245, 1999 WL 33742299, at *1 (Bankr. D. Del. July 28, 1999) ("the factual allegations outlined in the Affidavit [attached to an opposition to a motion to dismiss] cannot replace the allegations in the Complaint nor cure missing allegations in the Complaint").

But even if counsel's extrinsic evidence were admissible on a motion to dismiss, the materials do not help the Trustee's case because they do not suggest that the Key Packaging Shareholders were aware of any of Plassein's other transactions. Counsel's affidavit and materials are at most neutral regarding the Key Packaging Shareholders' knowledge and, in some respects, actually indicate that the Key Packaging Shareholders were *not* made aware of the other transactions that the Trustee now seeks to "collapse."

In the first place, counsel has not provided complete copies of authenticated executed documents. None of the exhibits to counsel's affidavit is signed by anyone, let alone by the Key Packaging Shareholders. Although counsel contends that one of the documents—a stock purchase agreement—was included in the "closing binders" for the Key Packaging acquisition (App. A00261 (Aff. of Charles R. Bennett, Jr., in Supp. of Trustee's Opp. to Defs.' Mot. to Dismiss ("Bennett Aff.") ¶¶ 3-4)), the stock purchase agreement nowhere suggests that Key Packaging would be jointly or severally liable for the debt of any other unrelated entities (App. A0264-0268 (Bennett Aff. Ex. A)). Notably, counsel does *not* say that the Key Packaging

"closing binders" contained the loan documents that Counsel claims *did* memorialize Key Packaging's assumption of broader debt obligations to Plassein. *Compare* App. A00261 (Bennett Aff. ¶ 4 (asserting that the purchase agreement (Ex. A) was in the "closing binders")) *with* App. A0262-0263 (Bennett Aff. ¶¶ 7-11 (conspicuously not asserting that the lending documents (Exs. C and D) were in the "closing binders")). Accordingly, nothing in counsel's affidavit or attachments suggests that the Key Packaging Shareholders even knew about, let alone agreed to or participated in, Plassein's decision to bundle the debt of several companies together through joint and several liability undertakings.

The Trustee himself stated, in briefing before the Bankruptcy Court, that it was *after* Plassein had purchased the Key Packaging Shareholders' stock that Key Packaging and the other January Target Companies became jointly and severally liable for each other's debt. App. A0211 ("*Following these acquisitions* [*i.e.*, the acquisitions of the January Target Companies], each of the January Target Companies became jointly and severally liable for the entire debt incurred to finance the transactions, and each granted a security interest in all of its assets to secure that debt." (citing Compl. ¶ 33) (emphasis added)). Neither the allegations in the Complaint nor the unexecuted fragments attached to counsel's improper affidavit suggest that the Key Packaging Shareholders were involved in a transaction that Plassein consummated with its own new subsidiaries *after* the Key Packaging Shareholders were bought out.

The Trustee has not alleged that the Key Packaging Shareholders were even *aware* of the details of transactions other than their own, let alone that they approved them. The Trustee has not pled that, at the time of the January 10, 2000 acquisition, the Key Packaging Shareholders had any knowledge of: (1) Plassein's planned purchase of the other January Target Companies; (2) how Plassein planned to finance its acquisition of the other January Target Companies; (3)

Plassein's plan to have Key Packaging pledge its assets to become jointly and severally liable to the Lenders for the money borrowed to purchase the other January Target Companies; (4) Plassein's subsequent plan to purchase Rex, seven months after the Key Packaging Shareholders had sold their stake in Key Packaging; or (5) how Plassein would finance the Rex Acquisition.

The Trustee's first mention of the "knowledge" he now belatedly attributes to the Key Packaging Shareholders is made in his Opening Brief *on appeal*. The Trustee now argues that the January and Rex Transactions were "considered by the participants, including the defendant shareholders, to be components of a whole" (Br. 34); that the Key Packaging Shareholders "unquestionably participated in the respective overall scheme for Plassein's two LBOs" (Br. 35); and that the shareholders "knew or should have known all of the stages of the transactions" (*id*.). The Trustee does not point to a single paragraph in his Complaint where such allegations can be found. Rather, as the Bankruptcy Court held, the "Complaint . . . does not allege any relationship whatsoever among the transactions or the Shareholders." *Plassein*, 366 B.R. at 326. Moreover, the Trustee never argued to the Bankruptcy Court that the Key Packaging Shareholders were actually aware of the structure of any transactions other than that concerning Key Packaging; he cannot raise such an argument now. *Kuntz v. Saul, Ewing, Remick & Saul (In re Grand Union Co.)*, 200 B.R. 101, 106 (D. Del. 1996) (issues not presented in a bankruptcy court are not properly preserved for appeal); *Mullins v. Burtch (In re Paradise & Assocs., Inc.)*, 249 B.R. 360, 364 (D. Del. 2000) ("Because the equitable subrogation argument was not properly raised in the Bankruptcy Court, the issue is not properly before this Court on appeal.").

As the Key Packaging Shareholders noted in their briefing to the Bankruptcy Court, the Trustee's position with respect to the Rex Transaction is particularly vague and troubling. It is not clear from either the Complaint or the Trustee's Brief whether the Trustee considers

Plassein's purchase of Rex—seven months after the Key Packaging Shareholders ceased to have any involvement with Key Packaging or Plassein (App. A0029 (Compl. ¶ 33); A0034 (Compl. ¶ 52))—to be a part of the overall scheme that he now argues should be collapsed. *See, e.g.*, Br. 35 ("The Trustee has alleged ample facts demonstrating that the shareholders knew or should have known of all of the stages of *the transaction* and that, at the end of the day, the acquired Target Companies received little or no value in exchange for the substantial new burden of debt for which each became responsible as a result of *the two LBOs*." (emphasis added)).

To the extent that the Trustee does assert that the January and Rex acquisitions should be collapsed, the argument is patently absurd. The Trustee makes no allegation that the Key Packaging Shareholders were ever aware that Plassein would acquire Rex, much less that it would do so by encumbering Key Packaging with more debt. In fact, the (again unexecuted) Second Amended and Restated Loan and Security Agreement, which the Trustee improperly submitted with his Opposition, shows that the intended signatory on behalf of Key Packaging was Plassein executive Richard J. Mosback, and not any of the Key Packaging Shareholders. App. A0313 (Bennett Aff. Ex. D). In his Brief and in the Complaint, the Trustee repeatedly distinguishes between the "January Transaction" (or "January Acquisitions") and the "Rex Transaction" (or "Rex Acquisition"), reflecting an implicit concession on his part that the purchase of Rex was a distinct business decision. *See, e.g.*, Br. 34 ("both the January and Rex Transactions"); App. A0029 (Compl. ¶ 31) (defining "January Acquisitions"); App. A0034 (Compl. ¶ 48) (defining "Rex Acquisition"). To "collapse" transactions that are so vividly distinct in both their timing and the companies involved would set a dangerous precedent, as it would expose participants in one transaction to unlimited liability on the basis of actions of unrelated parties months after the transaction closed.

## III.    THE TRANSFERS DID NOT RENDER KEY PACKAGING INSOLVENT

The "adjusted balanced sheet" attached to the Complaint (*see* App. A0102 (Compl. Ex. A); A0033 (Compl. ¶ 45)) demonstrates an additional fact warranting dismissal of the Complaint against the Key Packaging Shareholders: the transfer of funds to them, even if considered to have been made by Key Packaging (which it was not), did not render Key Packaging insolvent. According to that document, Key Packaging's balance sheet showed assets of $30,109,988 at the conclusion of the transaction. App. A0102 (Compl. Ex. B). Key Packaging's liabilities at that time were only $19,500,254, yielding a surplus of $10,609,734. Even excluding $9,256,600 of goodwill, Key Packaging's surplus after the acquisition stood at $1,353,134. *See id.*[15]

The Trustee conceded below that, taking into account the debt incurred to "purchase [Key Packaging's] shares and discharge certain of [Key Packaging's] outstanding liabilities," Key Packaging remained solvent after the transaction was completed. App. A0236. The Trustee's theory is that Key Packaging was rendered insolvent by becoming jointly and severally liable for debt incurred by Plassein to *other* companies. But the decision to saddle Key Packaging with such debt in connection with other, unrelated transactions was one made by, and for the convenience of, Plassein and its Lenders, not Key Packaging or its Shareholders. The Trustee's claim that the debt incurred *by Plassein* to purchase *other* companies tainted the Key Packaging acquisition is an abuse of the fraudulent transfer statute and essentially seeks to transform the Key Packaging Shareholders into guarantors or insurers of Plassein's business failures.

---

[15] As noted above, the Funds Flow Memorandum does not provide any insight into what the Key Packaging Shareholders knew at the time of the transaction, since there is no allegation that they even saw it. *See supra* p. 26. However, the Memorandum *is* relevant to demonstrate that the purchase price that Plassein paid for the Key Packaging stock was far outweighed by the value of Key Packaging's assets and thus did not leave Key Packaging insolvent.

The Delaware Statute expressly forbids the Trustee's maneuver: a transfer may only be avoided if "the debtor was insolvent at that time or the debtor became insolvent *as a result of the transfer or obligation*." 6 Del. Code Ann. § 1305(a) (emphasis added). Since Key Packaging was clearly not insolvent at the time of the January 2000 transaction, the Trustee must be contending that it became insolvent "as a result of the transfer or obligation," *i.e.* as a result of the payments to the Key Packaging Shareholders. But Key Packaging's balance sheet, taking into account the new debt incurred to buy out the Key Packaging Shareholders, clearly shows a surplus after its acquisition, even if goodwill is totally disregarded. According to the Delaware Statute's definition of insolvency, a "debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation." *Id.* § 1302(a). Consequently, on the face of the Complaint and its exhibits, Key Packaging did not become insolvent "as a result of the transfer or obligation" at issue. Rather, it was Plassein's separate decisions to burden Key Packaging with debts incurred to finance the purchase of other companies, including Rex on August 15, 2000, that made Key Packaging insolvent under the Trustee's theory.[16]

The unreasonableness of the Trustee's position is confirmed by the fact that, under the Trustee's view of the case, Key Packaging assumed over $39 million in debt despite having only $19,332,475 in assets prior to the transaction. App. A0102 (Compl. Ex. B). Clearly, Plassein did not believe that it was buying a company that was already in deficit to the tune of roughly $20 million. Rather, Plassein bought a company that (even after the payments to its Shareholders) had a healthy asset surplus, but subsequently lost that surplus through actions that are Plassein's responsibility alone. Delaware law does not allow the Trustee to unwind an arm's

---

[16] The Complaint likewise defeats any argument that Key Packaging was left with assets that were unreasonably small in light of its business or that Key Packaging would be unable to pay its debts as they came due. *See* 6 Del. Code Ann. § 1304(a)(2). The Complaint shows that Key Packaging continued for nearly two years before defaulting. App. A0036 (Compl. ¶ 62).

length transaction, negotiated and consummated in good faith, simply because Plassein's later

business decisions—in which the Key Packaging Shareholders took no part—did not succeed.[17]

## CONCLUSION

For the reasons set forth above and in the submissions of the other Appellees in this

matter, the Court should affirm the decision of the Bankruptcy Court.

Respectfully submitted,

THOMAS F. FAY, RUTH L. FISCHBACH,
MARK R. FREEDMAN, ROBERT N. ZEITLIN,
SIDNEY ZEITLIN, ZFC ASSOCIATES, INC.,
WILLIAM G. RUSSELL, and ROBERT N.
ZEITLIN 1999 CHARITABLE REMAINDER
UNITRUST

By their Attorneys,

POTTER ANDERSON & CORROON LLP

By: _Laurie S. Silverstein_ _(#1 for 3983)_
Laurie Selber Silverstein (2396)
Gabriel R. MacConaill (4734)
1313 North Market Street, 6th Floor
P. O. Box 951
Wilmington, DE  19899-0951
(302) 984-6000 (telephone)
(302) 658-1192 (facsimile)

Of Counsel:

WILMER CUTLER PICKERING
   HALE AND DORR LLP
Richard A. Johnston
Mark C. Fleming
Jeffrey Gleason
Dated:  March 10, 2008
60 State Street
853923
Boston, Massachusetts 02109
(617) 526-6000 (telephone)
(617) 526-5000 (facsimile)

---

[17] The Bankruptcy Court did not need to reach this argument, as it found ample other reasons to dismiss the Complaint.  And while it is true that solvency *generally* cannot be determined on a motion to dismiss (*Plassein*, 366 B.R. at 322 n.3), this is the rare case where the Complaint and its attachments defeat any claim of insolvency.

# EXHIBIT A

1

1

2   UNITED STATES BANKRUPTCY COURT

3   DELAWARE DISTRICT OF DELAWARE

4   Case No. 03-11489

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   PLASSEIN INTERNATIONAL CORP., ET. AL.,

9

10          Debtor.

11

12   - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              844 King Street

16              Wilmington, Delaware

17

18              April 12, 2007

19              3:00 PM

20

21   B E F O R E:

22   HON. KEVIN GROSS

23   U.S. BANKRUPTCY JUDGE

24

25

2

1

2  HEARING re:  Motion to Dismiss Adversary Proceeding against

3  William A. Brandt, Trustee of the Estates of Plassein

4  International Corp.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24  Transcribed by:  Hana Copperman

25

28

1    free to disregard it.  And I guess my question for you, Mr.

2    Bennett, is, you know, in a few weeks I'm going off to a

3    conference, a Third Circuit conference -- and tell me why, if I

4    follow your arguments, it will be my last Third Circuit

5    conference.

6              MR. BENNETT:  Hey, Your Honor.  My position is that,

7    as set forth in our brief, that Resorts establishes the

8    application of 546(e) to a settlement payment, establishes that

9    a leveraged buyout can fall within the purview of 546(e).  It

10   does run contrary to a number of other decisions, but

11   unfortunately for the trustee's case those other decisions are

12   all outside the Third Circuit, and if I want to completely

13   reverse Resorts, I agree that I need to do that in front of the

14   Third Circuit.  However, we did argue that there is an

15   exception open in Resorts, which is that it needs to be a

16   situation -- or the factual presentation needs to be one in

17   which the public is involved in which there is public

18   securities being traded, transacted, sold, bought or paid for.

19   And that a purely private transaction, such as the one that's

20   before you today, where the only involvement of any entity that

21   would be done within the purview of a settlement payment, is

22   Fleet acting as a financial institution.  But solely acting to

23   transfer funds by wire transfer out of the buyer's account into

24   the seller's account.  That that transaction was not covered by

25   Resorts, was not governed by Resorts, and therefore you would

29

1    be free to determine that this case could go forward, because

2    it's not a settlement payment contemplated either by the

3    statute or by Resorts.  Now I understand that my argument is

4    now directly contrary to the position taken by Judge Walrath in

5    the IT Group case.  All I can say on that point, Your Honor, is

6    I think Judge Walrath was wrong, and I would ask you to find

7    different from her.  And find that in a purely private

8    transaction 546(e) is not applicable.

9             THE COURT:  Okay.  And as far as your position is

10   concerned, you're not challenging that Fleet Bank is a

11   financial institution within the definition of a 546?

12            MR. BENNETT:  I am not challenging that Fleet is a

13   financial institution as defined by, I think it's 10122.  But

14   that it is not in the context of what it did in this case.  It

15   was certainly not acting to transfer securities or act in a

16   capacity as a custodian or other holder of securities.  So it

17   was not in any way acting under any of the commonly referred to

18   provisions under 741, such as a clearing.  It was not acting,

19   certainly, as a clearing house or otherwise.  That it had a

20   limited role solely to effectuate the wire transfer.

21            THE COURT:  And are you alleging -- I don't see it

22   under plaintiff or any allegation of actual fraud.

23            MR. BENNETT:  No, Your Honor, there is none.  It's

24   based on a constructive fraud.

25            THE COURT:  Okay.  Okay.  I think I understand your

33

1

2                    C E R T I F I C A T I O N

3

4    I, Hana Copperman, court approved transcriber, certify that the

5    foregoing is a correct transcript from the official electronic

6    sound recording of the proceedings in the above-entitled

7    matter.

8
     Hana Copperman    Digitally signed by Hana Copperman
                       DN: cn=Hana Copperman, c=US
                       Reason: I am the author of this document
9                      Date: 2007.05.23 11:27:02 -04'00'        May 21, 2007____

10   Signature of Transcriber              Date

11

12   Hana Copperman_____

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 7 |
|  | ) | Case No. 03-11489 (WS) |
| PLASSEIN INTERNATIONAL CORP., et al., | ) | Jointly Administered. |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |
| WILLIAM BRANDT, AS HE IS THE | ) |  |
| TRUSTEE OF THE ESTATES OF | ) |  |
| PLASSEIN INTERNATIONAL CORP., et al. | ) |  |
|  | ) |  |
| Plaintiff, | ) | Adv. Pro. No. 05-50692 (WS) |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| B.A. CAPITAL COMPANY LP, THOMAS F. FAY, RUTH L. | ) |  |
| FISCHBACH, MARK R. FREEDMAN, ROBERT N. ZEITLIN, | ) |  |
| SIDNEY ZEITLIN, ZFC ASSOCIATES, INC., WILLIAM G. | ) |  |
| RUSSELL, ROBERT N. ZEITLIN1999 CHARITABLE | ) |  |
| REMAINDER UNITRUST, THE ANDREW MARSHALL | ) |  |
| FORSBERG TRUST, ETHEL FORSBERG REVOCABLE | ) |  |
| TRUST, JANIS RAE FORSBERG TRUST, | ) |  |
| FRANK JOHN McCARTHY, DANIEL R. ORRIS, | ) |  |
| BERNADINE ORRIS, SAM CHEBEIR, CHARLES J. WARR, | ) |  |
| PAUL D. GAGE, STEPHEN S. WILSON, G. KENNETH POPE | ) |  |
| JR., KENNETH OLENLER and DANIEL A. JONES III, | ) |  |
|  | ) |  |
| Defendants. | ) |  |

## KEY PACKAGING DEFENDANTS' REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

Richard A. Johnston
Mark C. Fleming
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Tel: (617) 526-6329

Laurie Selber Silverstein (DE 2396)
Rebecca S. Beste (DE 4154)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, Sixth Floor
1313 North Market Street, Sixth Floor
P.O. Box 951
Wilmington, Delaware  19899
Tel: (302) 984-6000

Dated: August 15, 2005

*Attorneys for the Defendant*

## TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................... 2

ARGUMENT ........................................................................................................... 3

I.    Section 546(e) Applies To All "Statement Payments," Not Only Payments
      In Settlement Of Publicly-Traded Securities. .......................................................... 3

      A.    Under The Plain Meaning Of § 546(e), The Term "Settlement
            Payment" Supplies Equally To Publicly And Privately-Traded
            Securities ........................................................................................................3

      B.    In Addition To Being An Inappropriate Consideration, The
            Legislative History Of § 546(E) Does Not Support Plaintiff's
            Reading Of The Statue ............................................................................ 10

II.   Plaintiff Has Failed To Plead The Elements Of A Fraudulent Transfer
      Under Delaware Law ............................................................................................... 13

      A.    Plaintiff Has Not Alleged A Transfer Made By the Debtor, Key
            Packaging, To The Defendants ................................................................13

      B.    The Purchase Of The Key Packaging Stock Did Not Render Key
            Packaging Insolvent ..................................................................................14

CONCLUSION.............................................................................................................17

## TABLE OF AUTHORITIES

### CASES

*Badaracco v. Comm'r of Internal Revenue Deleet Merch. Corp.,*
  464 U.S. 386 (1983)................................................................................8

*Bevill, Bresler & Schulman Asset Mgmt., Corp. v. Spencer Sav. & Loan Ass'n,*
  878 F.2d 742 (3d Cir. 1989)....................................................................6

*Buckley v. Goldman, Sachs and Com.,*
  No. 02-CV-11497, 2005 WL 1206865 (D. Mass. May 20, 2005)........................12

*Harrison v. PPG Indus., Inc.,*
  446 U.S. 578 (1980)..............................................................................11

*In re Hechinger Inv. Co. of Del., Inc.,*
  274 B.R. 71 (D. Del. 2002)...............................................................13, 14

*Kaiser Steel Corp. v. Pearl Brewing Co.,*
  952 F.2d 1230 (10th Cir. 1991) .........................................................5, 7

*Kipperman v. Circle Trust (In re Grafton Partners),*
  321 B.R. 527 (9th Cir. 2005) ...............................................................12

*In re Loranger Mfg. Corp.,*
  324 B.R. 575 (Bankr. W.D. Pa. 2005) .....................................................6

*In re Olympic Natural Gas Co.,*
  294 F.3d 737 (5th Cir. 2002) .............................................................6, 7

*Pension Benefit Guaranty Corp. v. White Consol. Indus.,*
  998 F.2d 1192 (3d Cir. 1993)................................................................15

*Posman v. Bankers Trust Co. (In re Lomas Fin. Corp.),*
  No. Adv. A-97-245, 1999 WL 33742299 (Bankr. D. Del. Jul. 28, 1999) .............15

*Lowenschuss v. Resorts Int'l (In re Resorts Int'l, Inc.)*
  181 F.3d 505 (3d Cir. 1999).....................................2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 18

*Rosener v. Majestic Mgmt., Inc.,*
  321 B.R. 128 (Bankr. D. Del. 2005) ......................................................14

*TWA Inc. Post-Confirmation Estate v. Marsh USA Inc.*
*(In re TWA Post Confirmation Estate),*
  305 B.R. 228 (Bankr. D. Del. 2004) .....................................................15

*United States v. Tabor Court Realty Corp.,*
  803 F.2d 1288 (3d Cir. 1986)..........................................................13, 14

*Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*,
    919 F.2d 206 (3d Cir. 1990)................................................................................14


*Wieboldt Stores, Inc. v. Schottenstein*,
    131 B.R. 655 (N.D. Ill. 1991) .............................................................5, 10, 12

*Zahn v. Yucaipa Capital Fund*,
    218 B.R. 656 (D.R.I. 1998)..............................................................4, 5, 10

## STATUTES

11 U.S.C. §741 ............ 3, 9

11 U.S.C. §546(f) ............ 6, 7

11 U.S.C. §546(e) ............ 2, 3, 4, 5, 6, 7, 11

15 U.S.C. §78(c)(a)(4)(B)(vii) ............ 7

15 U.S.C. §78(c)(a)(4)(C) ............ 7

15 U.S.C. §78m(h)(8) ............ 7

DEL. CODE ANN. tit. 6 § 1304 ............ 3,14

DEL. CODE ANN. tit. 6 § 1305 ............ 3, 15, 17

DEL. CODE ANN. tit. 6 § 1302(a) ............ 14, 15

## MISCELLANEOUS

Merriam – Webster's Collegiate Dictionary ............ 8

Encyclopedia of Banking & Finance ............ 9

H.R. Rep. No. 420, 97th Cong., 2d Sess. (1982), *reprinted in* 1982 U.S.C.C.A.N. 583 ............ 11

## **INTRODUCTION**

Defendants Thomas F. Fay, Ruth L. Fischbach, Mark R. Freedman, Robert N. Zeitlin, Sidney Zeitlin, ZFC Associates, Inc., William G. Russell, and Robert N. Zeitlin 1999 Charitable Remainder Unitrust, all former shareholders of Key Packaging Industries Corporation (collectively the "Key Packaging Defendants") file this reply brief in support of their motion to dismiss the complaint ("Complaint") of Plaintiff William Brandt ("Plaintiff"), as Trustee of the Estates of Plassein International Corp., et al. ("Plassein").

This case falls squarely under the Third Circuit's holding in *Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 515-16 (3d Cir. 1999). Under *Resorts*, section 546(e) of the Bankruptcy Code[1] bars Plaintiff's fraudulent conveyance claim because the payments to the Key Packaging Defendants involved a settlement payment made by a financial institution. However, Plaintiff has asked this Court to take the extraordinary step of reading a restriction into section 546(e) that the Third Circuit already has rejected and that the legislative history in no way supports. Plaintiff acknowledges that the Third Circuit in *Resorts* refused to consider the legislative history of section 546(e) because the language of the statute is clear: transactions involving a settlement payment made by or to a financial institution are protected from trustee avoidance. Plaintiff nevertheless argues that the statutory protection applies only to "publicly-traded securities" – based almost *entirely* on legislative history. Given the *Resorts* court's refusal to consider legislative history in the face of clear statutory language, Plaintiff's argument is without merit. In addition, even if it were appropriate for this Court to consider the legislative history of the statute—which it is not—Plaintiff has identified no statement suggesting that Congress intended to exclude privately-traded securities from the protections of section 546(e) of the Bankruptcy Code.

---

[1] All references to sections unless otherwise noted are in reference to title 11 of the United States Code, (the "Bankruptcy Code").

- 2 -

This Court should also dismiss Plaintiff's Complaint against the Key Packaging Defendants because it fails to plead two of the elements required by the Delaware fraudulent transfer statute. DEL. CODE ANN. tit. 6 §§ 1304, 1305 (2005). First, the Delaware statute explicitly states that only a transfer "by a debtor" may be avoided. *Id.* § 1304(a). As the Key Packaging Defendants pointed out in their opening brief in support of their motion to dismiss, the Complaint and its exhibits allege that Plassein, not Key Packaging, made the payments to the Key Packaging Defendants. Second, Plaintiff cannot escape the fact that, even taking into account the debt incurred in the LBO to buy out the Key Packaging Defendants, Key Packaging remained solvent as a matter of law after its acquisition by Plassein. *See* Complaint, Exhibit B, at P08821 (stating that Key Packaging had $30,109,988 in assets and $19,500,254 in liabilities after the transaction and closing adjustments). Even Plaintiff's eleventh-hour attempt to distance himself from the financial allegations of his own Complaint by asserting new, unauthenticated facts outside the Complaint—which is inappropriate in response to a motion to dismiss—does not state a claim under Delaware's fraudulent transfer statute. Plaintiff still does not allege that the Key Packaging Defendants themselves engaged in a transaction that rendered Key Packaging insolvent.

Accordingly, for the reasons stated in the submissions of the Key Packaging Defendants and of all other defendants in this matter, the Court should dismiss the Complaint with prejudice.

## ARGUMENT

I. **SECTION 546(e) OF THE BANKRUPTCY CODE APPLIES TO ALL "SETTLEMENT PAYMENTS," NOT ONLY PAYMENTS IN SETTLEMENT OF PUBLICLY-TRADED SECURITIES.**

A. **Under The Plain Meaning of Section 546(e), The Term "Settlement Payment" Applies Equally To Publicly And Privately-Traded Securities.**

Plaintiff's attempt to read the Key Packaging transaction out of the definition of "settlement payment," as defined by section 741 of the Bankruptcy Code and used in section 546(e), not only

- 3 -

defies logic, but also ignores settled precedent which is controlling in this case. Every defendant in this case has pointed out that the Third Circuit considered and rejected the basic premise of Plaintiff's argument, namely that courts interpreting section 546(e) should elevate Congress's purported intent to protect the "system of intermediaries and guarantees" above the plain text of the statute. *Resorts*, 181 F.3d at 515-16 (quotation omitted). In *Resorts*, the court noted that "[w]hen the language [of a statute] is clear, no further inquiry is necessary unless applying the plain language leads to an absurd result." *Id.* at 515 (citation omitted). The court then concluded that it saw "no absurd result from the application of the statute's plain language and will not disregard it." *Id.* at 516.

Applying the "plain meaning" of the statute, the Third Circuit held in *Resorts* that a settlement payment "is generally the transfer of cash or securities made to complete a securities transaction." *Id.* at 515. The Resorts court elaborated, in terms dispositive here, that a "payment for shares during an LBO is obviously a common securities transaction" and is therefore "a settlement payment." *Id.* at 516. Plaintiff does not dispute that the transaction at issue involved a "transfer of cash" to complete a "securities transaction," or that the payments he seeks to avoid occurred as part of an LBO. Therefore, under the plain language of the statute and binding Third Circuit precedent, payments which the Key Packaging Defendants received in exchange for the sale of their shares in Key Packaging Industries Corporation ("Key Packaging") were "settlement payment[s]" under section 546(e) of the Bankruptcy Code and thus are unavoidable.

Plaintiff contends that this case differs from *Resorts* because the Key Packaging shares were not "publicly traded." Plaintiff's Opposition at 22. Yet the *Resorts* court at no point suggested that such a fact would be relevant under section 546(e). On the contrary, as Plaintiff acknowledges, the *Resorts* court considered and rejected decisions from other jurisdictions, which had made this same publicly-traded/privately-traded distinction. *See Zahn v. Yucaipa Capital Fund*, 218 B.R. 656 (D.R.I.

- 4 -

1998); *Wieboldt Stores, Inc. v. Schottenstein*, 131 B.R. 655 (N.D. Ill. 1991).  The Third Circuit noted

that the "reasoning of these courts is essentially that 'the system of intermediaries and guarantees' that

normal securities transactions involve is not in play in an LBO." *Resorts*, 181 F.3d at 515 (quotation

omitted).  The Third Circuit also considered the position, advanced by Plaintiff here, that section

546(e) of the Bankruptcy Code should not be applied to "a transaction that did not implicate the

concerns that Congress had in creating the law." *Id.* at 516 n.16 (citations omitted).  The Third Circuit

rejected those arguments in favor of the statute's "plain language," pursuant to which "a payment for

shares during an LBO is obviously a common securities transaction" and is therefore "a settlement

payment for the purposes of section 546(e)." *Id.* at 516.

　　　Plaintiff suggests that the Third Circuit's rejection of *Zahn* and *Wieboldt* might be limited to

the "mode of analysis" those cases used – *i.e.* "resting their conclusions on policy considerations

derived from the statutes' legislative history." Opposition at 21.  Plaintiff is arguing in vain.  The

Third Circuit's discussion of *Zahn* and *Wieboldt* did not mention a "mode of analysis" (whatever that

may mean).  Rather, the Third Circuit held that "[i]ncluding payments made during LBOs within the

scope of the [section 546(e)] definition is consistent with the broad meaning" of the definition

discerned by other federal courts of appeals. *Resorts*, 181 F.3d at 515-16 (citing *Kaiser Steel Corp. v.

Pearl Brewing Co.*, 952 F.2d 1230, 1239-40 (10th Cir. 1991); *In re Comark*, 971 F.2d 322, 325 (9th

Cir. 1992)).  The Third Circuit did not suggest that it would have reached the opposite conclusion had

the securities at issue not been publicly traded.  On the contrary, the Third Circuit's respect for the

statute's plain language makes it exceedingly unlikely that the Third Circuit would engraft Plaintiff's

nontextual exception onto section 546(e) under any circumstances.  Another court in this Circuit

accordingly had no difficulty concluding that the *Resorts* holding applied in the context of nonpublic

securities trades. *In re Loranger Mfg. Corp.*, 324 B.R. 575, 586 (Bankr. W.D. Pa. 2005).

Moreover, in the commodities context, at least one other circuit has definitively rejected Plaintiff's position that Congress intended to exclude private transactions from the protections of section 546(e). In a case in which a trustee sought to avoid payments made by the debtor to Morgan Stanley pursuant to a natural gas sales and purchase contract, the Fifth Circuit, citing *Resorts*, "reject[ed] the Trustee's argument that in order to be exempt from avoidance, a settlement payment … must be cleared or settled through a centralized system." *In re Olympic Natural Gas Co.*, 294 F.3d 737, 742 (5th Cir. 2002) (citation omitted). The Olympic Natural Gas trustee made the identical argument to the one Plaintiff makes here, asserting that Congress intended that section 546(e) apply only to transactions that utilize public exchanges. The Fifth Circuit rejected this argument, noting that "[b]y including references to both the commodities and the securities markets, it seems clear that Congress meant to exclude from the stay and avoidance provisions *both on-market, and the corresponding off-market transactions.*" *Id.* at 742 n.5 (emphasis supplied). Given Plaintiff's concession that the 1982 amendment to section 546(e) was designed to extend the protections already present in the commodities trade to the securities trade, Opposition at 14, the rejection of a public/private distinction for commodities cases in *Olympic Natural Gas* further compels dismissal of Plaintiff's complaint here.

Furthermore, the Third Circuit has explicitly held that Congress's use of the same words "settlement payment" in the provision immediately following section 546(e) includes transactions that do not involve public securities exchanges. In *Bevill, Bresler & Schulman Asset Mgmt., Corp. v. Spencer Sav. & Loan Ass'n*, 878 F.2d 742, 752 (3d Cir. 1989), the Third Circuit recognized that Congress intended the term "settlement payment" in section 546(f) of the Bankruptcy Code to include payments made in connection with repurchase ("repo") agreements. A repo agreement "is not a 'trade' entered into on an exchange." *Kaiser Steel*, 952 F.2d at 1239 (holding that "settlement

- 6 -

payment" included repurchase agreements).  The Third Circuit in *Resorts* was well aware not only of the *Kaiser Steel* decision, but also of the criticism by "a number of commentators" of that decision "for applying section 546 to a transaction that did not implicate the concerns that Congress had in creating the law."  *Resorts*, 181 F.3d at 516 n.16.  Nonetheless, the *Resorts* court maintained that the plain meaning of the statute required such a conclusion.  Since the term "settlement payment" clearly includes payments made in settlement of non-public repo transactions under section 546(f), it would be illogical for it to exclude non-public securities transactions under section 546(e) of the Bankruptcy Code.

Perhaps in recognition of the Third Circuit's dictate in *Resorts*, 181 F.3d at 515, that this Court must apply a "literal reading" of the statute, Plaintiff attempts to argue that section 546(e) actually contains an *express* limitation to publicly-traded securities.  Plaintiff reaches this conclusion through a novel reading of the words "securities trade."  Opposition at 22.  This argument fails for at least three reasons.

First, the language of section 546(e) simply does not differentiate between publicly-traded and privately-traded securities.  Congress has repeatedly shown that it is capable of making that distinction when it wishes.  *Compare* 15 U.S.C. § 78c(a)(4)(B)(vii) ("Private securities offerings") *with id.* § 78c(a)(4)(C) (providing that particular provisions "shall not apply if the activities described in such provisions result in the trade in the United States of any security that is a publicly-traded security"); *see also id.* § 78m(h)(8) ("the term 'publicly traded security' means any equity security ... listed, or admitted to unlisted trading privileges, on a national securities exchange, or quoted in an automated interdealer quotation system").  Therefore, it is clear that "[w]hen Congress intends" to distinguish

between privately-traded and publicly-traded securities "it knows how unambiguously to accomplish that result." *Badaracco v. Comm'r of Internal Revenue Deleet Merch. Corp.*, 464 U.S. 386, 395 (1983). Congress did not make such a distinction in section 546(e), and this Court should decline Plaintiff's invitation to write his desired limitation into the statute where Congress has not done so. *See id.*

Second, Plaintiff's suggestion that the words "securities trade" are "best read" as including only sales of publicly-traded securities, Opposition at 16, is contradicted by Plaintiff's own cited definitions of the word "trade," which themselves include sales outside of a publicly regulated market. Plaintiff defines "trade" as either "the business of buying and selling or bartering commodities" and "the business of buying and selling or bartering goods and services." Opposition at 16 (citing Merriam-Webster's Collegiate Dictionary 1246 (10th ed. 2001) and Black's Law Dictionary 1529 (8th ed. 2004)). Neither definition excludes private sales outside of a regulated market. Rather, Plaintiff's definitions of "trade" are met whenever commodities, goods or services are bought or sold as part of a business. Clearly those conditions were present when the shareholders of Key Packaging sold their stock to Plassein International Corporation after an arm's length negotiation.[3] Neither of Plaintiff's definitions suggests that an exchange of good or services that occurs privately is any less a "trade" than an exchange that occurs in a public market.

Third, even accepting *arguendo* Plaintiff's assertion that "securities trade" and "securities market" are interchangeable, Opposition at 16, there still is no support for Plaintiff's contention that the term "securities trade" excludes privately-traded securities. Plaintiff argues that a "securities market" "naturally refers" only to the buying and selling of publicly-traded securities, since there is no

---

[3] There can be no dispute that Plassein bought the Key Packaging stock for business purposes. Indeed, according to Plaintiff, Plassein was formed expressly for the purpose of acquiring various manufacturers or of flexible packaging and specialty film by means of purchasing securities that were not traded on public exchanges. *See* Complaint ¶ 27.

"organized" market for nonpublic securities. Opposition at 16. But securities markets are defined more broadly than the market for public securities. Indeed, Plaintiff's own source includes "private placements" in its description of "Securities Markets." Munn *et al.*, Encyclopedia of Banking & Finance 936 (9th ed. 1991), attached as Exhibit A to Opposition. As Plaintiff's source explains, "[p]rivate placements refer to the distribution of securities to fewer than 25 *private* buyers." *Id.* (emphasis supplied). Thus, "securities markets" and, by Plaintiff's own logic, "securities trade" are *not* limited to publicly-traded securities.[4]

Plaintiff's remaining arguments seek to avoid the straightforward application of the plain language of section 546(e). Although Plaintiff acknowledges that, through its *Resorts* decision, "the Third Circuit has thus made it clear that it will not allow legislative history and policy considerations to override a statute's plain language," Opposition at 22, Plaintiff inexplicably relies on the very analysis he acknowledges is not proper—using legislative history and purported "congressional intent" to override a statute's plain language. Moreover, although Plaintiff suggests that the term "securities trade" might be ambiguous, Opposition at 18, Plaintiff provides no support for a claim of ambiguity, particularly given that the Third Circuit has considered the meaning of "settlement payment" and definitively ruled (without recourse to legislative history) that it includes payments made to settle an LBO. *Resorts*, 181 F.3d at 516. Even if *Resorts* did not clear up any purported "ambiguity" about the meaning of "securities trade"—and it did—the Court need look no further than the definitions that Plaintiff has provided, which show that the sale of securities qualifies as the "securities trade"

---

[4] Plaintiff makes much of the fact that the statutory definition of a different term ("margin payment") also refers to the "securities trade," asserting that margin payments arise only in the context of publicly-traded securities. Opposition at 16-17 (citing 11 U.S.C. § 741(5)). But this proves at most that the "securities trade" *includes* the trade of public securities, a proposition that nobody disputes and that in no way supports Plaintiff's position that it *excludes* trades in all other securities. Similarly, the fact that the "securities trade" includes LBOs of public companies that are regulated by the Securities and Exchange Commission, Opposition at 22-23, says nothing about whether the "securities trade" excludes all other LBOs.

- 9 -

regardless of whether those securities happen to be traded on a public exchange.[5]  Given the clarity of

*Resorts* and of Plaintiff's own definitions, there is no reason for this Court to consult legislative

history in applying section 546(e) in this case.

**B.    In Addition To Being An Inappropriate Consideration, The Legislative History Of Section 546(e) Does Not Support Plaintiff's Reading Of The Statute.**

Even if recourse to legislative history were appropriate here—which it is not—Plaintiff

identifies *not one* statement in the legislative history that section 546(e) is limited to publicly-traded

securities and does not apply to private sales.  Plaintiff's basis for the assertion that Congress intended

section 546(e) to apply "exclusive[ly]" to publicly-traded securities, Opposition at 18, consists solely

of references to *one* purpose of the statute (protection of the system of intermediaries).  Plaintiff asks

this Court to conclude that Congress's failure to set down other statutory purposes in the legislative

history acts as a limitation on the plain language of the statute.  As the Supreme Court has stated,

however, parties cannot rely on what "Congress did *not* say" as a means to interpret statutory

language:

> "[I]t would be a strange canon of statutory construction that would require Congress to state in committee reports or elsewhere in its deliberations that which is obvious on the face of the statute.  In ascertaining the meaning of a statute, a court cannot, in the manner of Sherlock Holmes, pursue the theory of the dog that did not bark."

*Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 592 (1980). (emphasis in original) (citation omitted).

Plaintiff similarly seeks to characterize Congress as having had an "exclusive focus" on publicly-

traded securities in enacting section 546(e), Opposition, at 18, but fails to cite to anything in the

---

[5] Plaintiff again relies on *Zahn* and *Wieboldt*, which he admits the Third Circuit rejected, to argue that the definition of a "settlement payment" is "circular and cryptic" because it contains the term to be defined.  Plaintiff's Opposition at 15.  This argument is a red herring, as Plaintiff implicitly acknowledges: the circularity is avoided by analyzing whether the payment at issue was a "payment commonly used in the securities trade," as the Third Circuit did in *Resorts*.  Plaintiff provides no basis for concluding that the term "securities trade" is ambiguous.

legislative history by which Congress disclaims the pursuit of other (perhaps secondary) purposes. Indeed, the legislative history of section 546(e) is decidedly sparse;[6] Congress may have left much unsaid, particularly given that the statutory language is unambiguous. The Court should reject Plaintiff's attempt to use silence in legislative history as a basis for defying the plain language of section 546(e).[7]

The cases on which Plaintiff relies in support of his contentions regarding Congress's intent to exclude non-publicly-traded securities from section 546(e) do not bear on this case at all. Even Plaintiff acknowledges (Opposition at 20-21) that the Third Circuit considered and rejected two of these cases, *Zahn* and *Wieboldt*, in *Resorts*. *Resorts*, 181 F.3d at 516. In another case cited by Plaintiff, *Buckley v. Goldman, Sachs and Co.*, No. 02-CV-11497-RGS, 2005 WL 1206865 (D. Mass. May 20, 2005), a Massachusetts district court relied heavily on *Zahn* to conclude that the transaction at issue did not affect the public securities market. *Id.* at *6-7. However, in reaching its conclusion, the court held that the definition of "settlement payment" was ambiguous, *see id.* at *5, and rejected *Resorts*. *See id.* at *7. These cases carry no weight in this Court given the Third Circuit's binding holding in *Resorts*.

---

[6] The legislative history of the 1982 amendments to the Bankruptcy Code includes only one committee report, which is six pages long and contains only two paragraphs discussing § 546(e). H.R. Rep. No. 420, 97th Cong., 2d Sess. (1982), *reprinted in* 1982 U.S.C.C.A.N. 583. The Congressional Record shows only three Representatives speaking to the entire bill, and only two of them mentioned § 546(e), and then only in one sentence each recapitulating the language of the provision. 128 Cong. Rec. 1262-63 (1982) (statements of Reps. Edwards and McClory).

[7] While it is inappropriate to speculate as to Congress's reasons for drafting § 546(e) as broadly as it did, several policy reasons are plausible. For instance, Congress might have preferred to have a uniform rule for all securities transactions settled through financial institutions, regardless of the nature of the particular securities. Congress might also have intended to encourage the use of financial institutions in private sales of securities in order to regularize such transactions. Congress might also have wished to protect sellers of securities from opportunistic debtors later seeking to undo securities transactions negotiated in good faith.

- 11 -

The final case on which Plaintiff relies, *Kipperman v. Circle Trust* (*In re Grafton Partners*),

321 B.R. 527 (9th Cir. 2005), is simply inapposite. The *Grafton Partners* court concluded that trades

in "illegally unregistered securities" did not fall under the definition of "settlement payment" because

they were not common securities transactions:

> "This requirement of common usage in the securities trade
> necessarily excludes non-public trades in *illegally unregistered
> securities*. If integrity and compliance with securities laws are to
> be preserved as the hallmark of the brand name of the United
> State securities markets, then *trades in illegally unregistered
> securities must flunk the common usage test*."

*Id.* at 538 (emphasis supplied). Thus, the *Grafton Partners* court focused not on the public-private

distinction that Plaintiff seeks to make, but rather on the fact that the securities at issue in that case

were illegally unregistered. The court made it clear that the illegality of the transaction was critical to

its holding that the transaction at issue was not a common one. *Id.* Because Plaintiff here does not

allege that the securities at issue were "illegally unregistered," nor does he claim that the transaction

was not "common," *Grafton Partners* is irrelevant.

In this case, as in *Resorts*, the best indication of Congress's intent is the statutory language.

The fact that Plaintiff's legislative history argument rests not on statements made during the legislative

process, but on implications Plaintiff draws from what was *not* said, demonstrates the weakness of

Plaintiff's position. This Court should reject Plaintiff's attempt to ignore the statutory language based

solely on Plaintiff's extrapolations from legislative silence.

## II. PLAINTIFF HAS FAILED TO PLEAD THE ELEMENTS OF A FRAUDULENT TRANSFER UNDER DELAWARE LAW.

### A. Plaintiff Has Not Alleged A Transfer Made By The Debtor, Key Packaging, To The Defendants.

Plaintiff has not alleged, as required by the statute, that the transfer he seeks to avoid was made

by the debtor, Key Packaging. Indeed, it is clear from the face of the Complaint and its exhibits that

the transfer at issue was made by Plassein, not Key Packaging. *See* Complaint, Exhibit A, at P08898-08899, P08853 and P08848.

Undeterred, Plaintiff again asks this Court to depart from the plain language of the statutory text without providing any valid basis for doing so. Plaintiff relies principally on language taken from *In re Hechinger Inv. Co. of Del., Inc.*, 274 B.R. 71 (D. Del. 2002), and *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986), for his argument that this court should ignore the statute's explicit requirement that the alleged fraudulent transfer be made by the debtor. Opposition at 27-28. Neither case supports Plaintiff's position. Plaintiff cites a passage from *Hechinger* in which that court considered not the applicability of the fraudulent transfer statute, but rather the common law fiduciary duties of the directors of an insolvent company to the committee of unsecured creditors. *See Hechinger*, 274 B.R. at 89-91. The court held that the directors could have breached that duty by approving the first (but not all) of a series of transactions that foreseeably led to the harm complained of. *Id.* The holding that a fiduciary is liable for the foreseeable consequences of its actions in no way diminishes the requirement that a fraudulent transfer claim be premised on a transfer "by a debtor." DEL. CODE ANN. tit. 6 § 1304(a). While *Hechinger* states that an "integrated" LBO transaction may be "collapsible" for purposes of a *common law* breach of fiduciary duty analysis, it does not suggest that such a "collapsing" could dispense with the *statutory* requirement that a fraudulent transfer claim attack a transfer from a "debtor." The *Tabor* decision does not assist Plaintiff either. In *Tabor*, the challenged conveyances were clearly made by the debtor companies to a mortgage lender called IIT. *See Tabor*, 803 F.2d at 1295.

Plaintiff has not alleged that the Key Defendants took part in any "overall scheme to defraud the [Key Packaging] estate and its creditors," *Rosener v. Majestic Mgmt., Inc.*, 321 B.R. 128, 138 (Bankr. D. Del. 2005), and thus has not provided the grounds that courts in this Circuit have required

- 13 -

to justify "collapsing" the transaction at issue. *See e.g. Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206 (3d Cir. 1990) (affirming collapsing of several transactions into a single transaction based on "abundant" evidence that the transactions functioned as a "subterfuge"); *Rosener*, 321 B.R. at 138 (holding that "[i]n deciding whether to 'collapse' a series of transactions into one integrated transaction, the issue is … whether there was an overall scheme to defraud the estate and its creditors by depleting all the assets through the use of a leveraged buy-out"). Plaintiff clearly alleged that Plassein was formed not to defraud the creditors of Key Packaging or any of the other defendants in this case, but rather to acquire manufacturers of flexible packaging and specialty film for strategic business reasons. Complaint ¶ 27. This Court, therefore, should reject Plaintiff's attempt to circumvent the plain meaning of the Delaware fraudulent conveyance statute, which permits avoidance only of transfers made by the debtor. DEL. CODE ANN. tit. 6 § 1304(a).

## B.    The Purchase Of The Key Packaging Stock Did Not Render Key Packaging Insolvent.

Exhibit B to the Complaint makes clear that the assets of Key Packaging exceeded its liabilities following the acquisition by over $10 million, and by over $1 million even if no value is ascribed to goodwill. *See* Complaint, Exhibit B, at P08821. Accordingly, and as a matter of law, Key Packaging was not rendered insolvent by that transaction, since the sum of its debts was not "greater than all of the debtor's assets, at a fair valuation." DEL. CODE ANN. tit. 6 §1302(a). Since insolvency is an essential element of any fraudulent conveyance claim, *see id.* § 1305(a), Key Packaging's solvency following the transfer at issue defeats Plaintiff's claim conclusively.

Plaintiff now seeks to retreat from the information in the exhibit to his own Complaint by suggesting that the pleading "does not accurately reflect" Key Packaging's debts as a result of the transfer. Opposition at 30. Plaintiff may not impeach his own allegations in such a manner, nor may the Court simply turn a blind eye to this conclusive flaw in Plaintiff's case. Plaintiff's only purported

- 14 -

basis for his new argument is the assertion, based on an affidavit of Plaintiff's counsel, that Key

Packaging became "jointly and severally liable" for "[a]t least $39 million" borrowed by Plassein

under a loan agreement.  Opposition at 30 (citing Affidavit of Charles R. Bennett, Jr.).  Plaintiff's

attempt to introduce new factual allegations and evidence in response to a motion to dismiss is wholly

improper.  *See e.g. TWA Inc. Post-Confirmation Estate v. Marsh USA Inc. (In re TWA Post*

*Confirmation Estate)*, 305 B.R. 228, 232 (Bankr. D. Del. 2004) (a "party cannot amend its

[insufficient] complaint by response or affidavit filed in opposition to a motion to dismiss"); and

*Posman v. Bankers Trust Co. (In re: Lomas Fin. Corp.)*, No. Adv. A-97-245, 1999 WL 33742299 *1

(Bankr. D. Del. Jul. 28, 1999) ("the factual allegations outlined in the Affidavit [attached to an

opposition to a motion to dismiss] cannot replace the allegations in the Complaint nor cure missing

allegations in the Complaint"); *see also Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d

1192, 1196 (3d Cir. 1993) ("To decide a motion to dismiss, courts generally consider only the

allegations contained in the complaint, exhibits attached to the complaint and matters of public

record.").

     Even taken on its terms, counsel's affidavit does not assist Plaintiff's case.  Counsel does not

provide a comprehensive set of closing documents, or even any executed copy of an undertaking by

Key Packaging to be liable for the debts of other entities.  *See* Bennett Affidavit, Exhibit C (unsigned

documents).  Counsel's affidavit refers only to pieces of documents.  Notably, although counsel states

that documents attached as Exhibits A and B to his affidavit were included in the "closing binder" for

the Key Packaging acquisition, counsel conspicuously makes no claim that the loan documents

attached as Exhibit C were included in that binder or even agreed to at the time of the January 2000

acquisition.  *See id.* ¶¶ 3-4, 7.  Counsel appears to be insinuating that the Key Packaging Defendants

should be held responsible for the assumption of joint and several liability for the debts of other

companies, without ever specifically stating (much less demonstrating) that such debt was incurred

during the January 2000 acquisition, or even that it was incurred with the consent or participation of

the Key Packaging Defendants. This Court should reject counsel's murky and unsupported

suggestions and consider only the documents incorporated by reference in the Complaint. As stated

above, Exhibit B to the Complaint demonstrates that Key Packaging was solvent following the transfer

of funds to the Key Packaging shareholders.

Moreover, Plaintiff's argument actually *defeats* his claim. Plaintiff admits that, taking into

account the debt incurred to "purchase [Key Packaging's] shares and discharge certain of [Key

Packaging's] outstanding liabilities," Key Packaging remained solvent after the transaction was

completed. Opposition at 30. By Plaintiff's own theory, Key Packaging only became insolvent by

becoming jointly and severally liable for debt incurred by Plassein to acquire *other* companies. The

decision to saddle Key Packaging with such debt in connection with other, unrelated transactions was

one made for the convenience of Plassein and its lenders, not Key Packaging or its shareholders.

Several months later (after the Key Packaging Defendants had been bought out), Plassein loaded even

more debt onto Key Packaging in order to facilitate the acquisition of Rex. Notably, the Second

Amended and Restated Loan and Security Agreement, which Plaintiff attaches as Exhibit D to the

Bennett Affidavit, though unexecuted, indicates that Plassein executive Richard J. Mosback, and not

any of the Key Packaging Defendants, was the intended signatory on behalf of Key Packaging and

each of the other Defendants besides Rex. *See* Bennett Aff. Exhibit D, at P03608. This agreement is

dated August 15, 2005 – more than eight months after the transfer involving the Key Packaging

Defendants. Thus Plaintiff's own document clearly demonstrates that it was Plassein, and not Key

Packaging or the Key Packaging Defendants, that orchestrated the liability on which Plaintiff's

argument depends. Plaintiff's assertions that the debt incurred for Plassein to purchase other

- 16 -

companies tainted the Key Packaging transaction is an abuse of the fraudulent transfer statute, and essentially seeks to transform the Key Packaging Defendants into guarantors or insurers of Plassein's business failures.

The Delaware statute expressly forbids Plaintiff's maneuver: a transfer may only be avoided if "the debtor was insolvent at that time or the debtor became insolvent *as a result of the transfer or obligation.*" DEL. CODE ANN. tit. 6 § 1305(a) (emphasis added). Since Key Packaging was clearly not insolvent at the time of the January 2000 transaction, Plaintiff must be contending that it became insolvent "as a result of the transfer or obligation," *i.e.* as a result of the payments to the Key Packaging Defendants. But Plassein's balance sheet, taking into account the new debt incurred to buy out the Key Packaging shareholders, clearly shows a surplus after its LBO transaction, even if goodwill is totally disregarded. Consequently, Key Packaging did not become insolvent "as a result of the transfer or obligation" at issue. Rather, it was Plassein's separate decisions to burden Key Packaging with debts incurred to finance the purchase of other companies, including Rex on August 15, 2000, that made Key Packaging insolvent under Plaintiff's theory. Delaware law does not allow Plaintiff to hold the Key Packaging Defendants responsible for those decisions by Plassein.[8]

## CONCLUSION

The Third Circuit's controlling decision in *Resorts* forecloses Plaintiff's effort to undo Plassein's purchase of the Key Packaging stock. The facts of the Key Packaging acquisition, as evidenced by the Complaint and the exhibits thereto, also show that Plaintiff cannot state a claim under the Delaware fraudulent conveyance statute. For the reasons set forth above, in the Key

---

[8] The unreasonableness of Plaintiff's position is confirmed by the fact that, under Plaintiff's view of the case, Key Packaging assumed over $39 million in debt despite having only $19,332,475 in assets prior to the transaction. Complaint Ex. B at P08821. Clearly, Plassein did not believe that it was buying a company that was already in deficit to the tune of roughly $20 million. Rather, the numbers in Exhibit B to the Complaint demonstrate the truth of the matter: Plassein bought a company that (even after the payments to its shareholders) had a healthy asset surplus, but subsequently lost that surplus through actions that are Plassein's responsibility alone.

Packaging Defendants' opening brief, and in the submissions of the other defendants in this matter, the

Court should dismiss the Complaint as to the Key Packaging Defendants.

POTTER ANDERSON & CORROON LLP

By: *Rebecca S Beste*

Laurie Selber Silverstein (2396)
Rebecca S. Beste (4154)
1313 North Market Street, 6th Floor
P. O. Box 95
Dated: August 15, 2005                        Wilmington, DE  19899-0951
(302) 984-6000 (telephone)
(302) 658-1192 (facsimile)

- and -

WILMER CUTLER PICKERING
  HALE AND DORR LLP
Richard A. Johnston
Mark C. Fleming
Jeffrey Gleason
60 State Street
Boston, Massachusetts 02109
(617) 526-6000 (telephone)
(617) 526-5000 (facsimile)

*Attorneys for Thomas F. Fay, Ruth L. Fischbach, Mark R.
Freedman, Robert N. Zeitlin, Sidney Zeitlin, Zfc
Associates, Inc., William G. Russell, and Robert N.
Zeitlin 1999 Charitable Remainder Unitrust*

- 18 -

# EXHIBIT C

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:

PLASSEIN INTERNATIONAL CORP.,
PLASSEIN INTERNATIONAL OF MARTIN,
INC., PLASSEIN INTERNATIONAL OF
ONTARIO, LLC, PLASSEIN
INTERNATIONAL OF SALEM, INC.,
PLASSEIN INTERNATIONAL OF
SPARTANBURG, INC., PLASSEIN
INTERNATIONAL OF THOMASVILLE, INC.,
and TENO FILMS, INCORPORATED)

Chapter 11

Case No. 03-11489 (LK) and
Case Nos. 03-11491 (LK) through
03-11496 (LK)

Debtors.

## ORDER DIRECTING JOINT ADMINISTRATION OF CHAPTER 11 CASES [D.I. 4]

Upon consideration of the Debtors' Motion for Order Directing Joint Administration of
Debtors' Chapter 11 Cases (the "Motion") filed by Plassein International Corp., *et al.*, debtors
and debtors-in-possession (the "Debtors"); and after due deliberation and sufficient cause
appearing therefor,

### THE COURT FINDS AND CONCLUDES THAT:

A.     This Court has jurisdiction over these cases under 28 U.S.C. § 1334(b).

B.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

C.     Due and adequate notice has been given to all parties entitled thereto, and no
other or further notice is necessary or required.

D.     This Court has reviewed the Motion and the Declaration of V.M. Philbrook in
Support of Chapter 11 Petitions, First Day Motions and Applications and has considered the
representations regarding the relief requested therein.

E.     The relief requested in the Motion is necessary and in the best interests of the
Debtors and their respective estates.

**THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    The Motion is granted.

2.    These Chapter 11 cases are hereby consolidated for procedural purposes only and shall be jointly administered by this Court and by the Office of the United States Trustee in accordance with Fed. R. Bankr. P. 1015(b) and Del. Bankr. LR. 1015-1.

3.    The caption for these jointly administered Chapter 11 cases shall be as follows:

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>PLASSEIN INTERNATIONAL CORP., *et al.*, [1]<br><br>Debtors. | Chapter 11<br><br>Case No. 03-11489 (LK)<br><br>(Jointly Administered) |

[1] Additional debtors include all of Plassein International Corp.'s wholly-owned, domestic subsidiaries: Plassein International of Martin, Inc., Plassein International of Ontario, LLC, Plassein International of Salem, Inc., Plassein International of Spartanburg, Inc., Plassein International of Thomasville, Inc. and Teno Films, Incorporated.

and no party shall be required to list any further information beyond that set forth above in any pleadings filed in these Chapter 11 cases.

4.    All original docket entries shall be made in the case of Plassein International Corp., Case No. 03-11489 (LK), and the Clerk of this Court is directed forthwith to make separate docket entries with respect to each of these Chapter 11 cases substantially as follows:

> An order has been entered directing the procedural consolidation and joint administration of Plassein International Corp., Case No. 03-11489 (LK), Plassein International of Martin, Inc., Case No. 03-11491 (LK), Plassein International of Ontario, LLC, Case No. 03-11492 (LK), Plassein International of Salem, Inc., Case No. 03-11493 (LK), Plassein International of Spartanburg, Inc., Case No. 03-11494 (LK), Plassein International of Thomasville, Inc., Case No. 03-11495 (LK), and Teno Films, Incorporated, Case No. 03-11496 (LK), in accordance with Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware. The docket in Case No. 03-11489 (LK) should be consulted for all matters affecting the above-listed cases.

5.     Nothing contained in this Order shall be deemed or construed as directing or otherwise effecting a substantive consolidation of these Chapter 11 cases.

6.     This Order is effective immediately upon its entry and the Clerk of the Court is hereby directed to enter this Order on the docket in each Debtor's Chapter 11 cases.

7.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: May 16, 2003

United States Bankruptcy Court Judge